**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHARON KILLIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )          Civil Action No. 05-1925 (EGS) |
| | ) |
| GEORGETOWN DAY SCHOOL, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7 of the Local Rules of Civil Procedure, Defendant Georgetown Day School ("GDS" or "School"), through its undersigned counsel, hereby submits this Motion for Summary Judgment to dismiss all of Plaintiff's claims.

### SUMMARY

GDS seeks summary judgment on each of Plaintiff's claims: (1) "Section 1981 (Racial Discrimination)"; (2) "Section 1981 (Retaliation)"; (3) "DCHRA (Racial Discrimination); and (4) "DCHRA (Retaliation)." The Court should grant summary judgment because there is no genuine issue of material fact to support any of Plaintiff's claims, and GDS is entitled to judgment as a matter of law.

\*       \*       \*       \*       \*       \*       \*

GDS respectfully refers the Court to the accompanying Memorandum of Points and Authorities in further support of its motion.

Dated:  November 10, 2006

Respectfully submitted,


 /s/ Timothy R. Clinton
Thomas S. Williamson, Jr. (D.C. Bar No. 217729)
Timothy R. Clinton (D.C. Bar No. 497901)
**COVINGTON & BURLING LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 778-5218 - Fax

**COUNSEL FOR DEFENDANT**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHARON KILLIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     Civil Action No. 05-1925 (EGS) |
| | ) |
| GEORGETOWN DAY SCHOOL, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule of Civil Procedure 7(h), Defendant Georgetown Day School ("GDS" or

the "School"), through its undersigned counsel, hereby submits this statement of material facts as to

which there is no genuine issue:

1.     Plaintiff Sharon Killian is an African American woman.[1]

2.     GDS is a parent-owned nonprofit coeducational day school governed by a Board of

Trustees elected by the parent body and administered by a Head of School appointed by the Board of

Trustees.[2]

3.     GDS first opened its doors in 1945 as an integrated school in a segregated city.  The

School's mission statement reads as follows:

> Georgetown Day School honors the integrity and worth of each individual
> within a diverse school community. GDS is dedicated to providing a
> supportive educational atmosphere in which teachers challenge the
> intellectual, creative, and physical abilities of our students and foster
> strength of character and concern for others. From the earliest grades, we
> encourage our students to wonder, to inquire, and to be self-reliant, laying
> the foundation for a lifelong love of learning.[3]

---

[1] Ex. 1 (Compl. ¶ 3).

[2] Ex. 15 (Branch Decl. ¶ 3).

[3] Ex. 14 (Barr Decl. ¶ 17).

4.      At the recommendation of then-Art Department Chair Debbie Haynes, GDS first hired Plaintiff for the 1993–1994 academic year as a frequent substitute for the faculty of the Art Department.[4]

5.      In the 1994–1995 academic year, Plaintiff served as a "permanent substitute" for Erica Elliott, who had taken a leave of absence without pay.[5]

6.      When Elliott decided not to return the next year, Plaintiff was hired as a full-time member of the Art Department for the 1995–1996 academic year.[6]

7.      Plaintiff received a positive evaluation from Haynes for her teaching efforts in the 1994–1995 academic year.[7]

8.      Peter Branch served his first year as Head of School at GDS in the 1996–1997 academic year.[8]

9.      Prior to coming to GDS, Branch was the Headmaster at Holland Hall in Tulsa, Oklahoma, where he was the first headmaster in the Southwest to adopt the National Association of Independent Schools' ("NAIS") multicultural assessment plan.  He also served on the Episcopal Diocese's Committee to Dismantle Racism and on the Board of the National Council of Christians and Jews, and he was a member of a conference committee for the City of Tulsa to promote diversity.[9]

10.     The 1999–2000 academic year was Debbie Haynes' final year as Chair of the Art Department at GDS.[10]

---

[4] Ex. 19 (Killian Dep. Ex. 1); see also Ex 5 (Killian Dep. 14:16–16:13); Ex. 11 (Tolliver Decl. ¶ 3).

[5] Ex. 19 (Killian Dep. Ex. 1); Ex. 5 (Killian Dep. 16:14–22).

[6] Ex. 5 (Killian Dep. 17:2–16).

[7] Ex. 19 (Killian Dep. Ex. 1) ("Sharon is a gifted artist and teacher. . . . The work which the students have produced, especially in drawing, has been some of the best I have seen since starting my career here.  Sharon is an excellent student herself, as she is always asking to learn more about what to teach and how to teach.  This has been stimulating to me as a fellow professional . . . .  As a teacher as well as a full time and very involved mother, Sharon presents as a woman with strength and unwavering self esteem.  She is a good role model and I have observed that she is admired and well liked by not only her students but by the staff."); see also Ex. 5 (Killian Dep. 20:1–21:11).

[8] Ex. 15 (Branch Decl. ¶ 4).

[9] Ex. 15 (Branch Decl. ¶ 5).

[10] Ex. 5 (Killian Dep. 22:19–23:1).

11.     Haynes' final evaluation of Plaintiff, for the 1999–2000 academic year, was favorable.[11]

12.     Debbie Haynes retired at the end of the 2000–2001 academic year during which she worked as a part-time teacher in the Art Department at GDS.[12]

13.     In the spring of 2000, Nick Ryan, a Caucasian male, was hired as Chair of the Studio Art Department ("Art Department") at GDS beginning with the 2000–2001 academic year.[13]

14.     From the 2000–2001 academic year through her final year in the GDS Art Department, 2004–2005, Plaintiff taught four sections of art courses:  two sections of Introduction to Photography and either one section of AP Studio Art and one section of Advanced Painting and Drawing, or two sections of AP Studio Art.[14]

15.     In Ryan's first annual evaluation of Plaintiff's work, for the 2000–2001 academic year, Ryan wrote:

> Sharon's course material is demanding and her expectations are high, but no challenge is beyond the scope of her students.  The work that results from Sharon's assignments is impressive—at the advanced level it often serves as a benchmark for other students. . . . One of the tough parts of an advanced level teacher is conveying the sense of individual responsibility and encouraging students to accept their role as artists.  Creativity cannot be mandated, but I feel Sharon does well in leading students to this outcome.[15]

16.     In Ryan's second evaluation of Plaintiff's work, for the 2001–2002 academic year, Ryan wrote:

> I was impressed with Sharon's ability to clearly convey the material and explain the details of the process.  There was a good balance of firmness in her adherence to the parameters of the assignment, which at this level

---

[11] Ex. 20 (Killian Dep. Ex. 2) ("Sharon has had an extremely full and hopefully fulfilling year, including the graduation of her very special and talented son from GDHS.  Her first year teaching AP Studio Art went very well and I am sure the majority of the class will score high with the AP evaluators. . . . the ART MAGAZINE 2000 was a great success, thanks to Sharon's supervision. . . . Sharon has also been a leader in promoting activities which help to create an authentic awareness of our institutions [sic] mission of diversity education."); see also Ex. 5 (Killian Dep. 21:19–23:7).

[12] Ex. 10 (Ryan Decl. ¶ 4); Ex. 15 (Branch Decl. ¶ 6); see Ex. 5 (Killian Dep. 80:6–10)

[13] Ex. 5 (Killian Dep. 22:22–23:1); Ex. 15 (Branch Decl. ¶ 7).

[14] Ex. 10 (Ryan Decl. ¶ 5).

[15] Ex. 21 (Killian Dep. Ex. 3, at 1967–68).

inevitably invites challenge, especially from students more focused on product than process.[16]

17.    In Ryan's third evaluation of Plaintiff's work, for the 2002–2003 academic year, Ryan wrote:

> Although in an AP level course students tend to be quite focused, it is inevitable that frustrations occur and in these instances Sharon employees [sic] a healthy mixture of encouragement and firmness to keep students positively motivated and on-task. . . . This atmosphere, which Sharon fostered, is critical to the success of any class, but in this instance the individual growth that occurred would have been unthinkable for many without it. . . .[17]

18.    In Ryan's fourth evaluation of Plaintiff's work, for the 2003–2004 academic year, Ryan wrote an evaluation that was substantially similar to the 2002–2003 evaluation.[18]

19.    In Ryan's final evaluation of Plaintiff's work, for the 2004–2005 academic year, Ryan wrote:

> Sharon employs a variety of teaching methods and uses then [sic] effectively in her classes. . . . Sharon uses technology frequently and the students are well-versed in saving files to the network, scanning images, and utilizing Adobe PhotoShop software. . . . [M]ulticultural perspectives are frequently and effectively included.  Sharon is sensitive to student learning styles.[19]

20.    On June 8, 2005, Plaintiff responded to her 2004–2005 evaluation, stating that Ryan would be "mistaken" if he "intend[ed] to suggest that [Plaintiff] ha[d] somehow departed from procedures established in the Spring."  Plaintiff expressed disappointment that Plaintiff had failed to note her work with the foreign language department, and she objected to "implicit criticism" of several absences.[20]

21.    The next day, on June 9, 2005, Plaintiff and Ryan signed an "Addendum" to the 2004–2005 evaluation, clarifying that Ryan did not intend to imply that Plaintiff had departed from the

---

[16] Ex. 22 (Killian Dep. Ex. 4).

[17] Ex. 23 (Killian Dep. Ex. 5).

[18] Ex. 24 (Killian Dep. Ex. 6).

[19] Ex. 25 at 2063 (Killian Dep. Ex. 7).

[20] Id. at 2064.

established procedures.  He called Plaintiff's work with the foreign language department a "significant

contribution."  He also noted the exhibition of Plaintiff's AP students' artwork at Politics and Prose as

well as Plaintiff's participation in the Scholastic Art Awards and Congressional Art Competition.  Ryan

stated that he will ask department members to summarize their work in the classroom and in the GDS

community so that he can better credit their work in annual evaluations.  Ryan also clarified that the

absences noted in her evaluation "were prompted by unavailable emergencies or appointments [Plaintiff]

felt she could not miss."[21]  Plaintiff believes this was a satisfactory response by Ryan.[22]

22.    Plaintiff believes that Ryan's evaluations of her as a member of the GDS faculty were fair

and that these evaluations did not reflect racial prejudice against her as an African American.[23]

23.    In the 2000–2001 academic year, Ryan and then-Principal Paul Levy decided to name an

Art Award in honor of Haynes.[24]  This decision was made without consulting Plaintiff or Laura Tolliver,

the other faculty members of the Art Department.[25]

24.    Debbie Haynes taught at GDS for nearly three decades,[26] and she chaired the Art

Department for almost all of those years.[27]

25.    GDS High School department chairs, such as Nick Ryan, often make administrative

decisions without the input of the department members as part of their regular duties.[28]

26.    Ryan considered the decision to name an art award after Debbie Haynes to be an

administrative decision.[29]

---

[21] Ex. 25 at 2065 (Killian Dep. Ex. 7).

[22] Ex. 5 (Killian Dep. 44).

[23] Ex. 5 (Killian Dep. 24–45).

[24] Ex. 6 (Ryan Dep. 97:3–98:1).

[25] Ex. 6 (Ryan Dep. at 98:2–4); Ex. 7 (Tolliver Dep. 17–19).

[26] Ex. 6 (Ryan Dep. at 98); Ex. 7 (Tolliver Dep. 17–19).

[27] Ex. 14 (Barr Decl. ¶ 16).

[28] Ex. 14 (Barr Decl. ¶ 3); Ex. 15 (Branch Decl. ¶ 8).

[29] Ex. 6 (Ryan Dep. 99:7–100:5).

27.     Throughout her tenure in the Art Department at GDS, Plaintiff was the most junior member of the Art Department by more than ten years of teaching experience.[30]

28.     Regular supplies used by the Art Department are purchased out of the Art Department's "supply budget."[31]

29.     From the 2000–2001 academic year through the 2004–2005 academic year, each of the three full-time Art Department faculty members—namely Ryan, Tolliver, and Plaintiff—received an equal allocation of the Art Department supply budget.[32]  During Nick Ryan's tenure as Art Department Chair, the supply budget has been allocated equally on a per-course basis.  Ryan, Tolliver, and Plaintiff each taught four courses per semester from 2000–2001 through 2004–2005, so they each received the same allocation.  Debbie Haynes taught two courses while working part-time in the Art Department during the 2000–2001 academic year.  For that reason, she received one-half of the allocation Ryan, Tolliver, and Plaintiff each received during the 2000–2001 academic year.[33]

30.     Ryan has never rejected or denied a request by Plaintiff to purchase something out of her allocation of the supply budget.[34]

31.     As between Ryan, Tolliver, and Plaintiff, the three members of the Art Department, Plaintiff taught the fewest students each year from 2000–2001 through 2004–2005.[35]

32.     Plaintiff believes that the division of the Art Department's supply budget in three equal parts among the three Art Department teachers was "fair and equitable."[36]

---

[30] Ex. 16 (Lindsey Decl. ¶ 3) ("At the end of the 1999–2000 academic year, Debbie Haynes had nearly 40 years of teaching experience, Laura Tolliver had approximately 22 years of teaching experience, and Sharon Killian had approximately 7 years of teaching experience.  When Nick Ryan was hired in Spring 2000, he had approximately 20 years of teaching experience.").

[31] Ex. 5 (Killian Dep. 611–12).

[32] Ex. 5 (Killian Dep. 615–16, 622).

[33] Ex. 10 (Ryan Decl. ¶ 35).

[34] Ex. 5 (Killian Dep. 615–16, 622); Ex. 10 (Ryan Decl. ¶ 12))

[35] Ex. 10 (Ryan Decl. ¶ 13); see also Ex. 5 (Killian Dep. 616:10–617:7).

[36] Ex. 5 (Killian Dep. 622).

33.    An incident occurred in August 2003 when Tolliver had some photographic paper in her possession that Plaintiff had ordered.[37]  When Plaintiff did not find the specific paper in the box of photography supplies she received from the vendor, she e-mailed the vendor, who asked, "Did you physically open all the cases of paper?  One case had two boxes of glossy and two of silk in it.  Could Laura [Tolliver] have received part of your order?"[38]  Plaintiff approached Tolliver, who had received a shipment of photographic paper from the same vendor, and Tolliver replied, "I thought . . . that was actually my paper," and gave the paper to Plaintiff.[39]  Plaintiff promptly e-mailed the vendor, saying, "[T]hanks.  Laura found them in her order."[40]

34.    From 2002–2003 through 2004–2005, the only person with whom Tolliver shared photography supplies was Sharon Killian.[41]

35.    The Art Department's annual capital budget requests are sent to Ryan in his capacity as Department Chair; he compiles the requests and passes them on to the GDS administrative team.[42]

36.    The GDS administrative team decides which capital budget requests will be granted based on need and available funds.[43]

37.    Neither Ryan nor Tolliver has ever served on the School's administrative team.[44]

38.    Although the total membership has varied over time, the School's administrative team is composed of approximately 8–12 administrators, including at least two African American women,

---

[37] Ex. 5 (Killian Dep. 585–86)

[38] Ex. 5 (Killian Dep. 589); Ex. 61 (Killian Dep. Ex. 63).

[39] Ex. 5 (Killian Dep. 132).

[40] Ex. 5 (Killian Dep. 591); Ex. 61 (Killian Dep. Ex. 63).

[41] Ex. 11 (Tolliver Decl. ¶ 24).

[42] Ex. 10 (Ryan Decl. ¶ 15).

[43] Ex. 15 (Branch Decl. ¶ 9); Ex. 16 (Lindsey Decl. ¶ 5).

[44] Ex. 15 (Branch Decl. ¶ 11); Ex. 16 (Lindsey Decl. ¶ 6).

Mariama Richards and Gloria Runyon.  A third African American, Vincent Rowe, joined the administrative team in the 2004–2005 academic year.[45]

39.    Plaintiff's capital budget requests were, on multiple occasions, sent to Ryan well after the deadline for submission.  The requests sometimes lacked required information, such as how the requested item would be used by students.[46]

40.    Ryan never (i) failed to pass one of Plaintiff's capital budget requests on to the administrative team, (2) unfairly characterized the requests as a low priority, or otherwise (iii) "belittled" Plaintiff's requests to a member of the GDS administrative team.[47]

41.    Plaintiff has no idea what a "proportionate allocation" would be for her with regard to the School's allocation of capital budget expenditures.[48]

42.    Plaintiff was granted $4,040 in capital budget purchases, Tolliver $4,050, and Ryan $3,000, for the 2004–2005 academic year.[49]  Plaintiff believes that this was not an inequitable allocation.[50]

43.    For the 2005–2006 academic year, the School approved and purchased Plaintiff's capital budget request for $9,295.38 of equipment for her Film and Video class,[51] and another $3,346 requested by Tolliver for use by Plaintiff in the same course.[52]  No other capital budget requests were granted for use in the Art Department for that academic year.[53]

---

[45] Ex. 15 (Branch Decl. ¶ 12).

[46] Ex. 5 (See Killian Dep. 278–85); Ex. 10 (Ryan Decl. ¶ 16).

[47] Ex. 10 (Ryan Decl. ¶ 17); see also Ex. 5 (Killian Dep 274–76).

[48] Ex. 5 (Killian Dep. 606–07) ("Q:  When you use the term disproportionate and inequitable, what is your base of comparison for disproportionate?  **A:  The capital budget allocations that were approved in the studio.**  Q:  What would you have considered a proportionate allocation for you?  **A:  I don't know.**  Q:  You have no idea?  **A:  No.**")

[49] Ex. 5 (Killian Dep. 609–11); Ex. 62 (Killian Dep. Ex. 48).

[50] Ex. 5 (Killian Dep. 610)

[51] Ex. 5 (Killian Dep. 276); Ex. 63 (Killian Dep. Ex. 21).

[52] Ex. 64 (Purchase Order #7074); Ex. 16 (Lindsey Decl. ¶ 7).

[53] Ex. 16 (Lindsey Decl. ¶ 7).

44.     It is routine for capital budget requests from the Art Department not to be approved.[54]

45.     Plaintiff has no factual basis to claim that she was required to meet more exacting standards than Tolliver in order to get her capital budget requests approved.[55]

46.     In February 2002, Plaintiff came to the School over a weekend and replaced an art display of the work of one of Tolliver's students with African American art from a local gallery, without first seeking permission from Tolliver.[56]

47.     That same weekend in February 2002, the Black Culture Club ("BCC") hosted a dance at the School, leaving paper banners advertising the dance hanging outside the art studio windows.[57]

48.     When Ryan arrived in the art studio on Monday morning, he and GDS high school Building Manager George Buckwalter removed the paper banners, which had been damaged by the weather.  The two brought the paper banners inside and placed them on the floor.[58]

49.     Plaintiff did not witness Ryan and Buckwalter while they were taking the paper banners down.[59]

50.     Plaintiff did not inspect the BCC paper banners very closely, "except [to] see that they were ripped . . . ."[60]

51.     The BCC paper banners were the type of banner advertising a School event that is generally disposed of soon after the event takes place, regardless of their physical condition.  Most such

---

[54] Ex. 10 (Ryan Decl. ¶ 18); Ex. 15 (Branch Decl. ¶ 10).

[55] Ex. 5 (Killian Dep. 294).

[56] Ex. 5 (Killian Dep. 195–97).

[57] Ex. 6 (Ryan Dep. 27–28).

[58] Ex. 6 (Ryan Dep. 29); Ex. 0 (Ryan Account, at 2866); Ex. 10 (Ryan Decl. ¶ 7).

[59] Ex. 5 (Killian Dep. 190).

[60] Ex. 5 (Killian Dep. 190).

banners are placed inside the School and are relatively undamaged when the GDS high school's Building Manager takes them down and disposes of them.[61]

52.     Ryan wrote a contemporaneous account of his disposal of the paper banners.[62]

53.     These paper banners were the only banners that Ryan has ever encountered that had been placed outside the art studio windows.[63]

54.     Although "[a]t least one student in the Black Culture Club saw the banners and signs they had made strewn on the floor . . . ,"[64] there were no African American students who complained to Killian that they had expected that the banners would be saved.[65]

55.     Later that day in February 2002, Ryan communicated to Plaintiff that she should have asked Tolliver's permission before replacing the art display of Tolliver's student.  Plaintiff has characterized Ryan's tone of voice as "screaming."[66]

56.     There were no witnesses to Ryan's informing Plaintiff that she should have asked Tolliver's permission before replacing the art display of Tolliver's student.[67]

57.     Tolliver's student's work had been up for only a few days before Plaintiff took it down,[68] even though such displays are generally kept up for approximately two or three weeks before they are replaced.[69]

58.     The normal practice among the art teachers is to ask permission before replacing an art display, a practice that Plaintiff believes is "appropriate."[70]

_____

[61] Ex. 17 (Buckwalter Decl. ¶ 3).

[62] See Ex. 0 (Ryan Account).

[63] Ex. 10 (Ryan Decl. ¶ 8).

[64] Ex. 30 (Killian Dep. Ex. 39, at 2642).

[65] Ex. 5 (Killian Dep. 189).

[66] Ex. 5 (Killian Dep. 193).

[67] Ex. 5 (Killian Dep. 193–94).

[68] Ex. 7 (Tolliver Dep. 23).

[69] Ex. 11 (Tolliver Decl. ¶ 5).

59.    Plaintiff has acknowledged that although she should have followed the normal practice on this occasion relating to Tolliver's student, she did not do so.[71]

60.    Later on that same Monday in February 2002, after Tolliver and Killian had left for the day, Ryan discovered that the darkroom had been left in a messy condition.[72]

61.    The next morning, Ryan sent an e-mail with the subject "My honest thoughts at 8am" to both Tolliver and Plaintiff, expressing his concern that Tolliver and Plaintiff were "not following through with their responsibilities," that he was "tired of babysitting this department, of mediating these petty battles, and of cleaning up."[73]  He concluded his e-mail by saying, "[i]f this is the environment you both wish to work [sic] then I am sad for you both."[74]

62.    In a draft reply to Ryan's e-mail dated March 1, 2002, Plaintiff wrote:

> My honest thoughts at 8am Tuesday morning was [sic] not that I would be
> screamed at by my chairperson about how much Laura and I get on your
> nerves, about the state of the darkroom or anything else.  GDS has always
> shown kindness and understanding toward working parents and their
> children . . . .[75]

63.    Plaintiff followed up with an e-mail to Ryan in which she asked Ryan to "reconsider [his] attitudes about Laura and I [sic] occasionally tending to our children," and said that Plaintiff "extend[s] Laura latitude when it comes to taking care of her children . . . . If this is not a practice with which you agree, perhaps it bears further discussion amongst the three of us and if necessary with Paul or others in administration."[76]

---

[70] Ex. 5 (Killian Dep. 198–99).

[71] Ex. 5 (Killian Dep. 197).

[72] Ex. 0 (Ryan Account at 2867); Ex. 50 (Killian's Draft).

[73] Ex. 51 (Darkroom E-mail at 2864).

[74] Id.

[75] Ex. 50 (Killian Draft).

[76] Ex. 51 (Darkroom E-mail, at 2864–65).

64.     Ryan has never replaced one of Tolliver's art displays without first consulting Tolliver.[77]

65.     Ryan has never replaced one of Plaintiff's art displays without first consulting Plaintiff. [78]

66.     Tolliver has never replaced one of Ryan's art displays without first consulting Ryan.[79]

67.     Tolliver has never replaced one of Plaintiff's art displays without first consulting Plaintiff.[80]

68.     Sometime around February 2002, Ryan stated to the Plaintiff that she would not "force [him] out on the street like [she] did Debbie Haynes" in a tone of voice that Plaintiff considered inappropriate.[81]

69.     There were no witnesses to the February 2002 exchange in which Ryan referred to circumstances surrounding Debbie Haynes' departure as a member of the GDS faculty.[82]

70.     For Gay Pride Week in the spring of 2004 or 2005, I made posters celebrating famous gay individuals.  I wanted the display to reflect racial diversity, so I asked Mariama Richards, GDS Co-Director of Diversity, for suggestions.  Richards wrote "Audre Lord" on a piece of paper.  I subsequently created a poster celebrating the work of African American poet Audre Lorde, using the spelling that Richards had given me.  African American GDS English teacher Hayes Davis later complained to me that I had misspelled Lorde's last name.  I searched the internet and found her name spelled both "Lord" and "Lorde."  I e-mailed Davis what I had found.  Davis replied by e-mail that the correct spelling of the author's name is "Audre Lord."  He also informed me that there is an authoritative source that English

---

[77] Ex. 10 (Ryan Decl. ¶ 9); Ex. 10 (Tolliver Decl. ¶ 6).

[78] Ex. 10 (Ryan Decl. ¶ 10).

[79] Ex. 11 (Tolliver Decl. ¶ 7); Ex. 10 (Ryan Decl. ¶ 11).

[80] Ex. 11 (Tolliver Decl. ¶ 8)

[81] Ex. 29 (Branch Memo ¶ 2); Ex. 5 (Killian Dep. 179:3–180:20, 84:16–86:12).

[82] Ex. 5 (Killian Dep. 180–81).

teachers use to find the correct spelling of authors' names.  Based on what he told me, I created a new poster with the correct spelling and replaced the one I had previously displayed.[83]

71.    Plaintiff served as Chair of the School's Diversity Task Force Recruitment and Retention Committee,[84] a member of the School Board's Diversity Task Force, and a member of the Board's Equity and Justice Committee.[85]

72.    While part of the Recruitment and Retention Committee, Plaintiff was able to suggest and implement a program that would increase recruitment of Howard University students in order to increase the number of faculty of color at the School.[86]

73.    As an active participant in the Staff of Color group,[87] Plaintiff met regularly with members of the staff to talk about issues affecting their community, and ordinarily attended the annual "Staff of Color Retreat" sponsored by the School.[88]

74.    GDS is unusual, if not unique, among independent schools in the Washington, D.C. area in that it has two full-time Co-Directors of Diversity on its staff working full-time as members of the senior administrative team.  The two Co-Directors of Diversity are Mariama Richards, an African American woman, and Elizabeth Denevi, a Caucasian woman.[89]

75.    In 2003 GDS won the National Association of Independent Schools' Equity and Justice Award.[90]

---

[83] Ex. 10 (Ryan Decl. ¶ 34).

[84] Ex. 5 (Killian Dep. 714).

[85] Ex. 5 (Killian Dep. 715).

[86] See Ex. 5 (Killian Dep. 458).

[87] Ex. 5 (Killian Dep. 713).

[88] Ex. 12 (Richards Decl. ¶ 7); see, e.g., Ex. 52 (E-mail from Killian to Ryan (May 17, 2004); Ex. 53 (E-mail from Ryan to Clifford et al. (May 17, 2004)).

[89] Ex. 12 (Richards Decl. ¶ 2–3); Ex. 13 (Denevi Decl.¶ 3–4).

[90] Ex. 12 (Richards Decl. ¶ 4); Ex. 13 (Denevi Decl.¶ 5).

76.    The Co-Directors of Diversity at GDS are recognized as national leaders in the field of diversity education.  Both Directors of Diversity are called on as consultants for schools, non-profits, and corporations. The GDS Diversity office is closely aligned with the Chief Diversity Officer at Best Buy Incorporated.  The two Co-Directors are frequently asked by regional schools to come in for trainings for staff, parents, and students throughout the school year.  Additionally, Richards has worked with Court-Appointed Special Advocates and the National Cathedral on issues of non-profit equity program development.[91]

77.    Richards is a member of the National Association of Independent Schools' think tank for diversity, "Call to Action," and is a member of the Association of Independent Greater Washington Schools' steering committee for diversity.[92]

78.    Denevi received a doctorate from the University of London in 2004 for her dissertation entitled "Racial Identity Development of Adolescents," and has published articles in Independent School Magazine and the Journal of Multicultural Education on issues relating to multicultural diversity education.  She also serves on the Association of Independent Maryland Schools Diversity Committee as a trainer for National Multicultural Institute.[93]

79.    Plaintiff is a parent of two GDS graduates[94] and was an occasional participant in the Parents of Students of Color.[95]

80.    The School offers a Students of Color Mentoring Program[96] and affinity groups such as the Black Culture Club; Rainbow, a gay/straight alliance; Fusion, a club for multiracial students; and Brenner, a women's leadership group.  These all fall under the umbrella of Diversity Connections, a student club

---

[91] Ex. 12 (Richards Decl. ¶ 5). Ex. 13 (Denevi Decl. ¶ 6).

[92] Ex. 12 (Richards Decl. ¶ 6).

[93] Ex. 13 (Denevi Decl. ¶ 2); see Ex. 0 (Elizabeth Denevi, White on White, Independent School Magazine 78 (2004)); Ex. 55 (Elizabeth Denevi, Whiteness, Independent School Magazine, at 100 (2001)).

[94] Ex. 5 (Killian Dep. 56–57).

[95] Ex. 5 (Killian Dep. 715).

[96] Ex. 5 (Killian Dep. 711).

for promoting equity and justice that hosts discussions and a weekend retreat on topics related to diversity.[97]  Also, the School requires all High School freshman to enroll in a seminar focusing on diversity issues.[98]

81.     Over the course of Plaintiff's employment at GDS, both the number of African American faculty and their percentage of the total faculty at the high school increased significantly, from 5% to 13% between 1996–1997 and 2005–2006.[99]

82.     From 1996 to 2006, African American students at GDS increased from approximately 150 to 180, or approximately 14% to 17%.[100]

83.     Plaintiff received, in addition to her regular salary, a 40% tuition discount for her two children (worth over $78,500), and about $45,500 in additional need-based financial aid so her two children could attend GDS.  The tuition discounts and grants she received for her two children (including approximately $2,000 in free after-school care) totaled around $126,000 over eight academic years.  The 40% tuition discount is available to all GDS faculty.  GDS retroactively granted Plaintiff $9,719 in need-based financial aid in January 2002 for the 2001–2002 academic year after learning that Plaintiff's husband had lost his job.  The School subsequently granted Plaintiff approximately $24,700 in financial aid for her younger child's final two years at GDS.[101]

84.     The School sponsors "Seeking Educational Equity and Diversity," ("SEED"), a national curriculum development program that focuses on infusing equity and multiculturalism into classroom practice, and other professional development programs geared towards multicultural education.[102]

---

[97] Ex. 15 (Branch Decl. ¶ 24); see also, Ex. 5 (Killian at 711–16); Ex. 56 (GDS Website).

[98] Ex. 15 (Branch Decl. ¶ 24).

[99] Ex. 5 (Killian Dep. 458–60); Ex. 15 (Branch Decl. ¶ 22) (stating that African American faculty went from 5% to approximately 12% of the faculty population from 1996–1997 to 2000–2001, and from 12% to 13% from 2001–2002 to 2005–2006).

[100] Ex. 15 (Branch Decl. ¶ 23).

[101] Ex. 16 (Lindsey Decl. ¶ 4); see also Ex. 81 (Killian Dep. Ex. 11).

[102] Ex. 13 (Denevi Decl. ¶ 7); Ex. 56 (GDS website).

85.    On October 3, 2003, Plaintiff and Tolliver participated in small group session discussions of long- and short-term strategies to help students of color feel more connected to GDS for the School's "In Service Day."[103]

86.    On October 15, 2003, the GDS Arts Faculty, including Ryan, Tolliver, and Plaintiff, discussed the following questions:  How does my race influence my work as a teacher with students of color?  How might my students' racial experiences influence their work with me as the teacher?  What is the impact of race on my beliefs?  How do I, as a teacher, situate myself in the education of others, and how do I negotiate the power structures around race in my class to allow students to feel a sense of worth?  How might racial influences affect my and my students' interest in the classroom?  How might I connect lessons to those interests?  To what degree are my role as teacher and my experiences superior to the experiences and expertise of my students, and is there knowledge to be learned from my constituents?  How do I situate and negotiate the students' knowledge, experience, expertise, and race with my own?  Am I willing to speak about race on behalf of those who might not be present in the conversation *both* inside and outside of school, and am I willing to express the injustices of racism in conservative spaces?[104]

87.    As part of its process for proposing new courses, the School asks faculty to describe how the course will "further the School's commitment to multiculturalism and diverse learning styles."[105]

88.    In Ryan's first annual evaluation of Plaintiff, he wrote under the heading "Goals and Recommendations," "#1.  Our charge for the coming year is to continue to address multicultural education in all our classes and in the overall functioning of the department.  I am asking each faculty member to brainstorm how to implement this objective."[106]

---

[103]  See Ex. 57, (In Service Day Notes (Oct. 3, 2003)); Ex. 11 (Tolliver Decl. ¶ 10).

[104]  See Ex. 58, (In Service Day Notes (Oct. 15, 2003)); Ex. 11 (Tolliver Decl. ¶ 11).

[105]  Ex. 14 (Barr Decl. ¶ 4); see, e.g., Ex. 59 (Killian Course Proposal, at 2626); Ex. 60 (Ryan History Proposal at 7100).

[106]  Ex. 21 (Killian Dep. Ex. 3)

89.     The only comment Plaintiff recalled receiving regarding her extensive participation in diversity activities was "supportive of her participation and contributions to GDS' diversity efforts."[107]

90.     In Plaintiff's 2003–2004 evaluation, Ryan praised Plaintiff for choosing an African American student model for a painting project, "represent[ing] the diversity of the school," which Ryan said made "a powerful statement to what GDS stands for."[108]

91.     In Plaintiff's 2004–2005 evaluation, Ryan praised Plaintiff for "frequently and effectively" including "multicultural perspectives" in her projects.[109]

92.     Plaintiff never taught a "digitally-based" course or a course that was listed in the Course of Study as a "technology" course while she was employed at GDS.[110]

93.     Plaintiff used technology in her courses extensively as a matter of personal teaching style.[111]

94.     No one on the GDS faculty, including Tolliver, had "similar or comparable needs" for computer equipment as Plaintiff.[112]

95.     Plaintiff used more digital storage space than Tolliver on the School's servers while she was employed at GDS.[113]

---

[107] Ex. 5 (Killian Dep. 715:20–716:7) (Q: Did you receive comments on your participation in diversity activities in your evaluations at GDS? A: There may have been one comment in the history of my participation. I don't recall specifically. Q: Was that comment supportive of your participation and contributions to GDS' diversity efforts? A: Yes.).

[108] Ex. 24 (Killian Dep. Ex. 6); see also Ex. 23 (Killian Dep. Ex. 5).

[109] Ex. 25 (Killian Dep. Ex. 7).

[110] Ex. 5 (Killian Dep. 599–600).

[111] Ex. 5 (Killian Dep. 208) ("So [Ryan] might use—have used much less than I would have. Even though we were both teaching classes that were not digitally based. So it could be a teacher specific thing I guess.").

[112] Ex. 18 (Ruble Decl. ¶ 3); see also Ex. 5 (Killian Dep. 143:6–21) (Q: Is there any other faculty member or was there any other faculty member at GDS who had the same needs for computer access and artistic equipment that you had? A: Any other faculty member you said? Q: Yes, at GDS during the time you were employed there. A: Laura Tolliver taught classes that used the computer. Q: Did she have the same needs for computer equipment that you did? **A: I don't know.** Q: Is there anybody else you know on the faculty who had similar or comparable needs for the same type of equipment that you did? **A: I—I don't know.**).

[113] Ex. 5 (Killian Dep. 340–41); Ex. 18 (Ruble Decl. ¶ 4).

96.     From June 2003 to September 2004, Studio Art Teachers were allocated 0.75 Gigabytes on the "Users" folder on the School's servers, three times as much space as any other teachers at the School; and Arts and Publications students were allocated much more space than other students.[114]

97.     In June 2003, GDS's Educational Technology Coordinator Bruce Ruble sent an e-mail to the entire High School staff stating that he had archived to CD all teachers' files from the 2001–2002 academic year and older, and asking all teachers to "clean up [their] space."[115]

98.     In September 2003, Plaintiff was using 9.54 Gigabytes of space on the "Users" folder, which was more than any other teacher at the School and nearly 13 times her allocation.[116]

99.     Plaintiff also used much more space than any other teacher in the School, including Tolliver, in the "Public" folder on the School's servers.[117]

100.     Plaintiff's extensive use of the School's servers prevented the servers from backing up properly.[118]

101.     The inability of the School's servers to properly backup overnight was a valid reason for Ruble to be concerned about the number of files on the servers.[119]

102.     Ruble twice came into Plaintiff's class and expressed his concern to her about her extensive use of digital computer space on the School's servers.[120]

103.     Ryan once passed on to her Ruble's concerns about Plaintiff's use of digital storage space on the School's servers in a manner that Plaintiff viewed as angry.[121]

---

[114] Ex. 18 (Ruble Decl. ¶ 5).

[115] Ex. 82 (Killian Dep. Ex. 27).

[116] Ex. 18 (Ruble Decl. ¶ 6); Ex. 5 (Killian 340–41); Ex. 65 (Killian Dep. Ex. 28).

[117] Ex. 18 (Ruble Decl. ¶ 7)

[118] Ex. 5 (Killian Dep. 339–41); see also Ex. 65 (Killian Dep. Ex. 28).

[119] Ex. 5 (Killian Dep. 339–41).

[120] Ex. 5 (Killian Dep. 470–471).

[121] Ex. 5 (Killian Dep. 473).

104.    Plaintiff alleges that students witnessed each of the incidents referenced in paragraphs 102 and 103, but she could not name any such students during her depositions; nor did she know if any students could corroborate that any of these incidents actually occurred.[122]

105.    The only e-mail communication in the record specifically regarding Plaintiff's failure to archive digital files was directed equally to both Plaintiff and Tolliver, in which Ryan stated that although the limit for each Art Teacher was 0.75 Gigabytes, Tolliver had 7.07 Gigabytes on the server and Plaintiff 9.54 Gigabytes.  In the same e-mail, Ryan stated that Ruble had requested that Tolliver and Ryan archive their files by the end of the month (September 2003) so that the School's computer servers would be able to back up properly.[123]

106.    The computers in the Mac Lab each have separate hard drives designated for exclusive use by the Film and Video students, which are labeled "movie drives."  These "movie drives" are necessary for the Film and Video course to run because video files are exceptionally large—significantly larger than digital photographs or other files.[124]

107.    Plaintiff and her students would have had exclusive access to the "movie drives" during the 2005–2006 academic school year, because Plaintiff had been assigned to teach the Film and Video course that required their use.[125]

108.    As Supervisor of the Yearbook, Plaintiff's students had exclusive use of the hard drives in the School's "publications room."[126]

109.    In connection with Plaintiff's supervision of the Yearbook, she received a $5,410 stipend for 2004–2005.[127]

---

[122] Ex. 5 (Killian Dep. 472–74).

[123] Ex. 65 (Killian Dep. Ex. 28).

[124] Ex. 11 (Tolliver Decl. ¶ 12); Ex. 18 (Ruble Decl. ¶ 8).

[125] Ex. 5 (Killian Dep. 439).

[126] Ex. 18 (Ruble Decl. ¶ 9).

[127] Ex. 80 (Killian Dep. Ex. 65); Ex. 5 (Killian Dep. 217).

110.    Plaintiff's stipend for supervising the Yearbook in 2004–2005 was the largest stipend given to any GDS faculty member for supervising an extracurricular activity that year.[128]

111.    When Tolliver ran the Yearbook, Yearbook students used a primarily manual process for the cropping and placement of the photographs that they shot.[129]  The computer needs of the Yearbook expanded when Plaintiff moved to a primarily digital process that required more digital storage space.[130]

112.    Plaintiff's students were free to use the Mac Lab computers when the room was not reserved by a teacher,[131] and Tolliver occasionally allowed Plaintiff's students to use the computers in the Mac Lab during times when she was teaching there.[132]

113.    Once or twice a year Tolliver would say it was "inconvenient" to allow Plaintiff's students to work on computers in the Mac Lab while class was in session.[133]

114.    Plaintiff complained on February 9, 2005 that she was being denied equal access to the Art Department's digital video cameras.[134]

115.    At the time Plaintiff complained in February 2005, only Tolliver had a key to the cabinet with the cameras, because they had been purchased for use in Tolliver's Film and Video course.[135]

116.    Limiting access to the teacher in charge of the Film and Video course was considered an effective method to reduce the chance that a camera might become lost or unavailable for student use.[136]

117.    On February 14, 2005, Principal Kevin Barr directed "that each member of the Art Department have a key and equal access" to the storage cabinet.[137]

---

[128] Ex. 16 (Lindsey Decl. ¶ 8).

[129] Ex. 11 (Tolliver Decl. ¶ 13).

[130] Ex. 5 (Killian Dep. 220–21).

[131] Ex. 5 (Killian Dep. 223).

[132] Ex. 5 (Killian Dep. 298–99).

[133] Ex. 5 (Killian Dep. 298–99).

[134] Ex. 5 (Killian Dep. 138–39); Ex. 46 (Barr Dep. Ex. 2).

[135] Ex. 10 (Ryan Decl. ¶ 19); Ex. 14 (Barr Decl. ¶ 7); Ex. 11 (Tolliver Decl. ¶ 14).

[136] Ex. 10 (Ryan Decl. ¶ 19); Ex. 14 (Barr Decl. ¶ 8); see Ex. 46 (Barr Dep. Ex. 2, at 123).

118.    Had Plaintiff returned to teach at GDS during the 2005–2006 school year, she would have taught Film and Video and been in charge of the digital video cameras herself, a result which Plaintiff has acknowledged was "satisfactory."[138]

119.    In the course of resolving Plaintiff's complaint to Barr, it was also discovered that Plaintiff had access to certain cabinets to which Tolliver did not.  Tolliver was subsequently given a key to those cabinets.[139]

120.    Plaintiff was the only teacher in the Art Department who requested to teach AP Studio Art.[140]

121.    Plaintiff is the only member of the faculty whom Ryan assigned to teach AP Studio Art.[141]

122.    Ryan consistently praised Plaintiff's work with the AP students and her efforts to develop AP teaching skills over the summer in her annual evaluations.[142]

123.    Ryan never indicated to anyone that he was opposed to the Plaintiff's teaching AP Studio Art.[143]

124.    Michelle Cobb, an African American woman who replaced Plaintiff, has taught AP Studio Art since the 2005–2006 academic year.[144]

125.    Neither Ryan nor Tolliver advised or guided any student away from Plaintiff's AP Studio Art course.[145]

---

[137] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 4); see Ex. 5 (Killian 138–39); Ex. 66 (E-mail from Barr to Buckwalter (Feb. 14, 2005)).

[138] Ex. 5 (Killian Dep. 42–44).

[139] Ex. 14 (Barr Decl. ¶ 9); Ex. 11 (Tolliver Decl. ¶ 15); Ex. 67 (E-mail from Barr to Killian (Mar. 15, 2005)).

[140] Ex. 5 (Killian Dep. 500) ("Q: But, you have testified, haven't you, that the only person in the department who asked to teach an AP course was you; is that right?  **A: Yes.**").

[141] Ex. 5 (Killian Dep. 497–98).

[142] Ex. 5 (Killian Dep. 30–32).

[143] Ex. 10 (Ryan Decl. ¶ 20); see also Ex. 5 (Killian Dep. 503:19–504:2) ("Q: Do you know if the department chair ever communicated anything to Mr. Barr or anybody else at GDS saying that he, Nick Ryan, was opposed to your teaching the AP studio art course?  **A: I don't know.**").

[144] Ex. 6 (Ryan Decl. ¶ 21); Ex. 14 (Barr Decl. ¶¶ 14–15).

126.    There were at least two students to whom Ryan affirmatively suggested they should take Plaintiff's AP Studio Art course in the 2004–2005 academic year.[146]

127.    In response to requests from students (and their parents) who wanted to know if they could submit an AP 2-D Design portfolio after taking multiple years of Tolliver's "Advanced Technology for the Studio Arts" course, Tolliver and Ryan changed the course description in the 2003–2004 "Course of Study" to state that particularly motivated students could follow the AP 2-D Design curriculum.[147] According to the College Board, any student may submit an AP portfolio regardless of their coursework.[148]

128.    Allowing some AP Studio Art students to prepare AP Drawing portfolios and others to prepare AP 2-D Design portfolios meant that some students often would be left working without faculty supervision because the AP Drawing students would generally work in the Art Studio and the AP 2-D Design students would generally work in the photo lab or the Mac lab.  This problem did not generally exist with AP 2-D Design students in either Advanced Technology for the Studio Arts or Advanced Photography, because all students in that class generally worked in the same classroom space.[149]

129.    Tolliver did not consult Plaintiff about changing the course description for her course because Plaintiff did not teach Tolliver's course.[150]

130.    For the May 2002 AP examinations, the College Board expanded the "General Art" category of AP Studio Art portfolios to "2-D Design" and "3-D Design."[151]

---

[145] Ex. 10 (Ryan Decl. ¶ 22); Ex. 11 (Tolliver Decl. ¶ 16); see also Ex. 5 (Killian Dep. 506) ("Q:  Do you know the names of any students who were guided away from taking your AP Studio Art course?  **A:  No.**").

[146] Ex. 5 (Killian Dep. 512–15); Ex. 68 (Killian Dep. Ex. 42); Ex. 69 (Killian Dep. Ex. 43).

[147] Ex. 6 (Ryan Decl. ¶ 22); Ex. 11 (Tolliver Decl. ¶ 16).

[148] Ex. 5 (Killian Dep. 502).

[149] Ex. 10 (Ryan Decl. ¶ 33).

[150] Ex. 11 (Tolliver Decl. ¶ 18).

[151] Ex. 10 (Ryan Decl. ¶ 24).

131.    For the 2003–2004 "Course of Study," Ryan, in consultation with Plaintiff, arranged to change the course title of "Advanced Placement Studio Art" to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio," in order to describe more precisely the names of the AP Exams that the course prepared students to take.[152]

132.    Tolliver was not privy to any discussion regarding the change in Plaintiff's course title from "Advanced Placement Studio Art" to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio."[153]

133.    Ryan did not discuss the change to Plaintiff's course title with Tolliver because Tolliver did not teach Plaintiff's AP Studio Art course.[154]

134.    During the time that Plaintiff taught AP Studio Art at GDS, that course remained the only available option for students submitting AP 3-D Design or AP Drawing portfolios.[155]

135.    The number of AP Drawing and AP 3-D Design students alone was sufficient to justify running Plaintiff's AP Studio Art course.[156]

136.    Plaintiff continued to serve as the only faculty advisor to the Art Magazine through the time that she decided not to return to honor her contract to teach in the 2005–2006 academic year.[157]

137.    In Plaintiff's absence, the Art Magazine has ceased to exist.[158]

138.    In December 2003, Susie Ryan, GDS Alumni Director, planned to meet with Plaintiff about publishing alumni art in the Art Magazine.[159]  At a time when Plaintiff was away from school sick in January 2004, Ms. Ryan left phone messages for Plaintiff regarding scheduling a time to meet with a

---

[152] Ex. 10 (Ryan Decl. ¶ 24); compare Ex. 71 (Killian Dep. Ex. 36) with Ex. 72 (2002–2003 Course of Study at 7210).

[153] Ex. 11 (Tolliver Decl. ¶ 19).

[154] Ex. 10 (Ryan Decl. ¶ 25).

[155] Ex. 10 (Ryan Decl. ¶ 26).

[156] Ex. 10 (Ryan Decl. ¶ 26).

[157] Ex. 10 (Ryan Decl. ¶ 27).

[158] Ex. 7 (Tolliver Dep. 11).

[159] Ex. 5 (Killian Dep. 381–82).

visiting GDS alumna artist, Rebecca Drobis.[160]  Plaintiff did not check her School phone messages until the day after she returned to work.[161]

139.    While employed at GDS in December of 2003 and January of 2004, Plaintiff was able to check her School phone messages from her desk or remotely (e.g., from her home).[162]

140.    When Plaintiff heard Susie Ryan's voice message in January of 2004, Plaintiff promptly returned it and learned that a meeting had been scheduled with the GDS alumna, Rebecca Drobis, for later that day.[163]  Ms. Ryan also informed Plaintiff of the time of the meeting.[164]

141.    Nick Ryan and Laura Tolliver met with Rebecca Drobis at GDS in January 2004.[165]

142.    Plaintiff did not ask anyone if she could attend the meeting with Rebecca Drobis in January 2004, and no one told her she was prohibited from attending the meeting.[166]

143.    Plaintiff only spoke to Susie Ryan regarding the meeting with Rebecca Drobis.[167]  Plaintiff views Ms. Ryan's actions as "not inappropriate" and lacking in racial motivation.[168]

144.    Plaintiff did not have any interest in knowing what happened at the meeting that Susie Ryan had arranged with Rebecca Drobis in January of 2004.[169]

145.    Rebecca Drobis subsequently published some of her work in the 2004 Art Magazine.[170]

---

[160] Ex. 5 (Killian Dep. 382).

[161] Ex. 5 (Killian Dep. 384–86).

[162] Ex. 5 (Killian Dep. 384–86).

[163] Ex. 5 (Killian Dep. 390–91).

[164] Ex. 5 (Killian Dep. 390–91).

[165] Ex. 5 (Killian Dep. 388–89).

[166] Ex. 5 (Killian Dep. 392).

[167] Ex. 5 (Killian Dep. 392–93).

[168] Ex. 5 (Killian Dep. 407.)

[169] Ex. 5 (Killian Dep. 393).

[170] Ex. 74 (2004 Art Magazine, at 2021, 2029–30).

146.    The 2004 Art Magazine included photographs of work created by Tolliver's students, and Plaintiff had not shown proofs of the 2004 Art Magazine to Tolliver before the final printed 2004 Art Magazines arrived at the School.[171]

147.    Ryan was a strong supporter of Plaintiff's proposed course as initially proposed, when it was titled, "Yearbook Publishing and Advanced Independent Study Publishing (AISP)."[172]

148.    After Plaintiff's initial submission and consultation with Ryan, then-Principal Paul Levy suggested that Plaintiff make some modifications to her proposal.[173]  In response to Levy's suggestions, Plaintiff changed the name of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)," to "Graphic Design and Publishing."[174]

149.    "Technology for the Studio Arts," when it was taught, was a graphic design course throughout Plaintiff's tenure as a GDS faculty member.[175]  The course description for "Technology for the Studio Arts," a course taught by Tolliver, in the 2001–2002, 2002–2003, and 2003–2004 "Course of Study" books began, "This introductory computer-based graphic design course . . . ."[176]

150.    Plaintiff did not inform Tolliver of the change in the name of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)," to "Graphic Design and Publishing."  Killian did not discuss her proposed new course with Tolliver at all.[177]

151.    Ryan proposed a new course for 2004–2005, entitled "Multicultural Art History," which was designed to "focus on the diversity of human expression and its evolution as evidenced in a broad

---

[171] Ex. 5 (Killian Dep. 525).

[172] Ex. 5 (Killian Dep. 422).

[173] Ex. 5 (Killian Dep. 422–23); Ex. 75 (Killian Dep. Ex. 33).

[174] Compare Ex. 59 (Killian Course Proposal at 2649) with Id. at 2624.

[175] Ex. 5 (Killian Dep. 448–50); see, e.g., Ex. 73 (2001–2002 Course of Study).

[176] Ex. 72 (2002–2003 Course of Study); Ex. 73 (2001–2002 Course of Study); Ex. 71 (Killian Dep. Ex. 36).

[177] Ex. 11 (Tolliver Decl ¶ 20).

array of world cultures."[178]  According to Ryan's written course proposal, "[m]ulticulturalism would be

the guiding principle" of the course, bringing attention to "the much overlooked art of Africa, the South

Asian subcontinent, China, and Japan."[179]  Central to the thesis of the course's curriculum would be a

"conscious attempt to counter the bias toward a male-dominated European Civilization as the standard by

which other cultures are measured."[180]

> 152.    On January 20, 2004, Kevin Barr sent an e-mail to both Ryan and Plaintiff that stating:

> Dear Nick and Sharon:

> The admin. team met to discuss Course Proposals for next year.  Both of the
> proposed Art courses generated considerable enthusiasm and a sense that
> they represent exciting directions for the department to go.  The sense was
> for both courses, though, that given current space and personnel limitations,
> we will wait to offer them until the completion of the new facilities.

> Kevin.[181]

> 153.    The administrative team decided not to approve Plaintiff's proposed course, "Graphic

Design & Publishing," for the 2004–2005 academic year because of "space and personnel limitations."[182]

> 154.    Neither Ryan nor Tolliver played a role in the decision not to approve Plaintiff's proposed

new course, "Graphic Design and Publishing," for 2004–2005.[183]

> 155.    Plaintiff acknowledged in her deposition that her belief that Ryan or Tolliver played a role

in the decision not to approve her proposed "Graphic Design & Publishing" course for the 2004–2005

academic year was entirely speculative.[184]

---

[178] Ex. 10 (Ryan Decl. ¶ 29); Ex. 60 (Ryan History Proposal, at 7100).

[179] Ex. 60 (Ryan History Proposal, at 7100).

[180] Id.

[181] Ex. 76 (Killian Dep. Ex. 61).

[182] Ex. 5 (Killian Dep. 429–30); Ex. 1476 (Ex. 76 (Killian Dep. Ex. 61).

[183] Ex. 15 (Branch Decl. ¶ 13); Ex. 14 (Barr Decl. ¶¶ 5–6); Ex. 10 (Ryan Decl. ¶ 30); Ex. 11 (Tolliver Decl. ¶ 21).

[184] Ex. 5 (Killian Dep. 430) ("Q: So, you are just speculating when you suggest [Tolliver or Ryan] may have had some role in postponing your course; is that right?  **A:  I—yes.**").

156.    GDS assigned Plaintiff to teach "Graphic Design," formerly called "Technology for the Studio Arts," for the 2005–2006 school year.[185]

157.    Ryan and Tolliver's decision to change the title of "Technology for the Studio Arts" to "Graphic Design," was made, in part, to describe more accurately the course's content, and, in part, to encourage higher female enrollment in the course.[186]

158.    No significant substantive changes were made to either the course description or the curriculum of Tolliver's Technology for the Studio Arts course from 2003–2004 to 2004–2005.[187]

159.    In February 2004, Plaintiff became aware of Tolliver's plan to change the name of her graphic design course to "Graphic Design" for the 2004–2005 academic year.[188]

160.    In February 2004, after Plaintiff learned of the change from "Technology for the Studio Arts" to "Graphic Design," she said to Ryan:

> Nick, I'd like to talk with you about the Graphic Design course [that was] formerly [named] Technology for the Studio Arts[,] and the new course that was recently approved called Graphic Design and Publishing and I wondered first doesn't that seem to be redundant?[189]

161.    When Plaintiff approached Ryan to complain about the change in the name of Plaintiff's course to "Graphic Design," Ryan was unaware that the name of Plaintiff's proposed Yearbook course had been changed to "Graphic Design and Publishing."[190]

162.    In response to Plaintiff's complaint, Ryan leaned forward in his chair and said, in a fairly loud and expressive voice, "Sharon, I can't bend low enough to the ground to understand you."[191]

---

[185] Ex. 5 (Killian Dep. 439).

[186] Ex. 10 (Ryan Decl. ¶ 31); Ex. 11 (Tolliver Dec. ¶ 22).

[187] Ex. 11 (Tolliver Decl. ¶ 23); Ex. 5 (Killian Dep. 450–52); Ex. 71 (Killian Dep. Ex. 36); Ex. 21 (Killian Dep. Ex. 3).

[188] Ex. 5 (Killian Dep. 359); Ex. 4 (Pl.'s Supplemental Answer to Interrogs. 6).

[189] Ex. 5 (Killian Dep. 359).

[190] Ex. 10 (Ryan Decl. ¶ 32).

[191] Ex. 5 (Killian Dep. 360). According to Ryan, he told Plaintiff, "Sharon, what do you want? I can't lower myself enough to please you." Ex. 6 (Ryan Dep. 77) The statement reflected his frustration that despite his many attempts to accommodate her idiosyncratic desires in the face of Plaintiff's mistreatment of *him*, she could not be satisfied. Ex. 10 (Ryan Decl. ¶ 32).

163.    Plaintiff twice repeated to Ryan, "You just said I can't bend low enough to the ground to understand you?" and went downstairs to report the incident to then-Director of Studies Kevin Barr.[192]

164.    In light of Plaintiff's complaint, Barr suggested that the GDS Co-Directors of Diversity, Mariama Richards (an African-American woman), and Elizabeth Denevi (a Caucasian woman), use mediation as a way to help the members of the Art Department understand each others' perspectives and work more cooperatively.[193]

165.    At that time in late February 2004, Richards and Denevi had just completed several days of training in the mediation of disputes.[194]

166.    According to the Plaintiff, the "primary crux" of the mediation was to deal with Ryan's statement that he could not "bend down low enough to understand" the Plaintiff as well as how Plaintiff perceived that Ryan and Tolliver were trying to take the Art Magazine away from her.[195]

167.    The mediators met with each of the three Art Department members individually, and then reported back to each individual what they believed that person had expressed as his or her perspective on why there was tension in the Art Department.[196]

168.    The next step in the mediation would have been to distill the perspectives of each of the individual Art Department members and share them with the rest of the Department, in the hope that the process would facilitate understanding among the Department's members.[197]

169.    The mediation stalled, however, when Plaintiff told Richards that she was not comfortable with Richards' sharing her version of events with the others and that she wanted a paid leave of absence, to which Richards replied that the School had no paid sabbatical program.[198]

---

[192] See Ex. 5 (Killian Dep. 360–61).

[193] Ex. 8 (Richards Dep. 16); Ex. 9 (Denevi Dep. 60–61).

[194] Ex. 8 (Richards Dep. 16); Ex. 9 (Denevi Dep. 60–61).

[195] Ex. 5 (Killian Dep. 699).

[196] Ex. 8 (Richards Dep. 24–25)

[197] Ex. 8 (Richards. Dep. 24–25)

170.    When Richards asked Plaintiff how she would like her complaint regarding Ryan's "bend low" remark to be resolved, Plaintiff said she did not know what the solution should be, and expressed the belief that "she felt [Richards] was asking her to do [Richards'] job" for her.[199]

171.    On or about March 12, 2004, Branch met with Plaintiff to discuss her unhappiness relating to specific incidents that had occurred in the Art Department.[200]

172.    During that meeting with Branch, Plaintiff used a document she had prepared for that meeting as the basis for her discussion (hereinafter "Branch Memo").[201]

173.    During this meeting with Branch, Plaintiff also informed Branch that she wished to take time off from work, but that she could not afford to do so without pay because she was the sole earner in her family, and she had two children in school.[202]

174.    Branch informed Plaintiff that the School does not offer paid time off, but that he would be willing to consider an application for leave without pay.[203]

175.    Sometime shortly after his meeting with Plaintiff in the spring of 2004, Branch informed Plaintiff of a job opening in the Art Department at the National Cathedral School and offered to write her a supportive recommendation.[204]

176.    Branch's wife, Paula Carreiro, is Head of School at Beauvoir, the National Cathedral's elementary school.[205]

---

[198] Ex. 8 (Richards Dep. 53).

[199] Ex. 8 (Richards Dep. 54).

[200] Ex 5 (Killian Dep. 155:2–9); Ex. 15 (Branch Decl. ¶¶ 14, 16).

[201] Ex. 29 (Branch Memo); Ex. 5 (Killian Dep. 148:4–149:12).

[202] See Ex. 15 (Branch Decl. ¶ 17); see also Ex. 5 (Killian Dep. 152:18–153:7); Ex. 29 (Branch Memo at 2633) ("First, I can't afford to give up my job at GDS because I am currently the sole earner in my family and we have two children in school.").

[203] Ex. 15 (Branch Decl. ¶ 18).

[204] Ex. 15 (Branch Decl. ¶ 19); Ex. 5 (Killian Dep. 153:4–21).

[205] Ex. 15 (Branch Decl. ¶ 20).

177.    On July 6, 2004, Plaintiff sent a letter to Daniel Johnson, an attorney who had previously represented the School, in which Plaintiff's counsel outlined Plaintiff's basis for believing she was subject to a racially hostile work environment at GDS.[206]

178.    In the July 6, 2004 letter, Plaintiff's counsel, John Racin, described Plaintiff's "unhappy experience at GDS," indicating that "the straw that broke the back of [Plaintiff's] resistance to the conclusion racism was indeed at work" was the "verbal abuse" from Ryan, who "indicat[ed] he could not 'bend low enough to the ground' to understand what [Plaintiff] was saying (while gesturing with his hand towards the floor)."[207]

179.    In response to Plaintiff's letter, the School retained Caryn Pass, an attorney from Krupin O'Brien LLC, to conduct an independent investigation into Plaintiff's complaints.[208]

180.    In connection with Pass's investigation, Plaintiff's attorney sent Pass a copy of the Branch Memo.[209]

181.    Plaintiff prepared a five-page document of talking points that she used as a basis for her subsequent conversation with Pass on August 30, 2004 (hereinafter "Pass Talking Points Memo").[210]

182.    Pass conducted an extensive independent investigation that included reviewing the July 6, 2004 and Aug. 24, 2004 letters from Racin, the Branch Memo, and other documents, as well as interviewing Plaintiff, Peter Branch, Mariama Richards, Elizabeth Denevi, Kevin Barr, Laura Tolliver, Tom Yoder, Bruce Ruble, Nick Ryan, Paul Levy, Debbie Haynes, and Demeisha Lee.[211]

---

[206] Ex. 27 (Letter from John Racin to Daniel Johnson (Jul. 6, 2004)); Ex. 15 (Branch Decl. ¶ 25).

[207] Id. at 2795.

[208] Ex. 15 (Branch Decl. ¶ 26).

[209] Ex. 28 (Letter from Racin to Pass (Aug. 27, 2004) (attaching Killian Talking Points for Branch (Mar. 12, 2004)). The attached memorandum is substantially the same as the document discussed in Plaintiff's deposition. See Ex. 29 (Branch Memo).

[210] Ex. 5 (Killian Dep. 466–67); see Ex. 30 (Pass Talking Points Memo).

[211] Ex. 19 (Mem. from Caryn G. Pass & Grace H. Lee to Joe Sellers (Apr. 11, 2005) (hereinafter "Pass Report"), at 6837).

183.    On February 25, 2005, Plaintiff signed a contract to teach at GDS for the 2005–2006 academic year.[212]

184.    On April 11, 2005, Pass reported her findings to GDS.[213]

185.    In the Pass Report, Pass described how Plaintiff "was unable to articulate what she wanted or what changes the School or the art department could make that would resolve her issues," and concluded by expressing Pass's belief that Plaintiff's claims of racial discrimination were unfounded. Pass further concluded that Plaintiff "seemed to take every opportunity to construe a facially innocuous situation into something negative and somehow racially motivated."[214]  The Report further stated:

> [t]hroughout our interview with [Plaintiff], we asked her why she thought certain alleged treatment was a result of race.  Her response was that she could not think of any other reason for why she would be treated in this manner.  She regularly compared herself with other staff who she stated did not get the same treatment and yet when it was explained to her why the treatment may have been different, it was difficult for her to consider the explanation. . . . [W]e found [Ryan's] rebuttals to [Plaintiff's] claims of verbal or other types of mistreatment to be detailed and credible.  Further, his efforts to make policies that would assure equal allocation of resources and treatment of all staff reflected a commitment to make the relationship with Ms. Killian productive and professional.[215]

186.    Plaintiff decided to relocate to Arkansas in April 2005; she subsequently placed her home in Falls Church, VA on the market on April 14, 2005.[216]

187.    Plaintiff decided to move to Arkansas, at least in part, because she believed a potential settlement agreement with GDS including "the option of not coming back to school" was a "possibility."[217]

---

[212] Ex. 31 (Killian Dep. Ex. 59).

[213] Ex. 26 (Pass Report, at 6836).

[214] Ex. 26 (Pass Report, at 6850, 6854).

[215] Ex. 26 (Pass Report, at 6854).

[216] Ex.  5 (Killian Dep. 629:13–32:2); Ex 42 (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

[217] Ex. 5 (Killian Dep. 630:9–22) ("Q: And how long before April 14, 2005, did you, or you and your husband decide that you were going to move to Arkansas?  **A: Not long, not long before that.**  Q: Was it a few days, or a few weeks, or a month?  **A: No.  You know, GDS and I were in what were to have been some negotiations.  They had asked me previously about the** (continued…)

188.    Plaintiff's home in Falls Church, VA was placed under contract on April 20, 2005.[218]

189.    On or about June 20, 2005, Kate Lindsey, the School's Chief Financial Officer, saw Plaintiff removing boxes of files and personal belongings from the School at approximately six o'clock the evening.  Lindsey offered to help Plaintiff with the boxes, but Plaintiff declined.[219]

190.    Plaintiff closed on the sale of her home in Falls Church, VA on July 18, 2005.[220]

191.    Plaintiff sent all of her personal belongings to Arkansas in July 2005.[221]

192.    Plaintiff provided GDS with a post office box in a shopping mall in Tysons Corner, VA that forwarded her mail to Arkansas as her mailing address.[222]

193.    Plaintiff did not notify the School that she was in Arkansas until late September 2005. This occurred after the School was unable to deliver a certified-mail letter to the Tysons Corner, VA address Plaintiff had provided.[223]

194.    Plaintiff, and the other GDS faculty members, were scheduled to return to work on Monday, August 29, 2005, for "staff week" to prepare for teaching at GDS in the 2005–2006 school year.[224]

195.    On Tuesday, August 23, 2005, Plaintiff sent an e-mail to her 2005–2006 independent study advisee Sophia Maravell, a GDS student, about her independent study plan.[225]

---

option of not coming back to school as one of the things that I, that could be part of a settlement agreement.  So, it wasn't unusual that that could be a possibility.  We were, the market was great, and we sold our little house.") (emphasis added).

[218] Ex.  5 (Killian Dep. 629:13–32:2); Ex 42 (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

[219] Ex. 16 (Lindsey Decl. ¶ 9).

[220] Ex.  5 (Killian Dep. 629:13–32:2); Ex 42 (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

[221] Ex. 5 (Killian Dep. 632:3–14).

[222] Ex. 16 (Lindsey Decl. ¶ 10); see Ex. 5 (Killian Dep. 635:11–636:3) ("Q: When did you first notify Georgetown Day School that you were moving to Arkansas?  **A: I don't think I notified Georgetown Day School that I was moving to Arkansas.** Q: After you had moved to Arkansas, did you give GDS a Tyson's Corner P.O. Box as your mailing address?  **A: Yes.**  Q: And why did you do that instead of giving GDS your Arkansas address?  **A: Everybody, my bill paying, everybody had my box number, because there was definitely a possibility that I would be back.  As far as I knew, the Fayetteville address was going to be my summer residence.**").

[223] Ex. 16 (Lindsey Decl. ¶ 11); see also Ex. 77 (Letter from Branch to Killian (Sept. 27, 2005)).

[224] Ex. 5 (Killian Dep. 637:5–638:6, 687:3–9); Ex. 14 (Barr Decl. ¶ 10); Ex. 15 (Branch Decl. ¶ 27).

196.    On Tuesday, August 23, 2005, Plaintiff sent an e-mail to GDS student Zak Velazquez advising him on which high school courses would be most appropriate for him to take.[226]

197.    On or about Friday, August 26, 2005 Plaintiff left a voice message at the School saying that she could not return for staff week because of health reasons.[227]

198.    On August 31, 2005, the School placed an advertisement in the Washington Post for an "Art teacher to teach Studio Art, graphic design and film & video."  By September 4, 2005, the School had replaced "Art teacher" with "long-term substitute" in the advertisement.[228]

199.    On September 1, 2005, the School sent a letter informing Plaintiff that she would receive short-term disability benefits until approximately November 25, 2005, and that her "job restoration protections" under the District of Columbia Family Medical Leave Act ("DCFMLA") would expire on December 16, 2005.[229]

200.    On September 1, 2005, Plaintiff told Barr by phone that she would be unable to return for at least a week or two.[230]

201.    On September 5, 2005, Michelle Cobb, an African American woman, filed an application with GDS to be a "substitute teacher."[231]

202.    On September 6, 2005, Defendant's counsel, Thomas S. Williamson, Jr., sent a partially executed tolling agreement to Plaintiff's counsel Racin, which included a "tolling period" from May 1, 2005 through September 30, 2005.[232]

---

[225] Ex. 33 (Killian Dep. Ex. 66); Ex. 5 (Killian Dep. 644–46).

[226] Ex. 34 (Killian Dep. Ex. 67); Ex. 5 (Killian Dep. 647–48).

[227] See Ex. 5 (Killian Dep. 638, 640–41, 687:10–14); Ex. 32 (E-mail from Barr to Killian (Aug. 30, 2005)).

[228] Ex. 16 (Lindsey Decl. ¶ 12); Ex. 15 (Branch Decl. ¶ 29); Ex. 48 (Classified Ads (Aug. 31, 2005 & Sept. 4, 2005)).

[229] Ex. 35 (Letter from Lindsey to Killian (Sept. 1, 2005)); Ex. 16 (Lindsey Decl. ¶ 13).

[230] Ex. 14 (Barr Decl. ¶ 12); see also Ex. 39 (E-mail from Barr to Killian (Sept. 2, 2005)).

[231] Ex. 78 (Application of Cobb, at 2989 (Sept. 5, 2005); Ex. 15 (Branch Decl. ¶ 30).

[232] Ex. 44 (Letter from Williamson to Racin (Sept. 6, 2005), with tolling agreement attached).

203.    On September 7, 2005, Plaintiff consulted a doctor for the first time to treat her long-term disability symptoms, which she claims "first appeared" in April 2005.[233]

204.    On September 8, 2005, Plaintiff informed Barr, the principal of GDS's high school, by voice mail that she would be unable to return to work the following week.[234]

205.    On September 9, 2005, Plaintiff sent an e-mail to her 2005–2006 independent study student, Sophia Maravell, stating that "because of health issues [Plaintiff's] status is uncertain so [Maravell] should make arrangements with the substitute AP teacher through Nick Ryan."[235]

206.    On September 9, 2005, Plaintiff sent an e-mail to her 2005–2006 independent study student, Rebecca Russell-Einhorn, stating that Plaintiff's "status is quite uncertain in light of health issues. Under the circumstances you should coordinate your independent study through Nick Ryan and the person teaching the course in my absence."[236]

207.    On September 14, Nguyen Nguyen, an Asian American man, filed an application with the School to be a substitute teacher.[237]

208.    Although the School asked Plaintiff to inform them when she would be able to report back to work, she never told the School whether she intended to return to work.[238]

209.    In light of her continued absence, the School hired as long-term part-time substitutes Michelle Cobb, an African American teacher, and Nguyen Nguyen, an Asian American teacher.  Cobb and Nguyen are still teaching at GDS in the Art Department.[239]

---

[233] Ex. 5 (Killian Dep. 668:15–669:6, 672:22–673:5); see Ex. 38 (Killian Dep. Ex. 53, at 2899) (describing the "nature of illness and when symptoms [contributing to Plaintiff's long-term disability] first appeared.").

[234] Ex. 14 (Barr Decl. ¶ 13); see also Ex. 40 (E-mail from Barr to Killian (Sept. 9, 2005)).

[235] Ex. 36 (Killian Dep. Ex. 50).

[236] Ex. 37 (Killian Dep. Ex. 51).

[237] Ex. 79 (Application of Nguyen, at 2993 (Sept. 14, 2005)); Ex. 15 (Branch Decl. ¶ 31).

[238] Ex. 5 (Killian Dep. 687–89); Ex. 16 (Lindsey Decl. ¶ 14).

[239] Ex. 14 (Barr Decl. ¶ 14); Ex. 15 (Branch Decl. ¶¶ 30–32); Ex. 41 (E-mail from Barr to Webb (Sept. 7, 2005)).

210.    On September 29, 2005, Plaintiff's counsel, John Racin, sent to Defendant's counsel, Thomas S. Williamson, Jr., a fully executed Tolling Agreement, in which Plaintiff and her counsel agreed to "not initiate any administrative charges or civil lawsuits against GDS" from May 1, 2005 to September 30, 2005.[240]

211.    On September 29, 2005, Plaintiff filed this lawsuit.[241]

212.    Plaintiff eventually told the School that she was physically incapable of working because of a medical disability and applied for long-term disability benefits on November 18, 2005.[242]

213.    In her long-term disability application, Plaintiff stated that her symptoms of uncontrolled hypertension, depression, anxiety, insomnia, colitis, nausea and diarrhea "first appeared" in April 2005.[243]

214.    Plaintiff claims that her symptoms appeared as a result of "ongoing incidents" at GDS, including the February 2005 incident regarding her lack of a key to the video cameras used by the Film & Video students.[244]

215.    Plaintiff has identified no incidents of alleged racial hostility on the part of GDS that occurred after the February 2005 incident regarding her lack of a key to the cabinet storing the digital video cameras used by the Film & Video students.[245]

216.    Plaintiff never informed the School that she wished to come back to teach at GDS if her long-term disability was denied.[246]

217.    Upon the expiration of her "job restoration protections" under the DCFMLA, the School terminated Plaintiff's employment.[247]

---

[240] Ex 45 (Letter from Racin to Williamson (Sept. 29, 2005) with Tolling Agreement attached).

[241] Ex. 1 (Compl.).

[242] Ex. 5 (Killian Dep. 655); Ex. 38 (Killian Dep. Ex. 53).

[243] Ex. 38 (Killian Dep. Ex. 53, at 2899).

[244] Ex. 5 (Killian Dep. 658–59).

[245] See Ex. 5 (Killian Dep. 657:4–662:19, 677:10–684:14).

[246] Ex. 5 (Killian Dep. 689:3–12); Ex. 15 (Branch Decl. ¶ 33).

Dated:  November 10, 2006

        Respectfully submitted,


        /s/ Timothy R. Clinton

        Thomas S. Williamson, Jr. (D.C. Bar No. 217729)

        Timothy R. Clinton (D.C. Bar No. 497901)

        **COVINGTON & BURLING LLP**

        1201 Pennsylvania Ave., N.W.

        Washington, D.C. 20004

        (202) 662-6000

        (202) 778-5218 - Fax

        **COUNSEL FOR DEFENDANT**

---

[247] Ex. 16 (Lindsey Decl. ¶ 15).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated:  November 10, 2006

Respectfully submitted,


 /s/ Timothy R. Clinton
Thomas S. Williamson, Jr. (D.C. Bar No. 217729)
Timothy R. Clinton (D.C. Bar No. 497901)
**COVINGTON & BURLING LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 778-5218 - Fax

**COUNSEL FOR DEFENDANT**

# TABLE OF CONTENTS

I.      FACTUAL BACKGROUND ................................................................1

II.     ARGUMENT ...............................................................................9

  A.   Standard of Review ...............................................................9

  B.   Standard for Evaluation of Employment Discrimination Claims.........................10

  C.   Plaintiff Cannot Prove Hostile Work Environment. ...................................10

    1.   Incidents Prior to September 30, 2001 are Time-Barred. ........................13

    2.   GDS Equitably Allocated Supplies, Equipment, and Technology........................14

      a)   Regular Teaching Supplies ................................................15

      b)   Capital Budget Items .....................................................16

      c)   Computer Technology ......................................................18

      d)   Access to Digital Video Cameras .......................................22

    3.   GDS Made No Efforts to Undermine Plaintiff or Exclude Her from Departmental Decisions. .............................................................................23

      a)   AP Studio Art ..........................................................23

      b)   Art Magazine ...........................................................26

      c)   Course Proposal ........................................................27

      d)   Change in the Title of Tolliver's Course ..............................29

    4.   The Alleged Isolated Incidents Do Not Support a Hostile Work Environment. .................31

      a)   February 2002 Incidents ................................................31

      b)   Branch Recommendation ..................................................35

    5.   No Basis Exists for Proving "Institutional Efforts" by GDS Against People of Color. ........36

    6.   Caryn Pass's Independent Investigation Confirms the Absence of a Racially Hostile Work Environment. ..........................................................................39

  D.   Plaintiff Cannot Demonstrate Wrongful Termination Based on Her Race. ...........................41

  E.   Plaintiff's Abandonment of Her Teaching Job Does Not Constitute Retaliation. ...................44

III.    CONCLUSION ...............................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Aka v. Washington Hospital Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998) ................................. 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ....................................... 9

* *Bryant v. Brownlee*, 265 F. Supp. 2d 52 (D.D.C. 2003) ................................. 11

* *Carney v. America University*, 151 F.3d 1090 (D.C. Cir. 1998) .................................. 47

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................... 9

*Coleman v. Potomac Electric Power Co.*, 2004 U.S. App. LEXIS 21820 (2004)............ 13

*Duncan v. Department of Safety*, 397 F.3d 1300 (10th Cir. 2005) .................................. 14

* *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .......................................... 12, 44

* *George v. Leavitt*, 407 F.3d 405 (D.C. Cir 2005) ..................................... 9, 11,
12, 16

*Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999) ............................................ 11

*Jones v. Billington*, 12 F. Supp. 2d 1 (D.D.C. 1997), *aff'd*, 1998 U.S. App. LEXIS 15459
(D.C. Cir. 1998) ....................................................................................... 11

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) ............................................ 13

*Kalekiristos v. CTS Hotel Management Corp.*, 958 F. Supp. 641 (D.D.C. 1997) .............. 9

* *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .......................................... 10

*Moore v. Ashcroft*, 401 F. Supp. 2d 1 (D.D.C. 2005) ....................................... 12

* *Murray v. Gilmore*, 406 F.3d 708 (D.C. Cir. 2005)....................................... 44

*National R.R. Corp. v. Morgan*, 536 U.S. 101 (2002) ...................................... 13

*Nurriddin v. Goldin*, 382 F. Supp. 2d 79 (D.D.C. 2005) ................................. 11

*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998) ................................. 12

*Perkins v. District of Columbia*, 769 F. Supp. 11 (D.D.C. 1991) ..................................... 44

*Roberson v. Snow*, 404 F. Supp. 2d 79 (D.D.C. 2005) ..................................... 11

*Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48 (D.D.C. 2004)................... 11

*Taylor v. Small*, 350 F.3d 1286 (D.C. Cir. 2003) .............................................................. 47

* *Tsehaye v. William C. Smith & Co*, 402 F. Supp. 2d 185 (D.D.C. 2005) ............... 10, 44

*Villenes v. AFL-CIO*, 999 F. Supp. 97 (D.D.C. 1998) ...................................................... 10

* *Vickers v. Powell*, 2005 WL. 3207775 (D.D.C. 2005) ............................................. 13, 14

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002) ................................. 9

*Wheaton v. N. Oakland Med. Ctr.*, 130 Fed. Appx. 773, 787 (6th Cir. 2005) ................. 14

## FEDERAL STATUTES

Civil Rights Act of 1991, 42 U.S.C. § 1981 ....................................................................... 9

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* ............................... 10

## STATE STATUTES

District of Columbia Human Rights Act, D.C. Code § 2-1401.1 *et seq* ............................ 9

## MISCELLANEOUS

D.D.C. LCvR 7 ..................................................................................................................... 1

Fed. R. Civ. P. 7 ................................................................................................................... 1

Fed. R. Civ. P. 56(c) ............................................................................................................ 9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7,

Defendant Georgetown Day School ("GDS" or "School"), by its undersigned counsel, submits

this memorandum of points and authorities in support of its Motion for Summary Judgment to

dismiss all of Plaintiff's claims.

## I.    FACTUAL BACKGROUND[1]

Plaintiff Sharon Killian is an African American woman.[2]  GDS is a parent-owned

nonprofit coeducational day school in Washington, D.C.[3]  GDS first opened its doors in 1945 as

an integrated school in a segregated city.  The School's continued commitment to racial diversity

is reflected in its mission statement, which begins, "Georgetown Day School honors the integrity

---

[1] GDS relies on the undisputed facts cited in this Memorandum solely for purposes of its motion for summary judgment.

[2] Ex. 1 (Compl. ¶ 3).

[3] Ex. 15 (Branch Decl. ¶ 3).

and worth of each individual within a diverse school community."[4]  The School devotes significant resources and offers a broad range of programs to further its educational mission of promoting diversity.[5]  Also, during the time of Plaintiff's employment, the number and proportion of African American faculty and students at GDS significantly increased.[6]

At the recommendation of then-high school Studio Art Department ("Art Department") Chair, Debbie Haynes, GDS first hired Plaintiff for the 1993–1994 academic year as a frequent substitute for the Art Department faculty.[7]  The next year Plaintiff served as a "permanent substitute" for Erica Elliott, who had taken an unpaid leave of absence.[8]  Plaintiff received a positive evaluation for her teaching efforts that year.[9]

Plaintiff was hired as a full-time member of the Art Department for the 1995–1996 academic year when Elliott decided not to return to GDS.[10]  Haynes continued to be the Art Department Chair through the 1999–2000 academic year.[11]  Although the relationship between Haynes and Plaintiff was not always positive, Haynes's final evaluation of Plaintiff was favorable.[12]  In 2000–2001, newly-hired Nick Ryan, a Caucasian male, replaced Haynes as Department Chair.[13]  She stayed on part-time before retiring at the end of the academic year.[14]

---

[4] Ex. 14 (Barr Decl. ¶ 17).

[5] See, e.g., notes 201–219 and accompanying text.

[6] Ex. 5 (Killian Dep. 458–60); see also Ex. 15 (Branch Decl. ¶ 22).

[7] Ex. 19 (Killian Dep. Ex. 1); see also Ex 5 (Killian Dep. 14:16–16:13); Ex. 11 (Tolliver Decl. ¶ 3).

[8] Ex. 19 (Killian Dep. Ex. 1); Ex. 5 (Killian Dep. 16:14–22).

[9] Ex. 19 (Killian Dep. Ex. 1); see also Ex. 5 (Killian Dep. 20:1–21:11).

[10] Ex. 5 (Killian Dep. 17:2–16).

[11] Ex. 5 (Killian Dep. 22:19–23:1).

[12] Ex. 20 (Killian Dep. Ex. 2); see also Ex. 5 (Killian Dep. 21:19–23:7).

[13] Ex. 5 (Killian Dep. 22:22–23:1); Ex. 15 (Branch Decl. ¶ 7).

[14] Ex. 10 (Ryan Decl. ¶ 4); Ex. 15 (Branch Decl. ¶ 6); see Ex. 5 (Killian Dep. 80:6–10)

From the 2000–2001 academic year through her final year in the Department, 2004–2005, Plaintiff taught four sections of art courses:  two sections of Introduction to Photography and either one section of AP Studio Art and one section of Advanced Painting and Drawing, or two sections of AP Studio Art.[15]  In addition, Plaintiff played an active role in various GDS diversity-related initiatives.[16]  During that period, the only other full-time members of the Art Department were Laura Tolliver (a Caucasian woman) and Nick Ryan, the Department Chair.

Ryan's evaluations of Plaintiff's work were consistently positive throughout Plaintiff's tenure at GDS, and Ryan specifically praised Plaintiff for promoting the multicultural mission of the School.[17]  Plaintiff believes that Ryan's evaluations of her as a member of the GDS faculty were fair and that they did not reflect racial prejudice against her as an African American.[18]

Also, during Plaintiff's time at GDS, both of her children attended and graduated from the School.  Plaintiff received a total of $126,000 in tuition discounts and need-based financial aid from GDS so that she could afford to send her children to the School.

While Plaintiff was employed by GDS, incidents occurred that caused Plaintiff to believe that she was working in an environment that was not adequately hospitable and supportive.  For example, in February 2002, Ryan and GDS high school Building Manager George Buckwalter disposed of banners created by the Black Culture Club that had been ripped by weather conditions.  The banners advertised a dance that had already occurred.[19]  Later that day, Ryan

---

[15] Ex. 10 (Ryan Decl. ¶ 5).

[16] See notes 200–208, infra and accompanying text.

[17] See, e.g., Ex. 21 (2000–2001 Eval.); Ex. 22 (2001–2002 Eval.); Ex. 23 (2002–2003 Eval.); Ex. 24 (2003–2004 Eval.); Ex. 25 (2004–2005 Eval.).

[18] Ex. 5 (Killian Dep. 24–45).

[19] Ex. 6 (Ryan Dep. 27–29); Ex. 0 (Ryan Account, at 2866); Ex. 10 (Ryan Decl. ¶ 7).

expressed his concern to Plaintiff because of her failure to follow the Art Department's normal practice of asking a colleague, namely Tolliver, before replacing an art display of one of her students.[20]  The display had only been posted a few days.[21]  Plaintiff characterized Ryan's expression of concern as "screaming."[22]  At the end of that same day, Ryan sent an e-mail to both Tolliver and Plaintiff complaining about the messy state of the School's darkroom.[23]  At some point subsequent to his e-mail regarding the darkroom, Ryan told Plaintiff that she would not "force [him] out on the street like [she] did Debbie Haynes."[24]  Plaintiff also characterized Ryan as "screaming" during this interaction.[25]

About one year later, Ryan, after consulting Plaintiff and without consulting Tolliver, arranged to change the name of Plaintiff's "Advanced Placement Studio Art" course.  The name was changed to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio" to describe more precisely the names of the AP portfolios that the course prepared students to submit.[26]  Around the same time, Tolliver and Ryan responded to inquiries from students and parents by changing the course description in the 2003–2004 "Course of Study" to state that particularly

---

[20] Ex. 5 (Killian Dep. 193).

[21] Ex. 7 (Tolliver Dep. 23).  Such displays are generally kept up for approximately two or three weeks before they are replaced.  Ex. 11 (Tolliver Decl. ¶ 5).

[22] Ex. 5 (Killian Dep. 193).

[23] Ex. 51 (Darkroom E-mail at 2864).

[24] Ex. 29 (Branch Memo ¶ 2); Ex. 5 (Killian Dep. 84:16–86:12, 179:3–180:20).

[25] Ex. 5 (Killian Dep. 179:3–9).

[26] Ex. 10 (Ryan Decl. ¶ 24); compare Ex. 71 (Killian Dep. Ex. 36) with Ex. 72 (2002–2003 Course of Study at 7210); Ex. 11 (Tolliver Decl. ¶ 19).

motivated students could follow the AP 2-D Design curriculum.[27]  Plaintiff later complained that she should have been consulted before GDS changed Tolliver's course description.[28]

In June 2003, GDS's Educational Technology Coordinator, Bruce Ruble, sent an e-mail to the entire High School staff stating that he had archived to CD all teachers' files stored on the School's servers from the 2001–2002 academic year and older.  He asked all teachers to "clean up [their] space."[29]  About three months later, Ryan e-mailed Tolliver and Plaintiff to state that, although the limit was 0.75 Gigabytes per Art Teacher, Tolliver had 7.07 Gigabytes on the server and Plaintiff 9.54 Gigabytes.[30]  In that e-mail, Ryan stated that Ruble had requested that they archive their files by the end of the month so the School's servers could back up properly.[31] Ruble and Ryan subsequently expressed concerns to Plaintiff regarding her failure to do so.[32]

In January 2004, Tolliver and Ryan met with a visiting GDS alumna artist.[33]  Plaintiff knew in advance the time and location of the meeting; she failed to ask anyone if she could attend the meeting; and no one told her she was prohibited from attending the meeting. Nevertheless, Plaintiff did not attend.[34]  Instead, she claimed she had been excluded.

The following month, Plaintiff learned that Ryan's proposed new course, "Multicultural Art History,"[35] and Plaintiff's proposed new course, "Graphic Design and Publishing," had not

---

[27] Ex. 6 (Ryan Decl. ¶ 22); Ex. 11 (Tolliver Decl. ¶ 16).

[28] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 3).

[29] Ex. 82 (Killian Dep. Ex. 27).

[30] Ex. 65 (Killian Dep. Ex. 28).

[31] Ex. 65 (Killian Dep. Ex. 28).

[32] Ex. 5 (Killian Dep. 470–473).

[33] Ex. 5 (Killian Dep. 388–89).

[34] Ex. 5 (Killian Dep. 384–86, 390–93).

[35] Ex. 60 (Ryan History Proposal).

been approved by the School's administrative team for the 2004–2005 academic year due to "space and personnel limitations."[36]  (Plaintiff had changed the title of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)" without informing Tolliver or Ryan.[37])  Soon afterward, Plaintiff learned that Tolliver and Ryan had changed the title of Tolliver's existing graphic design course to "Graphic Design."[38]  Plaintiff expressed her concerns to Ryan, saying that she did not know there was a graphic design course on the curriculum, and that changing the course name to "Graphic Design" would create a potential conflict with her  recently-proposed "Graphic Design and Publishing" course. [39]  In response to Plaintiff's complaint, Ryan leaned forward in his chair and said, in a fairly loud and expressive voice, "Sharon, I can't bend down low enough to the ground to understand you."[40]

Plaintiff immediately complained to then-Director of Studies, Kevin Barr.[41] He suggested that the GDS Co-Directors of Diversity, Mariama Richards (an African-American woman), and Elizabeth Denevi (a Caucasian woman), who had just completed several days of training in mediation of disputes, use mediation to help the Art Department faculty understand each others' perspectives and work more cooperatively. [42]  The mediation stalled, however, when Plaintiff told Richards she wanted a paid leave of absence and Richards said that the School had no paid

---

[36] Ex. 76 (Killian Dep. Ex. 61).

[37] Ex. 10 (Ryan Decl. ¶ 32).

[38] Ex. 5 (Killian Dep. 359).

[39] Ex. 5 (Killian Dep. 359).

[40] Ex. 5 (Killian Dep. 360).

[41] See Ex. 5 (Killian Dep. 360–61).

[42] Ex. 8 (Richards Dep. 16); Ex. 9 (Denevi Dep. 60–61).

sabbatical program.[43]  Plaintiff then said that she did not know what the resolution to her

complaint should be, and that "she felt [Richards] was asking her to do [Richards'] job" for her.[44]

In July 2004, Plaintiff, through counsel, complained to GDS that she was subject to a

racially hostile work environment.[45]  In response, the School retained attorney Caryn Pass to

conduct an independent investigation into Plaintiff's allegations.[46]  In February 2005, while the

investigation was ongoing, Plaintiff informed Principal Kevin Barr that she was being denied

equal access to the digital cameras that had been purchased for use by students in Tolliver's Film

and Video course.[47]  Five days later, in response to Plaintiff's allegations, Barr directed

Buckwalter to provide Plaintiff and Ryan a key to the cabinet containing the cameras purchased

for Tolliver's course.[48]  He also directed Buckwalter to provide Ryan and Tolliver with keys to

cabinets to which only Plaintiff had access.[49]

On February 25, 2005, a few weeks after making her last complaint to Barr, Plaintiff

signed an employment contract to return to teach for the 2005–2006 academic year.[50]  By April,

Plaintiff had decided to relocate to Arkansas, and she placed her Falls Church, Virginia home on

the market.[51]  She moved to Arkansas with all of her personal belongings in July 2005,[52] in part,

---

[43] Ex. 8 (Richards Dep. 53).

[44] Ex. 8 (Richards Dep. 54).

[45] Ex. 27 (Letter from John Racin to Daniel Johnson (July 6, 2004)); Ex. 15 (Branch Decl. ¶ 25).

[46] Ex. 15 (Branch Decl. ¶ 26).

[47] Ex. 5 (Killian Dep. 138–39); Ex. 46 (Barr Dep. Ex. 2); Ex. 10 (Ryan Decl.¶ 19); Ex. 14 (Barr Decl. ¶ 7).

[48] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 4); Ex. 66 (E-mail from Barr to Buckwalter (Feb. 14, 2005)).

[49] Ex. 14 (Barr Decl. ¶ 9); Ex. 11 (Tolliver Decl. ¶ 15); Ex. 67 (E-mail from Barr to Killian (Mar. 15, 2005).

[50] Ex. 31 (Killian Dep. Ex. 59).

[51] Ex.  5 (Killian Dep. 629:13–32:2); Ex 42 (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

[52] Ex. 5 (Killian Dep. 632:3–14).

because she believed a potential settlement with GDS involving "the option of not coming back to school" was a "possibility."[53]

Pass reported her findings to the School in April 2005, stating that Plaintiff "was unable to articulate what she wanted or what changes the School or the art department could make that would resolve her issues." Pass concluded that Plaintiff's racial discrimination claims appeared to be unfounded and that Plaintiff "seemed to take every opportunity to construe a facially innocuous situation into something negative and somehow racially motivated."[54]

Plaintiff never returned to work at GDS; she eventually told the School she was suffering a medical disability, and she was applying for long-term disability benefits.[55] Although GDS asked Plaintiff when she would be able to report back to work, Plaintiff never told the School whether she intended to do so.[56] On September 1, 2005, the School informed Plaintiff that she would receive short-term disability benefits until approximately November 25, 2005, and that her "job restoration protections" under the District of Columbia Family Medical Leave Act of 1990 ("DCFMLA") would expire on December 16, 2005.[57] In light of her continued absence and her uncertain return date, the School had to find teachers to cover Plaintiff's classes, and hired as substitutes an African American teacher and an Asian American teacher.[58] Plaintiff brought this lawsuit on September 29, 2005.[59] Plaintiff's replacements continue to work in the GDS Art

---

[53] Ex. 5 (Killian Dep. 630:9–22).

[54] Ex. 26 (Pass Report, at 6850, 6854).

[55] Ex. 5 (Killian Dep. 638, 640–41, 655).

[56] Ex. 5 (Killian Dep. 687–89); Ex. 16 (Lindsey Decl. ¶ 14).

[57] Ex. 35 (Letter from Lindsey to Killian (Sept. 1, 2005)); Ex. 16 (Lindsey Decl. ¶ 13).

[58] Ex. 15 (Branch Decl. ¶¶ 30–32); Ex. 14 (Barr Decl. ¶ 14); Ex. 41 (E-mail from Barr to Webb (Sept. 7, 2005)).

[59] Ex. 1 (Compl.).

Department.[60]  On November 18, 2005, Plaintiff applied for long-term disability with the

School's insurance carrier,[61] and the School terminated Plaintiff's employment after her

DCFMLA protections expired on December 16, 2005.[62]

## II.    ARGUMENT

Plaintiff has advanced various claims under Section 1981 of the Civil Rights Act of 1866,

as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"), and the District

of Columbia Human Rights Act, D.C. Code § 2-1401.1 et seq. ("DCHRA").  Specifically,

Plaintiff contends that she was subject to (1) a racially hostile work environment; (2) wrongful

termination on account of her race; and (3) wrongful termination in retaliation for bringing this

lawsuit.  As demonstrated below, each of Plaintiff's claims fails as a matter of fact and law.

### A.    Standard of Review

The Court should grant summary judgment if there is no genuine issue of material fact

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); George v.

Leavitt, 407 F.3d 405, 410 (D.C. Cir 2005) (citing Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247 (1986)).  The non-moving party must present evidence that establishes a material issue

of fact and cannot avoid a motion for summary judgment by merely resting on the allegations in

her pleadings.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Summary judgment may be

granted for the defendant if the plaintiff's evidence presented "is merely colorable, or is not

significantly probative."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

Plaintiff cannot establish a material issue of fact based on "[v]ague, conclusory statements."

---

[60] Ex. 14 (Barr Decl. ¶ 14); Ex. 15 (Branch Decl. ¶¶ 30–32); Ex. 41 (E-mail from Barr to Webb (Sept. 7, 2005)).

[61] Ex. 5 (Killian Dep. 655); Ex. 38 (Killian Dep. Ex. 53).

[62] Ex. 16 (Lindsey Decl. ¶ 15).

Kalekiristos v. CTS Hotel Mgmt. Corp., 958 F. Supp. 641, 665 (D.D.C. 1997).  The Complaint

in this case is replete with conclusory allegations that certain events were due to unlawful

discrimination or retaliation, yet Plaintiff has produced no evidence sufficient to substantiate

such speculation.  Where, as here, the non-moving party fails to make a showing sufficient to

establish the existence of each element essential to that party's case and on which that party will

bear the burden of proof at trial, then summary judgment must be granted.  See Waterhouse v.

District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002) (citing Celotex, 477 U.S. at 322).

**B.     Standard for Evaluation of Employment Discrimination Claims**

When evaluating Section 1981 and DCHRA claims alleging race discrimination in

employment, courts apply the burden-shifting framework set forth in McDonnell Douglas Corp.

v. Green, 411 U.S. 792 (1973).  Tsehaye v. William C. Smith & Co., 402 F. Supp. 2d 185, 191

(D.D.C. 2005).  Under this standard, the employee first must establish a prima facie case of

discrimination by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  The

employer can then rebut the prima facie case by articulating its legitimate, non-discriminatory

reason for the challenged action.  Id.  If the employer meets this burden, then summary judgment

proceedings will involve a determination of whether a jury could infer discrimination from the

totality of the evidence.  See Tsehaye, 402 F. Supp. 2d at 192–93; Aka v. Washington Hosp. Ctr.,

156 F.3d 1284, 1289 (D.C. Cir. 1998).  As will be explained, the undisputed evidence in this case

shows that Plaintiff is unable to prove her claims.

**C.     Plaintiff Cannot Prove Hostile Work Environment.**

Plaintiff's argument that she has been subjected to a hostile work environment is clearly

lacking in legal merit.  To establish a claim for hostile work environment, an employee must

prove: (1) that she belongs to a protected group; (2) that she was subjected to unwelcome

harassment; (3) that the harassment was based on race; (4) that the harassment affected a term,

condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. <u>Jones v. Billington</u>, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), <u>aff'd</u>, No. 98-5014, 1998 U.S. App. LEXIS 15459 (June 30, 1998).[63]

A plaintiff may establish an inference that her treatment was based on her race "by demonstrating that she was treated differently from similarly-situated employees who are not part of [her] protected class." <u>George v. Leavitt</u>, 407 F.3d 405, 412 (D.C. Cir. 2005). To be similarly situated, the plaintiff must show that her employment situation was "similar in all relevant regards to those with whom [s]he seeks comparison." <u>Nurriddin v. Goldin</u>, 382 F. Supp. 2d 79, 97 (D.D.C. 2005); <u>see also</u> <u>Holbrook v. Reno</u>, 196 F.3d 255, 261 (D.C. Cir. 1999) ("all of the relevant aspects [must be] nearly identical to those" of her comparables.). **The mere fact that the plaintiff is African-American, however, is "too thin a reed to provide a basis for a reasonable fact-finder to conclude that the facially race- . . . neutral conduct at issue was motivated by improper discriminatory animus."** <u>Bryant v. Brownlee</u>, 265 F. Supp. 2d 52, 65 (D.D.C. 2003) (Bates, J.) (emphasis added). Without presenting "some greater indicator of rac[ial] bias," the fact that the plaintiff's race is unique in her workplace cannot substantiate a racially hostile work environment claim. <u>Id.</u>; <u>see also</u> <u>Singh v. U.S. House of Representatives</u>, 300 F. Supp. 2d 48, 57 (D.D.C. 2004) (citation omitted) ("[t]he mere fact that [plaintiff] was the sole non-Caucasian on the committee does not, without something more, suffice to make the necessary causal connection between [plaintiff's] race . . . and the alleged mistreatment."). Incidents unrelated to the plaintiff's race cannot be used to support a hostile work environment claim. <u>Roberson v. Snow</u>, 404 F. Supp. 2d 79, 97 (D.D.C. 2005).

---

[63] Courts analyze hostile work environment claims under both the DCHRA and Section 1981 together as if they were brought under Title VII. <u>See</u> <u>Villenes v. AFL-CIO</u>, 999 F. Supp. 97, 101 n.21 (D.D.C. 1998) (Urbina, J.).

In order for harassment to rise to the level of being so offensive as to be actionable as a matter of law, the workplace must be permeated with severe or pervasive discriminatory intimidation, ridicule, and insult. George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998)). When determining whether a work environment is so hostile or abusive as to be unlawful, courts examine the facts under the totality of circumstances, considering the frequency and severity of the harassment, whether it involves physical threats or humiliation, and whether it unreasonably interferes with the employee's work performance. George, 407 F.3d at 416 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In addition, the Supreme Court has circumscribed the scope of a hostile work environment so that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code[, and p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as [*inter alia*] the sporadic use of abusive language." Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998) (citation and quotations omitted). For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient to establish a hostile work environment claim. Id.

As will be demonstrated below, Plaintiff's case is no more than a list of "possible workplace slights compiled by a dissatisfied employee [that are] unsupported by the record, and in many cases expressly contradicted by it." Moore v. Ashcroft, 401 F. Supp. 2d 1, 34 (D.D.C. 2005) (Kollar-Kotelly, J.). She has alleged a laundry list of conclusory allegations against the School, none of which has any connection to her race, and taken together, are not sufficiently severe or pervasive to establish a hostile-work-environment claim. She can cite no specific incidents of conduct that a reasonable juror could conclude reflected racial bias, and she has

presented no evidence to support her bare allegation that similarly-situated white colleagues were treated more favorably than she.

Plaintiff has also not alleged a single example of an explicitly racial comment, a physical threat, or an incident involving intimidation or ridicule. Plaintiff's claims reflect no more than the "ordinary tribulations of the workplace," which the Supreme Court has cautioned do not qualify as a racially hostile work environment. Faragher, 524 U.S. at 788. For the majority of allegations, her basis for claiming that her alleged treatment was in any way unfavorable is completely illusory. She even admitted during her deposition that at least one allegation involved her "speculation [coming] back to bite [her],"[64] and for another, she may have been "facetious[]."[65] The remaining allegations do not even approach the level of hostility required to constitute a viable hostile work environment claim.

### 1.     Incidents Prior to September 30, 2001 are Time-Barred.

The statute of limitations is one year for DCHRA claims, Coleman v. Potomac Elec. Power Co., No. 04-7043, 2004 U.S. App. LEXIS 21820, at *2 (D.C. Cir. Oct. 19, 2004), and four years for racially hostile work environment claims brought pursuant to the 1991 amended version of Section 1981. Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383–84 (2004). Plaintiff filed her Complaint on September 29, 2005, so the statute of limitations will extend back to September 30, 2001.

Under the "continuing violation doctrine," however, a plaintiff may revive incidents outside of the statutory period that are part of the "same . . . hostile work environment," Nat''l R.R. Corp. v. Morgan, 536 U.S. 101, 122 (2002), unless the incidents alleged to have occurred

---

[64] Ex. 5 (Killian Dep. 220–21).

[65] Ex. 5 (Killian Dep. 292).

within the limitations period are merely "offensive without link to impermissible discrimination." Vickers v. Powell, No. Civ. 03-174, 2005 WL 3207775, at *33 (D.D.C. Nov. 21, 2005) (Kollar-Kotelly, J.) (unpublished). Defendant will demonstrate below that none of the incidents Plaintiff has alleged is sufficient to raise an inference of racial discrimination, and any alleged incidents occurring outside of the statutory period are time-barred.

If the Court does find that an incident within the statutory period raises an inference of racial motivation, however, the incidents falling prior to the statutory period may only be revived if the Court finds they are "sufficiently related to the incidents occurring within the statutory period as to form one continuous hostile work environment." Vickers, 2005 WL 3207775, at *32 (quoting Wheaton v. N. Oakland Med. Ctr., 130 Fed. Appx. 773, 787 (6th Cir. 2005)). Plaintiff can cite no specific incidents of hostile treatment prior to the limitations period that are sufficiently related to any incidents within the statutory period that raise an inference of racial discrimination to be considered part of the same continuing, hostile work environment claim.

## 2.     GDS Equitably Allocated Supplies, Equipment, and Technology.

In her Amended Complaint, Plaintiff alleges that her colleagues in the Art Department "denied her access to departmental space and resources on an equal basis."[66] Her complaint appears to involve allegations that she was denied (1) equal access to regular teaching supplies; (2) equal consideration for capital purchases; (3) equal access to computer technology; and (4) equal access to other equipment. When viewed in light of the undisputed facts, however, the record proves that, if anything, Plaintiff was treated at least as favorably as, if not **more** favorably than, her colleagues in the Art Department (Ryan and Tolliver).

---

[66] Ex. 2 (Am. Compl. ¶ 6).

14

a)        **Regular Teaching Supplies**

Regular supplies used by the Art Department are purchased out of the Art Department's "supply budget."[67]  Plaintiff has alleged that regular supplies were disproportionately and inequitably allocated among the members of the Art Department.[68]  Plaintiff has admitted, however, that the supply budget was divided in **three equal parts** among the three full-time Art Department faculty members after 2000.[69]  Plaintiff could not recall a request to purchase something out of her allocation of the supply budget ever being denied or rejected.[70]  Since Plaintiff consistently taught the fewest students in the Art Department,[71] she actually received the **most** money per student for regular supplies.[72]

While she admitted to receiving a "fair and equitable" allocation of the department's supply budget,[73] Plaintiff has alleged that her colleague Laura Tolliver would take and hide photographic supplies that had been purchased out of Plaintiff's allocation of the supply budget for use by Plaintiff's students.[74]  The only specific example she gave in her deposition was an incident in August 2003 when Tolliver had some photographic paper in her possession that Plaintiff had ordered.[75]  When Plaintiff did not find the specific paper in the box of photography

---

[67] Ex. 5 (Killian Dep. 611–12).

[68] Ex. 5 (Killian Dep. 605, 611–12).

[69] Ex. 5 (Killian Dep. 615–16, 622).  Debbie Haynes taught part-time in the Art Department during the 2000–2001 academic year.  That year, Debbie Haynes received an allocation of the supply budget that was one half of what Ryan, Tolliver, and Plaintiff each received.  This was in proportion to the number of courses she taught that year. Ex. 10 (Ryan Decl. ¶ 35).

[70] Ex. 5 (Killian Dep. 615–16); Ex. 10 (Ryan Decl. ¶ 12).

[71] Ex. 10 (Ryan Decl. ¶ 13); <u>see</u> <u>also</u> Ex. 5 (Killian Dep. 616:10–617:7).

[72] Ex. 5 (Killian Dep. 618).

[73] Ex. 5 (Killian Dep. 622).

[74] Ex. 5 (Killian Dep. 132).

[75] Ex. 5 (Killian Dep. 585–86).

supplies she received from the vendor, she e-mailed the vendor, who asked, "Did you physically open all the cases of paper?  One case had two boxes of glossy and two of silk in it.  Could Laura [Tolliver] have received part of your order?"[76]  Plaintiff approached Tolliver, who had received a shipment of photographic paper from the same vendor.  Tolliver replied, "I thought . . . that was actually my paper," and gave the paper to Plaintiff.[77]  Plaintiff promptly e-mailed the vendor, saying, "[T]hanks.  Laura found them in her order."[78]  Plaintiff is unable to explain how this race-neutral incident was an example of racial hostility toward her.  There is no similarly-situated teacher at the School, because, at that time, the only person with whom Tolliver shared photographic supplies was the Plaintiff.[79]

### b)    Capital Budget Items

Plaintiff has claimed that her "annual requests for capital budget items routinely go unapproved each year and are often belittled and challenged by Ryan [and] Tolliver."[80]  She has further claimed that, "on the other hand, Laura [Tolliver] has to only hint at a wish and her requests are approved."[81]  While it is true that it is routine for capital budget requests by Plaintiff to not be approved, this applies across the board to everyone in the Art Department.[82]  The key for any kind of discrimination claim would be to show that Plaintiff's requests were disproportionately denied or that she was required to meet more exacting standards in submitting requests; and if so, that this was on account of her race rather than for a legitimate non-racial

---

[76] Ex. 5 (Killian Dep. 589); Ex. 61 (Killian Dep. Ex. 63).

[77] Ex. 5 (Killian Dep. 132).

[78] Ex. 5 (Killian Dep. 591); Ex. 61 (Killian Dep. Ex. 63).

[79] Ex. 11 (Tolliver Decl. ¶ 24).

[80] Ex. 5 (Killian Dep. 263–64).

[81] Ex. 5 (Killian Dep. 290).

[82] Ex. 10 (Ryan Decl. ¶ 18); Ex. 15 (Branch Decl. ¶ 10).

reason.  See George v. Leavitt, 407 F.3d 405, 415 (D.C. Cir 2005).  Plaintiff is unable to state

such a claim.  Not only does she admit that she has no basis for claiming that her capital budget

requests were disproportionately denied,[83] but also she has no basis to claim that she was

required to meet more exacting standards than Tolliver in order to get her requests approved.[84]

    The Art Department's annual capital budget requests are sent to Ryan in his capacity as

chair of the Art Department.  He compiles the requests and passes them on to the GDS

administrative team.[85]  The administrative team then decides which capital budget requests will

be granted based on need and available funds.[86]  The School's administrative team is composed

of approximately 8–12 administrators, including at least two African American women, Mariama

Richards and Gloria Runyon.  Neither Ryan nor Tolliver has ever served on it.[87]  Plaintiff's

requests were on multiple occasions sent to Ryan well after the deadline for submission and

sometimes lacked required information, such as how the requested item would be used by

students.[88]  Nevertheless, Plaintiff cannot identify one example of a capital budget request that

Ryan (i) failed to pass on to the administrative team, (ii) unfairly characterized as a low priority,

or (iii) otherwise "belittled" to a member of the administrative team.[89]

---

[83] Ex. 5 (Killian Dep. 606–07) ("Q:  When you use the term disproportionate and inequitable, what is your base of comparison for disproportionate?  **A:  The capital budget allocations that were approved in the studio.**  Q:  What would you have considered a proportionate allocation for you? **A:  I don't know.**  Q:  You have no idea?  **A:  No.**")

[84] Ex. 5 (Killian Dep. 294).

[85] Ex. 10 (Ryan Decl. ¶ 15).

[86] Ex. 15 (Branch Decl. ¶ 9); Ex. 16 (Lindsey Decl. ¶ 5).

[87] Ex. 15 (Branch Decl. ¶ 12).  A third African American, Vincent Rowe, joined the administrative team in the 2004–2005 academic year.  Id.

[88] Ex. 5 (See Killian Dep. 278–85); Ex. 10 (Ryan Decl. ¶ 16).

[89] Ex. 10 (Ryan Decl. ¶ 17); see also Ex. 5 (Killian Dep 274–76).

Notably, for the 2004–2005 academic year, Plaintiff was granted $4,040 in capital budget purchases, Tolliver $4,050, and Ryan $3,000.[90]  Plaintiff has effectively admitted that this was an equitable allocation.[91]  For the 2005–2006 academic year, the School approved and purchased Plaintiff's request for $9,295.38 of equipment for her scheduled Film and Video class,[92] and another $3,346 requested by Tolliver for use by Plaintiff in the same course.[93]  GDS did not grant any other capital budget requests for use in the Art Department for that academic year.[94]

Plaintiff has not provided any specific evidence to support her allegation that her capital budget requests were unfairly denied or that she was required to meet more exacting standards in submitting her requests; she has certainly presented no evidence that would give rise to an inference that such denials were on account of Plaintiff's race.

### c)      Computer Technology

Plaintiff has alleged that while the administration and Ryan encouraged her to incorporate technology in her courses, "the means to do so [were] systematically withheld."[95]  Although Plaintiff never taught a "digitally-based" course or a course that was listed in the Course of Study as a "technology" course,[96] she used technology extensively in her courses as a matter of personal teaching style.[97]  Specifically, she claims that she was limited to a "minimum of computer space," by which she is referring to digital storage space on the School's servers and

---

[90] Ex. 5 (Killian Dep. 609–11); Ex. 62 (Killian Dep. Ex. 48).

[91] Ex. 5 (Killian Dep. 610).

[92] Ex. 5 (Killian Dep. 276); Ex. 63 (Killian Dep. Ex. 21).

[93] Ex. 64 (Purchase Order #7074); Ex. 16 (Lindsey Decl. ¶ 7).

[94] Ex. 16 (Lindsey Decl. ¶ 7).

[95] Ex. 5 (Killian Dep. 204–05).

[96] Ex. 5 (Killian Dep. 599–600).

[97] Ex. 5 (Killian Dep. 208) (admitting that her high use of technology was a "teacher specific thing.").

hard drives.  She alleges that her colleague Tolliver was allocated more such space[98] and that Tolliver "made clear [that] the 'Mac Lab' (and its suite of computers) were [sic] off limits to Plaintiff and her students when classes were underway, even if very few students were in the class at the time."[99]   Plaintiff acknowledged in her deposition, however, that she did not know if anybody else on the GDS faculty, including Tolliver, had "similar or comparable needs" for computer equipment.[100]  Accordingly, she is unable to demonstrate that she was treated less favorably than a similarly-situated person outside of her protected class.

With respect to digital storage space on the School's servers, the undisputed record shows that, if anything, Plaintiff used **more** space than Tolliver, and that Plaintiff far exceeded her allocation.[101]  Plaintiff's extensive use of the School's servers prevented the servers from backing up properly; and for that reason, Bruce Ruble reportedly came into Plaintiff's class on two occasions and expressed concern regarding her use of digital space on the School's servers. Ryan passed on Ruble's concerns to Plaintiff on one other occasion.[102]  Plaintiff contends that students witnessed each of these incidents; but, at her deposition, she could not name any such students; nor did she know if any students could corroborate any of these incidents.[103]

Plaintiff's basis for characterizing these interactions as racially hostile incidents is that she never saw Ryan or Ruble express similar concerns to Tolliver.[104]  Yet Plaintiff admitted that

---

[98] Ex. 5 (Killian Dep. 601–02).

[99] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 4).

[100] Ex. 5 (Killian Dep. 143:6–21); see also Ex. 18 (Ruble Decl. ¶ 3) (affirming that no one on the GDS faculty had "similar or comparable needs" to Killian).

[101] Ex. 18 (Ruble Decl. ¶ 4–7); Ex. 65 (Killian Dep. Ex. 28); see also Ex. 5 (Killian Dep. 340–41).

[102] Ex. 5 (Killian Dep. 470–473).

[103] Ex. 5 (Killian Dep. 472–74).

[104] Ex. 5 (Killian Dep. 474).

she does not recall ever being in Tolliver's class when Ryan came in to speak to her while she was teaching and that interference with the servers' backup process was a legitimate nonracial reason for Ryan's statement to her.[105]  Furthermore, the only e-mail communication in the record specifically regarding Plaintiff's failure to archive digital files was directed equally to **both** Plaintiff and Tolliver.[106]

Beyond the School's servers, Plaintiff also appears to object to the computers in the Mac Lab each having separate hard drives labeled "movie drives" that were designated for exclusive use by the Film and Video students, taught by Tolliver.[107]  This equipment is necessary for the Film and Video course to run because video files are exceptionally large—significantly larger than digital photographs or other files.[108]  Although Plaintiff did not have access to these Mac Lab "movie drives" initially, she and her students would have had exclusive or primary access to them during the 2005–2006 academic school year, because Plaintiff had been assigned to teach the Film and Video course that required their use.[109]  The hard drives in the Mac Lab, moreover, were not the only ones at the School designated exclusively for the use of a single teacher's students.  As Yearbook Supervisor, Plaintiff's own students had exclusive use of the hard drives in the School's "publications room."[110]

---

[105] Ex. 5 (Killian Dep. 339–41); see also id. at 475.

[106] Ex. 65 (Killian Dep. Ex. 28).

[107] See Ex. 5 (Killian Dep. 221–22); Ex. 11 (Tolliver Decl. ¶ 12) (affirming that these "movie drives" were for the exclusive use of the Film and Video students); Ex. 18 (Ruble Decl. ¶ 8) (same).

[108] Ex. 11 (Tolliver Decl. ¶ 12); Ex. 18 (Ruble Decl. ¶ 8).

[109] Ex. 5 (Killian Dep. 439).

[110] Ex. 18 (Ruble Decl. ¶ 9).  Also in connection with Plaintiff's supervision of the Yearbook, she received a $5,410 stipend for 2004–2005, which was the largest stipend at the School.  Ex. 80 (Killian Dep. Ex. 65); Ex. 5 (Killian Dep. 217).

In March 2004, Plaintiff had alleged that "when Laura Tolliver ran the Yearbook, space was not at such a premium."[111]  During her deposition, however, she characterized this allegation as her "speculation coming to bite [her]," because the difference was in the different production processes that Tolliver and Plaintiff used, and not the resources available to her.[112]  When Tolliver supervised the Yearbook, Yearbook students used a primarily manual process for the cropping and placement of the photographs that they shot.[113]  The computer needs of the Yearbook expanded when Plaintiff moved to a "digital process."[114]

The other aspect of Plaintiff's complaint with regard to computer technology is that she and her students were unfairly denied access to the Mac lab by Tolliver.  According to Plaintiff, Tolliver "made clear [that] the 'Mac Lab' (and its suite of computers) were [sic] off limits to Plaintiff and her students when classes were underway, even if very few students were in the class at the time."[115]  However, Plaintiff has not alleged that she and her students were completely denied access to the computers in the Mac Lab.  Plaintiff has admitted that her students were free to use the Mac Lab computers when the room was not reserved by a teacher,[116] and that Tolliver occasionally allowed Plaintiff's students to use the computers in the Mac Lab even though Tolliver was teaching there.[117]  It was only once or twice a year Tolliver that would say it was "inconvenient" to allow Plaintiff's students to work on computers in the

---

[111] Ex. 5 (Killian Dep. 220–21).

[112] Ex. 5 (Killian Dep. 220–21).

[113] Ex. 11 (Tolliver Decl. ¶ 13).

[114] Ex. 5 (Killian Dep. 220–21).

[115] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 4).

[116] Ex. 5 (Killian Dep. 223).

[117] Ex. 5 (Killian Dep. 298–99).

Mac Lab while class was in session.[118]  Tolliver's actions are facially race-neutral, and Plaintiff cannot establish that there was a similarly-situated teacher who was treated more favorably.

### d)    Access to Digital Video Cameras

Plaintiff has alleged that she was denied equal access to Art Department digital video cameras in February 2005.[119]  At the time Plaintiff complained, only Tolliver had a key to the cabinet with the cameras because they had been purchased for use in Tolliver's Film and Video course.[120]  Limiting access to the teacher in charge of that course was considered an effective method to reduce the chance that a camera might become lost or unavailable for student use.[121]  Plaintiff has admitted that, after she complained on February 9, Principal Kevin Barr directed "that each member of the Art Department have a key and equal access" to the storage cabinet a mere five days later.[122]  (Had Plaintiff honored her contract to teach at GDS during the 2005–2006 school year, she would have taught Film and Video and been in charge of those cameras herself, a result which Plaintiff admitted was "satisfactory."[123])  In the course of resolving Plaintiff's complaint to Barr, it was also discovered that Plaintiff had access to certain cabinets to which Ryan and Tolliver did not.  They were subsequently given keys to those cabinets.[124]

---

[118] Ex. 5 (Killian Dep. 298–99).

[119] Ex. 5 (Killian Dep. 138–39).

[120] Ex. 10 (Ryan Decl.¶ 19); Ex. 14 (Barr Decl. ¶ 7); Ex. 11 (Tolliver Decl. ¶ 14).

[121] Ex. 10 (Ryan Decl. ¶ 19); Ex. 14 (Barr Decl. ¶ 8); see Ex. 46 (Barr Dep. Ex. 2, at 123).

[122] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 4); see Ex. 5 (Killian 138–39); Ex. 66 (E-mail from Barr to Buckwalter (Feb. 14, 2005)).

[123] Ex. 5 (Killian Dep. 42–44).

[124] Ex. 14 (Barr Decl. ¶ 9); Ex. 11 (Tolliver Decl. ¶ 15); Ex. 67 (E-mail from Barr to Killian (Mar. 15, 2005)).

### 3.     GDS Made No Efforts to Undermine Plaintiff or Exclude Her from Departmental Decisions.

Plaintiff has made several allegations that Nick Ryan and Laura Tolliver unfairly excluded her from decisions affecting the Art Department and actively conspired to undermine Plaintiff's courses and extracurricular activities.  Specifically, she has alleged that (1) Ryan and Tolliver engaged in a "long-term campaign to wrest the AP courses from" the Plaintiff; (2) Ryan and Tolliver attempted to take supervision of the Art Magazine away from her; (3) Ryan and Tolliver unfairly denied her proposal for a new course; and (4) Ryan and Tolliver unfairly excluded her from the decision to rename Tolliver's graphic design course "Graphic Design." Plaintiff's allegations, however, are unfounded.  The record is devoid of evidence to show that Ryan or Tolliver attempted to undermine Plaintiff's teaching and extracurricular efforts. Plaintiff is also unable to articulate a reasonable evidentiary basis for her belief that it was unfair for her not to have been included in the two decisions about which she has complained.

#### a)     AP Studio Art

Plaintiff has stated that Ryan and Tolliver engaged in a "long term campaign to wrest the AP courses from [her . . . so they would] diminish and die," by incorporating AP curriculum into Tolliver's courses and actively advising students against taking Plaintiff's AP Studio Art course during the course registration process.[125]  There simply is no evidentiary basis for these claims.

Plaintiff has admitted that from the time this alleged "campaign" began in 2000 through the year in which she decided not to honor her teaching contract, she was the **only** teacher in the Art Department who requested to teach AP Studio Art, and the **only** member of the faculty

---

[125] Ex. 5 (Killian Dep. 494–500).

whom Ryan assigned to teach it.[126]  Plaintiff also admitted that in her annual evaluations, Ryan

consistently praised Plaintiff's work with the AP students and her efforts to develop AP teaching

skills over the summer.[127]  Ryan has never indicated that he was opposed to Plaintiff's teaching

AP Studio Art.[128]  Even now, it is Plaintiff's replacement, an African American woman, who

teaches AP Studio Art.[129]

    In addition, Plaintiff has alleged that Ryan and Tolliver guided students out of Plaintiff's

AP Studio Art as part of their "campaign,"[130] but she cannot recall the name of a single such

student.[131]  To the contrary, she acknowledged that there were at least two students to whom

Ryan affirmatively suggested they **should** take Plaintiff's AP Studio Art course in the 2004–

2005 academic year.[132]

    Plaintiff has also indicated her belief that when Ryan and Tolliver changed the course

description of Tolliver's "Advanced Technology for the Studio Arts" in the 2003–2004 "Course

of Study" to state that particularly motivated students could follow the AP 2-D Design

curriculum, they did so in order to lure students way from Plaintiff's course.[133]  Plaintiff

effectively admitted in her deposition, however, that her allegation is speculative.[134]  She has

---

[126] Ex. 5 (Killian Dep. 497–500).

[127] Ex. 5 (Killian Dep. 30–32).

[128] Ex. 10 (Ryan Decl. ¶ 20); see also Ex. 5 (Killian Dep. 503:19–504:2) (admitting that Plaintiff knew of no instance where Ryan communicated to anyone that he was opposed to Plaintiff teaching the AP studio art course.).

[129] Ex. 10 (Ryan Decl. ¶ 21); Ex. 14 (Barr Decl. ¶¶ 14–15).

[130] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 3).

[131] Ex. 5 (Killian Dep. 506).

[132] Ex. 5 (Killian Dep. 512–15); Ex. 68 (Killian Dep. Ex. 42); Ex. 69 (Killian Dep. Ex. 43).

[133] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 3); Ex. 5 (Killian Dep. 496–97).

[134] Ex. 5 (Killian Dep. 497).  In fact, the change was made in response to requests from students (and their parents) who wanted to know if they could submit an AP 2-D Design portfolio after taking multiple years of Tolliver's (continued…)

presented no other evidence to suggest that the change in course description was made to "lure" students away from Plaintiff's course.

That same year, Ryan, in consultation with Plaintiff, arranged to change the title of Plaintiff's "Advanced Placement Studio Art" course to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio, " in order to describe more precisely the names of the AP portfolios that the course prepared students to submit.[135]  Tolliver was not privy to any discussion regarding the change in Plaintiff's course title,[136] likely because Tolliver did not teach AP Studio Art.[137]

The changes to the course titles and descriptions demonstrated an overlap between Tolliver and Plaintiff's courses for those students wishing to submit AP 2-D Design portfolios, but Plaintiff's AP Studio Art course remained the only available option for students submitting AP 3-D Design or AP Drawing portfolios.[138]  There is no reason to believe that the number of AP Drawing and AP 3-D Design students alone would be insufficient to justify running Plaintiff's AP Studio Art course.[139]

---

"Advanced Technology for the Studio Arts" course. Ex. 6 (Ryan Decl. ¶ 22); Ex. 11 (Tolliver Decl. ¶ 16).  Tolliver did not consult Plaintiff because Plaintiff did not teach Tolliver's course.  Ex. 11 (Tolliver Decl. ¶ 18).

[135] Ex. 10 (Ryan Decl. ¶ 24); compare Ex. 71 (Killian Dep. Ex. 36) with Ex. 72 (2002–2003 Course of Study at 7210).  In May 2002, the College Board had expanded the "General Art" category of AP Studio Art portfolios to "2-D Design" and "3-D Design."  Ex. 10 (Ryan Decl. ¶ 24).

[136] Ex. 11 (Tolliver Decl. ¶ 19).

[137] See Ex. 10 (Ryan Decl. ¶ 25).

[138] Ex. 10 (Ryan Decl. ¶ 26).  Plaintiff cannot dispute that allowing some of Plaintiff's students to prepare AP Drawing portfolios and others to prepare AP 2-D Design portfolios meant that some students often would be left working without faculty supervision because the AP Drawing students would generally work in the Art Studio and the AP 2-D Design students would generally work in the photo lab or the Mac lab.  This problem did not generally exist with AP 2-D Design students in Tolliver's courses because all students in those courses generally worked in the same classroom space.  Ex. 10 (Ryan Decl. ¶ 33).

[139] Ex. 10 (Ryan Decl. ¶ 26).

### b)    Art Magazine

Plaintiff has alleged that in January 2004, Ryan and Tolliver "decided that they would take control of the Art Magazine, by taking an appointment with the director of the Alumni affairs office without even informing [the Plaintiff.]"[140]  Plaintiff continued to serve as the **only** faculty advisor to the Art Magazine through the time that she decided not to return to honor her 2005–2006 teaching contract with GDS.[141]  The Art Magazine has since ceased to exist.[142]

Plaintiff's version of the incident is as follows:  Susie Ryan, GDS Alumni Director, planned to meet with Plaintiff about publishing alumni art in the Art Magazine.  At a time when Plaintiff was away from school sick, Susie Ryan left phone messages for Plaintiff regarding scheduling a time to meet with a visiting GDS alumna artist, Rebecca Drobis.  Although Plaintiff could check her School phone messages from her desk or remotely from home, Plaintiff neglected to do so until the day after she returned to work.[143]  When she heard Susie Ryan's voice message, Plaintiff promptly returned it and learned that a meeting had been scheduled with the alumna for later that day.  Susie Ryan also informed Plaintiff of the time of the meeting.[144]

Plaintiff admits that, although she knew the time and place of the meeting **before** it happened, she did not ask anyone if she could attend the meeting; and no one told her she was prohibited from attending the meeting.[145]  Plaintiff stated in her deposition that the only person she spoke to regarding the meeting with Drobis was Susie Ryan, whose actions Plaintiff admitted

---

[140] Ex. 30 (Pass Talking Points Memo, at 2646)

[141] Ex. 10 (Ryan Decl. ¶ 27).

[142] Ex. 7 (Tolliver Dep. 11).

[143] Ex. 5 (Killian Dep. 381–86).

[144] Ex. 5 (Killian Dep. 390–91).

[145] Ex. 5 (Killian Dep. 392).

were "not inappropriate" and lacked racial motivation.[146]  Plaintiff also acknowledged that she

did not have "any interest in knowing what happened at the meeting."[147]  Notwithstanding

Plaintiff's decision to forgo the meeting, Drobis subsequently published some of her work in the

2004 Art Magazine,[148] which was the goal Plaintiff had initially established for her own

involvement with Susie Ryan.  Plaintiff is wholly unable to explain how this incident

demonstrates hostility toward her in any way, or provide any factual basis to suggest that

Tolliver or Ryan attempted to "take control of the Art Magazine" from Plaintiff.

**c)     Course Proposal**

Plaintiff believes that her proposed course, "Graphic Design and Publishing," was not

approved to be taught in the 2004–2005 academic year because of racial hostility by Ryan and

Tolliver, based on her "experience over the last 12 years."[149]  But she admitted in her deposition

that her belief that either of them played a role in the decision not to approve the course for

2004–2005 is entirely speculative.[150]  Plaintiff also admitted that Ryan was a strong supporter of

Plaintiff's proposed course as initially proposed, when it was titled, "Yearbook Publishing and

Advanced Independent Study Publishing (AISP)." [151]

After Plaintiff's initial submission and consultation with Ryan, then-Principal Paul Levy

suggested that she make some modifications to her proposal.[152]  In response to Levy's

---

[146] Ex. 5 (Killian Dep. 392–93, 407).

[147] Ex. 5 (Killian Dep. 393).

[148] Ex. 74 (2004 Art Magazine, at 2021, 2029–30).

[149] Ex. 5 (Killian Dep. 429–30).

[150] Ex. 5 (Killian Dep. 430) ("Q: So, you are just speculating when you suggest [Tolliver or Ryan] may have had some role in postponing your course; is that right?  **A:  I—yes.**").

[151] Ex. 5 (Killian Dep. 422).

[152] Ex. 5 (Killian Dep. 422–23); Ex. 75 (Killian Dep. Ex. 33).

27

suggestions, Plaintiff changed the name of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)" to "Graphic Design and Publishing."[153]  Even though Tolliver had been teaching a graphic design course for the last several years,[154] Plaintiff neither informed Tolliver of the name change nor discussed the possibility that Plaintiff's course, if approved, might create an overlap with Tolliver's existing class.[155]  Plaintiff also failed to discuss the name change with Nick Ryan, the Chair of her Department, despite the obvious appearance of potential redundancy in the Art Department's course offerings.[156]

Ryan had also proposed a new course for 2004–2005, entitled "Multicultural Art History," which was designed to "focus on the diversity of human expression and its evolution as evidenced in a broad array of world cultures."  According to Ryan's written course proposal, "[m]ulticulturalism would be the guiding principle" of the course, bringing attention to "the much overlooked art of Africa, the South Asian subcontinent, China, and Japan."  Central to the thesis of the course's curriculum would be a "conscious attempt to counter the bias toward a male-dominated European Civilization as the standard by which other cultures are measured."[157]

On January 20, 2004, Kevin Barr sent an e-mail to **both** Ryan and Plaintiff stating that although "**[b]oth** of the proposed Art courses generated considerable enthusiasm, . . . given current space and personnel limitations, [the School] will wait to offer them . . . ."[158]  Plaintiff cannot dispute that the decision not to approve Plaintiff's proposed course for the 2004–2005

---

[153] Compare Ex. 59 (Killian Course Proposal at 2649) with Id. at 2624.

[154] Ex. 5 (Killian Dep. 448–50); see, e.g., Ex. 73 (2001–2002 Course of Study).

[155] Ex. 11 (Tolliver Decl ¶ 20).

[156] Ex. 10 (Ryan Decl. ¶ 32).

[157] Ex. 10 (Ryan Decl. ¶ 29); Ex. 60 (Ryan History Proposal, at 7100).

[158] Ex. 76 (Killian Dep. Ex. 61).

academic year was made by the administrative team due to "space and personnel limitations."[159]
The administrative team at that time included two African Americans.[160]

### d)    Change in the Title of Tolliver's Course

Plaintiff complains that GDS excluded her from discussions regarding the decision to
change the title of "Technology for the Studio Arts" to "Graphic Design" for the 2004–2005
academic year.[161]   Technology for the Studio Arts, taught by Tolliver, had been described in the
Course of Study as an "introductory computer-based graphic design course" at least as far back
as 2001–2002.[162]   Plaintiff herself was assigned to teach this course for the 2005–2006 school
year,[163] but she failed to honor her teaching contract.   Ryan and Tolliver's decision to change the
title of "Technology for the Studio Arts" to "Graphic Design" was made, in part, to describe
more accurately the course's content; and, in part, to encourage higher female enrollment in the
course.[164]   Plaintiff admitted that she knew of no substantive changes to either the course
description or the curriculum of Tolliver's Technology for the Studio Arts course.[165]   Plaintiff is
unable to articulate why such an insignificant change in the course title of another faculty
member's course reflects racial hostility toward her, especially since she did not notify Tolliver
or Ryan when she changed the name of her own proposed course mere months earlier.

---

[159] Ex. 5 (Killian Dep. 429–30); Ex. 14 (Barr Decl. ¶ 6); Ex. 76 (Killian Dep. Ex. 61).

[160] Ex. 15 (Branch Decl. ¶ 12).

[161] Ex. 4 (Pl.'s Supplemental Answer to Interrogs. at 6).

[162] Ex. 73 (2001–2002 Course of Study); Ex. 72 (2002–2003 Course of Study); Ex. 71 (Killian Dep. Ex. 36).

[163] Ex. 5 (Killian Dep. 439).

[164] Ex. 10 (Ryan Decl. ¶ 31); Ex. 11 (Tolliver Dec. ¶ 22).

[165] Ex. 5 (Killian Dep. 450–52).

Plaintiff became aware in February 2004 of Tolliver's plan to change the name of her graphic design course to "Graphic Design."[166]  Plaintiff complained to Ryan, saying that she did not know there was a graphic design course in the curriculum, and that changing the course name to "Graphic Design" would create a potential redundancy with her recently proposed "Graphic Design and Publishing" course. [167]  The reality is that Tolliver's "Technology for the Studio Arts" course had actually been described as a graphic design course in the official "Course of Study" book for **at least three years**,[168] so any potential "redundancy" was created by Plaintiff herself.  Plaintiff even acknowledged in her deposition that "Technology for the Studio Arts" was, in substance and official description, a graphic design course.[169]  Moreover, when Plaintiff approached Ryan to complain about the name change, Ryan was unaware that the name of Plaintiff's proposed course had been changed to "Graphic Design and Publishing," and therefore unaware that the title of Plaintiff's proposed course might create confusion with regard to Tolliver's existing graphic design course.[170]

In response to Plaintiff's complaint, Ryan leaned forward in his chair and said, in a fairly loud and expressive voice, "Sharon, I can't bend low enough to the ground to understand you."[171]  Plaintiff twice repeated to Ryan, "You just said I can't bend low enough to the ground to understand you?" and went downstairs to report the incident to Director of Studies Kevin

---

[166] Ex. 5 (Killian Dep. 359); Ex. 4 (Pl.'s Supplemental Answer to Interrogs. 6).

[167] Ex. 5 (Killian Dep. 359).

[168] Ex. 72 (2002–2003 Course of Study); Ex. 73 (2001–2002 Course of Study); Ex. 71 (Killian Dep. Ex. 36).

[169] Ex. 5 (Killian Dep. 448–50).

[170] Ex. 10 (Ryan Decl. ¶ 32).

[171] Ex. 5 (Killian Dep. 360).  According to Ryan, he told Plaintiff, "Sharon, what do you want?  I can't lower myself enough to please you."  Ex. 6 (Ryan Dep. 77)  The statement reflected his frustration that despite his many attempts to accommodate her idiosyncratic desires in the face of Plaintiff's mistreatment of *him*, she could not be satisfied. Ex. 10 (Ryan Decl. ¶ 32).

Barr.[172]  Plaintiff has presented no evidence to suggest that she should have been consulted

before the name of Tolliver's graphic design course was changed to "Graphic Design," and no

evidence from which a reasonable juror could conclude that Ryan's reaction to her unjustified

complaint was racially motivated.

> **4.      The Alleged Isolated Incidents Do Not Support a Hostile Work Environment.**

In addition to the conditions discussed above, Plaintiff has made allegations of isolated

incidents that she believes contributed to a racially hostile work environment at the School:  (1)

the February 2002 incidents; and (2) Head of School Peter Branch's offer to provide Plaintiff

with a supportive recommendation for a job opening at another school.  These isolated incidents

do not evidence racial discrimination against plaintiff as an African American, nor do these

incidents otherwise provide support for plaintiff's claim of a racially hostile work environment.

> **a)      February 2002 Incidents**

In February 2002, Plaintiff came to the School over a weekend and replaced an art

display of the artwork of one of Tolliver's students with African American art from a local

gallery.[173]  That same weekend, the Black Culture Club ("BCC") hosted a dance at the School,

leaving paper banners advertising the dance hanging outside the art studio windows.[174]  When

Ryan arrived in the art studio on Monday morning, he and GDS high school Building Manager

George Buckwalter noticed that the paper banners had been damaged by the weather.  The two

of them removed the banners, brought them inside, and placed them on the floor.[175]

---

[172] See Ex. 5 (Killian Dep. 360–61).

[173] Ex. 5 (Killian Dep. 195–97).

[174] Ex. 6 (Ryan Dep. 27–28).

[175] Ex. 6 (Ryan Dep. 29); Ex. 0 (Ryan Account, at 2866); Ex. 10 (Ryan Decl. ¶ 7).

Plaintiff has alleged that Ryan "ripped down" the paper banners, and that it was an act of racial hostility because it demonstrated to Plaintiff that Ryan "would actually destroy children's work if I was associated with it and that works that involve children of color are especially vulnerable."[176] Plaintiff, however, did not actually witness Ryan and Buckwalter taking the paper banners down, and does not know if the banners, which had been left hanging outside over a weekend, had been ripped by wind or rain.[177] Plaintiff admitted that she did not inspect the paper banners very closely, "except [to] see that they were ripped . . . ."[178]

These paper banners were the type of banner advertising a School event that are normally disposed of soon after the event takes place, regardless of their physical condition. Most such banners are placed inside the School and are undamaged when Buckwalter takes them down and disposes of them.[179] These particular paper banners, by contrast, had been badly damaged by weather before Ryan and Buckwalter decided to dispose of them.[180]

At her deposition, Plaintiff could not identify a similarly-situated group whose banners were treated differently from the BCC's banners.[181] In other words, Plaintiff is unable to offer any evidence that materially disputes the School's position that it is normal practice to discard paper banners announcing an event that has already taken place.[182] Thus, Plaintiff's allegations are insufficient to raise any inference that Ryan's conduct was based on Plaintiff's race.

---

[176] Ex. 5 (Killian Dep. 186–87, 189).

[177] Ex. 5 (Killian Dep. 190).

[178] Ex. 5 (Killian Dep. 190).

[179] Ex. 17 (Buckwalter Decl. ¶ 3).

[180] Ex. 6 (Ryan Dep. 29); Ex. 0 (Ryan Account, at 2866); Ex. 10 (Ryan Decl. ¶ 7).

[181] Ex. 5 (Killian Dep. 188–90).

[182] For example, Plaintiff admitted that even though "[a]t least one student in the Black Culture Club saw the banners and signs they had made strewn on the floor . . . ," Ex. 30 (Killian Dep. Ex. 39, at 2642), there were no (continued…)

32

Plaintiff has also alleged that, later that day, Ryan expressed concern to her that she should have asked Tolliver's permission before replacing an art display of Tolliver's student. Plaintiff contends that Ryan "screamed" at her when he communicated this concern, but Plaintiff does not recall any witnesses to Ryan's alleged "screaming."[183]  Tolliver's student's work had been posted for only a few days before Plaintiff took it down.[184]  Such presentations of student art are typically maintained on display for approximately two or three weeks before they are replaced.[185]  The normal practice among the art teachers is to ask permission before replacing an art display, a practice that Plaintiff believes is "appropriate."[186]  Plaintiff admitted that, although she should have followed the normal practice on this occasion, she did not do so.[187]

Even later on that same Monday in February, after Tolliver and Killian had left for the day, Ryan discovered that the darkroom had been left in a messy condition.[188]  The next morning, Ryan sent an e-mail with the subject "My honest thoughts at 8am" to **both** Tolliver **and** Plaintiff, expressing his perception that Tolliver and Plaintiff were "not following through with their responsibilities," that he was "tired of babysitting this department, of mediating these petty battles, and of cleaning up."  He concluded his e-mail by saying, "[i]f this is the

African American students who complained to Killian that they had expected that the banners would be saved.  Ex. 5 (Killian Dep. 189).

[183] Ex. 5 (Killian Dep. 193–94).

[184] Ex. 7 (Tolliver Dep. 23).

[185] Ex. 11 (Tolliver Decl. ¶ 5).

[186] Ex. 5 (Killian Dep. 198–99).

[187] Ex. 5 (Killian Dep. 197).

[188] Ex. 0 (Ryan Account at 2867); Ex. 50 (Killian's Draft).

environment you **both** wish to work [sic] then I am sad for you **both**."[189]  In a draft reply to

Ryan's e-mail dated March 1, 2002, Plaintiff wrote:

> My honest thoughts at 8am Tuesday morning was [sic] not that I
> would be screamed at by my chairperson about how much **Laura
> and I** get on your nerves, about the state of the darkroom or
> anything else.  GDS has always shown kindness and understanding
> toward working parents and their children . . . .[190]

She followed up with an e-mail to Ryan about the BCC banners, Plaintiff's replacement of

Tolliver's art, and the messy darkroom.  In the e-mail, she asked Ryan to "reconsider [his]

**attitudes about Laura and I** [sic] occasionally tending to our children," and said that Plaintiff

herself "extend[s] Laura latitude when it comes to taking care of her children . . . . If this is not a

practice with which you agree, perhaps it bears further discussion amongst the three of us and if

necessary with Paul or others in administration."[191]

     At her deposition, Plaintiff stated that she believed her treatment was racially motivated

because it was Black History Month, and she speculated that Ryan had taken down Tolliver's

work before without asking.[192]  However, Plaintiff's own contemporaneous documents discussed

in the previous paragraph indicate that she believed at the time that Ryan's treatment stemmed

from his insensitivity to her **and** Tolliver's parental responsibilities, and no other reason.[193]

Tolliver identifies as Caucasian;[194] accordingly, it would be plainly illogical to infer that Ryan's

e-mail to Plaintiff and Tolliver was racially motivated.

---

[189] Id. (emphasis added).

[190] Ex. 50 (Killian Draft) (emphasis added).

[191] Ex. 51 (Darkroom E-mail, at 2864–65) (emphasis added).

[192] Ex. 5 (Killian Dep. 197).  Ryan and Tolliver affirm that they have always followed the normal practice.  Ex. 10 (Ryan Decl. ¶ 9–11); Ex. 10 (Tolliver Decl. ¶ 6–8).

[193] See Ex. 50 (Killian Draft); Ex. 51 (Darkroom E-mail, at 2864–65).

[194] Ex. 7 (Tolliver Dep. 8:17–18).

In addition, Plaintiff has alleged that sometime around February 2002, Ryan stated to the
Plaintiff that she would not "force [him] out on the street like [she] did Debbie Haynes" in a tone
of voice that Plaintiff considered inappropriate.[195]  Although Ryan was allegedly
"screaming . . . in and out of the art department office" at 8:00 a.m. on a school day, Plaintiff
could not identify any witnesses to corroborate that such a verbal confrontation occurred.[196]
More important, Plaintiff could articulate no reason why she believed this incident related to her
race; indeed, Plaintiff admitted that she interpreted his statement to mean that Ryan blamed
Plaintiff for the retirement of the former Art Department Chair, Debbie Haynes.[197]  Ryan's
alleged statement to Plaintiff that she would not "force [him] out on the street like [she] did
Debbie Haynes" is facially race-neutral, and Plaintiff has alleged no evidence from which any
reasonable juror could infer that the statement, or any other conduct by Ryan in February 2002,
was motivated by racial animus toward the Plaintiff.

### b)     Branch Recommendation

Sometime in the spring of 2004, Branch informed Plaintiff of a job opening in the Art
Department at the National Cathedral School and offered to write a supportive recommendation
for her.[198]  Branch made this recommendation shortly after Plaintiff had advised him that she was
unhappy at the School and wished to take time off from work, but that should could not afford to

---

[195] Ex. 29 (Branch Memo ¶ 2); Ex. 5 (Killian Dep. 179:3–180:20, 84:16–86:12).

[196] Ex. 5 (Killian Dep. 180–81).

[197] Ex. 5 (Killian Dep. 182).

[198] Ex. 15 (Branch Decl. ¶ 19); Ex. 5 (Killian Dep. 153:4–21).  Branch's wife, Paula Carreiro, is Head of School at
Beauvoir, the National Cathedral's Elementary School.  Ex. 15 (Branch Decl. ¶ 20).

do so without pay.[199]  No reasonable person could conclude, in light of Plaintiff's statement that she was unhappy at GDS, that Branch's offer was either hostile or an act of racial discrimination.

**5.    No Basis Exists for Proving "Institutional Efforts" by GDS Against People of Color.**

During her deposition, Plaintiff stated that she believed there might be "an institutional effort [by GDS] in a negative way having to do with people of color, faculty, students and all." Plaintiff believes this was "part of the milieu" of racial harassment of her as an employee of GDS.[200]  Plaintiff is fully aware that there is no "institutional effort" against people of color at GDS.  To the contrary, Plaintiff knows that the School's very mission is to promote diversity education, and it is peerless in its leadership in that area.

As Chair of the School's Diversity Task Force Recruitment and Retention Committee, a member of the School Board's Diversity Task Force, and a member of the Board's Equity and Justice Committee, Plaintiff saw the School's commitment to hiring talented faculty of color at work.[201]  While part of the Recruitment and Retention Committee, Plaintiff was able to suggest and implement a program that would increase recruitment of Howard University students in order to improve the number of faculty of color at the School.[202]  Plaintiff admitted in her deposition that over the course of her employment at GDS, both the number of African American faculty and their percentage of the total faculty at the high school increased.[203]

---

[199] Ex. 29 (Branch Memo at 2633) ("First, I can't afford to give up my job at GDS because I am currently the sole earner in my family and we have two children in school."); Ex. 15 (Branch Decl. ¶ 17); see also Ex. 5 (Killian Dep. 152:18–153:7).

[200] Ex. 5 (Killian Dep. 151–52).

[201] Ex. 5 (Killian Dep. 714–15).

[202] See Ex. 5 (Killian Dep. 458).

[203] Ex. 5 (Killian Dep. 458–60).

36

As an active participant in the Staff of Color group,[204] Plaintiff met regularly with members of the staff to talk about issues affecting their community, and she ordinarily attended the annual "Staff of Color Retreat" sponsored by the School.[205]  GDS is unusual as an independent School because it has two full-time Co-Directors of Diversity on its staff and has them working full-time as members of the senior administrative team.[206]  The Co-Directors of Diversity are recognized as national leaders in the field of diversity education.[207]

As a parent of two GDS graduates[208] and an occasional participant in the Parents of Students of Color,[209] Plaintiff is aware that the School offers a Students of Color Mentoring Program[210] and a myriad of affinity groups for students of color.[211]  Notably, the School also requires all High School freshman to enroll in a seminar focusing on diversity issues.[212]

The School's commitment to diversity is further evidenced by the School's willingness to provide extraordinary tuition support for Plaintiff's children, which totaled $126,000.  Plaintiff

---

[204] Ex. 5 (Killian Dep. 713).

[205] Ex. 12 (Richards Decl. ¶ 7); see, e.g., Ex. 52 (E-mail from Killian to Ryan (May 17, 2004); Ex. 53 (E-mail from Ryan to Clifford et al. (May 17, 2004)).

[206] Ex. 12 (Richards Decl. ¶ 2–3); Ex. 13 (Denevi Decl.¶ 3–4).

[207] Ex. 12 (Richards Decl. ¶ 5). Ex. 13 (Denevi Decl. ¶ 6).  The GDS Diversity office is closely aligned with the Chief Diversity Officer at Best Buy Incorporated.  The two Co-Directors are frequently asked by regional schools to come in for trainings for staff, parents, and students throughout the school year.  Id.  Denevi, for example, received a doctorate from the University of London in 2004 for her dissertation entitled "Racial Identity Development of Adolescents," and has published articles in Independent School Magazine on issues relating to multicultural diversity education.  Ex. 13 (Denevi Decl. ¶ 2).  Richards is a member of the National Association of Independent Schools' think tank for diversity, "Call to Action," and is a member of the Association of Independent Greater Washington Schools' steering committee for diversity.  Ex. 12 (Richards Decl. ¶ 5–6).

[208] Ex. 5 (Killian Dep. 56–57).

[209] Ex. 5 (Killian Dep. 715).

[210] Ex. 5 (Killian Dep. 711).

[211] Ex. 15 (Branch Decl. ¶ 24); see also, Ex. 5 (Killian at 711–16).  For example, GDS sponsors the Black Culture Club and Fusion, a club for multiracial students.  The School's affinity groups fall under the umbrella of Diversity Connections, a student club for promoting equity and justice.  Ex. 56 (GDS Website).

[212] Ex. 15 (Branch Decl. ¶ 24).  Plaintiff also cannot dispute that from 1996 to 2006, African American students at GDS increased from approximately 150 to 180, or approximately 14% to 17%.  Ex. 15 (Branch Decl. ¶ 23).

received tuition discounts worth over $78,500, nearly $2,000 in free after-school care, and approximatley $45,500 in need-based financial aid so her two children could attend GDS. GDS retroactively granted Plaintiff $9,719 in need-based financial aid in January 2002 for the 2001–2002 academic year after learning that Plaintiff's husband had lost his job. The School subsequently granted Plaintiff approximately $24,700 in financial aid for her younger child's final two years at GDS.[213]

As a member of the School's faculty, Plaintiff experienced how the School actively encourages faculty to incorporate the School's mission to promote diversity into course curricula. For example, during an October 3, 2003 In Service Day small group session, Plaintiff and Tolliver discussed strategies to help students of color feel more connected to GDS.[214] At the October 15, 2003 In Service Day meeting of the GDS Arts Faculty, Ryan, Tolliver, Plaintiff, and others discussed the ways in which racial issues affect the classroom.[215]

The School's commitment to integrating diversity into its curriculum is also reflected in its course proposal forms. These forms ask faculty to describe how their proposed courses will "further the School's commitment to multiculturalism and diverse learning styles."[216]

In her annual evaluations, Plaintiff also received frequent praise for her work promoting the multicultural mission of the School. The **only** comment Plaintiff recalled receiving from GDS regarding her extensive participation in diversity activities was "supportive of her

---

[213] Ex. 16 (Lindsey Decl. ¶ 4); see also Ex. 81 (Killian Dep. Ex. 11).

[214]  See Ex. 57, (In Service Day Notes (Oct. 3, 2003)); Ex. 11 (Tolliver Decl. ¶ 10).

[215] Ex. 11 (Tolliver Decl. ¶ 11); Ex. 58 (In Service Day Notes (Oct. 15, 2003)).

[216] Ex. 14 (Barr Decl. ¶ 4); see, e.g., Ex. 59 (Killian Course Proposal, at 2626); Ex. 60 (Ryan History Proposal at 7100).

participation and contributions to GDS' diversity efforts."[217]  For example, in her 2003–2004

evaluation, Ryan praised Plaintiff for choosing an African American student model for a painting

project, "represent[ing] the diversity of the school."  Ryan said Plaintiff's choice made "a

powerful statement to what GDS stands for."[218]  In her 2004–2005 evaluation, Ryan praised

Plaintiff for "frequently and effectively" including "multicultural perspectives" in her projects.[219]

### 6.    Caryn Pass's Independent Investigation Confirms the Absence of a Racially Hostile Work Environment.

In the summer and fall of 2004, Plaintiff and her counsel provided to the School and

Caryn Pass several documents and some testimony describing in detail why Plaintiff believes she

was a victim of racial harassment at the School.  Ms. Pass is the attorney the School had retained

to conduct an independent investigation into Plaintiff's allegations.[220]  Plaintiff's written

allegations and her statements to Pass further reinforce the reality that Plaintiff has no basis for

claiming that any alleged treatment she received at GDS was on account of her race or is

sufficiently severe or pervasive to constitute a hostile work environment.

On July 6, 2004, Plaintiff's counsel, John Racin, sent a letter to Daniel Johnson, an

attorney who had previously represented the School, in which Racin outlined Plaintiff's basis for

believing she was subject to a racially hostile work environment at GDS.[221]  In the letter, Racin

described Plaintiff's "unhappy experience at GDS."  Racin indicated that "the straw that broke

the back of [Plaintiff's] resistance to the conclusion racism was indeed at work" was the "verbal

---

[217] Ex. 5 (Killian Dep. 715:20–716:7).

[218] Ex. 24 (Killian Dep. Ex. 6); see also Ex. 23 (Killian Dep. Ex. 5).

[219] Ex. 25 (Killian Dep. Ex. 7).

[220] Ex. 15 (Branch Decl. ¶ 26).

[221] Ex. 27 (Letter from John Racin to Daniel Johnson (Jul. 6, 2004)); Ex. 15 (Branch Decl. ¶ 25).

abuse" from Ryan, who "indicat[ed] he could not 'bend low enough to the ground' to understand what [Plaintiff] was saying (while gesturing with his hand towards the floor)."[222]

In response to Racin's letter, the School retained Caryn Pass, an attorney from Krupin O'Brien LLC, to conduct an independent investigation into Plaintiff's complaints.[223]  As part of her investigation, Racin sent Pass a copy of a document Plaintiff had prepared for meeting she had with Head of School Peter Branch in March 2004 to discuss her unhappiness at the School.[224]  The document that Plaintiff prepared for her meeting with Branch provided specific examples of the reasons for her dissatisfaction with the environment at GDS.[225]

Plaintiff prepared a five-page document of talking points for her subsequent meeting with Pass.[226]  The allegations in this document substantially overlap those in the document she prepared for her meeting with Branch.[227]

On April 11, 2005, after reviewing Plaintiff's documents, interviewing her, and otherwise conducting an extensive independent investigation,[228] Pass reported her findings to GDS.  The findings stated, in part, as follows:

> [W]e asked her why she thought certain alleged treatment was a result of race.  **Her response was that she could not think of any other reason for why she would be treated in this manner.**  She

---

[222] Id. at 2795.

[223] Ex. 15 (Branch Decl. ¶ 26).

[224] Ex. 28 (Letter from Racin to Pass (Aug. 27, 2004) (attaching Killian Talking Points for Branch (Mar. 12, 2004)). The attached memorandum is substantially the same as the document discussed in Plaintiff's deposition.  See Ex. 29 (Branch Memo).

[225] See Ex. 29 (Branch Memo).

[226] Ex. 5 (Killian Dep. 466–67); see Ex. 30 (Pass Talking Points Memo).

[227] See Ex. 30 (Pass Talking Points Memo).

[228] Ex. 19 (Memorandum from Caryn G. Pass & Grace H. Lee to Joe Sellers (Apr. 11, 2005) (hereinafter "Pass Report"), at 6837).  Pass also met with Peter Branch, Mariama Richards, Elizabeth Denevi, Kevin Barr, Laura Tolliver, Tom Yoder, Bruce Ruble, Nick Ryan, Paul Levy, Debbie Haynes, and Demeisha Lee.  Id.

> regularly compared herself with other staff who she stated did not
> get the same treatment and yet when it was explained to her why
> the treatment may have been different, it was difficult for her to
> consider the explanation. . . . **[W]e found [Ryan's] rebuttals to
> [Plaintiff's] claims of verbal or other types of mistreatment to
> be detailed and credible.  Further, his efforts to make policies
> that would assure equal allocation of resources and treatment
> of all staff reflected a commitment to make the relationship
> with Ms. Killian productive and professional.**"[229]

In the Report, Pass described how Plaintiff "was unable to articulate what she wanted or what

changes the School or the art department could make that would resolve her issues," and

concluded by expressing Pass's belief that Plaintiff's claims of racial discrimination were

unfounded.  Pass further stated that Plaintiff "seemed to take every opportunity to construe a

facially innocuous situation into something negative and somehow racially motivated." [230]

Nineteen months after Pass submitted her report, Plaintiff has made no further progress in

providing specific evidence from which a reasonable jury could conclude that her allegedly

unfair treatment in the Art Department at GDS was on account of her race, or that her allegations

are sufficiently severe or pervasive to constitute a hostile work environment claim.  In the

cautionary words of the Supreme Court, this is a classic example of a plaintiff straining to

transform "the ordinary tribulations of the workplace" into a hostile environment discrimination

claim.  Faragher, 524 U.S. at 788.  Accordingly, Plaintiff's hostile work environment claims

against the School should be dismissed.

### D.     Plaintiff Cannot Demonstrate Wrongful Termination Based on Her Race.

Wrongful termination claims under Section 1981 and the DCHRA are evaluated using

the familiar burden-shifting McDonnell Douglas framework.  Murray v. Gilmore, 406 F.3d 708,

---

[229] Id. at 6854 (emphasis added).

[230] Ex. 26 (Pass Report, at 6850, 6854).

713 (D.C. Cir. 2005) (Section 1981); see also Perkins v. District of Columbia, 769 F. Supp. 11,

14 n.3 (D.D.C. 1991) (DCHRA).  A plaintiff may meet her prima facie burden by showing she is

a member of a protected class, was otherwise qualified for the position, was discharged by the

defendant, and was replaced by another employee.  See id.  Once the employer has rebutted the

prima facie case by articulating its legitimate, non-discriminatory reason for the termination,

summary judgment proceedings will involve a determination of whether a jury could infer

discrimination from the totality of the evidence.  See Tsehaye, 402 F. Supp. 2d at 192–93.

When a plaintiff alleges wrongful termination on account of her race and she is replaced

by a member of the same race, however, this cuts strongly against any inference of

discrimination.  Murry v. Gilmore, 406 F.3d 708, 715 (D.C. Cir 2005).  In this case, GDS

terminated Plaintiff's employment because she failed to appear to teach her class for more than

16 consecutive weeks of work due to an alleged "long-term disability" and she refused to tell the

School when she would be available to return to work.[231]  In order to meet the School's

responsibilities to its students, GDS filled Plaintiff's vacant position in the Art Department with

an African American teacher and an Asian American teacher.[232]  Both individuals are still

teaching in the Art Department at GDS.[233]

After signing a contract in February 2005 to teach for the 2005–2006 academic year,[234]

Plaintiff decided to relocate to Arkansas in April 2005, and she sold her home in July 2005.[235]

She did so, in part, because she believed a settlement agreement with GDS including "the option

---

[231] See Ex. 5 (Killian Dep. 655, 687–89); Ex. 16 (Lindsey Decl. ¶¶ 14–15).

[232] Ex. 15 (Branch Decl. ¶¶ 30–32); Ex. 14 (Barr Decl. ¶ 14); Ex. 41 (E-mail from Barr to Webb (Sept. 7, 2005)).

[233] Ex. 14 (Barr Decl. ¶ 14).

[234] Ex. 31 (Killian Dep. Ex. 59).

[235] Ex. 5 (Killian Dep. 629:13–32:2); Ex 42 (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

of not coming back to school" was a "possibility."[236] Plaintiff failed to notify the School that she

was in Arkansas until late September 2005, after the School was unable to deliver a certified-

mail letter to the Tysons Corner, VA address Plaintiff had provided.[237]

On or about Friday, August 26, 2005, a few days before she was supposed to return to

work for "staff week," Plaintiff left a voice message at the School saying that she could not

return for staff week because of health reasons.[238] She left this message even though she had not

seen a doctor for treatment of her alleged symptoms from the time they "first appeared" in April

2005, until September 7, 2006, **two weeks after** she told the School she could not return to work

because of health reasons.[239]

On September 1, 2005, the School sent a letter informing Plaintiff that she would receive

short-term disability benefits until approximately November 25, 2005, and that her "job

restoration protections" under the District of Columbia Family Medical Leave Act ("DCFMLA")

would expire on December 16, 2005.[240] Plaintiff eventually told the School that she was

physically incapable of working because of a medical disability and applied for long-term

disability benefits on November 18, 2005.[241] The School asked Plaintiff to inform them when

---

[236] Ex. 5 (Killian Dep. 630:9–22) ("Q: And how long before April 14, 2005, did you, or you and your husband decide that you were going to move to Arkansas? **A: Not long, not long before that.** Q: Was it a few days, or a few weeks, or a month? **A: No. You know, GDS and I were in what were to have been some negotiations. They had asked me previously about the option of not coming back to school as one of the things that I, that could be part of a settlement agreement. So, it wasn't unusual that that could be a possibility. We were, the market was great, and we sold our little house.**") (emphasis added).

[237] Ex. 16 (Lindsey Decl. ¶ 11); see also Ex. 77 (Letter from Branch to Killian (Sept. 27, 2005)).

[238] Ex. 5 (Killian Dep. 637:5–638:6, 640–41, 687:3–14); Ex. 14 (Barr Decl. ¶ 10); Ex. 15 (Branch Decl. ¶ 27); Ex. 32 (E-mail from Barr to Killian (Aug. 30, 2005)).

[239] Ex. 5 (Killian Dep. 668:15–669:6, 672:22–673:5); see Ex. 38 (Killian Dep. Ex. 53, at 2899) (describing the "nature of illness and when symptoms [contributing to Plaintiff's long-term disability] first appeared.").

[240] Ex. 35 (Letter from Lindsey to Killian (Sept. 1, 2005)); Ex. 16 (Lindsey Decl. ¶ 13).

[241] Ex. 5 (Killian Dep. 655); Ex. 38 (Killian Dep. Ex. 53). Notably, although she claimed in her April 2005 disability symptoms resulted from "ongoing incidents" at GDS, Ex. 5 (Killian Dep. 658–59), the last alleged (continued…)

she would be able to report back to work, but she never told the School whether she intended to return to work at all.[242]  Upon the expiration of her "job restoration protections" under the DCFMLA, the School terminated Plaintiff's employment.[243]

Under these circumstances, no reasonable juror could infer that the School's legitimate, non-discriminatory reason for terminating Plaintiff's employment was pretextual, or that it was somehow an attempt to shield racially discriminatory motives.  For these reasons, her wrongful termination claims against the School should be dismissed.

### E.    Plaintiff's Abandonment of Her Teaching Job Does Not Constitute Retaliation.

Retaliation claims are also "governed by the McDonnell Douglas burden-shifting scheme."  Carney v. Am. Univ., 151 F.3d 1090, 1094 (D.C. Cir. 1998).  To establish a prima facie case of retaliation, Plaintiff must prove the following elements:  (1) she engaged in protected activity under the statute; (2) she suffered from an adverse ultimate employment decision; (3) and there is a causal link between the protected activity and the ultimate employment decision.  Id.; see Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir. 2003).  There is no dispute that Plaintiff satisfied the first two elements of a retaliation claim when she filed this lawsuit in September 29, 2006 and was subsequently terminated in December 2006.  But she can point to no evidence demonstrating that the School's legitimate, nondiscriminatory reason for terminating her was a pretext to shield retaliatory motives.  On September 1, 2005, GDS informed Plaintiff that her "job restoration protections" for an inability to work due to prolonged

---

"incident" (involving access to cameras) had been resolved on February 14, 2005.  See Ex. 5 (Killian Dep. 657:4–662:19, 677:10–684:14).

[242] Ex. 5 (Killian Dep. 687–89); Ex. 16 (Lindsey Decl. ¶ 14).

[243] Ex. 16 (Lindsey Decl. ¶ 15).

illness under the DCFMLA would expire on December 16, 2005.[244]  Plaintiff filed her complaint

on September 29, 2005,[245] and subsequently filed for long-term disability,[246] without ever

informing the School that despite her long-term disability, she somehow planned to return to

work.[247]  In short, she abandoned her contractual commitment to return to GDS.  For that reason,

Plaintiff's retaliation claims against the School should be dismissed.

## III.     CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant its Motion

for Summary Judgment and dismiss Plaintiff's lawsuit.

Dated:  November 10, 2006

Respectfully submitted,


 /s/ Timothy R. Clinton
Thomas S. Williamson, Jr. (D.C. Bar No. 217729)
Timothy R. Clinton (D.C. Bar No. 497901)
**COVINGTON & BURLING LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 778-5218 - Fax

**COUNSEL FOR DEFENDANT**

---

[244] Ex. 35 (Letter from Lindsey to Killian (Sept. 1, 2005)); Ex. 16 (Lindsey Decl. ¶ 13).

[245] Ex. 1 (Compl.).

[246] Ex. 5 (Killian Dep. 655); Ex. 38 (Killian Dep. Ex. 53).

[247] Ex. 5 (Killian Dep. 687–89); Ex. 16 (Lindsey Decl. ¶ 14); Ex. 15 (Branch Decl. ¶ 33).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SHARON KILLIAN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )    **Civil Action No. 05-1925 (EGS)** |
| | ) |
| **GEORGETOWN DAY SCHOOL,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## <u>ORDER</u>

AND NOW, upon consideration of Defendant's Motion for Summary Judgment, it is hereby ORDERED that Defendant's Motion is GRANTED.  Accordingly, all of Plaintiff's claims are dismissed with prejudice.

_____

HONORABLE EMMET G. SULLIVAN

_____

DATE

## <u>CERTIFICATE OF SERVICE</u>

I, Timothy R. Clinton, hereby certify that on this date I caused a true and correct copy of the

above document, Defendant's Motion for Summary Judgment and Defendant's Memorandum of

Points and Authorities in Support of its Motion for Summary Judgment, to be served upon

Plaintiff's attorney as follows:

**<u>BY E-MAIL AND ECF:</u>**
John Racin
1721 Lamont Street, N.W.
Washington, DC  20010
202 265-2516
awjrlaw@erols.com

Dated: November 10, 2006

 /s/ Timothy R. Clinton
Timothy R. Clinton