# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,              )

                  )

       **Plaintiff,**     )

                  )

    **vs.**               )       **Civil Action No. 05-1925 (EGS)**

                  )

GEORGETOWN DAY SCHOOL,    )

                  )

                  )

       **Defendant.**    )

## APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## VOLUME I

Exhibit   1.        Complaint

Exhibit   2.        Amended Complaint

Exhibit   3.        Plaintiff's Answer to Interrogatories

Exhibit   4.        Plaintiff's Supplemental Answer to Interrogatories (Feb. 10, 2006).

Exhibit   5.        Killian Deposition

Exhibit   6.        Ryan Deposition

Exhibit   7.        Tolliver Deposition

Exhibit   8.        Richards Deposition

Exhibit   9.        Denevi Deposition

Exhibit   10.       Ryan Declaration

# E X H I B I T   1

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

SHARON KILLIAN

V.

GEORGETOWN DAY SCHOOL

**SUMMONS IN A CIVIL CASE**

Cʌ

CASE NUMBER   1:05CV01925

JUDGE: Emmet G. Sullivan

DECK TYPE: Employment Discrimination

DATE STAMP: 09/29/2005

TO: (Name and address of Defendant)

Georgetown Day School
4530 MacArthur Blvd., N.W.
Washington, D.C.   20007

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

John P. Racin
Law Office of John P. Racin
1721 Lamont Street, N.W.
Washington, D.C.   20010
202.265.2516

an answer to the complaint which is served on you with this summons, within _____20_____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

NANCY M. MAYER-WHITTINGTON                SEP 2 9 2005

CLERK                                                          DATE

_Marion D. Higgins_
(By) DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Nancy M. Mayer-Whittington
Clerk of Court

## NOTICE OF RIGHT TO CONSENT TO TRIAL
## BEFORE A UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in the delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to trial of your case by a United States Magistrate Judge. By statute, 28 USC § 636(c), Fed.R.Civ.P. 73 and Local Civil Rule 73.1, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

## WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Civil Rule 16.3 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Counsel for the plaintiff has been furnished a copy of the "Consent to Proceed Before a United States Magistrate Judge for all Purposes" form. If and when the form is executed, your response should be made to the Clerk of the United States District Court only.

## WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned to all purposes to a Magistrate Judge.

CO-942A
Rev. 7/99

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN                          )
2227 N. College Avenue                  )
Fayetteville, AR 72703                  )
479.442.9312                            )
                                        )
            Plaintiff                   )        CASE NUMBER  1:05CV01925
                                        )
        v.                              )        JUDGE: Emmet G. Sullivan
                                        )
GEORGETOWN DAY SCHOOL                   )        DECK TYPE: Employment Discrimination
4530 MacArthur Blvd. N.W.               )
Washington, D.C. 20007                  )        DATE STAMP: 09/29/2005
202.295.6200                            )
                                        )
            Defendant.                  )
_____)

## COMPLAINT FOR DAMAGES
(Equal Employment Opportunity)

### JURISDICTION AND VENUE

1. This is an action to vindicate the right against racial discrimination in employment
secured by the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of
1991 ("Section 1981"), and the District of Columbia Human Rights Act, D.C. Code §1401.01, et seq.
("DCHRA"). The Court has original jurisdiction of Plaintiff's Section 1981 claims pursuant to
28 U.S.C. §1343(3); and supplemental jurisdiction of Plaintiff's DCHRA claims pursuant to 28
U.S.C. 1367(a).

2. Venue is proper in the District of Columbia pursuant to 28 U.S.C. §1391(b), in that the
Georgetown Day School engaged in the practices at issue and has its principal place of business in
the District of Columbia

PARTIES

3. Plaintiff Sharon Killian ("Plaintiff" or "Killian" hereafter) is an adult African American female employed as a faculty member in the Art Department of the High School operated by the Georgetown Day School at 4200 Davenport Street, N.W., Washington, D.C. 20016.

4. Defendant Georgetown Day School (or "GDS") is an educational institution located in the District of Columbia and an "employer" within the meaning of the DCHRA.

FACTS

5. Killian has been employed by GDS since 1993. Throughout the period of her employment, Killian and other African American faculty, staff and students have routinely been accorded terms and conditions at the School different from, and less favorable than, the treatment routinely accorded similarly situated white faculty, staff and students.

6. Killian has been subjected to regular and pervasive hostile treatment based on race: White colleagues who have been and are invariably polite and respectful in dealings with other white persons have treated and addressed her in rude and demeaning fashion, treated her as very junior member of the faculty throughout her tenure in the Art Department, denied her access to departmental space and resources on an equal basis, denied her consideration for course assignments on an equal basis, discouraged students from enrolling in her classes in the apparent hope there would be insufficient enrollments to justify them, wrongfully accused her of misconduct in handling departmental property, and otherwise denied her equal terms and conditions of employment as a faculty member and colleague at GDS on the basis of her race.

7. Killian has reported regular, pervasive and racially motivated hostile treatment to administrators and others at GDS, who have failed to intervene or otherwise prevent or ameliorate such hostile treatment despite repeated and specific notice of the same.

8. As a direct and proximate result of regular, pervasive and racially motivated hostile treatment as aforesaid, Killian has suffered racial discrimination, physical injury and mental distress, such that she was forced her to use leave prescribed by policy and practice at GDS, and delay her

return for the 2005-06 academic year.

9. Upon information and belief, regular, pervasive and racially motivated hostile treatment of the kind Killian has suffered at GDS would detrimentally affect any reasonable person of African American heritage.

10. Upon information and belief, Defendant GDS, through its officers, agents and/or employees has engaged in a regular, pervasive and racially motivated pattern and practice of hostile treatment against African American employees and students; and has otherwise denied African American employees and students equal terms and conditions of employment and student status on the basis of race.

CLAIMS

COUNT I:  Section 1981 (Racial Discrimination)

11. Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-10.

12. Defendant, through its officers, agents and/or employees, has subjected Plaintiff to regular, pervasive and racially motivated hostile treatment, and otherwise denied equal terms and conditions of employment on the basis of race, thereby denying Plaintiff the right to make and enforce contracts on the same basis and with the same freedom enjoyed by white citizens of the United States, all in violation of Section 1981.

13. Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

14. As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered racial discrimination, physical injury and mental distress.

COUNT II: DCHRA (Racial Discrimination)

15.  Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1-10.

16.  Defendant, through its officers, agents and/or employees, has subjected Plaintiff to regular, pervasive and racially motivated hostile treatment, and otherwise denied equal terms and conditions of employment on the basis of race, in violation of the DCHRA.

17.  Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

18. As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered racial discrimination, physical injury and mental distress.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

A. That the practices complained of herein be adjudged, decreed and declared to be violative of the rights secured by Section 1981 and the DCHRA.

B. That Plaintiff be awarded compensatory damages in an amount to be established at trial.

C. That Plaintiff be awarded punitive damages in an amount to be established at trial.

D. That the Court grant Plaintiff reasonable attorneys' fees and costs.

E.  That the Court grant such other and further relief as it may deem just and proper.

LAW OFFICE OF JOHN P. RACIN

John P. Racin Bar   No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202  265-2516

Attorney for Plaintiff
Sharon Killian

- 4 -

<u>JURY DEMAND</u>

Plaintiff requests trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

_____
John P. Racin

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

# INITIAL ELECTRONIC CASE FILING
# ORDER

Subsequent filings in this case must be made electronically using the Court's Electronic Case Filing System (ECF) pursuant to Local Rule 5.4.

ORDERED that counsel shall:

- Submit in paper, the original and copy of the complaint/notice of removal/petitions for habeas corpus and any accompanying papers. Additionally, litigants are hereby required to provide those filings in PDF Format on a floppy disk or CD-Rom compact disk. The disk should be clearly labeled with the case number (if known) and the name of the parties. If unable to deliver the filing on a disk at the time of the new case filing, counsel should e-mail the initiating document and accompanying papers to dcd_cmecf@dcd.uscourts.gov by the close of business the day the new case was filed. Failure to supply electronic copies of the new case in a timely manner, will result in the attorney's name being added to the attorney non-compliant list and shared with the Court's ECF Judge's Committee. Regardless of what option, counsel chooses the complaint/notice of removal and accompanying papers must come to the Court as PDF documents. Each exhibit to the new case shall be in a separate PDF file. Failure to submit PDF versions of the complaint/notice of removal and other documents will delay the opening of the case in ECF.

- Register, if not previously registered, to become an electronic filer by completing and returning the enclosed ECF Registration Form found on the Court's Website at (www.dcd.uscourts.gov). The login and password are case specific and can be used for all cases.

- All subsequent filings must be made electronically.

- Have a PACER (Public Access to Court Electronic Records) account, in order to view dockets and documents. Call 1-800-676-6856 or visit www.pacer.psc.uscourts.gov for additional information.

- Schedule a training class at the Courthouse by going to the Court's ECF Internet Website (www.dcd.uscourts.gov/ecf.html). Also, filing instructions and an interactive tutorial can be found at this Internet Website.

SULLIVAN, J. EGS

---
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## ELECTRONIC CASE FILES
## Attorney/Participant Registration Form

## LIVE SYSTEM

This form shall be used to register for an account on the Court's Electronic Case Files (ECF) system and to subscribe to the ECF EMail (Listserver) notification service. Registered attorneys and other participants will have privileges both to electronically submit documents, and to view and retrieve electronic docket sheets and documents for all cases assigned to the Electronic Case Files system. Listserver subscribers receive email messages whenever the Court wishes to electronically notify ECF registrants of pertinent ECF information.

The following information is required for registration:

First Name/Middle Initial/Last Name    _____

Last four digits of Social Security Number    _____

DC Bar ID#.    _____

Firm Name    _____

Firm Address    _____

Voice Phone Number    _____

FAX Phone Number    _____

Internet E-Mail Address    _____

By submitting this registration form, the undersigned agrees to abide by the following rules:

1.    This system is for use only in cases permitted by the *U.S. District Court for the District of Columbia*. It may be used to file and view electronic documents, docket sheets, and notices. Please visit the Court's ECF Internet, www.dcd.uscourts.gov, website to schedule training.

2.    Pursuant to Federal Rule of Civil Procedure 11, every pleading, motion, and other paper (except list, schedules, statements or amendments thereto) shall be signed by at least one attorney of record or, if the party is not represented by an attorney, all papers shall be signed by the party. An attorney's/participant's password issued by the court

combined with the user's identification, serves as and constitutes the attorney's/participant's signature. Therefore, an attorney/participant must protect and secure the password issued by the court. If there is any reason to suspect the password has been compromised in any way, it is the duty and responsibility of the attorney/participant to immediately notify the court. This should include the resignation or reassignment of the person with authority to use the password. The Court will immediately delete that password from the electronic filing system and issue a new password.

3.  An attorney's/participant's registration will not waive conventional service of a summons and complaint, subpoena, or other judicial process; submit the client to the jurisdiction of the Court; or operate as a consent to accept service of pleadings, documents, and orders in actions in which such attorney/participant has not entered an appearance. An attorney's/participant's registration will constitute a waiver in law only of conventional service of other non-process pleadings, documents, and orders in the case. The attorney/participant agrees to accept, on behalf of the client, service of notice of the electronic filing by hand, facsimile or authorized e-mail.

4.  Upon receipt of your login and password, you are strongly encouraged to change your password, which may be done through the Utilities function, to a name easily recalled. **You may be subjected to a fee, should the Clerk's Office have to create a new password for you, or alternatively, you may be required to appear in person to receive your new password.**

5.  Attorneys who are active members of the bar of this Court, or government attorneys who are employed or retained by the United States, or who have been permitted to proceed *pro hac vice*, must file pleadings electronically.

Please return this form to:

U.S. District Court for the District of Columbia
Attn:   Attorney Admissions
333 Constitution Avenue NW, Room 1825
Washington, DC  20001

Or FAX to:

Peggy Trainum
U.S. District Court for the District of Columbia
(202) 354-3023

Applicant's Signature

| Full Last Name | Initial of First Name | Last 4 Digits SS# |
| --- | --- | --- |

# E X H I B I T   2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN              )
                                     )
                Plaintiff          )
                                       )
                v.                 )         Civil Action No. 05-1925 (EGS)
                                       )
GEORGETOWN DAY SCHOOL     )
                                       )
                 Defendant.      )
_____ )

CONSENT MOTION FOR LEAVE
TO FILE FIRST AMENDED COMPLAINT

Plaintiff, through undersigned counsel, respectfully requests pursuant to Rule 15(a) of the

Federal Rules of Civil Procedure and the Amended Scheduling Order entered January 30, 2006

(permitting amendments to pleadings on or before March 3, 2006), that this Court grant leave to file

the attached First Amended Complaint.

Respectfully submitted,

LAW OFFICE OF JOHN P. RACIN

  /s/ _____
John P. Racin Bar   No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202  265-2516

Attorney for Plaintiff
Sharon Killian

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN          )
                                   )
            Plaintiff      )
                                   )
            v.            )      Civil Action No. 05-1925 (EGS)
                                   )
GEORGETOWN DAY SCHOOL   )
                                   )
           Defendant.    )
_____ )

### FIRST AMENDED COMPLAINT
(Equal Employment Opportunity)

### JURISDICTION AND VENUE

1.  This is an action to vindicate the right against discrimination in employment secured by the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), and the District of Columbia Human Rights Act, D.C. Code §1401.01, et seq. ("DCHRA"). The Court has original jurisdiction of Plaintiff's Section 1981 claims pursuant to 28 U.S.C. §1343(3); and supplemental jurisdiction of Plaintiff's DCHRA claims pursuant to 28 U.S.C. 1367(a).

2.  Venue is proper in the District of Columbia pursuant to 28 U.S.C. §1391(b), in that the Georgetown Day School engaged in the practices at issue and has its principal place of business in the District of Columbia

### PARTIES

3.  Plaintiff Sharon Killian ("Plaintiff" or "Killian" hereafter) is an adult female person of color who until December 2005 was employed as a faculty member in the Art Department of the High School operated by the Georgetown Day School at 4200 Davenport Street, N.W., Washington, D.C. 20016.

4.  Defendant Georgetown Day School ("GDS" or "School") is an educational institution located in the District of Columbia and an "employer" within the meaning of the DCHRA.

– 2 –

FACTS

5.   Killian was employed as a faculty member in the Art Department of the High School at GDS until December 2005. Throughout the period of her employment, Killian and other faculty, staff and students of color were routinely accorded terms and conditions at the School different from, and less favorable than, the treatment routinely accorded similarly situated white faculty, staff and students.

6.   Killian was subjected to regular and pervasive hostile treatment based on race:  White colleagues in the Art Department, including especially the Chairs of the Department, who were invariably polite and respectful in dealings with other white persons, treated and addressed Plaintiff in rude and demeaning fashion, treated her as very junior member of the faculty throughout her tenure in the Art Department, denied her access to departmental space and resources on an equal basis, denied her consideration for course assignments on an equal basis, discouraged students from enrolling in her classes in the apparent hope there would be insufficient enrollments to justify them, wrongfully accused her of misconduct in handling departmental property, and otherwise denied her equal terms and conditions of employment as a faculty member and colleague at GDS on the basis of her race.

7.   Killian reported regular, pervasive and racially motivated hostile treatment to administrators and others at GDS, who failed to intervene or otherwise prevent or ameliorate  such racially abusive and hostile treatment despite repeated and specific notice of the same.

8.   As a direct and proximate result of regular, pervasive and racially motivated hostile treatment from white colleagues as aforesaid, Killian suffered racial discrimination, physical injury and mental distress, such that she was unable to return to School for the 2005-06 academic year and forced  to take leave prescribed by GDS policy and practice.

9.   On September 29, 2005, Killian filed this law suit alleging in part that during the course of her employment she had been victimized by a regular, pervasive and racially motivated hostile treatment.

10.  Killian was afforded short-term disability leave based on her inability to return to work, leave which she exhausted in November 2005.   Her application for long-term disability remained pending as of March 3, 2006.

11.  In December 2005, at a time when administrators at the School were aware Killian's application for long-term disability remained pending, and when her potential ability to return to the faculty remained unknown to them, GDS gave notice that Killian's tenure on the School's "employee roster" was at an end.  Upon information and belief, this notice was tantamount to termination, effective on or about December 16, 2005.

12.  Upon information and belief GDS terminated Killian's employment as aforesaid in order to retaliate against and punish her for initiating this judicial proceeding to challenge treatment at the School she reasonably believed to be discriminatory on the basis of race.

13.  Upon information and belief, any reasonable person of color subjected to the regular, pervasive and racially motivated hostile treatment afforded Killian during the course of her employment at GDS would find the discriminatory terms and conditions of employment so utterly intolerable that she or he would be unable to continue working at the School.

14. Upon information and belief, any reasonable person of color subjected to the regular, pervasive and racially motivated hostile treatment afforded Killian would have been detrimentally affected by the experience.

15.  Upon information and belief, Defendant GDS, through its officers, agents and/or employees has engaged in a regular, pervasive and racially motivated pattern and practice of hostile treatment against African American employees and students; and has otherwise denied African American employees and students equal terms and conditions of employment and student status on the basis of race.

## CLAIMS

### COUNT I:  Section 1981 (Racial Discrimination)

16.  Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through15.

17.  Defendant, through its officers, agents and/or employees, has subjected Plaintiff to regular, pervasive and racially motivated hostile treatment, otherwise denied equal terms and conditions of employment, subjected her to a constructive discharge and formal termination, all on the basis of race, thereby denying Plaintiff the right to make and enforce contracts on the same basis and with the same freedom enjoyed by white citizens of the United States, in violation of Section 1981.

18.  Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

19.  As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered racial discrimination, economic and physical injury, and mental distress.

### Count II: Section 1981 (Retaliation)

20.  Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 15.

21.  Defendant, through its officers, agents and/or employees, terminated Plaintiff at a time when her potential ability to return to work was unknown to administrators at the School, and did so in order to retaliate against and punish her for initiating this judicial proceeding to challenge treatment at the School she reasonably believed to be discriminatory on the basis of race, in further violation of Section 1981.

22.  Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

– 5 –

23.  As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered retaliation, economic and physical injury, and mental distress.

COUNT III:  DCHRA (Racial Discrimination)

24.  Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 15.

25.  Defendant, through its officers, agents and/or employees, has subjected Plaintiff to regular, pervasive and racially motivated hostile treatment, otherwise denied equal terms and conditions of employment, subjected her to a constructive discharge and formal termination on the basis of race, all in violation of the DCHRA.

26. Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

27. As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered racial discrimination, economic and physical injury and mental distress.

COUNT IV: DCHRA (Retaliation)

28.  Plaintiff realleges and incorporates herein by reference the allegations contained in paragraphs 1 through 15.

29.  Defendant, through its officers, agents and/or employees, terminated Plaintiff at a time when her potential ability to return to work was unknown to administrators at the School, and did so in order to retaliate against and punish her for initiating this judicial proceeding to challenge treatment at the School she reasonably believed to be discriminatory on the basis of race, in further violation of the DCHRA.

30.  Defendant, through its officers, agents and/or employees, has engaged in discriminatory and unlawful employment practices which have been intentional, deliberate, willful, repetitive, systematic, and conducted in callous disregard of Plaintiff's rights.

31. As a direct and proximate result of Defendant's conduct as aforesaid, Plaintiff has suffered retaliation, economic and physical injury, and mental distress.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

A. That the practices complained of herein be adjudged, decreed and declared to be violative of the rights secured by Section 1981 and the DCHRA.

B. That Plaintiff be awarded compensatory damages in an amount to be established at trial.

C. That Plaintiff be awarded punitive damages in an amount to be established at trial.

D. That the Court grant Plaintiff reasonable attorneys' fees and costs.

E. That the Court grant such other and further relief as it may deem just and proper.


LAW OFFICE OF JOHN P. RACIN


/s/
_____
John P. Racin Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C. 20010
202 265-2516

Attorney for Plaintiff
Sharon Killian


JURY DEMAND

Plaintiff requests trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.


/s/
_____
John P. Racin


– 7 –

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHARON KILLIAN | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1925 (EGS) |
| | ) | |
| GEORGETOWN DAY SCHOOL | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PLAINTIFF'S ANSWERS TO DEFENDANT
GEORGETOWN DAY SCHOOL'S INTERROGATORIES

<u>GENERAL OBJECTIONS</u>

A.  Plaintiff will respond in the manner set forth in this introductory portion of her answers and objections and in the manner described in the specific answers and objections set forth below.  Where Plaintiff has not answered or responded in the manner requested by Defendant's definitions, interrogatories or document requests, Plaintiff objects to those definitions, interrogatories or document requests to the extent that they exceed the obligations imposed by the Federal Rules of Civil Procedure.

B.  Under the Federal Rules of Civil Procedure, Defendant is not entitled to information, documents or other facts to the extent that such information, documents or other facts are or is protected against disclosure by attorney-client privilege or the work product doctrine.

C.  The following definitions are usages that apply to all answers and responses contained herein:

An objection to an interrogatory or any portion thereof on the ground that it is "not relevant", shall mean that the information, or other thing(s) requested are not relevant to the

subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence.

An objection to an interrogatory or any portion thereof on the ground that it is "overly broad", shall mean that the interrogatory encompasses information, document(s) or other thing(s) vaguely or imprecisely defined.

An objection to an interrogatory or any portion thereof on the ground that it is "burdensome", shall mean that the requested documents or other information cannot be located by a reasonable search and the time and effort required to locate and/or produce information or the other thing(s) requested in light of the marginal relevance of the information sought and that injustice would result if Plaintiff were required to comply with such document request.

D.  In preparing the responses to these interrogatories, Plaintiff has conducted a thorough and reasonable search of where information pertaining to Defendants' inquiries and requests are most likely to be found.  To the extent any interrogatory seeks to require Plaintiff to take any further action, plaintiff objects to such interrogatory on the ground that it is overly broad and burdensome.

E.  In addition to these general objections, Plaintiffs may note certain additional specific objections in response to various interrogatories.

<u>ANSWERS TO INTERROGATORIES</u>

1.  Identify all judicial and administrative proceedings (besides the present action), whether civil or criminal in nature, in which Plaintiff has been a party or witness, including, but not limited to, arrests, prosecutions, and civil litigation alleging discrimination based on ethnicity, race, or color.

Answer:   Plaintiff has never been a party or witness to any instance of "arrest[],

prosecution[], [or other] civil litigation alleging discrimination based on ethnicity, race of color."

Plaintiff objects to furnishing identifying information pertaining to a judicial proceeding to

which she was a party involving divorce and related domestic relations issues on the ground such

information is not relevant.

2.   Identify all admissions or statements against interest concerning this lawsuit that you

believe were made by Defendant's current and former agents or employees, and with respect to

each such admission or statement against interest:  (a) describe the content or subject matter of

the admission or statement against interest; (b) identify the person who communicated the

admission or statement against interest; ( c) state the actual or approximate date of such

admission or statement; (d) identify all persons to whom the admission or statement against

interest was communicated; and (e) identify all documents that concern the admission or

statement against interest.

Answer:  The former principal of the upper school (Paul Levy) has described himself as a

"recovering racist" in settings both public and private.   Plaintiff does not recall the actual or

approximate dates Levy described himself as a "recovering racist", or the identity of all persons

to whom the statement was made.  Her attorney reported the "recovering racist" phrase Levy has

used to describe himself in correspondence of July 6, 2004 to Daniel Johnson, an attorney at

McKenna, Long & Aldridge in Washington, D.C. ("the Johnson correspondence").   Mariama

Richards and Elizabeth Denevi, who were serving as Diversity Coordinators at the Georgetown

Day School ("GDS" or "the School") at the time, told Plaintiff some time during the Spring of

2004 that colleagues in the Art Department, including especially its Chair Nick Ryan, were

approaching issues of racial equity from positions of "white privilege."  This statement was also

reported in the Johnson correspondence.   Caryn Pass, retained by the School some time during

2004 to investigate Plaintiff's allegations of racism, reported to Plaintiff's attorney in or about

March 2005 that GDS officials acknowledged the existence of "institutional racism" at the

School.  The acknowledgment of "institutional racism" at the School was memorialized in

correspondence of March 7, 2005 from Plaintiff's attorney to Ms. Pass.

   3.  Identify all persons who have any knowledge that concerns the allegation in paragraph

5 of the Complaint that since 1993 Plaintiff "and other African American faculty, staff and

students have routinely been accorded terms and conditions at the School different from, and less

favorable than, the treatment routinely accorded similarly situated white faculty, staff and

students."

   Answer:   Plaintiff believes the persons identified in Plaintiff's Rule 26(a)(1) Initial

Disclosure Statement as having knowledge with respect to existence of a racially hostile work

and study environment, and with respect to Plaintiff's efforts to gain relief from discriminatory

treatment, should have knowledge concerning the subject allegations.  She believes the

following persons should have such knowledge as well:

   Rosa Grillo
   Grillo & Company
   733 15th St., NW
   Suite 310
   Washington, DC 20005
   202.638-4900

   Michael Martin
   c/o Joseph Koonz, Esq.
   Koonz McKenney
   2001 Pennsylvania Avenue, N.W.
   Suite 450
   Washington, D.C.  20006
   202.659.5500

-4-

Mr. & Mrs. Michael Martin
c/o Joseph Koonz, Esq.
Koonz McKenney
2001 Pennsylvania Avenue, N.W.
Suite 450
Washington, D.C.  20006
202.659.5500

Vernese Edghill
[no current contact information]

Lisa Rauschart
Georgetown Day School
4200 Davenport Street, N.W.
Washington, D.C.  20016

Maribel Prieto
Georgetown Day School
4200 Davenport Street, N.W.
Washington, D.C.  20016

Veronica Ampey
Georgetown Day School
4200 Davenport Street, N.W.
Washington, D.C.  20016

Anike Oliver
Georgetown Day School
4200 Davenport Street, N.W.
Washington, D.C.  20016

Guillermo Valerin
[no current contact information]

4.  Identify all persons who have any knowledge that concerns the allegation in paragraph

6 of the Complaint that Plaintiff "has been subjected to regular and pervasive hostile treatment

based on race."

Answer:  Plaintiff believes the persons identified in Plaintiff's Rule 26(a)(1) Initial

Disclosure Statement as having knowledge with respect to claims of  a racially hostile work and

study environment, and with respect to Plaintiff's efforts to gain relief from discriminatory

-5-

treatment, should have knowledge concerning the subject allegations.  She believes the following persons should have such knowledge as well:   Lisa Rauschart, Vernese Edghill, Maribel Prieto.

    5.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues who have been and are invariably polite and respectful in dealings with other white persons have treated and addressed [Plaintiff] in rude and demeaning fashion."

    Answer:   Plaintiff believes the following persons should have knowledge concerning the subject allegation: Nick Ryan, Laura Tolliver, Peter Branch, Paul Levy, Kevin Barr, Vernese Edghill, John Burghardt, Mariama Richards, Elizabeth Denevi, and Rosa Grillo.

    6.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] treated [Plaintiff] as very [sic] junior member of the faculty throughout her tenure in the Art Department."

    Answer:  Nick Ryan, Laura Tolliver, Peter Branch, Paul Levy, Kevin Barr, Vernese Edghill, John Burghardt, Mariama Richards, Elizabeth Denevi, Lisa Rauschart, and Maribel Prieto.

    7.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] denied [Plaintiff] access to departmental space and resources on an equal basis."

    Answer:   See persons identified in Answer to Interrogatory Number 6, in addition to Bruce Ruble and Tom Yoder.

    8.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] denied [Plaintiff] consideration for course

-6-

assignments on an equal basis."

Answer: <u>See</u> Answer to Interrogatory Number 7.

9.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] discouraged students from enrolling in [Plaintiff's] classes in the apparent hope there would be insufficient enrollments to justify them."

Answer: Nick Ryan, Laura Tolliver, Paul Levy, Kevin Barr, Mariama Richards and Elizabeth Denevi..

10.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] wrongfully accused [Plaintiff] of misconduct in handling departmental property."

Answer:   Plaintiff believes the following persons should have knowledge concerning the subject allegation:   Nick Ryan, Laura Tolliver, Tom Yoder, Kevin Barr, Caryn Pass.

11.  Identify all persons who have any knowledge that concerns the allegation in paragraph 6 of the Complaint that "[w]hite colleagues . . . [have] otherwise denied [Plaintiff] equal terms and conditions of employment as a faculty member and colleague at GDS on the basis of her race."

Answer: <u>See</u> Answer to Interrogatory Number 7.

12.  Identify all persons who have any knowledge that concerns the allegation in paragraph 7 of the Complaint that Plaintiff "has reported regular, pervasive and racially motivated hostile treatment to administrators and others at GDS, who have failed to intervene or otherwise prevent or ameliorate such hostile treatment despite repeated and specific notice of the same."

Answer: <u>See</u> Answer to Interrogatory Number 7.

-7-

13.  Identify all persons who have any knowledge that concerns the allegation in paragraph 8 of the Complaint that Plaintiff has suffered "physical injury and mental distress" including, but not limited to, the identity of each doctor, psychiatrist, psychologist, therapist, hospital, clinic, or other health care provider that has observed, examined, diagnosed, or treated Plaintiff since May 1, 2001.

Answer: Charles Killian, Lindsay Booker, Lisa Rauschart, Maribel Prieto, Dr. Maryann Giordano, Suite 405, 611 South Carlin Springs Road, Arlington, VA  22204, 703.379.5757, Dr. Fran Pearson, 1216 W. Lakeridge Drive, Fayetteville, AR  72703, 479.973.4331.

14.  Identify all persons who have any knowledge that concerns the allegation in paragraph 8 of the Complaint that Plaintiff "was forced her [sic] to use leave prescribed by policy and practice at GDS, and delay her return for the 2005–06 academic year."

Answer: Charles Killian, Lindsay Booker, Dr. Fran Pearson.

15.  Identify all persons who have any knowledge that concerns the allegation in paragraph 9 of the Complaint that "regular, pervasive and racially motivated hostile treatment of the kind Killian has [allegedly] suffered at GDS would detrimentally affect any reasonable person of African American heritage."

Answer:   Plaintiff objects to Interrogatory Number 15 on the ground that it is overly broad and would be unduly burdensome to answer, in that she believes virtually every African American, and many non-African American people in this country and elsewhere have knowledge concerning the allegation.

16.  Identify all persons who have any knowledge that concerns the allegation in paragraph 10 of the Complaint that GDS "has engaged in a regular, pervasive and racially motivated pattern and practice of hostile treatment against African American employees and

students; and has otherwise denied African American employees and students equal terms and conditions of employment and student status on the basis of race."

Answer: <u>See</u> Answer to Interrogatory Number 3.

17.  Identify all communications Plaintiff has had with any other person or entity (including, but not limited to, Defendant's current and former agents or employees, and Plaintiff's current and former colleagues, friends, and relatives) concerning any of the claims, events, facts, circumstances, or damages alleged or referred to in the Complaint, and for each such communication specify the claims, events, facts, circumstances, or damages discussed.

Answer: Plaintiff objects to Interrogatory Number 17 on the ground that it is overly broad and unduly burdensome, in that she has had innumerable conversations over the course of her career at GDS concerning "the claims, events, facts, circumstances, or damages alleged or referred to in the Complaint ..."  Subject to and without waiving such objections, Plaintiff states that she will furnish an answer to Interrogatory Number 17.

18.  Identify all persons who have any knowledge concerning any of the claims, events, facts, circumstances, or damages alleged or referred to in the Complaint, not previously identified.

Answer: None.

Respectfully submitted,


LAW OFFICE OF JOHN P. RACIN


_____
John P. Racin Bar   No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202  265-2516

Attorney for Plaintiff
Sharon Killian

# E X H I B I T   4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN                          )
                                        )
              Plaintiff                 )
                                        )
         v.                             )        Civil Action No. 05-1925 (EGS)
                                        )
GEORGETOWN DAY SCHOOL                   )
                                        )
              Defendant.                )
                                        )

PLAINTIFF'S SUPPLEMENTAL ANSWER TO DEFENDANT
GEORGETOWN DAY SCHOOL'S INTERROGATORIES

GENERAL OBJECTIONS

A.  Plaintiff will respond in the manner set forth in this introductory portion of her answers and objections and in the manner described in the specific answers and objections set forth below.  Where Plaintiff has not answered or responded in the manner requested by Defendant's definitions, interrogatories or document requests, Plaintiff objects to those definitions, interrogatories or document requests to the extent that they exceed the obligations imposed by the Federal Rules of Civil Procedure.

B.  Under the Federal Rules of Civil Procedure, Defendant is not entitled to information, documents or other facts to the extent that such information, documents or other facts are or is protected against disclosure by attorney-client privilege or the work product doctrine.

C.  The following definitions are usages that apply to all answers and responses contained herein:

An objection to an interrogatory or any portion thereof on the ground that it is "not relevant", shall mean that the information, or other thing(s) requested are not relevant to the

subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence.

An objection to an interrogatory or any portion thereof on the ground that it is "overly broad", shall mean that the interrogatory encompasses information, document(s) or other thing(s) vaguely or imprecisely defined.

An objection to an interrogatory or any portion thereof on the ground that it is "burdensome", shall mean that the requested documents or other information cannot be located by a reasonable search and the time and effort required to locate and/or produce information or the other thing(s) requested in light of the marginal relevance of the information sought and that injustice would result if Plaintiff were required to comply with such document request.

D. In preparing the responses to these interrogatories, Plaintiff has conducted a thorough and reasonable search of where information pertaining to Defendants' inquiries and requests are most likely to be found. To the extent any interrogatory seeks to require Plaintiff to take any further action, plaintiff objects to such interrogatory on the ground that it is overly broad and burdensome.

E. In addition to these general objections, Plaintiff may note certain additional specific objections in response to various interrogatories.

objections in response to various interrogatories.

## SUPPLEMENTAL ANSWER TO INTERROGATORY

17. Identify all communications Plaintiff has had with any other person or entity (including, but not limited to, Defendant's current and former agents or employees, and Plaintiff's current and former colleagues, friends, and relatives) concerning any of the claims, events, facts, circumstances, or damages alleged or referred to in the Complaint, and for each such communication specify the claims, events, facts, circumstances, or damages discussed.

Answer: Plaintiff objects to Interrogatory Number 17 on the ground that it is overly broad and unduly burdensome, in that she has had innumerable conversations with the categories of persons identified over the course of her career at GDS concerning "the claims, events, facts, circumstances, or damages alleged or referred to in the Complaint ..."  Subject to and without waiving such objections, Plaintiff identifies the following representative examples of "claims, events, facts, [and] circumstances" demonstrating the racially abusive work environment she routinely encountered at GDS, and the communications relating to them she can now recall:

Racially Abusive Treatment in the Art Department

Nick Ryan and Laura Tolliver routinely used derisive or dismissive tones of voice in their dealings with Plaintiff (who has never heard them use such tones in dealings with white people), and made decisions regarding courses offered by the Department without seeking her views, facts that Plaintiff reported at various times to Paul Levy, Kevin Barr, Peter Branch, Mariama Richards, Elizabeth Denevi, Vernese Edghill and John Burghardt, and discussed with colleagues including Lisa Rauschart, and family members including her husband Charles Killian. On one occasion when Plaintiff objected to the absence of a collaborative process in determining course titles and content, and Ryan (whom she has never heard yell at a white person) screamed at her, "Listen, this is the way it is going to be!"

When the administration (through principal Paul Levy) assigned Plaintiff to teach the Advanced Placement ("AP") studio art course, Ryan and Tolliver together - again without collaboration from Plaintiff and in an apparent effort to undermine the status and continuing viability of the AP course - acted to change course descriptions to reflect AP level work in their classes, and suggested to students that AP work in their courses made enrollment in Plaintiff's AP course unnecessary.  Plaintiff also discussed these events with many if not all the persons

-3-

identified above.

Plaintiff's classroom and other resources were treated as shared, at the same time her white colleagues treated departmental resources in a proprietary manner. Laura Tolliver on several occasions came into the art studio with students as Plaintiff was conducting a class, saying nothing by way of explanation as she and her students sat down to use the computers and printers. Yet Tolliver made clear the "Mac Lab" (and its suite of computers) were off limits to Plaintiff and her students when classes were underway, even if very few students were in the class at the time. Plaintiff believes she has also discussed this "common/proprietary space" dichotomy in discussions with many of the persons identified above.

Plaintiff also reported to Nick Ryan and Kevin Barr an episode early in 2005, in which Laura Tolliver all but accused Plaintiff of stealing a camera belonging to the Department. Plaintiff objected to Tolliver's demand that she somehow account immediately for the camera's use and return, when Tolliver and Ryan routinely treated departmental equipment as if it were personal property. Plaintiff went to principal Kevin Barr to seek access to departmental equipment on an equal basis. Barr said Plaintiff should have the right to sign out departmental property, but indicated she would still have to go to Laura Tolliver for the key to the storage cabinet, then proceed to sign out equipment. Nick Ryan then informed Plaintiff he too would have a key to the storage cabinet, meaning that Plaintiff would still have to come to her white colleagues whenever she needed something. Only when Plaintiff continued to find the treatment inequitable did Barr finally direct that each member of the Art Department have a key and equal access to storage cabinet and departmental property.

Treatment During Black History Month (2002)

During observances of Black History Month, Plaintiff routinely took on responsibility for displaying artwork by African American artists from the area. In 2002 she worked over the course of a weekend to exhibit such artwork in the hallway at the entrance of the School. In the process it was necessary to remove artwork of Laura Tolliver's students that had been up for some time (Plaintiff did so carefully in order to protect against damage). Nick Ryan angrily confronted Plaintiff about removing student artwork without "permission" from Laura Tolliver, though Ryan and Tolliver had both taken down artwork produced by Plaintiff's students, doing so with no discussion, much less with "permission" from her.

Plaintiff's brother died unexpectedly in February 2002, and she took leave to join her family and assist in funeral arrangements. When she returned to GDS for the first time after her brother's funeral, she encountered Nick Ryan ripping down student artwork from a bulletin board and throwing it to the floor. The work had been produced for Black History Month by members of the School's Black Culture Club, and Plaintiff was amazed seeing Ryan treat it this way. She objected, saying he was ruining work students could very well want to keep (Ryan was usually careful about preserving student artwork). Ryan screamed back at her that the work had been up too long, and others needed the space. Plaintiff reported the incident to Paul Levy and Vernese Edghill, one of School's Diversity Coordinators at the time, and the person who actually supervised the student effort. Plaintiff may also have told colleagues including Lisa Rauschart, and discussed the episode with her husband Charles Killian as well.

## "I Can't Bend Down Low Enough to the Ground to Understand You"

In the Spring of 2004, Plaintiff became aware Nick Ryan and Laura Tolliver had changed the name of one of Laura Tolliver's courses (again without Plaintiff's involvement) from "Technology In the Studio Arts" to "Graphic Design." Plaintiff feared the change could prove confusing, since one of her courses was going to be called "Graphic Design and Publishing." Troubled by the change, but anticipating certain controversy if she raised the issue directly with Ryan, Plaintiff went to then-principal Paul Levy. Levy suggested she speak with Kevin Barr, who was then Director of Studies for the high school. Plaintiff did as Levy suggested, telling Barr she was concerned about discussing the issue with Nick Ryan and wanted Barr's advice. Barr reviewed the course descriptions, said something like "I see what you're saying, they're redundant." He then encouraged her to go speak with Ryan ("Oh, go and talk about it"). Plaintiff went to Ryan, sat down near his desk, and said something like, "Nick, I want to talk about the name of this course -". Before she got much further, Ryan began screaming at her. Plaintiff had anticipated possible conflict, but this reaction stunned her, and she sat stock-still and speechless. She saw Ryan bend low in his chair, extend his arms downward, and bring his hands up towards his sides with an ape-like scooping motion, yelling, "I can't bend down low enough to the ground to understand you!" Scarcely believing what had happened, Plaintiff began to repeat, "You just said, 'You can't bend down low enough -' ", and eventually fled the room for Kevin Barr's office. Barr was shocked ("What?"), and trying to comfort Plaintiff when Ryan appeared at the door, asking "Can I explain?" Plaintiff, thoroughly revolted by Ryan and his behavior, did not want to talk with him, and Barr told Ryan to leave. Barr then phoned Mariama Richards, one of the School's Diversity Coordinators, and asked her to come to his office. Barr seemed shocked and dismayed, and said he regretted sending Plaintiff off to speak

-6-

with Ryan.

Mariama Richards and Elizabeth Denevi later told Plaintiff they had spoken with Nick Ryan, and their distinct impression was that Ryan operated from a position of "white privilege and superiority." Plaintiff also discussed the episode with colleagues including Lisa Rauschart, and family members including her husband Charles Killian.

Respectfully submitted,

LAW OFFICE OF JOHN P. RACIN

John P. Racin Bar  No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202  265-2516

Attorney for Plaintiff
Sharon Killian

-7-

# E X H I B I T   5

# Sharon Killian

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

-------------------------------X

SHARON KILLIAN,                    )

        Plaintiff,          )

V                                  ) Case No.

GEORGETOWN DAY SCHOOL,             ) 1:05CV01925

        Defendant.          ) PAGES 1-366

-------------------------------X

Videotaped Deposition of SHARON KILLIAN

Washington, DC

Monday, March 27, 2006

Reported by: Denise Vickery, RMR-CRR

JOB NO. 173644

# Sharon Killian

## Page 2

```
1
2
3
4                      March 27, 2006
5                      10:40 a.m.
6
7
8   Deposition of SHARON KILLIAN, held at the offices of:
9
10    COVINGTON & BURLING
11    1201 Pennsylvania NW
12    Washington, DC  20004-2401
13
14  Pursuant to notice, before Denise Dobner Vickery, a
15  Registered Merit Reporter, Notary Public of the
16  District of Columbia.
17
18
19
20
21
22
```

## Page 3

```
1   APPEARANCES:
2   For the Plaintiff:
3   Law Offices
4       1721 Lamont Street NW
5       Washington, DC  20010
6       202-265-2516
7       Awjrlaw.erols.com
8   BY: John Racin, Esq.
9
10  For the Defendant:
11  COVINGTON & BURLING
12      1201 Pennsylvania NW
13      Washington, DC  20004-2401
14      202-662-5538
15      TWILLIAMS@COV.COM
16  BY: Thomas S. Williamson, JR., Esq.
17      Timothy Clinton, Esq.
18
19  ALSO PRESENT:
20      Steve Shaw, Videographer
21
22
```

## Page 4

```
1                    I N D E X
2
3   EXAMINATION OF SHARON KILLIAN          PAGE
4   BY MR. WILLIAMSON            8
5   BY MR. RACIN                 358
6
7
8   KILLIAN DEPOSITION EXHIBITS:          PAGE
9   No. 1  Evaluation 1994-95 by Haynes. 6483.    19
10    2  Evaluation 1999-00 by Haynes. 6498.    21
11    3  June 1, 2001 Narrative Response. 1967-69. 23
12    4  Evaluation Jan 2002. 1966.        26
13    5  Evaluation Spring 2003. 1964-65.     28
14    6  Observation Winter Quarter 2004. 1962-63. 32
15    7  Evaluation June 3, 2005. 2062-65.    38
16    8  Faculty Contract 2004-05. 2906.     47
17    9  GDS Purchase Order 4468. 2519.     54
18    10  GDS Purchase Order 4474. 2520.     54
19    11  GDS Accounty Activity Report. 2724-25.   71
20    12  Handwritten Note Sun Feb 24, 2002. 2737.  73
21    13  Letter to Peter from Killian. 2633-36.  145
22    16  May 4, 2004. Ruble to Killian. 3636.   244
```

## Page 5

```
1    19  GDS Purchase Order 7880. 1528.      252
2    20  GDS Purchase Order 6635. 1531.      253
3    21  GDS Purchase Order 7631. 2369.      257
4    22  June 10, 2003. Ruble to Ryan. 3046.    304
5    23  June 10, 2003. Ruble to Killian. 3047.  313
6    24  June 10, 2003. Killian to Ruble. 3048.  315
7    25  Nov 2, 2004. Killian to Ruble. 4084.   327
8    26  GDS Purchase Order 5458. 2739.      330
9    27  Feb 27, 2006. Arnstein to Ruble. 6499.  331
10   28  User Folder Limits Memo. 2695.      337
11   29  May 5, 2004. Ruble to Ryan. 3641.    346
12   45  April 2, 2004. Killian to Ryan. 1829.  278
13   46  Feb 23, 2004. Ryan to Killian. 1817.   280
14   59  Faculty Contract 2005-06. 2905.     144
15
16
17
18
19
20
21
22                (Exhibits attached.)
```

2 (Pages 2 to 5)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 6

PROCEEDINGS

1      THE VIDEOGRAPHER: Good morning. Here
2  begins videotape number 1 in the deposition of Sharon
3  Killian in the matter of Sharon Killian versus
4  Georgetown Day School in the US District Court for the
5  District of Columbia, case number which is 1:05CV01925.
6  Today's date is March 27, 2006, and the time is
7  10:42:13.
8      The deposition is being taken at 1201
9  Pennsylvania Avenue, Northwest, Washington, DC and was
10 made at the request of -- is it Timothy Clinton?
11     MR. WILLIAMSON: Say Thomas Williamson.
12     THE VIDEOGRAPHER: I'm sorry?
13     MR. WILLIAMSON: Thomas Williamson.
14     THE VIDEOGRAPHER: At the request of
15 Thomas Williamson of the law offices of Covington &
16 Burling.  The videographer is Steve Shaw on behalf of
17 Esquire Deposition Services.
18     Would counsel and all present please
19 identify yourself and state whom you represent.
20     MR. WILLIAMSON: Thomas S. Williamson,
21 Jr., for the defendant, Georgetown Day School.

Page 7

1      MR. CLINTON: Timothy R. Clinton for the
2  defendant, Georgetown Day School.
3      MR. RACIN: John Racin for the
4  plaintiff, Sharon Killian.
5      If I might note for the record, just
6  preliminarily, that notice is essence of due process
7  and we didn't get any as to the videotape deposition.
8  Notice doesn't mention the video.  We have no
9  particular objection, but we would have appreciated,
10 you know, having notice of same.  We'd like the record
11 to reflect that.  Thank you.
12     MR. WILLIAMSON: Well, counsel, we
13 apologize if that was not included in the notice.
14 That was an oversight on our part.  We normally do
15 that and we didn't intend any surprise by the -- by the
16 videotape.
17     MR. RACIN: I didn't mean to suggest
18 that.
19     MR. WILLIAMSON: Thank you very much.
20     MR. RACIN: Thank you.
21     THE VIDEOGRAPHER: Would the court
22 reporter please swear in the witness.

Page 8

1  Thereupon,
2      SHARON KILLIAN
3  was called for examination, and, after having been duly
4  sworn or affirmed, was examined and testified as
5  follows:
6      EXAMINATION BY COUNSEL FOR THE DEFENDANT
7  BY MR. WILLIAMSON:
8      Q. Ms. Killian, my name is Tom Williamson and I'm
9  one of the lawyers who's representing the defendant in
10 the lawsuit that you have brought against our client,
11 the Georgetown Day School.  We're going to be spending
12 the day asking you a series of questions relating to
13 the allegations in your complaint, and as you can see,
14 the discussion between you and me will be recorded by
15 the court reporter.  So there will be a written
16 transcript and also there's going to be a videograph
17 record of the deposition.
18      In this type of exchange, it's very important
19 that when you answer a question, you actually answer
20 verbally as distinguished from just nodding or using
21 your body language.  That works for the videotape part
22 of the transcription here, but it doesn't for the court

Page 9

1  reporter.
2      Also, it's helpful if you use yes or no rather
3  than uh-huh or uh-uh, the way we sometimes do in normal
4  conversation, but that can make it a little more
5  difficult for the court reporter.
6      Another thing that I'd like you to be mindful
7  of as we go through this process is avoiding talking
8  over each other.  What I mean by that is, if you can
9  wait until I finish a question before you answer, and I
10 will likewise try to wait until you finish your answer
11 before I go on to the next question, and that's
12 particularly important for the sanity and the good
13 health of our court reporter.  Since it's extremely
14 difficult to try to transcribe when more than one
15 person is talking at the same time.
16      We're going to be here quite a while.  I
17 think at least seven hours, and so there are going to
18 be times when you may want to take a break either if
19 you want to go to the ladies' room or just you want a
20 little rest or break from the actual deposition and
21 that's -- that's fine.  If you just let me know that
22 you'd like to take a break, then we can -- we can

3  (Pages 6 to 9)

d22d6e2d-a955-4b8c-ae04-386a3bc1f9feb

Sharon Killian

Page 10

1 arrange that.
2     Now, you've been placed under oath.
3     A. (Nods head).
4     Q. So I'm assuming that you understand that that
5 means you have a legal duty to tell the truth in
6 response to questions?
7     A. (Nods head).
8     Q. Do you understand that?
9     A. Yes, I do.
10     Q. Okay. Have you ever been deposed before?
11     A. No.
12     Q. All right. Are you currently under the
13 influence of any medication or drugs that would impair
14 or limit your ability to recollect or -- events or
15 participate in this deposition?
16     A. No.
17     Q. Did you do anything to prepare for the
18 deposition?
19     A. I did speak with my attorney, yes.
20     Q. And did you speak to anybody besides your
21 lawyer about preparation for the deposition?
22     A. I am staying with a friend and I've talked

Page 11

1 about whatever I'm here for, yes.
2     Q. Uh-huh. Did you talk to that friend about any
3 of the substance of the allegations in your complaint?
4     A. No, not this complaint.
5     Q. And did you look at any documents in
6 preparation for the deposition?
7     A. Yes, I did.
8     Q. What did you look at?
9     A. I looked at the request for interrogatories.
10 The responses to the interrogatories. Any documents
11 that were gathered by my attorney from your offices.
12 I looked at the documents that I provided.
13     Q. When you say the documents you provided, what
14 do you mean?
15     A. In terms of your request for documents.
16     Q. Okay. And do you have any of those documents
17 with you today?
18     A. No.
19     Q. All right. I'm going to start asking you
20 some background questions.
21     A. Okay.
22     Q. And then we'll get to some more specifics

Page 12

1 about the -- the lawsuit. Where did you receive your
2 high school education?
3     A. Lewis D. Brandeis High School in New York
4 City.
5     Q. Okay. And did you attend college?
6     A. Yes, I did.
7     Q. What college did you go to?
8     A. I went to the University of Rochester in
9 Rochester, New York.
10     Q. Okay. And what was your major?
11     A. My major -- I got degrees in art history and
12 painting.
13     Q. Are you an artist?
14     A. Yes.
15     Q. What sort of artwork do you do?
16     A. I do all kinds of things but primarily
17 two-dimensional work. Painting, drawing and so on.
18 Uh-huh.
19     Q. And what -- did you say what you got your
20 degree in at Rochester?
21     A. Art history and painting.
22     Q. Okay. Did you attend graduate school?

Page 13

1     A. No, I did not. Except for I did take a
2 course at LaSalle University and received graduate
3 credit for it, but no --
4     Q. I see. So --
5     A. -- otherwise.
6     Q. -- do you have any postgraduate degrees of any
7 sort?
8     A. No, uh-uh.
9     Q. Okay. Have you taken other educational
10 courses or training?
11     A. Yes.
12     Q. What types of things?
13     A. I've done figure sculpture outside of, you
14 know, beyond my undergraduate schooling. I've done AP
15 studio art training, and I believe that's pretty much
16 it. Mostly in the arts. Uh-huh.
17     Q. Who paid for these other courses or training
18 that you've done?
19     A. Georgetown Day School paid for my professional
20 development for the AP studio art course as well as for
21 the -- actually, no. Yeah, that's all. That's all
22 they paid for. My figure sculpture course I -- I

4  (Pages 10 to 13)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

**Page 14**

1 earned as a teacher in Washington, DC at the Corcoran.
2    Q. I see. Was that before you started working at
3 Georgetown Day School?
4    A. No.
5    Q. When did you start working at Georgetown Day
6 School?
7    A. In '93, I was a substitute. So I would say I
8 really started working at Georgetown Day School in
9 1993.
10    Q. All right. Now, as we go through this
11 deposition, it maybe allows us to get through it more
12 efficiently from time to time, I'm going to refer to
13 Georgetown Day School as GDS, and are you familiar with
14 that --
15    A. Yes.
16    Q. -- as a reference to the school? Okay. How
17 did you get your job at GDS?
18    A. I received a telephone call from Debbie Haynes
19 and saying that she needed a substitute.
20    Q. How did she know to call you?
21    A. She knew me through my husband.
22    Q. And how was that?

**Page 15**

1    A. I think her husband worked for the Association
2 of American Medical Colleges where my husband was also
3 an employee.
4    Q. Okay. Did she interview you?
5    A. Yes.
6    Q. And did anybody else interview you?
7    A. For that position? For the -- as a -- no.
8    Q. And what -- what was her position at the time
9 she called you about being a substitute?
10    A. Chair.
11    Q. Chair of what?
12    A. Art department.
13    Q. Was that at GDS?
14    A. At George -- at GDS.
15    Q. And who made the decision to hire you?
16    A. I believe it was Paul, who then probably went
17 to the head of school at the time and that's it.
18    Q. And who recommended you for hiring?
19    A. Debbie Haynes.
20    Q. Okay. How long did you work at GDS?
21    A. I've worked at GDS from '93 until 2005.
22 That's 12 years.

**Page 16**

1    Q. In your first year at GDS, what was the
2 position you held?
3    A. I -- that first year I was a substitute
4 teacher.
5    Q. I see. And whom are you substituting for?
6    A. Anybody in the department, actually.
7    Q. Who else was there in the department?
8    A. There was an Erika Elliott, a Laura Tolliver,
9 along with Debbie Haynes. I substituted for all three
10 of them.
11    Q. And during that first year, was Laura Tolliver
12 present during most of the year?
13    A. I believe so. I believe so.
14    Q. What about your second year; what position did
15 you hold at GDS?
16    A. I -- I was a -- I think I was called a
17 permanent substitute.
18    Q. What does that mean?
19    A. One faculty member went on a leave for a year
20 and I took that position.
21    Q. Who was that?
22    A. I was offered that position. Erika Elliott.

**Page 17**

1 As I recall, that was her name.
2    Q. And in your third year, what position did you
3 hold at GDS?
4    A. I was a faculty member in the department.
5    Q. And how did that come about?
6    A. Erika Elliott did not return and I -- I
7 believe then I was offered the job on a permanent
8 basis.
9    Q. And was that a job in the art department at
10 GDS?
11    A. Yes.
12    Q. And how many other faculty were in the art
13 department when you -- when you were at GDS?
14    A. Two others.
15    Q. Who were they?
16    A. Laura Tolliver and Debbie Haynes.
17    Q. And when you -- you stopped working at GDS in
18 2005. How many faculty were in the art department
19 when you stopped working at GDS?
20    A. I believe there were two others.
21    Q. Who were they?
22    A. I believe that was Nick Ryan and Laura

5 (Pages 14 to 17)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 18

1  Tolliver.
2      Q. Okay. Who was the chair of the art department
3  when you first began working at GDS?
4      A. Debbie Haynes.
5      Q. And who was the chair of the art department
6  when you stopped working at GDS?
7      A. Nick Ryan.
8      Q. And when did Mr. Nick Ryan become the chair of
9  the art department at GDS?
10     A. I believe that was 2000.
11     Q. Okay. After you started working at GDS, did
12 you receive evaluations of your work performance as a
13 teacher from time to time?
14     A. Yes.
15     Q. Who prepared those evaluations of your work?
16     A. Debbie Haynes prepared evaluations and Nick
17 Ryan prepared evaluations.
18     Q. Did you feel that the teacher evaluations
19 by Ms. Haynes and Mr. Ryan of you were fair?
20     A. There -- there was one evaluation in -- I
21 don't recall exactly, but I do believe it was '95 or
22 '96 that there were some issues with for me.

Page 19

1      Q. Otherwise, did you feel the evaluations of you
2  by Ms. Haynes and Mr. Ryan were fair?
3      A. I would say otherwise, other than where I have
4  noted and we don't know if all the numbers will be
5  any of those, I'd say yeah. Yes.
6      Q. Yes what?
7      A. That otherwise fair.
8          MR. WILLIAMSON: Okay. Let's take a
9  look at a few of these. I just want to say to the
10 court reporter, we've got prenumbered references to
11 exhibits and we don't know if all the numbers will be
12 sequential because her answers will determine whether
13 we're actually going to use them.
14         But what we'd like do is just have you put the
15 numbers on it that we specify when we get to that point
16 in the outline. However, for the first exhibit we
17 will use number 1.
18         I hand you a document that's going to be
19 marked as Exhibit 1 and ask you to take a look at that.
20         (Thereupon, a document was marked for
21 identification Exhibit No. Exhibit 1.)
22 BY MR. WILLIAMSON:

Page 20

1      Q. Can you tell us what the title is on Exhibit
2  1?
3      A. The title says "Sharon Killian Studio Arts
4  1994-1995."
5      Q. And who -- who prepared this document?
6      A. It says "Deborah Haynes."
7      Q. Have you had a chance to look over the
8  document that's been marked as Exhibit 1?
9      A. Yes.
10     Q. Can you tell us what it is?
11     A. It -- without reading all the way to the end,
12 it is a -- it appears to be a recommendation that I
13 be -- that I be given the job as a teacher in the art
14 department.
15     Q. Does the recommendation include an evaluation
16 of how you performed during the 1994 and 1995 year?
17     A. Yes.
18     Q. Was that your first year on a full-time basis
19 at GDS?
20     A. Yes.
21     Q. Okay. Now, do you regard Exhibit 1 as an
22 example of GDS's racially hostile treatment of you as

Page 21

1  an employee?
2      A. Repeat the question.
3      Q. I said -- well, first let me ask. Did you
4  want to finish reading the full document?
5      A. Sure. Yes, I would like that.
6      Q. Okay.
7      A. (Pause). Now?
8      Q. The question is, do you regard Exhibit 1 as an
9  example of GDS's racially hostile treatment of you as
10 an employee?
11     A. No.
12         MR. WILLIAMSON: I'm going to hand you
13 another document that we're going to mark as Exhibit 2.
14 Ask you to take a look at that.
15         (Thereupon, a document was marked for
16 identification Exhibit No. 2.)
17         THE WITNESS: Yes.
18 BY MR. WILLIAMSON:
19     Q. What's the heading on the document that's been
20 marked as Exhibit 2?
21     A. "Sharon Killian 1999-2000."
22     Q. Is that a reference to the 1999-2000 school

6  (Pages 18 to 21)

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 22

1  year?
2      A. I'm assuming that's what that is.
3      Q. And who -- whose signature appears at the
4  bottom of Exhibit 2?
5      A. It says "Deborah Haynes."
6      Q. And does it have a date there?
7      A. 6/16/2000.
8      Q. What is Exhibit 2?
9      A. I'm assuming that this was her end-of-the-year
10  evaluation for 1999-2000.
11      Q. You say you're assuming that.  Do you have
12  any reason to believe that it's not that?
13      A. No.
14      Q. Okay.  Have you ever seen this evaluation
15  before?
16      A. I'm sure I have.  Uh-huh.
17      Q. Does that look familiar to you?
18      A. Uh-huh.  Yes, it does.
19      Q. Is this the final evaluation of your teacher
20  performance that was done by Deborah Haynes before she
21  ceased to be the chair of the GDS art department?
22      A. I -- I believe that it could be because Nick

Page 23

1  Ryan came in for 2000-2001.
2      Q. Have you had a chance to read Exhibit 2?
3      A. Yes.
4      Q. And do you consider Exhibit 2 to be an example
5  of GDS's racially hostile treatment of you as an
6  employee?
7      A. No.
8      Q. Let's now go to another document that we're
9  going to mark as Exhibit 3.  I'm going to ask you to
10  take a look at that document and then have a few
11  questions.
12      A. Uh-huh.
13          (Thereupon, a document was marked for
14  identification Exhibit No. 3.)
15          THE WITNESS: (Pause).  Okay.
16  BY MR. WILLIAMSON:
17      Q. What does the first line of Exhibit 3 say?
18      A. "Art department faculty evaluation."
19      Q. And what's the date on Exhibit 3?
20      A. June 1, 2001.
21      Q. Okay.  Can you tell us what Exhibit 3 is?
22      A. It says it's a faculty evaluation of Sharon

Page 24

1  Killian.
2      Q. Okay.  And who prepared that evaluation?
3      A. Nick Ryan, department head.
4      Q. And is that -- is his signature one of the
5  signatures near the top of the first page of Exhibit 3?
6      A. Yes.  To the best of my recollection, yes.
7      Q. Is that your signature next to his signature
8  on the same line?
9      A. Yes.
10      Q. All right.  Now, I'd like to ask you to turn
11  to the second page of Exhibit 3, which has a number on
12  the bottom right corner which we call a Bates number,
13  which is 1968.
14      A. Uh-huh.
15      Q. Have you had a chance to -- to read over
16  Exhibit 3?
17      A. Yes.
18      Q. Okay.  Now, would you read the excerpt that's
19  the second paragraph on page -- Bates numbered page
20  1968 of Exhibit 3?
21      A. The second paragraph?
22      Q. Yes, please.

Page 25

1      A. "One of the tough parts of an advanced level
2  teacher is conveying the sense of individual
3  responsibility and encouraging students to accept this
4  role as artists.  Creativity cannot be mandated, but I
5  feel Sharon does well in leading students to this
6  outcome."
7      Q. Okay.  Do you regard Exhibit 3 as a fair and
8  accurate evaluation of your performance as a teacher in
9  2000-2001?
10      A. Yes.
11      Q. And did you submit any comments challenging or
12  disagreeing with any aspect of the evaluation reflected
13  in Exhibit 3?
14      A. I don't recall.  I don't recall.  I don't
15  recall submitting anything in regard to that.
16      Q. Looking at it today, do you think there's some
17  comment you would have submitted challenging the
18  accuracy or fairness of that evaluation?
19      A. No.
20      Q. Do you regard Exhibit 3 as an example of
21  racially hostile treatment of you by GDS?
22      A. No.

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

Page 26

1    Q. All right.  I'd like you to turn to another
2  exhibit that we're going to mark as Exhibit 4.
3          (Thereupon, a document was marked for
4  identification Exhibit No. 4.)
5  BY MR. WILLIAMSON:
6    Q. Take a moment to look at that, please.
7    A. (Pause).  Yes.
8    Q. What is Exhibit 4?
9    A. It is "Upper School Art Department Teacher
10  Evaluation January 2002 Sharon Killian teacher."
11    Q. And who prepared this evaluation?
12    A. Nick Ryan prepared this evaluation.  Even
13  though it doesn't say, I know that he did.  Uh-huh.
14    Q. Have you had a chance to read the
15  assessment --
16    A. Yes.
17    Q. -- contained in this evaluation on Exhibit 4?
18    A. Yes.
19    Q. Do you see in the first paragraph the last
20  sentence or two where it says, "I was impressed with
21  Sharon's ability to clearly convey the material and
22  explain the details of the process"?

Page 27

1    A. Yes.
2    Q. "There was a good balance of fairness in
3  her --
4    A. Firmness.
5    Q. "A good balance of firmness in her adherence
6  to the parameters of the assignment which at this level
7  inevitably invites challenge, especially from students
8  more focused on product than process."
9          Was that a fair and accurate assessment of
10  your performance in dealing with your students?
11    A. Yes.
12    Q. And you see at the bottom of Exhibit 4 there's
13  a line that says "Accepted by"?
14    A. Yes.
15    Q. And that's followed by your signature?
16    A. Yes.
17    Q. Does that signify that you do not have any
18  disagreements with the evaluation contained in Exhibit
19  4?
20    A. Yes.  Yes.
21    Q. Okay.  Now, do you regard Exhibit 4 as an
22  example of racially hostile treatment of you by GDS?

Page 28

1    A. No.
2    Q. All right.  Now I want to go to another
3  document, which we're going to mark as Exhibit 5.
4          (Thereupon, a document was marked for
5  identification Exhibit No. 5.)
6  BY MR. WILLIAMSON:
7    Q. Why don't you take a moment to look at that,
8  please.
9    A. (Pause).  Yes.
10    Q. Okay.  I'm going to ask you to focus on the
11  Bates numbered page 1964, which is the first page of
12  Exhibit 5.  And do you see there's a paragraph upper
13  part of the page that begins "The assignment
14  progressed."  Do you see where that paragraph is?
15    A. Yes.  Yes.
16    Q. And if you go down toward the last few of the
17  sentences, it says, "Although in an AP level course
18  students tend to be quite focused, it is inevitable
19  that frustrations occur and in these instances Sharon
20  employs a healthy mixture of encouragement and firmness
21  to keep students positively motivated and on task.
22  While monitoring the progress of her class, Sharon

Page 29

1  would offer praise, suggest options or pose questions
2  that would lead a student to discover the solution."
3          Do you think that was a fair assessment of how
4  you were handling the AP studio art course in the
5  spring of 2003?
6    A. Yes.
7    Q. And did we already note that this evaluation
8  was for the spring of 2003?  I don't know if I asked
9  you that.
10    A. I don't think you asked me that.
11    Q. Okay.  What -- what's the period that this
12  evaluation relates to?
13    A. It says "Spring 2003."
14    Q. And what course was observed as the basis for
15  the evaluation?
16    A. An AP studio art class.
17    Q. Okay.  Now, I'd like you to go to the next
18  paragraph after the one that we just read an excerpt
19  from, and do you see there where it says in the first
20  sentence:  "The outcome of this lesson plan is a body
21  of artwork that exceeded the achievement the class had
22  previously been able to attain."

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 30

1    And then skipping over the second sentence and
2  going on to the next one, it says: "This atmosphere,
3  which Sharon fostered, is critical to the success of
4  any class, but in this instance the individual growth
5  that occurred would have been unthinkable for many
6  without it."  Do you agree with that portion of Mr.
7  Ryan's assessment of your performance?
8    A. Yes.
9    Q. Now, is there anything else in Exhibit 5
10  either on this Bates numbered page 1964 and 1965 that
11  suggests that the evaluation gives you positive ratings
12  for your efforts in teaching the AP studio art course?
13    A. I'd say that it reflected my -- my energy and
14  my -- my attempt to educate, yes.
15    Q. But particularly is there anything else in the
16  evaluation that notes what you're doing with this as an
17  AP course?  I'd like you to look at -- actually take a
18  look at page 1965 after you've looked at page 1964.
19    A. Would you rephrase that question?
20    Q. Was there -- I'm sorry.  Did you finish saying
21  what you were going to say?
22    A. I was going to ask you, would you rephrase

Page 31

1  your question for me?
2    Q. Sure.  Would you take a look at page 1965 of
3  Exhibit 5.
4    A. Uh-huh.
5    Q. And my question is whether there's anything
6  else in this evaluation reflected in Exhibit 5 that
7  gives you positive acknowledgment for your efforts in
8  teaching the AP studio art course and preparing
9  yourself to do that?
10    A. The rest of the body of this on page 1965 does
11  describe some of my activities as you suggested for my
12  AP studio art class.
13    Q. What does it say?
14    A. It says, "As of this writing, Sharon's
15  students have received four Gold Key Awards from the
16  National Scholastic Art and Writing Awards."  And in
17  regard to professional development, that I continue to
18  make a strong commitment to my professional development
19  and have done that by visiting universities that my
20  students would be interested in matriculating, so on.
21    Q. Doesn't it also say that over the summer you
22  worked independently on development of the AP studio

Page 32

1  art course content?
2    A. Yes.
3    Q. Now, do you regard Exhibit 5 as an example of
4  racially hostile treatment of you by Mr. Ryan or GDS?
5    A. No.
6    Q. Okay.  Let's take a look at another
7  evaluation.  This one will be marked as Exhibit 6.
8      (Thereupon, a document was marked for
9  identification Exhibit No. 6.)
10      THE WITNESS:  Thank you.
11  BY MR. WILLIAMSON:
12    Q. Please take a moment to read or look over
13  Exhibit 6.
14    A. (Pause.)  Okay.
15    Q. What is Exhibit 6, Ms. Killian?
16    A. It says "Teacher Observation Form High School
17  Art Department Georgetown Day School."  Should I
18  continue?
19    Q. What was the observation period?
20    A. It says "Informally over many weeks in the
21  winter of 2004."
22    Q. And what course was being observed?

Page 33

1    A. AP studio art.
2    Q. And what was the assignment that was being
3  observed?
4    A. Figure drawing and painting.
5    Q. And who was the teacher being observed?
6    A. Sharon Killian.
7    Q. And that's you, correct?
8    A. Uh-huh.
9    Q. And who prepared the evaluation?
10    A. Nicholas Ryan.
11    Q. All right.  Now, you see where there's a
12  heading Observation?
13    A. Uh-huh.
14    Q. And that paragraph or the paragraph that
15  follows says, "This assignment spanned many weeks and
16  evolved sequentially from earlier figure work executed
17  in charcoal and paper."
18    A. Uh-huh.
19    Q. "Sharon effectively presented the concept and
20  objective to the class, answering questions and
21  encouraging a creative response from each student."
22  Do you agree with Mr. Ryan's assessment of your

9  (Pages 30 to 33)

Sharon Killian

Page 34

1 performance?
2     A. I -- I would agree to the assessment based on
3 those two -- those two sentences you just read, yes,
4 and, yeah, it seems to match.  It looks like the one
5 from the year before.  So, yeah, uh-huh.
6     Q. Now, this first page of Exhibit 6 is Bates
7 numbered 1962.
8     A. Uh-huh.
9     Q. Would you look down at the bottom of 1962?
10     A. Uh-huh.
11     Q. And would you please read that paragraph?
12     A. The last paragraph here?
13     Q. Yes, please.
14     A. "As in previous years, a secondary outcome of
15 this project was the positive impact these paintings
16 had on the GDS community.  The choice of model
17 represents the diversity of the school.  As a body of
18 work, these paintings offer a powerful statement to
19 what GDS stands for.  Also, it is from this strong
20 artwork that many students built their applications to
21 art schools, colleges, art competitions and the AP
22 exam."

Page 35

1     Q. Do you agree with that statement by Mr. Ryan
2 about the impact of your class's project?
3     A. Yes.
4     Q. All right.  Would you turn to page 1962 of
5 Exhibit 6, please, which is the second page of the
6 exhibit.
7     A. 1963?  Okay.
8     Q. I'm sorry.  Did I say 1962?  I should have
9 said 1963.  Thank you for that correction.
10     Do you see the reference in that paragraph at
11 the top of page 1963 to "Sharon's continuing silent
12 treatment of Laura and me since mid-February indicates
13 an unwillingness to enter into an honest dialogue about
14 issues she perceives here at GDS."  Do you know what
15 the silent treatment is that Mr. Ryan is referring to?
16     A. After Nick Ryan bent over his chair and said
17 he couldn't bend low enough to the ground to understand
18 me, I did stop to stop offering niceties and, so on, of
19 even a good morning or getting into any serious
20 conversations about things that.  So perhaps, yes.
21 Yes, I do.
22     Q. When you say niceties, good morning and

Page 36

1 serious things, would that mean when you came to an art
2 department meeting, you wouldn't talk to Mr. Ryan?
3     A. I don't believe that we had any -- if there
4 was a meeting and I was involved in the meeting, I
5 would speak, yes.  I would speak.
6     Q. What are the other niceties where you wouldn't
7 speak to Mr. Ryan?
8     A. If -- if I walked into a room and he was
9 laughing at something, I didn't participate in the
10 laugh.
11     Q. If he asked you about something, would you
12 speak to him?
13     A. Yes.
14     Q. Are there any other examples of the silent
15 treatment that you adopted at that time?
16     A. No.
17     Q. You're sure?
18     A. I'm sure.
19     Q. Now, do you see lower on the page there's a
20 heading that says "Summary of goal achievements as of
21 5/19/04"?
22     A. Uh-huh.  Uh-huh.

Page 37

1     Q. And would you read the comment by Mr. Ryan
2 that appears below that heading?
3     A. "Goals for the 2003-04 school year were due by
4 October 31st.  Despite repeated request to Sharon over
5 many months and additional request conveyed through
6 Mari and Elizabeth, I have yet to achieve Sharon's
7 goals for the current school year.  I am therefore
8 unable to address this aspect of her evaluation."
9     Q. And this, this evaluation report was for the
10 winter quarter of 2004; is that right?
11     A. Yes.
12     Q. Is it true that you had not submitted your
13 2003-2004 goals to Mr. Ryan by the winter quarter of
14 2004?
15     A. To the best of my recollection, that could be
16 true.
17     Q. And is it also true that you did not respond
18 to repeated requests for a specific lesson or class
19 period for Mr. Ryan to observe your teaching?
20     A. I -- I asked -- I talked to Kevin Barr about
21 that.  I -- so, yes.  I guess the answer is yes.
22     Q. Okay.  Now, did you regard Exhibit 6 as an

10  (Pages 34 to 37)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 38

1  example of racially hostile treatment of you by Mr.
2  Ryan?
3      A. No.
4          MR. WILLIAMSON: Okay. I'm going to take
5  a look at another evaluation.  I think this may be the
6  last one of the evaluations we'll do.  This one will
7  be marked as Exhibit 7.
8          (Thereupon, a document was marked for
9  identification Exhibit No. 7.)
10         THE WITNESS:  (Pause.)  Yes.
11 BY MR. WILLIAMSON:
12     Q. You've had a chance to read Exhibit 7?
13     A. Yes.
14     Q. What is Exhibit 7, Ms. Killian?
15     A. "High School Art Department Faculty Evaluation
16 June 3, 2005."
17     Q. Who was the teacher who was being evaluated?
18     A. Sharon Killian.
19     Q. And what course was observed?
20     A. Intro photography.
21     Q. And who prepared this evaluation?
22     A. Nick Ryan.

Page 39

1      Q. And this would have been an evaluation that
2  applied to the 2004 --
3      A. Right.
4      Q. -- 2005 school year; is that right?
5      A. Yes.
6      Q. Now, you said you had a chance to read the
7  evaluation?
8      A. Yes.
9      Q. Would you agree that the evaluation of your
10 teaching performance was generally accurate?
11     A. Yes.
12     Q. Okay. Did you submit comments questioning
13 certain portions of Mr. Ryan's 2004-2005 evaluation of
14 you?
15     A. Yes.
16     Q. All right. I'm going to ask you to turn to
17 page 2064.
18     A. Yes.
19     Q. Of Exhibit --
20     A. 7.
21     Q. -- 7.  Thank you.  Is that where your
22 comments appear?

Page 40

1      A. Yes.
2      Q. Okay.  What were your comments?
3      A. "The evaluation of my teaching for 2004-05 is
4  generally accurate.  However, there are two aspects of
5  it that require response."
6      Q. Now, not -- you can read it if you like, but
7  if you could summarize it that would also be
8  sufficient, but whichever you prefer.
9      A. Okay.  There were two parts of -- two points
10 in the evaluation that had been of issue, and I wanted
11 to be sure that Nick Ryan understood that I had not
12 avoided any procedures that were in place.
13     Q. What procedures were you talking about?
14     A. Signing out digital cameras and video
15 equipment and also my -- that my work in foreign
16 language or with the foreign language department to
17 create a book of poetry and prose and imagery was not
18 mentioned and other -- generally other things that I
19 had done to enhance the department, the kids, the
20 parents, the school were not included.  And that about
21 a couple of absences that I -- that I had had during
22 the year --

Page 41

1      Q. What were --
2      A. -- were mentioned as really significant items
3  for my whole year of -- of work that two absences were
4  mentioned.
5      Q. You say two absences were mentioned.  Were
6  you criticized about being absent in the evaluation?
7      A. Implicit criticism.
8      Q. When you say implicit, that's something that
9  you read into the evaluation, but it wasn't actually
10 stated?
11     A. Actually, let me look at.  It -- it says,
12 "During the school year --"
13     Q. Can you tell us what page you're on?
14     A. I'm on page 2063.  It says, "During the
15 school year, there are obligations such as cross
16 divisional meetings, community services, et cetera,
17 which should not be missed.  It is understood -- it
18 understood that emergencies and illnesses occur for
19 which one is unable to plan. However, these are the
20 exception and in the interest of fostering collegial
21 and respectful relationships within the department and
22 across the three divisions, et cetera, absences such as

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

Sharon Killian

Page 42

1  personal leave should not coincide with the scheduled
2  obligations such as meetings, community service, et
3  cetera."
4      And I thought that -- my reading of that, yes,
5  is that there was an implication that -- that there was
6  a criticism there from being absent on those two days.
7  Yes.
8      Q. How did Mr. Ryan respond to the comments you
9  made on the evaluation contained in Exhibit 7?
10     A. There is an addendum to summary evaluation,
11  page 2065.
12     Q. And what's there?
13     A. It's an addendum by Nicholas Ryan. "In
14  response to our review of Sharon's observation and
15  evaluation, I offer the following clarifications."
16  And he responds that "The inclusion of hardware such as
17  digital cameras is intended to apply to all members of
18  the department."
19     Q. Is or is not?
20     A. Is intended to apply to all members of the
21  department, not only to me in my evaluation, but to all
22  members of the department.  That no implication of a

Page 43

1  departure from existing professional practices was
2  intended.   And -- and then he goes on to say in regard
3  to the other points:  "I have encouraged Sharon to
4  write a summary of" my work with the foreign language
5  department and so on.
6      And another significant contribution of the
7  exhibitions that I've held outside of the school that
8  satisfies some of the -- well, he doesn't say that.
9  It says my work in the department, et cetera, is --
10  "This is a significant contribution which should be
11  noted.  In addition, I neglected to note the
12  exhibition of Sharon's AP students' artwork at politics
13  and prose, as well as her participation in the
14  scholastic awards and Congressional art competition."
15     And that as of now he will be asking all
16  department members for a summary of their work for
17  classes in the GDS community each year, so that he can
18  better credit those efforts in the annual evaluations
19  and that continues regard to the two absences.
20     "The two absences noted did occur at times
21  when the existing meeting schedule was clear and
22  established.  However, in conversation, Sharon

Page 44

1  clarified that those absences were prompted by
2  unavoidable emergencies or appointments she felt she
3  could not miss."
4      And finally, he'll be posting a meeting
5  schedule for regular department meetings to ensure we
6  maintain communication with the department.
7      Q. With regard to that first point, did he also
8  indicate that for the next school year, that is,
9  2005-2006 that you would be taking over the film and
10  video class and be the primary person in charge of the
11  video cameras next year?
12     A. Yes.
13     Q. Were you satisfied with Mr. Ryan's response to
14  your comments on the evaluation contained in Exhibit 7,
15  Ms. Killian?
16     A. I signed it as having acknowledged it that I
17  received that.
18     Q. Did you feel it was a satisfactory response?
19     A. Yes.
20     Q. Do you regard Exhibit 7 as an example of
21  racially hostile treatment of you by Mr. Ryan or GDS?
22     A. No.

Page 45

1      Q. Now, in making your comments on Exhibit 7, did
2  you indicate that you felt you had been subjected to
3  racially hostile treatment during the 2004-2005 school
4  year?
5      A. Repeat that for me.
6      Q. In making your comments on Exhibit 7.
7      A. Uh-huh.
8      Q. Those would be the comments that appear on
9  page 206 --
10     A. Uh-huh.
11     Q. -- 4.
12     A. Uh-huh.
13     Q. Did you indicate that you felt you had been
14  subjected to racially hostile treatment during the
15  school year of 2004-2005?
16     A. No, I did not say that.
17     Q. And in making your comments on Exhibit 7, did
18  you give GDS any indication that you thought you would
19  be unable to teach at GDS or that -- let me stop.
20     Did you give GDS any indication that you
21  thought you would be unavailable to teach at GDS in
22  June 2005-2000 -- in the 2005-2006 school year?

12  (Pages 42 to 45)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 46

1      A. In this evaluation?  Is that what you're
2  saying?
3      Q. I garbled it so much, let me just start again.
4      A. Yeah.  Would start again, please.
5      Q. Let me just start again.
6      A. Please.
7      Q. In making your comments on Exhibit 7.
8      A. Uh-huh.
9      Q. Did you give GDS any indication that you
10  thought you would be unable to teach at GDS in the
11  2005-2006 school year?
12      A. No.
13      Q. Now, during the years that you worked at GDS,
14  did you sign an employment contract each year?
15      A. Yes.
16      Q. And what was the term or length of the
17  contract?
18      A. It's a school year, an academic year I
19  believe.  Yeah, uh-huh.
20      Q. And did you sign a contract each year?
21      A. Yes.
22      Q. I'd like to ask you to take a look at a

Page 47

1  document we're going to mark as Exhibit 8.
2      A. Uh-huh.
3          (Thereupon, a document was marked for
4  identification Exhibit No. 8.)
5          THE WITNESS: Thank you.  Okay.
6  BY MR. WILLIAMSON:
7      Q. What is Exhibit 8?
8      A. Exhibit 8 is a Georgetown Day School faculty
9  contract 2004-05 school year.
10      Q. And is this typical of the type of contract
11  that you would have signed each year?
12      A. I believe it's changed.  It changed at one
13  point there, but I'd say in the end you either accept
14  or not.  You sign and the head of school signs,
15  something like this.  Uh-huh.
16      Q. Do you know if it changed for the 2005-2006
17  year?
18      A. I don't recall whether it did or not.
19      Q. Okay.  We'll try to get ahold of that later on
20  and see if we can find out if there's been any change.
21          About what time of year would you be required
22  to sign an employee contract for the upcoming school

Page 48

1  year?
2      A. It looks like February.
3      Q. Is it your recollection that February was
4  normally the time when you --
5      A. I think so.
6      Q. -- signed these contracts?
7      A. To the best of my recollection, yes.
8      Q. And did you --
9      A. It was.
10      Q. -- sign a similar comparable contract --
11      A. Yes.
12      Q. -- in February --
13      A. Sorry.  Uh-huh.
14      Q. -- of 2005 saying that you were planning to be
15  available to work as an art teacher in the 2005-2006
16  school year?
17      A. Yes.
18      Q. Now, did you work at GDS during the summers
19  after the regular school year ended?
20      A. Yes.  At my home and at school.  I'd use my
21  desk in both places occasionally.
22      Q. Were you working as a teacher?

Page 49

1      A. I was on my -- my own.  No.  I was doing my
2  own work or doing my work for school, and I'd use the
3  desk there or my desk at home.
4      Q. I see.
5      A. Is that the question?  Did I answer the
6  question?  Could you rephrase that so I --
7      Q. Well --
8      A. -- I'm clear.
9      Q. -- I think, yes.  What I'm trying to
10  understand is: Did you have any teaching duties at GDS
11  during the summers after the end of the school year in
12  June and before the beginning of the school year in
13  late August or early September?
14      A. No.
15      Q. So you weren't teaching summer school or
16  anything like that?
17      A. No.
18      Q. It was more the type of work that was referred
19  to in one of your evaluations where you were working on
20  preparing courses and your own career development; is
21  that right?
22      A. Yes.

13  (Pages 46 to 49)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 50

1    Q. Now, before you came back to school in the
2 late summer, did you know what courses you would be
3 teaching in the next school year?
4    A. By then, yes. Uh-huh. Yes.
5    Q. Okay. You say by then, when --
6    A. You --
7    Q. -- did you find out? What was the earliest
8 time when you found out what courses you had been
9 assigned for the next school year?
10    A. I believe it's around February/March.
11    Q. February/March of the previous?
12    A. The previous, yeah, yeah.
13    Q. Okay. So you would know by the summer --
14    A. Uh-huh.
15    Q. -- before the school year?
16    A. What courses you would, yes.
17    Q. Remember, I just -- want you to let me finish
18 just for the reporter.
19    A. Sorry.
20    Q. Okay. So you would know by February or March
21 what courses you would be teaching in the next school
22 year; is that right?

Page 51

1    A. Yes.
2    Q. Okay. Now, were you responsible for ordering
3 supplies in the summer for the courses that you knew
4 you would be teaching in the fall?
5    A. No.
6    Q. You were not?
7    A. Not during the summer.
8    Q. Okay. Did you ever order supplies for the
9 courses you would be teaching in the fall during the
10 summer --
11    A. Yes.
12    Q. -- before those courses began?
13    A. Yes.
14    Q. And why, why were you doing that if that was
15 not part of your responsibility?
16    A. It depended on whether you needed the
17 equipment or the materials and you didn't have a ready
18 supply. So you would be prepared so that on the first
19 day of classes, you would have everything.
20    Q. Were there any years where you didn't order
21 any supplies before you started teaching your courses
22 in the fall?

Page 52

1    Let me rephrase that. Were there any years
2 where you didn't order supplies during the summer for
3 courses that you would be teaching in the fall at GDS?
4    A. I'm sure. Well, I shouldn't say I'm sure.
5 To the best of my recollection, yes.
6    Q. There were years when you didn't order any
7 supplies?
8    A. Until September.
9    Q. I see. Do you remember what years those
10 would have been?
11    A. No, but the whole department would decide, you
12 know, we will -- we will -- we have enough materials
13 just to begin. We can order certain things in the
14 beginning of the year and we would do it then.
15    Q. And what types of supplies would you order as
16 an art teacher?
17    A. Cameras and paper and pens and software and
18 all types.
19    Q. Okay. And do you know whether these supplies
20 would be paid -- purchased using the art department's
21 supply budget?
22    A. Some of them would be. Certain things would

Page 53

1 be what would be called a capital budget.
2    Q. And to get these supplies, how far -- when you
3 had -- when you had a need for them, how far in advance
4 of the school year did you need to place the orders?
5    A. That depended really on -- on the availability
6 of the equipment by the manufacturer or the maker or --
7    Q. What would be the range of time periods?
8    A. Hmm. I have -- I have received materials as
9 quickly as two days to five days and sometimes it's
10 gone for longer periods than that, but it varied.
11    Q. For the 2004-2005 school year, do you remember
12 whether you had a need to order supplies in the summer
13 before that school year?
14    A. I don't remember exactly. I can look at that
15 and see whether I -- I did or not. If you have a
16 purchase order, I'd be happy to take a look at it to
17 see if I did have to or not.
18    Q. Do you remember ordering any supplies in July
19 of 2004 in anticipation of the 2004-2005 school year?
20    A. I don't recall.
21    Q. Let's take a look a couple of documents I'm
22 going to mark as Exhibits 9 and 10.

14  (Pages 50 to 53)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

Page 54

1    A. Thank you.
2        (Thereupon, documents were marked for
3    identification Exhibit Nos. 9 and 10.)
4        THE WITNESS: Okay. All righty.
5    BY MR. WILLIAMSON:
6    Q. Can you tell us what Exhibit 9 is, Ms.
7    Killian?
8    A. It's a purchase order, Penn Camera, to Penn
9    Camera by Sharon Killian for general photo.
10   Q. What's general photo?
11   A. Well, general photographic supplies.
12   Supplies that were used for all black and white
13   photography processes. Uh-huh.
14   Q. And who was placing that order?
15   A. I, Sharon Killian, placed. That's me,
16   uh-huh.
17   Q. And when did you place that order?
18   A. Placed 7/6/04.
19   Q. Take a look at Exhibit 10. Tell us what that
20   is.
21   A. Exhibit 10 is another purchase order to Penn
22   Camera. Sharon Killian for, ship to and ordered by

Page 55

1    me. And order placed 7/6/04, written 6/21/04.
2    Uh-huh.
3    Q. Did you or do you recall whether you told Nick
4    Ryan in the first week of July 2005 that you would be
5    placing an order for supplies for the 2005-2006 school
6    year?
7    A. I believe so.
8    Q. Ms. Killian, do you have any children?
9    A. Yes, I do.
10   Q. And how old are your children?
11   A. 31, 23, 19.
12   Q. You have three children?
13   A. Yes.
14   Q. What are their names?
15   A. Jacob Killian, Jarrell Booker, Lindsay Booker.
16   Q. Okay. Did any of them attend Georgetown Day
17   School?
18   A. Yes.
19   Q. Did all of them attend Georgetown Day School?
20   A. No.
21   Q. Which ones attended Georgetown Day School?
22   A. Jarrell Booker, Lindsay Booker.

Page 56

1    Q. And Jarrell Booker is how old?
2    A. He's 23, soon to be 24.
3    Q. And Lindsay is?
4    A. 19.
5    Q. 19?
6    A. Uh-huh.
7    Q. How many years did your son Jarrell Booker
8    attend Georgetown Day School?
9    A. Four years.
10   Q. What -- what grades were those?
11   A. 9 through 12.
12   Q. And do you remember what year he started
13   attending Georgetown Day School?
14   A. Hmm. What is that? '96 I believe. '96 or
15   '97. It's four years. So, subtract four from 2000,
16   which is his year of graduation.
17   Q. You sound -- you sound like a pretty proud
18   mother.
19   A. I am.
20   Q. There's probably -- probably some good reasons
21   for that. How many years did your daughter attend
22   Georgetown Day School?

Page 57

1    A. Hmm. Seven years.
2    Q. This is your daughter Lindsay?
3    A. Yes.
4    Q. So, when did she start attending Georgetown
5    Day School?
6    A. '97 I think. 1997. She was in fifth grade.
7    Q. And she graduated in the class of what?
8    A. 2004.
9    Q. What college did your son go to after he
10   graduated from -- well, let me. I'll do a little
11   foundational question. Did your son go to college
12   after he graduated from Georgetown Day School?
13   A. That's a good question. Yes, he did.
14   Q. And what college did he go to?
15   A. Virginia Commonwealth University.
16   Q. Okay. And did your daughter go to college
17   after she graduated from Georgetown Day School?
18   A. Yes.
19   Q. And what college did she go to?
20   A. Princeton University.
21   Q. Is she currently enrolled at Princeton
22   University?

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 58

1     A. Yes.
2     Q. That's very impressive.   Congratulations.
3     A. Thank you.
4     Q. When your children were attending Georgetown
5  Day School?
6     A. Uh-huh.
7     Q. Did you have to pay their tuition as students
8  at the school?
9     A. Yes.
10     Q. Did GDS give you a tuition discount for your
11  children when they were attending Georgetown Day School
12  because you were a staff member?
13     A. Yes.  Faculty received a percentage discount,
14  yes.
15     Q. Do you remember what that percentage discount
16  was?
17     A. I believe that was 40 percent.
18     Q. Okay.  And were you given that benefit each
19  year that your children attended the Georgetown Day
20  School?
21     A. I believe, yes, as a policy that all faculty
22  whose children were in attendance would receive 40

Page 59

1  percent and yes.
2     Q. And that discount applied to both of the
3  children?
4     A. Yes.
5     Q. In addition to tuition discounts of 40 percent
6  for your two children, did you receive any financial
7  aid or scholarship benefits from GDS while your
8  children were attending the school?
9     A. Yes.
10     Q. What were those?
11     A. There was a period where I or maybe periods
12  where we did receive financial aid.  I don't remember
13  the exact percentage, but I know that GDS has a copy of
14  whatever that was.
15     Q. Do you know about how much financial aid you
16  received for each of your children while they were
17  attending GDS?
18     A. No.
19     Q. You have no idea?
20     A. I don't recall.  No.
21     Q. Do you know the approximate total dollar value
22  of the tuition discounts and financial aid that you

Page 60

1  received from GDS while your children were enrolled at
2  the school?
3     A. No.
4     Q. And how would you be able to determine the
5  total dollar value of the tuition discounts and
6  financial aid that you received from GDS for the
7  benefit of your children?
8     A. I would go back to the announcement of the
9  cost of tuition for the years that my children went to
10  GDS and look at the award letters and subtract that
11  out, and I would be able to -- to do it, to calculate
12  it, yes.
13     Q. Do you have copies of these award letters?
14     A. I would have to go back to my, you know, go
15  home and search through boxes, or GDS would have those.
16     Q. We'll check with your counsel.  I'm not sure
17  off the top of my head whether we had specifically made
18  a request for those documents.  But if we didn't, then
19  we'll send you an amended or an additional request for
20  documents.
21     A. The GDS.
22     MR. RACIN:  It's so clearly in your

Page 61

1  files.  I'm not sure why you would burden Ms. Killian
2  with such a request, but we can discuss it.
3     MR. WILLIAMSON:  We'll -- we'll -- we
4  don't need to take time to discuss that one right now.
5     MR. RACIN:  Right.
6  BY MR. WILLIAMSON:
7     Q. Is it accurate to say that you waited until
8  after your children had graduated from GDS and you had
9  received these tuition benefits and financial aid
10  before you filed your lawsuit against GDS?
11     A. No, it wouldn't be accurate.
12     Q. Okay.  When did your younger child graduate
13  from GDS?
14     A. 2004.
15     Q. And when did you file your lawsuit against
16  GDS?
17     A. 2005.
18     Q. Let me ask the question again.  You may not
19  have understood what I was saying.
20     A. Uh-huh.
21     Q. Is it accurate to say that you waited until
22  after your children had graduated from GDS and you had

16  (Pages 58 to 61)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 62

1  received the tuition discount benefits and financial
2  aid before you filed your lawsuit against GDS?
3      A.  And my --
4          MR. RACIN:  I object on the grounds it's
5  argumentative.
6          THE WITNESS:  Yeah.
7          MR. RACIN:  The facts are what they are.
8  The characterization of waited versus --
9          THE WITNESS:  Uh-huh.
10         MR. RACIN:  Objection on grounds
11 argumentative.  But you may answer.
12         THE WITNESS:  I would still say, no, I
13 didn't wait.  I didn't, no.  The answer is no.
14 BY MR. WILLIAMSON:
15     Q.  Why is it you didn't file your lawsuit sooner
16 while your -- while your children were still enrolled
17 at GDS?
18     A.  I -- I didn't really want to have to do that.
19 I suffered racial hostility while my children were in
20 school, yes.  I wanted them to have their education
21 nonetheless.  But I had no plan on filing a lawsuit.
22     Q.  When was it that you decided that you should

Page 63

1  file a lawsuit?
2      A.  It was in August/September of -- of '05 when
3  the school and I through my attorney were in discussion
4  about all of the facts that I have -- that we have
5  shared and our negotiations broke down.  I was further
6  hurt by the response of the school after I had suffered
7  for over 11 years and had worked towards helping the
8  school to do the right thing according to what their
9  mission is and...
10     Q.  How was it that you were further hurt in
11 August of 2005?  Or you perceived it?
12     A.  The school refused to -- we were told that
13 there was a negotiation going on and then the school
14 refused to negotiate and in good faith and that was it.
15     Q.  When you say the school refused to negotiate
16 in good faith, what do you mean by that?  What is it
17 that the school refused to do?
18     A.  To -- to even discuss -- to discuss the
19 damages that I had suffered.
20     Q.  What's your basis for saying that the school
21 refused to discuss the damages you had suffered?
22     A.  My attorney was in contact with -- I believe

Page 64

1  you became the attorney for the school.  After we were
2  told that -- that you were the attorney to -- for a
3  different -- with a different focus in helping the
4  school to -- to decide on insurance matters and so on,
5  and then we were then told that you were representing
6  the school and that you -- you were going to -- this
7  is -- this is what the school has said and that's --
8  there's no further negotiation about anything.  That's
9  as much as I know.
10     Q.  You were told there was no further negotiation
11 about anything; is that right?
12     A.  I was told that this is what the school has
13 said and that's it.
14     Q.  Were you told that the school offered a
15 tolling agreement to allow additional time for
16 discussion and that your lawyer filed a lawsuit before
17 the end of that tolling period?
18     A.  What is it?  What do you mean?  Would you
19 explain the tolling --
20     Q.  I'm not going to give you --
21     A.  -- to me.
22     Q.  -- legal advice, but I'm just asking you

Page 65

1  whether you knew anything about whether -- did your
2  lawyer tell you that the school had agreed to something
3  called a tolling agreement to allow some additional
4  time to discuss possibilities for settlement?
5          MR. RACIN:  Objection, assumes facts not
6  in evidence.  You know, asking a question in terms of
7  tolling agreement, which most lawyers -- most lay
8  people and some lawyers know nothing about.  I would
9  object to the -- but to the extent you can answer, you
10 can answer.
11         THE WITNESS:  There -- as far as I
12 understood and as far as I understand, there was
13 something called a tolling agreement, but that time was
14 based on some retroactive date.  Is that not right?
15 BY MR. WILLIAMSON:
16     Q.  That's all right.  We don't need to spend too
17 much on it.  I think your counsel has a point that not
18 all lawyers have a clear understanding of tolling
19 agreements.  So I'm not going to press you on that.
20     A.  Okay.
21     Q.  We want to understand your claim of bad faith,
22 though, by the university.  Are you saying --

17  (Pages 62 to 65)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 66

1    A.  By the school.

2    Q.  Excuse me.  By Georgetown Day School.  I'm

3  sorry.  I got some other cases where we represent

4  Georgetown University.

5        Are you saying that Georgetown Day School

6  negotiated in bad faith because they wouldn't agree to

7  your settlement proposal, or are you saying that they

8  negotiated -- GDS negotiated in bad faith because they

9  refused to discuss settlement issues with your lawyer?

10  Which is it?

11    A.  I believe it's settlement issues.

12    Q.  That the university, I mean -- excuse me, that

13  Georgetown Day School was not willing to get close

14  enough in terms of the settlement that you thought was

15  fair; is that right?

16    A.  There was no negotiation.

17    Q.  I beg your pardon?

18    A.  There was no negotiation.

19    Q.  When you say there was no negotiation, isn't

20  it true that the university made a counteroffer?

21        MR. RACIN:  Objection as to form,

22  leading.  But you may answer.

Page 67

1        THE WITNESS:  GDS, the school, a

2  counteroffer?  I would have to go back and look at the

3  notes that I received to -- to be able to answer that

4  question I think with real knowledge, you know.

5  BY MR. WILLIAMSON:

6    Q.  So, right now you don't -- you can't recall

7  whether in the course of the negotiations during the

8  summer of 2005 Georgetown Day School made a

9  counteroffer to your proposal for settlement?

10    A.  There was a -- there was a -- I'm trying to

11  remember whether it's a counteroffer and that -- there

12  was a counteroffer and then that was the end of that.

13  And so --

14    Q.  When you say that was the end of that, did --

15  did you make a response to the university's

16  counteroffer?

17    A.  To the school?

18    Q.  I'm sorry, to GDS's counteroffer.  Let me

19  just get Georgetown out of my head.  Say GDS's

20  counteroffer?

21    A.  I don't recall exactly.

22    Q.  So --

Page 68

1    A.  I don't recall exactly.

2    Q.  It's possible that --

3    A.  This is in August.  I don't recall exactly.

4    Q.  August of 2005?

5    A.  Uh-huh.

6    Q.  It's possible that you got a counteroffer from

7  GDS, but you said that that counteroffer was so low

8  that you were not interested in responding with your

9  own counteroffer; is that possible?

10    A.  My -- my understanding was that the GDS offer

11  was the last and final offer.

12    Q.  Do you remember making any response to that

13  last and final offer?

14    A.  I don't recall.

15    Q.  And do you know if there was someone

16  representing GDS who said that they refused to talk to

17  your lawyer any further about settlement?

18    A.  My understanding is, Mr. Williamson, is that

19  you were the representative for GDS and that's all I

20  know.

21    Q.  Do you know whether I ever said that GDS was

22  unwilling to talk any further about settlement with

Page 69

1  with you or your lawyer?

2    A.  I don't know exactly.  Can you --

3    Q.  Okay.  That's -- I want to --

4    A.  No?

5    Q.  This is your deposition.

6    A.  Just for me, okay.

7    Q.  And I'm just asking about your recollection.

8        Was there a time while your children were

9  attending GDS when your husband lost his job?

10    A.  Yes.

11    Q.  About when did that occur?

12    A.  2001 I think.

13    Q.  What was GDS's response in terms of tuition

14  discounts and financial aid when the school became

15  aware that your husband had lost his job?

16    A.  I thought that GDS was -- was very generous,

17  actually.

18    Q.  Why did you think that?

19    A.  Because I -- well, any parent in -- in -- at

20  GDS in a position to need to be -- to receive financial

21  aid once the student is there, it's my -- my

22  understanding, especially as a faculty member in that

18  (Pages 66 to 69)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 70

1  position, could expect that -- I believe that the
2  school would offer financial aid to keep the kid in
3  school.
4      Q. Did GDS provide you with additional financial
5  aid when GDS learned that your husband had lost his
6  job?
7      A. When I became the sole wage earner, yes.
8      Q. And did they make an adjustment in your
9  financial aid in the amount of 9,000 or to increase it
10  by an amount of $9,719?
11      A. I don't -- I would have to look to be
12  exactly -- to be sure of that number and which year and
13  all of that.  But you could be right.  Yeah.  If
14  that's the 60 percent or close to it.  It wouldn't be
15  the total because I was paying as I went along, but
16  some amount.
17      Q. Does that sound approximately right?
18      A. I couldn't guarantee that it would be exactly
19  that, but I, you know, the numbers are probably very
20  close.
21      Q. Let me hand you a document we're going to mark
22  as Exhibit 11.  See if that refreshes your

Page 71

1  recollection.
2      A. Okay.
3          (Thereupon, a document was marked for
4  identification Exhibit No. 11.)
5  BY MR. WILLIAMSON:
6      Q. Would you take a look at that document and go
7  down about two-thirds of the page.
8      A. Two-thirds, uh-huh.
9      Q. About two-thirds of the way down.
10      A. About what date are we looking at here?
11      Q. 1/24.
12      A. Okay.
13      Q. 2002.
14      A. Uh-huh.
15      Q. Was that around the time that your husband
16  lost his job?
17      A. Probably so.
18      Q. And do you see the notation there that says?
19      A. FA.
20      Q. FA adjustment $9,719?
21      A. Okay.
22      Q. Does that refresh your recollection as to

Page 72

1  whether the financial aid for your children was
2  increased by that amount --
3      A. Hmm.
4      Q. -- in January of 2002?
5      A. For my daughter?  One child at that point.
6  It could be.  Could be.
7      Q. Okay.  Were you grateful to the school for
8  granting you this aid when the school learned your
9  husband had lost his job?
10      A. I was glad that the school decided to -- to
11  help us with the financial aid for my daughter to
12  continue her education.
13      Q. Is that something the school did unsolicited,
14  or did you ask the school to do that?
15      A. When a financial situation comes up, everybody
16  needs to ask.  Everybody needs to ask.
17      Q. Right.
18      A. And I did.
19      Q. Whom did you ask?
20      A. I talked to Kate Lindsay as I would at any
21  other time.
22      Q. And who is Kate Lindsay?

Page 73

1      A. Kate Lindsay is the CFO of Georgetown Day
2  School.
3      Q. Did you express your gratitude to Ms. Lindsay
4  in -- in writing?
5      A. I don't remember if I expressed it to her in
6  writing, but I certainly would have said, "Kate, thank
7  you for taking care of that for me."
8      Q. Let me hand you a document that's been --
9  that's going to be marked as Exhibit 12.
10      A. Thank you.
11          (Thereupon, a document was marked for
12  identification Exhibit No. 12.)
13          THE WITNESS: Yes.  Yes.
14  BY MR. WILLIAMSON:
15      Q. What is Exhibit 12?
16      A. It's a note that I sent to Kate.
17      Q. What's the --
18      A. On February 24, '02.
19      Q. Is this a handwritten note?
20      A. Yes, it is.
21      Q. And what's the substance of what you said in
22  the note?

19  (Pages 70 to 73)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 74

1    A. I -- I am catching up with her, essentially
2  telling her what's going on.  "After all we've been
3  through these last weeks and months, I felt ill with
4  the flu and was in bed through Friday.  I'm feeling
5  much better now and hope the bug doesn't infect Lindsay
6  and Charles, too.  I've had enough.  Thank you for
7  your patience and support.  We are still plugging
8  along, working for and hoping for good news for
9  Charles.  Keep your fingers crossed.  Again, thanks.
10 Sharon."
11    Q. Who is Charles?
12    A. Charles is my husband.  Uh-huh.
13    Q. What was the good news that you were looking
14 for?
15    A. That perhaps -- well, at this time probably
16 that, you know, another job would come along perhaps.
17    Q. And when you say in that note "Thank you for
18 your patience and support," what are you referring to?
19    A. I -- I don't recall exactly if -- what that
20 would be.  Patience and support.  Patience could
21 be -- usually when one says patience means that maybe
22 she asked me for something and I -- I've given it to

Page 75

1  her?  You know, maybe she asked me for some documents
2  or something and I, you know, she waited for it or
3  something of that nature.  Usually that's what I --
4  when somebody has to wait or somebody has -- I owe
5  somebody something, then I usually send them a note
6  saying thank you for your patience and support.
7    Q. Is it your testimony today that you can't
8  remember specifically why you said thank you for your
9  patience and support to Ms. Lindsay back in 2000 -- in
10 February of 2002?
11    A. That's true, except, you know, I am not
12 ashamed of saying thank you for -- for what -- any good
13 that has come from Kate Lindsay or anyone else at GDS.
14    Q. Okay.  I didn't -- I didn't want to suggest
15 that you should be ashamed of saying thank you.  My
16 question was just whether your testimony is that you
17 can't specifically recollect why --
18    A. No.
19    Q. -- you said thank you for your patience and
20 support?
21    A. No.  I -- I would have to think about when
22 app -- when -- if you -- you are suggesting that this

Page 76

1  is in regard to the 24th having to do with my -- my
2  daughter's tuition.
3    Q. I'm not --
4    A. In which case --
5    Q. Ms. Killian, I'm not suggesting.  I'm asking
6  you a question to get your answer to the question.
7    A. I understand what you are saying.  Although
8  this says January 24th here on that activity report
9  and February 24th on my note.  So they could possibly
10 not -- it could possibly not have anything to do with
11 financial aid at that point.  So you're right, I
12 really can't tell you exactly what that is about.
13 Maybe Kate can refresh my memory.
14    Q. Is there anybody else who could refresh your
15 recollection beside Kate?
16    A. About this particular thing?
17    Q. Yes.
18    A. I think Kate would be the one since she had my
19 handwritten note and so I think she'd be the perfect
20 one to refresh my memory on that, my recollection on
21 that.
22    Q. Ms. Killian, did you say when you were

Page 77

1  initially hired at GDS that the chair of the art
2  department was Deborah Haynes?
3    A. Yes, I did.
4    Q. How would you describe your relationship with
5  Deborah Haynes when you were first hired in the art --
6  into the art department?
7    A. I -- I was very happy to be at GDS and Deborah
8  Haynes seemed very happy to -- to teach me the ropes at
9  that school.  She was, I would say, initially a good
10 mentor.
11    Q. How did that relationship evolve over time in
12 your early years as a member of the GDS faculty?
13    A. As time went on and I learned what she was
14 trying to teach me and I began to develop my teaching
15 strategies and became more as time went on and started
16 -- I started to feel like, okay, I'm teaching these
17 courses.  I need space for these courses.  I noticed
18 that I -- I could not decide about teaching spaces or
19 anything like that.  It was I had to request
20 permission to -- to move an object from a space, even
21 if I were teaching a course in the space.
22    I had to ask permission to -- to clean a space

20  (Pages 74 to 77)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 78

1  if I hadn't left the mess, and things became a
2  little -- not just a little strained.  It continued to
3  build into a negative situation.
4      Q.  When you say just not a little strain, what --
5  how strained did it become?
6      A.  It -- it became very strained.
7      Q.  And what would be examples of how it became so
8  strained?
9      A.  It -- I'd be in a classroom and I'd be
10  teaching my -- my students.  Teaching in my class or
11  I'd be in the studio with students working, and Deborah
12  would come into the classroom and stop and ask the
13  students, you know, "What are you doing?"  Like "Why
14  are you using the computers?"  And they'd say, "Sharon
15  said we could use the computers" and she, you know,
16  would say to the kids, "Well, Sharon is not the
17  chairperson.  I am the one who decides who gets to use
18  the computers.  So don't use them."  Right there in
19  front of the kids.  She -- so, that's when it
20  deteriorated.
21      Q.  Do you remember what year that occurred?
22      A.  That was probably something like '97, '96 or

Page 79

1  '97.
2      Q.  During the -- this mid to late '90s period,
3  did you regularly attend meetings of the art department
4  faculty?
5      A.  Whenever we had meetings, yes.
6      Q.  And whenever you had meetings, did you
7  participate in discussions involving the art department
8  faculty members?
9      A.  Yes, I tried.  Yes, I did.
10      Q.  Were there ever meetings where you refused to
11  participate in discussions at the meetings?
12      A.  No, not to my recollection.  No.
13      Q.  And did you ever refuse to attend any art
14  department meetings when Deborah Haynes was the -- the
15  chair of the department?
16      A.  No, not -- not that I recall.  Uh-uh.
17      Q.  Now, is Ms. Haynes still the chair of the art
18  department?
19      A.  No.
20      Q.  When did she cease being the chair of the art
21  department?
22      A.  I believe that was 2000.

Page 80

1      Q.  Okay.  I think that's what you testified
2  earlier.
3      A.  Yes.
4      Q.  Okay.  Is Ms. Haynes still employed by GDS?
5      A.  I really don't know.
6      Q.  While you were employed at GDS, was there any
7  time when Ms. Haynes ceased to be employed by the
8  school?
9      A.  I -- I believe so.  She left I think it was I
10  guess at 2000-2001 academic year, something like that.
11      Q.  Did you play any role in Ms. Haynes -- well,
12  tell me.  Do you know whether she left voluntarily or
13  whether she was terminated involuntarily by the school?
14      A.  I don't know.
15      Q.  Did you play any role in Ms. Haynes' departure
16  from the GDS faculty?
17      A.  No.
18      Q.  Are there any GDS employees who think that you
19  played a role in the termination of Ms. Haynes as a GDS
20  faculty member?
21      A.  Yes.
22      Q.  Who are they?

Page 81

1      A.  Certainly Nick Ryan said to me that I won't
2  get rid of him the way I got rid of Debbie Haynes.
3      Q.  Anybody else besides Nick Ryan?
4      A.  I'm -- there were -- there are a group of
5  people who have treated me since her departure and who
6  were her friends who have treated me with what I think
7  hostility and disrespect, yes.  But Nick Ryan is the
8  one who said that to me.
9      Q.  All right.  My question, is there any other
10  GDS employee who thinks that you played a role in the
11  termination of Ms. Haynes' employment by GDS?
12      A.  I would only answer that my -- I would say
13  that some of her long-time friends because of the way
14  that I have been treated, I would only speculate that
15  that is part of it.  I've heard that.
16      Q.  Which long-time friends are you talking about?
17      A.  Bruce Ruble, Norrine Mac, Laura Tolliver.
18      Q.  You say you've heard that they believe that
19  you had some responsibility for the termination of Ms.
20  Haynes' employment.  Whom have you heard that from?
21      A.  It's -- I -- I can't give you an exact name of
22  somebody who would have said that to me, but, you know,

21  (Pages 78 to 81)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

**Page 82**

1  I've heard.  It's like the quote, unquote grapevine.
2  Plus Nick Ryan, who had been hired to replace Deborah
3  Haynes, has said that, and I am assuming that since he
4  became friends with those people that they must have
5  told him that.
6      Q.  You say --
7      A.  Because how else would he know that or say
8  that?
9      Q.  You say you're assuming that.  Do you know
10  whether they told him that?
11      A.  I don't know exactly that they told him that.
12      Q.  Do you know generally whether they told him
13  that?
14      A.  I, as I said before, that I would be
15  speculating that that's what would have happened if he
16  were to say that.
17          MR. RACIN:  Now, Mr. Williamson does not
18  want you to speculate I'm sure.  So, take that.
19          THE WITNESS:  Okay.  So, the answer.
20  Rephrase the question, please, so I can answer you.
21  BY MR. WILLIAMSON:
22      Q.  That's fine.  I don't mind if you speculate

**Page 83**

1  as long as you characterize what you're saying as -- as
2  speculation.  Then that's -- that's fine with me.
3      Why do you think those long-time friends of
4  Debbie Haynes might have the impression that you played
5  a role in the termination of Ms. Haynes as a GDS
6  employee?
7          MR. RACIN:  I would object to asking the
8  witness to speculate.  You can speculate if you
9  choose.
10          THE WITNESS:  Repeat the question.
11  BY MR. WILLIAMSON:
12      Q.  Why is it that you think that the people you
13  referred to as long-time friends of Ms. Haynes might
14  have the impression or view that you played a role in
15  the termination of Ms. Haynes as a GDS employee?
16      A.  Primarily because of the severe negative
17  treatment that I received once she left from those
18  people.
19      Q.  What I'm trying to understand is -- well, tell
20  me.  Do you know why Ms. Haynes was terminated?
21      A.  Actually, not exactly, no.
22      Q.  And is there anything that you've done or said

**Page 84**

1  that might suggest to somebody else on the faculty that
2  you might have played a role in her termination?
3      A.  You know, I don't know.  I think -- I'm
4  pretty sure she was an alcoholic and I -- I and maybe
5  it's not that.  Maybe she was -- she just happened to
6  be drunk several times, but I have been in curriculum
7  nights where all the parents come into the classroom
8  and the teacher then has to talk to the parents about
9  what occurs or what will happen for the school year.
10      I've had to run to her.  I ran to Norrine.
11  I run to Bruce and say, "She's falling down" or "She's
12  slipping up" or something and they'd come in and -- and
13  get her and then take care of her presentation, you
14  know, and so I -- they know that I have done that.  I
15  have -- these people know that I've had to do that.
16      Now, I'm sure that I'm not the only one who
17  has seen this, but I'm the one who Nick Ryan has
18  screamed at that I won't get rid of him the way I got
19  rid of Debbie Haynes.  And I have not done anything to
20  get -- as far as I know, to get rid of Debbie Haynes.
21      Q.  Did you ever ask Mr. Ryan what he meant by
22  that statement?

**Page 85**

1      A.  I believe that I have.
2      Q.  And what was his answer?
3      A.  His answer -- I don't remember exactly.  It
4  may be written somewhere in my notes that you probably
5  have, but usually -- well, not usually.  Let's not say
6  usually.  In addition to screaming and total
7  unprofessional behavior, you know, directed at me in a
8  situation like that or in that particular situation, I
9  doubt that it was anything different than, "Yes, you
10  got," you know, you know, "You're not going to get rid
11  of me."  Just repeating the same thing.
12      Q.  So he didn't provide any explanation of why he
13  was saying that?
14      A.  No.  No.  "You got rid of," you know, same
15  story over and over again.
16      Q.  What was the same story over and over again?
17      A.  You know, "You're not going to get rid of me
18  the way you got rid of Debbie Haynes."
19      Q.  That's something that he said to you on
20  repeated occasions?
21      A.  On -- during that same discussion I recall
22  that he -- he repeated that to me after I said, "Why

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 86

1  would you say such a thing?" I also remember going to
2  Paul and saying to Paul Levy, who was the principal.
3  "This is what Nick Ryan has said to me, Paul," and
4  he's -- and Paul said to me, "Really. I've already
5  talked to Nick about what has happened with Debbie
6  Haynes. He should know better than that."
7      Q. Was there more than --
8      A. But nobody told -- yes.
9      Q. No. Go ahead. I want you to finish your
10 question.
11     A. No, I'm sorry, I'm finished.
12     Q. Was there more than one day when Mr. Ryan made
13 the statement to you?
14     A. No.
15     Q. Now, did you ever socialize with Ms. Haynes
16 when she was the chairman of the art department?
17     A. I have -- I had been invited to a party
18 before. So the answer to that was I had been to --
19 she had invited us to her house, yes.
20     Q. And did you go in response to that
21 invitation --
22     A. Yes.

Page 87

1      Q. -- to her home?
2      A. Uh-huh. Yes.
3      Q. Is it more than once?
4      A. I have also been to her home for an art
5  department retreat. So faculty -- different faculty
6  groups go to different places, and I've also been to an
7  art department retreat at Laura Rosberg's house, the
8  theater production person's house. So, and yes. So
9  the art department had a meeting at Deborah Haynes's
10 house on another occasion, yes.
11     Q. Were you -- you ever invited to Ms. Haynes'
12 home either for a social occasion or a faculty meeting
13 and you declined the invitation?
14     A. No.
15     Q. And did you ever accept invitations from Ms.
16 Hines or Ms. Haynes, rather, to come to a function at
17 her home but then not actually appear at the event?
18     A. No.
19     Q. Who is Laura Tolliver?
20     A. She is a teacher in the art department.
21     Q. And was she working in the art department when
22 you first started working at GDS?

Page 88

1      A. Yes.
2      Q. Do you know how long she had been working at
3  GDS before you came?
4      A. I wouldn't be able to give you an exact
5  number, but it was over 10 years I think. Maybe
6  even -- yeah, yeah. It was over 10 years.
7      Q. How would you describe your relationship with
8  Laura Tolliver?
9      A. I would say that that -- that it's not good.
10     Q. Why do you say that?
11     A. She has hindered my -- my work as a faculty in
12 the art department.
13     Q. How did your relationship with Ms. Tolliver
14 start out?
15     A. As a colleague. She -- when I came in there,
16 her husband was sick and she -- he eventually did die,
17 but I substituted for her. This is the person -- one
18 of the people I substituted for.
19     Q. And then when she came back to working full
20 time, well, how would you describe your relationship
21 back then?
22     A. I would say it was -- it was a situation where

Page 89

1  I came in to substitute for classes and if everybody
2  was there, then I wasn't there and if somebody was
3  missing, Laura Tolliver were in the place, I would do
4  my job and go about my business. It was that's it.
5  Pretty cordial. You know, just collegial or as much
6  as can be expected for that situation.
7      Q. And was there some point where that
8  collegiality and cordiality changed to a different sort
9  of relationship between you and Ms. Tolliver?
10     A. I believe when I became a permanent --
11 permanent full time, a full-time member of the
12 department.
13     Q. Relationship changed at that point?
14     A. (Nods head).
15     Q. What indicated to you that the relationship
16 changed then? Or before I ask that. Would that have
17 been around 1994-1995?
18     A. Yeah. Yes.
19     Q. And what happened that indicated to you that
20 the relationship was changing to something less than
21 cordial?
22     A. Denial of the resources for the courses I

23  (Pages 86 to 89)

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 90

1  would be teaching, especially photography.   She was
2  also teaching photography.
3      Q.  Was she in charge of the resources for
4  photography?
5      A.  I believe at that time she might have been in
6  charge of the resources for that -- for that.   She was
7  buying all of the supplies, yes.
8      Q.  And did she say to you that she was -- there's
9  something that you asked her to buy and then she said
10  she wasn't going to do it?
11      A.  It would be like whatever we have, you know,
12  is mine and not -- you can't, you know, even though I'm
13  teaching the courses, too, and that whatever, you know,
14  she had, I would have to get permission to use
15  materials that were supposed to be accessible for me to
16  teach a class.   And after -- and even after equipment
17  was shared or -- or supplies are shared, then she would
18  (indicating) come and take them.   Take them from me.
19  Take them from my students.   And so it was kind -- it
20  was very -- it became very strained.
21      Q.  This was in the 1990s?
22      A.  Yeah.

Page 91

1      Q.  And did you express any concerns to Ms.
2  Haynes, who was then the chairman or the chair, rather?
3      A.  Yes.   Yes.
4      Q.  And how did she respond?  First, tell me what
5  did you say to Ms. Haynes about this situation?
6      A.  I would say that pretty much, you know, how I
7  tried to -- I tried to explain it to you.   That I --
8  that I need to be able to function in my classroom
9  as -- as a responsible teacher.   To be able to give to
10  the students what the school expects for me to give to
11  the students and more if I can.   And it is impossible
12  to do this when I'm continuously, continually
13  marginalized.   Continually being denied basic supplies
14  and refused -- refusing space to do what I need to do.
15  A space that was supposedly allotted already.
16      Q.  And how did Ms. Haynes respond to your
17  complaints?
18      A.  Actually, Debbie Haynes was already talking
19  about the space was hers.   Debbie Haynes was already
20  saying the space was Debbie Haynes' space and that
21  nothing happens in that space unless she decides that
22  it happens.  So...

Page 92

1      Q.  Was she talking about your space or Laura
2  Tolliver's space or some different space?
3      A.  She's essentially the -- art studio, that
4  is the painting studio, Debbie Haynes said that that
5  was her space.  I was teaching painting.   The photo
6  lab she decided was Laura Tolliver's space and Laura
7  Tolliver knew it was her space, and I was teaching
8  photo also.   And so none of the spaces were available
9  to me unless I -- even though there was a class, there
10  are classes scheduled, I still had to ask permission to
11  use materials and to use the space and all of that
12  stuff.
13      Q.  Now, when you say Debbie Haynes said that --
14  which space was her space?
15      A.  So you were asking me -- you were asking me
16  then is Debbie Haynes saying, you know, that Laura
17  Tolliver's space was her own or not, and what I'm
18  saying to you is that what I asked -- when I talked to
19  Laura -- to Debbie Haynes about the space issues
20  with -- with regard to Laura Tolliver, by that time
21  Debbie Haynes had already taken a position that she's
22  also in charge of her own space and that I really don't

Page 93

1  have any access to any space, unless she or Laura tell
2  me it's okay to use the space.   Do you see?   So it
3  was almost like deaf ears.
4      Q.  Did you have a classroom during that period
5  where you taught your classes?
6      A.  These are the same -- the classrooms were
7  shared.   All shared space.
8      Q.  And when Debbie Haynes said that, which space
9  did she say was her space?
10      A.  Debbie Haynes?   The painting, the larger
11  studio.  The larger studio.
12      Q.  Larger studio?
13      A.  Where painting and print making and so on.
14  Debbie Haynes' space.
15      Q.  And when she made that statement, did she mean
16  that for both you and Laura Tolliver she expected you
17  to defer to her wishes for the use of that space?
18      A.  Yes.
19      Q.  So she didn't just -- she didn't just limit
20  you in that regard.   She also limited Laura Tolliver?
21      A.  Oh, no.   No.   In other words, there was
22  already a symbiotic -- there was a relationship between

24  (Pages 90 to 93)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 94

1 the two of them as the people who were in charge of
2 those spaces. Laura knew that Debbie -- she didn't --
3 Laura Tolliver didn't paint. So she really didn't
4 have classes in the larger studio space where Debbie
5 Haynes had her classes. She did the ceramics and the
6 photography.
7    Q. And were you able to have classes in the space
8 that Laura Tolliver used for her classes?
9    A. Yeah, that's -- yeah, I was assigned
10 photography, two photography classes and I taught two
11 photography classes in this, in the photography studio,
12 which is Laura Tolliver's space.
13    Q. And when your classes were in session, did you
14 actually use that space?
15    A. I used that space. Tried to use that space,
16 yes.
17    Q. And were your students able to use that space?
18    A. My students were able to use that space, yes,
19 but "Don't, you know, don't mess with the enlarger
20 heads." Of course, my students had to use the
21 enlargers. "Don't mess with the enlarger heads."
22 "Did you touch this?" "Why are you," you know. It

Page 95

1 was I had to defer to whatever it was that was there,
2 and if anything was not the way she expected it to be,
3 then it was a problem for me.
4       It wasn't as if I could go in there and make a
5 correction to something that was wrong. If the
6 bellows were not properly aligned or something, I
7 better go ask if it was okay for me to align the
8 bellows so that I could have proper use of a piece of
9 equipment.
10    Q. Well, what would happen if you didn't ask, you
11 just went ahead and fixed something --
12    A. Oh.
13    Q. -- that you thought needed to be fixed?
14    A. If it were different, then I would get the --
15 I'd get chewed out.
16    Q. Get chewed out by whom?
17    A. By Laura Tolliver.
18    Q. All right. Was Laura Tolliver your
19 supervisor?
20    A. No.
21    Q. Okay. What authority did she have to direct
22 you as a member of the faculty?

Page 96

1    A. I suppose it was just a matter of that she was
2 there before me. I don't know. No, she wasn't my
3 supervisor.
4    Q. And did the school designate her as your
5 supervisor?
6    A. No.
7    Q. So, were there ever times when she chewed you
8 out for something and you said, you know, you're not my
9 supervisor. This is what I think makes sense to do, so
10 that's what I'm going to do? Did you ever say that to
11 her?
12    A. I -- I have tried to do that. I have done
13 that before and what happens is that I -- I have
14 serious retaliation.
15    Q. And what's the serious retaliation? Can you
16 give me an example?
17    A. (Laughs). Deborah Haynes then -- she would
18 talk to Deborah Haynes or they would have their meeting
19 together and then they would then somehow force. It
20 could be any number of things. I would -- I would
21 lose one more thing. I would lose one more thing.
22 One more what I may have thought was -- like, for

Page 97

1 instance, I wanted to do a field trip and there was a
2 certain process for field trips at that particular
3 time. But after, you know, I may have tried to assert
4 myself in some way that would have been I think for
5 somebody who wasn't -- who didn't look like me, who
6 wasn't black, quite the norm, just like, you know, you
7 had just said. It sounded fairly normal to me.
8       New rules. New rules would be put in. Not
9 even put in place. Just told to me. That you have to
10 do this differently, that differently and that
11 differently.
12    Q. Do you remember something where you asserted
13 yourself in a way that you thought was appropriate and
14 the result was that you were denied being able to take
15 students on a field trip? Is that your testimony?
16    A. Um. I -- I wasn't in the end denied. I went
17 through all the new machinations. I went through all
18 the -- whatever new machinations were placed on the
19 process, I went through them. I flew through the
20 hoops to do it.
21    Q. What are the new machinations, or what are you
22 talking about machinations?

25 (Pages 94 to 97)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 98

1    A.  For a routine trip, I think I had to get
2  parental permission separate from what was already
3  received when the school had the parents sign the
4  contract for the kid.
5        There are general field trips that are a part
6  of the -- of the contract and/or part of the school
7  process and there are some trips I suppose where, you
8  know, if the kid's going to -- if you're going to take
9  the kid to Philadelphia or whatever, you do want the
10  parents to know and so on, but there are some general
11  things like going to Union Station or going to National
12  Gallery and so on that you don't really -- you don't
13  need to have a parental, individual parental
14  permission, but for me there was a parental permission.
15    Q.  And when was that?
16    A.  It was someplace around '96, '97, something
17  like that.  After all of this stuff.
18    Q.  Do you know if there were any other teachers
19  who when they took students on those types of trips
20  were expected to get parental permission?
21    A.  No.
22    Q.  You're sure that they were not?

Page 99

1    A.  I'm -- I --
2    Q.  Or are you speculating?
3    A.  -- dare say speculate.  I don't know.  I
4  know of no other -- no other teacher.
5    Q.  To your personal knowledge?  Okay.
6    A.  Yes.
7    MR. WILLIAMSON:  I think the
8  videographer may be near the end of the tape.  Do you
9  want to change it?
10    THE VIDEOGRAPHER:  I have to change it.
11    MR. RACIN:  Be a good time for a comfort
12  break?
13    MR. WILLIAMSON:  Sure.
14    THE VIDEOGRAPHER:  Going off the record
15  at 12:30 -- 12:40:40.  End of tape 1.
16    (Recess.)
17    THE VIDEOGRAPHER:  Going back on the
18  record at 12:51:24.
19  BY MR. WILLIAMSON:
20    Q.  So, is it fair to say, Ms. Killian, that your
21  relationship with Ms. Tolliver became less cordial
22  because she seemed to be so assertive about having

Page 100

1  control over spaces and equipment at the school?
2    A.  No.
3    Q.  Okay.  Then what would you say was the reason
4  that the relationship became so difficult?
5    A.  She only treated me that way.  She didn't
6  treat anybody else like that.
7    Q.  Didn't treat anybody else like that?
8    A.  Nobody that I saw.  No other -- no.
9    Q.  Was there any other colleague in the art
10  department at her level besides you?
11    A.  No.
12    Q.  There was the chair of the department and then
13  the two regular faculty members; is that right?
14    A.  Yes.
15    Q.  Okay.  And did she ever say or do anything
16  that suggested to you that she was treating you this
17  way because of your race?
18    A.  Repeat the question.
19    Q.  Did Ms. Tolliver ever say or do anything that
20  indicated to you that she was treating you differently
21  from others because of your race as an African
22  American?

Page 101

1    A.  I don't remember her saying that she's
2  treating me that way because I'm black.  I don't think
3  I ever heard of anybody doing that, but she wasn't
4  treating anybody else the way she was treating me.
5    Q.  Did she ever use any racial epithets around
6  you?
7    A.  None that I recall.  None that I recall.
8    Q.  Did she ever tell you that she had had
9  negative experiences with African American people?
10    A.  No.
11    Q.  Do you know whether in her personal life she
12  associated with any African American people?
13    A.  No.
14    Q.  Do you know if she has any relatives who are
15  African American?
16    A.  No.
17    Q.  No, she doesn't or, no, you don't know?
18    A.  No, I don't know.
19    Q.  Okay.  When you said no earlier, were you
20  saying no in the absolute sense or just, no, you don't
21  know?
22    A.  To which question was that?

26  (Pages 98 to 101)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 102

1        MR. WILLIAMSON:  What was the question
2    two questions back.
3        (Requested material was read.)
4    BY MR. WILLIAMSON:
5        Q.  I just want to understand what you're saying.
6    No, she did not or, no, you don't know?
7        A.  No, I don't know.
8        Q.  Was there any time during your employment with
9    GDS when you refused to speak to Ms. Tolliver at
10   meetings of the art department faculty?
11       A.  No.
12       Q.  You said earlier that Nick Ryan was first
13   hired by GDS in 2000; is that right?
14       A.  I believe that's correct.
15       Q.  And was he hired as the chair of the
16   department of art, or was he hired in some other
17   capacity?
18       A.  My understanding is that he was hired as the
19   chair.  That's what I was told.
20       Q.  And at the time Mr. Ryan was hired as the
21   chair of the art department, had you applied to become
22   the chair of the department?

Page 103

1        A.  I talked to Paul Levy, who was the principal,
2    before an application came through.
3        Q.  And what did you say to him?
4        A.  I -- I told him that I thought I could take --
5    I could turn the department around, and he said that he
6    was going to go outside to -- to hire someone.
7        Q.  Did you make an application?
8        A.  He said -- you know what?  Because he said he
9    was sure they were going outside.
10       Q.  But you -- it's your testimony that you told
11   him you were interested in becoming --
12       A.  Yes.
13       Q.  -- the chair of the department?
14       A.  Yes.
15       Q.  And about when was that?
16       A.  2000 when the application went out.  I guess
17   it was, yeah, early 2000 I think.  Or is it 1999-2000?
18   I think he started 2000-2001.  So it would have been
19   early in the year when the app -- the position opening
20   was announced I think.  So...
21       Q.  Did Mr. Levy tell you why he preferred to go
22   outside the department to hire chair?

Page 104

1        A.  The only reason I remember is that he said he
2    wanted to go outside to hire a chair.  So, that's it.
3    No, nothing else.
4        Q.  Now, Ms. Killian, you brought a lawsuit
5    alleging that you were subjected to a racially hostile
6    environment at the Georgetown Day School; is that
7    correct?
8        A.  Uh-huh.  Yes.
9        Q.  When was it that you first began to believe
10   that you were being subjected to a racially hostile
11   work environment at the Georgetown Day School?
12       A.  From 1994, '95, '96, '97, '98.  A long time
13   ago.
14       Q.  Okay.  Let me ask the question again.  I'm
15   asking you:  When was it that you first began to
16   believe that you were being subjected to a racially
17   hostile work environment at the Georgetown Day School?
18       A.  It was probably '94-95.
19       Q.  And what caused you to think that you were
20   being subjected to a racially hostile work environment
21   at GDS in 1994-95?
22       A.  Because I was being treated with disrespect,

Page 105

1    marginalized by the two white people in the art
2    department in ways that they were not doing to each
3    other, and that I had not seen them do to any other
4    white person in that school.
5        Q.  Who were these two white people?
6        A.  Laura Tolliver and Debbie Haynes, her
7    sister-in-law.  Uh-huh.
8        Q.  Okay.  What did Laura Tolliver do to you in
9    1994 that made you feel that you were being treated in
10   a racially hostile way?
11       A.  Denial of the space.  Denial of resources.
12       Q.  Okay.  What space were you denied?
13       A.  Art studio space.
14       Q.  Did you ask to use the art studio space?
15       A.  Yes.
16       Q.  And what did you want to use it for?
17       A.  Classroom activities.
18       Q.  Was this for a class that you were teaching?
19       A.  Everything was for a class that I was
20   teaching, yes.
21       Q.  Okay.  And how did you communicate your
22   request?

27  (Pages 102 to 105)

Sharon Killian

Page 106

1    A. In the most cordial of ways.  Most respectful
2  of ways.
3    Q. After you were denied the space, where did you
4  teach your class?
5    A. I teach my class in that space that was
6  assigned for the class.
7    Q. Let me understand.  Were you seeking some
8  space other than your assigned space?
9    A. No.
10   Q. Okay.  Maybe I didn't understand your -- your
11  comment earlier.  I thought you said you were denied
12  space for teaching your class; is that right, by Ms.
13  Tolliver?
14   A. Yes.  Yes.
15   Q. And can you tell me exactly what space was it
16  that you were denied in 1994 and '95?
17   A. There is -- let's just say that it's art
18  studio space, including the computer labs and so on.
19   Q. Art studio space.  Is that a room?
20   A. There are several rooms.
21   Q. Several rooms then.  So, were you excluded
22  from all of those rooms?

Page 107

1    A. No, not at all times.  No.
2    Q. So you were -- what -- what part of the space
3  did you ask for that you were denied?
4    A. I would ask for room to work in, say, the
5  computer lab and since Laura Tolliver used that for her
6  classroom proper, I may not have been able to take my
7  students, who were necessarily doing computer work,
8  along with whatever else it was on the curriculum, from
9  using that room.
10   Q. Is it --
11   A. Find something else.
12   Q. Is it your testimony that in 1994-95 none of
13  your students were allowed to use the computer lab that
14  Laura Tolliver's students were using?
15   A. No.
16   Q. So some of them were?
17   A. Some or at different times.
18   Q. Is it your testimony that there were certain
19  occasions when --
20   A. Uh-huh.
21   Q. -- your students were denied use of those
22  labs, but there are other occasions when they were

Page 108

1  allowed to use that space; is that correct?
2    A. I would say me because I am -- I am the one
3  who -- I wouldn't ask the child to go and ask Laura
4  Tolliver to do this.  So I.  I would.  I was denied
5  space.
6    Q. So there was some times you were denied, but
7  other times you were allowed to use the space?
8    A. Yes.  I had limited access to, with permission
9  to, as a full-fledged member of the department.
10   Q. And what was it that Debbie Haynes did to you
11  in 1994 and '95 that made you feel like you were being
12  -- well, let me go back.  And what was -- what was
13  your reason for thinking that you were being denied
14  space on occasion because of your race?
15   A. Because I was the only person of color in that
16  department, and I was the only person denied and
17  treated differently than anyone else.  Once you became
18  a member of the institution, as far as I know, you have
19  equal access to the resources.
20   Q. When you say you have equal access, is it your
21  understanding that all the art teachers have equal
22  access to use of the computer lab?

Page 109

1    A. Should be.  I think so.
2    Q. Is -- tell me, would it be incorrect to say
3  that the use of the computer lab by art faculty varies
4  depending on what courses they're teaching?
5    A. Yes.
6    Q. You'd say that's -- that's not true or that is
7  true?
8    A. That is true.
9    Q. So, then do the art faculty teach different
10  courses?
11   A. Yes.
12   Q. So, would it be reasonable to expect in any
13  particular year certain faculty would have more access
14  to computer labs because of courses they're teaching as
15  compared with other art teachers who are teaching
16  courses where perhaps they did not have the same need
17  for the computer lab?
18   A. No.
19   Q. I made that --
20   A. Because you're saying access as opposed to
21  normal routine being able to use the space.  Everybody
22  has access, but if I need to teach the place where --

28  (Pages 106 to 109)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

**Page 110**

1  teach in the room, then obviously I'm going to have my
2  classes in there, but that doesn't mean that persons
3  have limited access, you know, from different levels.
4      Q.  So --
5      A.  Everybody has access, but if you have a class
6  going on, then you have a class going on.
7      Q.  Right.  So, when you needed to teach in the
8  room in 1994-95, were you able to use the room to teach
9  your class?
10     A.  Not all the time, no.
11     Q.  What classes --
12     A.  And --
13     Q.  -- were you not able to teach when you had a
14  need to use the computer room for teaching a class that
15  you had been assigned in 1994-95?
16     A.  In 1994 and '95 I would -- I would say that --
17  I would say that I would be able to use the -- the
18  space but only at the permission of Laura Tolliver.
19     Q.  I see.
20     A.  Or Debbie Haynes.
21     Q.  And did you get that permission so you could
22  teach your classes?

**Page 111**

1      A.  Sometimes.
2      Q.  Okay.  What happened when you had a need to
3  teach a class and you were not given permission to use
4  the space in 1994-95?  What did you do with your
5  class?
6      A.  If you -- if you -- you're specifically asking
7  me about 1994-95 now?
8      Q.  Yes.
9      A.  And rephrase the question, please.
10     Q.  I'm saying in those -- you said there are some
11  circumstances where when you needed to teach your
12  class, you were denied the computer lab space to teach
13  it; is that right?
14     A.  I would -- I would prefer to -- to -- yeah,
15  there were times when I needed to take my students in,
16  yes, that's right.  That's right.
17     Q.  Needed to take your students in.  Was that --
18     A.  To -- to --
19     Q.  -- to teach a class?
20     A.  To teach a class and to -- yes.
21     Q.  Were these regularly scheduled classes?
22     A.  Yes.

**Page 112**

1      Q.  And so what would you do with your students
2  when they had a regularly scheduled class where you
3  felt you needed to use the computer lab, but Laura
4  Tolliver or Debbie Haynes didn't grant you permission
5  to do that?  What would you do with your students?
6      A.  I would -- I would use other space.
7      Q.  Other space.  What other space?
8      A.  I would use the larger art studio space.
9      Q.  Were there computers in the larger art studio
10  space?
11     A.  There were some.  There were some, yes.
12  '94-95.
13     Q.  When you were or did you ever ask to use the
14  computer lab for your students while Laura Tolliver was
15  teaching her computer lab class?
16     A.  I have -- yes.
17     Q.  And were those some of the occasions where Ms.
18  Tolliver said she wasn't going to allow you to use the
19  space?
20     A.  No.
21     Q.  So, when she was teaching a class and you
22  asked to use the computer lab, she allowed you to use

**Page 113**

1  it; is that right?
2      A.  The only time --
3      Q.  Could you just answer that question, please?
4      A.  Say that again.
5      Q.  I said, so when Ms. Tolliver was teaching one
6  of her classes in the computer lab and you said you
7  wanted to use it for your students during the time she
8  was teaching that class --
9      A.  Uh-huh.
10     Q.  -- she would let you do that; is that right?
11     A.  Yes.  When she had one student in the
12  classroom.
13     Q.  Were there any other times when she let you do
14  that?
15     A.  Not that I recall.
16     Q.  Were you at any -- yeah, question I wanted to
17  ask.  Were there any times when Ms. Tolliver was not
18  teaching a class in the computer lab and you asked to
19  use it for your students where she denied you
20  permission to use the computer lab?
21     A.  Not that I recall.
22     Q.  Were there any other teachers who taught

                                    29  (Pages 110 to 113)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 114

1  classes in these -- these computer lab rooms.
2      A. I believe.  I believe to the best of my
3  knowledge.
4      Q. In the art studio?  Were there any other
5  teachers besides you and Ms. Tolliver who taught
6  teaches -- who taught classes in those computer labs?
7      A. You said in the art studio?
8      Q. In the art studio, yes.
9      A. No.  There are three art studio teachers, and
10  we generally all taught in the art studio.
11      Q. Ms. Killian, approximately when does the
12  school year at GDS begin and when does it normally end?
13      A. For faculty, over the last few years
14  mid-August.  End of August to June, beginning of June
15  graduation.  After graduation, week after graduation.
16      Q. I'd like to ask you some questions about the
17  2001-2002 school year.
18      A. Okay.
19      Q. During that school year, did you feel you were
20  subjected to any incidents of racial harassment while
21  you -- while you were working at GDS?
22      A. Yes.

Page 115

1      Q. Can you tell me just briefly what those
2  incidents were in chronological order?
3      A. Hmm.  Yes, just a moment, please.  You said
4  the 2000-2001 school year?
5      Q. 2001-2002 school year.
6      A. Okay.  I -- in chronological order.  On a
7  daily basis there was something, and I -- it's very
8  difficult for me to enumerate them, but there were --
9  there were several things.
10      Q. Well, can you tell me, what were the things
11  that happened on a daily basis in 2001-2002?
12      A. Daily basis.  Marginalization.
13      Q. Can you tell me a specific incidence is what
14  I'm trying to understand from you.
15      A. I'm teaching a class and Nick Ryan, you know,
16  comes in and says, "I've already asked you to take
17  your, you know, to reduce the size of your computer
18  space," you know.  Stop and do that in my class as I'm
19  going through my class.
20      Q. Is it your testimony that happened each day in
21  2001-2002?
22      A. Something like that pretty much happened each

Page 116

1  day.  It wasn't always about taking -- taking my --
2  reducing the size of my computer files.
3      Q. What else when he'd come in?
4      A. It could have --
5      Q. On these daily visits, what else would he say
6  in your class?
7      A. And that's, you know, as a matter of fact, you
8  know, that's in front of my students.  Otherwise,
9  having -- having meetings between him and Laura
10  Tolliver and as I come into the room, there is a
11  pregnant pause and, you know, they laugh and, you know,
12  I'm not involved in the discussion.  Having decisions
13  made about --
14      Q. And you regarded that as racially -- a
15  racially hostile act toward you?
16      A. Yes.  Yes.  And decisions made about any
17  number of daily things having to do with the department
18  that I was not included in.  And, you know, just not
19  being -- not being included in the basic functioning of
20  the department.  And I've been told that by the work
21  that I was doing with diversity, you know, was, you
22  know, something that I needed to make some different

Page 117

1  time for.  It wasn't that important to do, you know.
2      Q. Who told you that?
3      A. Both Laura Tolliver and Nick Ryan would say,
4  you know, you have to, you know, you have to do this
5  instead of, say, some work that I might have been doing
6  with the -- the Black Culture Club.
7      Q. And that happened during the 2001-2002 school
8  year?
9      A. I believe that was 2001-2002 school year, but
10  it was so -- everything was so constant?  The whole
11  attitude about whether I was a part of -- of the
12  department or not and there's just the negative
13  responses to everything that I did.
14      Q. Can you think of any other specific incidents
15  from the 2001-2002 school year?
16      A. The screaming.  The screaming at me by Nick
17  Ryan.  When I -- I asked him why the banners from the
18  kids were strewn all over the -- over the art studio
19  and him not doing that for anyone else.  Any other
20  persons.  Any other groups that would come up to the
21  studio to work.  It was only the Black Culture Club
22  kids or the black kids' work that were destroyed.  And

30  (Pages 114 to 117)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 118

1  then dumping that on me. Dumping that on me.
2      Q. What do you mean, dumping what?
3      A. That is, making it something that I was
4  responsible for.
5      Q. How are you responsible for destroying the
6  black students' artwork?
7      A. Well --
8      Q. Or how did he make you responsible for that?
9      A. Well, he wasn't making me responsible, sorry,
10  for destroying the black students' artwork but, rather,
11  that I had them come up there and work and left their
12  things around. And so, you know, and then his
13  strewing them all over the place and then screaming at
14  me about why they are leaving their stuff all over the
15  place. Said that to me.
16      Q. Any other -- any other specific incidents you
17  can recall from the 2001-2002 school year?
18      A. There are -- if you give -- if you like to
19  pull out one of the documents that I've provided with
20  that information on it, that would be -- be great, but
21  that's -- those are just three of the many, many daily
22  things that have occurred.

Page 119

1      Q. Okay. And during the 2001-2002 school year,
2  what did you regard as the most serious incident of
3  racial harassment?
4      A. It was -- that's very, very difficult to say,
5  except that everything, that incident where he screamed
6  at me about the banners and all that, along with all of
7  the other things, the daily insults really made me feel
8  this way.
9      Q. Okay. And during the 2001-2002 school year,
10  was anything said to you by a number -- another member
11  of the faculty or the administration at GDS that
12  referred specifically to your race?
13      A. No other member of the faculty. I know -- I
14  know that Nick Ryan said something about that -- I
15  think he said something about that I was accusing him
16  of being a racist.
17      Q. Yes, but what I'm asking is: Did anybody,
18  either another member of the faculty or a member of the
19  administration, refer specifically to your race, that
20  is, you're an African American, correct?
21      A. Yes.
22      Q. During the 2001 --

Page 120

1      A. Yes, as a matter of fact --
2      Q. -- 2002 school year?
3      A. As a matter of fact, I was referred to --
4  about these issues that came up throughout this time, I
5  was referred to the diversity office by Paul Levy.
6  By --
7      Q. When was that?
8      A. 2000, 2001, 2002.
9      Q. And when you say you're referred to the
10  diversity office, was there something insulting or
11  negative being said about your race because you were --
12  the issues were referred to the diversity office?
13      A. I believe that Paul Levy understood that it
14  was race and that's why he sent me to the diversity
15  office.
16      Q. But did you regard that as some sort of
17  pejorative or derogatory comment on your race by Mr.
18  Levy?
19      A. No.
20      Q. And what made you believe that these incidents
21  you've described during the 2001-2002 school year were
22  motivated by racial prejudice against you?

Page 121

1      A. No. The treatment was reserved for me. The
2  treatment that I was receiving was reserved for me and
3  me alone. I never seen Nick Ryan or Laura Tolliver
4  treat any white person with the disregard.
5      Q. Did you ever see what Mr. Ryan said when he
6  went into Ms. Tolliver's classes? Were you present?
7      A. No.
8      Q. So, are you just speculating as to whether he
9  might have said similar things to Ms. Ryan, or are you
10  just speculating that he never said similar things
11  to Ms. Tolliver?
12      MR. RACIN: Objection. Mischaracterizes
13  the testimony I believe, but you can answer if you can.
14      THE WITNESS: Yeah. Repeat the
15  question, please.
16  BY MR. WILLIAMSON:
17      Q. I said, are you just speculating then as to
18  whether Mr. Ryan did not say similar things when he
19  visited the classroom of Ms. Tolliver?
20      A. No, I'm not speculating. I'm sure.
21      Q. Okay. When you say you're sure, what's your
22  basis for being sure? Were you present in Ms.

31 (Pages 118 to 121)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 122

1  Tolliver's classroom when Mr. Ryan would visit her
2  classes?
3      A. There's -- there are some classes on the -- in
4  a -- there's a large room and then there's a photo
5  classroom there.  Doors are open, and I may have been
6  in earshot.  I never heard it.  Never heard it
7  happen.  We all teach in studios.
8      Q. Wait a minute.  Excuse me.  You say you may
9  have been in earshot?
10     A. Uh-huh.
11     Q. Is it your testimony that you may have been
12 able to hear what Mr. Ryan said when he visited Ms.
13 Tolliver's office?
14     A. You mean her classroom that she may have been
15 in?
16     Q. Her classroom, yes.
17     A. I -- I have never heard him treat her the way
18 he treated me.
19     Q. I understand that.  What I'm trying to
20 understand is whether you were in a position to
21 evaluate whether the way he conducted himself in her
22 classroom was different from the way he conducted

Page 123

1  himself in your classroom.  And so the threshold
2  question, I just want to be sure I understand is
3  that --
4      A. Uh-huh.
5      Q. Or I want to be sure I get your testimony
6  right.  Was it your testimony earlier that you were
7  not present, generally speaking, in Ms. Tolliver's
8  classroom when Mr. Ryan visited her classes?
9      A. So inside the classroom.
10     Q. Is that --
11     A. Inside the classroom.
12     Q. Okay.  And were you generally able to hear
13 what Mr. Ryan said to Ms. Tolliver when he was visiting
14 her classroom?
15     A. That depends.
16     Q. Depends on what?
17     A. On whether the door is closed.  Whether there
18 are noises around.
19     Q. Well, do you --
20     A. Whether I'm on the other side of the room or
21 not.  Uh-huh.
22     Q. And would you say that on a regular basis you

Page 124

1  were able to hear and you did actually hear what Mr.
2  Ryan said when he visited Ms. Tolliver's classroom?
3      A. I have -- I have heard.  I have heard, seen
4  him go into classroom -- into her classroom because the
5  doors are there and open, and I have never heard him
6  treat her the way he's treated me.
7      Q. But can you answer my question?
8      A. I thought I did.
9      Q. I don't think so.
10         MR. WILLIAMSON:  Would you read back my
11 question, please?
12         (Requested material was read.)
13         THE WITNESS:  What I can say to you is
14 that when I -- whenever I have heard his visits to
15 Laura Tolliver's classroom while I was in the art
16 studio space, I have never heard him talk to her the
17 way he's talked to me.
18 BY MR. WILLIAMSON:
19     Q. Okay.  Now, would you answer?  The question
20 calls for a yes or no answer.  Would you answer the
21 question, please?
22     A. Repeat the question, please.

Page 125

1          (Requested material was read.)
2          THE WITNESS:  No.
3  BY MR. WILLIAMSON:
4      Q. Let's turn to the 2002-2003 school year.
5  What were the specific incidents that occurred during
6  the 2002-2003 school year that you viewed as examples
7  of racial harassment of you?
8      A. There was -- there was constant denial of
9  computer space.
10     Q. You say constant denial of computer space.
11 How often were you --
12     A. I --
13     Q. -- requesting computer space?
14     A. I -- quite often.
15     Q. Is that every day?
16     A. Just about.  Just about.
17     Q. And each day you would be denied computer
18 space?
19     A. Just about.  It's been very difficult.
20     Q. Who would you request the computer space from?
21     A. Ask Nick Ryan and Bruce Ruble and -- who's in
22 charge of technology, and Nick Ryan's response would be

32  (Pages 122 to 125)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 126

1  "Bruce said you have to work within the limits."  And
2  I had -- well, that's it.  So...
3      Q.  Who would you go to each day to ask for
4  computer space?
5      A.  Nick Ryan.   Then to Paul Levy.
6      Q.  And what time of day would you usually ask Mr.
7  Ryan about the computer space each day?
8      A.  It depends on what the schedule was.
9      Q.  It's your testimony you did that almost every
10 day in the year 2002-2003?
11     A.  Yeah, and before.  Yes, uh-huh.
12     Q.  And the response you got was that you need to
13 work within the limits that had been established?
14     A.  Uh-huh.  Yes.
15     Q.  And you regarded that as racially hostile
16 treatment of you?
17     A.  Yes.
18     Q.  Were there any other faculty who were told
19 that they would have to work within the limits of the
20 available computer space?
21     A.  I believe that Laura Tolliver might have been
22 told that by Nick Ryan, but at the same time she had

Page 127

1  been awarded 75 gigabytes per machine.
2      Q.  Were there any additional incidents in
3  2002-2003 that you consider to be racial harassment of
4  you by faculty or administrators at GDS?
5      A.  It is very -- it is very difficult to separate
6  each and every drip that I have had dropped right in
7  the center of my forehead.
8      Q.  When you say there's a drip that's been
9  dropped in the center of your forehead, Ms. Killian,
10 what are you talking?
11     A.  Like water torture.
12     Q.  Is that what -- is this a metaphor that you're
13 using?
14     A.  Yes, like water torture.  Every day something
15 else.  Every day.
16     Q.  Okay.
17     A.  Every day one more.
18     Q.  Why don't you give us examples of what the
19 daily trip drip was in 2002-2003, other than denial of
20 computer space?
21     A.  Not being included in any discussion about
22 course -- about course offerings.  Being undermined --

Page 128

1      Q.  Is that something --
2      A.  Hmm?
3      Q.  Go ahead.   Was that something that happened
4  every day?
5      A.  The -- there is a period where -- where
6  courses are supposed to come up for review.   So it's
7  not an everyday thing, but it actually resonates as
8  time, you know, goes on because there's a period --
9  there's supposed to be a period of discussion, review
10 and recommendations and change and so on.  And those
11 are supposed to be happening routinely, and what was
12 happening is that there were hardly any meetings for
13 the department, but Laura and Nick were meeting.
14     Q.  Were there some meetings for the department?
15     A.  Gosh.   In that particular year, there might
16 have been two.   You'd have to look at the record for
17 that, sir.
18     Q.  Were you invited to meet -- faculty meetings
19 of the art department in 2002-2003?
20     A.  If there were any, then I was.   If there were
21 any, then I was.
22     Q.  And did you participate?

Page 129

1      A.  And I would have participated, yes.
2      Q.  And were you allowed to raise discussions
3  about course offerings?
4      A.  If I raised any discussions about course --
5  yes.  Yes.  The answer is yes.
6      Q.  Now, when these -- the denial of the computer
7  room or the computer space I guess and the exclusions
8  from discussions about course offerings, when those
9  things occurred, was there any reference to your race
10 as an African American by Mr. Ryan or Ms. Tolliver?
11     A.  No.
12     Q.  And what is your basis for believing that
13 these incidents occurred because of your race as an
14 African American?
15     A.  That I was the only one being treated in this
16 way and I am the only black faculty in that department.
17 That this kind of treatment was obviously only reserved
18 for me and that no one was coming to my aid.   That it
19 was --
20     Q.  When you said no one --
21     A.  -- the way it was.
22     Q.  -- was coming to your aid, did you ask anybody

33  (Pages 126 to 129)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 130

1  to come to your aid?
2      A. Yes.
3      Q. Whom did you ask?
4      A. I've asked Paul Levy, Kevin Barr, the
5  diversity officers, the -- John Burkhart. All of the
6  administrators I think that you've -- you've been told
7  about that.
8      Q. Is it your testimony that Mr. Levy and Mr.
9  Barr and the staff of the diversity office did nothing
10 in response to your complaints?
11     A. I'm -- I'm not sure. I know that I have
12 asked and we've talked, and I don't know if there was a
13 culmination. There may have been actions in between,
14 but I don't know if there was a culmination of
15 anything.
16     Q. What do you mean a culmination?
17     A. A result.
18     Q. Of the incidents that occurred in the
19 2002-2003 school year, what did you consider the most
20 serious example of racial harassment?
21     A. It was all serious, sir. Not being included
22 in the process for what occurs in the department as we

Page 131

1  were supposed to, as was decided that we were supposed
2  to be able to do.
3      Q. Okay. I've got some similar questions about
4  the 2003-2004 school year.
5      A. Uh-huh.
6      Q. Can you tell me in chronological order to the
7  best of your recollection what incidents of racial
8  harassment occurred in the 2003-2004 school year?
9      A. The primary -- the primary -- in chronological
10 order. In chronological order. Still being denied
11 resources. Still being kept out of the loop for any
12 kind of decision-making about what's -- what we're
13 supposed to be doing in the art department, and
14 actually just being told about the decisions. Not
15 even -- not even being told about some of the
16 decisions. Not necessarily even being involved with
17 the decision, but not even being told about decisions.
18     Q. What was --
19     A. Be --
20     Q. What would be an example of a decision you
21 weren't told about?
22     A. Course name changes. Course offerings.

Page 132

1      Q. How did you find about the course name change?
2      A. When -- when it was time for the departments
3  to tell the curriculum director what course offerings
4  we have decided to -- to present and also supplies
5  being taken away by Laura Tolliver. Being hidden.
6      Q. This is 2003-2004?
7      A. Yes.
8      Q. What supplies were taken away by Laura
9  Tolliver?
10     A. Photographic supplies. Photographic supplies
11 being taken out and hidden that were bought for the use
12 of my students.
13     Q. How did you find out these supplies had been
14 taken out and hidden?
15     A. Well, I've actually seen her try to do that
16 physically. I mean, visibly try to do that and
17 then --
18     Q. But when you saw her trying to do that, what
19 did you do?
20     A. I said, "Oh, those -- those were mine." "Oh,
21 I thought" -- she responded those were -- "I thought
22 they were actually my -- that was actually my paper."

Page 133

1      Q. And was it your view that she was doing that
2  because of her dislike for you as an African American?
3      A. Yes, and it had been happening for years.
4  Yes.
5      Q. She had been taking your supplies for years?
6      A. Yes.
7      Q. Had you complained to anybody about that?
8      A. Yes.
9      Q. Whom did you complain to?
10     A. Paul Levy.
11     Q. And what did he do?
12     A. Deborah Haynes. I don't know.
13     Q. Any other incidents of racial harassment that
14 you recall from the 2003-2004 school year?
15     A. There -- there are so many of them, sir, that
16 I -- I probably just need to relax for a minute
17 to -- to get them to come -- to come up. I'm -- I
18 feel like I need a break, but I'm going to -- to tell
19 you that it is a daily -- it was a daily occurrence of
20 marginalization, and it's very difficult to tell you of
21 for those 200 days how awful it was on a daily basis by
22 giving you every specific thing because it was so

34 (Pages 130 to 133)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 134

1  constant.
2      Q.  Okay.  I want you to be able to answer the
3  question because as your counsel knows, we're going to
4  be seeking or most likely have to seek a second day of
5  your deposition.  You said that you feel like you need
6  to take a break now and then you might be able to
7  answer the questions better.  Would you like to take a
8  lunch break now?
9      A.  I would like to make sure that I've answered
10  that one question I think you just asked me.  I've
11  answered that question.  Have I not?
12      Q.  Well, not with any specifics.  I was asking,
13  were there any other specific incidents of racial
14  harassment that you recall from the 2003-2004 school
15  year?
16      A.  2003-2004 school year?
17      Q.  Yes, ma'am.
18      A.  Well, I recall that the most -- the most
19  significant one is my having a question about course
20  names and --
21      Q.  What was the question?
22      A.  Does the name that -- the new name that was

Page 135

1  put on a course that was being taught by Laura Tolliver
2  not make the course name that -- for the course that I
3  was -- I just wrote redundant.  The course that was
4  just approved with -- that I had to be teaching.  Does
5  it not make my course redundant now.  Did you
6  understand any of that?  No.
7      Q.  (Shakes head).
8      A.  Okay.  Sorry.  I'll try that again.  If
9  you'll ask me the question one more time, I think I
10  can.
11      Q.  You were saying that the most -- I asked you
12  about whether there were other incidents in 2003-2004.
13      A.  Uh-huh.
14      Q.  And then I believe you testified that the most
15  significant incident had to do with --
16      A.  Of course.
17      Q.  -- changing?
18      A.  Okay.
19      Q.  Is it the title of a course offering?
20      A.  Yes.  Nick Ryan and Laura Tolliver changed
21  the name of a course that she was teaching from
22  Technology in the Studio to Graphic Design.  I was

Page 136

1  encouraged to create a course for -- a publishing
2  course and --
3      Q.  Who encouraged you to do that?
4      A.  Well, I knew we needed it and Paul encouraged
5  it.  Paul Levy encouraged it and I did it, and he
6  talked to Nick Ryan about it and Nick Ryan told him
7  that it was -- he talked to Nick Ryan about this class
8  that I created.  Told me to put -- to make it Graphic
9  Design in Publishing.  Then Laura Tolliver and Nick
10  Ryan changed the course name to Graphic Design.  It
11  seemed redundant.  When I asked about the name of the
12  course, Nick Ryan bent down in his chair like this
13  (indicating) and said, "Sharon, I can't bend low enough
14  to the ground to understand you."  I thought that was
15  the most significant.
16      Q.  I was going to ask you --
17      A.  That happened in 2003 or '04.
18      Q.  -- some similar questions for 2004-2005.  Do
19  you want to do that and go to lunch or go to lunch
20  right now?  We can do it either way you want.
21      A.  I'd rather take a break right now.
22      Q.  Let's do that.

Page 137

1          THE VIDEOGRAPHER:  Going off the record
2  at 1:47:48.
3          (Recess.)
4          AFTERNOON SESSION
5          THE VIDEOGRAPHER:  Going back on the
6  record at 2:26:40.
7  BY MR. WILLIAMSON:
8      Q.  Ms. Killian, your last year as a teacher at
9  GDS was the 2004-2005 school year; is that correct?
10      A.  Yes.
11      Q.  Would you please describe in chronological
12  order the specific incidents of racial harassment that
13  occurred in the 2004-2005 school year at GDS?
14      A.  Among the various marginalizations as occurred
15  on a day-to-day basis, primary to my memory is an
16  incident having to do with my having borrowed a camera
17  from Laura Tolliver and then her just about accusing me
18  of stealing the camera.
19      Q.  What did she -- did she say that she thought
20  you had stolen the camera?
21      A.  Well, she said -- when I said, "I returned
22  that to you when you asked for it," she tapped on a

35  (Pages 134 to 137)

## Sharon Killian

Page 138

1  piece of paper on a wall and said, "No, you didn't."
2  And I said "Yes, I did" and she said "No, you didn't."
3  She repeatedly said that and --
4     Q. Did she say that she thought you had stolen
5  the camera?
6     A. That's -- to me that's tantamount to saying I
7  stole the camera.
8     Q. Okay. Would you answer the question. Did she
9  say to you that she thought you had stolen a camera?
10    A. No, she didn't use those words.
11    Q. And what happened after you said that you had
12  returned the camera?
13    A. She continued to accuse me about stealing the
14  camera and I -- thank you. And I decided that I -- I
15  should have had access to -- to a camera for use, and I
16  went to Kevin Barr and I told -- I told Kevin Barr that
17  I've just about been accused of stealing a camera.
18  That I'm tired of it. That I want to have access to
19  department property, and it was decided that there was
20  a key in the end. Well, I shouldn't say in the end.
21  In the interim. It was decided that the two white
22  people in my office would have the key and not me.

Page 139

1  That I would have to ask permission still to use the
2  department camera.
3     Q. You say in the interim. What period was the
4  interim?
5     A. It was supposed to be the final decision and I
6  think that was -- I don't remember exactly what -- what
7  date it was, but at some point around March I think.
8  The record should show that the appropriate -- the
9  correct date I think. And Karen Pass, with whom my
10  attorney was working, inquired as to whether the
11  situation had been rectified, and she had to be told
12  they've rectified it by giving -- by not giving a key
13  to Sharon.
14        And I suppose that maybe she intervened and
15  Kevin Barr then decided that, as he said, it's become
16  the realm of the bizarre that the two white people in
17  the office have or Laura and Nick Ryan have keys, but
18  that I don't and that I actually should have access to
19  department property.
20    Q. So, were you given access to department
21  property?
22    A. Finally I got a key.

Page 140

1     Q. And when was that that you finally got the
2  key?
3     A. It was March or April 2005.
4     Q. Okay. Any other specific incidence of racial
5  harassment that you recall from the 2004-2005 school
6  year?
7     A. Pretty much every day there was some slight,
8  really. Secret meetings. Not just secret meetings,
9  but meetings happening without my involvement and --
10    Q. What meetings were those?
11    A. About whatever, whatever issue might arise
12  about any number of things, including course, course
13  offerings, course descriptions and daily activities.
14  Daily running of the department.
15    Q. Do you have any specific knowledge of one of
16  these meetings that you're describing?
17    A. It had -- I don't recall exactly what it was
18  surrounding, but I can tell you that the silence when I
19  entered the room and the subsequent e-mails about
20  equipment or about the budget or about any number of
21  things --
22    Q. And you said --

Page 141

1     A. -- occurred.
2     Q. -- there was silence when you entered the
3  room. Was that the room where the meeting was being
4  held?
5     A. Yeah, that's our office.
6     Q. And so were you coming to participate in the
7  meeting?
8     A. No. There were no formal -- there was no
9  formal meeting set up, no.
10    Q. Okay. Your basis for believing that there
11  were secret meetings is that when you would come into
12  the room, who would fall silent?
13    A. Both Nick and Laura would fall silent and
14  that's just one example. Other examples would be that
15  Laura and Nick would know the result of a process like
16  a course that was going to be offered or something that
17  was approved. They would both know it, but I never --
18  I hadn't even been introduced to it.
19    Q. And during 2004-2005, did you ever fail to
20  attend a faculty meeting of the art department?
21    A. No.
22    Q. And when you came upon these situations in the

36 (Pages 138 to 141)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 142

1  office where Nick Ryan and Laura Tolliver would fall
2  silent, did either of them say anything about your
3  race?
4      A. No.
5      Q. And why is it that you believe these incidents
6  occurred because of your race as an African American?
7      A. Again, I believe that I have provided much
8  documentation about my experiences and so some of those
9  things you should be able to see, sir, but also, as I
10  said before, it happened to me on a daily basis and I
11  saw no one else being treated that way. In fact,
12  except for -- I know, for instance, that one faculty
13  member, a black faculty member was putting up -- saw,
14  saw a sign that Nick Ryan had put up in celebration of
15  Gay Pride Week, and he had misspelled Audre Lorde's
16  name and the black faculty member said, "That's a
17  misspelling. Audre Lorde is spelled with an E," and
18  Nick Ryan proceeded to say that he got it off the web.
19  He got the spelling off the web.
20      This is an English teacher with -- who is a
21  poet who has experience and happens to be black, and he
22  didn't accept this teacher's position on the spelling

Page 143

1  of this artist's name.
2      Q. And did you regard that as racial harassment
3  of that teacher?
4      A. I certainly regarded it at least racial, yes.
5  Yes.
6      Q. Is there any other faculty member or was there
7  any other faculty member at GDS who had the same needs
8  for computer access and artistic equipment that you
9  had?
10      A. Any other faculty member you said?
11      Q. Yes, at GDS during the time you were employed
12  there.
13      A. Laura Tolliver taught classes that used the
14  computer.
15      Q. Did she have the same needs for computer
16  equipment that you did?
17      A. I don't know.
18      Q. Is there anybody else who you know on the
19  faculty who had similar or comparable needs for the
20  same type of equipment that you did?
21      A. I -- I don't know.
22      Q. I want you to take a look at a document we're

Page 144

1  going to mark as Exhibit 59.
2      (Thereupon, a document was marked for
3  identification Exhibit No. 59.)
4      THE WITNESS: Okay.
5  BY MR. WILLIAMSON:
6      Q. Have you had a chance to look at that?
7      A. Uh-huh. Oh, excuse me. (Pause.) Yes.
8      Q. What is Exhibit 59?
9      A. It's Georgetown Day School faculty contract
10  2005-2006 school year.
11      Q. And who are the signatories to that contract?
12      A. Peter Branch and Sharon Killian.
13      Q. And when was the contract signed?
14      A. February 25, '05.
15      Q. And does that contract contemplate that you
16  would be working as a full-time faculty member at GDS
17  starting August 29, 2005 through August 28, 2006, with
18  June 9, 2006 through August 28, 2006 designated as paid
19  vacation?
20      A. Yes.
21      Q. All right. Next I'm going to ask you to take
22  a look at Exhibit 13, which we will have marked here

Page 145

1  momentarily.
2      (Thereupon, a document was marked for
3  identification Exhibit No. 13.)
4      THE WITNESS: Thank you.
5  BY MR. WILLIAMSON:
6      Q. Have you seen this document before?
7      A. Yes.
8      Q. Whom is it addressed to?
9      A. "Dear Peter."
10      Q. Who is Peter?
11      A. Peter Branch.
12      Q. And who is Peter Branch in connection with the
13  Georgetown Day School?
14      A. He is the head of school.
15      Q. And what is the date of this document, of
16  Exhibit 13?
17      A. 3/12/2004.
18      Q. What is -- what is exhibit or who wrote
19  Exhibit 13?
20      A. I wrote Exhibit 13.
21      Q. And what is Exhibit 13 about?
22      A. I think. It's about the problems that I had

37 (Pages 142 to 145)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 146

1  been experiencing at GDS.
2      Q.  What sorts of problems?
3      A.  The racially hostile environment that I've had
4  to live with for some time.  The problems with getting
5  equipment from the departments responsible for
6  providing technology resources.  It talks about --
7  well, I'd have to read to be sure because I know it
8  doesn't have everything in it.  In section 1 it talks
9  about how I've had to live for so long with Debbie
10  Haynes and Laura Tolliver.
11      Q.  Okay.  Actually, I'm going --
12      A.  And then it goes on --
13      Q.  -- to go through.  I don't mean to interrupt,
14  but I'm going to ask you about each of the specific --
15      A.  Okay.
16      Q.  -- numbered paragraphs.  So --
17      A.  All right.
18      Q.  -- I think just giving an overview is fine for
19  right now.  Tell me, why did you prepare this
20  document?
21      A.  I prepared the document because my -- I was
22  getting no relief.  I had taken on the --

Page 147

1      Q.  Getting no relief from what?
2      A.  Getting no relief from the racial hostility
3  that I was experiencing at GDS.  I had taken on during
4  the 2002 or '3 school year the Yearbook, which I had
5  refused initially, refused to do initially.  And Paul
6  Levy begged me to do it and his comment was "Sharon, I
7  believe that with you we can get a diverse student body
8  to work for the Yearbook as opposed to the clique that
9  we have now under Laura Tolliver and that maybe we'll
10  be able to see the pictures of the kids in the
11  Yearbook.  The black kids won't all look like smudges."
12  And I said, "I don't believe that it's" -- well, at any
13  rate.
14      Q.  Said you don't believe it's what?
15      A.  That I -- I wasn't sure that I could do the
16  job because I've already been suffering in that
17  department, and he begged me to do it and I thought I
18  would do it.  But at any rate, I think I answered that
19  question.
20      Q.  I'm not sure you did.  The question is:  Why
21  did you prepare this document that's addressed to
22  Peter, to Peter Branch?

Page 148

1      A.  Okay.  I did it because I had not had any
2  response or relief from Paul Levy or the -- other,
3  the diversity officers.
4      Q.  So, what were you planning to do with Exhibit
5  13?
6      A.  To send it to Peter Branch.
7      Q.  And did you send it to Peter Branch?
8      A.  I actually did not send it to Peter Branch.
9  I sat with Peter with my -- with this as my talking
10  points.
11      Q.  Did you show your talking points to Peter
12  Branch?
13      A.  He didn't ask me to -- to see my notes.  I
14  sat there with him like this and went through it with
15  him.
16      Q.  Did you go through each of the talking points
17  in Exhibit 13?
18      A.  Yes, and in fact I talked to him personally
19  over telephone on the 7th of February I think it was
20  about some of these very same issues.
21      Q.  Was that a second time that you talked to him
22  or when -- when was the first time you discussed

Page 149

1  Exhibit 13 with him?
2      A.  I didn't discuss Exhibit 13.  I discussed
3  some of the issues in Exhibit 13 with him on February
4  7th.  I think that was a Saturday or something.  He
5  called me at the office.
6      Q.  And then you had a subsequent conversation
7  with him?
8      A.  Yes.
9      Q.  Was that a face-to-face conversation?
10      A.  Yes.
11      Q.  And where did that take place?
12      A.  In Peter Branch's office.
13      Q.  All right.  Now, does Exhibit 13 exclusively
14  describe incidents of racial harassment that you feel
15  had happened to you as an employee of the Georgetown
16  Day School?
17      What I'm going to ask you next will be:  Are
18  there any of the incidents described in this document
19  that you would say are not examples of racial
20  harassment in your view?
21      A.  No.
22      MR. RACIN:  Take a second.

38  (Pages 146 to 149)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 150

1      THE WITNESS: Uh?
2      MR. RACIN: Review it.
3      THE WITNESS: Read?
4   BY MR. WILLIAMSON:
5      Q. So, are you saying that --
6      A. Are any of these -- pardon.  Please repeat
7   your question.
8      Q. Okay.  One way.  I asked it two different
9   ways.  Maybe the simplest way to say it is: Do you
10  regard all of the incidents described in Exhibit 13 as
11  examples of racial harassment of you?
12     A. Okay.  (Pause.)  Yes, but it's not complete.
13  It doesn't have everything in it.
14     Q. What's missing?
15     A. I didn't write in here about Nick Ryan bending
16  low to the ground and saying he can't bend low enough
17  to the ground to understand me.  And --
18     Q. Anything else?
19     A. I'm just checking.  Just one second.
20  That's -- that's definitely something that's
21  significant that wasn't on -- on this sheet of paper.
22     Q. Anything else?

Page 151

1      A. Not that I can enumerate at this time.
2      Q. Is there anything that would refresh your
3   recollection about something else that you might have
4   omitted?
5      A. I -- I didn't talk to him about my concern
6   about whether there was some an institutional effort in
7   a negative way having to do with people of color,
8   faculty, students and all.  What with the recent
9   Michael Martin dismissal and reinstatement.
10     Q. What did you mean by effort in an
11  institutional way?  What does that mean?
12     A. Michael Martin, as far as I knew, wasn't the
13  only one who had been in that situation that occurred
14  on the bus and he was the only one that was kicked out,
15  and I wasn't sure based on some of the things that came
16  up later whether this was an institutional approach
17  that I should have taken into account.
18     Q. And did you regard the discipline of an
19  individual student as a form of racial harassment of
20  you as an employee of GDS?
21     A. And as a teacher of that student?  I --
22  everything that I'm talking about to you right now

Page 152

1   directly affects me and so --
2      Q. How did it --
3      A. -- it's part of the milieu.  It's part of the
4   whole atmosphere.
5      Q. And how did the discipline of that student
6   directly affect you?
7      A. Well, I happen to have been his teacher and
8   had to take particular strains to -- to work with him
9   and with the constraints of whatever I was told I could
10  or could not do.
11     Q. Would you take a look toward the top of the
12  first page of Exhibit 13.
13     A. Okay.
14     Q. There's a third paragraph that begins --
15     A. Repeat that for me, please.
16     Q. This is toward the top of the first page.
17     A. Oh, 2633?  2633 is the Bates number.  And
18     Q. Exhibit 13.  2633 is the Bates number.  And
19  it's a paragraph that begins: "First, I can't afford
20  to give up my job at GDS because I am currently the
21  sole earner in my family, and we have two children in
22  school."

Page 153

1      A. Uh-huh.
2      Q. Do you see that?
3      A. Yes, I do.
4      Q. In March of 2004, had anyone at GDS suggested
5   that you give up your job at the school?
6      A. Actually, after I talked to Peter Branch, he
7   said that there was a job at NCS.
8      Q. At the time you wrote this letter to Peter
9   Branch, had anyone suggested to you that you give up
10  your job at GDS?
11     A. No.  No one had suggested, as I said, until
12  afterwards but...
13     Q. And after you said you had the discussion with
14  Peter Branch and then he -- he suggested that you might
15  be interested in an opportunity at NCS; is that what
16  he --
17     A. He said there was an opening at NCS if he
18  would -- it's late, but he would write me a
19  recommendation.
20     Q. And do you know why he made that suggestion?
21     A. My only -- no.  No, I don't.
22     Q. Let me see if we can refresh your

39 (Pages 150 to 153)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

Page 154

1 recollection. Is it possible that he made the
2 suggestion because you had indicated you were so
3 unhappy with the working environment at GDS?
4         MR. RACIN: Objection as to form.
5         THE WITNESS: That would be speculation
6 I would say. He didn't tell me.
7 BY MR. WILLIAMSON:
8     Q. During the conversation, did you tell him
9 how -- that is, the conversation you were having about
10 these talking points, did you tell him how unhappy you
11 were with the working environment at GDS?
12     A. Yes. I did tell him that I was being racially
13 harassed.
14     Q. Would you answer the question, please?
15     A. I said I told him I was being racially
16 harassed.
17     Q. Okay. The question calls for a yes or no
18 answer.
19     A. Okay.
20     Q. You're welcome to explain it, but could you
21 please --
22     A. Could you tell me that again, then? The last

Page 155

1 then again.
2     Q. Sure. During your conversation --
3     A. Uh-huh.
4     Q. -- with Mr. Branch when you were discussing
5 the points that you raised in Exhibit 13 --
6     A. Uh-huh.
7     Q. -- did you tell him how unhappy you were with
8 the working environment at GDS?
9     A. Yes.
10     Q. Now, do you see a little later in that same
11 paragraph?
12     A. Uh-huh.
13     Q. I guess it's the last sentence where it says,
14 "Second, I love teaching. I love my students and I
15 believe I conduct myself in a way that there is some
16 appreciation of my work on the part of students, their
17 parents, and most of my colleagues."
18     A. Uh-huh.
19     Q. Is that an accurate statement?
20     A. I do believe so.
21     Q. When you refer to most of your colleagues, are
22 you referring to the other faculty members at

Page 156

1 Georgetown Day School?
2     A. Yes.
3     Q. At the time, were most of your colleagues
4 white or minority persons on the faculty at GDS?
5     A. Both white and black.
6     Q. Were most of them white or minority?
7     A. Most of them are white.
8     Q. Okay.
9     A. GDS is minority --
10     Q. When you made reference to "most of my
11 colleagues," were you including white colleagues as
12 well as colleagues who are members of minority groups?
13     A. Yes.
14     Q. You said that most of your colleagues
15 appreciate your work on the part of students. How
16 many colleagues would you say did not appreciate your
17 work on the part of your students at GDS?
18     A. I know of two.
19     Q. Which two?
20     A. Laura Tolliver and Nick Ryan.
21     Q. Anybody else?
22     A. There I can -- Bruce Ruble.

Page 157

1     Q. Is he a member of the faculty?
2     A. Yes.
3     Q. Anybody else?
4     A. At this point, I'm assuming that maybe Peter
5 Branch is on that list.
6     Q. You say at this point?
7     A. Well...
8     Q. Was there some other point where you thought
9 Peter Branch appreciated your work on the part of your
10 students?
11     A. I may have received one e-mail at some time
12 saying congratulations on a show someplace. I don't
13 recall. You'd have to look at my e-mails. I -- I
14 know you have a quite a number of them. So it is
15 probably in there.
16     Q. Is it your testimony that Mr. Branch did
17 appreciate your work on the part of your students?
18     A. I'm -- I am not sure. I thought that perhaps
19 it was appreciated, but I -- I -- after the meeting, I
20 didn't think so.
21     Q. Before the meeting did you think so?
22     A. It was -- there was actually no involvement.

40 (Pages 154 to 157)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 158

1  So I was looking for -- I was looking for some help
2  here.  So I was neutral in that regard.  So I wasn't
3  sure.
4     Q. So you're just not sure whether --
5     A. Wasn't sure whether he appreciated it.
6     Q. -- whether he appreciated your work on the
7  part of your students?
8     A. Let's see.  Based on the contract, I'd say
9  he -- he should.  So maybe I should say yes to that
10 because he offered the contract and it's his job to
11 offer the contract.
12    Q. All right.  And are Ms. Tolliver and Mr. Ryan
13 and Mr. Ruble -- or tell me, what is the race of Ms.
14 Tolliver, Mr. Ryan and Mr. Ruble?
15    A. I believe they're Caucasian.
16    Q. Now, would you take a look at Exhibit 13
17 numbered paragraph 1.
18    A. Uh-huh.
19    Q. Do you see where it says, "I have lived
20 through the debacle of having an alcoholic department
21 head, who along with her sister-in-law, Laura Tolliver,
22 both blame me for her leaving GDS"?

Page 159

1     A. Yes.
2     Q. And what department head were you referring to
3  in that numbered paragraph 1?
4     A. That is Debbie Haynes.
5     Q. And you've already testified that you didn't
6  have anything to do with Ms. Haynes being terminated
7  from her position at GDS?
8     A. Not that I know of.
9     Q. Now, later in that paragraph, do you see where
10 it says, "Only I have been blamed and targeted for
11 reprisals"?
12    A. Uh-huh.
13    Q. Is that an accurate statement, to the best of
14 your knowledge?
15    A. To the best of my knowledge.
16    Q. Who has blamed and targeted you for reprisals?
17    A. Laura Tolliver, Nick Ryan, Bruce Ruble in my
18 estimation.  That's what I would say.
19    Q. And what are the specific reprisal actions
20 that you were referring to in that paragraph?
21    A. All of the incidents that I have already
22 mentioned.  The bending over.  "Can't bend low enough

Page 160

1  to the ground to understand you."  The taking of my
2  materials from my classes.  The --
3     Q. Who took materials from your classes?
4     A. Laura Tolliver taking.
5     Q. And when did she do that?
6     A. That happened over the years and as my
7  previous statement mentioned and --
8     Q. Did she take materials from your class in the
9  school year of 2004-2005?
10    A. I believe that you -- there is that, yes, I
11 believe that's --
12    Q. What materials did she take from your class?
13    A. Paper.  Paper.  Photographic paper.
14    Q. All right.  Do the art faculty share the
15 photographic paper supplies that are in your classroom?
16    A. In this particular case, they were not being
17 shared.
18    Q. When you say they weren't being shared, what
19 was --
20    A. I have my own bought box with my name on it.
21 Her name was on her own boxes that she bought for her
22 classes and mine were as well.

Page 161

1     Q. And it's your testimony that she took some of
2  your paper as reprisal for your -- her believing that
3  you were involved in the termination of Debbie Haynes;
4  is that your testimony?
5     A. Along with, yes.
6     Q. Anything else that was a reprisal action that
7  was taken against you because these other faculty
8  members thought you were involved in the termination of
9  Debbie Haynes?
10    A. I -- many, many of the incidents I've already
11 stated and have felt that --
12    Q. You say many of the incidents you've already
13 stated.  Can you finish that thought?  I didn't quite
14 exam understand.  Are those other examples of reprisal
15 actions; is that what you're trying to say?
16    A. They are.  Some of those are, yes.
17    Q. Which ones?
18    A. I'm sure.  I -- some of the belittlements.
19 The idea that they could continue to do -- to treat me
20 negatively, belittle me and marginalize me, and create
21 a hostile environment for me is I believe part of this
22 whole thing and that they could do it because I am

41  (Pages 158 to 161)

Sharon Killian

Page 162

1  black is part of this whole thing.  I think that.
2      Q.  Okay.  Now --
3      A.  Uh-huh.
4      Q.  -- what I'm asking about is, which things do
5  you feel were reprisals that you're referring to here
6  in response to the perception by these individual that
7  you were involved in the termination of Debbie Haynes.
8      Now, what I've heard you say so far is the
9  incident where Nick Ryan said something to you about
10  bending so low, and Laura Tolliver's taking the
11  photographic paper, and then you said there were other
12  incidents that you regarded as part of the reprisal.
13  Maybe I can ask it another way.
14      Were the meetings where you were excluded from
15  the decision-making about course offerings and
16  allocation of resources part of the reprisals against
17  you?
18      A.  They very well could have been.
19      Q.  You don't know whether they were?
20      A.  That's -- I'd say they very well could have
21  been.
22      Q.  Okay.

Page 163

1      A.  And that they could do these things because of
2  who I was in that department.
3      Q.  Okay.
4      A.  And get away with that.
5      Q.  What about -- what about denial of access to
6  computers?  Was that part of the reprisals that you
7  felt you were subjected to because these individuals
8  viewed you as having been involved in the termination
9  of -- of Debbie Haynes?
10      A.  I -- I -- let me think about that for a
11  second.  I -- I do believe that a lot of that was
12  because of this blaming me, but in addition, the
13  marginalization and the treatment that they conducted
14  only applied to me and no one else.
15      Q.  Okay.  And did you -- do you know if there was
16  anybody else whom they blamed for Debbie Haynes' losing
17  her job at GDS?
18      A.  I believe that you could probably find that
19  they all -- many of them probably knew other folks or
20  folks who actually did go to Paul about problems that
21  Debbie Haynes might have had.  But I didn't see anyone
22  else being treated the way I was being treated.

Page 164

1      Q.  Okay.  What about the occasions when Mr. Ryan
2  would come into your class and make comments that you
3  thought marginalized you?  Did you view that as part
4  of the reprisal that he was taking against you because
5  he thought you had played a role in the termination
6  of Ms. Haynes?
7      A.  No.  I believe as the diversity officer
8  explained it, it was as a sense of white superiority
9  and privilege.
10      Q.  What -- what explanation or who gave you that
11  explanation?
12      A.  Mariama Richards and Elizabeth Denevi.
13      Q.  I see.  And were they present when he came
14  into your room to make the statements that you felt
15  were inappropriate?
16      A.  No, and that was only one of the instances,
17  but I believe they talked with him after the "I can't
18  bend low enough to the ground to understand you"
19  incident and that was one of the things they told me.
20      Q.  And it's still your belief that you were
21  subject to these reprisal actions that you've described
22  because you were being blamed by others for the

Page 165

1  termination of Debbie Haynes?  You still believe that?
2      A.  Sir, the record stands as it is.  I've told
3  you what I know.
4      Q.  I'm asking you a question.  Just calls for a
5  yes or no answer.  Do you still believe that's the
6  case?
7          MR. RACIN:  Objection.  I would ask for
8  clarification.  Could you rephrase that?
9          MR. WILLIAMSON:  All right.
10         MR. RACIN:  I didn't understand that.
11  BY MR. WILLIAMSON:
12      Q.  Do you still believe that you were subject to
13  the reprisal actions you've discussed during this
14  deposition because you were being blamed by others for
15  the termination of Debbie Haynes?
16      A.  Yes.  Some of those were -- do apply there I
17  believe, yes.
18      Q.  Now, do you see where it says that still on
19  numbered paragraph 1 -- let me find it myself.  Yeah.
20  You see where it says that you have been or that you're
21  saying you have been a magnet for resentment by
22  Tolliver, Haynes and her core of friends on the staff?

42  (Pages 162 to 165)

Sharon Killian

Page 166

1    A. Uh-huh.
2    Q. Bruce Ruble, Noreen Mac and others.  Is that
3  an accurate statement?
4    A. I -- it's a -- it's a relatively accurate
5  statement, but I would -- I would --
6    Q. When you say relatively -- oh, go ahead.
7    A. You know, it's an accurate statement.
8    Q. Okay.
9    A. It's an accurate statement.
10    Q. When you say relatively accurate, is there
11  part of it that's not accurate?
12    A. I -- it's not a matter of not being accurate.
13  I -- the "and others," some of those others I have not
14  had, you know, the direct contact with where it happens
15  in front of my face.
16    Q. Who are the others?
17    A. Perhaps if you -- GDS would know much, much
18  better than I probably the old guard.
19    Q. To your -- the best of your recollection, who
20  are the others?
21    A. Hmm.   There were people who had been there
22  for 25 years or more.

Page 167

1    Q. What are their names?
2    A. I don't recall all of their names, sir.
3    Q. Do you recall any of their names?
4    A. No.
5    Q. And then you say "each of them" and you're
6  talking about --
7    A. Uh-huh.
8    Q. -- Tolliver, Haynes, Ruble and Mac.   You say,
9  "Each of them in their own style seeks to undermine and
10  demean me and is not above dishonesty to achieve this
11  end."   What did you mean by that statement?
12    A. Simply to -- to conduct or to -- to do
13  these -- these -- do these activities and then profess
14  that they never did it, essentially.
15    Q. What would be an example of -- of dishonesty
16  by one of these people who had demeaned you?
17    A. Bruce Ruble.   You are only allowed 750
18  megabytes for your classroom use and get your -- your
19  database down to that size.  Meanwhile he's created a
20  separate drive of 75 gigabytes per actual machine in
21  the studio, in the labs that Laura Tolliver has access
22  to, for anything she needs over 750 megabytes, and

Page 168

1  that's not shared and that space isn't offered to me as
2  someone who used, you know, technology pretty intensely
3  in whatever class I had.   I -- making digital
4  photographs and so on.
5    Q. Who is Bruce Ruble?
6    A. He is a technology head I think in the high
7  school.
8    Q. At GDS?
9    A. Or was.   Yeah.
10    Q. And was Ruble persuaded that you had a role
11  in Ms. Haynes losing her job?
12    A. I -- he didn't tell me personally as -- as
13  Nick intimated when he said, "You're not going to, you
14  know, get me fired."   But I -- that in addition to it
15  must be my race why I was treated that way is what I
16  have.
17    Q. Okay.  Why is it you included Mr. Ruble as one
18  of the people who you said had made you a magnet for
19  resentment because these people thought that you had a
20  role in the termination of Debbie Haynes as an employee
21  of GDS?
22    A. Because primarily I didn't really have -- I

Page 169

1  didn't teach a class with him.  I had a fairly limited
2  contact with him except for that he -- he was a
3  technology person for the high school, and I had to go
4  to him to -- to get resources in that regard.
5    Q. And so what was your basis for concluding that
6  he shared this resentment toward you?
7    A. Aside from also coming into my classroom when
8  my students are present and screaming at me about
9  taking, you know, taking -- reducing the number of
10  megabytes that I'm using.   In a rude demeaning way in
11  my class as I'm speaking to my students.
12    Q. Is that the reason that you think --
13    A. That's one.
14    Q. -- he believes that you had some role in Ms.
15  Haynes losing her job?
16    A. That and just a general negative treatment,
17  yes.   And they are friends and it started right after
18  she left.  So, the negative treatment.
19    Q. Do you know if there's anybody who uses -- at
20  the time that Mr. Ruble made that comment in the class,
21  do you know whether there was anybody in the school who
22  was using more megabyte capacity than you were?

43  (Pages 166 to 169)

Sharon Killian

Page 170

1    A.  I don't know, except that as I said before,
2  there was 75 gigabytes for machine that Laura had
3  access to.
4    Q.  But you don't know whether there was anybody
5  using more computer capacity at that time than you
6  were?
7    A.  You know, there might have been a memo that
8  said I might be using the most.
9    Q.  Do you think --
10   A.  There might have been one.
11   Q.  Do you think that would have been accurate?
12   A.  It could have been.   I -- I was -- it could
13  have been.
14   Q.  How would you know whether it was accurate?
15   A.  I would have just had to guess it, and Bruce
16  said it and said it to Nick, who said it to me.  Could
17  have been accurate.  Could maybe not have been
18  accurate, but I suppose that he should have known and
19  then that he would be telling the truth, or I hope.
20  But...
21   Q.  Did you have reason to believe that he wasn't
22  telling the truth?

Page 171

1    A.  It didn't really quite matter to me because it
2  was totally inadequate anyway for the work I had to do.
3  So...
4    Q.  Now, what about Norrine Mac; is she also
5  somebody who made you a target for resentment because
6  she is a friend of Ms. Tolliver and Ms. Haynes and she
7  was persuaded that you had a role in Ms. Haynes losing
8  her job?
9    A.  It manifested itself in insidious ways.  So...
10   Q.  Could you answer my question first?
11   A.  Okay.
12   Q.  You want me to give you the question again?
13   A.  (Nods head).
14   Q.  What about Norrine Mac; is she also somebody
15  who made you a target for resentment because she is a
16  friend of Ms. Tolliver and Ms. Haynes and she was
17  persuaded that you had a role in Ms. Haynes losing her
18  job?
19   A.  Yes.
20   Q.  And you also said that "each of them" which
21  presumably includes Ms. Mac?
22   A.  Uh-huh.

Page 172

1    Q.  "In their own style seeks to undermine me,
2  demean me and is not above dishonesty to achieve this
3  end."  What is it that Norrine Mac did to undermine
4  you and demean you and was not above dishonesty to
5  achieve that end?
6    A.  The -- Norrine, I believe her position is as
7  counselor at the school and she gets to see all the
8  kids coming in that first year.  She has classes with
9  all the first year kids.  One of the things I think
10  that they've instituted is a -- inside that program
11  that she offers is, you know, talking to the kids about
12  extra curriculars and so on.  And one of the things
13  that I do is Yearbook and routinely -- or did was
14  Yearbook and routinely the kids were redirected to
15  other things.
16   Q.  How do you know that they were redirected to
17  other things?
18   A.  I've heard it said by students and so on.
19   Q.  What students told you that?
20   A.  At least one or two students who initially had
21  signed up to do -- to do it said that they learned in
22  the classroom that there they should do something

Page 173

1  different.
2    Q.  They learned in what classroom?
3    A.  In the classes.  The classes that Norrine was
4  offering.
5    Q.  Is she a counselor or classroom teacher?
6    A.  She does a class for I think all of the kids,
7  all the freshmen and juniors and that kind of thing.
8    Q.  Did they say -- did they say that whether she
9  had any reasons for why she was redirecting them to
10  something else?
11   A.  No, and I didn't really push, push, you know,
12  the kids to tell me.
13   Q.  Do you know would there ever be a legitimate
14  reason to redirect a student from Yearbook to some
15  other activity?
16   A.  Not in my estimation, no.
17   Q.  Now, is Nick Ryan another person who was one
18  of the core of friends of Laura Tolliver and Debbie
19  Haynes who made you a magnet for resentment because you
20  thought you -- because they thought you had a role in
21  termination of Ms. Haynes?
22   A.  Nick Ryan, yes.

44  (Pages 170 to 173)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 174

1    Q. Now, would you take a look at the second
2  numbered paragraph.  Second numbered paragraph of
3  Exhibit 13 where you say: "Nick Ryan has become
4  closely involved with this clique.  So much so, that he
5  parties with them and has vacationed at Norrine's San
6  Francisco home and used her new car while there."
7    A. Uh-huh.
8    Q. Exactly what clique are you talking about?
9    A. The Bruce Ruble, Norrine Mac and others
10 from -- and probably Laura Tolliver and Bruce Ruble and
11 Nick Ryan could probably explain to you better what the
12 clique is.
13   Q. What --
14   A. But they're a group of people who are -- have
15 been at the school for a long time and they did stuff
16 together.  So I think it's Laura Tolliver, Debbie
17 Haynes, Norrine Mac, Laura Rosberg, et al.
18   Q. Who are the et al.?
19   A. Hmm.  There was one.  There's a gentleman in
20 -- that's all I know in terms of the -- the party, et
21 al. and so on.
22   Q. Do you know if Laura Tolliver and Nick Ryan

Page 175

1  socialize outside of school?
2    A. I do -- I believe so.
3    Q. But do you know whether they actually do?
4    A. I -- I have heard them talk about their --
5  their after-school meetings, sure.
6    Q. What sort of social event did you hear them
7  discussing that they attended outside of school
8  together?
9    A. They've gone to Debbie Haynes' parties and
10 probably have been to each other's homes.  I don't --
11 from the sound of the conversations.  That's all.
12   Q. And you testified earlier that you had been
13 invited to Debbie Haynes party as well, didn't you?
14   A. Before Nick Ryan came, yes.
15   Q. Have you ever been invited to any parties or
16 meetings at the home of Laura Tolliver?
17   A. No.
18   Q. No parties?
19   A. No.
20   Q. And no meetings at Laura Tolliver's house?
21   A. Let me think.  Actually, there was a meeting.
22 There wasn't a party.

Page 176

1    Q. All right.
2    A. There was a meeting.
3    Q. Did you attend a meeting at Laura Tolliver's
4  house?
5    A. Yes.  It was before Nick Ryan came.  It was
6  actually probably in like '93 or '94 and it was one of
7  those staff retreats, and I do believe I was there.
8    Q. Do you feel it was a form of racial harassment
9  of you that you were not invited to the same parties
10 that Nick Ryan was invited to outside the school?
11   A. I don't know.
12   Q. You don't know if that's a form of racial
13 harassment toward you?
14   A. I don't know.
15   Q. Why is it that when you made complaints about
16 racial harassment to Mr. Branch, you referred to people
17 in this clique going to parties with each other?
18   A. Because when Nick came onboard, he was to have
19 quelled certain favor favoritism and lopsidedness in
20 the department and that's what -- that's what Paul Levy
21 told me and -- and it quickly changed completely to
22 another lopsided situation that I had been living with

Page 177

1  for the last many years.
2    Q. What's the relevance to that of the social
3  parties that faculty members went to outside school?
4    A. In that that's where some of the information
5  was learned that -- that was brought back into the
6  department.
7    Q. And you felt that was a form of racial
8  harassment of you that they were --
9       MR. RACIN:  Objection.  That's not the
10 testimony.
11      MR. WILLIAMSON:  I'm asking the
12 question.
13      MR. RACIN:  The testimony was she did
14 not know.
15      MR. WILLIAMSON:  I'm now asking for
16 further clarification.
17 BY MR. WILLIAMSON:
18   Q. Did you regard that, that is, the people
19 attending these parts and talking about things are
20 subjects that they then brought back to school, is that
21 part of what you regard as racial harassment of you?
22   A. I don't know.

45  (Pages 174 to 177)

## Sharon Killian

Page 178

1    Q.  Did you feel that it was a form of racial
2  harassment that you were not invited to visit the
3  vacation home of Norrine Mac in San Francisco and
4  allowed to use her new car?
5    A.  No.
6    Q.  How is it that you know Mr. Ryan vacationed at
7  Norrine Mac's San Francisco home and used her new car
8  while there?
9    A.  I happened upon a discussion between them.  I
10  was in a -- coming into a meeting and -- and they were
11  there and they were -- their backs were turned to the
12  door and I -- and they were talking about it and they
13  stopped as soon as I heard.  You know, it was too late
14  for me to hear the whole thing, but I -- that's what I
15  heard.
16    Q.  Do you know when Mr. Ryan was visiting
17  with Ms. Mac on vacation, was that an activity that he
18  was doing as part of his job as an employee of GDS?
19    A.  No, I'm sure that was his personal time.  I'm
20  not sure.  I shouldn't say I'm sure.  I'm not -- I
21  don't know if it was business or pleasure.
22    Q.  And what -- is Ms. Mac a member of the art

Page 179

1  department?
2    A.  No.
3    Q.  Now, looking again at numbered paragraph 2 of
4  Exhibit 13, would you read the second sentence that
5  begins "Last spring"?
6    A.  "Last spring Nick Ryan actually screamed at me
7  while in episodic fits that I would not do the same to
8  him.  'You are not going to force me on the street
9  like you did Debbie Haynes.'"
10    Q.  Now, when you referred to last spring in that
11  sentence, are you referring to the spring of 2002?
12    A.  2002-03 I guess it was.  I don't know.
13    Q.  Do you know which?
14    A.  It's -- it was 2002 after the ripping down of
15  the -- of the -- and there have been more than one.  So
16  I'm trying to --
17    Q.  Ripping down of the what?
18    A.  Of the kids' work from the walls.  The Black
19  Culture Club banners and other things.  There have
20  been more than one scream.  So...
21    Q.  Now, was that --
22    A.  Yes, here it is.  Content for this was Nick's

Page 180

1  tearing down the children's room for the Black Culture
2  Club.
3    Q.  Do you remember approximately what -- what
4  date Mr. Ryan allegedly screamed at you?
5    A.  In that regard, it would be 2002 around Black
6  History Month, which was around February 20 something
7  probably.
8    Q.  Is it Black History Month?
9    A.  February.
10    Q.  It's for the whole month, right?
11    A.  Yes.
12    Q.  But you think this happened around February 20
13  something?
14    A.  Uh-huh.
15    Q.  All right.
16    A.  Or 17th, something like that.
17    Q.  Now, where was it that he was screaming at you
18  in one of his episodic fits as you describe it?
19    A.  In and out of the art department office.
20    Q.  Where is that located?
21    A.  On the third floor.
22    Q.  Okay.  Was there anybody else present who

Page 181

1  either saw or heard Mr. Ryan screaming at you in the
2  spring of 2002?
3    A.  I don't recall exactly if Laura Tolliver was
4  in the room or not.
5    Q.  Is there anything that would refresh your
6  recollection?
7    A.  Perhaps there could be something.  It was
8  very shocking to me.  So, you know, I don't know if
9  she was there yet or not.  8 o'clock.  She might not
10  have been there yet.
11    Q.  Was there someplace where you said he was
12  doing this in front of one of your colleagues?
13    A.  And students, yeah.
14    Q.  Would that colleague have been Laura Tolliver?
15    A.  It would have been Laura Tolliver and -- this
16  is a different situation you're talking about?
17    Q.  No.  For this I'm asking about when --
18    A.  Uh-huh.
19    Q.  -- the screaming relating to -- that occurred
20  around the time these banners were taken down.
21    A.  It probably would have been Laura Tolliver at
22  that time of the morning.  Maybe.

46  (Pages 178 to 181)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 182

1    Q. What do you think Mr. Ryan meant when he said
2  "You are not going to force me out on the street like
3  you did Debbie Haynes"?
4    A. This as I explained before, he blamed me for
5  Debbie Haynes' departure.
6    Q. How did you interpret what he said?
7    A. That's what I -- I just said, sir.
8    Q. Okay. Now, was it your belief at the time --
9  well, let me skip that question.
10       Why don't you take a look, again, at paragraph
11  2 of Exhibit 13. Do you see in the middle of that
12  paragraph it says, "The context for this was Nick's
13  tearing down the children's work for the Black Culture
14  Club and throwing it onto the floor"?
15    A. Yes.
16    Q. What children's work for the Black Culture
17  Club were you talking about when you made that
18  statement?
19    A. The Black Culture Club students had been
20  making banners. I believe it was for an assembly and
21  surrounding activities.
22    Q. When you say banners, what are -- are banners

Page 183

1  pictures or something?
2    A. Yes. Drawings. Sayings on big paper painted
3  with acrylic paint or other materials like that.
4    Q. You'll have to bear with me during the
5  deposition. I'm -- as you can see, I'm a lawyer and
6  most presumptively artistically challenged.
7    A. You have kids, do you?
8    Q. I do have children.
9    A. (Laughs).
10    Q. But if their artistic ability depends on
11  hereditary, they're going to come up short.
12    A. (Laughs).
13    Q. Now, were you actually present when Mr. Ryan,
14  as you said, tore down the children's work for the
15  Black Culture Club and threw it onto the floor?
16    A. No. I came in in the morning and they were
17  strewn all over.
18    Q. All right.
19    A. And I asked him.
20    Q. If you were not present when the work was
21  taken down, how is it that you know he tore it down and
22  threw it onto the floor?

Page 184

1    A. Because they were ripped and torn, and then he
2  was also throwing -- he starts pick them up, picks some
3  up and throw them in the trash. So I assumed he was.
4  They looked like they were ripped and they were torn.
5  He ripped them off and tore them down, yeah, and he I
6  believe said he did that.
7    Q. Now, would it be fair to say that you came
8  into the room and saw the work on the floor and
9  inferred that it had been torn down and thrown onto the
10  floor by Mr. Ryan; is that right?
11    A. No. He ripped them and tore them and --
12    Q. Were you a witness to his ripping and tearing?
13    A. Subsequent to the stuff on the floor, the way
14  he snatched them up and threw them and tore them and
15  put them in the trash as he was doing this.
16    Q. Were you a witness to his tearing down the
17  banners, Ms. Killian?
18    A. I was not a witness. As I said in here, I
19  came in or in something else that you might have read,
20  that I came in and they were ripped and torn and strewn
21  all over the floor.
22    Q. Do you know if there was anybody else who was

Page 185

1  involved in taking down the banners that you saw on the
2  floor?
3    A. Not to my knowledge. He told me he did -- he
4  had done that.
5    Q. He told you he had done it by himself?
6    A. Well, he told me he had taken -- he had
7  done -- he had taken them down because there was --
8  there were other things to do or other people needed
9  the space or something like that.
10    Q. Now, later in the paragraph you say, "I asked
11  how the banners were torn down and thrown about."
12    A. Uh-huh.
13    Q. You see that?
14    A. Let's read it.
15    Q. Now, did you ask that question because you had
16  not actually seen the manner in which the banners and
17  posters had been taken down and put on the floor?
18    A. As I had told you, yes, that's right. When I
19  came in, they were ripped and torn and strewn on the
20  floor and I asked him.
21    Q. And how did he answer the question?
22    A. He said, you know, he was pretty upset about

47  (Pages 182 to 185)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

| Page 186 | Page 188 |
|---|---|

**Page 186**

1  it, that I would even ask and screamed and marched very
2  quickly back and forth through the studio. And I think
3  I -- let me see what I said here. "He exploded with
4  the Debbie Haynes reference." "You're not going
5  to" -- yeah, that's what he said.
6      Q. There was screaming. Was there anybody else
7  who was present who would have heard Mr. Ryan screaming
8  at that time?
9      A. As I said, I -- I don't recall exactly. If
10  anyone was there, then perhaps Laura Tolliver would
11  have been there. Although she might not have been
12  there.
13      Q. Okay.
14      A. I'll have to --
15      Q. In the last sentence of that first paragraph
16  associated with number 2.
17      A. Uh-huh.
18      Q. You say, "It was clear from that day forward
19  that Nick Ryan, like Debbie Haynes, would actually
20  destroy children's work if I was associated with it and
21  that works that involve children of color are
22  especially vulnerable."

**Page 188**

1      Q. Relationship between what and what?
2      A. From -- between Debbie Haynes and Laura
3  Tolliver and that group that you had me go through.
4  But many kids have many different clubs, and they come
5  up to the art studio to create their banners or their
6  posters or whatever it may be. This is the only
7  group's stuff that's ever been ripped down and thrown
8  out and especially laying all over the floor and -- and
9  treated with disgust. He's saved other things.
10  Taken down carefully and saved other things and so
11  that's my point.
12      Q. What other banners like this has he saved?
13      A. There -- as I said, sir, there are many other
14  groups.
15      Q. Can you give me any specific example?
16      A. I'm trying to think for you here. There are
17  hundreds, if not -- of groups that -- that work in
18  there. There -- there are banners for the Christmas
19  assembly. There are banners for any number of
20  programs that occur.
21      Q. And do you know if the banners for the
22  Christmas assembly are saved each year?

| Page 187 | Page 189 |
|---|---|

**Page 187**

1      A. Yes.
2      Q. Now, did you say that because you believe
3  that Mr. Ryan thought you had played a role in Ms.
4  Haynes' termination and he resented you for that?
5      A. I don't know. I just know that the children
6  of color, you know, other -- other groups come up to
7  the studio and work, and this is the only one that has
8  ever been ripped down.
9      Q. Is it your testimony now that you don't know
10  whether Mr. Ryan resented you for -- because of his
11  belief that you had played a role in the termination
12  of Ms. Haynes?
13          MR. RACIN: I object on an asked and
14  answered grounds at this point. This has been going
15  on at some length. You can answer but, you know,
16  we're going to the end of this inquiry.
17          THE WITNESS: In the paragraph 1, I
18  believe that I said there that -- or paragraph 2 I talk
19  to you about in this, you could see that I mentioned
20  the clique and so you can probably infer from that that
21  there's a relationship. But other students --
22  BY MR. WILLIAMSON:

**Page 189**

1      A. No, I don't know if they're saved each year.
2      Q. All right. Is there any other specific
3  example you can give?
4      A. No, not at this time.
5      Q. Were there any African American students who
6  complained to you that they had expected that their
7  banners would be -- be taken down and saved in February
8  of 2002?
9      A. I -- indeed, the children were working with
10  Vernese Edgehill, who was the -- one of the codirectors
11  of diversity at the time, and indeed she was the one
12  who was up there working with the kids and also gave
13  the kids -- brought them into the space to use the
14  space. So, and I shared the incident with her, and I
15  think maybe you need to talk to her about that.
16      Q. Would you answer my question, please?
17      A. No.
18      Q. And did you regard the incident involving the
19  Black Culture Club banners as an example of racially
20  hostile treatment of you by GDS?
21      A. Yes. Did Mr. Ryan tell you that he was taking down

48  (Pages 186 to 189)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 190

1  -- he had taken down the banners because there was
2  another group that needed to use the space?
3      A. He said that other people needed the space.
4      Q. All right. And why is it you think Mr.
5  Ryan's motive for taking down the Black Culture Club
6  banners was racial prejudice against you as an African
7  American?
8      A. Well, they really weren't taken down. They
9  were ripped down. Taking down and ripping down are
10 two different things and so that -- that stark
11 difference in itself says something like -- says
12 something to me about racial prejudice.
13     Q. Do you know were these banners exposed to any
14 weather or any outside conditions?
15     A. I really don't know, sir. I didn't really
16 inspect them very clearly, you know, closely, except I
17 could see that they were ripped, ripped and strewn.
18     Q. So you wouldn't know whether they might have
19 been ripped because of weather or some outside
20 condition over the weekend?
21     A. Right.
22     Q. In the second paragraph of that numbered item

Page 191

1  2 of Exhibit 13, do you see where it says you had to
2  take down from the walls on the first floor entrance
3  some works completed by Laura's students?
4      A. Uh-huh.
5      Q. Would those be Laura Tolliver's students?
6      A. Yes, sir.
7      Q. And you took those works down on a Friday
8  after Ms. Tolliver -- let me see. I want to go back
9  before I ask you these questions. On these BCC
10 banners that we were talking about, did that incident
11 occur on a -- was that after a weekend or do you
12 remember?
13     A. Let me just dry my glasses.
14     Q. Do you remember if that encounter --
15     A. Yeah.
16     Q. -- with Mr. Ryan was after a weekend?
17     A. Just -- just a second, please. I cannot tell
18 you with complete accuracy at this moment, sir.
19     Q. Okay.
20     A. I need to be refreshed on that.
21     Q. Let's go back to this question about Laura's
22 students. You took down those -- the work of Laura's

Page 192

1  students on a Friday --
2      A. Uh-huh.
3      Q. -- when Ms. Tolliver had already left for the
4  weekend; is that right?
5      A. Yes.
6      Q. And since she had left for the weekend, you
7  didn't have a chance to ask her permission for taking
8  down her students' work?
9      A. Yes.
10     Q. Now, did you think it was appropriate to ask
11 permission of another teacher before taking down her
12 students' artwork?
13     A. Generally speaking, there should be some -- I
14 agree with there being a discussion about these things,
15 yes, sir.
16     Q. Okay. I think we're going to change a tape
17 now for a moment.
18     A. Okay.
19         THE VIDEOGRAPHER: Going off the record
20 at 3:39:02. End of tape 2.
21         (Discussion off the record.)
22         THE VIDEOGRAPHER: Going back on the

Page 193

1  record at 3:40:28. Beginning of tape 3.
2  BY MR. WILLIAMSON:
3      Q. Ms. Killian, do you see in the second
4  paragraph under numbered item 2 of Exhibit 13 where you
5  say, "Ryan screamed at me that you're supposed to ask
6  permission first before you can take down anyone else's
7  works."
8      A. Uh-huh. Yes.
9      Q. Where was it that Mr. Ryan screamed at you
10 that you're supposed to ask permission first before you
11 can take down anyone else's works?
12     A. In the office, art office.
13     Q. Do you know the approximate date when that
14 incident occurred?
15     A. It was -- it was, ooh, again late February and
16 I -- I wrote -- I wrote something to him pretty soon
17 after that happened. I sent him a note. So that the
18 date should exist in much more accuracy than I would
19 speculate for you right now.
20     Q. Sometime in February?
21     A. Yes.
22     Q. Was there anybody present who heard Mr. Ryan

49 (Pages 190 to 193)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 194

1  scream at you that you're supposed to ask permission
2  first before you can take down anyone else's works?
3      A. Not that I recall.  We were in the office,
4  and I didn't know.  I didn't see Laura then at that
5  time.  I don't recall seeing her in the room at that
6  time and since it's the three of us usually, that would
7  be --
8      Q. Is the art office next to any other office?
9      A. No.  No.  It's in a large studio and it's in
10  the back.
11     Q. Is there anybody else on the floor?
12     A. Yes.  Science is on that floor as is
13  technology.
14     Q. If -- if someone was screaming at you, would
15  anybody in science or technology be able to hear the
16  screaming?
17     A. The gallery space is very long and goes out to
18  the hallway, and the doors would have to be definitely
19  open and, you know, people had to be there at the time
20  of day that this is all happening.  So, you know.
21     Q. What time of day was it happening?
22     A. It would either be late afternoon or early

Page 195

1  morning.
2      Q. Would there have been other faculty around at
3  that time?
4      A. It all depends.  You know, what happens in
5  the -- this, no.  For this particular situation, my
6  answer is no.
7      Q. Now, in the next sentence where you say, "He
8  can rip down the Black Culture Club's works and leave
9  it on the floor," is that in reference to the incident
10  where you were not actually present when the Black
11  Culture Club works were taken down and left on the
12  floor?
13     A. Uh-huh.  Yes.
14     Q. Now, did you regard Mr. Ryan's statement to
15  you that you're supposed to ask permission first before
16  you can take down anyone else's work as an example of
17  racial harassment?
18     A. Yes.
19     Q. And what made you think that statement was
20  based on racial prejudice towards you?
21     A. I think it was for the past four or five years
22  I have invited the owner of Remy Art Gallery to help us

Page 196

1  to celebrate Black History Month, and how she did that
2  was by bringing original artwork to the school for me
3  and hang them on the first floor right in the entryway.
4  So that parents, teachers and so on would get another
5  feel.  Would get to see the works of African American
6  artists or artists who -- who enhanced African American
7  artwork or the visible reputation of African
8  American's, especially for that time of year, you know,
9  that month.
10     Q. Sure.
11     A. And I had been very, very busy.  Very busy
12  that February.  My brother died that year, that
13  February month and so I wasn't able to get the works up
14  for the entire month.  Edith Buffalo said we can do
15  it.  We can still do it for the rest of February.  My
16  husband helped me to go pick up the works, bring them
17  out to the school.  Laura was gone, and he helped me
18  put the works up on the first floor.
19         It wasn't even as substantial as I would have
20  normally done, but that's the only reason I took the
21  students work down.  I assumed, you know, I didn't
22  have to call her at home about this.  That it would be

Page 197

1  okay to take down the students' work and, you know, the
2  kids' work.  I mean, I later found out whose work it
3  was.  I respect my students' works or any students'
4  works.  So I packaged them very carefully, took them
5  upstairs to her office, and put them in a very safe
6  place.  I didn't call her at home to say I had to.
7  Although, you know, I really thought I should have, but
8  I didn't do it.
9      Q. Hold on, Ms. -- I just want to be sure you
10  understand the question I'm asking you.
11     A. Yes.
12     Q. What made you think that the statement by Mr.
13  Ryan was based on racial prejudice towards you?
14         MR. RACIN: This is fully responsive.
15         THE WITNESS:  At any rate, it was for
16  Black History Month and he takes -- he's taken her
17  things down without asking.  I have not heard or I
18  have not been privy to any discussion about why he
19  didn't ask her or vice versa, and this was a special
20  situation.  And I -- I think I've answered the
21  questions.
22  BY MR. WILLIAMSON:

50  (Pages 194 to 197)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 198

1    Q. If I understand your answer, the normal or the
2  answers you've given today, the normal practice is to
3  ask permission first before you take down the work of
4  another teachers' students; is that right?
5    A. And I use the word permission here
6  specifically, but usually among colleagues if there's a
7  real need, I believe that one can say, may I borrow
8  this space and so on, and it didn't necessarily happen
9  in exchange with me, but this I thought was a special
10  situation.   It should have been -- I shouldn't have
11  had to have heard a negative response like this.   It
12  should have been "The works are beautiful up.   I am
13  glad you had a chance to do some celebration for Black
14  History Month in this way, Sharon -- month in this way,
15  Sharon.  I'm sure Laura will understand."
16    Q. Now, would you answer my question, please?
17  Is it -- was it your prior testimony that the normal
18  practice among the art school teachers is that if you're
19  going to take down the work of another teacher, that
20  you ask that teacher's permission before you do that?
21    A. Yes.
22    Q. And why is it you have a practice like that at

Page 199

1  GDS when you were there?
2    A. Perhaps Nick Ryan can answer this one, but
3  there are three of us and we have many, many students
4  and it's -- I think it's -- I think it's appropriate --
5    Q. Okay.
6    A. -- that we have, you know, we ask.
7    Q. And setting aside that -- your allegation
8  that Mr. Ryan screamed at you, what makes you think he
9  made this statement about following that practice for
10  any other reason than that the faculty -- the art
11  faculty thinks that's an appropriate way to operate?
12        MR. RACIN:  In addition to what's
13  already been testified to?
14        THE WITNESS:  Yeah.  I don't -- I don't
15  know.
16        MR. RACIN:  I mean, asked and answered.
17  BY MR. WILLIAMSON:
18    Q. Would you answer my question?
19    A. I -- I don't know what else you want me to say
20  about that, sir.
21    Q. I just --
22    A. I believe --

Page 200

1    Q. I'm trying to understand why you think that or
2  tell me, do you think that the reason he gave that he
3  thinks you should follow the policy, whether or not he
4  had adequate justification in this particular
5  circumstance, are you saying that that reason was not
6  the real reason why he asked -- said to you that you
7  should get permission before you take down these
8  things?
9    A. Well, considering all I have been suffering
10  over these past years with -- with him, I suppose
11  that's possible.
12    Q. Or is it your testimony the real reason he
13  said that to you is because he wanted to make you feel
14  racial hostility?
15    A. Yes.
16    Q. That's --
17    A. He wants me to feel racial hostility.   He
18  couldn't -- obviously couldn't help it.
19    Q. Now, in numbered paragraph 3, you say that you
20  told Paul Levy about Nick's reference to Debbie Haynes.
21  Why did you feel that it was important to tell Paul
22  Levy about Nick's reference to Debbie Haynes?

Page 201

1    A. Because he was coming in.   He was brought in
2  from the outside to do something totally different.
3    Q. Did you tell Nick -- did you tell Paul Levy
4  because you believe that Nick Ryan resented you because
5  of his understanding that you had played a role in the
6  termination of Debbie Haynes?
7    A. Repeat that, please.
8    Q. Did you -- did you go to Paul Levy because you
9  believed that Nick Ryan resented you because of his
10  understanding that you had played a role in the
11  termination of Debbie Haynes?
12    A. I went to Paul because I felt harassed by that
13  statement.
14    Q. But why did you make the reference to or why
15  did you tell him about the references to Debbie Haynes?
16    A. Because I felt harassed by it.
17    Q. All right.   And was that harassment based on
18  Nick Ryan's resentment of you because of what he
19  thought you had done to Debbie Haynes?
20    A. I -- if you will, a combination of racial
21  hostility and resentment since he really didn't know
22  and wasn't there when.   He was hired, in fact,

51  (Pages 198 to 201)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 202

1  interviewed with Debbie Haynes I think.  So, all I can
2  tell you, sir, is that I felt harassed and I told Paul.
3      Q.  Did you say earlier that you felt that Nick
4  Ryan was part of a clique of friends --
5      A.  Yes.
6      Q.  -- of Debbie Haynes?
7      A.  Yes.
8      Q.  All right.  Now, who is Paul Levy?
9      A.  Paul Levy was the principal of the high
10 school.
11     Q.  And what did Mr. Levy do in response to your
12 complaints to him about the incident where Mr. Ryan
13 made reference to Debbie Haynes?
14     A.  I think my next comment is "I never heard
15 another word about this matter from Paul."
16     Q.  What is it that you feel Mr. Levy should have
17 done that he did not do in response to your reporting
18 to him of Mr. Ryan's reference to Debbie Haynes?
19     A.  I don't know what he did.
20     Q.  But I'm asking you, what is it you think he
21 should have done?
22     A.  As principal and as there must have been some

Page 203

1  information that would help him know what to do as
2  principal of the high school in situations like this, I
3  would think that it would be his position to do
4  something.  Now, since I'm not the principal or wasn't
5  the principal, I think that he, you know, something.
6  I don't know.  Something.  I wasn't told whether
7  anything was done.  Maybe he did something.  You're
8  assuming that maybe he didn't do anything.  I never
9  heard anything.  He may have done something.  I don't
10 know.
11     Q.  Were there any repeat incidents like this
12 with Mr. Ryan after that occasion in February of 2002?
13     A.  With the -- I -- about Debbie Haynes and me?
14 Not that I recall, sir.
15     Q.  So it's possible he spoke to Mr. Ryan and Mr.
16 Ryan --
17     A.  I don't know.
18     Q.  -- did not engage in similar conduct
19 subsequently?
20     A.  I don't know.
21         MR. RACIN:  Objection, calls for
22 speculation.

Page 204

1  BY MR. WILLIAMSON:
2      Q.  All right.  Next I'd like to ask you some
3  questions about numbered paragraph 4 --
4      A.  Okay.
5      Q.  -- in Exhibit 13.  You see in paragraph 4
6  where you say, "I have at once been encouraged to use
7  technology"?
8      A.  Uh-huh.
9      Q.  "And at the same time the means to do so have
10 been systematically withheld."
11     A.  Yes.
12     Q.  Do you regard that as an accurate statement?
13     A.  Yes.
14     Q.  And who has encouraged you to use technology
15 at GDS?
16     A.  The administration.
17     Q.  Who in the administration?
18     A.  It's come through Paul.  It's come through --
19     Q.  Paul Levy?
20     A.  Levy, uh-huh.
21     Q.  Anybody else?
22     A.  I'd consider him pretty good administration.

Page 205

1  I'm sure he was told by someone else.  So I'd say Paul
2  definitely.
3      Q.  Anybody in the art department?
4      A.  We -- let's see.  I had heard that, yes --
5  excuse me -- that -- that it was something that we
6  wanted to do.  Yes.
7      Q.  Who had you heard that from?
8      A.  That Paul -- that Paul had said something to
9  Nick Ryan in a chairpersons meeting and so, yeah, I'd
10 say from the department chair.
11     Q.  Anybody else?
12     A.  Bruce Ruble.  Bruce Ruble.
13     Q.  Anybody else?
14     A.  My students.
15     Q.  Well, what was Bruce Ruble's position again?
16     A.  I believe he was the head of technology in the
17 high school.
18     Q.  Now, what caused you to say that the means to
19 do so have been systematically withheld?
20     A.  In order to use technology in the arts, you
21 need disk space and in order to get disk space, you
22 have to ask technology for it.  And they have to say

52  (Pages 202 to 205)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 206

1  yes for you to and do something to create that disk
2  space for you in order for you to do the things you
3  need to do with Technology in the Arts.   And also you
4  have to be able to -- to get equipment like, you know,
5  I wanted cameras for the kinds of things you're doing
6  in your classes.   Even if you're not doing, you know,
7  Technology in the Arts class or Graphic Design class.
8  You're doing painting class.   Your kids all need --
9      Q.   All right?
10     A.   -- that stuff and so, you know, you have to
11  have the disk space and in order to get that, you have
12  to ask for that.   You have to tell somebody it's
13  needed.
14     Q.   And whom do you ask?
15     A.   Well, you could say that to your -- to your
16  chairperson, who may say, I'll ask for you or go ahead
17  and talk to -- to Bruce, or as I did, I asked Paul
18  because he was my direct report for something I did.
19     Q.   Now, Ms. Killian, you say that you were
20  limited to 10 gigabytes of disk space for most of last
21  year while managing the Yearbook and teaching?
22     A.   Uh-huh.

Page 207

1      Q.   Is that right?
2          Now, when you refer to last year in this
3  document, Exhibit 13, are you referring to the
4  2002-2003 school year?
5      A.   Yes.
6      Q.   Okay.  And each year do all the art teachers
7  have the same needs for gigabyte capacity?
8      A.   I couldn't say yes to that, sir.  I don't
9  know.
10     Q.   Would you say that what matters is what are
11  the needs of the specific art courses that are being
12  taught?
13     A.   As opposed to what?
14     Q.   As opposed to everybody just having the same
15  needs for gigabyte capacity, do the art teachers' needs
16  vary depending on what courses they're teaching?
17     A.   It can.  It can.
18     Q.   Did it --
19     A.   So --
20     Q.   Did it vary in 2002-2003?
21     A.   I -- I'm not sure what Laura used.  So I
22  can't really tell you whether it's varied.

Page 208

1      Q.   Were there any years where it was your
2  experience that the computer disk capacity needs of the
3  teachers in the art department varied because of the
4  different courses they were teaching?
5      A.   I -- I can say I -- I taught courses that were
6  not digitally based.   Say if we just talk about the
7  art course, they are not digitally based for me, and
8  Nick also taught two courses that are not digitally
9  based.   My -- my students would use a lot more space
10  than Nick might use with his students because I'm -- I
11  use the technology in my class, even though it might be
12  a painting class.   You see?   Do you understand?
13         So he might use -- have used much less than I
14  would have.   Even though we were both teaching classes
15  that are not digitally based.   So it could be a
16  teacher specific thing I guess.
17     Q.   Okay.  I actually think I do understand what
18  you said.
19     A.   Okay.
20     Q.   Now, was there any other art teacher who had a
21  higher gigabyte limit than you did during the 2002-2003
22  school year?

Page 209

1      A.   I don't know.
2      Q.   You also say in this numbered -- well, who
3  would know?
4      A.   Bruce Ruble would know.   Technology people.
5  Paul or Kevin Barr could give you that information.
6  One of those people.
7      Q.   You say in this numbered paragraph 4 of
8  Exhibit 13 that: "Only in these past few months was I
9  increased to a limit of 20 gigabytes."
10     A.   Uh-huh.
11     Q.   When was the limit increased to 20 gigabytes?
12     A.   Past few months.   That would be something
13  like probably January or so.
14     Q.   January of 2000?
15     A.   What is it '3 or '4?   '4.
16     Q.   2004?
17     A.   Yeah.
18     Q.   Okay.  And who made the decision to increase
19  your limit to 20 gigabytes?
20     A.   Oh, gosh.  I don't know exactly.   I would
21  have begged and it could have been -- it could have
22  been through Bruce or not since he was the one in that

53  (Pages 206 to 209)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 210

1    department.  It could have been -- it would have -- it
2    would have come through either the -- that department.
3        Q.  Do you have any recollection of how you
4    achieved getting that increase --
5        A.  Well --
6        Q.  -- to 20 gigabytes?
7        A.  -- it could have been that since I was running
8    an entirely digital book, the Yearbook, a 305-page
9    book, which really needs about 40 to 50 gigabytes to
10   produce a fully digital book.  I couldn't make one last
11   change or something to edit because every time you make
12   a change, it increases the, you know, the amount of
13   space you need and the book had to be done.  And so
14   somebody might have said, well, she's telling me --
15   she's saying, you know, she needs more and so that
16   could have been how that happened.
17       Q.  So, now you're just speculating, though, you
18   don't actually know?
19       A.  About how that happened?
20       Q.  Yes.
21       A.  There was at least one occasion where I know
22   that I hit a wall with that.  So I might have said to

Page 211

1    Paul that I needed -- because Paul was my -- I worked
2    directly with Paul on the Yearbook.  Paul Levy, the
3    principal, that I just have to have -- I can't make
4    another change.  I have to have more space.  So
5    that's probably how it happened.
6        Q.  When you say probably, again are you just
7    speculating or --
8        A.  I'm speculating right now, sir.
9        Q.  Now, in coming to the 20 gigabyte number, what
10   resources did you count in coming to that total?
11       A.  Let me read what your -- this might have even
12   -- this might have been an imposed as opposed to
13   requested.  20 gigabytes as opposed to 40 or 50.  Is
14   that what you're asking me?  How did I get to the 20
15   gigabyte limit?
16       Q.  What -- what resources, what computer capacity
17   resources are you counting in coming to the figure of a
18   20 gigabyte limit?
19       A.  If I understand you, my class files.
20       Q.  Your class files?
21       A.  Uh-huh.  Each one of my classes has a folder
22   on the network and the students are photography

Page 212

1    students or painting students or AP students and they
2    have to keep their images at high resolution, a folder.
3        Q.  Okay.
4        A.  For themselves, their writings and so on, and
5    each one of these kids, and there are probably for me
6    about 70 kids a year.  Each one of those, plus my
7    notes, plus my teaching tools and so on count.  Plus
8    the year --
9        Q.  You're getting a little bit ahead of me.  How
10   many gigabytes were there in the class files --
11       A.  Oh, gosh.
12       Q.  -- of the 20 that you're talking about?
13       A.  That varies.  The class files would probably
14   at least be one, two gigabytes and then --
15       Q.  And then what's the next thing you talked
16   about?
17       A.  And the network space is probably -- and,
18   again, that one or two gigabytes, you know, I'm giving
19   you a rough kind of estimate there.  My -- my network
20   space that is allotted to me.
21       Q.  What's the network space?
22       A.  They said -- they said it was someplace

Page 213

1    near --
2        Q.  Do they have any special name for your network
3    space?
4        A.  No.  It's just called S. Killian or whatever.
5        Q.  S. Killian.  How do you spell?
6        A.  S. Killian with my name.
7        Q.  Oh, and how many gigabytes --
8        A.  I think --
9        Q.  -- did you get there?
10       A.  Well, as you can see, they, you know, there
11   was a limit of 750 gigabytes.  I'm sorry, megabytes
12   and then, you know, they might have up, you know,
13   opened that up a little bit for one gigabyte.  Then
14   the Yearbook not only includes --
15       Q.  So your network space would have been one
16   gigabyte?
17       A.  Up to 750 gigabytes is what they had said that
18   my limit was.  So let's say that was 750 megabytes.
19       Q.  Is your limit 750 megabytes or 750 gigabytes?
20       A.  I'm sorry.  Megabytes.
21       Q.  So when you talk about your network space, how
22   many gigabytes is that of the 20 that you were

54  (Pages 210 to 213)

Sharon Killian

Page 214

1  allocated?
2      A.  700 -- I would say that -- I'd say probably
3  about one gigabyte.
4      Q.  About one gigabyte; okay.   What are the other
5  sources of the 20?
6      A.  There were about 40 kids in Yearbook Club that
7  I worked with and each of them needed space in that 20.
8      Q.  How many -- how many gigabytes did they get
9  out of the 20?
10     A.  Oh, my goodness.  Gosh, I probably only had
11 them to maybe between one and two, depending on who was
12 doing what at a certain time.  Rotate.
13     Q.  As the total for the Yearbook Club?
14     A.  Just the kids and then there are the files
15 with the images and the --
16     Q.  And how many gigabytes were used up by those
17 files?
18     A.  And in the end on a better day, it was 40 that
19 was needed for that.  But let's say that would make up
20 the rest of the 20 if we were talking about this
21 particular time.  Okay?
22     Q.  Does the 20 gigabytes include your personal

Page 215

1  allocation or, first of all, do you know what the
2  user's folder on the HS common server means?
3      A.  S. Killian.  I told you that one.
4      Q.  So the 20 gigabytes included your personal
5  allocation in the user's folder on the HS common
6  server?
7      A.  Yes.  Yes, sir.
8      Q.  All right.  Does it include your allocation on
9  the public folder on the HS common server?
10     A.  The students had to be given extra -- extra
11 space for this where they had their names.  So the --
12 for the HS common folder it --
13     Q.  This is the public folder --
14     A.  Public folder.
15     Q.  -- on the HS common server.
16     A.  Whenever I signed onto it.  If I signed onto
17 it and did anything in those students' folders, it went
18 towards my 20 gigabytes.  So if I did anything in any
19 of those folders, which I did, reviewed, commented, if
20 I signed on, it applied to my 20 gigabytes.
21     Q.  Now, you didn't mention the public folder on
22 the HS common server when you were explaining before

Page 216

1  the sources of your 20 gigabytes, did you?
2      A.  Uh-huh.  The student folders.  I believe I
3  did.  The student folders.
4      Q.  Student folders?
5      A.  My class folders, rather.  Did I say class
6  folders on there?
7      Q.  You said class files.
8      A.  That's it.  Class files.  Inside class files
9  are student folders.
10     Q.  So your students stored files on the public
11 folder; is that right?
12     A.  Uh-huh.
13     Q.  Okay.  Now, does the 20 gigabytes include the
14 disk space allocated to your e-mail account?
15     A.  I don't think so.  I think it might be a
16 different thing.
17     Q.  Does it include the hard drive space on your
18 computer in the art department office?
19     A.  Hmm.  I don't think so.
20     Q.  Does it include the hard drive space on the
21 computers in the photo lab?
22     A.  Hard drive space?  No, uh-uh.

Page 217

1      Q.  Does it include the hard drive space on the
2  computers in the art studio?
3      A.  I don't think so.  Not the desktop right,
4  uh-uh.
5      Q.  All right.
6      A.  We're talking desktop here, right?
7      Q.  Yes.
8      A.  Okay.
9      Q.  I don't know if you covered this before.
10 Does it include the space on the HS common server
11 available for the Yearbook staff's use?  Was that the
12 Yearbook Club?
13     A.  Uh-huh.
14     Q.  Okay.  Does it include the hard drive space on
15 the computers in the pub room?
16     A.  No.
17     Q.  All right.  You also say in this numbered
18 paragraph 4 that there was a time when Laura Tolliver
19 ran the Yearbook.  Do you see that?
20     A.  Yes.  Well, no, not yet.  How far down are
21 you, please?
22     Q.  Let's see if we can find.  Paragraph 4.

55 (Pages 214 to 217)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 218

1  A. Okay.
2  Q. You find it?
3  A. Yes, I did, sir.  Mr. Williams.
4  Q. What was the time period when Laura Tolliver
5  ran the Yearbook?
6  A. I believe she did it for over 20 years and --
7  I believe and the -- she's -- 2002 is the last one she
8  did.
9  Q. And was Ms. Tolliver a colleague who was a
10 member of the art department faculty at GDS?
11 A. Yes.
12 Q. Do you know what the gigabyte limit was on the
13 space she was allowed when she was running the
14 Yearbook?
15 A. No, I don't.
16 Q. So you don't know whether the gigabyte limit
17 that she was subject to is higher or lower than what
18 you had in -- what was it -- 2002-2003 that we were
19 talking about?
20 A. No, but I could always speculate.  I could
21 tell you that it -- she wasn't doing a digital book.
22 It changed from paper to digital.

Page 219

1  Q. And what's your speculation then?
2  A. Well, it was probably less.  I mean, the need
3  for digital space.  You're not running a digital book,
4  then you probably didn't need it.  But I'm sorry.
5  Q. No, that's all right.  That's helpful.  You
6  think that because you changed the Yearbook to --
7  changed to digital under your supervision?
8  A. Yes.
9  Q. Wasn't digital at all under her supervision;
10 is that right?
11 A. Wasn't a digital book.
12 Q. Okay.  And so it's your speculation that the
13 -- you were given a higher gigabyte limit because of
14 the needs related to putting out a digital Yearbook; is
15 that right?
16 A. After I begged and begged, yes.  Is that what
17 you're asking me?
18 Q. No, that's not what I asked you.
19 A. (Laughs). Okay.
20 Q. Can you answer the question that I asked you?
21 A. Okay.  I -- I had the same gigabyte limit that
22 they allocated to everyone.  Notwithstanding the fact

Page 220

1  that I was doing a digital book and so there was a lot
2  of difficulty getting this to go up to 20 --
3  Q. Here's my question.
4  A. -- or to go up to one, two, whatever.
5  Q. Here's my question.
6  A. Uh-huh.
7  Q. Was the 20 gigabyte limit higher than the
8  gigabyte limit that Laura Tolliver was subject to when
9  she was in charge of the Yearbook?
10 A. I don't know.
11 Q. Do you think it's likely?
12 A. I don't know.
13 Q. Well, when you say you don't know, what did
14 you mean in numbered item 4 when you say, "I will tell
15 you also that when Laura Tolliver ran the Yearbook,
16 space was not at such a premium"?  What does that mean?
17 A. I don't know.  Space is -- was not such a
18 premium.  Perhaps that is my speculation coming to --
19 to bite me that since she didn't use -- she didn't use
20 a digital process, then space wasn't a serious issue
21 for the Yearbook.
22 Q. What did you mean when you said your

Page 221

1  speculation is coming to bite you?
2  A. I said -- I said I didn't know for sure and
3  here it is.  I was trying to speculate that it could
4  be that she didn't need as much space, and I didn't
5  want to commit to that because I don't know for sure.
6  Q. Okay.
7  A. But I'm assuming and speculating again that it
8  probably, you know, since it wasn't a digital book that
9  she was producing in terms of the Yearbook, that maybe
10 she didn't need to -- to do that.  So that's -- that's
11 all I meant.
12 Q. Okay.  Also numbered paragraph 4 of Exhibit
13 13, do you see where you say that:  "Even now she is
14 allowed significantly more disk space than I am
15 permitted"?
16 A. Yes.
17 Q. Were you comparing that to the 20 gigabytes
18 you referred to earlier?
19 A. Uh-huh.  Yes.
20 Q. And how did you conclude that Ms. Tolliver was
21 allowed significantly more disk space than you were?
22 A. There were -- I found out that there were -- I

56  (Pages 218 to 221)

Sharon Killian

Page 222

1 may be wrong about whether it's 70 gigabytes or 75
2 gigabytes installed on each machine in the department
3 in the Mac lab access to Laura Tolliver.
4     Q. All right. What resources did you count when
5 adding up how much disk space Ms. Tolliver was allowed
6 compared to you?
7     A. Hmm. Let me read that again.
8     Q. It's where you say, "Even now she is allowed
9 significantly more disk space than I am permitted."
10     A. Yeah. So there that's -- that's those 75
11 gigabytes per machine.
12     Q. Those are machines in the Mac lab?
13     A. In the Mac lab in the art studio labeled
14 something -- changed to art drive at one point from
15 something else. I don't remember exactly what. For
16 Laura's use.
17     Q. Okay.
18     A. Aside from the hard drive.
19     Q. When you said for Laura's use, are you saying
20 that your students were not allowed --
21     A. Right.
22     Q. -- to use the computers in the Mac lab?

Page 223

1     A. Oh, no. They can come in in free periods and
2 use the Mac lab whether they're students or not, but,
3 no, these are for her students.
4     Q. Are they for her students exclusively, or are
5 they for her students when she's teaching a class to
6 them?
7     A. Probably students' work.
8     Q. But does that mean when she's not teaching the
9 class to them, other students could use those
10 computers?
11     A. They could use the computers, but not the
12 space. Not the -- the digital space, you know.
13     Q. They couldn't use the digital space?
14     A. Those spaces were for her and her class, her
15 students.
16     Q. Was that in connection with the classwork they
17 were doing in the Mac labs?
18     A. Probably. I really don't.
19     Q. All right. Now, also do you see in numbered
20 paragraph 4 of Exhibit 13 where it says "In fact"?
21     A. Excuse me. Can I stand up for a moment?
22     Q. Sure. Did you want to take a break?

Page 224

1     A. That would be great. Thank you.
2     Q. I want you to --
3     A. Stretch my legs.
4     Q. I want you to understand that whenever you're
5 feeling uncomfortable, you just let me know and we
6 can -- we can take a break. This is --
7     A. I would like to answer your question before I
8 leave.
9     Q. Okay. That's fine.
10     A. Okay.
11     Q. But I just want to be sure. You don't have to
12 wait for a lawyer to say anything. Just let either
13 one of us know --
14     A. Okay.
15     Q. -- that you would like to take a break and
16 we'll do everything we can to accommodate that.
17     A. Okay. Thank you.
18         MR. WILLIAMSON: Was there a question
19 pending or should we just -- if there's not, then I'll
20 take a break. If there's a question pending, I'd like
21 to get an answer.
22         (Requested material was read.)

Page 225

1 BY MR. WILLIAMSON:
2     Q. That's a half question pending.
3     A. Okay.
4     Q. Why don't we take a break.
5     A. Thank you. Thank you.
6         THE VIDEOGRAPHER: Go off the record at
7 4:16:15.
8         (Recess.)
9         THE VIDEOGRAPHER: Going back on the
10 record at 4:28:40.
11 BY MR. WILLIAMSON:
12     Q. All right. Ms. Killian, I'm going to start
13 my question again. Do you see in numbered paragraph 4
14 of Exhibit 13 where it says "In fact, additional disk
15 space was added to the art studio Mac and all the
16 computers in the Mac lab labeled art drive specifically
17 and only for Laura Tolliver's use."
18         Is it your testimony that you and your
19 students were not allowed to use the computers in the
20 Mac lab?
21     A. No.
22     Q. Okay. Is it your testimony that they weren't

57 (Pages 222 to 225)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 226

1  allowed to use any of the capacity of the computers in
2  the Mac lab?
3      A. No.
4      Q. What is the Mac lab at GDS?
5      A. It's a lab of 20 or so computers that are
6  MacIntosh computers.
7      Q. And are these used -- is this a lab for the
8  art department?
9      A. No. It's a lab for the entire school.
10     Q. Okay. Are there any courses that were taught
11  primarily in the Mac lab while you were employed by
12  GDS?
13     A. Yes.
14     Q. Were these arts courses?
15     A. Yes.
16     Q. And who taught those courses in 2004-2005?
17     A. Laura Tolliver.
18     Q. Did you ever teach any courses in the Mac lab?
19     A. No.
20     Q. Did you ever request to teach any courses in
21  the Mac lab?
22     A. In that year?

Page 227

1      Q. Ever.
2      A. Yes.
3      Q. What -- what course or courses did you request
4  to teach in the Mac lab?
5      A. A digital photography class and film and video
6  and graphic design.
7      Q. Were you ever assigned responsibility for
8  teaching any of the courses that primarily used the Mac
9  lab?
10     A. Yes.
11     Q. When was that?
12     A. 2005-06.
13         (Phone ringing.)
14         MR. WILLIAMSON: Can we go off for one
15  second.
16         THE VIDEOGRAPHER: Go off the record at
17  4:30:56.
18         (Discussion off the record.)
19         THE VIDEOGRAPHER: Going back on the
20  record at 4:31:22.
21  BY MR. WILLIAMSON:
22     Q. Do you believe that the gigabyte limitations

Page 228

1  on your use of computer disk space was imposed by Mr.
2  Ruble because he was resentful as a result of his
3  belief that you played a role in the termination of
4  Debbie Haynes?
5      A. I don't know.
6      Q. Do you believe that Bruce Ruble imposed these
7  gigabyte limitations on you because of racial prejudice
8  by him towards you?
9      A. Yes.
10     Q. All right. And why is it that you think he
11  imposed the gigabyte limitation on you because of
12  racial prejudice?
13     A. Why does anybody do that? I don't know.
14  Why does anybody do what they do to me?
15     Q. You don't know?
16     A. Especially in this case.
17     Q. You don't know?
18     A. Except for that racial insensitivity. Maybe
19  white superiority and that's all I can figure at this
20  point.
21     Q. Are you -- are you speculating about that, or
22  do you have a specific reason why you believe that's

Page 229

1  the case with respect to Mr. Ruble?
2      A. I know that I didn't receive when asked --
3  when I asked and Laura Tolliver received when she asked
4  and/or whatever she had to do to get what she needed,
5  and I've never heard Nick Ryan complain.
6      Q. You say that you know that Laura Tolliver
7  received when she asked. Were you present when Mr.
8  Ruble was reviewing Ms. Tolliver's request for
9  technology?
10     A. I was at one point at one meeting that I was
11  included in.
12     Q. And did she receive everything she requested
13  at that meeting?
14     A. I believe so.
15     Q. You say you believe so. Are you sure?
16     A. If you look in the -- in the record, you
17  probably will find that it's so.
18     Q. When was that meeting?
19     A. My understanding -- my understanding from that
20  time, I think that might have been 2002-03 where -- I
21  believe so and Paul Levy was in that meeting.
22     Q. Do you know if she's ever made a request for

58 (Pages 226 to 229)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 230

1 technology or computer space at other meetings?
2    A. I don't know.
3    Q. Would it be fair to say you haven't been
4 present at any other meetings where she might have made
5 requests for technology or computer space?
6    A. Yes.
7    Q. All right.  And so you would not have a basis
8 for knowing whether she has ever been denied a request
9 for technology or computer space, would you?
10    A. Right. Yes.
11    Q. Would you now take a look at numbered
12 paragraph 5 of Exhibit 13, please.  Do you see where
13 it says "Though I'm given lip service publicly"?
14    A. Uh-huh.
15    Q. "Bruce Ruble negatively questions all
16 technology requests I make for my teaching and my
17 students."  What are you referring to when you say,
18 "I'm given lip service publicly"?
19    A. He might say that he has said that he'll take
20 care of it or, "Yes, we'll work on that for you" and
21 the like.
22    Q. When has he said that to you?

Page 231

1    A. On various occasions.  Numerous various
2 occasions.
3    Q. Okay.  And what is Bruce Ruble's
4 responsibility concerning budgets or expenditures for
5 technology requests?
6    A. I think that it would -- that might be
7 something that you might find in the record.  I would
8 be speculating on -- on his responsibility as that in
9 that position.
10    Q. You don't know?
11    A. No, I don't know his job description, sir.
12    Q. So, do you know whether it's part of his job
13 to review the appropriateness and reasonableness of
14 technology requests that are made by faculty at GDS?
15    A. That's a different question, right, sir?
16 That is -- I believe that is something I have heard
17 from -- from Paul before that Bruce will do that.
18 Bruce does review that, yes.  I've heard that.
19    Q. Is it part of his job, to your knowledge, to
20 decide which technology request would be approved to be
21 paid by the art department supply budget?
22    A. I -- I'm not sure whether that's a unilateral

Page 232

1 thing or a cooperative thing.
2    Q. When you say --
3    A. Decision, rather.
4    Q. -- unilateral or cooperative, if it were
5 unilateral, who would be making the decision?
6    A. I don't -- I don't know.
7    Q. You just said you didn't know if it was
8 unilateral or cooperative.  What do you mean by
9 unilateral?
10    A. Whether he would make the decision that it's a
11 technology buy or in cooperation with a discussion with
12 the department about use of the materials and so on
13 within the school.  Like, you know, maybe there are
14 some cameras that can be used by a classroom and also
15 the community service people.
16    Q. Have you ever participated in one of these
17 types of cooperative discussions with Mr. Ruble?
18    A. Yes.
19    Q. When was that?
20    A. Paul created the opportunity I suppose.  I
21 think that's the same meeting I've -- I talked about.
22 2002 or '3 I think.

Page 233

1    Q. And how many of those meetings have you been
2 to?
3    A. That one.
4    Q. And were there any subsequent meetings where
5 you participated in this cooperative type of
6 decision-making about technology used for the art
7 department?
8    A. There have been meetings in the art department
9 and part of those meetings might be about technology,
10 yes.
11    Q. Did you attend those meetings?
12    A. Yes.  Yes.
13    Q. Is it part of Mr. Ruble's job to decide which
14 technology requests would be approved to be paid by the
15 main GDS capital budget?
16    A. I don't know.
17    Q. Have you ever heard of anything called the
18 administrative team at GDS?
19    A. Yes, there's an administrative team I think.
20 I don't know who's on it.
21    Q. Do you know whether the administrative team
22 makes decisions about technology requests that will be

59 (Pages 230 to 233)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 234

1  paid by the main GDS capital budget?
2  A. No, I don't know.
3  Q. If you -- are you aware of Mr. Ruble's
4  technology budget?
5  A. That it exists?
6  Q. Yes.
7  A. Yes.
8  Q. And is it part of Mr. Ruble's job to decide
9  which technology requests would be approved to be
10  purchased out of his technology budget?
11  A. I -- if that is the case, then that is the
12  case.  I'm assuming that you're telling me fact right
13  now.
14  Q. I'm not telling you a fact.  I'm asking you a
15  question.
16  A. I don't know.
17  Q. All right.  Now, did you testify earlier that
18  except for one occasion, you were not present when Mr.
19  Ruble was reviewing the requests of other art
20  department faculty, such as Laura Tolliver?
21  A. Yes.  Best of my knowledge.
22  Q. Do you know whether he has ever questioned the

Page 235

1  technology requests that Ms. Tolliver has made for
2  teaching in her students?
3  A. No.
4  Q. Are you present when Mr. Ruble reviews
5  requests for technology from Mr. Ryan?
6  A. No.
7  Q. Do you know if Mr. Ryan makes requests for
8  technology?
9  A. No.
10  Q. Do you know whether Mr. Ruble questions Mr.
11  Ryan about whether the requests from art department
12  teachers are justified?
13  A. No.
14  Q. Have you ever been present when Mr. Ruble
15  reviews requests for technology from teachers and other
16  departments at GDS?
17  A. No.
18  Q. Would it be fair to say that you're
19  speculating when you say your requests are questioned
20  more rigorously than others?
21  A. No.
22  Q. All right.  If you're not speculating, what's

Page 236

1  the basis for your knowing that Mr. Ruble's questioning
2  of your requests is more rigorous than his questioning
3  of other faculty members at GDS?
4  A. Section 4.  The results of section 4.
5  Q. I want you to answer the question for the
6  record, please.
7  A. That I have asked in the past for one printer
8  perhaps and then discovered that since my printer -- I
9  couldn't get my printer, but there are four new
10  printers in a space or a division that -- a section
11  that Laura might use.  And the fact that I might have
12  asked for a printer and not gotten it and that Laura
13  has asked for four printers and received it.  So
14  that's -- that's how I know.
15  Q. How does that tell you anything about how
16  rigorously she was questioned?  If you were not --
17  A. Nothing.
18  Q. -- present for the questioning?
19  A. Details.  Nothing about that.
20  Q. So, would it be fair to say that on this
21  particular topic of whether she's questioned more
22  rigorously, you do not have a basis for making that

Page 237

1  judgment that is based on your personal observation
2  of Mr. Ruble's questioning of Ms. Tolliver, do you?
3  A. Could you repeat your question, please?
4  Q. Yeah.  I'm just trying to understand what
5  your basis is for believing that you are questioned
6  more rigorously by Mr. Ruble than Ms. Tolliver, and you
7  had indicated that you, generally speaking, are not
8  present when Mr. Ruble is questioning Ms. Tolliver
9  about her technology request; is that right?
10  A. Yes.
11  Q. All right.  And have you reviewed documents
12  that show the relationship between what Ms. Tolliver
13  has submitted as a request and anything about the
14  questioning that she was subjected to by Mr. Ruble?
15  A. I've been inside one meeting.
16  Q. I said other than that one meeting.
17  A. No.
18  Q. All right.  So, other than that one meeting,
19  is it fair to say that you are speculating when you say
20  that Mr. Ruble questions you more rigorously than Ms.
21  Tolliver with respect to technology requests?
22  A. And could you go back on the record for me

60  (Pages 234 to 237)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 238

1  please just to -- and remind me about my -- my answer
2  to that question and the question that you asked me
3  about a rigorous questioning.
4      Q. It's the same question I'm asking now.
5      A. Yeah, but you said that I was -- I made a
6  response to a question about Bruce Ruble questioning
7  Laura Tolliver more rigorously.
8      Q. Right. The first --
9      A. I don't remember.
10     MR. RACIN: She's making the objection I
11 should have made, which is assumes facts not in
12 evidence.
13     MR. WILLIAMSON: All right. I don't
14 think it does. I asked --
15     MR. RACIN: I don't know where that --
16 that comes from.
17     MR. WILLIAMSON: Yeah, I don't think --
18 I think -- I don't think it does, but let me ask it
19 again.
20 BY MR. WILLIAMSON:
21     Q. First I asked you except for this one meeting
22 that you mentioned where you were present when Laura

Page 239

1  Tolliver was submitting a request for technology to
2  Bruce Ruble. I asked you, have you been present at
3  any other meetings where you could observe Mr. Ruble
4  questioning Ms. Tolliver in response to requests that
5  she made for technology or computer space?
6      A. You asked me that --
7      MR. RACIN: The question assumes that
8  other meetings have taken place.
9  BY MR. WILLIAMSON:
10     Q. And what's your answer to that? The answer
11 was that you had not; is that correct?
12     A. Right, uh-huh.
13     Q. Okay. And now as a follow-up to that, I'm
14 saying, is it fair to say that your view that you were
15 being questioned more rigorously by Mr. Ruble than he
16 questioned Ms. Tolliver is based on speculation, except
17 for that one meeting where you said you were present?
18     A. And all I'm asking because I don't understand.
19 That's why I'm asking this question is, you're using
20 the term rigorously questioned, and I'm just asking you
21 to go back for me to tell me where in -- where I
22 just -- did I just say that? Did you ask me something

Page 240

1  about the rigorousness of his questioning to me and to
2  Laura?
3      Q. I think the term -- I think the term is this.
4      A. And that I need to respond to?
5      Q. Okay. Let me just say, I think the term that
6  you used is negatively questioned --
7      A. Tell me where that is, please.
8      Q. -- all technology requests. All right. If
9  you take a look at --
10     A. Okay. Negative.
11     Q. -- paragraph 5 of Exhibit 13.
12     A. Negatively questioned, okay.
13     Q. Okay.
14     A. And I'm talking about me here, not Laura
15 Tolliver here.
16     Q. Okay.
17     A. So --
18     Q. Do you know -- all right.
19     A. -- you want me to speculate about how he
20 treats Laura Tolliver? I mean, I could tell you what I
21 feel, but you wanting me to speculate about how
22 negatively he questions her and I really can't answer

Page 241

1  that because I haven't been in but that one meeting
2  where that didn't happen.
3      Q. All right. Are you aware of any documents
4  that show that Bruce Ruble negatively questioned all
5  technology requests you make for your teaching and your
6  students?
7      A. No.
8      Q. Have you reviewed the purchase orders from Mr.
9  Ruble's department to determine how much money Mr.
10 Ruble spent from his budget in response to your
11 requests?
12     A. No.
13     Q. When you said, "Mr. Ruble negatively questions
14 all technology requests I make for my teaching and my
15 students," does that mean he denied all such requests?
16     A. No.
17     Q. Do you remember what technology requests you
18 made to Mr. Ruble that he denied?
19     A. Certainly gigabyte space for -- yes.
20     Q. Any others?
21     A. For me that's like one of the most significant
22 things right now. I would say that that gigabyte space

61 (Pages 238 to 241)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 242

1  on a yearly basis, on a daily basis.
2      Q. Any others?
3      A. Nothing.  None others that I am aware of
4  right now.
5      Q. What -- what would refresh your recollection?
6      A. Maybe some of those requests to -- to Nick
7  Ryan to his meeting with Bruce Ruble might help.  I
8  haven't seen any, you know.
9      Q. Anything else?
10     A. If you have those.  No.
11     Q. Now, when you said, "Mr. Ruble negatively
12 questions all technology requests I make for my
13 teaching and my students," you said that that wasn't
14 intended to mean that he denied all the requests; is
15 that right?
16     A. I eventually received things.
17     Q. Okay.
18     A. I eventually received things.  So if that's
19 what you mean.
20     Q. Well, first let me ask.  Can you think of any
21 technology request you made to Mr. Ruble that he did
22 not negatively question?

Page 243

1      A. Yes.
2      Q. What would those be?
3      A. This past year.
4      Q. When you say this past year, what year are you
5  referring to?
6      A. 2004-05 I asked for an upgrade to a desktop
7  publishing program and I got it.
8      Q. He didn't negatively question that?
9      A. Boy.  I got it.
10     Q. My question is, did he negatively question
11 you're asking for it?
12     A. In the past he had, but this year 2004-05 I
13 got it.  It -- that wasn't the first time, but I got
14 it in 2004-05.
15     Q. Did he negatively question your request in
16 2004 to have the five new Macs in the pub room equipped
17 with DVD burners?
18     A. Yeah.  Yes, actually.  Let me think about
19 that whole sequence, okay?  I got those eventually.
20 I even got new computers eventually.
21     Q. Well, let me show you an exhibit that's going
22 to be marked as Number 16.  See if that refreshes your

Page 244

1  recollection.
2      A. Okay.  It doesn't sound right what I just
3  said, that I got them eventually?  Sorry, tired.
4      Q. With all due respect, Ms. Killian, I'm the one
5  deposing you.
6      A. Sorry.  I'm tired.
7          MR. RACIN:  Just for clarification, we
8  moved from 13 to 16?  The last one in was 13?
9          MR. WILLIAMSON:  Yes.  They're not
10 necessarily going --
11         MR. RACIN:  Right.
12         MR. WILLIAMSON:  -- to be sequential,
13 counsel.
14         (Thereupon, a document was marked for
15 identification Exhibit No. 16.)
16 BY MR. WILLIAMSON:
17     Q. Have you had a chance to look at Exhibit 16?
18     A. Yes.
19     Q. And what is Exhibit 16?
20     A. It is an e-mail from Bruce Ruble to me, Sharon
21 Killian.
22     Q. What's the date of the e-mail?

Page 245

1      A. May 2004.
2      Q. Is it May 4, 2004?
3      A. Yes, it is.
4      Q. And what's the subject?
5      A. The subject is -- let's see what he says.
6  His response to my --
7      Q. Where it says "subject," what does it say, Ms.
8  Killian?
9      A. Oh, oh, I see.  Sorry.  "Re:  DVD burners."
10     Q. What does the e-mail say?
11     A. "Sharon Killian writes:  Hello.  In regard to
12 the PCs that will replace the five-year Book Macs in
13 the pub room, please buy them equipped with DVD
14 burners.  Thanks.  Yes, we can get you external DVD
15 burners and fire wire interface cards."
16     Q. Now, let me ask the question again.  Did Mr.
17 Ruble negatively question your request in 2004 to have
18 the five new Macs in the pub room equipped with DVD
19 burners?
20     A. Five new PCs.
21         MR. RACIN:  Counsel, you're referring to
22 the memo dated 3/12/04 in reference to that question?

62  (Pages 242 to 245)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 246

1      MR. WILLIAMSON: I'm not referring to
2 the memo.  I'm asking her about what happened.
3      MR. RACIN: The negatively questions
4 arise from the memo dated 3/12/04. I'm sure in
5 fairness the reference to an e-mail two months later,
6 you're not suggesting a connection between the two?
7      MR. WILLIAMSON: No, I'm not suggesting
8 a question between the two.
9      MR. RACIN: Thank you.  Thank you for
10 the clarification.
11      MR. WILLIAMSON: But the question I
12 asked earlier was whether her experience was that her
13 requests for technology were always negatively
14 questioned, and that's what we want to probe while she
15 was -- while you were an employee at GDS.
16 BY MR. WILLIAMSON:
17      Q. Were you negatively questioned about your
18 request in 2004 to have the five new Macs in the pub
19 room equipped with DVD burners?
20      A. Your point is a good point.  I hadn't noticed
21 that.
22      MR. WILLIAMSON: All right.  Well,

Page 247

1 counsel, also we suggest --
2      MR. RACIN: It was an objection.
3      MR. WILLIAMSON: -- there not be
4 speaking objections.
5      MR. RACIN: It is a good faith
6 objection.
7      THE WITNESS: Yeah.
8      MR. WILLIAMSON: As I said, appreciate
9 we limit the objection to basis for the objection and
10 not make it a speaking objection.
11      MR. RACIN: Thank you.
12      THE WITNESS: It's PCs.  The PCs were
13 replacing the Macs and notwithstanding my request,
14 machines, PCs I requested should come with DVD burners,
15 and I sent him a note making sure that those PCs that
16 were approved were going to have burners.  In fact, I
17 wanted internal DVD burners, but he's saying -- and
18 that's what I was asking for, PCs with internal DVD
19 burners.
20      And his response was, we can get you
21 external DVD burners as opposed to internal DVD
22 burners.  I didn't use the word internal here, but you

Page 248

1 see I said buy them equipped with DVD burners.
2 Traditionally, well, the most streamlined product is
3 one with a burner.  You could just press a button and
4 it opens up.  As opposed to a separate piece of
5 material -- of material or machine that sits on the
6 side, and I was essentially asking them to come
7 equipped with DVD burners.
8      And he was telling me you can get
9 external burners.  That's what that was.
10 BY MR. WILLIAMSON:
11      Q. Did you specify that you wanted them equipped
12 with internal DVD burners?
13      A. I'm sure I said something to him about that.
14 I was reminding him that those PCs should have DVD --
15 come equipped with DVD burners.
16      Q. Did you say that in the e-mail that you sent
17 to him on May 4, 2004?
18      A. Well, it doesn't -- it really does and I have
19 to use the word imply here, but let me say, no, I
20 didn't use the word internal.  I used the word
21 equipped.
22      Q. All right.  Did you ever request that Mr.

Page 249

1 Ruble give you GDS-owned -- a GDS-owned computer for
2 you to take home for your personal use?
3      A. In my life, sir, there is no personal use.
4 For computers, there's no -- there's no personal use.
5 I use a computer at home to work.  So, no.  The answer
6 is no then.
7      Q. Do you ever send e-mails to relatives or
8 friends on a computer that you use at home?
9      A. Yes.
10      Q. You regard that as a personal use?
11      A. Well, I suppose that's so.
12      Q. Now, my question is: Did you ever request
13 that Mr. Ruble give you GDS -- a GDS-owned computer for
14 you to take home?
15      A. Yes.
16      Q. Oh, you did?
17      A. Yes.
18      Q. When was that?
19      A. It was probably 2003 or 2004.  I don't
20 remember exactly when.  Hmm.
21      Q. Maybe we can refresh your recollection on
22 this.

63  (Pages 246 to 249)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 250

1   A. Okay.
2   Q. Do you remember if Mr. Ruble ever asked you if
3   you would like to take -- or first, prior to its
4   replacement in 2004, did you have G3 Mac Cube on your
5   desk in the art department office for your use?
6   A. Yes, uh-huh.
7   Q. And did Mr. Ruble ever ask you if you would
8   like to take the G3 Mac Cube home for your personal use
9   when it was replaced with a newer computer in 2004?
10  A. Yes.
11  Q. Did you accept his offer?
12  A. Yes.
13  Q. Did you take a monitor home as well?
14  A. I -- I don't recall that.  He didn't give me
15  a monitor, I don't think.  Starting -- he didn't give
16  me the one that came with the Mac, but I don't
17  remember.
18  Q. You don't remember?
19  A. Uh-uh.
20  Q. Did Mr. Bruce negatively or did you make a
21  request in July 2005 to purchase Final Cut Studio
22  and/or Final Cut Pro 5 for the computers in the Mac

Page 251

1   lab?
2   A. Yes.
3   Q. And did Mr. Ruble negatively question that
4   request?
5   A. I don't recall, but those -- those, I believe,
6   those two programs are listed in the course of studies.
7   So they're required for a class.
8   MR. RACIN:  Excuse me, counsel.  For my
9   note purposes, what was that request for?
10  MR. WILLIAMSON:  Says something called
11  Final Cut Studio and/or Final Cut Pro 5 for the
12  computers in the Mac lab.
13  MR. RACIN:  Thank you.
14  THE WITNESS:  Uh-huh.
15  BY MR. WILLIAMSON:
16  Q. And I guess I just want to ask you again.  Do
17  you remember any negative questioning about that
18  request from Mr. Ruble?
19  A. No.
20  Q. Did you request software for the Mac lab
21  because you were going to be teaching courses in the
22  Mac lab in the 2005-2006 school year?

Page 252

1   A. Yes.
2   Q. And was that software purchased?
3   A. I'm not quite sure, sir.  I believe it was.
4   You would know better than I.
5   Q. Do you know how much it cost, approximately?
6   A. I -- when I submitted the request, I put a
7   price tag on it.  I don't recall what that is.
8   Q. I'd like you to take a look at a document that
9   we're going to mark as Exhibit 19.
10  (Thereupon, a document was marked for
11  identification Exhibit No. 19.)
12  THE WITNESS:  Thank you.
13  BY MR. WILLIAMSON:
14  Q. What is Exhibit 19, Ms. Killian?
15  A. It is a Georgetown Day School purchase order.
16  Q. What's the number of that order?
17  A. 7880.
18  Q. And what's the date the order was placed?
19  A. July 21, '05.
20  Q. And what's an order -- what's the order cover?
21  A. Should I enumerate down the list?
22  Q. Can you just summarize?  Can you just

Page 253

1   summarize?
2   A. It appears to be software and license sets.
3   Q. Is that the Final Cut Pro 5 and the Final Cut
4   Studio software?
5   A. Yes.  There are there are 5 and 2, yes.
6   Q. And about how much did that software cost?
7   A. A License, it looks like license and whatever,
8   if I add up $5,372 and 1,387, that's about 6,7.  6,700
9   I believe.
10  Q. Okay.  And do you recall whether you were
11  negatively questioned about your request to purchase
12  this software by Mr. -- by Mr. Ruble?
13  A. I wasn't.  I don't believe I was negatively
14  questioned.
15  Q. Next I'm going to ask you to take a look at a
16  document marked as Exhibit 20.
17  (Thereupon, a document was marked for
18  identification Exhibit No. 20.)
19  THE WITNESS:  Yes.
20  BY MR. WILLIAMSON:
21  Q. Do you know what Exhibit 20 is?
22  A. It's a purchase order.

64  (Pages 250 to 253)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 254

1    Q. Can you identify the purchase order for us?
2    A. It's purchase order 6635.
3    Q. And what is being purchased?
4    A. An Epson Perfection photo scanner and a
5  handicam camcorder mini DVD.
6    Q. How many handicam camcorders?
7    A. Eight.
8    Q. Do you know who requested that that order be
9  placed by Mr. Ruble?
10    A. The handwriting looks like Laura Tolliver's
11  handwriting.  Is that what you're asking me?
12    Q. I'm asking you whether you recall who placed
13  the order for these, who asked Bruce Ruble to order
14  these eight camcorders.
15    A. Maybe you can refresh my memory.  I --
16    Q. Do you know what the camcorders were going to
17  be used for?
18    A. Uh-huh.  Yes, I do.
19    Q. What were they going to be used for?
20    A. They were going to be used for the film and
21  video class, I'm assuming.
22    Q. Okay.  And who was --

Page 255

1    A. And I was going to be teaching the class.
2    Q. Let me finish the question.  Who was going to
3  be teaching the film and video class?
4    A. I was.
5    Q. All right.  So, would it have been part of
6  your responsibility during the summer to order
7  equipment that you needed for the course that you were
8  supposed to be teaching?
9    A. I -- I do believe that the cameras were
10  ordered.
11    Q. These camcorders here; is that what you're
12  talking about?
13    A. Were ordered, yeah, before I left.
14    Q. By you; is that right?
15    A. I do believe so.  But these don't look like my
16  handwriting.
17    Q. Now, did Mr. Ruble negatively question your
18  request in July of 2005 to purchase --
19        MR. RACIN:  Objection.  I'm sorry.
20  Finish the question.
21  BY MR. WILLIAMSON:
22    Q. Let me finish the question.  You said that you

Page 256

1  believe you placed this order.  Did you place it in
2  July of 2005 or approximately around that time?
3        MR. RACIN:  I would object.  Assumes a
4  fact of the placing the order, which I don't think is
5  in evidence yet.
6        THE WITNESS:  I would need to -- to look
7  at copies of purchase orders, sir, but there were some.
8  This is not my handwriting.
9  BY MR. WILLIAMSON:
10    Q. I'm not asking you whether it's your
11  handwriting.  I'm asking you whether you were the one
12  who ordered these eight camcorders in July of 2005.
13  Tell me, or do you remember --
14    A. These are --
15    Q. -- whether you did it?
16    A. I believe I ordered cameras and -- and
17  software.  I -- this is not my handwriting.
18    Q. Right.  All right, Ms. Killian.  Let's take
19  a look at a document we're going to mark as Exhibit 21.
20    A. Is that my handwriting coming up?
21    Q. Ms. Killian, I want you to just answer the
22  questions.

Page 257

1    A. Sorry.
2    Q. And we can get this deposition done a lot
3  faster.
4    A. Yes, I'm so sorry.  I'm so sorry.
5        (Thereupon, a document was marked for
6  identification Exhibit No. 21.)
7  BY MR. WILLIAMSON:
8    Q. Have you had a chance to look at Exhibit 21?
9    A. Yes.
10    Q. And what is it?
11    A. It's purchase order 7631.
12    Q. And what is that?  Does that purchase order
13  say anything about eight Sony DCR 8 mini DC camcorders?
14    A. Yes, sir.
15    Q. And who was ordering those eight Sony
16  camcorders?
17    A. That's Sharon Killian's name.  That's me.
18    Q. And how do you know that?
19    A. I can recognize my signature, my handwriting.
20    Q. Is your signature at the bottom of Exhibit 20
21  -- is this Exhibit 21?  Is that your signature on the
22  bottom left corner?

65 (Pages 254 to 257)

Sharon Killian

| Page 258 | Page 260 |
|---|---|
| 1  A. Yes. | 1  heard? |
| 2  Q. It's right where it says or next to where it | 2  A. 13?  Which one?  Sorry. |
| 3  says "ordered by"? | 3  MR. RACIN:  Paragraph 5. |
| 4  A. Yes. | 4  THE WITNESS:  Paragraph 5; okay.  Yes. |
| 5  Q. And who does it say authorized this? | 5  BY MR. WILLIAMSON: |
| 6  A. Nick Ryan. | 6  Q. Who was present at that meeting? |
| 7  Q. All right.  Now let's go back to Exhibit 20. | 7  A. To the best of my recollection, Paul Levy, |
| 8  A. Okay. | 8  Nick Ryan, Laura Tolliver, Bruce Ruble. |
| 9  Q. Now, does your having had a chance to look at | 9  Q. And what was discussed at that meeting? |
| 10  Exhibit 21 refresh your recollection as to whether you | 10  A. Technology needs for the art department I |
| 11  were the faculty member who had ordered the eight | 11  believe for the Mac lab and for the studio. |
| 12  camcorders that are reflected on Exhibit 20? | 12  Q. And why was it significant -- or when you say |
| 13  A. Repeat the question, please. | 13  the studio, what studio is that? |
| 14  MR. WILLIAMSON:  Yeah, sure.  Why | 14  A. I'm sorry.  The art studio meaning the larger |
| 15  don't you read it back to her. | 15  studio where the painting and drawing occur and, yes. |
| 16  (Requested material was read.) | 16  Q. Why was it significant that Paul Levy sat |
| 17  THE WITNESS:  This is -- Exhibit 20 is | 17  in -- well, let me go back.  So, all the people in the |
| 18  not my handwriting.  Exhibit 20 is either Bruce Ruble | 18  meeting were members -- no.  Let me start again. |
| 19  or Laura Tolliver's handwriting I think.  On Exhibit | 19  Why was it significant that Paul Levy sat in |
| 20  20. | 20  on the meeting? |
| 21  BY MR. WILLIAMSON: | 21  A. Because I -- because I had not been included |
| 22  Q. Well, let me just ask you.  Are you -- | 22  in discussions about art department technology needs, |

| Page 259 | Page 261 |
|---|---|
| 1  haven't you already testified that you are the faculty | 1  and he thought that I should be and he was going to |
| 2  member who ordered eight Sony DCR HD 42 mini DVD | 2  come into a meeting and see that I'm there, I believe. |
| 3  camcorders on July 2 of 2005; is that correct? | 3  Q. Were you given an opportunity to express your |
| 4  A. As approved by the capital budget, yes. | 4  concerns about being heard by Mr. Ruble at that |
| 5  Q. Okay.  Now, when you placed that order, | 5  meeting? |
| 6  did Mr. Ruble negatively question your request to | 6  A. I had talked to Paul about that and at that |
| 7  purchase those eight camcorders for $4,632 to be used | 7  meeting I sat, right.  I sat there and listened and |
| 8  in the film and video course you were scheduled to | 8  participated in that meeting. |
| 9  teach in the following year? | 9  Q. Did you express your concerns about being |
| 10  A. No. | 10  heard by Mr. Ruble? |
| 11  Q. Now, you also said in paragraph 5 of Exhibit | 11  A. Not in that meeting, no. |
| 12  13 -- let's go back to that document.  We're going to | 12  Q. You said you spoke to Mr. Ruble at some other |
| 13  be spending quite a bit of time on that. | 13  point, or you just spoke to Paul Levy about that? |
| 14  A. Oh, sorry. | 14  A. Mr. Ruble and I have had discussions about not |
| 15  Q. You may want to set that to the side because | 15  being able to give me what I needed.  So, yes, I've |
| 16  we're going to keep referring to those -- | 16  talked to Mr. Ruble. |
| 17  A. Okay. | 17  Q. Did you have discussions about being heard |
| 18  Q. -- as we go through these questions. | 18  by Mr. Ruble? |
| 19  A. All right. | 19  A. With? |
| 20  Q. Do you see in paragraph 5 of Exhibit 13 that | 20  Q. With Mr. Ruble. |
| 21  there was a meeting of the art department with Bruce | 21  A. Yes. |
| 22  Ruble and Paul Levy to assure that your voice was | 22  Q. When did you have those discussions? |

66  (Pages 258 to 261)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 262

1    A. Whenever I asked for material and the answer
2  is no, I would say, "But I need that. I need that for
3  my work."
4    Q. Do you believe that Mr. Ruble negatively
5  questioned your technology requests because he was
6  resentful as a result of his belief that you played a
7  role in the termination of Debbie Haynes?
8    A. Yes.
9    Q. And what is your basis for believing that?
10   A. The refusals and negative responses to my
11 requests heightened when she left, when Debbie Haynes
12 left. That's all.
13   Q. And do you believe that Bruce Ruble negatively
14 questioned your technology requests because of racial
15 prejudice towards you?
16   A. Yes.
17   Q. And what's your basis for thinking that?
18   A. Because I believe that my -- I was the only
19 black person that was being -- I was the only person
20 who was being refused requests or being held back by --
21 by Bruce Ruble in terms of resources that I know of.
22   Q. What's your basis for saying that you were the

Page 263

1  only person who was being refused technology requests
2  on the faculty of GDS by Bruce Ruble? Or how do you
3  know that?
4    A. I'm sure refusals have to be made by any and
5  everybody, but to -- I was systematically, routinely
6  denied resources. At some point, something should be
7  approved when there is visible need and that is the
8  result that I had.
9    Q. And is it your testimony that when you had
10 visible need, none of your requests were ever approved?
11   A. In -- no. In 2005 -- 2004, the 2005-06 year
12 purchase orders approved. The Mac -- the PCs were
13 coming in and so on. But I don't know if -- well,
14 that's okay. Sorry. That's it. No additional.
15 No addendum to my sentence.
16   Q. I'd like to ask you to take a look at numbered
17 paragraph 6 of Exhibit 13.
18   A. Okay.
19   Q. Do you see where it says, "My annual requests
20 for capital budget items routinely go unapproved each
21 year and are often belittled and challenged by Ryan and
22 Tolliver." What time period are you talking about

Page 264

1  when you make that statement?
2    A. Well, it -- throughout, certainly mostly up
3  until -- what's the date on this? Somewhere in the
4  beginning of 2004.
5    Q. Excuse me. Starting when and up to
6  sometime -- and up to March of 2004; is that what
7  you're saying?
8    A. Some -- something in that.
9    Q. What's the starting date?
10   A. I'd say probably somewhere around either '99,
11 '99-2000, as best as I could tell you or remember right
12 now without having something to jar my memory.
13   Q. Is that around the time that Debbie Haynes
14 ceased to be an employee at GDS?
15   A. Yes.
16   Q. Now, when you say capital budget items, are
17 you referring to requests made to the GDS
18 administrative team that are paid out of the school's
19 capital budget?
20   A. The requests go to Nick Ryan. My capital
21 budget requests go to Nick Ryan, and then he does
22 something else with them. He takes them or whatever,

Page 265

1  does another process.
2    Q. Do you know if he forwards those requests to
3  the GDS administrative team that's responsible for
4  making decisions about what will be spent out of the
5  school's capital budget?
6    A. I believe that's what's supposed to happen.
7    Q. And what did you mean when you said that your
8  requests are belittled and challenged by Ryan and
9  Tolliver?
10   A. You don't -- I have been told before my
11 request is past forward, "You don't need a camera.
12 You don't need a camera for that class." Or "You
13 don't need that for this project." You don't need to
14 ask for this or that. That's what I mean.
15   Q. And when were you told that?
16   A. At various times throughout the year, sir.
17   Q. What sort of camera were you told you didn't
18 need?
19   A. A digital camera. At one point --
20   Q. Digital camera?
21   A. -- a manual camera.
22   Q. Do you have any digital cameras that you use

67 (Pages 262 to 265)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 266

1  in your class?
2      A. That I used in my class?
3      Q. Yes.
4      A. For years it was my personal camera and then
5  my personal digital camera.
6      Q. You only had one digital camera?
7      A. And there was one digital camera that I know
8  has been mentioned that Paul bought one for each person
9  in the department and it -- it became immediately
10 outdated.
11     Q. Did you get one of those?
12     A. Yes, and mine was always in school and always
13 used. And I frequently needed more than one, but the
14 others, although they weren't being used by Nick Ryan
15 or Laura Tolliver, were never seemingly available.
16 Perhaps not kept at school. I don't know. But so I
17 used my personal digital camera when my request to get
18 one, an adequate camera for my classes, was denied over
19 and over again.
20     Q. Did there come a time when your request for a
21 digital camera was granted?
22     A. Yeah.

Page 267

1      Q. When was that?
2      A. This is 2004-05 for the 2005-06 year.
3      Q. And were you going to be teaching different
4  courses in the 2005-06 year than you had taught in the
5  2004-05 year?
6      A. Yes.
7      Q. What would be the difference in the courses?
8      A. All digital, all video as opposed to black and
9  white photography, but still needed with the black and
10 white photography on my portfolio my camera. At least
11 one or one more for my other classes, non-photo-related
12 classes.
13     Q. But the school had provided you with one
14 digital camera for your -- was it your
15 non-photo-related classes; is that right?
16     A. The one that I mentioned before, the Nikon
17 4500, yes.
18     Q. Now, did Mr. Ryan and Ms. Tolliver have
19 authority to decide which capital items were actually
20 approved for purchase?
21     A. I don't know.
22     Q. Do you know who actually made the final

Page 268

1  decision about which capital budget request would get
2  approved?
3      A. I don't know.
4      Q. Was it the administrative team?
5      A. I don't know. I believe you told me that
6  that's what happened. That's what the process is.
7      Q. I'm not telling you, Ms. -- Ms. Killian. I
8  want you to listen carefully to the questions because
9  maybe getting a little confused here. I'm asking you
10 about what you know. I'm not trying to tell you
11 anything. I'm trying to understand what you know
12 about facts related to this case.
13     A. I --
14     Q. So I don't want you to assume something just
15 because I mention it in a question. If, you know, if
16 you think that what's being mentioned is not true or
17 accurate, then you should feel free to point that out.
18     A. Okay.
19     Q. But I was trying to find out whether you knew
20 who made the final decision about these capital budget
21 items.
22     A. I do know that the -- the team, there's a team

Page 269

1  responsible for it. There's an administrative team I
2  believe and that might be a newly devised group over
3  the last two or three years. I don't know exactly, but
4  there is a body that then looks at -- at the request
5  from the departments to say yea or nay or so, but it
6  depends on what they receive. So I can't tell you
7  whether my requests went from one place -- from step
8  one through step five. I don't know how to answer the
9  question otherwise.
10     Q. Do you know whether there were any requests
11 that you made for a capital budget item that was not
12 passed on to the administrative team?
13     A. No.
14     Q. Have you ever attended a meeting of the
15 administrative team where they decided which capital
16 budgets would be approved and which would be denied?
17     A. As a non-administrator, I was never invited.
18     Q. Could you answer the question, please?
19     A. I was never invited to a -- to a team meeting.
20     Q. Well, for example, is it possible --
21        MR. RACIN: There's been testimony that
22 she doesn't know that there's an administrative team.

68  (Pages 266 to 269)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 270

1      MR. WILLIAMSON:  Counsel, just I want a
2   straightforward answer for the record here.
3   BY MR. WILLIAMSON:
4      Q. You know, Ms. Killian, it's possible you could
5   not be invited to something but still actually attend
6   it and so --
7      A. Oh, I didn't mention that.  I've never been
8   to one of those meetings.
9      Q. Okay.  That's all I want is to get that clear.
10      Now, do you know what factors the
11   administrative team took into consideration when making
12   decisions about capital budget requests?
13      A. I believe that there must be some position
14   paper each year.  I would -- I would assume that there
15   should be a position paper each year that the whole
16   group should try to comply to.  So I'm -- it's only an
17   assumption, but I believe that there should be a
18   position paper and, you know, who needs what and, you
19   know, all of that stuff.
20      Q. And did I hear you say earlier you didn't know
21   whether Nick Ryan had ever refused to forward one of
22   your requests to the administrative team?

Page 271

1      A. I'm -- I'm -- perhaps in your discovery we
2   might find something that confirms that my requests
3   didn't necessarily all go directly out of his office.
4   In other words --
5      Q. Ms. Killian, isn't it true that Mr. Ryan
6   forwarded all of the requests by the members of his
7   department to the administrative team for capital
8   budget items?
9      A. I don't know.
10      Q. You don't know?
11      A. Uh-huh.
12      Q. All right.  Now, do you have any reason to
13   believe that the administrative team denied any of your
14   capital budget requests because any member of the
15   administrative team was racially prejudiced against
16   you?
17      A. I don't know who's on the administrative team.
18      MR. RACIN:  And we're assuming the
19   existence of an administrative team.
20   BY MR. WILLIAMSON:
21      Q. So, what's the -- I'm asking you just what
22   your knowledge is.  Do you know whether -- you say you

Page 272

1   don't know anybody on the administrative team?
2      A. I don't know who is on the administrative
3   team.
4      Q. Okay.  All right.  Well, let's say, do you
5   have any reason to believe that there is somebody on
6   the administrative team who might have influenced that
7   team to deny one of your capital budget item requests
8   because of racial prejudice against you?
9      A. It depends on who was on that team.  If I
10   knew who was on the team, sir, I think I would be able
11   to give a more reasonable answer than just...
12      Q. All right.  Now, we'll -- we'll see if we can
13   get to that later.
14      Did you ever -- were you ever privy to any
15   conversations during which Mr. Ryan discussed the art
16   department's capital budget requests with a member of
17   the administrative team?
18      A. I -- I don't know exactly because if I knew
19   who was on the administrative team, then I would be
20   able to tell you.  If Bruce is on the administrative
21   team, then I would say, oh, I've heard him talk about
22   the capital, you know, the GDS high school art

Page 273

1   department capital budget with Bruce.  But I don't know
2   if Bruce is on the administrative team, so I can't tell
3   you.
4      Q. Okay.  Let's assume that Bruce is on the team.
5   So let me ask you the question.
6      A. Okay.  Ask me the question again.
7      Q. Did you ever listen to any conversation during
8   which Mr. Ryan discussed the art department's capital
9   budget request with a member of the administrative
10   team?
11      A. In that one meeting I did, sir.
12      Q. What one meeting are you talking about?
13      A. The meeting where Paul was present and -- and
14   that I mentioned in this document here in 2002 I think.
15      Q. Was there any other time between September of
16   2001 and the summer of 2005 where you listened to any
17   conversations during which Mr. Ryan discussed the art
18   department's capital budget request with a member of
19   the administrative team?
20      A. Yes.  Yes.  That's what I --
21      Q. Other than that one example?
22      A. Oh.  Not purely.  Not -- I can't recall a

69 (Pages 270 to 273)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 274

1  meeting where that discussion was underway.
2      Q. Have you ever seen any documents in which Mr.
3  Ryan addressed the art department's capital budget
4  requests to a member of the administrative team?
5      A. Hmm.  There have been memos, sir.  I -- if
6  you were to use a name, I can I might be -- instead of
7  administrative team, I might be able to say I've seen
8  that or I've, you know, I know that he was sending --
9  the capital budget requests have to go to Kevin Barr.
10 If Kevin Barr is on the administrative team, I believe
11 he did send -- I remember him sending something to
12 Kevin Barr for approval or to Paul Levy for approval.
13     Q. What memo?
14     A. I do.
15     Q. What memo are you talking about?
16     A. Oh, well, it would have been an e-mail of some
17 kind I think saying, you know, here are the capital
18 budget requests or something like that.
19     Q. And were you sent a copy of that e-mail?
20     A. I don't -- I'm not sure.  I must have either
21 received a copy, or he sent a copy and copied it for a
22 meeting.  You know, he wrote a copy and copied up for a

Page 275

1  meeting.  I would have to -- you have all of my
2  e-mails.  I know I don't have all of my e-mails.  We
3  could look through that and I could tell you which one
4  would apply to that situation.
5      Q. Do you know if you have copies of any of those
6  e-mails in your possession?
7      A. I really don't know, sir.  I don't know.  I,
8  you know, I'm -- no.
9      Q. Did you ever personally witness Mr. Ryan
10 belittling or challenging one of your capital budget
11 requests in the presence of a member of the
12 administrative team?
13     A. Not that I recall right now, sir.
14     Q. Okay.  Did Mr. Ryan ever tell you that he was
15 not going to pass one of your capital budget requests
16 on to the administrative team?
17     A. I don't recall that he's done that, said that.
18     Q. Did he ever tell you that he was going to
19 characterize one of your capital budget requests as a
20 low priority in his communications with the
21 administrative team?
22     A. I don't -- I'm not sure.  I'm not sure about

Page 276

1  that.  I know that I -- I was supposed to prioritize.
2  So, I don't know.
3      Q. But did he ever -- did he ever say to you that
4  he was going to characterize one of your capital budget
5  requests as a low priority in his communications --
6      A. Not that I can recall.
7      Q. -- to the administrative team?
8      A. Not that I can recall.
9      Q. Do you know how capital budget requests are
10 made?
11     A. I -- to whom?  Question.  To whom?
12     Q. I'm asking.
13     A. From my level to the next level?
14     Q. Yes.
15     A. I believe so.
16     Q. Are the requests made in writing?
17     A. I -- we've all been asked I believe to write
18 up a list or a note of things that you want and give it
19 to -- give it to Nick Ryan.
20     Q. What information are you supposed to provide
21 when making capital budget requests?
22     A. What I usually provide is the cost of the

Page 277

1  item.  I try to find the cheapest thing I can find for
2  the quality and maybe today give an e-mail -- not an
3  e-mail, but rather a web address or find or some copy
4  of a page from a book and which one of these things I
5  would like to -- to get the most on a list from, you
6  know, highest priority to the lowest priority,
7  whatever.  I believe.
8      Q. Were you ever asked to describe the course or
9  courses in which the item would be used and how it
10 would be used by students?  As part of the process of
11 making a capital budget request?
12     A. I may have been asked that at one time or
13 another.
14     Q. Did your capital budget requests always
15 reflect that information?
16     A. Probably as much as anyone else's.
17     Q. What about just could you just answer the
18 question about whether your budget requests reflected
19 that information?
20     A. If I were directly asked that question, sir, I
21 would -- I provided it.
22     Q. Did your capital budget request for --

70 (Pages 274 to 277)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

|  |  |
|---|---|
| Page 278 | Page 280 |

Page 278

1  requests for 2004-2005 describe how the students would
2  use the items you requested?
3      A. If I were asked the question, then I would
4  have provided that information and if I didn't, it
5  would have been an oversight of some kind.
6      Q. All right. I'd like you to take a look at a
7  document we're going to mark as Exhibit 45.
8          (Thereupon, a document was marked for
9  identification Exhibit No. 45.)
10 BY MR. WILLIAMSON:
11     Q. Have you had a chance to look at Exhibit 45?
12     A. Yes.
13     Q. What is Exhibit 45?
14     A. It's an e-mail.
15     Q. And --
16     A. Printed out.
17     Q. -- what's the date of the e-mail?
18     A. April 15, 2004. Actually, printed on April
19 15th. Friday, April 2nd.
20     Q. What year?
21     A. Message -- Friday, April 2nd, 2004 from Sharon
22 Killian. Subject: Capital budget.

Page 279

1      Q. And that is a capital budget request for what
2  school year?
3      A. I believe it would be 2004-05.
4      Q. And whom did you send this e-mail to?
5      A. It says to Nick Ryan, Paul Levy, Mariama
6  Richards, Elizabeth Denevi.
7      Q. And why did you send it to Mari Richards and
8  Elizabeth Denevi?
9      A. Either it was the original request was
10 addressed to me, or at this time Nick Ryan was in
11 meetings with -- with Mari Richards and Elizabeth
12 Denevi as was I and Paul Levy I believe.
13     Q. Ms. Killian, does Exhibit 45 describe how your
14 students would use the capital budget items you
15 requested?
16     A. No.
17     Q. Did you describe how your students would use
18 the capital budget items you requested in any other
19 document for 2004-2005?
20     A. I don't recall.
21     Q. How would you be able to refresh your
22 recollection about that?

Page 280

1      A. If this -- if this e-mail belongs to a string
2  of other e-mails with a request for capital budget
3  items, I would be able to see whether I was asked for
4  information as to how my students would -- would use it
5  at that time. And/or some note from my chairperson
6  saying, I need you to tell me how your students are
7  going to use these items and so on. I could refresh
8  my memory.
9      Q. Ms. Killian, were your capital budget requests
10 for 2004-2005 sent before the day on which those
11 capital budget requests were due?
12     A. I -- I don't know. What was the due date?
13     Q. Do you recall what the due date was?
14     A. No, I don't, sir. Not with this. I have to
15 read something.
16     Q. Let's take a look at a document we're going to
17 mark as Exhibit 46 to see if that refreshes your
18 recollection.
19     A. Okay.
20         (Thereupon, a document was marked for
21 identification Exhibit No. 46.)
22         THE WITNESS: Thank you. Might I

Page 281

1  digress for a moment?
2  BY MR. WILLIAMSON:
3      Q. Actually, I'd like you to just answer the
4  questions.
5      A. Okay.
6      Q. And when you say digress, is it do you want to
7  supplement another answer or you just want to talk
8  about something else?
9      A. You had asked me a question and you asked me a
10 specific question. I think I had a more specific
11 answer for you now.
12     Q. Okay. Well, if you want -- I don't view that
13 as a digression.
14     A. Okay.
15     Q. What is the more specific answer you wanted to
16 give?
17     A. You asked me why I sent this e-mail to all of
18 these people.
19     Q. Yes.
20     A. And it was that Nick had bent himself low to
21 the ground, as I showed you before, and said he
22 couldn't bend low enough to the ground to understand

71 (Pages 278 to 281)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 282

1  me, and at this point I -- we're all talking to the
2  diversity coordinators and so just about everything
3  that was sent through whatever was supposed to have
4  gone to them or -- and --
5      Q.  Okay.
6      A.  -- that's why having the string of, you know,
7  e-mails around would -- would help.
8      Q.  Okay.
9      A.  Nonetheless.
10     Q.  What is Exhibit 46?
11     A.  46 is capital budget request from Nick Ryan to
12 Sharon Killian, Laura Tolliver, and the date is
13 February 23, 2004.
14     Q.  And does it tell you the deadline for getting
15 your capital budget requests in?
16     A.  "No later than March 5th I would appreciate
17 it."
18     Q.  Did you submit your capital budget requests
19 for 2004-2005 to Mr. Ryan prior to March 5th?
20     A.  I submitted it according to this e-mail,
21 number 45, on April 2 --
22     Q.  What's the answer?

Page 283

1      A.  -- 2004.
2      Q.  What's the answer?  What's the yes or no
3  answer to my question, Ms. Killian?
4      A.  Oh. No.
5      Q.  All right.  Now, you said you didn't send in
6  the capital budget request until April; is that right?
7      A.  Yes.
8      Q.  Now, looking at Exhibit 46, does that refresh
9  your recollection as to what information you were
10 supposed to provide in your capital budget request?
11     A.  Courses -- no.  Course or courses in which the
12 item will be used and how it will be used by students.
13 I must admit that I only -- I only approached half of
14 that question.
15     Q.  You say you only --
16     A.  Because I put photo next to -- I put the -- I
17 put next to in parentheses to the items I put H
18 scanner, for instance, number one.  Atrix scan film
19 scanner, in parentheses I put all for all classes.  And
20 then number 2 Elinchrom Striplite soft box for flash
21 only, I put photo in parentheses as in photo class.
22 And Intuos2, 9 by 12 pen, tablet and five button mouse

Page 284

1  set, I put in parentheses AP studio.  Beseler 23 C3 XL
2  condenser, enlarger and full frame negative carrier, in
3  parentheses photo as in photo class.   And then Canon
4  EOS SLR or Elan SLR with Canon 28 to 105 millimeter F4
5  to 5.6 USM Elans, AP studio class.
6         Kodak 4600 carousel slide projector with lens
7  and accessories.  Entire -- I didn't put it, but
8  that's for the entire department.  And HP Deskjet
9  9650, in parentheses photo as in photo class.  I must
10 admit that I did not tell -- say that I'm going to use
11 the Canon EOS Elan SLR to take slides for the AP
12 portfolio submissions each year.
13     I didn't say the Atrix scan film scanner for
14 all, you know, all classes all teachers can use.  I
15 didn't, I admit, do that.
16     Q.  So you only --
17     A.  But I did designate the names of the courses.
18     Q.  Right.  But you're acknowledging that when you
19 say you only addressed half of the request in that
20 lines, you failed to provide information about how the
21 equipment would be used by students; is that right?
22     A.  I did not do that.  I admit.  I see that now

Page 285

1  and perhaps I was too distraught for it, or I don't
2  know why I would have missed that.
3      Q.  Do you think that Mr. Ryan belittled and
4  challenged your capital budget request because he was
5  resentful because you played a role in the termination
6  of Debbie Haynes?
7      A.  Partly, yes.  Yes.
8      Q.  And do you believe that Ms. Tolliver belittled
9  and challenged -- well, and what's -- what's your basis
10 for that that belief about Mr. Ryan?
11         MR. RACIN:  In addition to all the other
12 things testified to since 10:45?
13         MR. WILLIAMSON:  Counsel, please.
14         MR. RACIN:  Come on.
15         MR. WILLIAMSON:  You make an objection.
16         MR. RACIN:  Come on.  I object.
17         MR. WILLIAMSON:  But we don't need to
18 volunteer testimony for the witness, sir.
19         MR. RACIN:  I object, asked and
20 answered.
21 BY MR. WILLIAMSON:
22     Q.  All right.  You can go ahead and answer.

72  (Pages 282 to 285)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 286

1    A. Please repeat the question.
2    Q. What is your basis for believing that Mr. Ryan
3 belittled and challenged your capital budget request
4 because he was resentful as a result of his belief that
5 you played a role in the termination of Debbie Haynes?
6    A. After Debbie Haynes left, my requests, my need
7 to be a part of the department since I was actually a
8 part of the department was -- could you repeat that for
9 me, please?
10    Q. What is your --
11    A. What did I just say, please.
12        (Requested material was read.)
13        THE WITNESS: Okay. Challenged,
14 belittled by Nick Ryan.
15 BY MR. WILLIAMSON:
16    Q. Do you have the same belief about Ms.
17 Tolliver?
18    A. Yes.
19    Q. And for the same reason?
20    A. Yes.
21    Q. Now, do you believe that Mr. Ryan also
22 belittled and challenged your capital budget request

Page 287

1 because of racial prejudice towards you?
2    A. Yes.
3    Q. And what's your basis for believing that?
4    A. That the treatment was only addressed to me --
5    Q. What treatment?
6    A. -- in that department.
7    Q. What treatment?
8    A. You just mentioned. Challenging my requests.
9 Belittling me in front of my students. Treating me as
10 lesser than in the department. Yes, I attribute that
11 to race.
12    Q. And do you believe that Ms. Tolliver belittled
13 and challenged your capital budget requests because of
14 racial prejudice towards you?
15    A. Yes.
16    Q. And what's the basis for that?
17    A. The same.
18    Q. The same. Can you --
19    A. As I just mentioned. She -- she didn't treat
20 Nick Ryan like that.
21    Q. But did she -- did she have any authority to
22 approve these requests?

Page 288

1    A. They acted together even like there was some
2 authority. Between Nick Ryan and Laura Tolliver, they
3 both acted like Laura Tolliver and Nick Ryan had the
4 authority.
5    Q. Ms. Killian, did either one of them have
6 authority to approve capital budget requests?
7    A. They had -- they shouldn't have had the
8 authority to approve capital budget requests.
9    Q. Did they?
10    A. I believe that they challenged and changed at
11 some point and I, like I said, this is -- I said I
12 believe.
13    Q. Does that mean you're just speculating?
14    A. I -- I think that perhaps with some of the
15 materials we may discover, you might find that there
16 might be some fact there.
17    Q. Right now?
18    A. Right now I don't have a fact in front of me
19 that says Nick Ryan changed my -- as in these e-mails
20 here.
21    Q. So right now --
22    A. From me to -- to Paul or from me to -- to

Page 289

1 Kevin Barr.
2    Q. So right now you're just speculating?
3    A. Yes.
4    Q. And at the time that you -- you wrote this,
5 the memo to Peter Branch?
6    A. Uh-huh.
7    Q. You could have only speculated about that
8 based on the information you knew at that time; is that
9 right?
10    A. This to the best of my knowledge. To the
11 best of my knowledge.
12    Q. Does --
13    A. But perhaps there are -- can I finish that?
14    Q. Sure.
15    A. Perhaps in discovery we'll find the piece of
16 paper that says my document didn't go straight --
17    Q. But at the time you wrote this memo in March
18 of 2004 you didn't have that piece of paper that showed
19 you factual support for that, did you?
20    A. To the best of my recollection, no. I was
21 going on what was going on in the office from my word,
22 my -- my paper to what was brought back to me.

73 (Pages 286 to 289)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 290

1    Q. You also say in this numbered paragraph 26,
2  "On the one hand" --
3    A. Say that again, please.
4    Q. I'm sorry. You got -- you're doing -- hold
5  onto that Exhibit 13.
6    A. Okay.
7    Q. That's going to be our anchor in these
8  questions for quite a while. You also say in this
9  numbered paragraph 6: "On the other hand, Laura has to
10  only hint at a wish and her requests are approved."
11  What -- do you see that?
12    A. Yes.
13    Q. What would be an example of Laura's just
14  hinting at a wish and obtaining approval for capital
15  budget item requests?
16    A. One printer per pod. So five printers in one
17  room for four -- for five tables.
18    Q. Can you explain what you just said?
19    A. Yeah. As an example, one print -- a request,
20  whatever request that I've -- I've seen. Actually not
21  any request, but in particular one particular request
22  that I can just mention to you, sir, is five printers

Page 291

1  in the Mac lab. Five printers. One printer for five
2  or four machines.
3    Q. What was the hint that Laura Tolliver gave --
4    A. The hint.
5    Q. -- that resulted in her getting a capital
6  budget item just based on that hint?
7    A. I don't recall whether there was any
8  discussion about whether that -- that printer was going
9  to work for those machines.
10    Q. What printer are you talking about?
11    A. One of those five that I just mentioned to
12  you.
13    Q. And did -- I'm just trying to follow. Can
14  you tell us how Laura Tolliver hinted that she wanted
15  the printer?
16    A. Well, I think you're -- if you're taking the
17  hint literally, let me read it again, okay? You use
18  the word.
19    Q. Why don't you take a look at it.
20    A. Yeah.
21    Q. What I'm trying to do is understand the
22  wording that you used to describe what you were

Page 292

1  complaining about?
2    A. Yes, and I'm trying to -- I'm going to read it
3  again and put it in context. So I can see whether this
4  is facetiousness or just -- or just fact.
5    Q. Fine. And if it shouldn't be taken literally
6  then, please explain that.
7    A. (Pause.) Oh, here we are. It says, "On the
8  other hand, Laura has to hint" -- and I'm repeating.
9  This is my same memory. So I'm just going to read it
10  for you. The one scanner was --
11    Q. Just one second. Did you read it? Again, I
12  think you may have left out a word. Start with "On
13  the other hand."
14    A. Okay. "On the other hand, Laura has to only
15  hint at a wish." Which word did I forget here?
16    Q. Only.
17    A. Oh, okay. "On the other hand, Laura has to
18  only hint at a wish and her capital budget purchase of
19  an entire suite of printers for the Mac lab where Laura
20  teaches two classes and claims as her own, her personal
21  classroom space."
22    Q. Excuse me. I think you may have skipped a

Page 293

1  line.
2    A. Did I skip a line?
3    Q. Let's go back to "On the other hand."
4    A. Oh. "Laura has only to hint at a wish and
5  requests are approved. In fact, during that meeting,
6  I saw for the first time the planned capital budget
7  purchase of an entire suite of printers for the Mac lab
8  where Laura teaches two classes and claims as her own
9  personal classroom space." So there, those are the
10  suite of printers that I was talking -- trying to
11  explain to you in words that came out a little jumbled
12  before, but that's the example that I wanted to --
13    Q. Okay.
14    A. -- to tell you about.
15    Q. And what's -- what was the hint that Laura
16  gave? Hinting at when you say she was only -- "Laura
17  has to only hint at a wish."
18    A. Yeah.
19    Q. What was the hint --
20    A. Maybe I'm --
21    Q. -- hint at a wish that she gave?
22    A. Maybe I'm merely characterizing the fact that

74  (Pages 290 to 293)

## Sharon Killian

Page 294

1  I didn't hear any discussion about the usefulness or
2  the feasibility of those suite of printers, and it was
3  put out for the first time and there were no questions
4  about it.  Perhaps in my -- sorry.  No, no follow-up.
5      Q.  Do you have any other examples of Laura
6  hinting at a wish and getting approval for a capital
7  budget item?
8      A.  Not that I can recall right now.
9      Q.  Now, is it your position that Laura was able
10 to get approval of that budget item for those printers
11 without actually submitting a written request?
12     A.  I saw the written request.  I saw the -- I
13 saw the document.   In fact, it was preliminarily
14 provided.
15     Q.  So, would it be fair to say that Laura had to
16 do more than hint at a wish in order to get the
17 printers?
18     A.  If you wish.
19     Q.  I'm not asking if I wish.   It's a question
20 that calls for a yes or no answer.
21     A.  If writing it down on a piece of paper is
22 such, sir, then the answer is yes.

Page 295

1      Q.  I didn't quite understand the first part
2  there.  What I'm asking you is -- well, actually, let
3  me go by asking:  How did I phrase the question
4  previously?
5      A.  My mouth is dry.  May I have some water?
6      Q.  Sure.
7      A.  I'll go get some?  My mouth -- well, you have
8  some?  I'll just go sip some.
9      Q.  We've got -- we've got a --
10     A.  It's cold.
11     Q.  -- question pending.  We'll try to --
12         MR. RACIN:  Why don't you answer the
13 pending question first.
14         THE WITNESS:  Let me answer the question
15 first before I go.
16         MR. RACIN:  Then maybe we can take a
17 little bit of a break with a final stretch.
18         THE WITNESS:  Yeah.  Please ask me.
19         MR. WILLIAMSON:  She is going to read
20 back the question.
21         I don't want to risk changing it because
22 I may not remember it exactly.

Page 296

1          THE WITNESS:  Yeah.  Okay.  I
2  understand.
3          (Requested material was read.)
4  BY MR. WILLIAMSON:
5      Q.  That's the question.  Did she have to do more
6  than hint?
7      A.  And I answered it.  Could you repeat the
8  answer, please?
9      Q.  I think -- actually, I think we're going to
10 run out of tape.  So maybe we should just take a
11 break.
12     A.  I thought I answered the question.
13         THE VIDEOGRAPHER:  You got like about a
14 minute.
15         MR. WILLIAMSON:  Okay.  Let's try it
16 then.  All right.  What did she say in response?
17         (Requested material was read.)
18         THE WITNESS:  Meaning yes.
19 BY MR. WILLIAMSON:
20     Q.  The answer to the question is yes?
21     A.  As I -- if that's not good enough.  If my
22 answer -- my answer is not good enough?

Page 297

1      Q.  Well, let me just ask it again then.  Is it
2  fair to say that Laura needed to do more than hint at a
3  wish in order to get the printers approved for purchase
4  by GDS?
5      A.  I don't know.
6          MR. WILLIAMSON:  All right.  We can take
7  a break then.
8          THE VIDEOGRAPHER:  Going off the record
9  at 5:52:49.  End of tape 3.
10         (Recess.)
11         THE VIDEOGRAPHER:  Going back on the
12 record at 6:04:15.
13 BY MR. WILLIAMSON:
14     Q.  Staying with this numbered paragraph 6 in
15 Exhibit 13, I'd like to ask you what you meant when you
16 said that:  "Laura's suite of printers was intended for
17 only her and her students' use and would only benefit
18 me if I invaded her space.  Something she has made
19 clear isn't acceptable on a number of occasions."
20         First let me ask.  What were the occasions
21 when Laura Tolliver made clear that it wasn't
22 acceptable for you to invade this classroom space where

75 (Pages 294 to 297)

# Sharon Killian

Page 298

1 the Mac lab was located?
2     A. On more than one occasion, if I've needed to
3 use the Mac lab, if she's -- and she has been in the
4 classroom and I say, you know, ask. If all the
5 machines aren't being used, may I use one or two of
6 these because I -- I have a couple of extra students
7 and I need to help them do some research on the machine
8 or something like that. And she say, you know, "The PC
9 lab is open" or go to, you know, "You need a Mac, why
10 don't you use the Macs in the classroom space" or
11 whatever. So it hasn't been a welcoming kind of
12 thing. So that's -- that's response to that. So...
13     Q. Okay. And when you say it hasn't been
14 welcoming, was it an absolutely prohibition that she
15 wouldn't allow your students or it's just she didn't do
16 it in a welcoming way?
17     A. On more than one occasion I've asked to use,
18 and she said it was inconvenient even if there were
19 extra seats in the classroom space.
20     Q. Were there some occasions when you've asked
21 and she said, yes, they can use it use it, use the
22 space?

Page 299

1     A. She said probably once or so okay. Yes. So,
2 yes. Yes.
3     Q. And how often would that occur in a year, or
4 how often would you ask during the year?
5     A. I -- it's very difficult for me to say how
6 often that would be, but maybe once or twice but, you
7 know, that's over between September and June and you
8 just learn that what you can't do, you know. If I
9 need it, I'm just going to have to make alternate
10 arrangements before I have to do that.
11     Q. And so what is it that you meant when you said
12 "Laura's suite of printers was intended for only her
13 and her students' use and would only benefit me if I
14 invaded her space"? Particularly interested in
15 meaning, what did it mean that you were invading her
16 space?
17     A. Came to use her space. Came into the Mac lab
18 to use her space.
19     Q. Okay.
20     A. And, you know.
21     Q. And is that something you discussed with --
22 with Nick Ryan, chair of the department?

Page 300

1     A. I have tried to discuss all of these issues at
2 some point with Nick Ryan over the years.
3     Q. And what did Nick Ryan say about this concern
4 that you had raised?
5     A. Right now I don't recall exactly what he said
6 about that. Many times, you know, it's go back to
7 talk to Laura again.
8     Q. Did you ever send him an e-mail or some other
9 document expressing your concern?
10     A. I don't remember sending him an e-mail about
11 Laura Tolliver, no, in that way. In regard to that,
12 no.
13     Q. And how do you normally communicate with each
14 other at the school? In writing?
15     A. Sometimes e-mail. Sometimes memo.
16     Q. Did you ever send him a memo expressing your
17 concern about the way in which Laura was limiting your
18 students' use of the -- was it the Mac lab? Or you
19 said these printers?
20     A. I don't recall right now. I can look to see
21 what I have and we could look through the documents
22 again and see if there's anything in there about that

Page 301

1 particular subject.
2     Q. And this went on over a period of years, this
3 conduct by Laura Tolliver?
4     A. Yes.
5     Q. But you're not able to recall any e-mail or
6 memo that you sent expressing your concern about this
7 to Mr. Ryan?
8     A. There are several memos. Some that I have
9 provided to you that may be compounded with other
10 things of issue. I -- I couldn't. I mean, I was a
11 busy -- as you can see, I hope you can see, I was a
12 really busy teacher.
13     Q. I think that's very clear that you're a busy
14 teacher?
15     A. And I -- and I didn't write down everything.
16 I, you know, couldn't complain about everything because
17 sometimes the result was worse than the original
18 action, and I can -- I could only hold so much and
19 still function as a decent teacher.
20     Q. What was an example of when the result of
21 complaining was worse than the original action?
22     A. Requesting information about, for instance,

76 (Pages 298 to 301)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 302

1  the advance -- actually, here we are.  This is a
2  perfect example.  I asked about the change in Laura
3  Tolliver's course name from Technology in the Arts or
4  Technology in the Studio Arts to Graphic Design, and it
5  relates to this newly approved course that I had been
6  working on called Graphic Design and Publishing.
7      And the response I believe was worse than the
8  request in that Nick Ryan bent over in his chair like
9  he was an ape (indicating) and scooped up like he was
10  an ape.  Saying he can't bend low enough to the ground
11  to understand me as if, you know, he was talking to an
12  animal or that's the only way that he would understand
13  me.  And so I believe, I feel that that was worse than
14  me -- the response to my question was worse than --
15  worse than the actual asking.
16      Q.  Talking about apes, are you suggesting that
17  apes move their arms to scoop things up?
18      A.  Well, my characterization right now is that he
19  scooped down with his arms like so (indicating) and
20  said he can't bend low enough to the ground to
21  understand me.
22      MR. RACIN:  And, counsel, so that the

Page 303

1  written record fairly reflects the motion involved,
2  would you take a stab at describing that for the
3  record?
4      MR. WILLIAMSON:  I'm not going to take a
5  stab at it since I'm not the one being deposed,
6  counsel.  If you got an objection, make your objection
7  for the record.  Otherwise, we're moving on.
8      MR. RACIN:  Well, I think the record
9  should reflect what the -- so that the written record
10  also -- I'm not sure the --
11      MR. WILLIAMSON:  Counsel, we've got a
12  videotape here.  That's how --
13      MR. RACIN:  But the video --
14      MR. WILLIAMSON:  That's how we record.
15      MR. RACIN:  The video is not showing it,
16  you know, accurately it seems to me.  But I will have
17  cross-examination.
18  BY MR. WILLIAMSON:
19      Q.  Ms. Killian, would you please turn your
20  attention to numbered paragraph 7 of Exhibit 13.
21      A.  Yes.
22      Q.  You see where you say: "When computers were

Page 304

1  upgraded in the art department, I asked that the used
2  machines be transferred to the Yearbook office.
3  Instead, Bruce gave all but two machines to the Iona
4  House (Bill Young former GDS assistant principal) --
5      A.  Uh-huh.
6      Q.  -- along with two printers that I thought and
7  said were still quite useful to the art department and
8  to the Yearbook office."
9      A.  Uh-huh.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  All right.  Ms. Killian, I would like to show
13  you a document that's been marked as Exhibit 22.
14      A.  Okay.
15      (Thereupon, a document was marked for
16  identification Exhibit No. 22.)
17      THE WITNESS:  Okay.
18  BY MR. WILLIAMSON:
19      Q.  Can you tell us what Exhibit 22 is?
20      A.  It's a memo.  An e-mail, rather, Tuesday,
21  June 10th.  Message from Bruce Ruble.  Subject -- you
22  want me to go through all that?

Page 305

1      Q.  Yes.
2      A.  Subject?  All right.  Macs.  To Nick Ryan,
3  Sharon Killian and Laura Tolliver.
4      Q.  And what's the message?
5      A.  It says, "Please deal with any files saved to
6  the hard drives of the Macs in the art studio and the
7  photo class in this week.  I will be setting up the
8  art studio Macs with OS 10 -- or OS X versions of
9  software beginning next week.  The blue and white Macs
10  in the photo classroom will be cleaned off and given
11  away to Iona."
12      Q.  And does it say B underneath that?
13      A.  B for Bruce Ruble I'm assuming.
14      Q.  Okay.
15      A.  It's kind of highlighted up here.  I'm not
16  used to seeing that print like that.  The name.
17      Q.  Let me just ask you a few questions --
18      A.  Right here.
19      Q.  -- about that.  When he says, "The blue and
20  white Macs in the photo classroom will be cleaned off
21  and given away to Iona," is that what you were
22  referring to in paragraph 7 of Exhibit 13?

77  (Pages 302 to 305)

## Sharon Killian

Page 306

1    A. Quite possible, yes.
2    Q. How many blue and white -- how many blue and
3  white Macs were there in the photo classroom?
4    A. If I recall, and it's been a while, four or
5  five.
6    Q. Okay. Do you know what model computer they
7  were?
8    A. They -- I don't remember if they were -- these
9  are -- they were probably -- if they are going to be
10  upgraded. If they were upgraded, in fact PCs came in
11  it looks like. They were probably an older version of
12  the -- than the newer Macs in the classroom.
13    Q. Do you know if they were newer models or older
14  models than a G4?
15    A. I believe they might have been G4s. I think
16  they -- I could be corrected on that. If they were
17  not G4s, they were G3s, but I think they were G4s.
18    Q. Is G3 something that's older or newer --
19    A. Older.
20    Q. -- than G4?
21    A. Older. Older.
22    Q. How would you be able to determine whether

Page 307

1  they were G3s or G4s?
2    A. They -- in addition to that, they could have
3  been marked like that.
4    Q. Okay.
5    A. They're also more capable of running high,
6  high volume types of digital work on them.
7    Q. Do you know how many of the blue and white
8  Macs were given to Iona House?
9    A. Let me read, see what I say. I said all but
10  two. So if there were five, there were three. I
11  don't know. From that room. But --
12    Q. I'm sorry. You said earlier there were four
13  or five, right?
14    A. In the arts -- in the photo classroom. Did
15  you ask me the photo classroom? Art studio and photo
16  classroom.
17    Q. Yeah.
18    A. In the photo classroom, there are five and
19  then outside in the studio. So, thank you for
20  refreshing me on that. There were others. So there
21  are an additional five or six outside.
22    Q. Okay.

Page 308

1    A. So, there would have been all but two would
2  have been eight or so. Eight or so.
3    Q. All right. Did you ever reply to this e-mail
4  telling Mr. Ruble that you thought the blue and white
5  Macs in the photo classroom would be useful to the art
6  department and to the Yearbook office?
7    A. Actually, no, I can't recall that. But --
8  and I'd also like to -- to -- I don't really exactly
9  recall receiving this memo at this time. Do you know
10  that whether I got this? Whether this was sent to me?
11  Do you know?
12    Q. I think you would actually be the best person
13  to answer that question?
14    A. I'd have to look. I have to look at my --
15  look at --
16    Q. Do you recall ever receiving this e-mail?
17    A. I don't -- that's what I'm saying. I can't
18  be sure that I got it this way, you know.
19    Q. Do you read e-mails that are addressed to you?
20    A. Yes.
21    Q. From Bruce Ruble?
22    A. Oh, yes. Yes.

Page 309

1    Q. Is there any reason that you think you might
2  not have gotten the e-mail?
3    A. I just -- I knew that the studio Macs were
4  going to go away. I just don't remember exactly the
5  chain of events and whether this, you know, June 10th,
6  and I read this June 10th and so on and so on. I
7  don't want to characterize anything that I --
8    Q. And so you said you're not sure if you ever
9  sent an e-mail telling Mr. Ruble that you thought the
10  blue and white Macs in the photo classroom would be
11  useful to the art department and to the Yearbook
12  office?
13    A. I think I might have told it to Nick Ryan.
14    Q. Okay. Did you ever send an e-mail to that
15  effect to Mr. Ruble?
16    A. I -- I don't think so. I don't think so.
17    Q. Did you ever send any e-mail to Mr. Ruble
18  requesting that he keep the blue and white Macs in the
19  photo classroom for the use of the art department or
20  the Yearbook office?
21    A. I might have sent it directly to him.
22    Q. Do you recall whether you did?

78  (Pages 306 to 309)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 310

1    A. I believe I did ask him that we keep those
2 Macs for the -- yes, and I have to look to see and
3 maybe you can look, too, but, yeah, I'm pretty sure I
4 asked him about keeping some of those Macs for the --
5 the Yearbook office because the ones in the Yearbook
6 office were even older, much older.
7    Q. Where was Mr. Ruble's office located?
8    A. Third floor.
9    Q. So his office was near your office?
10    A. It was outside the studio office, yes.
11 Studio entry.
12    Q. Was that at the end of this long gallery where
13 you said the doors were?
14    A. Right.
15    Q. So, was that something where you could just
16 raise your voice a little bit and speak to him?
17    A. No.
18    Q. Or did you have to get up out of the office
19 and go see him?
20    A. I would be out there to his office or if he
21 had come into the office, into the art studio.
22    Q. And you don't remember communicating --

Page 311

1    A. Did I tell him that I need -- you have
2 something that says that we need it?
3        MR. RACIN: Just wait for the question.
4        THE WITNESS: Oh, sorry.  I'm talking
5 over you.  I apologize.
6 BY MR. WILLIAMSON:
7    Q. Okay.
8    A. You asked me not to do that.
9    Q. Yes, that's right.  Just listen to the
10 question because it slows down the deposition when you
11 do that.
12    A. It does.  It does.  I apologize.
13    Q. I just want to be clear --
14    A. Uh-huh.
15    Q. -- that you don't have any recollection of
16 sending him an e-mail saying that you wanted to keep --
17 that you wanted to suggest that the school keep the
18 blue and white Macs in the photo classrooms for the use
19 of the art department or the Yearbook office?
20    A. I don't -- as I said, I don't remember if I
21 sent him an e-mail to that effect, but I'm pretty sure
22 that I at least talked to him about that verbally.  You

Page 312

1 know, openly said something.
2    Q. Did you talk to him on the phone?
3    A. It would have more than likely been face to
4 face.  If I didn't send him an e-mail.
5    Q. I'd like to take -- let me find my place
6 here.  Did you regard Mr. Ruble's donating the blue
7 and white Macs to the Iona House as an indication of
8 racial harassment of you?
9    A. Yes.
10    Q. Okay.  And what is your basis for thinking
11 that this decision was based on racial prejudice?
12    A. That, as with all the other things that I have
13 mentioned, sir, this was one more way to -- to diminish
14 my work and to diminish my progress in taking care of
15 the -- the responsibilities that I was entrusted.
16    Q. Okay.  And how was it that donating these
17 computers, except for the two of them to Iona House,
18 diminished your work?
19    A. As I said out of turn -- and I again apologize
20 for that -- the computers in the -- in the Yearbook
21 office were not really capable of doing the work that I
22 needed to do, and the ones that were given away could

Page 313

1 have been transferred and would have helped the process
2 of publishing the Yearbook much more adequately.
3    Q. All right.  Now I'd like to show you a
4 document that's been marked as Exhibit 23.
5    A. Okay.
6        (Thereupon, a document was marked for
7 identification Exhibit No. 23.)
8        THE WITNESS: Okay.
9 BY MR. WILLIAMSON:
10    Q. Have you had a chance to look at Exhibit 23?
11    A. Yes, I see it.
12    Q. And what is Exhibit 23?
13    A. It's a letter -- it's an e-mail from Bruce
14 Ruble to Macs for Yearbook for Sharon Killian.  "Dear
15 Sharon: Would you like me to replace the two older
16 Macs in the pub room with two much newer G4s.  Bruce."
17    Q. What time was that e-mail sent?
18    A. This is at 8:41 just a few minutes afterwards.
19    Q. You say --
20    A. A.m. on June 10, 2003.
21    Q. Is that about two minutes after the e-mail
22 that was sent on Exhibit -- that was reflected in

79 (Pages 310 to 313)

Sharon Killian

Page 314

1  Exhibit 22?
2      A. Could be so, yes, sir.
3      Q. And when you say could be, I'd like you to
4  take a look at Exhibit 22 and Exhibit 23.
5      A. Yes.
6      Q. And tell me whether Exhibit 23 is an e-mail
7  that was sent approximately two minutes after Exhibit
8  22 on the morning of June 10, 2003.
9      A. Absolutely. Two minutes.
10     Q. All right. Now, does this exchange of
11 e-mails refresh your recollection as to whether you
12 communicated by e-mail with Mr. Ruble about the blue
13 and white Macs that he was proposing to donate to Iona?
14     A. Not really. No.
15     Q. Would you have gone and had a conversation
16 with him during that two-minute period and then
17 returned to your office and sent an e-mail to him?
18     A. No, I don't think so.
19     Q. And this Exhibit 23, that was sent only to
20 you; is that right?
21     A. Yes.
22     Q. And in -- is this an e-mail -- is this e-mail

Page 315

1  an offer to replace -- let me start again.
2      Is this e-mail an offer from Mr. Ruble to
3  replace two of the older iMacs in the pub room with two
4  much newer G4s?
5      A. With the two G4s. That's what it says here
6  and those G4s are these, the two G4s that were not
7  given away.
8      Q. Okay. Now let's take a look at a document
9  that's been marked as Exhibit 24.
10         (Thereupon, a document was marked for
11         identification Exhibit No. 24.)
12         THE WITNESS: Thank you.
13 BY MR. WILLIAMSON:
14     Q. Or tell me, what is your basis for saying that
15 the much newer G4s were among the -- the blue and
16 whites that were the same as the types of computers
17 that were going to be donated to Iona House? How do
18 you know that?
19     A. I know that for sure.
20     Q. And how do you know that for sure?
21     A. Because I've seen them. I know what the G4s
22 looked like. We talked about -- a moment ago you

Page 316

1  asked me, you know, were they -- what kind of machines
2  were they. You asked me were they G4s. I said,
3  they're either G4s and G3s and an IMac and a G4 and a
4  G3 are two different things. You know, the G4s and
5  G3s are different than the iMacs and the G4s, those two
6  G4s are the two remaining, the leftover ones from the
7  ones that were given away.
8      Q. Okay.
9      A. And there was definitely need for at least two
10 or three more in that pub room if I recall. There
11 were probably that, you know, need for more than two.
12 But so, yes. The answer is, yes, I say in this e-mail
13 here.
14     Q. All right. What is Exhibit 24?
15     A. Exhibit 24 is an e-mail from me, Sharon
16 Killian, subject: Re: Two Macs for Yearbook to Bruce
17 Ruble. Bruce Ruble writes: "Dear Sharon: Would you
18 like me to replace the two older iMacs in the pub room
19 with two much newer G4s." And his address and so on.
20 "Bruce." And then I answered: "The answer is yes!
21 Thanks, Sharon."
22     Q. Did you put an exclamation point after --

Page 317

1      A. Yes, I did. I was glad.
2      Q. Please let me finish the question.
3      A. Sorry.
4      Q. Did you put an exclamation point after the
5  word "yes" in Exhibit 24 when you're saying "thanks,
6  Sharon"?
7      A. Yes, I did, sir.
8      Q. All right. In that e-mail that you sent back
9  to Mr. Ruble, did you request that he also give you any
10 of the other blue and white Macs from the photo lab?
11     A. No, I didn't because with the two-minute
12 difference that we talked about here, I suspect that he
13 had heard me before. That I had asked for the
14 suite -- for a suite for the pub room, but he could
15 give me two.
16     Q. When you say you suspect, you're just
17 speculating about that?
18     A. I know that I talked to Bruce about this. It
19 obviously wasn't in the two minutes between the two
20 e-mails and I know that I had.
21     Q. All right.
22     A. So I'm assuming. I will say I talked to

Sharon Killian

| Page 318 | Page 320 |
|---|---|

**Page 318**

1  Bruce.  The answer is, I talked to Bruce prior to this
2  e-mail about getting --
3       Q.  Where -- where did you speak to him between
4  the e-mails that were sent at 8:39 and 8:41 in the
5  morning and your e-mail that was sent at 11:37 a.m. in
6  the morning?
7       A.  It would have been -- it would have been prior
8  to June 10th then is what I'm saying, sir.
9       Q.  And did you regard his offer to replace two of
10  the older iMacs in the pub room with two much newer G4s
11  as an indication of racial harassment of you?
12       A.  I --
13           MR. RACIN:  Asked and answered I think.
14  You may answer.
15           THE WITNESS:  Yes.
16  BY MR. WILLIAMSON:
17       Q.  Ms. Killian, do you see numbered paragraph 8
18  where you say that -- I'm sorry.  That's numbered
19  paragraph 8 of Exhibit 13 where you say that:  "I have
20  asked for a dedicated art server or increased server
21  space for over three years and have been met with
22  refusal by Bruce, but with instructions that I should

**Page 319**

1  take my art files off of the network by copying them to
2  CDs.  CDs hold 700 megabytes."
3       A.  I see that, sir.
4       Q.  All right.  Now, when you talk about the --
5  the network that you would be taking these files off
6  of, is this the same network that is commonly referred
7  to at GDS as HS common?
8       A.  And public.
9       Q.  Okay.  Is the answer yes?
10       A.  May I say something more than yes or no on
11  this one?
12       Q.  Sure.  What I'd prefer is if you could give
13  me a yes or no answer and then if you want to explain
14  it, that's fine.
15       A.  Yeah.  It's difficult to give the yes or no
16  because -- because the sizes on the common, the work on
17  the common and the work on the public, HS common and HS
18  public, as long as my name is attached to them, it
19  costs space.  So network really means the whole --
20  both of those two things.  So when you ask me about
21  common, I guess my answer should be no.
22       Q.  All right.  Does it include HS common?

**Page 320**

1       A.  Yes.
2       Q.  And do you regard this as another example of
3  how Mr. Ruble targeted you for reprisals because he
4  blamed you for Ms. Haynes' departure?
5       A.  Yes.
6       Q.  And do you believe he instructed you to copy
7  your files to CD -- what does CD mean?
8       A.  A compact disk.
9       Q.  To compact disk because he resented you based
10  on his belief that you played a role in Ms. Haynes'
11  departure?
12       A.  Yes, that was the -- yes.
13       Q.  And is this in your view another example of
14  racial prejudice or racial hostility on the part of Mr.
15  Ruble toward you?
16       A.  Yes.
17       Q.  And why is it that you think his instructing
18  you to take your art files off the network by copying
19  them to CDs is a form of racial harassment?
20       A.  Because I had, as I said before, I had
21  explained the processes and processing that I needed to
22  do and how much --

**Page 321**

1       Q.  Well, I'm sorry.  What was it that you had
2  explained before?  Can you tell me specifically?
3       A.  I'm -- I will restate that, please, if I have
4  the opportunity.  I had on numerous occasions
5  requested that I -- that the space for the work on
6  school-related courses and activities be increased to
7  accommodate the Yearbook and my classes and it was, as
8  I said here, refused on many occasions.
9       Q.  And that's why you thought this was a form of
10  racial harassment?
11       A.  And at the same time that he's asking me to
12  take my work off and put them onto CDs, and I may have
13  actually received an e-mail with -- from Bruce about
14  that.  There were additional disk space -- disk space
15  provided for my white counterpart in my department that
16  was available to her, not to me.  Now, he made
17  available to her and not to me.
18       Q.  When the art files are copied to CDs, are they
19  still available and accessible for use on a computer?
20       A.  They can be.
21       Q.  And approximately how many CDs would it take
22  or would it have taken to remove all of your files off

81 (Pages 318 to 321)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 322

1  of the network?
2      A. Could have been a hundred of them.
3      Q. And approximately how many megabytes of art
4  files did you have on the network at that time?
5      A. At this time in '03?  I -- I'm really not
6  sure.  The Yearbook by then would have been -- 20 gigs
7  or close to 20 gigs and I'd say --
8      Q. 20 gigs would be how many megabytes?
9      A. Gigabytes.  1,000.  One gig -- one gigabyte
10 would be 1,000 megabytes.  So, 20 times 100.
11     Q. 20 times 100 or 20 times 1,000?
12     A. 20 times 1,000.
13     Q. So that would be 20,000 megabytes?
14     A. Uh-huh.
15     Q. Of art files?
16     A. Uh-huh.  That would be for the -- the
17 Yearbook and then if -- I believe and I recall the
18 number seven or nine gigabytes in a note that was --
19 that may have been sent to me at some time, and the
20 same math applies to that.
21     Q. What is the math that applies?
22     A. 700 megabytes.  1,000 -- 1,000 megabytes, one

Page 323

1  gigabyte, times nine would be the amount of quote,
2  unquote megabytes that needed to be -- that could have
3  possibly been taken off the computer, you see.  Now,
4  depending on what my allotment was, you know.
5      Q. Was it 9,000 megabytes 20,000 megabytes?  I
6  thought earlier --
7      A. Different numbers.
8      Q. Right.  I thought you said earlier that you
9  needed to multiply something by 20?
10     A. Yeah.  The Yearbook files are about that much
11 by themselves.
12     Q. That would be 20,000 megabytes and then there
13 was -- there are other files that would be 9,000?
14     A. About.  Yeah.  It all depends on what he's,
15 you know, if you look at the computer, you say get
16 information, you could look to see how -- how much
17 space is being used by Sharon or, you know, if I log on
18 and see, but I can't really tell you what that is right
19 now.  I'd have to go back and look at something he may
20 have sent me or some copy of database that would tell
21 me how many gigabytes I would have used.
22     Q. What about the gigabytes that you would have

Page 324

1  had on the public file?
2      A. My classes?  Those would be my classes.
3      Q. What you keep on the public files; is that
4  right?
5      A. Yes.
6      Q. And how many gigabytes would you have had
7  there?
8      A. It depends on what -- see what time of year it
9  is.  End of the year.  It's not quite the end of the
10 year because I think I'm writing grades.  I -- I
11 really can't tell you.  I would be speculating.  So
12 maybe he can figure that out for me from, you know,
13 record from a database.
14     Q. Can you just give us an approximation?
15        MR. RACIN:  You're asking for
16 speculation, counsel?
17        THE WITNESS:  Yeah.  By then my
18 students' portfolios should all be on there and they're
19 high resolution files.  They would have been pretty
20 large.  So I would say probably -- I probably had in
21 those student files probably at least -- and I'm
22 speculating again -- about 7 maybe, 7 gigabytes.  But

Page 325

1  the way I've been working, I'm thinking that that might
2  have been it before they -- their portfolios were
3  culled and all that.
4  BY MR. WILLIAMSON:
5      Q. And how much of a gigabyte can you get on one
6  CD?
7      A. 700 megabytes of it.
8      Q. .7?
9      A. Yeah.
10     Q. So, for all of your files, about how many CDs
11 would you have needed to copy based on these estimates
12 you just made?
13     A. I tell you, I wouldn't have been able to do it
14 with the kind of work that I had.  I couldn't do it
15 with the time that I had.  It was -- I couldn't.
16     Q. Can you tell me how many you would have needed
17 to if you could have done it?
18     A. And then to consider that you have -- you'd
19 have to figure out how many megabytes per folder and so
20 on because you don't want to split up a student's work.
21 So, in any event, gosh.  One about --
22     Q. Did you want to write something down?  You

82  (Pages 322 to 325)

## Sharon Killian

Page 326

1  want to write some notes on a piece of paper?
2      A. Do I want to?  I'm going to do math now.
3      Q. All right.  Use your own counsel's paper.
4      A. Thank you.
5      Q. That will be privileged communication, note
6  paper from him.
7      A. Oh, okay?  Let me see if I can multiply here.
8      Q. We won't look while you write on it.  Shall we
9  go off for a minute?
10         THE VIDEOGRAPHER:  You want to go off
11  for a minute.  Okay.  Going off the record at 6:38:25.
12         (Discussion off the record.)
13         THE VIDEOGRAPHER:  Going back on the
14  record at 6:39:59.
15         THE WITNESS:  I'd say that I'd need
16  probably about 50 or 60 CDs.
17  BY MR. WILLIAMSON:
18      Q. Would it be closer to 50 than 60, maybe around
19  51 or so?
20      A. Depending on how many megabytes there really
21  were.  Could be.  It could be, yes.
22      Q. Now, would it be easy -- easier to copy your

Page 327

1  files from the network if you could copy them onto DVDs
2  rather than CDs?
3      A. It's possible.  DVDs are larger, hold more,
4  yes.
5      Q. How many megabytes can one DVD hold?
6      A. That depends.  They -- I've seen 4.2.  I've
7  seen 3.
8      Q. Have you seen 4.7?
9      A. Probably.
10      Q. Did Mr. Ruble ever purchase a DVD burner for
11  you out of his budget?
12      A. Out of the budget?  Yes.  I don't remember
13  what year that was, whether it was '04-05 or not.
14      Q. Okay.  Let's take a look at Exhibit 25.
15      A. Uh-huh.
16         (Thereupon, a document was marked for
17  identification Exhibit No. 25.)
18         THE WITNESS:  Thank you.
19  BY MR. WILLIAMSON:
20      Q. What is Exhibit 25?
21      A. Exhibit 25 is an e-mail dated Tuesday,
22  November 2, 2004 from Sharon Killian, me, to subject:

Page 328

1  Re:  To Norton Anti-Virus Key to Bruce Ruble.  Bruce
2  Ruble.  Shall I continue?
3      Q. Well, what does the e-mail say in the -- in
4  the PS?
5      A. "In regard to the external burner, there is a
6  Sony double layer dual format plus and minus R 16 times
7  DVD plus minus R/RW fire wire -- excuse me -- and USB
8  2.0 external burner that would meet our needs.  I
9  think Memorex also makes one.  Sounds good.  How much
10  does it cost?"  I don't know.  It must be -- I think
11  it's under 200.  So these are several, you know,
12  iterations or responses I guess.  "It's under $200.
13  Thanks, Bruce.  Sharon."
14      Q. Can you explain what is going on there?
15      A. Yes.  The Yearbook was being done all
16  digitally and I needed to burn DVDs just about on a
17  daily basis for that and other things, but primarily.
18      Q. What does it mean when you say you burn DVDs?
19      A. Oh, make them from the files on the database
20  or on a space.  So I was making DVDs as part of my --
21  my job to get this to publication.
22      Q. And when you say that this certain model

Page 329

1  external burner that would meet your needs, and I think
2  you said "Memorex makes them"?
3      A. Yes.
4      Q. You were writing to Mr. Ruble, right?
5      A. Yes.
6      Q. And then who said, "Sounds good, how much does
7  it cost?"  Who wrote that?
8      A. That must -- I don't know.  I'm assuming it's
9  Bruce.
10      Q. And what was your reply?
11      A. And then it looks like I said I think it's
12  under 200.  I'm not sure, you know, I think that's --
13  that's --
14      Q. You think that was a response you were giving?
15      A. I -- I'm -- if I found -- if I found the Sony
16  double layer, then I found the price, too.  So that's
17  why I'm assuming that was me.
18      Q. Right.  I'd like to show you a document that's
19  been marked Exhibit 26.
20      A. Okay.
21         (Thereupon, a document was marked for
22  identification Exhibit No. 26.)

83  (Pages 326 to 329)

## Sharon Killian

Page 330

1    THE WITNESS: Thank you.
2    BY MR. WILLIAMSON:
3    Q. Have you had a chance to look at Exhibit 26?
4    A. Yes. Just one second. Yes, I have.
5    Q. And what is Exhibit 26?
6    A. It is a purchase order number 5458 to GOV
7    Connection. Jessica Chase. Attention to Bruce
8    Ruble.
9    Q. Does it have a date on it?
10    A. Yes, at the bottom 11/16/04. November 16,
11    '04.
12    Q. Do you see where it says Sony 16X external DVD
13    plus R drive?
14    A. Uh-huh.
15    Q. And right next to it it says $199.95?
16    A. Yes, I do. That's 200 almost, isn't it?
17    Q. And whose signature is at the bottom of this
18    document?
19    A. Bruce Ruble.
20    Q. Okay. Is this a purchase order for the DVD
21    burner that Bruce Ruble purchased from you out of his
22    budget?

Page 331

1    A. Out of the technology budget? Yes, I believe
2    this came out of there.
3    Q. And, Ms. Killian, if you copy files and remove
4    them from the server, does that allow space for other
5    files to be placed on the server?
6    A. Not if they were using the files as you take
7    them off.
8    Q. Let's say you just take them off. Does that
9    create space for someone else to use space on the
10    server?
11    A. For someone else? Probably so, yes.
12    Q. Now, when you copy files and remove them from
13    the server, does that help speed up the overnight
14    backup of files on the server?
15    A. That's what I was told, yes.
16    Q. Now, Ms. Killian, I'd like to show you a
17    document that's been marked as Exhibit 27.
18    A. Uh-huh. What time is it, please?
19    MR. RACIN: Quarter to 7.
20    (Thereupon, a document was marked for
21    identification Exhibit No. 27.)
22    THE WITNESS: Thank you. Yes.

Page 332

1    BY MR. WILLIAMSON:
2    Q. What is Exhibit 27?
3    A. It's a March 3, 2006 printing by Bruce Ruble
4    titled "Forward Cleanup of Public GDS High School."
5    Monday, February 27, 2006. Message from David
6    Arnstein, GDS lower school and Bruce Ruble. Subject:
7    Cleanup of Public to Bruce Ruble. Should I continue?
8    Q. Yes. What is the e-mail that's shown under
9    original message on Exhibit 27?
10    A. Original message. Thursday, June 26, 2003.
11    High school staff from Bruce Ruble. June 26, 2003.
12    That's during the summer. We are all gone now.
13    Okay. From Bruce Ruble, GDS high school, cleanup of
14    public to high school staff. "Well, folks" --
15    Q. Let me ask you something. When you say
16    you're all gone, are you able to read your e-mails
17    during the vacation after the end of the regular school
18    year?
19    A. I used to be able to, yes, sir.
20    Q. Okay. So, even though you might not be
21    physically in the school, if you had access to a
22    computer or a BlackBerry, something like that, you'd be

Page 333

1    able to read these e-mails in June of that year; is
2    that right?
3    A. Uh-huh.
4    Q. All right. Now, let me ask you a few
5    questions about this.
6    A. I haven't read it yet. Do you want me to
7    read it at all?
8    Q. Yeah. Why don't you read it to yourself. We
9    don't need to read the whole thing.
10    A. Okay. Can I do that before you ask me a
11    question?
12    Q. I certainly want you to do that.
13    A. Okay. Thank you. (Pause.) Okay. I've
14    read it now. Thank you.
15    Q. Okay. Did you already tell us whom that --
16    who was the sender of that e-mail?
17    A. Yes.
18    Q. That's Bruce Ruble, right?
19    A. It says from David Arnstein and Bruce Ruble.
20    You mean -- are we talking about this document itself
21    or are the original message underneath? Which one?
22    Q. The original message portion, who is that

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

# Sharon Killian

|  |  |
|---|---|
| Page 334 | Page 336 |

**Page 334**

1  from?

2    A. Bruce Ruble.

3    Q. Okay. And that was sent on June 26, 2003; is

4  that right?

5    A. Yes.

6    Q. Now, you see where it says, "Well, folks, we

7  filled up nearly 80 percent of HS common with our

8  stuff." What do you interpret that to mean?

9    A. That we've -- the faculty because they sent to

10  the high school staff, the faculty has filled up nearly

11  80 percent of HS common with our stuff.

12    Q. Then he says, "I've made CDs of all the

13  2001-2002 and before files that were stored in public

14  in your departmental folders."

15    A. Yes.

16    Q. And does it appear from this document that Mr.

17  Ruble copied to CD the files from 2001-2002 and before

18  for all of the high school faculty?

19      MR. RACIN: Object. For the record, the

20  document speaks for itself. Says what it says. You

21  may answer.

22      THE WITNESS: It says that he has made

**Page 335**

1  CDs of all the 2001-2002 and before files that were

2  stored in public.

3  BY MR. WILLIAMSON:

4    Q. Now, when he says later that "I would guess

5  that there are probably some files in your user space

6  that could be archived to a CD or deleted."

7    A. Uh-huh.

8    Q. "Please clean up your space."

9    A. Uh-huh.

10    Q. Was this request to "please clean up your

11  space" directed at just you or at the whole high school

12  faculty?

13    A. It says to the high school staff.

14    Q. Does the high school --

15      MR. RACIN: Object to lack of

16  foundation. We haven't established that the witness

17  received it. Has any knowledge of it.

18  BY MR. WILLIAMSON:

19    Q. Does the high school staff include the high

20  school faculty?

21    A. Oh, yes. Yeah.

22    Q. Then when he says, "And if you supervise a

**Page 336**

1  publication, look through its folder in Public with and

2  archive."

3    A. Uh-huh.

4    Q. Do you think that request was directed only at

5  you?

6    A. I -- I don't know. I don't think so. I

7  don't know, though.

8    Q. Are there publications at the school other

9  than the Yearbook?

10    A. Yes, there are publications. I don't know

11  how much they keep on the database, but I'm sure there

12  are.

13    Q. What are the other publications at the school?

14    A. The art magazine. The Augur Bit.

15    Q. What's the Augur Bit?

16    A. It's the newspaper, school newspaper, and

17  there are probably one or two others that won't come to

18  mind right now. There is a list of publications

19  someplace I think.

20    Q. Okay. Now I'd like you to look at a document

21  that we're going to mark as Exhibit 28.

22    A. Okay.

**Page 337**

1      (Thereupon, a document was marked for

2  identification Exhibit No. 28.)

3      THE WITNESS: Thank you. Can you see a

4  date on this? I can't really see it.

5  BY MR. WILLIAMSON:

6    Q. I think if you look carefully --

7    A. Uh-huh.

8    Q. -- you'll show it looks like Thursday 04

9  September 2003.

10    A. Okay.

11    Q. I don't know if that helps you to see it.

12    A. I have my glasses. Okay. Can I read it?

13    Q. Yes. Just so you understand generally, when I

14  hand you a document, unless you already feel you're so

15  familiar with it that you don't need to read it, I'm

16  inviting you to read the document before I ask you

17  questions and then I just ask you to let me know when

18  you're ready for the questions.

19    A. Okay. Thank you.

20    Q. All right.

21    A. (Pause). Okay.

22    Q. What is Exhibit 28?

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 338

1    A.  It's an e-mail message.
2    Q.  Who is it from?
3    A.  From Nick Ryan.
4    Q.  To whom is it addressed?
5    A.  Laura Tolliver and Sharon Killian.
6    Q.  And what is the date?
7    A.  It's Thursday, the 4th of September, 2003.
8    Q.  Do you see in the text at the beginning where
9  it says, "Bruce has requested that you both start to
10  archive material in your user folder"?
11    A.  Yes.
12    Q.  Was this request addressed to both you and Ms.
13  Tolliver?
14    A.  Yes.
15    Q.  And when he says archive material, do you
16  understand that to mean copy your files to a CD or DVD?
17    A.  It asks for that at the bottom, yes.
18    Q.  Then do you see where it says, "Of the total
19  space available together, you are using 64 percent of
20  all available user space and this is making the
21  overnight backup of files a 15-hour process which means
22  it cannot be done in time for the start of the

Page 339

1  following school day."
2        Now, when he refers to "you" in that sentence,
3  is he referring just to you, Ms. Killian, or to you
4  and Ms. Tolliver?
5    A.  I'm assuming since he says Laura and Sharon,
6  he's saying Laura and Sharon.  To me and Laura.
7    Q.  So you're assuming that "you" refers to you
8  and to --
9    A.  Laura.
10    Q.  -- Laura Tolliver?
11    A.  Yes.
12    Q.  Now, do you regard this communication to be a
13  valid reason for Mr. Ruble to be requesting that you
14  and Ms. Tolliver begin archiving your network files?
15    A.  Repeat the question, please.
16    Q.  Do you regard this e-mail communication about
17  the status of available space in the computer to be a
18  valid reason for Mr. Ruble to be requesting that you
19  and Ms. Tolliver begin archiving your network files?
20    A.  The user folders?  Yes, if the -- if the
21  backups don't happen.  If the overnight backup files
22  don't happen in a reasonable time frame.

Page 340

1    Q.  Do you see where it says, "At present, Laura
2  has 7.07 gigs and Sharon 9.54 gigs"?
3    A.  Yes.
4    Q.  Do you understand gigs to refer to gigabytes?
5    A.  Yes.
6    Q.  And do you believe that -- that that was an
7  accurate statement at the time with respect to the
8  amount of gigabytes you had in the user folder on the
9  network at the time?
10    A.  It -- it could have been true.
11    Q.  When you say could have been true, do you --
12    A.  I didn't look at it myself, sir.  I'm
13  assuming that this is what he got off of there and so,
14  yes.
15    Q.  Do you have any reason to believe that it's
16  inaccurate?
17    A.  No.  No.
18    Q.  And what about the number of gigabytes that
19  this e-mail says Ms. Tolliver had in the user folder?
20  Does that seem approximately accurate to you?
21    A.  I wouldn't know whether it's accurate or
22  approximately accurate, but I believe that it was 7.07

Page 341

1  gigs if they said so.
2    Q.  And do you know if there was any other faculty
3  member at GDS who was using a higher number of
4  gigabytes in the user folder on HS common than you at
5  that time in September of 2003?
6    A.  I -- I'm assuming that since they said that I
7  was and Laura was that we -- well, that I was higher
8  than Laura and the two of us were the only two with
9  that much or 64 percent.  Then that must -- I'm
10  deducing that must mean that I had 9.54 gigs and that
11  was the highest number by anyone on the user folder.
12    Q.  Well, I'm not asking you to assume or deduce.
13  I'm asking you if you know --
14    A.  Uh-huh.
15    Q.  -- if there's any other faculty member who was
16  using a higher number of gigabytes in the user folder
17  on HS common than you at that time in September of
18  2003?
19    A.  I don't know, sir.
20    Q.  Do you know how to find from the computer how
21  many gigabytes of files you have stored in the user
22  folder on the network at any given time?

86  (Pages 338 to 341)

Sharon Killian

Page 342

1    A. Yes.
2    Q. Do you know how to take screen shots that
3  record exactly how many gigabytes you have stored in
4  the user folder at any given time?
5    A. I could probably walk myself through it.   You
6  know, I could figure it out I think.   Different
7  machines sometimes do different things.   I think I
8  could do it.
9    Q. Do you know how to take screen shots that
10 record how many gigabytes you've stored in the public
11 folder at any given time?
12   A. Screen shots meaning like a copy?  Print it
13 you mean?  Print it or just be able to see it?  How
14 many -- I'm confused.   Which one?  Printing or?
15   Q. See it.
16   A. See it?  Yes.
17   Q. Did you take any such screen shots at the time
18 in 2003 to see what portion of the capacity you were
19 using?
20   A. I don't recall doing that.
21   Q. Have you ever taken such screen shots, Ms.
22 Killian?

Page 343

1    A. I've had to when in my work I've had to know
2  how much space I had available for the Yearbook, for
3  the classes and so on.   Working at night.
4    Q. Have you kept any record, electronic or
5  printed, of those screen shots that you've taken?
6    A. Of the size files?  I don't recall keeping a
7  record of how large the files were at certain days or
8  certain times, no.  I don't recall.  I don't remember
9  saving that.
10   Q. And when Mr. Ryan says, "Bruce has asked me to
11 convey this information and requested that you complete
12 the archiving to CDs and DVDs by the end of September,"
13 did you believe this request was an instance of racial
14 harassment by either Mr. Ryan or Mr. Ruble?
15   A. Yes.
16   Q. And what is your basis for that belief?
17   A. Laura could actually drag her 7 gigs to any
18 hard drive with 75 gigs of disk space sitting on top of
19 a machine at any time without having to burn one CD.
20   Q. And that caused you to think that this was --
21 this message was sent to you from Mr. Ruble with the
22 intent of subjecting you to racial harassment?

Page 344

1    A. Yes.
2    Q. How many gigabytes did you have on your
3  computer in the art office at that time?
4    A. I didn't -- let's see.   The computers may
5  have come with a certain amount on the desktop and I
6  don't recall how much -- how many were available for
7  desktop work.  And I believe that I was using a PC at
8  -- I'm not sure if I was using a PC at this time or
9  not, but the way the PCs were set up is that they would
10 sweep everything off of, you know.  It might have been
11 a Mac that I was using at the time.
12     I don't remember exactly how many there were,
13 but there were six, eight computers in the studio area.
14 More in the Mac lab.  All of those in the Mac lab.
15 Each with an additional number of gigs, as I mentioned,
16 76, 75 gigs.  And one for the Mac, you would open up.
17 You find your box and you drag it.  You sign on and
18 you could drag, you know, your classes.
19     I didn't -- I needed -- I needed the space
20 that I was currently using for constant work.  I think
21 I answered more than you requested.  I hope I answered
22 your question.  If I didn't, please ask it again.

Page 345

1    Q. Well, let me ask a little different way.   If
2  you had done what was asked by Bruce, that is, to
3  complete the archiving to CDs and/or DVDs, would you
4  still have been able to use the information on the
5  computer?
6    A. Very marginally, but I suppose so.
7    Q. When you say very marginally, what do you mean
8  by that?
9    A. I used every machine that every student used
10 in the Yearbook and in my photo classes and so on I had
11 -- I would have to -- to use.  I could need to use at
12 any number of times.  Depending on where I've got the
13 CD stored, I might need something that I needed to use
14 at the time, and just because the things were done the
15 year before doesn't mean I don't need them for the
16 current year.
17   Q. Did you have places where you could store CDs
18 that you could get access to at the school?
19   A. Sure.  Yes.
20   Q. Now, when or did you believe this request
21 about conveying or archiving this information to CDs
22 and DVDs was made because either Mr. Ryan or Mr. Ruble

87  (Pages 342 to 345)

# Sharon Killian

Page 346

1 resented you based on your belief that you played a
2 part in Ms. Haynes' termination from the faculty?
3      A. Yes.
4      Q. Okay. I would also like to show you a
5 document that's been marked as Exhibit 29.
6           (Thereupon, a document was marked for
7 identification Exhibit No. 29.)
8           THE WITNESS: Thank you.
9 BY MR. WILLIAMSON:
10      Q. Have you had a chance to look at Exhibit 29?
11      A. Yes.
12      Q. And what is it?
13      A. It's an e-mail dated Wednesday May 5, 2004 at
14 2:14:02 p.m. Message from Bruce Ruble, Mac Lab and
15 Art Studio Computer Users to News, CC Nick Ryan, Sharon
16 Killian, Laura Tolliver.
17      Q. Okay. Do you see where it says in the second
18 paragraph of the e-mail: "If you have work stored on
19 these computers that you wish to keep, you need to deal
20 with it soon. You can either save it to your network
21 space or burn a CD. All of these computers have CD
22 burners. I can give you a blank CD and help you burn

Page 347

1 your files."
2           Did you believe that request from Mr. Ruble
3 was an example of racial harassment toward you?
4      A. To the students, this letter to the students?
5      Q. Yes. Well, the e-mail is addressed --
6      A. To the students.
7      Q. Yeah. Well, let's put it this way. Was it
8 addressed -- were some of the students that this was
9 addressed to your students?
10      A. I'm sure they probably were.
11      Q. And you were cc'ed on the e-mail, right?
12      A. Yes.
13      Q. And did you regard this, this -- the message
14 in this e-mail as an example of racial harassment of
15 you?
16      A. No.
17      Q. Okay. Would you next take a look at Exhibit
18 13, please.
19      A. Say that again. 13?
20      Q. Yes. Go back to Exhibit 13.
21           MR. RACIN: This one I think.
22           THE WITNESS: Okay.

Page 348

1 BY MR. WILLIAMSON:
2      Q. This is the letter that you prepared --
3      A. Yes.
4      Q. -- for your discussion with Peter Branch.
5 I'd like you to take a look at numbered paragraph 9 of
6 Exhibit 13.
7      A. Uh-huh.
8      Q. Do you see where it says that you were asked
9 to be the advisor of a new club, the Film Club, and
10 that Debbie Haynes and Laura Tolliver decided they
11 would take a charge of that?
12      A. Yes.
13      Q. When did that incident occurred?
14      A. That was either '97 or '98. Let's see '98.
15 '98 or -- '98 or '99 I suppose, yes.
16      Q. And what was the conversation that went on
17 between you and Debbie Haynes and Laura Tolliver
18 regarding the Film Club?
19      A. I -- I mentioned that students wanted me to,
20 as I said here, and then Debbie Haynes --
21      Q. I'm sorry. Did you finish? You said a
22 student wanted you to do what?

Page 349

1      A. To be the advisor to the Film Club.
2 Actually, there were two of them. I don't remember
3 the other one's name right off the bat here, but they
4 asked me if I could be the advisor to the Film Club.
5 They were -- they were my photo students at the time,
6 and I said, yes, it would be great. And Debbie Haynes
7 -- I told this to Debbie Haynes, and she and Debbie
8 Haynes said they wanted to meet with me and we -- we
9 met in the large studio, and she told me that I was not
10 going to be the advisor to the Film Club. That it
11 would be Laura would do it or the three of us would do
12 it, something like that.
13      Q. And what was the reason that or what was your
14 understanding of the reason that they decided they
15 should be the ones who would be in charge of the Film
16 Club?
17      A. That they wanted to -- to do it and that I
18 couldn't do it.
19      Q. But did they give you any reasons why you
20 couldn't do it?
21      A. No. Except for that they wanted to do it and
22 that I could not do it.

88 (Pages 346 to 349)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 350

1    Q. And was film a part of the AP curriculum?
2    A. No.
3    Q. Did you teach film making in any of your
4  courses at GDS at that time?
5    A. No one was, I don't think.
6    Q. Said you don't think.  Do you know for sure
7  whether anybody was teaching a film course?
8    A. I'm pretty sure.  I don't -- when I -- when
9  this happened, no film class was being taught.
10    Q. Was Ms. Tolliver teaching Technology in the
11  Arts or Advanced Technology in the Arts at that time?
12    A. I don't recall.
13    Q. Do you recall whether film was part of Ms.
14  Tolliver's curriculum in either of those -- of those
15  courses?
16    A. At the time there, I do not believe she was
17  teaching a technology class and subsequent to that
18  perhaps Technology in the Studio Arts became a course
19  if we look at that --
20    Q. Now, I thought you --
21    A. -- more closely.
22    Q. I thought you said earlier you didn't know

Page 351

1  whether Ms. Tolliver was teaching Technology in the
2  Arts or Advanced Technology in the Arts at that time in
3  1996-97, whatever?
4    A. And what refreshed my memory is that it was
5  Laura Tolliver and Debbie Haynes and me I was teaching
6  two photo classes.  Laura Tolliver was teaching two
7  photo classes and Laura Tolliver was teaching a --
8  teaching a -- I think it was ceramics.
9    Q. Is a photo class the same as a film class?
10    A. No.  It's a black and white photography
11  class.
12    Q. Okay.  When did you start teaching film class
13  at GDS?
14    A. I would have started to teach a film class
15  this fall, '05-06.
16    Q. So, back in the 1990s, you were not teaching a
17  film class; is that right?
18    A. No.  No.
19    Q. And do you regard this decision about the Film
20  Club by Ms. Haynes and Ms. Tolliver to be an example of
21  racial hostility in the work environment at GDS from
22  your vantage point?

Page 352

1    A. Yes.
2    Q. And what is your reason for thinking that the
3  decision about the Film Club was based on racial
4  prejudice toward you?
5    A. The Film Club would have brought an
6  opportunity for a new and exciting venue at GDS high
7  school, and I would have been the one to help to
8  spearhead it, along with the children.  And as with --
9    Q. And so how does that lead you to thinking
10  that --
11    MR. RACIN:  She hadn't finished,
12  counsel.
13  BY MR. WILLIAMSON:
14    Q. Well, why don't you go ahead and finish.
15    A. And as with other incidents where my work was
16  diminished, where programs where I would be able to do
17  something that is highly on the community and the
18  courses, Laura and Debbie wanted to have that for
19  themselves and that I would not do it.
20    Q. Would you take a look at paragraph 10 in
21  Exhibit 13, please.
22    A. Yes.

Page 353

1    Q. Do you see there where you say that Ms.
2  Tolliver had some problems getting enough students to
3  sign up for the film class she had created to teach the
4  next year; is that right?
5    A. Yes.  I believe if it were not fully labeled
6  Film Class, it would be labeled Technology in the
7  Studio Arts.
8    Q. Okay.  Now, when you say the next year, what
9  school year are you referring to?
10    A. Oh, gosh.  Would it be 2000-2001 or '99-2000.
11  My memory is not perfect on this.  I can look at my --
12  and find it in some other place probably, and you
13  probably have that.
14    Q. Well, could you let us know -- well, can you
15  let us know when you find that what year you're
16  referring to, or ask your counsel to communicate that?
17    A. Okay.  Would you write that down?
18    Q. Now, did you regard Ms. Tolliver's asking your
19  assistance and encouraging students to enroll in that
20  class as an example of racial harassment at GDS toward
21  you?
22    A. Repeat the question, please.

89  (Pages 350 to 353)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

## Sharon Killian

Page 354

1 Q. Did you regard Ms. Tolliver's asking your
2 assistance and encouraging students to enroll in that
3 class as an example of racial harassment at GDS toward
4 you?
5 A. No.
6 Q. Okay. Would it be fair to say then this is an
7 item in this document that actually does not refer to
8 racial harassment?
9 A. No.
10 Q. So, you think this is still an item that does
11 refer to racial harassment, that is, numbered paragraph
12 10?
13 A. It is a continuum of is what I'm saying.
14 It's a continuum of. You asked me if this is an item.
15 Q. This is on the continuum of racial harassment?
16 A. Let me reread the item, please.
17 Q. Sure.
18 A. And try to think about your question.
19 Q. Did you want me to restate the question?
20 A. No, I think I can recall it. The first part
21 of this where "Debbie Haynes and Laura Tolliver
22 promptly created a film class for Tolliver to teach the

Page 355

1 next year" is part of the -- I would definitely
2 consider iteration harassment.
3 Q. Here's my question. Did you regard Ms.
4 Tolliver's asking your assistance in encouraging
5 students to enroll in --
6 A. Okay.
7 Q. -- the film class that she had created as an
8 example of racial harassment at GDS toward you?
9 A. Thank you for your clarification to that
10 because I kept reading the first sentence along with
11 the rest of it. Her asking me to help her fill the
12 class, I could see as a need by another teacher and
13 because I'm more concerned about the success of the
14 students and the experience of the students, I will
15 help you fill the class. However, Debbie Haynes and
16 Laura Tolliver promptly created a film -- quote,
17 unquote film class for Tolliver to teach the next year
18 is I would say part of the continuum of racial
19 harassment.
20 Q. And what's your basis for saying that was
21 racial harassment?
22 A. As with Debbie Haynes and Laura Tolliver doing

Page 356

1 the Film Club and not allowing me to do the Film Club,
2 for the very same reason.
3 Q. I'm sorry. What did you just say?
4 A. You asked me what was the basis for?
5 Q. Right.
6 A. It's the same reasons I believe that I stated
7 regarding Debbie Haynes and Laura Tolliver telling me
8 that I could not do that Film Club. Rather that they
9 would do it or Laura would do it.
10 Q. And at that time, had you submitted any
11 proposal to teach a film class at that time?
12 A. I don't recall that I did that, no.
13 Q. Did you ever submit a proposal to teach a film
14 class?
15 A. I don't recall that I did that.
16 MR. WILLIAMSON: Counsel, I think we're
17 close to seven hours for today, and the witness has
18 been very patient and we don't want to put her under
19 undue strain. However, for the record, I want to point
20 out, of course, you and I have had correspondence about
21 our request that there be a second day of deposition
22 of Ms. Killian.

Page 357

1 You indicated that you were not willing
2 to make her available for a second day at this time,
3 and we advise that if we aren't able to work it out
4 between counsel, then we will file a motion to request
5 a second day of deposition.
6 We're approximately a half or about a
7 little more than halfway through the outline that had
8 been prepared based on the documents that we had been
9 provided. So we think we're going to be able to show
10 a substantial need for a second day, but at this point
11 I think it may be in everybody's best interest to -- to
12 terminate the deposition today.
13 MR. RACIN: Well, against the event that
14 there is no second day and this concludes the
15 deposition, I would like a very brief cross-examination
16 on the one item I mentioned.
17 MR. WILLIAMSON: It's easy to insure
18 that you can have a second day of examination. All
19 you have to do is consent to our request, but if you
20 want to use the time now to do your cross you can, you
21 know, we won't object to it.
22 MR. RACIN: I just have one question at

90 (Pages 354 to 357)

## Sharon Killian

Page 358

1  this juncture.
2           MR. WILLIAMSON:  Fine.
3           MR. RACIN:  Well, one, one inquiry,
4  really.
5     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
6  BY MR. RACIN:
7     Q.  You mentioned several times the episode -- you
8  made several references in your testimony to the
9  episode involving Nick Ryan in which he bent low to the
10  ground.  (Ringing).  Excuse me.  Let me turn this off.
11        And I'm going to ask you for the record to
12  describe more about that, but first, what did you --
13  tell us more about the encounter with Nick Ryan.  What
14  did you go to him for?
15     A.  I had gone to him to talk about the names of
16  courses that were going to be offered the following
17  year.
18     Q.  Where was he at the time?
19     A.  He was in his office.
20     Q.  And --
21     A.  In the art studio office.
22     Q.  Behind a desk?

Page 359

1     A.  Sitting at his desk.
2     Q.  And what did you do to initiate the
3  conversation?
4     A.  I walked into the room and I asked Nick if I
5  could talk with him about something, and he said yeah.
6  And I started to talk with him about the name of a
7  course, a graphic design course.
8     Q.  Did you remain standing?
9     A.  I actually sat down in my chair, and we were
10  facing each other almost as like this.
11     Q.  What did you say?
12     A.  And I --
13     Q.  As best you recall it now.
14     A.  Yes.  I said, "Nick, I'd like to talk with you
15  about the graphic design course that is now named and
16  formerly Technology For the Studio Arts and the new
17  course that was recently approved called Graphic Design
18  and Publishing and I wondered first doesn't that seem
19  to be redundant?"  And -- and, you know, when did
20  this -- I didn't realize that we had a graphic design
21  course on the curriculum.  And he immediately looked
22  at me and Laura Tolliver was in the room at the time.

Page 360

1  And he --
2     Q.  Did he say, first of all?
3     A.  -- sat like this.  He said, I can't --
4  "Sharon, I can't bend low enough to the ground to
5  understand you."  (Indicating).
6     Q.  Was that the first thing he said to you?
7     A.  Yes.
8     Q.  And what was the level of his voice?  Was he
9  yelling?  Was he talking in normal tone?
10     A.  He was talking fairly loudly and very -- with
11  expressiveness.
12     Q.  And describe for the record, remember that
13  folks may be reading this deposition.
14     A.  Yes.
15     Q.  Describe for the record what he did.
16     A.  He moved forward in his chair, bent low over
17  his knees or between his knees with his arms
18  outstretched in a scooping motion towards his head as
19  he said that.  (Indicating).
20     Q.  And how did you interpret that?
21     A.  I can't bend.
22     Q.  How did you interpret that movement?

Page 361

1     A.  I -- the only thing I could think of is, is he
2  is he calling me an ape?  He said -- and I said to
3  him, "You just said I can't bend low enough to the
4  ground to understand you?"  And I repeated that and
5  then I -- I left the room and went downstairs.
6     Q.  Now, when you say he made a scooping motion?
7     A.  Yes.
8     Q.  Did he come up towards his sides as he --
9     A.  Yes.
10     Q.  -- scooped?
11     A.  Yes, he did.
12           MR. WILLIAMSON:  Objection, leading.
13           MR. RACIN:  This is cross.
14        No further questions.
15        THE WITNESS:  Thank you.
16           MR. WILLIAMSON:  We have nothing further
17  at this time.  Just reserve our right to seek a second
18  day of deposition of Ms. Killian.
19           THE VIDEOGRAPHER:  Going off the record
20  at 7:24:16.  End of the deposition.  End of tape 4.
21        (Thereupon, at 7:22 p.m., signature
22  having not been waived, the deposition in the

91  (Pages 358 to 361)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

# Sharon Killian

Page 362

1  above-entitled matter concluded.)
2
3            *    *    *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 364

1            CERTIFICATE OF NOTARY PUBLIC
2      I, Denise Dobner Vickery, the officer before whom
3  the foregoing deposition was taken, do hereby certify
4  that the witness whose testimony appears in the
5  foregoing deposition was duly sworn by me; that the
6  testimony of said witness was taken by me in stenotypy
7  and thereafter reduced to typewriting under my
8  direction; that said deposition is a true record of the
9  testimony given by said witness; that I am neither
10  counsel for, related to, nor employed by any of the
11  parties to the action in which this deposition was
12  taken; and, further, that I am not a relative or
13  employee of any attorney or counsel employed by the
14  parties hereto, nor financially or otherwise interested
15  in the outcome of this action.
16
17
18            Notary Public in and for the
               District of Columbia
19
20
21  My Commission expires:
      February 1, 2008
22

Page 363

1
2
3
4
5      ACKNOWLEDGMENT OF DEPONENT
6
7      I, SHARON KILLIAN, do hereby acknowledge I have
8  read and examined the foregoing pages of testimony, and
9  the same is a true, correct and complete transcription
10  of the testimony given by me, and any changes and/or
11  corrections, if any, appear in the attached errata
12  sheet signed by me.
13
14
15
16  Date            SHARON KILLIAN
17
18
19
20
21
22

Page 365

1
      John Racin, Esq.
2  Law Offices
   1721 Lamont Street NW
3  Washington, DC  20010
4
   Re:  SHARON KILLIAN V. GEORGETOWN DAY SCHOOL
5      DEPOSITION OF:  SHARON KILLIAN
6  Dear MR. RACIN:
7  Enclosed for review is your copy of the above
   referenced deposition.  Please have the deponent read
8  the copy of the transcript and sign the enclosed
   certificate of deponent.  Also enclosed is an errata
9  sheet which the deponent should use to note corrections
   and the reasons for such corrections.  This and any
10  additional errata sheets should be signed and dated by
    the deponent.
11
    The deponent has thirty days in which to read and sign
12  the transcript.  After the deponent has reviewed the
    copy of the transcript, please return the certificate
13  of deponent and any errata sheets to 1020 19th Street,
    N.W., Suite 620, Washington, D.C. 20036.
14
    Sincerely,
15
16
17
    Denise Dobner Vickery, RMR-CRR
18
19
20
21
22

92  (Pages 362 to 365)

d22d6e2d-a955-4b8c-ae04-386a3bc19feb

Sharon Killian

Page 366

1   ESQUIRE DEPOSITION SERVICES
    1020 19TH STREET, NORTHWEST
2   SUITE 620
    WASHINGTON, D.C.  20036
3         ERRATA SHEET
    Case Name:  SHARON KILLIAN V. GEORGETOWN DAY SCHOOL
4   Witness Name:  SHARON KILLIAN
    Deposition Date:  March 27, 2006
5   Job No.:  173644
6   Page No.  Line No.   Change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
         Signature                Date
22

93 (Page 366)

Esquire Deposition Services
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

Sharon Killian

Page 367

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


SHARON KILLIAN,                )

          Plaintiff,           )

               v.              )  Case No:

GEORGETOWN DAY SCHOOL,         )  1:05CV01925

          Defendant.           )

          - - - - - - - - - - -



     VIDEOTAPED DEPOSITION OF SHARON KILLIAN

               VOLUME II

          Wednesday, May 17, 2006




     Reported by:  Lori G. Mackenzie, RPR

     Job No:  174674


ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

Page 368

```
 1        The continued videotaped deposition
 2  of SHARON KILLIAN was convened on Wednesday, May
 3  17, 2006, commencing at 9:55 a.m., at the offices
 4  of Covington & Burling, 1201 Pennsylvania Avenue,
 5  N.W., Washington, D.C., before Lori Goodin
 6  Mackenzie, Registered Professional Reporter,
 7  Realtime Reporter, and Notary Public for the
 8  District of Columbia.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 370

```
 1              CONTENTS
 2  EXAMINATION BY                    PAGE
 3  Mr. Williamson              374
 4              EXHIBITS
 5  NO.     DESCRIPTION              PAGE
 6  33    E-mail dated December 10, 2003
 7        regarding course proposal for
 8        Ms. Killian from Paul Levy        420
 9  35    2004/2005 High School Graduation
10        Requirements              451
11  36    GDS High School Course of Study
12        for 2003/2004             447
13  39    Talking Points for Carin Pass
14        Meeting, 8/30/04          463
15  40    E-mail dated May 11, 2004        492
16  42    E-mail regarding Silla and Art to
17        Ted at Kron and Peggy     511
18  43    E-mail regarding Tuffer Toragus
19        Dated February 27, 2004   514
20  48    E-mail message from Nick Ryan dated
21        June 9th, 2004            608
22
```

Page 369

```
 1            APPEARANCES
 2
 3  For Plaintiff:
 4     JOHN P. RACIN, Esquire
 5     Law Offices of John P. Racin, LLP
 6     1721 Lamont Street, N.W.
 7     Washington, D.C. 20010
 8     202-265-2516
 9     202-483-7895 (fax)
10     awjrlaw@erols.com
11
12  For Defendant:
13     THOMAS S. WILLIAMSON, JR., Esquire
14     TIMOTHY R. CLINTON, Esquire
15     Covington & Burling
16     1201 Pennsylvania Avenue, N.W.
17     Washington, D.C.  20004
18     202-662-5438
19     202-778-5438 (fax)
20     twilliamson@cov.com
21     tclinton@cov.com
22  Also present:  Steven Shaw, Videographer
```

Page 371

```
 1         EXHIBITS (Continued)
 2  NO.     DESCRIPTION              PAGE
 3  50    E-mail dated September 9, 2005
 4        regarding independent study for
 5        Sophia Maravel            650
 6  51    E-mail message regarding health
 7        issues from Sharon Killian     650
 8  52    E-mail dated March 31, 2004 from
 9        Sharon Killian to Mari Anna Richards 700
10  53    Long-term disability claim
11        Statement dated November 18, 2005   653
12  55    Consent Motion for Relief to File
13        First Amended Complaint     718
14  57    E-mail dated April 1st, 2005, Course
15        Assignments for 2005/2006 for Laura
16        Tolliver and Sharon Killian     498
17  60    E-mail message to Kevin Barr from
18        Sharon Killian regarding course
19        proposal dated December 17, 2003   424
20  61    E-mail message from Kevin Barr
21        dated January 20, 2004    427
22
```

2 (Pages 368 to 371)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 372

1           EXHIBITS (Continued)
2    NO.    DESCRIPTION                    PAGE
3    62     Georgetown High School layout or
4           floor plan for the third floor     727
5    63     Clearer copy of Exhibit 70 e-mail   587
6    65     Agreement between Georgetown Day
7           School, Inc. And Sharon Killian
8           For the School Year 2004/2005 dated
9           10/26/04                        379
10   66     E-mail message dated regarding AP
11          Independent Study for Sophia Maravel
12          dated August 23rd, 2005         644
13   67     E-mail message dated August 23, 2005
14          regarding Zak Velazquez         646
15   69     E-mail dated October 29, 2003
16          regarding course proposal for
17          Ms. Killian from Paul Levy      418
18   70     E-mail dated August 27th        587
19
20   (Exhibits attached to transcript.)
21
22

Page 373

1             PROCEEDINGS
2         THE VIDEOGRAPHER:  Good morning.
3    Here begins Videotape Number 1 in the deposition
4    of Sharon Killian, in the matter of Sharon
5    Killian versus Georgetown Day School, in the
6    United States District Court for the District of
7    Columbia, Case Number which is 1:05CV01925.
8         Today's date is May 17th, 2006, and
9    the time is 9:55.
10        The deposition is taking place at
11   Covington & Burling at 2101 Pennsylvania Avenue,
12   Northwest, Washington, D.C., and was made at the
13   request of Thomas S. Williamson, Jr. of the law
14   offices of Covington & Burling.
15        The videographer is Steve Shaw, here
16   on behalf of Esquire Deposition Services.
17        Would counsel and all present please
18   identify yourself and state whom you represent.
19        MR. WILLIAMSON:  Tom Williamson,
20   Covington & Burling, representing the defendant,
21   Georgetown Day School.
22        MR. CLINTON:  Tim Clinton, Covington

Page 374

1    & Burling, and I represent Georgetown Day School
2    as well.
3         MR. RACIN:  John Racin for Sharon
4    Killian, the plaintiff in the matter.
5         THE VIDEOGRAPHER:  Will the court
6    reporter please swear in the witness.
7         MR. RACIN:  Actually, this is a
8    resumption of the deposition, the witness has
9    been sworn.  But, I have no objection to --
10        MR. WILLIAMSON:  We would prefer
11   that she be sworn in.
12        SHARON KILLIAN,
13   a witness called for examination, having been
14   first duly sworn, was examined and testified
15   further as follows:
16      EXAMINATION BY COUNSEL FOR DEFENDANT
17      BY MR. WILLIAMSON:
18      Q.  As counsel for the plaintiff
19   mentioned, this is a continuation of a deposition
20   that was started on March 27th, this year, as the
21   first day.
22        Before we get into more substantive

Page 375

1    issues, Ms. Killian, I'd like to note, for the
2    record, that the last time we met, starting your
3    deposition, Mr. Racin said on the record that
4    notice is the essence of due process, and we
5    didn't get any as to the videotape deposition,
6    notice doesn't mention the video.
7         And I'd like to know if your counsel
8    would be willing to retract that statement and
9    stipulate that GDS did, in fact, provide notice
10   that the deposition would be recorded by
11   stenographic and/or videographic means.
12        MR. RACIN:  We will stipulate
13   absolutely that that was something that the kids
14   would call "my bad."
15        And as our president might say, I
16   misremembered, and I apologize for the record.
17        MR. WILLIAMSON:  That's fine.  We
18   just wanted to clarify that on the record.
19   BY MR. WILLIAMSON:
20      Q.   Now, I'd like to ask you to take a
21   look at a document that has already been marked
22   as Exhibit 13, that we had spent a considerable

                              3  (Pages 372 to 375)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 376

1  amount of time talking about at the first day of
2  the deposition, and I've got some more questions
3  related to that.
4      A.   Okay.
5      Q.   Since we've already identified this
6  document, I'm not going to ask you to identify it
7  again, but do you remember that this is a
8  document we looked at --
9      A.   Yes.
10     Q.   -- at your previous deposition.  And
11 that is a letter to Peter Branch that was dated
12 March 12th, 2004.
13     A.   Yes.
14     Q.   Okay.  I'd like to ask you to turn
15 to Paragraph 11, which is on the page that's
16 Bates numbered 2635, down in the lower right-hand
17 corner.
18     A.   Yes.
19     Q.   And do you see where it says there
20 that "Three years ago, Paul said that he would
21 look into getting funding from a parent to do
22 more with the magazines such as was done was done

Page 377

1  for Grasslands.
2          "Although he put that on the table,
3  my ideas to follow through with that were not
4  taken.  The art magazine still functions as a
5  club burning funding from the SSC.  I received no
6  compensation for the art magazine."
7          Now, is what you're describing in
8  numbered Paragraph 11, in your view, an example
9  of racial hostility towards you at GDS?
10     A.   I don't know.
11     Q.   When you say that you made this
12 proposal -- well, what is it, is there something
13 else that you would need to look at or to recall
14 in order to know?
15     A.   No.  I just don't know.
16     Q.   Okay.  Now, when you say that you
17 made this proposal three years ago, approximately
18 what date were you talking about?
19     A.   If this were 2004, then I would say
20 that it must have been somewhere around 2001.
21     Q.   Okay.  And do you know whether there
22 were teachers at GDS who supervised student extra

Page 378

1  curricular activities who did not receive a
2  stipend for supervising of those activities?
3      A.   What kind of activities?  Can you be
4  specific?
5      Q.   It would be clubs or magazine types
6  of activities, or student clubs relating to some
7  special interest that students might have.
8      A.   I'm not sure.  I'm not sure.
9      Q.   Okay.  Isn't it true that, generally
10 speaking, teachers at GDS, when you were there,
11 were expected to teach four classes, advise
12 students, and supervise one activity without
13 receiving any additional compensation beyond
14 their salary?
15     A.   I believe that is, I believe that's
16 true.
17     Q.   Isn't it true that in 2004/2005, you
18 received a stipend for supervising the GDS
19 yearbook.
20     A.   Yes.
21     Q.   How much was that stipend?
22     A.   I don't recall exactly.  It was

Page 379

1  $5,000 plus something.
2      Q.   And let me ask you to take a look at
3  a document that's been marked as Exhibit 65, and
4  see if that refreshes your recollection of what
5  the exact figure was.
6          (Killian Exhibit Number 65
7              marked for identification.)
8  BY MR. WILLIAMSON:
9      Q.   Have you had a chance to take a look
10 at Exhibit 65?
11     A.   Yes.
12     Q.   Can you tell us what that is?
13     A.   Agreement between Georgetown Day
14 School, Inc. and Sharon Killian for the School
15 Year 2004/2005.
16     Q.   And what's the date of that
17 document?
18     A.   10/26/04 it's dated.
19     Q.   And who is the, who's sending -- did
20 you say it was from Peter Branch?
21     A.   This -- the signature looks like it
22 is Kevin Barr, I think, if you --

4  (Pages 376 to 379)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 380

1    Q.   Is he the director of studies, is
2   that who Kevin Barr is?
3        A.   Uh-huh -- was.
4        Q.   Or was as that time.  And who else's
5   signature is on there?
6        A.   Sharon Killian, teacher, that's my
7   signature.
8        Q.   And what does the document indicate?
9        A.   It reads: "You are assigned to be a
10  faculty sponsor of the yearbook.  The position
11  carries a stipend of $5,419.  You would be paid
12  in four quarterly installments, October 15th,
13  December 30th, March 15th and May 30th."
14       Q.   That gives us a sense of what's in
15  it.
16            Do you know if there was any other
17  teacher at GDS, while you were employed there,
18  who received a larger stipend in 2004/2005 for
19  supervising extracurricular activities?
20            Let me start that question again.
21            Do you know if there was any teacher
22  who received a larger stipend in December of 2004 than

Page 381

1   the stipend that you received for supervising the
2   yearbook.
3        A.   No.
4        Q.   I want to clarify that.  Are you
5   saying there was not another teacher who did?
6        A.   I don't know.
7        Q.   You don't know.  Now, I would like
8   you to turn to numbered Paragraphs 12, 13 and 14
9   of Exhibit 13.
10            Take a moment to look at those,
11  please.  Just let me know when you've finished
12  looking at those paragraphs.
13       A.   I have read 12, 13 and 14.
14       Q.   Okay.  And who was Susie Ryan?
15       A.   Susie Ryan is the, I believe her
16  title was alumni director.
17       Q.   And what was it that Susie Ryan was
18  calling you about in December of 2003?
19       A.   She was interested in publishing
20  alumni art.
21       Q.   And did you actually speak to her
22  and agree to meet sometime in January to talk to

Page 382

1   her about plans to have alumni artwork included
2   in the art magazine?
3        A.   Yes.  We talked.
4        Q.   When you say publishing art, where
5   would that have been, when you said publishing
6   alumni art, where would that have been published?
7        A.   In the art magazine.
8        Q.   Is that a GDS magazine?
9        A.   Yes.
10       Q.   Now, would you take a look at
11  Paragraph 14 of Exhibit 13.
12            And in the second sentence, do you
13  see where it says that "Susie Ryan left messages
14  on my school phone wanting to meet.  She did not
15  call me at home, but did call Nick Ryan to
16  discover my whereabouts."
17            Why did she call Nick Ryan to
18  discover your whereabouts?
19       A.   I can speculate that since he was in
20  the department that I worked, he was my
21  chairperson, that she could maybe see whether he
22  knew where I was.

Page 383

1        Q.   And do you know whether, in January
2   of 2004, Ms. Ryan spoke to anybody else at GDS
3   about trying to contact you, besides Mr. Ryan?
4        A.   I don't know.
5        Q.   And why was it that you were
6   unavailable to take Ms. Ryan's call when she
7   called your school number?
8        A.   14 says I had been out of school
9   sick for two days.
10       Q.   And when you said Paragraph 14 says
11  that, is that accurate?
12       A.   I would say that, yes.
13       Q.   Okay.  Now, in Paragraph 14, you
14  said that Ms. Ryan left a message on your school
15  phone wanting to meet.
16            Do you remember about what date she
17  left that message?
18       A.   No.
19       Q.   Can you give an approximation?
20       A.   Not -- no, I can't.
21       Q.   Would it have been sometime in early
22  January?

5  (Pages 380 to 383)

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

Page 384

1    A.    It would have been sometime, I would
2  say around MLK Day and a snow day and so on.  I'd
3  have to look at calendars and so on.
4    Q.    What is MLK Day?
5    A.    Martin Luther King holiday.
6    Q.    And is that in January?
7    A.    Yes.
8    Q.    About middle January?
9    A.    Yes.
10    Q.    Did you ever return the message that
11  Ms. Ryan left on your school phone?
12    A.    Yes.
13    Q.    When did you return that message?
14    A.    As soon as I got the message off the
15  machine when I got back to work.
16    Q.    Do you remember about when that was?
17    A.    Again, I would have to look at the
18  calendar to give you an exact date, but, I did
19  call her.
20    Q.    And so you had a -- does that mean
21  you had a communication with Ms. Ryan between the
22  time she left the message on your school phone

Page 385

1  and the time of the actual meeting at GDS that
2  she was trying to arrange?
3    A.    No.  Repeat that question for me,
4  please.  Ask me that again.
5    Q.    Did you have a communication with
6  Ms. Ryan between the time she left the message on
7  your school phone and the time of the actual
8  meeting at GDS that she was trying to arrange?
9    A.    The day that I recalled her, the day
10  that I called her is the day that she actually
11  had set up a meeting to meet with Ryan, I guess.
12    Q.    So, and was that the day that you
13  came back to school or the day after you came
14  become to school?
15    A.    I don't recall exactly.  Again, I
16  would have to look at a calendar.
17    Q.    Does looking at these paragraphs in
18  Exhibit 13 refresh your recollection at all about
19  that?
20    A.    May I then read?
21    Q.    Yes.  Why don't you take a look at
22  those.

Page 386

1    A.    It says in Paragraph 15 the day
2  after I returned to school.
3    Q.    So, what, does that mean you called
4  her the day after you returned to school, or the
5  day that you returned to school?
6    A.    It says the day after I returned to
7  school.  I can only assume that maybe I meant the
8  day after I returned to school.
9         And, again, it would be more,
10  probably more clear if I were able to look at
11  phone records and so on.  I don't have access to
12  that stuff.
13         But, the day after I returned to
14  school.  I can only assume I meant that.
15    Q.    You meant that's when you spoke to
16  her?
17    A.    Uh-huh.
18    Q.    And while you were out sick, were
19  you able to gain access to your school phone
20  messages by calling from your home number?
21    A.    Yes.  One can access phone messages.
22  So, while you're not at school.

Page 387

1    Q.    And was that -- well, just one thing
2  I wanted to ask.
3         Another thing I wanted to ask is did
4  you make any effort to gain access to your school
5  phone messages while you were sick at home in
6  January?
7    A.    I don't believe I did.  You would
8  have to look at the phone records to see whether
9  I did that or not.  But, I don't believe I did.
10    Q.    Okay.  Was the only communication
11  that you had with Ms. Ryan, between the time that
12  she left a message on your school phone and the
13  time of the meeting she was trying to arrange,
14  the discussion you had with her the day after you
15  got back to school?
16    A.    I believe so.
17    Q.    Now, when you spoke to Susie Ryan,
18  or take a look at numbered Paragraph 15 of
19  Exhibit 13.
20    A.    Uh-huh.
21    Q.    Do you see where it says you've
22  contacted Susie to say that you had been out

6  (Pages 384 to 387)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

| Page 388 |
|---|
| 1 sick. |
| 2    A.    Yes. |
| 3    Q.    When you contacted Susie Ryan to let |
| 4 her know that you were sick, what did she say to |
| 5 you? |
| 6    A.    She told me not to worry, never |
| 7 mind, she had already spoken with Nick Ryan, and |
| 8 that she and he had set the date to meet. |
| 9    Q.    Okay.  And that was to meet, to do |
| 10 what? |
| 11    A.    To talk about including alumni art |
| 12 in the art magazine, I believe. |
| 13    Q.    Do you know who was supposed to |
| 14 attend that meeting? |
| 15    A.    I didn't know who was supposed to be |
| 16 attending that meeting. |
| 17    Q.    Did she tell you who was going to |
| 18 attend the meeting? |
| 19    A.    She told me during that phone call |
| 20 that she was meeting with Nick Ryan. |
| 21    Q.    Did she say she was meeting with |
| 22 anybody else, along with Nick Ryan? |

| Page 389 |
|---|
| 1    A.    I believe that she was meeting, she |
| 2 was going to see Nick Ryan and Laura Tolliver. |
| 3    Q.    Do you recall whether there was any |
| 4 alumni person who was going to come to the |
| 5 meeting? |
| 6    A.    I believe she told me that Rebecca |
| 7 Drobis would be coming to that meeting to see |
| 8 Nick Ryan and Laura Tolliver. |
| 9    Q.    And who is Rebecca Drobis? |
| 10    A.    She's an alum. |
| 11    Q.    When you say alum, do you mean an |
| 12 alum of Georgetown Day School? |
| 13    A.    Yes. |
| 14    Q.    And you said she had already set a |
| 15 date for the meeting; is that right? |
| 16    A.    She?  Meaning -- |
| 17    Q.    She meaning Ms. Ryan, Susie Ryan. |
| 18    A.    Yes.  15 said she told me not to |
| 19 worry, never mind she had already spoken with |
| 20 Nick Ryan and that she had set a date to meet. |
| 21    Q.    Did she, or did you ask her what the |
| 22 date was of the meeting? |

| Page 390 |
|---|
| 1    A.    She told me during that call that |
| 2 she was meeting on that actual day. |
| 3    Q.    Okay.  And that's the same day that |
| 4 you had informed her that you had been out sick; |
| 5 is that right? |
| 6    A.    Yes. |
| 7    Q.    So, the meeting occurred after you |
| 8 had returned to school and started work; is that |
| 9 right? |
| 10    A.    Yes. |
| 11    Q.    And you were informed of the time of |
| 12 the meeting prior to when the meeting took place; |
| 13 is that right? |
| 14    A.    I don't exactly recall what time |
| 15 that meeting was that day.  But, it was sometime |
| 16 after that call. |
| 17    Q.    So, is the answer to the question |
| 18 yes or no? |
| 19    A.    Repeat the question. |
| 20    Q.    You were informed of the meeting at |
| 21 school with, that Ms. Ryan had arranged prior to |
| 22 the time when the meeting took place. |

| Page 391 |
|---|
| 1    A.    Yes.  I'd say yes to that. |
| 2    Q.    Do you remember when the meeting |
| 3 actually did take place that day? |
| 4    A.    I'd have to look at the notes.  So, |
| 5 may I? |
| 6    Q.    Sure. |
| 7    A.    I haven't noted in here the actual |
| 8 time of the meeting that day, whether it was the |
| 9 morning or the afternoon. |
| 10    Q.    Do you remember whether it was |
| 11 around lunchtime? |
| 12    A.    I couldn't be specific about exactly |
| 13 what time that was -- |
| 14    Q.    Since you were informed -- I'm sorry |
| 15 were you going to say something? |
| 16    A.    -- that day. |
| 17    Q.    Since you were informed of the |
| 18 meeting before it actually took place, you had an |
| 19 opportunity to go ahead and attend the meeting, |
| 20 didn't you? |
| 21    A.    It actually turns out I wasn't |
| 22 invited to the meeting.  The meeting was between |

7  (Pages 388 to 391)

## Sharon Killian

Page 392

1  Laura Tolliver, Nick Ryan, Rebecca Drobis and
2  Susie Ryan.
3      Q.  Did you ask anyone if you could
4  attend the meeting?
5      A.  No.
6      Q.  Did anybody say that you were
7  prohibited from attending the meeting?
8      A.  Nobody talked to me about the
9  meeting except for what I just stated.
10     Q.  Except for what you just stated.
11     A.  No one said you cannot come to this
12  meeting.
13     Q.  Now, would you take a look at
14  Paragraph 17 of Exhibit 13.
15     A.  Yes.
16     Q.  Do you see where it says that "Nick
17  Ryan, Susie Ryan and Lori Tolliver have not
18  subsequently said a word to me about that
19  meeting."
20     A.  Yes.
21     Q.  Have you asked Nick Ryan, Susie, or
22  did you ever ask Nick Ryan, Susie Ryan or Lori

Page 393

1  Tolliver anything about the meeting in January of
2  2004?
3      A.  I spoke with Susie Ryan
4  subsequently, I think.
5      Q.  What was discussed in that
6  conversation?
7      A.  I called her.
8      Q.  You called her?
9      A.  I called her and --
10     Q.  What did you say to her?
11     A.  That I was not told about, that she
12  tried to call me, or that she wanted to talk with
13  me about that meeting about the art magazine.
14     Q.  Did you ask her anything about what
15  happened during the meeting?
16     A.  Nope.  No, I did not.
17     Q.  Did you have any interest in knowing
18  what happened at the meeting?
19     A.  No.  I did not.
20     Q.  Now, do you regard the arrangements
21  that were made for Susie Ryan -- let me step
22  back.

Page 394

1          Originally Susie Ryan had been
2  calling to try to get ahold of you to attend the
3  meeting; isn't that right?
4      A.  I don't know.  I don't know.
5      Q.  Well, what was the -- in your notes
6  that you wrote in Exhibit 13, didn't you say that
7  Susie Ryan had left a message with you to talk
8  about getting alumni involved, more involved with
9  the art magazine?
10     A.  Yes.
11     Q.  Is it still your testimony that you
12  don't know whether Susie Ryan was calling to try
13  to meet with you?
14     A.  You said a meeting, or the meeting,
15  and who's to know whether this would have
16  happened then or not.  I don't know whether she
17  was calling to set up a meeting date with me or
18  not.
19          So, yes, I know that she was trying
20  to call me about, to talk about the art magazine
21  and alumni works, but I didn't know about the
22  meeting --

Page 395

1      Q.  Thank you.
2      A.  -- in those phone calls, if I recall
3  correctly.
4      Q.  You didn't know about the meeting
5  because you were home sick; is that right?
6          But you knew about the meeting the
7  day after you got back to school and you spoke to
8  Susie Ryan, right?
9      A.  And knew she had set up the meeting
10  from that call.
11     Q.  And did you ask her at that time
12  whether her earlier message related in any way to
13  the meeting that she had set up with Nick Ryan
14  and Rebecca Drobis?
15     A.  I think I can probably assume that
16  whatever discussions occurred with them, that the
17  result was a meeting with Rebecca Drobis and
18  Susie Ryan and Laura Tolliver and Nick Ryan.
19     Q.  Did you ask Ms. Ryan why she had
20  asked Nick Ryan if he knew your whereabouts?
21     A.  No.  No.  I don't recall that.
22     Q.  Was it your understanding that she

8  (Pages 392 to 395)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 396

1  had asked Nick Ryan where you could be located
2  because she wanted to speak to you about a
3  meeting to discuss having alumni more involved
4  with the art magazine?
5      A.   I think that that would be something
6  you might want to ask Susie Ryan.
7      Q.   No, I'm asking you.  Is that your
8  understanding from the message that you heard on
9  your school phone, and that you refer to in
10 Exhibit 13?
11     A.   There was the message on the school
12 phone.  I don't recall exactly whether she said
13 Rebecca Drobis was here or not.
14         But, I called Susie Ryan because a
15 message was left on my machine that she was
16 seeking, she was trying to find me.
17         And when I called her, she told me
18 that a meeting was already set up with Nick Ryan
19 and Laura Tolliver and Rebecca Drobis.
20     Q.   Now, would you take a look at
21 Paragraph 12 of exhibit of -- excuse me, of
22 Exhibit 13.

Page 397

1      A.   Yes.
2      Q.   Do you see where it says in the last
3  sentence of that paragraph:  "We agreed to meet
4  some time in January to talk about plans to
5  continue to do this, that is, involve alumni with
6  the art magazine on a broader scale."
7      A.   Yes.
8      Q.   Did you ever have a meeting with
9  Susie Ryan to talk about involving alumni with
10 the art magazine on a broader scale?
11     A.   No, we haven't, we didn't have a
12 meeting to discuss that.  No.
13     Q.   And do you know whether the purpose
14 of the meeting that occurred with Nick Ryan
15 and -- what was the name, is it Dorothy Drobis?
16     A.   Rebecca.
17     Q.   Rebecca Drobis was to talk about
18 involving the alumni more broadly with the art
19 magazine?
20     A.   I don't know.  That's specific as
21 opposed to broad to me, when you have an
22 individual -- but, no.

Page 398

1      Q.   Did you ask Ms. Ryan whether that
2  was the purpose of the meeting, that is --
3      A.   No.
4      Q.   Just let me finish the question --
5  that Ms. Drobis attended?
6      A.   No.
7      Q.   Do you regard the arrangements that
8  were made with Susie Ryan at GDS to talk about
9  the art magazine as an example of GDS's racially
10 hostile treatment of you?
11     A.   I don't understand what you're
12 asking me.
13     Q.   You said that Ms. Ryan was trying to
14 make arrangements to meet with you at GDS to talk
15 about involving the alumni more with the art
16 magazine, didn't you say that?
17     A.   I said that Susie Ryan called me in
18 December because she was interested in publishing
19 alumni art.  And you're asking me whether that
20 was a -- an indication of racial hostility?
21     Q.   I'm asking you whether the efforts
22 she made to try to contact you about discussing

Page 399

1  the subject of involving the alumni more broadly
2  with the art magazine, is something that you
3  regard as an example of racially hostile
4  treatment by an employee of GDS?
5      A.   Are you talking about the December
6  calls, or are you talking about the January call?
7      Q.   I'm talking about the December call
8  and the January discussion that you had with
9  Ms. Ryan.
10     A.   No.
11     Q.   And also I'm talking about her
12 efforts to get ahold of you through Mr. Ryan.
13         MR. RACIN:  Well, then I --
14 BY MR. WILLIAMSON:
15     Q.   All of those.
16         MR. RACIN:  -- object to the
17 compound question.  Why don't you break them up
18 into --
19 BY MR. WILLIAMSON:
20     Q.   I'm trying to clarify.  She was
21 asked, what I'm referring to, they're not really
22 separate questions.

9  (Pages 396 to 399)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

| Page 400 | Page 402 |
|---|---|

Page 400

1      It's the combination of the call
2  from Ms. Ryan in December, the efforts by
3  Ms. Ryan to reach you through Mr. Ryan, and the
4  discussion that you had with Ms. Ryan on the day
5  that the meeting took place with Rebecca Drobis.
6      Did you regard that, the combination
7  of events, as evidence of racially hostile
8  treatment of you by an employee of GDS?
9    A.  If you would repeat that, because
10  you mentioned Rebecca Drobis' name just now and
11  it threw me.
12      If you would repeat that, that would
13  be really great.
14    Q.  Sure.  What I'm asking you is
15  whether you regard Susie Ryan's telephone message
16  to you in December, her efforts to reach you
17  through Mr. Ryan, and her discussion with you on
18  the day that the meeting took place with Rebecca
19  Drobis, as evidence of racially hostile treatment
20  of you by a GDS employee?
21    A.  Yes.
22    Q.  And why is that?

Page 401

1    A.  That this -- that the art magazine
2  and -- that the art magazine is an activity that
3  I was working on, not Laura Tolliver or Nick
4  Ryan.
5      And that the development of that
6  program was rested in my lap, as it was my
7  responsibility.
8      And that -- the result of her
9  efforts, my efforts, went to discussing something
10  that I had responsibility for with Nick Ryan and
11  Laura Tolliver, when they had nothing to do with
12  whether the work was done or not.
13    Q.  And you feel that Ms. Ryan did that
14  because she was racially hostile toward you?
15    A.  I don't know.
16    Q.  When you said earlier that you
17  regarded her conduct as an example of racially
18  hostile treatment of you by GDS, were you just
19  speculating about that, or do you know that she
20  was acting based on racial prejudice toward you?
21      MR. RACIN:  Objection.  I think it
22  mischaracterizes the testimony.  That was the

Page 402

1  whole combination of things you referred to,
2  that's the problem with not breaking it up into
3  separate questions.
4      I don't think that was the
5  testimony.
6  BY MR. WILLIAMSON:
7    Q.  Did she --
8      MR. RACIN:  But, you may answer if
9  you can.
10  BY MR. WILLIAMSON:
11    Q.  Can you answer the question?
12    A.  Repeat it please.
13    Q.  Let me ask you this, did Ms. Ryan,
14  in late December of 2003, or January of 2004, say
15  anything to you that you felt indicated that she
16  was racially motivated to be hostile toward you?
17    A.  No.
18    Q.  Would you take a look at
19  Paragraph 18 of Exhibit 13.
20    A.  Yes.
21    Q.  Just give me a moment, while I think
22  about how to phrase this question.

Page 403

1      Did you feel that the meeting that,
2  or the fact that Nick Ryan, the chair of the
3  department, and Laura Tolliver, the other faculty
4  member of the art department, met with Susie Ryan
5  and Rebecca Drobis was an example of racially
6  hostile treatment of you?
7    A.  Specifically to the art magazine?
8    Q.  Just whether their meeting in
9  response to the inquiry that had been made by
10  Susie Ryan, and the arrangements to have Rebecca
11  Drobis come in, do you regard that as an
12  indication of racially hostile treatment of you
13  because Nick Ryan and Laura Tolliver was present
14  at that meeting?
15    A.  Did I not answer that question
16  before?
17    Q.  No.
18    A.  It was a part, that question was
19  part of a question that you asked me before.
20      MR. RACIN:  Let me object.  I'm not
21  sure I understand the question.  Therefore, I
22  can't decide whether an objection was

10  (Pages 400 to 403)

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 404

1  appropriate.
2       Would you mind rephrasing it?  I'm
3  not sure I follow you.
4  BY MR. WILLIAMSON:
5       Q.   I'm not sure I want to rephrase it.
6  I just want to know, let me try and give it to
7  you in pieces.
8       You were aware that Ms. Ryan was
9  trying to work on having broader alumni
10  involvement with the art magazine in late
11  December of 2003, early January of 2004; is that
12  right?
13       A.   I can -- let me clarify it for you.
14  The idea, the original idea is actually an idea
15  of mine.  And I approached Susie Ryan about
16  inclusion of alumni.  But --
17       Q.   So, she was working on following up
18  on your idea; is that right?
19       A.   Yes.
20       Q.   And that was in late December or
21  early January; is that right?
22       A.   Uh-huh.

Page 405

1       Q.   And she left a message for you in
2  late December; is that right, late December of
3  2003?
4       A.   No.
5       Q.   When did she leave a message for you
6  regarding --
7       A.   I was out sick in January.
8       Q.   So, she left a message for you
9  sometime in early January of 2004 about this
10  subject?
11       A.   It said sometime in January.
12       Q.   Okay.  But, you didn't respond to
13  the message because you were out sick; is that
14  right?
15       A.   I was out sick for two days.
16       Q.   And, in the meantime, she tried to
17  contact other members of the art department to
18  talk about broader alumni involvement with the
19  art department; is that right?
20       A.   I don't know.
21       Q.   You didn't say in your notes here
22  that she contacted Nick Ryan to see if he knew

Page 406

1  where you were or how you could be reached?
2       A.   Let me reread this again.  It says
3  in 14: "She did not call me at home, but did
4  call Nick Ryan to discover my whereabouts."
5       Q.   How did you know that?
6       A.   When I contacted Susie to say I was
7  out sick after receiving her message, she told me
8  not to worry, never mind, she had already spoken
9  with Nick Ryan and that she and he had set a date
10  to meet.
11       Q.   In your -- did you think it was
12  inappropriate for Susie Ryan to contact the chair
13  of the art department and the other art
14  department faculty member when she did not
15  receive a response to the message she had left
16  for you in early January?
17       A.   No.
18       Q.   Did you think there was any racial
19  motivation in her reaching out to Mr. Ryan to try
20  to arrange this meeting with Rebecca Drobis to
21  talk about more alumni involvement with the art
22  magazine?

Page 407

1       MR. RACIN:  Objection.  Asked and
2  answered.  You asked if she thought it would be
3  inappropriate.  The answer is no.  How could
4  there be racial motivation involved if it was not
5  inappropriate?
6       You may answer.
7       MR. WILLIAMSON:  Well, counsel, we
8  want testimony from the witness.
9  BY MR. WILLIAMSON:
10       Q.   Do you agree with what your counsel
11  just said?
12       Could you answer that question, do
13  you agree with what your lawyer just said?
14       A.   Yes.
15       Q.   Okay.  Then we can move on to
16  another question.
17       In Paragraph 18, do you see where it
18  says: "I went to the diversity office
19  immediately and told of this without an
20  appointment.
21       "Mari listened and said she would
22  work on this.  I later saw Elizabeth, who said

11  (Pages 404 to 407)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 408

1 that she and Mari will check into my story and
2 provide help to me."
3        When you went to the diversity
4 office, what was it that you said to -- before I
5 ask that, who is Mari?
6    A.   Mari Anna Richards, codirector of
7 diversity.
8    Q.   When you went to the diversity
9 office, what was it you said to Mari about what
10 had happened?
11    A.   The same chain of events as I
12 expressed in the above noted bullets.
13    Q.   Those being Paragraphs 11 through --
14    A.   12 to --
15    Q.   12 through 17?
16    A.   Yes.
17    Q.   And why did you feel it was
18 appropriate to bring this series of events to the
19 attention of the diversity office?
20    A.   I believe that I answered in a
21 previous question, that I thought it was racial
22 hostility.

Page 409

1    Q.   What was racial hostility?
2    A.   May I ask for a reread of my answers
3 back to, maybe five answers ago?
4    Q.   That may be a little tricky to do.
5        Why don't you just tell us, what was
6 the, what was it that you described to Mari and
7 Elizabeth as evidence of racial hostility with
8 respect to this meeting that Susie Ryan arranged
9 to talk about broader involvement of alumni with
10 the art department?
11    A.   To my recollection, that I was, that
12 I was the advisor to the art magazine, that I was
13 in discussions with Susie Ryan, that a meeting
14 was set up without my involvement, or input, and
15 discussion about the art magazine was taking
16 place.
17    Q.   And that meeting was set up by Susie
18 Ryan?
19    A.   I don't know.
20    Q.   You have no idea who set up the
21 meeting?
22    A.   I know that Susie called Nick Ryan,

Page 410

1 but in terms of what you said, set up, I don't
2 know whether Nick Ryan said this date is a date
3 that's good for me, or Susie Ryan said this date
4 is good for me.
5    Q.   When you spoke to Susan Ryan, didn't
6 she inform you that you didn't need to worry
7 about the meeting because she had already made
8 arrangements with Nick Ryan for the meeting?
9    A.   That she and he had set a date to
10 meet.
11    Q.   And haven't you testified previously
12 that you are not aware that Ms. Ryan was racially
13 motivated to set up that meeting?
14    A.   To make phone calls to me to talk
15 about the broadening of alumni.  So, my answer
16 would be no, and I'm a little confused about that
17 right now.
18    Q.   A little confused about what?
19    A.   I believe my answer that you were
20 referring to now was to the question about
21 whether Susie Ryan's calls to me in December and
22 January were racially motivated.

Page 411

1        And my answer to that question was
2 no.
3    Q.   Was her efforts to set up the
4 meeting with Rebecca Drobis racially motivated?
5        MR. RACIN:  I'm going to object at
6 this point.  Come on, counsel, this is the sixth
7 variation of this same question.
8        This is, this is going to be a long
9 day, you know, could we move on?
10        MR. WILLIAMSON:  We want to move on.
11 The witness, I think, gave us a little different
12 version of her answer and I want to clarify what
13 her position is.
14 BY MR. WILLIAMSON:
15    Q.   I want to be sure I understand
16 whether you're saying that Susie Ryan was
17 racially motivated because of racial hostility
18 toward you in setting up the meeting in January
19 of 2004, where you were not included?
20    A.   So, you're saying racially
21 motivated, I don't know.
22    Q.   You don't know?

12  (Pages 408 to 411)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 412

1    A.   If she's racially motivated.
2    Q.   Do you know if she -- is it your
3  understanding that she set up that meeting
4  because she intended to be racially hostile
5  toward you?
6    A.   I don't know.
7    Q.   Now, did Ms. Ryan tell you, when you
8  spoke to her, that she, the meeting was set up at
9  the time it was because that was the only time
10 that Rebecca Drobis was available?
11   A.   Repeat the question.
12   Q.   When you spoke to Ms. Ryan the day
13 after you returned to school in January of 2004,
14 did Ms. Ryan tell you that the meeting was set up
15 at the time and on the date that it was because
16 that was the only time that Rebecca Drobis was
17 available?
18   A.   No.
19   Q.   Did you ask her anything about why
20 it was set up for that time?
21   A.   I don't recall.
22   Q.   Do you remember her telling you any

Page 413

1  reason why it was set for the date, that the
2  date, that was the day after you returned to
3  school?
4    A.   Not during that phone call, no.
5    Q.   Was there some other time when she
6  told you why the meeting was set for that date?
7    A.   In, subsequent to, subsequent to a
8  meeting, my talking to the diversity office, I
9  believe she did tell me that after that.
10   Q.   Tell you what?
11   A.   That there was a, Rebecca was in and
12 out of town.
13   Q.   So, she told you that was the only
14 date she was available?
15   A.   But that was subsequent to all of
16 this.  That was the explanation, subsequent to
17 all of this.
18   Q.   But the explanation was that that
19 was the only date Ms. Drobis was available?
20   A.   Uh-huh.
21   Q.   Can you say yes or no?
22   A.   Subsequent to all of this, including

Page 414

1  talking to the diversity office, I recall that
2  she said to me something about Rebecca not being
3  able to be in town for more than that period.
4    Q.   Was there any follow-up from the
5  diversity office in response to the concerns you
6  had expressed?
7    A.   I -- Mari Richards, Mari in this
8  said, in an informal setting, but, that is there
9  was nothing in writing that I recall, that she
10 said something to Susie Ryan.
11   Q.   Do you know what she said?
12   A.   No, I don't.  I can't tell you
13 exactly what she said, no.
14   Q.   Do you have a general idea of what
15 she said?
16   A.   No.
17   Q.   Do you have any idea of what she
18 said?
19   A.   No.  I would only assume that she
20 expressed what I've already told you.
21   Q.   Okay.  Did that conversation you had with
22 Mari had lead to the conversation you had with

Page 415

1  Susie, where you were informed after these events
2  had occurred that the meeting was set on that
3  date in January, because that was the only day
4  that Rebecca Drobis was available?
5    A.   Yes.
6    Q.   In Paragraph 19 you say, this is
7  Paragraph 19 of Exhibit 13, "I couldn't go to
8  Paul again.  I had done this so many times
9  already to no avail."
10        What did you mean when you said
11 that?
12   A.   That I couldn't go to Paul again, I
13 felt at that time that I couldn't go to Paul
14 again.
15   Q.   Why is it you felt that way -- well,
16 first off, who is Paul?
17   A.   Because I had done it so many times
18 to no avail.
19   Q.   Who is Paul?
20   A.   Paul Levy was the principal of the
21 high school.  And you say the reason was you had
22   Q.   And you say the reason was you had

13  (Pages 412 to 415)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 416

1  gone so many times to no avail, you had gone to
2  do what so many times?
3      A.   To discuss issues of
4  marginalization.
5      Q.   And is it your testimony that
6  whenever you discussed these issues of
7  marginalization with Paul Levy, he didn't do
8  anything to address your concerns?
9      A.   I'm sure that that occurred on many
10 occasions.
11     Q.   He didn't do anything, that's your
12 testimony?
13     A.   On many occasions.  I didn't say
14 ever, on many occasions, yes.
15     Q.   So, you decided that it would not be
16 worthwhile to talk to Paul Levy because you had
17 been disappointed by his follow-up in the past;
18 is that right?
19     A.   Yes.
20     Q.   And so you decided not to address
21 this concern to Mr. Levy; is that right?
22     A.   I think I said:  "I couldn't go to

Page 417

1  Paul again.  I had done this so many times
2  already to no avail."
3      Q.   Right.  I know what you said there.
4  But, what I want to know is does that mean that
5  you did not raise this issue about the meeting
6  involving Susie Ryan and Dorothy Drobis with
7  Mr. Levy?
8      A.   To the best of my recollection,
9  that's right, at that time.  Uh-huh.
10     Q.   Now, in Paragraph 20 of Exhibit 13,
11 would you take a look at that, please.
12         Do you see where it says:  "In
13 November I proposed a course called Graphic
14 Design and Publishing that was verbally endorsed
15 by Nick Ryan to me and according to Paul, also to
16 him."
17         And then if you move to Paragraph
18 21, you say:  "My course proposal was approved
19 but postponed until '06."
20     A.   Yes.
21     Q.   Is the course proposal you discuss
22 in Paragraph 21 the same course proposal you

Page 418

1  discuss in Paragraph 20?
2      A.   Yes.
3      Q.   Okay.  Do you recall when in 2003
4  the deadline for submitting course proposals was?
5      A.   No.
6      Q.   Okay.  I'm going to ask you to take
7  a look at a document marked as Exhibit 69 and see
8  if we can refresh your recollection about that.
9      A.   Okay.
10         (Killian Exhibit Number 69
11          marked for identification.)
12 BY MR. WILLIAMSON:
13     Q.   Have you had a chance to look at
14 Exhibit 69?
15     A.   No, I'm reading right now.
16     Q.   Okay.
17     A.   I've read it.
18     Q.   What is Exhibit 69?
19     A.   It's an e-mail.
20     Q.   From whom?
21     A.   Kevin Barr.
22     Q.   To whom?

Page 419

1      A.   To high school staff.
2      Q.   And what's the date of the e-mail?
3      A.   Wednesday, October 29, 2003.
4      Q.   And what's the subject?
5      A.   New Course Proposals.
6      Q.   Now, does that e-mail that has been
7  marked as Exhibit 69, refresh your recollection
8  as to what the deadline was in 2003 for
9  submitting course proposals?
10     A.   It says:  "Formal proposals for new
11 courses or significant changes in program need to
12 be submitted by December 8th."
13     Q.   Does that refresh your recollection
14 as to the deadline?
15     A.   I can see it, yes.
16     Q.   All right.  And are you also advised
17 in this e-mail that if you have new course
18 proposals you should vet them with your
19 department members?
20     A.   Yes.
21     Q.   And did you do that with any new
22 course proposals in, I guess it was the fall of

14  (Pages 416 to 419)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 420

1    2003?
2        A.    In November, I proposed a course
3    called Graphic Design and Publishing that was
4    verbally endorsed by Nick Ryan to me.
5            Meaning I talked to Nick Ryan about
6    it, and according to Paul, also to him.  Yes, I
7    did.
8        Q.    In December 2003, Paul Levy told you
9    that he and Nick Ryan supported your course, your
10   new course proposal, right?
11       A.    I would have to look at something to
12   refresh my memory about December.
13       Q.    All right.
14       A.    You just said that in December Paul
15   talked to me about that.  And I would need
16   something to verify that date.
17       Q.    All right.  Maybe we can help you
18   out on that.
19       A.    Okay.
20       Q.    We're going to hand you a document
21   that has been marked as Exhibit 33.
22            (Killian Exhibit Number 33

Page 421

1            marked for identification.)
2            THE WITNESS:  Okay, I see it.
3    BY MR. WILLIAMSON:
4        Q.    Let me ask again, in December 2003,
5    Paul Levy told you that he and Nick Ryan
6    supported your new course proposal; is that
7    right?
8        A.    Yes.  It says:  "He is a strong
9    supporter of your proposal and helped me to
10   clarify questions I had."
11       Q.    Who is the he you're referring to?
12       A.    Nick.
13       Q.    Now, Paul Levy suggested that you
14   make some revisions to the proposal, didn't he?
15       A.    Yes.
16       Q.    Okay.  I guess we didn't properly
17   identify Exhibit 33.  What is Exhibit 33?
18       A.    It's an e-mail message from Paul
19   Levy, Subject:  Course Proposal, to me.
20       Q.    And what's the date?
21       A.    Wednesday, December 10, 2003.
22       Q.    And the e-mail message is in

Page 422

1    typewritten form; is that right?
2        A.    Yes.
3        Q.    And that's where it says that, or
4    that's where Paul Levy tells you that Nick Ryan
5    is a strong supporter of your proposal and helped
6    me to clarify questions that I had, correct?
7        A.    Yes.
8        Q.    Now, do you see there's some
9    handwritten notes on Exhibit 33?
10       A.    Yes.
11       Q.    Do you recognize that handwriting?
12       A.    Yes.
13       Q.    Whose handwriting is that?
14       A.    That's my handwriting.
15       Q.    And what are you saying in that
16   note?
17       A.    My note in my own files says:  "But,
18   I wrote the proposal, not NR, and would be the
19   one who could most clearly explain any content."
20       Q.    Okay.  Do you remember what
21   revisions to the proposal Paul Levy suggested?
22       A.    I would have to look at it again,

Page 423

1    but, one of them could have been the course name.
2            I would have to look at the string
3    of conversations, you know, back and forth for
4    that.
5        Q.    Do you remember what he was
6    suggesting about the course name?
7        A.    I think, if I recall, changed to
8    Graphic Design and Publishing.
9        Q.    Now, a few days after you got this
10   e-mail in December of 2003, didn't you tell Kevin
11   Barr that after discussing the new course
12   proposal with Paul Levy, you decided to make
13   revisions to your course proposal over the
14   holiday?
15       A.    There is -- if you could refresh my
16   memory.
17       Q.    I don't know if I can refresh your
18   memory or not.
19       A.    With a document or an e-mail that I
20   might have sent.
21       Q.    Well, the way we go at this is first
22   to ask do you have any recollection of

15 (Pages 420 to 423)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 424

1  communicating to Kevin Barr that you discussed
2  your new course proposal with Paul Levy and you
3  decided to make revisions to your course proposal
4  over the holiday?
5      A.   That is, to my recollection, that's
6  possible, yes.
7      Q.   Okay.  You say it is possible.  Do
8  you think you did that?
9      A.   I'm pretty sure.  I worked over the
10  holidays a lot on things.  So, that's quite
11  possible I would have sent him a note saying I
12  would be doing that, yes.
13      Q.   Let's take a look at a document we
14  will mark as Exhibit 60 to see whether you can
15  definitively recall whether you did that?
16      A.   Okay.  Thank you.
17          (Killian Exhibit Number 60
18          marked for identification.)
19          THE WITNESS:  Yes.
20  BY MR. WILLIAMSON:
21      Q.   What is Exhibit 60?
22      A.   It is an e-mail message from Sharon

Page 425

1  Killian, Subject:  Course Proposal to Kevin Barr,
2  GDS Lower School.
3      Q.   And what are you saying in that --
4  what was the date of that?
5      A.   December 17th.
6      Q.   What year?
7      A.   Sorry, December 17th, 2003.
8      Q.   And what were you saying to Kevin
9  Barr in that message?
10      A.   I said to Kevin:  "Paul and I have
11  talked about the new course and there are a
12  couple of changes that need to be made to it.
13          "In your e-mail regarding the
14  deadline for submitting new course
15  proposals/changes are you also referring to
16  revisions?
17          "If you get this message today,
18  please reply.  I'm working on a publishing
19  deadline and would like to make the revisions to
20  the course proposal over the holiday."
21      Q.   And then you submitted your final
22  revised course proposal to Kevin Barr sometime in

Page 426

1  early January, right?
2      A.   I believe that's true.
3      Q.   Now, Ms. Killian, isn't it true that
4  Kevin Barr sent an e-mail to both you and Nick
5  Ryan in January 2004 -- well, let me go back.
6          Around that same time, was Nick Ryan
7  submitting a new course proposal also?
8      A.   I believe so.
9      Q.   And --
10      A.   To the best of my recollection.
11      Q.   And isn't it true that Kevin Barr
12  sent an e-mail to both you and Nick Ryan, in
13  January of 2004, stating that "both of your
14  proposed art courses generated considerable
15  enthusiasm, but would be postponed until the
16  completion of the new facilities in light of
17  space and personnel limitations."
18      A.   May I -- I don't remember that
19  exactly.  May I see a copy of that e-mail?
20      Q.   Sure.
21          MR. WILLIAMSON:  Let's take a look
22  at a document I'm going to mark as Exhibit 61.

Page 427

1          (Killian Exhibit Number 61
2          marked for identification.)
3  BY MR. WILLIAMSON:
4      Q.   Before you look at it, were you
5  aware in early January 2001 that Georgetown Day
6  School was planning to do a major building and
7  renovation project at the high school?
8      A.   Yes.
9      Q.   Would you take a look at Exhibit 61,
10  please?
11      A.   Yes.
12      Q.   Can you tell us what Exhibit 61 is?
13      A.   It's an e-mail message from Kevin
14  Barr.
15      Q.   To whom?
16      A.   To Nick Ryan, Sharon Killian, cc
17  Paul Levy.
18      Q.   And what's the date of it?
19      A.   January 20, 2004.
20      Q.   All right.  Does Exhibit 61 refresh
21  your recollection as to whether Kevin Barr sent
22  an e-mail to both you and Nick Ryan in January of

16  (Pages 424 to 427)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 428

1   2004 stating that both of your proposed art
2   courses generated considerable enthusiasm, but
3   would be postponed until the completion of the
4   new facilities in light of space and personnel
5   limitations?
6       A.   Yes.
7       Q.   And do you consider this response by
8   Kevin Barr to your new course proposal to be
9   evidence of GDS's racial hostility toward you?
10      A.   No.
11      Q.   And is it your understanding that
12  the new GDS facilities were not scheduled to be
13  completed until the 2006/2007 school year?
14      A.   Yes.
15      Q.   Did you regard it as an incident of
16  racial harassment that your proposed course was
17  approved in 2004, but postponed for actual
18  teaching until the 2006/2007 year?
19      A.   Repeat the question, please.
20      Q.   Did you regard it as an incident of
21  racial harassment by GDS that your proposed
22  course was approved in 2004, but postponed for

Page 429

1   actual teaching until the 2006/2007 year?
2       A.   Yes.
3       Q.   And why do you think that?
4       A.   The required facilities to teach the
5   course existed already.
6       Q.   And, therefore, what makes you think
7   that the postponement to 2006/2007 was based on
8   your race?
9       A.   My experience over the last 12 years
10  with Laura Tolliver, Nick Ryan, would bring me to
11  this.
12      Q.   Right.  Was the decision about the
13  postponement being made by Laura Tolliver or Nick
14  Ryan?
15      A.   I don't know.
16      Q.   Wasn't the decision being made by
17  Kevin Barr?
18      A.   Kevin Barr sent me the note, yes.
19      Q.   Didn't he tell you that the decision
20  actually was made by the administrative team?
21      A.   It says that "the admin team met to
22  discuss course proposals for next year."

Page 430

1       Q.   So, is it your understanding that
2   the decision about postponing your proposed
3   course was made by the administrative team?
4       A.   I can assume that, based on this
5   e-mail.
6       Q.   Were Laura Tolliver or Nick Ryan
7   members of the administrative team at GDS?
8       A.   I don't know.  I know that -- I
9   don't know.
10      Q.   You don't know whether they had any
11  role in deciding whether the course was going,
12  your course was going to be postponed; is that
13  right?
14      A.   Laura Tolliver uses the lab, the
15  computer labs, that are managed by -- well, I
16  don't know.
17      Q.   So, you are just speculating when
18  you suggest they may have had some role in
19  postponing your course; is that right?
20      A.   I -- yes.
21      Q.   And you said that you thought there
22  was space where you could have taught the course.

Page 431

1       Don't they also say that, in this
2   Exhibit 61, that there are personnel limitations
3   that are part of the reason why they want to
4   postpone the course?
5       A.   I see that.  It says "given the
6   current space and personnel limitations."
7       Q.   And do you know what the personnel
8   limitations were they were referring to?
9       A.   No.
10      Q.   Going back to the space issue, I'd
11  like to show you a document that has been marked
12  as --
13      A.   Excuse me, may I take a break,
14  please, before you ask a question.
15      MR. WILLIAMSON:  Yes, you certainly
16  may.
17      THE WITNESS:  Thank you.
18      THE VIDEOGRAPHER:  Going off the
19  record at 11:08:04.
20      (Recess -- 11:08-11:23 a.m.)
21      THE VIDEOGRAPHER:  Going back on the
22  record at 11:23:30.

17 (Pages 428 to 431)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 432

1  BY MR. WILLIAMSON:
2      Q.   Ms. Killian, when you made revisions
3  in your new course proposal that was approved in
4  2004, did those revisions include taking into
5  account new space that would be available after
6  GDS had completed its construction and renovation
7  project?
8      A.   Repeat that please.
9      Q.   I said when you made revisions to
10 your course proposal, your new course proposal
11 that was approved in 2004, did those revisions
12 take into account the renovations and new space
13 that would be available after the construction
14 had been completed in 2006/2007?
15     A.   I don't recall exactly, but I
16 remember being asked to think about all
17 publishing.  So, it's possible.
18     Q.   And did you understand Exhibit 61 as
19 indicating that the administrative team was
20 approving the course on the basis of the uses
21 that would be made of facilities in the newly
22 renovated, or the newly constructed building that

Page 433

1  was being planned for GDS?
2      A.   I don't know.
3      Q.   Okay.  Let's take a look at
4  Exhibit 61.
5           Weren't you informed, in January of
6  2004, by Kevin Barr that the administrative team
7  was approving your course with the understanding
8  that it would be offered after the completion of
9  the new facilities?
10     A.   The e-mails, Exhibit 61, says: "The
11 sense was for both course (sic), though, that
12 given current space and personnel limitations, we
13 will wait to offer them until the completion of
14 the new facilities."
15     Q.   So, those were the facilities that
16 were going to be completed in the 2006/2007
17 school year; is that right?
18     A.   I believe so.
19     Q.   Okay.  And you indicated earlier
20 that you had some recollection that Mr. Ryan had
21 also proposed a new course for consideration by
22 the administrative team in early 2004; is that

Page 434

1  right?
2      A.   I believe so.  Yes.
3      Q.   And isn't it true that Mr. Ryan's
4  proposed course, just like yours, was approved in
5  2004, but postponed until the completion of the
6  new facilities in light of space and personnel
7  limitations?
8      A.   I don't know if it was approved.  I
9  don't know if his course was approved.
10     Q.   All right.  Will you take a look at
11 Exhibit 61.
12     A.   Okay.
13     Q.   And see whether that refreshes your
14 recollection as to whether Mr. Ryan's course was
15 approved for offering after the completion of the
16 new facilities.
17     A.   It -- I can reread the --
18     Q.   I'm not asking you to read it.
19          I just want you to tell me what is
20 your understanding of this e-mail that was sent
21 to you and Mr. Ryan?
22     A.   It said that "both the proposed art

Page 435

1  courses generated considerable enthusiasm."
2      Q.   Ms. Killian, I'm not asking you to
3  reread it.
4           I want to know, is it your
5  understanding that you and Mr. Ryan were being
6  informed that your proposed courses were going to
7  be approved for offering, not in 2004/2005, but
8  after the completion of the new facilities?
9      A.   It says:  "We will wait to offer
10 them until the completion of the new facilities."
11     Q.   I'm not asking you what the document
12 says.  I'm asking you for your understanding of
13 what the document meant.
14     A.   It says here that they'll wait to
15 offer them.  In no case, nothing in here says to
16 me that they're approved.
17          But, I can assume that, then, I can
18 make an assumption that they were approved.
19     Q.   And that would be approved to be
20 offered after those facilities had been
21 completed, right?
22     A.   I can assume.  I can make an

18 (Pages 432 to 435)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 436

1  assumption that that's what it means.
2      Q.   Now, I would like to turn to
3  Paragraph 21 of Exhibit 13.
4          Have you located that paragraph?
5      A.   Yes.  So, you said 21?
6      Q.   Yes.
7      A.   Yes.  I have located it.
8      Q.   Do you see where it says:  "In the
9  end, Paul said he would talk with Bruce Ruble
10 about teaching another course in the MAC lab"?
11     A.   Yes.
12     Q.   Do you know what that was referring
13 to?
14     A.   The graphic design and publishing
15 course would use the MAC lab -- and Paul -- the
16 MAC lab could be used to teach the graphic design
17 and publishing course.
18         And that Paul said that he would
19 talk with Bruce Ruble about teaching that
20 particular course in the MAC lab.
21     Q.   Now, you were scheduled to teach two
22 different -- I'm sorry.

Page 437

1          What was the -- you were talking
2  about graphic design and publishing, but in
3  Paragraph 21, you seem to be saying that Paul
4  said he would talk with Bruce Ruble about
5  teaching another course in the MAC lab.
6      A.   Yes.
7      Q.   What was the other course you were
8  talking about?
9      A.   It was graphic design and
10 publishing.
11     Q.   Was there a course named graphic
12 design?
13     A.   I think a course name was -- there
14 was a course subsequently called that, I think.
15     Q.   And was there another course called
16 graphic design and publishing?
17     A.   That's the proposed course, graphic
18 design and publishing.
19     Q.   Okay.  So, graphic design is one
20 course, and graphic design and publishing is
21 another course?
22     A.   At the time that this occurred, I'm

Page 438

1  not sure, sir, about the graphic design course,
2  whether a course was actually titled graphic
3  design on the books yet.  I'd have to look.
4      Q.   And can you tell us, in this
5  Paragraph 21 where you say:  "In the end, Paul
6  said he would talk with Bruce Ruble about
7  teaching another course in the MAC lab."
8          Which course is the another course?
9      A.   It could have been technology in the
10 studio arts.
11     Q.   Okay.
12     A.   Or another course that was already
13 being taught then.
14     Q.   Now, for 2005/2006, you were
15 scheduled to teach two different courses in three
16 sections; is that right?
17     A.   I believe so.
18     Q.   So, if you had to come back to teach
19 during the 2005 or, if -- excuse me.
20         If you had come back to teach during
21 the 2005/2006 school year, you would have been
22 teaching three sections of courses in the MAC

Page 439

1  lab; is that right?
2      A.   I don't believe that -- well, I
3  don't know.
4      Q.   How would you know?
5      A.   I think the course assignments
6  didn't happen yet, as of the time of these, I
7  don't believe.
8      Q.   Right.  But, you knew, the course
9  assignments had been made by the spring of 2005,
10 hadn't they?
11     A.   Subsequent to this matter, or these
12 matters.
13     Q.   Okay.  And based on those
14 assignments, if you had come back to teach during
15 the 2005/2006 school year, isn't it true that you
16 would have been teaching three sections of
17 courses in the MAC lab?
18     A.   And they would be what?
19     Q.   Well, the two courses would have
20 been graphic design and film and video; is that
21 right?
22     A.   Uh-huh, yes.

19 (Pages 436 to 439)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 440

1    Q.    And you would have been teaching
2    three sections of the courses in the MAC lab; is
3    that right?
4    A.    And that would be two courses.
5    Q.    For one of those courses, didn't you
6    have two sections, or wouldn't you have been
7    teaching two sections?
8    A.    In the AP studio art, yes, uh-huh.
9    Q.    No. In the MAC lab, for one of
10   these courses, it was either graphic design or
11   film and video, weren't you going to be assigned
12   two sections to teach in the MAC lab?
13   A.    I believe that could be true.
14   Q.    Do you remember which one would have
15   had two sections?
16   A.    I don't recall right off, right now,
17   no.
18   Q.    But, one of the courses you would
19   have been teaching in the MAC lab was the graphic
20   design, right?
21   A.    Would have been graphic design,
22   that's right.

Page 441

1    Q.    Would you take a look at Paragraph
2    22 of Exhibit 13, now.
3    A.    Uh-huh.
4    Q.    Do you see where it says: "I
5    received an e-mail from Nick Ryan sent at 3:20,
6    on Thursday, February 12th, to review the course
7    descriptions and titles, and found that
8    technology in the studio arts course titles and
9    important content was changed to reflect graphic
10   design.
11          "I was not included in any of the
12   discussions leading up to this."
13          Now, do you regard these course
14   descriptions and title changes without including
15   you in the discussions as examples of racially
16   hostile treatment of you by GDS?
17   A.    Yes.
18   Q.    And what is it about this incident
19   that causes you to believe that the course titles
20   and important content were changed because of
21   racial prejudice against you?
22   A.    It's a continuation of a 12-year

Page 442

1    long marginalization in the department. And --
2    Q.    What do you mean by marginalization?
3    A.    Not being included in discussions of
4    issues related to our department.
5    Q.    And, in this instance, did you feel
6    there was some important content that was changed
7    without including you?
8    A.    Certainly the graphic, the title
9    graphic design, which would make that course that
10   was supposedly approved redundant.
11   Q.    How would graphic design make the
12   approved course redundant?
13          Let me rephrase that question.
14          When you say graphic design, you
15   mean putting graphic design in the title would
16   make the course redundant?
17   A.    Partly.
18   Q.    By putting graphic design in the
19   title, did that change the subject matter of the
20   course?
21   A.    I need to -- if I were able to look
22   at the description of the courses I could be more

Page 443

1    specific to tell you that.
2    Q.    Right now, you can't remember?
3    A.    Not exactly.
4    Q.    Can you remember approximately?
5    A.    I can tell you that using graphic
6    design, changing the course on technology in the
7    studio arts to graphic design, would, among other
8    things, make the appearance of the courses to be
9    redundant. And --
10   Q.    And what would be, redundant with
11   what?
12   A.    With graphic design and publishing.
13   Q.    Now, is there any other redundancy
14   besides the course title?
15   A.    To the best of my recollection,
16   there may be.
17   Q.    And what would be the other
18   redundancy besides a redundancy in the titles of
19   the two courses?
20   A.    There may be some content areas.
21   Q.    Are you aware of any content areas
22   that would have been, become redundant by

20  (Pages 440 to 443)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 444

1 changing the, or by, is it by using the title
2 graphic design?
3     A.    Are we talking about content or just
4 title now?
5     Q.    I want to know whether changing the
6 title would cause any of the content of either of
7 these courses to become redundant.
8     A.    The graphic design and publishing
9 course approached specific magazines or
10 publications and the graphic, the quote, unquote,
11 "graphic design course" is more general to, say,
12 for instance, magazine covers, general magazine
13 covers.
14          But, it's possible that, depending
15 on the focus, it could be redundant.
16     Q.    Just possible, but you don't know if
17 it actually was?
18     A.    I don't know.
19     Q.    And you said, in Paragraph 22, of
20 Exhibit 13 that there -- you say important
21 content was changed to reflect graphic design.
22          What was the important content that

Page 445

1 was changed?
2     A.    If you would allow me to see a copy
3 of the descriptions, I could be more clear.
4     Q.    But, right now, you can't remember
5 what this important content was that was changed
6 to reflect graphic design; is that right?
7     A.    Generally there were items within
8 the graphic design and publishing course that
9 appeared in the new graphic design titled course.
10          And I don't know specifically, I
11 can't tell you right now, sir, what those
12 specific things are.
13     Q.    Now, were you aware that -- well,
14 let me first ask:
15          What is it about this incident that
16 caused you to believe that the course titles and
17 important content were changed because of racial
18 prejudice against you?
19     A.    I didn't see this happening to
20 anyone else who happened to be white.
21     Q.    Is there any other reason?
22     A.    And it had been -- it had been

Page 446

1 happening to me for 12 years.
2     Q.    What -- they had been changing the
3 titles of courses for 12 years?
4     A.    Not only that, but also --
5     Q.    No, I'm sorry, answer that.
6          The courses' titles were changed for
7 12 years, is that what you're saying?
8     A.    No, sir.
9     Q.    All right.  Now, Ms. Killian, were
10 you aware that -- and the courses we're talking
11 about are the Technology For the Studio Arts
12 course, is that one title?
13     A.    The courses we're talking about in
14 which regard?
15     Q.    In this Paragraph 22 of Exhibit 13.
16     A.    Okay.
17     Q.    It's technology in the studio arts,
18 is that one of the courses that you're talking
19 about?
20     A.    Yes.
21     Q.    Okay.  And were you aware that
22 Technology For the Studio Arts is described in

Page 447

1 the 2003/2004 course of study as a graphic design
2 course?
3     A.    Described in the content area.
4     Q.    Now, I want you to take a look at a
5 document that we're going to mark as Exhibit 36.
6          (Killian Exhibit Number 36
7          marked for identification.)
8 BY MR. WILLIAMSON:
9     Q.    I'm sorry is your answer to the
10 previous question yes or no?
11          I asked you were you aware that
12 Technology For the Studio Arts is described in
13 the 2003/2004 course of study as a graphic design
14 course?
15     A.    Described in the content area that
16 is a graphic design course?
17     Q.    Is your answer yes or no?
18     A.    I'm asking you, are you saying
19 described in the content area as a graphic design
20 course?
21     Q.    The question is, does it say that in
22 the 2003/2004 course of study?

21 (Pages 444 to 447)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

| Page 448 | Page 450 |
|---|---|
| 1    A.   If I, when I get the copy, I will<br>2  read it.<br>3    Q.   Right now, I just want to ask you<br>4  what your recollection is.<br>5    A.   I don't know.  I don't recall.<br>6    Q.   Now, take a look at Exhibit 36,<br>7  please.<br>8    A.   Thank you.<br>9    Q.   And can you find where it says<br>10  Technology For the Studio Arts.<br>11       Well, first, tell me what is<br>12  Exhibit 36?<br>13    A.   It says GDS High School Course of<br>14  Study.<br>15    Q.   And for what year?<br>16    A.   2003/2004, High School Graduation<br>17  Requirements.<br>18    Q.   Okay.  Now, if you would turn to the<br>19  back side of the second page in the document,<br>20  which it has Course of Study, and three down at<br>21  the bottom.<br>22       Do you see that, in the lower | 1  the actual substance of the course?<br>2    A.   No.<br>3    Q.   Now, besides the course title, were<br>4  there any other, what you called important<br>5  content changes to the course description of<br>6  technology for the arts, that you consider to be<br>7  examples of racial hostility toward you?<br>8    A.   Repeat that, please.<br>9    Q.   You had said earlier that you<br>10  regarded the change in the course title as an<br>11  indication of racial hostility toward you; is<br>12  that right?<br>13    A.   Yes.<br>14    Q.   And now I'm asking you, besides the<br>15  course title, were there any other what you call<br>16  important content changes to the course<br>17  description of technology for the arts that you<br>18  consider to be examples of racial hostility<br>19  toward you?<br>20       I should have said Technology For<br>21  the Studio Arts.<br>22    A.   Yes.  I don't know. |

| Page 449 | Page 451 |
|---|---|
| 1  right-hand corner of Exhibit 36?<br>2    A.   Yes, I see it.<br>3    Q.   And do you see where it says<br>4  Technology for the Studio Arts?<br>5    A.   Uh-huh.<br>6    Q.   And would you read the first<br>7  sentence of the Course Description, please?<br>8    A.   "This introductory computer-based<br>9  graphic design course familiarizes students with<br>10  Adobe PhotoShop, and IMovie II and the use of a<br>11  digital camera and scanner."<br>12    Q.   Do you have any reason to believe<br>13  that the course description for technology in the<br>14  studio arts, in the 2003/2004 Course of Study,<br>15  did not reflect accurately the actual substance<br>16  of the course?<br>17    A.   Would you repeat that, please.  I<br>18  was reading.<br>19    Q.   Do you have any reason to believe<br>20  that the course description for Technology for<br>21  the Studio Arts in the 2003/2004 Course of Study,<br>22  that is Exhibit 36, did not accurately reflect | 1    Q.   You don't know?  Is there anything<br>2  that could refresh your recollection?<br>3    A.   I don't know, maybe the 2004/2005<br>4  course of studies would help me.<br>5    Q.   All right.  Let's take a look at a<br>6  document that we're going to mark as Exhibit 35.<br>7       (Killian Exhibit Number 35<br>8       marked for identification.)<br>9  BY MR. WILLIAMSON:<br>10    Q.   Can you tell us what Exhibit 35 is?<br>11    A.   It's 2004/2005 High School<br>12  Graduation Requirements.<br>13    Q.   And what's the title up at the<br>14  beginning of the document?<br>15    A.   High School Curriculum Overview.<br>16    Q.   Okay.<br>17    A.   I'm looking, reading.<br>18    Q.   Sure, take your time.<br>19    A.   Okay.<br>20    Q.   The question was:  Besides the<br>21  course title, were there any other important<br>22  content changes to the course description of |

22  (Pages 448 to 451)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 452

1  technology for the arts that you consider to be
2  examples of racial hostility toward you?
3      A.   On the face of this, I don't really
4  see a difference in the, much difference in the
5  content.
6          Whether I was looking at the final
7  piece, as it is represented here or not, when I,
8  when that comment was made is a different story.
9          I don't know --
10     Q.   When you say the final piece, what
11  would you have been looking at other than the
12  high school, or these Exhibits 35 and 36?
13     A.   Hopefully, it would have been the
14  piece to be submitted for publication.
15         But, on its face here I see, I don't
16  see a significant difference except for some
17  reflecting of the writer's 20th century art, et
18  cetera.
19     Q.   Do you consider that a significant
20  difference?
21     A.   No.
22     Q.   And would that difference make

Page 453

1  aspects of the two courses redundant?
2      A.   The -- are you asking me about the
3  insignificant difference between these two
4  descriptions here?
5      Q.   Yes.  Would that insignificant
6  difference make the courses redundant?
7      A.   Not that I know.
8      Q.   Okay.  Would you turn back to
9  Exhibit 13, paragraph numbered 25, please.
10     A.   Paragraph 25?
11     Q.   Yes, ma'am.
12     A.   Yes.
13     Q.   Do you see where it says:  "Nick
14  Ryan was hired as an outsider with no strings to
15  the old guard, to create an equitable teaching
16  and learning environment.  This has been a
17  failure."
18         Do you see that?
19     A.   Yes, I do.
20     Q.   Whom are you referring to when you
21  refer to the old guard?
22     A.   Debbie Haynes, Laura Tolliver.

Page 454

1      Q.   Anybody else?
2      A.   That's who I'm referring to in this
3  case.
4      Q.   Okay.  And what is it about the
5  teaching environment when Mr. Ryan was hired that
6  you regarded as inequitable?
7          MR. RACIN:  Objection.  Asked and
8  answered.  We devoted substantial portions of the
9  first day to this very issue.
10         Is the question in addition to that
11  already testified to?
12         MR. WILLIAMSON:  Just -- I don't
13  think we asked her specifically about this term
14  inequitable.  And I want to understand what the
15  witness means by that.
16  BY MR. WILLIAMSON:
17     Q.   And you can feel free to just say if
18  you want to give a summary of previous testimony,
19  then that's fine.
20     A.   It's really difficult to give a
21  summary of the previous testimony.
22     Q.   Okay.  Just give --

Page 455

1      A.   Seven hours worth of trying to
2  answer.
3      Q.   Give me three examples of what was
4  inequitable about the teaching environment.
5      A.   My not being included in discussions
6  about course offerings in a timely way.
7      Q.   Anything else?
8      A.   My having to ask permission to use
9  resources and space.
10         My being treated as a very junior
11  member -- actually I shouldn't probably even
12  describe it as a junior member with total
13  disrespect in front of my students or any
14  students.
15     Q.   Who was the most junior member of
16  the art department when you were working at GDS?
17     A.   When?
18     Q.   Prior to when Nick Ryan started
19  working as the chair?
20     A.   I was the, I came in last in that
21  department.
22     Q.   So, it would be accurate to say you

                              23  (Pages 452 to 455)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 456

1  were the most junior member of the department?
2      A.   Uh-huh.
3      Q.   And how many years longer had others
4  in the department worked than you had?
5      A.   I don't know exactly.
6      Q.   Now, in numbered paragraph 26, would
7  you take a look at that, on Exhibit 13.
8          You say: "The art department and
9  ultimately the school is an unhealthy environment
10 for me or anyone who looks like me to work."
11         Do you see that?
12     A.   Yes, I do.
13     Q.   What are you referring to when you
14 use the expression "anyone who looks like me"?
15     A.   Anyone who is black.
16     Q.   Okay.  And is it your testimony that
17 any person who was black is working in an
18 unhealthy environment at the Georgetown Day
19 School?
20     A.   My feeling is that it's an unhealthy
21 environment for me or anyone who looks like me,
22 yes.

Page 457

1      Q.   Now, while you were working at the
2  Georgetown Day School, were other people of color
3  hired to work on the faculty?
4      A.   I believe so, yes.
5      Q.   And did those people of color
6  include African-Americans?
7      A.   Yes.
8      Q.   Do you recall, or can you estimate,
9  how many more African Americans and other people
10 of color were hired to work on the faculty of GDS
11 between when you started at GDS and when your
12 employment terminated in 2005?
13     A.   No.  I can't give you an exact
14 number.
15     Q.   Can you give me an approximate
16 number?
17     A.   No.  Because I don't always see the
18 people at lower middle school, although we're
19 talking about the high school, right?
20         We're talking about the high school
21 here?
22     Q.   Yes.

Page 458

1      A.   I still can't do it for you.  But,
2  it was suggested that GDS make a real concerted
3  effort to bring other faculty of color, including
4  black faculty, into the school.
5      Q.   Now, even if you can't give a
6  specific estimate, can you tell me whether the
7  number of African-American faculty at GDS
8  increased or decreased while you were working
9  there between 1994 and 2005?
10     A.   I'd say it increased, because when
11 I, you know, when I was there initially there
12 were not that many of us.
13         And then partly because of
14 suggestions I made, that changed some, but I
15 can't tell you exactly how many.
16     Q.   Uh-huh.  What suggestions did you
17 make that resulted in increased hiring of
18 African-Americans?
19     A.   There were many suggestions, sir,
20 including talking to students at Howard
21 University, or other places where that would,
22 where you could find students of color.

Page 459

1      Q.   And whom did you make those
2  suggestions to?
3      A.   I believe that was the board of
4  trustees.
5      Q.   Anyone else you made suggestions to
6  about increasing, hiring of African-American
7  faculty?
8      A.   Paul Levy.  I'm sure Peter Branch,
9  through the diversity committee on board.
10     Q.   And they responded to those
11 suggestions by increasing the hiring of, or the
12 employment of African-American faculty?
13     A.   I believe that there, there was some
14 change.
15     Q.   Can you -- you've talked about the
16 numbers, can you tell me whether the number of
17 African-American faculty, as a percentage of the
18 total faculty at GDS, increased or decreased
19 while you were working there between 1994 and
20 2005?
21     A.   I'm sure that the school can give
22 you the actual number, sir.

24  (Pages 456 to 459)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 460

1    Q.   I know that.  But, I'm asking
2  whether your observation was that the percentage
3  of African-American faculty increased or
4  decreased while you were employed at GDS?
5    A.   It was so bad that it had to
6  increase.  So, I'm sure the answer to that is it
7  increased.
8        Now, whether it stayed constant
9  between the time I was there or not, or reduced
10  from the time, you know, over that time period, I
11  can't really tell you.
12        I'd have to look at some data to
13  tell you that, sir.
14    Q.   And, when you say so bad, what's
15  your measure of so bad, compared to what?
16    A.   Compared to the number of white
17  faculty.
18    Q.   What about compared to other private
19  schools in Washington, D.C., was the percentage
20  of African-American faculty at GDS higher or
21  lower?
22    A.   I don't know.

Page 461

1    Q.   You have no --
2    A.   It was probably lower in some cases
3  or higher in some cases.
4    Q.   In total, was it -- oh, you think
5  there are some cases where there were other
6  private schools in the District of Columbia that
7  had a higher percentage of African-American
8  faculty than GDS?
9    A.   At the -- at what stage or when?
10    Q.   In 2005, or 2004.
11    A.   Oh, not, not when I started?
12    Q.   I'm just asking you now for the time
13  you left the school.
14    A.   I don't know.
15    Q.   You don't know?
16    A.   I don't know.
17    Q.   Okay.  Was there some period during
18  your time at the school when you did know?
19    A.   I was -- yes.
20    Q.   And what period was that?
21    A.   '99/2000, I think.  Somewhere around
22  there.

Page 462

1    Q.   And what is it that you knew in
2  '99/2000?
3    A.   I had access to actual data that I
4  could read and talk to folks about that.
5    Q.   And what did that data tell you
6  about how GDS compared in terms of percentage of
7  African-American, African-American faculty as
8  compared with other private schools in the
9  District?
10    A.   I don't recall.
11    Q.   What would refresh your
12  recollection?
13    A.   The actual documents with the
14  numbers, percentages listed.
15    Q.   And, at the time that -- your last
16  year teaching at the school was 2004/2005; is
17  that right?
18    A.   Yes.
19    Q.   Do you have any idea how the
20  percentage of African-American teachers at GDS
21  compared with the percentage of African-American
22  teachers at other private schools in the District

Page 463

1  of Columbia?
2    A.   No, sir.
3    Q.   And do you currently know what the
4  total percentage of teachers who work at GDS are
5  African-American?
6    A.   No.
7    Q.   Do you know what the current total
8  number of teachers of color are who work at GDS,
9  not just African-American, but other minority
10  groups such as Hispanics or Asians?
11    A.   No.
12    Q.   And, so you wouldn't know what the
13  current total percentage of teachers who work at
14  GDS who are teachers of color, would you?
15    A.   Right.
16    Q.   Ms. Killian, I want to shift to a
17  different document from Exhibit 13, and ask you
18  to take a look at Exhibit 39, or a document that
19  we're going to mark as Exhibit 39.
20        (Killian Exhibit Number 39
21         marked for identification.)
22  BY MR. WILLIAMSON:

25  (Pages 460 to 463)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 464

1    Q.    What is the -- I'm sorry, have you
2    had a chance to look at Exhibit 39, is that
3    document familiar to you?
4        A.    Yes.
5        Q.    What is it?
6        A.    It's Talking Points for Carin Pass
7    Meeting, 8/30/04.
8        Q.    And who is the author of Exhibit 39?
9        A.    That's me.
10       Q.    And what was the purpose of your
11   preparing Exhibit 39?
12       A.    I was meeting with Carin Pass who
13   was hired by Georgetown Day School to conduct an
14   investigation, I think.
15       Q.    And can you just tell us, in summary
16   form, what are the contents of Exhibit 39, just
17   generally?
18       A.    The contents of Exhibit 39
19   essentially or generally are talking points about
20   my experience at GDS.
21       Q.    Can you be a little more specific
22   about what it is about your experience you were

Page 465

1    trying, you were going to be communicating to
2    Ms. Pass?
3        A.    There's a category called Being
4    Undermined in Front of Students, Sabotaging
5    Course Registration, Speaking About
6    Discrimination and Experiencing Retaliation.
7            Denial of Resources, Sense of
8    Ownership and me as an Outsider, Disrespect for
9    my Professional Capacity and Activities.
10       Q.    Those were the main headings of your
11   talking points?
12       A.    Main headings.
13       Q.    And did you submit Exhibit 39 to
14   Carin Pass?
15       A.    I don't remember.
16       Q.    Do you remember what use you did
17   make of Exhibit 39?
18       A.    I remember taking it with me to our
19   meeting.
20       Q.    To your meeting?
21       A.    With Carin Pass.
22       Q.    Do you remember when that was?

Page 466

1        A.    I believe, it says 8/30/04 here.
2    And it could be that date, I'm not exactly sure.
3        Q.    Would it be sometime either around
4    that date or shortly after?
5        A.    I believe so, yes.
6        Q.    Okay.  Now, did you discuss each of
7    the talking points with Carin Pass when you met
8    with her?
9        A.    I don't recall.  I don't recall
10   exactly.
11       Q.    Does the memorandum encompass
12   everything you discussed with Carin Pass?
13       A.    I don't know.
14       Q.    Is there anything that you recall
15   that is not in this Exhibit 39 that you discussed
16   with Carin Pass about your experience at GDS?
17       A.    I don't know.
18       Q.    What would refresh your
19   recollection?
20       A.    At this point, I really, I'm not
21   sure.  I didn't take notes during that meeting,
22   if I remember correctly.

Page 467

1        Q.    Is there anything else --
2        A.    On my own.
3        Q.    So, you don't have notes.  Is there
4    anything else that might refresh your
5    recollection?
6        A.    Perhaps the Carin Pass' report might
7    help me.
8        Q.    Anything else?
9        A.    Or her notes, or her assistant's
10   notes.
11           MR. WILLIAMSON:  I think the
12   videographer wants us to take a short break right
13   now.  So, why don't we do that?
14           THE VIDEOGRAPHER:  Going off the
15   record, at 12:09:15.  End of Tape 1.
16           (Recess -- 12:09-1:09 p.m.)
17           THE VIDEOGRAPHER:  Going on the
18   record at 1:09:47.  Beginning of Tape 2.
19   BY MR. WILLIAMSON:
20       Q.    Ms. Killian, we were just talking
21   about Exhibit 39, your talking points for your
22   meeting with Carin Pass just before we went to

26  (Pages 464 to 467)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 468

1  lunch.
2        Can you tell me, did you regard each
3  of the talking points as examples of GDS' racial
4  hostility toward you?
5        A.   Yes.
6        Q.   On the first page of Exhibit 39, the
7  first heading is being:  "Undermined in Front of
8  Students."
9        And, in that section, you give
10  examples of situations where you feel you have
11  been undermined by a GDS colleague in the
12  presence of your students, correct?
13       A.   Yes.
14       Q.   The first example that you give
15  says:  "I have been insulted in front of my
16  students.  For example, the chairperson, Debbie,
17  announced, while my class was in session, it's
18  irrelevant what Sharon has told you to do.  I am
19  the chairperson of the department."
20       Now, is the person you are talking
21  about there Debbie Haynes?
22       A.   Yes.

Page 469

1        Q.   And when did Ms. Haynes make that
2  statement in your class?
3        A.   I believe it was '96.
4        Q.   Okay.  And can you identify any
5  witnesses to that incident?
6        A.   No.
7        Q.   And do you regard this statement as
8  an example of racial harassment?
9        A.   Yes.
10       Q.   And why is it that you think that
11  statement was based on racial animosity toward
12  you?
13       A.   Because it was only happening to me.
14       Q.   Is there any other reason why you
15  think that it was a racial-based statement?
16       A.   The treatment I received was not the
17  same as what she imparted to other white faculty
18  in the department or elsewhere in the school.
19       Q.   How many other white faculty were
20  there in the department?
21       A.   There's one.
22       Q.   Was that Laura Tolliver?

Page 470

1        A.   Yes.
2        Q.   Now, did Ms. Haynes make similar
3  statements in your classroom on any other
4  occasions?
5        A.   I don't recall.
6        Q.   Okay.  In the second, was there
7  anything that would refresh your recollection
8  about that?
9        A.   No.
10       Q.   In the second bullet of, on the
11  first page of Exhibit 39, you say:  "Bruce Ruble
12  has stormed into the art studio during my class
13  and condescendingly chastised me about my
14  student's use of computer space when I had to
15  stop him and ask that he not speak to me like
16  this in front of my students."
17       Do you see that?
18       A.   Yes.
19       Q.   When did Mr. Ruble come into your
20  class and speak to you in a condescending way in
21  front of your students?
22       A.   I don't remember the exact date of

Page 471

1  this.
2        Q.   Can you give me the year?
3        A.   It was probably 2000, 2001.
4        Q.   Can you be any more specific than
5  that?
6        A.   No.
7        Q.   And how many times did that happen
8  with Mr. Ruble?
9        A.   Probably twice.  At least.
10       Q.   Okay.  About when was the first time
11  and when was the second time?
12       A.   Probably 2000 and 2001.
13       Q.   Was there any other faculty or staff
14  member present when Mr. Ruble came in and made
15  that statement in your class?
16       A.   I believe Nick Ryan was there in
17  that space.
18       Q.   Anybody else?
19       A.   Not that I recall.
20       Q.   And is there any way you could
21  refresh your recollection about who else might
22  have been, any other faculty or staff member who

27 (Pages 468 to 471)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 472

1  was present when he came and made that statement
2  in your class?
3      A.   No.
4      Q.   Are there students who were
5  witnesses to Mr. Ruble's making that statement in
6  front of your class?
7      A.   There were students around.
8      Q.   And do you know if any of those
9  students heard what was said?
10     A.   I don't know.
11     Q.   Do you know if there were any other
12 witnesses to Mr. Ruble making this sort of
13 statement to you on two occasions?
14     A.   I don't recall.
15     Q.   And is there anybody or any document
16 that would help you recall?
17     A.   Not offhand, no.
18     Q.   Now, I don't want you to be offhand,
19 we've got a pretty serious matter here.
20         Can you think about it for a moment?
21     A.   Yes.  I've thought about it and I
22 don't know of any document that would tell you

Page 473

1  other folks who were in the space at that time.
2      Q.   And the third bullet under the first
3  category of Exhibit 39 you say that:  "Nick Ryan
4  has stopped me in the middle of class to angrily
5  tell me that he wants me to immediately delete
6  student files from the computer."
7          When did that incident occur?
8      A.   I don't recall.  Probably 2003.
9      Q.   Do you remember about when in 2003?
10     A.   No.
11     Q.   Why does 2003 come to mind as the
12 year when you think that probably happened?
13     A.   There were, as we have talked about
14 the first time I was here, computer issues I
15 think during that year.  That's all.
16     Q.   Were there any witnesses to this
17 incident?
18     A.   I don't know.  There were students
19 around.
20     Q.   Can you --
21     A.   So, it was in the middle of a class.
22     Q.   Can you identify any student who

Page 474

1  would have heard what was said?
2      A.   No.
3      Q.   Did Mr. Ryan give you any
4  explanation about why he wanted you to delete
5  student files from the computer?
6      A.   No.
7      Q.   Do you believe that Mr. Ryan had a
8  racial motivation for stating to you that he
9  wanted you to remove student files from the
10 computer?
11     A.   This -- yes.
12     Q.   And why do you think that?
13     A.   I didn't see Nick go into the middle
14 of Laura Tolliver's class and demand that her
15 student files be deleted from the computer.
16     Q.   Were you always present in Laura
17 Tolliver's class when she was teaching?
18     A.   No.
19     Q.   Were you normally present in her
20 class while she was teaching?
21     A.   No.
22     Q.   What would be your basis for knowing

Page 475

1  what Mr. Ryan had said in her class?
2      A.   We have been in proximity
3  classroom-wise and I've never heard that.  I've
4  never heard him do that to her, and she has never
5  said it to me.
6      Q.   Have you ever been in Laura
7  Tolliver's class when Mr. Ryan came in to speak
8  to her while she was teaching?
9      A.   I don't recall.
10     Q.   And is this another example of what
11 you consider the racially hostile environment at
12 GDS?
13     A.   Yes.
14     Q.   Now, is it possible that Mr. Ryan
15 was rude in the way he spoke to you, but that he
16 had a legitimate nonracial reason for his
17 statement?
18     A.   I don't know.
19     Q.   How often did Mr. Ryan stop you in
20 the middle of a class to angrily tell you that he
21 wanted you to immediately delete student files
22 from the computer?

28  (Pages 472 to 475)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 476

1    A.   I recall this one time.
2    Q.   And what year did this happen?
3       MR. RACIN:  Asked and answered.
4  BY MR. WILLIAMSON:
5    Q.   Did I ask it about Mr. Ryan or did I
6  ask it earlier about Mr. Ruble?
7       I have already asked that?
8       Okay, we'll move on.
9       All right, in the fourth bullet
10 under this heading of Exhibit 39, you say that:
11 "You were turned away from a theatre performance
12 when you made a special effort to make sure there
13 were photographs of the play for the yearbook."
14      Do you see that?
15   A.   Yes.
16   Q.   Just for the record, I want, we're
17 talking about the, it's Exhibit 39 and the page
18 number, or the Bates number is 2642.
19      What theater performance were
20 you talking about?
21   A.   I don't recall which play.
22   Q.   Was it a theater performance at GDS?

Page 477

1    A.   Yes.
2    Q.   Who is it that turned you away?
3    A.   Laura Rosberg.
4    Q.   Who is Laura Rosberg?  How do you
5  spell her name?
6    A.   R-O-S-B-E-R-G, I think.
7    Q.   Uh-huh.  Do you know how she spells
8  her first name?
9    A.   L-A-U-R-A.
10   Q.   Okay.  What is here -- is she
11 someone who is employed by GDS?
12   A.   Yes.
13   Q.   What is her position?
14   A.   Chair of performance, performing
15 arts.
16   Q.   And what did she say when you were
17 turned away?
18   A.   That there was no room for you.
19   Q.   Meaning that there was not a seat
20 for you, is that what she was saying?
21   A.   No room for me.
22   Q.   And did you regard being turned away

Page 478

1  from the theater performance on that basis as an
2  incident of racial harassment?
3    A.   Yes.
4    Q.   Did you have a reason for thinking
5  that Ms. Rosberg was racially prejudiced against
6  you?
7    A.   Before this?
8    Q.   Yes.
9    A.   I don't know.
10   Q.   Was there something she said at the
11 time of the incident that indicated to you that
12 she was acting on the basis of racial prejudice?
13   A.   I told you what I recall that she
14 said to me.
15   Q.   Let me be sure I understand your
16 testimony.
17      You feel that her telling you that
18 there was not room for you was a racially
19 motivated statement against you?
20   A.   There were seats, there was room,
21 and I'm a faculty member.  And this was another
22 one of the continuing incidents at GDS.

Page 479

1    Q.   Did you tell her that you knew where
2  there was a seat that you could sit?
3    A.   No.
4    Q.   Why not?
5    A.   I was tired.
6    Q.   Do you know whether she knew if
7  there were seats, the seats, if she knew about
8  the vacant seats that you knew about?
9    A.   Yes.
10   Q.   How do you know that?
11   A.   We were standing right there at the
12 door.
13   Q.   So, you are standing right there at
14 the door, you could both see the vacant seats; is
15 that right?
16   A.   Yes.
17   Q.   And you, when she said there was not
18 room, you did not say to her there's a vacant
19 seat because you were too tired; is that your
20 testimony?
21   A.   I had had it, yes.  So, I was too
22 tired.

29 (Pages 476 to 479)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 480

1    Q.    Did you complain to anybody at the
2  school about being turned away when you thought
3  there was a place where you could sit?
4    A.    I don't recall that.
5    Q.    Do you know if the vacant seats that
6  you saw were being held for anybody else who had
7  reserved a place?
8    A.    No, because the doors were closing
9  for the night for the play.
10    Q.    Is it possible that someone who had
11  a reserve seat would might come later?
12    MR. RACIN:  Objection as to form.
13  You may answer.
14    THE WITNESS:  The doors were being
15  closed for the play.  They close the doors so
16  that the students can do the play without any
17  interruptions.
18      And the door was going to be closed
19  and no one else was going to come in, at least
20  during that period.
21    Q.    Do you know if the seats that were
22  vacant might have been occupied by people who had

Page 481

1  left temporarily to go to the restroom?
2    A.    No.
3    Q.    You don't know?
4    A.    No.  At any rate, they couldn't come
5  back in, because the doors were closed for the
6  play.
7    Q.    They closed the doors for the whole
8  play or just the first act?
9    A.    I don't know.
10    Q.    Was there ever any other time that
11  you sought to attend a theater performance at GDS
12  where Ms. Rosberg, or anybody else, turned you
13  away from the theater performance for a racial
14  reason -- no, strike that.
15      Was there any other time when you
16  were turned away from a theater performance at
17  GDS when you sought admission to the performance?
18    A.    No.
19    Q.    In the last bullet under the
20  heading, "Being Undermined in Front of Students,"
21  on Exhibit 39, you say:  "The faculty and staff
22  who assisted the students in preparing these

Page 482

1  signs and banners also became aware of my
2  powerlessness to even allow simple sign making to
3  occur in the space where I teach."
4      Do you see that?
5    A.    Yes.
6    Q.    Now, is the space where you teach
7  your classroom?
8    A.    Yes.
9    Q.    Is it your testimony that you were
10  not allowed by GDS to permit students to engage
11  in sign-making in your classroom?
12    A.    Are you asking about this particular
13  thing here?
14    Q.    I'm trying to understand what you
15  mean by this bullet point on Exhibit 39 under the
16  heading:  "Being Undermined in Front of
17  Students."
18      The quote that you have here, what
19  we quoted from this statement says that:  "Your
20  students became aware of your powerlessness to
21  even allow simple sign-making to occur in the
22  space where I teach."

Page 483

1      And then you just testified that
2  where you teach is your classroom.
3      And my question is:  Whether your
4  testimony is that you were not allowed by GDS to
5  permit students to engage in sign-making in your
6  classroom?
7    A.    No.
8    Q.    Can you state any specific dates
9  when students were not allowed to engage in
10  sign-making in your classroom?
11    A.    This statement.
12    Q.    Can you answer the question first,
13  and then you can explain the statement?
14    A.    Repeat the question, please.
15    Q.    Can you state any specific dates
16  when students were not allowed to engage in
17  sign-making in your classroom?
18    A.    No.
19    Q.    Okay.  I'm having trouble
20  understanding what your statement means when you
21  said that:  "Your students became aware of your
22  powerlessness to even allow simple sign-making to

30  (Pages 480 to 483)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 484

1  occur in the space where I teach."
2         Can you explain that to us?
3     A.   Not your students, the faculty and
4  staff who assisted the students, "the faculty and
5  staff who assisted the students in preparing
6  these signs and banners also became aware of my
7  powerlessness to even allow simple sign-making to
8  occur in the space where I teach."
9         I think that's different than the
10 question you are asking me.  That's why I'm
11 having trouble answering it, I think.
12    Q.   Okay.  What time period are you
13 talking about here?
14    A.   I believe that this is directly
15 related to the Black Culture Club and the --
16 2002.
17    Q.   Would that be February of 2002?
18    A.   I believe so.
19    Q.   Now, let's say, if you came to
20 school in, on February 1st of 2002, let's assume
21 that's a school day, and you wanted to have your
22 students make simple signs in your classroom,

Page 485

1  would GDS have allowed you to do that?
2     A.   Yes.
3     Q.   All right.  The next heading on
4  Exhibit 39 is "Sabotaging Course Registration."
5         What do you mean by that heading?
6     A.   The bullets listed below that is
7  what my meaning is.
8     Q.   Why did you use the phrase
9  "Sabotaging Course Registration," what does that
10 heading denote?
11    A.   All of the items listed beneath
12 that, sir.  I can read it for you.
13    Q.   I don't want you to read it.  I'm
14 not asking you to read the things.
15        I just want to understand what you
16 mean by sabotaging, or what does it mean to
17 sabotage something?
18    A.   You want me to define what I mean by
19 sabotage?
20        I did not use any of these bullets
21 listed beneath it to explain my meaning.
22    Q.   Well, as a starter, I'm going to ask

Page 486

1  you about some of the specifics underneath it and
2  you can use that if you want.
3         But, I was hoping you could give us
4  a general understanding of what you mean by
5  sabotaging course registration, and then maybe
6  provide a couple of examples.
7     A.   As a teacher you, one wants to feel,
8  make sure you have students interested in your
9  courses and so on.
10    Q.   When you use sabotage here, you were
11 saying that the registration process was being
12 conducted in a way to deter or discourage
13 students from taking your courses, is that what
14 you're saying?
15    A.   That's a part of it.  And, in fact,
16 it says Bullet Number 2:  "I was told that I
17 would not be participating in student on-site
18 registration process where students are advised
19 about which courses to sign up for.
20    Q.   What year was that?
21    A.   I don't know.
22    Q.   Were there any years where you

Page 487

1  participated in on-site student registration?
2     A.   Yes.
3     Q.   Did you do that in -- or, when did
4  this on-site registration take place?
5     A.   You mean -- when do you mean, what
6  month?
7     Q.   Yes.  What time during the school
8  year?
9     A.   Springtime, I think, sometime around
10 spring.
11    Q.   Did you participate in on-site
12 registration in the spring of 2005?
13    A.   Uh-huh.
14    Q.   What about the spring of 2004?
15    A.   I don't recall.
16    Q.   And what about the spring of 2003?
17    A.   I don't recall.
18    Q.   And what about the spring of 2002?
19    A.   I don't recall.  I've done more than
20 one, though.
21    Q.   And what about the spring of 2001?
22    A.   I don't recall exactly, but I've

31 (Pages 484 to 487)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 488

1  done more than one.
2      Q.   And what about the spring of 2000?
3      A.   My answer is the same.
4      Q.   Do you remember whether you
5  participated in on-site registration during any
6  spring periods before or between 1994 and 2000?
7      A.   Yes.
8      Q.   Do you remember how many?
9      A.   No.
10     Q.   Most of them?
11     A.   I don't know.
12     Q.   Would there have been anything that
13  could refresh your recollection about when you
14  did, or the timing of when you did or did not
15  participate in the on-site registration process?
16     A.   Not that I'm aware.
17     Q.   Is there any document that would
18  refresh your recollection?
19     A.   Not that I have, sir.  No.
20     Q.   Okay.  Anybody you can think you can
21  talk to who might be able to refresh your
22  recollection?

Page 489

1      A.   No.
2      Q.   Do you see under this heading on
3  Exhibit 39 relating to "Sabotaging Course
4  Registration," where it says:  "Laura Tolliver,
5  with Nick Ryan's approval, began to incorporate
6  AP components into her classes without discussion
7  with me individually or as a department."
8          Now, do you regard -- do you see
9  that?
10     A.   Yes, I do, sir.
11     Q.   Do you regard this approval by Nick
12  Ryan relating to Laura Tolliver's class as an
13  example of racially hostile treatment of you?
14     A.   Repeat the question, please.
15     Q.   Do you regard this approval by Nick
16  Ryan relating to Laura Tolliver's class as an
17  example of racially hostile treatment of you?
18     A.   This particular thing, yes.
19     Q.   And why is it you viewed that as
20  conduct that was motivated by racial prejudice?
21     A.   Without discussion with me, or
22  individually as the department as usual.

Page 490

1      Q.   But, did anybody say or write
2  anything to you that indicated that the motive
3  for not including you in the discussion was that
4  you were a black person?
5      A.   I don't know.  If they wrote
6  something to me, I haven't seen it.  If they
7  wrote something directly to me saying that, no.
8      Q.   Did they say anything to you that
9  had a racial content?
10     A.   In this regard or most any of them,
11  not that I recall.
12     Q.   Now, were you allowed to teach an AP
13  course -- well, tell me, what's an AP course?
14     A.   It's an advanced placement course
15  that is offered in high schools through the
16  college board.
17     Q.   How are AP courses different from
18  regular courses?
19     A.   A student can possibly earn college
20  level credit for achieving a certain result on an
21  exam.
22     Q.   Now, were you allowed to teach AP

Page 491

1  courses at GDS while you were a teacher there?
2      A.   Yes.
3      Q.   What were the AP courses that you
4  taught while you were employed by GDS?
5      A.   AP Studio Art.
6      Q.   Any others?
7      A.   No.
8      Q.   You also said, on the first page of
9  Exhibit 39, the Bates number 2642, under the
10  second heading, that:  "You were told that you
11  would not be participating in student on-site
12  registration process where students are advised
13  about which courses to sign up for."
14          Now, when you say student on-site
15  registration process, were you referring to the
16  arena for upper classmen, or are you referring to
17  9th grade registration?
18     A.   The arena.
19     Q.   And what is the arena?
20     A.   Where students have the opportunity
21  to sign up for courses for the following year.
22     Q.   And I'm going to ask you to take a

32  (Pages 488 to 491)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 492

1  look at a document that's going to be marked as
2  Exhibit 40.
3          (Killian Exhibit Number 40
4          marked for identification.)
5  BY MR. WILLIAMSON:
6    Q.   Have you had a chance to look at
7  Exhibit 40?
8    A.   Yes.
9    Q.   What is Exhibit 40?
10   A.   An e-mail.
11   Q.   From whom?
12   A.   From Nick Ryan and Tom Yoder.
13   Q.   Who's Tom Yoder?
14   A.   Assistant principal, high school.
15   Q.   And who is the recipient of the
16 e-mail?
17   A.   Sharon Killian, Laura Tolliver.
18   Q.   And what's the date of the e-mail?
19   A.   May 11, 2004.
20   Q.   And what is the subject of the
21 e-mail?
22   A.   Arena, Forward Arena.

Page 493

1    Q.   And what message is being
2  communicated to you about the arena in this
3  e-mail?
4    A.   It reads, in part:  "FYI, Laura, if
5  you would assist at the signup table and Sharon,
6  if you would help in the counselor area working
7  with students and guiding appropriate choices,
8  that would be great.
9          "If you would both like to trade off
10 roles, that's fine, also.  Thanks, Nick."
11   Q.   Is this e-mail, in your view,
12 evidence of Nick Ryan's efforts to sabotage your
13 role in the on-site registration process?
14   A.   No.
15   Q.   This e-mail indicates that he wanted
16 you to assist in that process in the spring of
17 2004, doesn't it?
18   A.   Yes.
19   Q.   And he was also asking your
20 colleague, Laura Tolliver, to assist; is that
21 right?
22   A.   Yes.

Page 494

1    Q.   And he gave the two of you the
2  option of trading off roles that he was
3  requesting you to play; is that right?
4    A.   Yes.
5    Q.   Did you consider that reasonable and
6  appropriate on his part?
7    A.   Yes.
8    Q.   And did you consider that respectful
9  of you as a member of the faculty and as an
10 African-American?
11   A.   Yes.
12   Q.   Did you participate in the Arena in
13 May of 2004?
14   A.   Yes.
15   Q.   Let's look at the third bullet on
16 the first page of Exhibit 39.
17          It says that:  "As part of a
18 long-term campaign to wrest the AP courses from
19 me, Ryan and Tolliver attempted to persuade
20 students to take Laura's courses rather than the
21 AP classes that I teach."
22          Do you see that?

Page 495

1    A.   Yes.
2    Q.   All right.  Does Ryan refer to Nick
3  Ryan, the chair of the art department?
4    A.   Yes.
5    Q.   And does Tolliver refer to your
6  colleague, Laura Tolliver, the other faculty
7  member in the art department?
8    A.   Yes.
9    Q.   Now, when did the long-term campaign
10 to wrest the AP courses from you begin at GDS?
11   A.   I don't know.
12   Q.   You're the person who wrote this
13 statement, aren't you?
14   A.   Yes.  Yes, I wrote this statement.
15   Q.   Is there some document you could
16 look to that would help you remember when this
17 campaign began?
18   A.   There are probably documents, none
19 that I can tell you specifically, but I can give
20 you a specific date.
21   Q.   What's the specific date?
22   A.   I started to teach in 2000, teach

33  (Pages 492 to 495)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 496

1  this course in 2000.  And --
2      Q.  Who decided you would teach the
3  course in 2000?
4      A.  Paul Levy.
5      Q.  Who was the chairman of the art
6  department at that time?
7      A.  Debbie Haynes.
8      Q.  Did she object to your teaching the
9  course?
10     A.  I don't know.
11     Q.  Okay.  When you said you could give
12  me the specific date, are you giving me the
13  specific date when the long-term campaign to
14  wrest AP courses away from you started?
15     A.  I'm sorry, I might have misspoke.  I
16  said I couldn't give you a specific date.  I
17  could not give you a specific date, but I started
18  teaching the course in 2000.
19     Q.  I see.  Well, what did Mr. Ryan and
20  Ms. Tolliver do in order to carry out the
21  long-term campaign to rest AP courses from you?
22     A.  Guided students out of my advanced

Page 497

1  courses during registrations and so on, including
2  the AP opportunity in other courses that were
3  being taught by Laura Tolliver without, as
4  mentioned in the Bullet Number 1, and explained
5  clearly, I think in Bullet Number 1.
6      Q.  Is it your testimony that the reason
7  they were offering AP in Ms. Tolliver's courses
8  was to get students to not take your AP course?
9      A.  I don't know.
10     Q.  Okay.  Were you still teaching AP
11  courses in the 2004/2005 school year, that is the
12  last year you taught at GDS?
13     A.  Yes.
14     Q.  What AP courses?
15     A.  It's one, it was advanced placement
16  studio art.
17     Q.  And were you assigned to teach any
18  AP courses in the 2005/2006 school year?
19     A.  Yes.
20     Q.  What AP course or courses?
21     A.  AP studio art.
22     Q.  How many AP courses did Ms. Tolliver

Page 498

1  teach?
2      A.  None that I know of.
3      Q.  How many AP courses did Mr. Ryan
4  teach?
5      A.  None.
6      Q.  So, in the art department, you were
7  the only faculty member teaching an AP course?
8      A.  Yes.
9      Q.  Okay.  Would you take a look at a
10  document we're going to mark as Exhibit 57,
11  please.
12          (Killian Exhibit Number 57
13           marked for identification.)
14  BY MR. WILLIAMSON:
15     Q.  Have you had a chance to look at
16  Exhibit 57?
17     A.  Yes.
18     Q.  And what is that?
19     A.  It's an e-mail.
20     Q.  We'll do the usual drill.
21     A.  Yes, sorry.  E-mail from -- dated
22  April 1st, 2005, from Nick Ryan, Course

Page 499

1  Assignments '05/'06, to Laura Tolliver, Sharon
2  Killian."
3      Q.  Excellent identification of the
4  exhibit.
5      A.  Thank you.
6      Q.  You're quite welcome.  Now, let me
7  ask you a few questions about that.
8      A.  Okay.
9      Q.  Does this e-mail from Mr. Ryan state
10  that either Mr. Ryan or Ms. Tolliver requested to
11  teach AP studio art?
12     A.  No.
13     Q.  Who is the only teacher who asked to
14  teach AP studio art?
15     A.  I did.
16     Q.  In your view, did Mr. Ryan and
17  Ms. Tolliver succeed in their long-term campaign
18  to wrest your AP courses away from you?
19     A.  No.
20     Q.  Did you consider these efforts to
21  try to wrest the AP course away from you as
22  evidence of racially hostile treatment of you?

34  (Pages 496 to 499)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 500

1    A.   Yes.
2    Q.   And what is your basis for thinking
3 that race was a motivating factor behind the
4 efforts of Mr. Ryan and Ms. Tolliver to wrest
5 control of the AP class from you?
6    A.   It was yet another action that only
7 happened to me and not to anyone else in that
8 department.
9    Q.   But, you have testified, haven't
10 you, that the only person in the department who
11 asked to teach an AP course was you; is that
12 right?
13   A.   Yes.
14   Q.   So, if you were the only one, or if
15 the others were not asking to teach the AP
16 course, how could somebody wrest away from them
17 their role teaching an AP course?
18   A.   Well, if you, if the students don't
19 sign up, you don't teach a class.
20       If someone else is offering AP, in a
21 different class, whether the class is labeled AP
22 or not, then the class will diminish and can die.

Page 501

1        So --
2    Q.   Did that happen?
3    A.   Almost.
4    Q.   What do you mean almost?
5    A.   There are actually -- sorry.
6    Q.   I didn't mean to interrupt you.  Let
7 me just first ask, because I may be a little
8 confused now.
9        Did Mr. Ryan or Ms. Tolliver offer
10 any alternative AP course to students at GDS
11 while you were a teacher there?
12   A.   Alternative course, I don't get --
13   Q.   Any other AP course, besides the AP
14 studio art course that you were offering, did
15 either Mr. Ryan or Ms. Tolliver offer some other
16 AP course in art to students at GDS while you
17 were a teacher there?
18   A.   The descriptions might say something
19 like that.  No course was offered, no alternate
20 AP class was offered that I know of.
21   Q.   Okay.  And you said something about
22 how somebody might put something AP into their

Page 502

1 course that would draw students away from your AP
2 course, is that what you're saying?
3    A.   Yes.  In the first bullet:  "Laura
4 Tolliver began to incorporate AP components into
5 her classes without discussion with me
6 individually or as a department chair.
7    Q.   If you have AP components, but
8 you're not an AP course, are the students able to
9 get the college credit that you were talking
10 about?
11   A.   Students, if you sit for the exam,
12 you may, sure.
13   Q.   So, you can sit for an AP exam
14 without having taken an AP course, is that what
15 you're saying?
16   A.   Yes.
17   Q.   Now, who made the decision that you
18 would be allowed to continue teaching AP studio
19 art at GDS?
20   A.   I don't know.
21   Q.   Do you know if Nick Ryan approved or
22 supported your teaching AP studio art at GDS?

Page 503

1    A.   I don't know.
2    Q.   Do you have any idea who at GDS was
3 responsible for determining which faculty would
4 be allowed to teach AP courses?
5    A.   No.
6    Q.   How would you find out the answer to
7 that?
8    A.   Probably we could ask the principal.
9 You know, how it, what the process is, if there
10 is a process.
11   Q.   Who would the principal have been in
12 April of 2005?
13   A.   Kevin Barr.
14   Q.   Is there anybody else who would
15 know?
16   A.   I don't know.  The department chair
17 should know, and, but, certainly the principal
18 would know, if you wanted to ask him.
19   Q.   Do you know if the department chair
20 ever communicated anything to Mr. Barr or anybody
21 else at GDS saying that he, Nick Ryan, was
22 opposed to your teaching the AP studio art

35  (Pages 500 to 503)

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

Page 504

1  course?
2      A.   I don't know.
3      Q.   Now, in the fourth bullet under
4  "Sabotaging Course Registration," you say: "By
5  guiding students out of my advanced courses as
6  was done last year, there was a chance that an
7  insufficient number of students would sign up and
8  the course would have to be dropped."
9          When you talk about guiding students
10  out of your advance courses as was done last
11  year, what year are you talking about; is that
12  2003/2004?
13      A.   Maybe it would have been 2003/04.
14      Q.   Okay.
15      A.   I think.  To the best of my
16  recollection.
17      Q.   Or would it be going forward, when
18  you say this process was going on, would it have
19  been -- let me go back.
20          You wrote this set of talking points
21  in August of '04; is that right?
22      A.   Uh-huh.

Page 505

1      Q.   That's Exhibit 39.  So, when you're
2  talking about these students who are being guided
3  out of advanced courses as was done last year,
4  the last year you're talking about is 2003/2004;
5  is that right?
6      A.   I think so.
7      Q.   But, the effect would have been on
8  the 2004/2005 school year; is that right?
9      A.   Uh-huh.  Yes.
10      Q.   Okay.  How many students were guided
11  out of your advanced course during the 2004/2005
12  school year?
13      A.   I don't recall.  If the, if that's
14  the year that I went from two courses, two full
15  courses to one course.
16          And I think that's what happened.  I
17  think I did lose a whole class of about 16, 17
18  students.  I believe that's the year it happened.
19      Q.   And it is your understanding that
20  that happened because Mr. Ryan or Ms. Tolliver
21  were discouraging students from taking your
22  course?

Page 506

1      A.   Yes.  I think that's what I said
2  here.
3      Q.   Okay.  I know that's what you said
4  there, I want to be sure that's still your
5  understanding?
6      A.   Yes.
7      Q.   Do you know the names of any
8  students who were guided away from taking your AP
9  studio art course?
10      A.   No.
11      Q.   With respect to the year when you,
12  you said there was one year when you only had one
13  section instead of two sections of that course?
14      A.   Yes.  I believe so, yes.
15      Q.   Okay.  Let's see if -- did you
16  normally have two sections of AP studio art?
17      A.   Yes.
18      Q.   Okay.  Did you have two sections of
19  AP studio art in the most recent year that you
20  taught at GDS 2004/2005?
21      A.   No, I think that's what I was saying
22  here, is that it went from two to one.

Page 507

1      Q.   And was there any other year when
2  you only had one section of AP studio art that
3  you taught?
4      A.   I don't think so.  But, I'm not
5  sure.  It may have built up from one to two, you
6  know, from 2002, it might have increased, and
7  then.  But, I'm not sure.  I don't know.
8      Q.   In 2004/2005, were you asked to
9  teach an additional course that was not an
10  advanced placement course?
11      A.   I -- yes.
12      Q.   What course was that?
13      A.   I taught advanced drawing and
14  painting.
15      Q.   Advanced drawing and painting?
16      A.   Yes.
17      Q.   Did that have any AP components?
18      A.   No.
19      Q.   During this, during -- tell me,
20  during the time that you were employed at GDS,
21  did you always teach at least four courses?
22      A.   Yes.

36 (Pages 504 to 507)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 508

1    Q.    Did you ever teach more than 4
2    courses?
3    A.    I don't think so.
4    Q.    Do you know how many, do you
5    remember how many sections of AP studio art you
6    were scheduled to teach for the 2005/2006 school
7    year?
8    A.    One.
9    Q.    And what were the other courses you
10   were scheduled to teach during that year?
11   A.    Film and video, and advanced photo.
12   Actually, no.  Film and video and graphic design.
13   Q.    And that's one of those where you
14   were going to have two sections?
15   A.    That's right.  Film and video was
16   two sections and the graphic design was one.
17   Q.    Okay.  Now, was there ever a year
18   when there were insufficient students for you to
19   teach any AP studio art course?
20   A.    Could you repeat that, please?
21   Q.    I said were there any years where
22   you had insufficient students for you to be able

Page 509

1    to teach any AP studio art course?
2    A.    No.
3    Q.    And in 2000 --
4    A.    Since 2000?
5    Q.    Yes.
6    A.    Uh-huh.
7    Q.    And, in the spring of 2005, how many
8    sections of AP studio art did you request to
9    teach?
10   A.    One section, it says one section of
11   AP studio art.
12   Q.    Why is it you only requested to
13   teach one section?
14   A.    There is a class list by this time
15   of student signups for the courses.
16   Q.    Was there, at any point during the
17   2004/2005 school year, where you indicated you
18   wanted to teach two sections of AP studio art?
19   A.    I don't recall.
20   Q.    If you had wanted to do that --
21   A.    Excuse me.  May I be excused?
22   MR. WILLIAMSON:  Yes.  Sure.

Page 510

1    THE VIDEOGRAPHER:  Going off the
2    record at two o'clock.
3    (Recess -- 2:00 to 2:10 p.m.)
4    THE VIDEOGRAPHER:  Going on the
5    record at 2:10:23.
6    BY MR. WILLIAMSON:
7    Q.    Ms. Killian, how many courses, or
8    how many art courses did Mr. Ryan teach each
9    year?
10   A.    I believe he taught about four
11   courses.
12   Q.    Were there any years when Mr. Ryan
13   had to drop a course because of insufficient
14   enrollment?
15   A.    I don't know.
16   Q.    How many courses did Ms. Tolliver
17   teach in the art department each year?
18   A.    Four.
19   Q.    Were there any years when
20   Ms. Tolliver had to drop a course because of
21   insufficient enrollment?
22   A.    I don't know.

Page 511

1    Q.    And did I ask you earlier whether
2    you could name any specific students that
3    Mr. Ryan guided away from your AP studio art
4    course for the 2004, 2005 school year?
5    A.    You asked me that.
6    Q.    Okay.  And did I ask the same
7    question, and the answer was no?
8    A.    Yes.
9    Q.    Okay.  And did I ask you also about
10   Ms. Tolliver, whether you knew of any students
11   that she had guided away from your course?
12   A.    I don't recall.  Perhaps the
13   recorder would tell us.
14   Q.    Well, can you tell me whether you
15   remember any students that were guided away from
16   your AP studio art course for 2004/2005 by
17   Ms. Tolliver?
18   A.    No.
19   Q.    Okay.  Would you take a look at an
20   exhibit that we're going to mark as Exhibit 42.
21   (Killian Exhibit Number 42
22   marked for identification.)

37 (Pages 508 to 511)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 512

1  BY MR. WILLIAMSON:
2      Q.   Before you answer any questions
3  about Exhibit 42, do you know of any instances
4  where Mr. Ryan guided or suggested to students
5  that they take your AP studio art course for the
6  2004/2005 school year?
7      A.   There -- I don't know a specific
8  instance, but there probably was at least one.
9      Q.   All right.  Why don't you take a
10 look at Exhibit 42.  Tell us what that is.
11     A.   It's an e-mail from Nick Ryan and
12 somebody called Peggy W., Subject:  Forward Silla
13 and Art to Ted at Kron and Peggy, cc Sharon
14 Killian.
15     Q.   Do you remember getting a copy of
16 this e-mail?
17     A.   I see it's cc'd to me.  I could
18 probably, it will probably refresh my memory as
19 to having read it, if I just keep looking.
20 Should I read?
21     Q.   Why don't you just look it over and
22 then tell me if that refreshes your recollection

Page 513

1  as to whether you received this e-mail.
2      A.   It clearly was cc'd to me and,
3  although it is not clear in my mind, I would
4  assume that I looked at it.
5      Q.   Do you see at the beginning of the
6  message in the e-mail where it says:  "Peggy, my
7  first response is that if Silla wants to go to a
8  school like RISD, then she should have AP studio
9  art on her schedule with Sharon Killian."
10         Do you see that?
11     A.   Yes, I do.
12     Q.   Okay.  Is RISD the Rhode Island
13 School of Design?
14     A.   Yes.
15     Q.   And is this an example of Mr. Ryan
16 guiding students to take your AP studio art
17 course?
18     A.   It's guiding Silla, yes, to take the
19 studio art course.
20     Q.   And what race is Silla?
21     A.   Silla is white as I recall.
22     Q.   I want to ask you to take a look at

Page 514

1  another exhibit that we're going to mark as
2  Exhibit 43.
3          (Killian Exhibit Number 43
4           marked for identification.)
5          THE WITNESS:  Yes.
6  BY MR. WILLIAMSON:
7      Q.   Do you recognize the document that's
8  been marked as Exhibit 43?
9      A.   Yes.
10     Q.   What is it?
11     A.   It's an e-mail from Nick Ryan to
12 Tuffer Toragus (ph.), actually:  Subject Tuffer
13 Toragus to Sharon."
14     Q.   What's the date of the e-mail?
15     A.   February 27th, 2004.
16     Q.   And what was the subject?
17     A.   Tuffer Toragus.
18     Q.   Who was Tuffer Toragus?
19     A.   He was a student of mine.
20     Q.   Okay.  And Mr. Ryan wrote in that
21 e-mail to you, "Tuffer Toragus is considering AP
22 studio art with a 3D concentration.  I

Page 515

1  recommended that he speak with you."
2          Do you see that?
3      A.   Yes.
4      Q.   Now, was that an example of
5  Mr. Ryan's guiding a student to take your AP
6  studio art course?
7      A.   Yes.
8      Q.   Did you think that Mr. Ryan and
9  Ms. Tolliver ever guided students away from your
10 AP studio art course because they resented you
11 because of their belief that you played a role in
12 Ms. Haynes' departure from GDS?
13     A.   I don't know.
14     Q.   Do you know whether Mr. Ryan or
15 Ms. Tolliver ever guided students away from your
16 AP studio art course because they wanted to treat
17 you in a racially hostile way?
18     A.   Yes.
19     Q.   And how do you know that?
20     A.   That's my belief.
21     Q.   Is there anything else besides your
22 belief?

38  (Pages 512 to 515)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 516

1    A.    And my experience for these past
2    years.
3    Q.    How many years are you talking
4    about?
5    A.    Twelve.
6    Q.    Now, in the bottom bullet on, let's
7    see, the page that we were looking at on
8    Exhibit 39 which is, it's got a Bates number
9    2642.
10       Do you see where it says:  "I have
11   proposed review of the course including breaking
12   it into three sections, to allow them both the
13   opportunity to teach it, but no discussions about
14   my proposal have occurred."
15       Can you tell us what you were
16   talking about there?
17   A.    I wrote to Nick Ryan about AP studio
18   art, and that the course could actually be taught
19   in three different sections, which would give the
20   other staff members opportunity to teach AP
21   studio art, in their disciplines.
22   Q.    What other teachers were you talking

Page 517

1    about?
2    A.    Laura Tolliver and Nick Ryan.
3    Q.    And why was it you were proposing
4    that they have an opportunity to teach AP studio
5    art?
6    A.    One was the development of the
7    program.
8    Q.    What do you mean development of the
9    program?
10   A.    To enrich the AP program.
11   Q.    You thought it would enrich the
12   program if there were more faculty who taught AP
13   courses, is that what you're saying?
14   A.    Not just that there would be more
15   faculty that taught the AP program, but that the
16   course could broaden and more students could come
17   into it.
18       And they were, Nick Ryan and Laura
19   Tolliver were trying to eliminate the AP program.
20   They -- there was, as I said here in this bullet
21   above, there was a continued campaign to
22   eliminate the AP studio art class.

Page 518

1        Always a question as to whether we
2    should offer it the following year, the whole
3    school had been through a whole consideration of
4    whether AP courses should continue, and the AP
5    studio art courses that were on that list decided
6    to be continued.
7    Q.    Who decided that?
8    A.    Peter Branch and a committee of
9    students and faculty, I think.
10   Q.    And why were people at the school
11   talking about whether the AP program should be
12   continued more broadly?
13   A.    Should be continued, whether it
14   should be continued.  It's a national issue
15   that's always taken up by institutions.
16   Q.    And what's the issue?
17   A.    Whether the school should
18   participate with the college board giving AP
19   classes.
20   Q.    And that issue or that question was
21   focused more broadly than just AP studio art at
22   GDS?

Page 519

1    A.    Yes.
2    Q.    Was it focused on all of the AP
3    courses at GDS?
4    A.    All of the AP courses, yes.
5    Q.    You've been doing pretty well, try
6    to hold off on speaking while I am speaking,
7    because it makes it very hard for the reporter to
8    keep up with us.
9    A.    Okay.
10   Q.    She's good, but you have to be
11   really good to get it right when two people are
12   speaking at the same time.
13       And the "both" that you were
14   referring to in this bullet point, referred to
15   Nick Ryan and Laura Tolliver; is that right?
16   A.    Yes.
17   Q.    Is there any reason why you couldn't
18   have just taught three sections of the AP studio
19   art course since you were already doing it?
20   A.    No.
21   Q.    Did you ever propose that?
22   A.    No.

39 (Pages 516 to 519)

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 520

1    Q.    Why is it you didn't propose to do
2  that as a way to enrich the program?
3    A.    I'm a dedicated teacher.
4    Q.    What do you --
5    A.    I leave it open to -- I want to hear
6  what my faculty members have to say, and how they
7  want to help to impact the offerings of the
8  department.
9    Q.    Did you ever ask them if, what they
10  thought about the idea that you would just teach
11  three sections of AP studio art?
12    A.    No.
13    Q.    And you said that there were no
14  discussions about your proposal, at least as of
15  the time you wrote this memo.
16        Were there any discussions
17  subsequently?
18    A.    None that I recall.
19    Q.    And do you regard the failure to
20  engage you in discussion about your proposal to
21  have three sections of the AP studio art course
22  as evidence of racially hostile treatment by GDS?

Page 521

1    A.    No.
2    Q.    In the first bullet on the second
3  page of Exhibit 39, if you would turn to that
4  Bates page 2643.
5        Do you see where it says -- or, let
6  me say in that bullet point you discuss:
7  "Attempts to take credit and/or take away control
8  of any activities that brought visibility to your
9  teaching and leadership activities such as the
10  film club, and this year the art magazine."
11        What's an example of someone at GDS
12  trying to do that to you?
13    A.    That meeting that was conducted with
14  Nick Ryan, Laura Tolliver and Susie Ryan about
15  the art magazine.
16    Q.    Any other examples?
17    A.    My being told that I would not be
18  advisor to the film club.
19    Q.    And any other example you can think
20  of?
21    A.    I think those are two examples that
22  I can name right now.  There are lots of other

Page 522

1  things, but, I would -- you know --
2    Q.    But, what --
3    A.    The AP studio art class.  There are,
4  the exhibits that I might put on outside the
5  school that aren't mentioned.
6    Q.    What exhibits are those, and where
7  is it that they're not mentioned?
8    A.    An exhibit with, at Politics & Prose
9  of my student artwork, that were not even
10  mentioned in my evaluations and not touted about
11  the school or the department.
12    Q.    Did you express concern about your
13  evaluation not reflecting that?
14    A.    I did.
15    Q.    And was the evaluation modified in
16  response to your concern?
17    A.    Yes.
18    Q.    Any other examples?
19    A.    No.
20    Q.    Now, the next bullet in this second
21  page of exhibit, I believe it's Exhibit 39, you
22  say that:  "Laura Tolliver had a printing

Page 523

1  contractor open a box for the art magazine that
2  was delivered to your desk."
3        Was this the 2004 art magazine?
4    A.    I believe so.
5    Q.    Is this an example of conduct that
6  you consider racially hostile treatment of you by
7  GDS?
8    A.    Yes.
9    Q.    And what makes you think that the
10  box was opened because of -- or, let me start
11  again.
12        What makes you think that the box
13  was opened by Laura Tolliver because of racial
14  bias against you?
15    A.    It's another part of the whole
16  process, a part of the continuum, a part of the
17  whole.
18    Q.    The whole process of what?
19    A.    Of marginalization over a long and
20  consistent period of time.  I'm --
21    Q.    Now, was the -- I'm sorry, did you
22  finish your answer?

40  (Pages 520 to 523)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 524

1    A.  Yes, I did.
2    Q.  Was the art magazine supposed to
3  reflect the creative art of all students who took
4  courses in the art department?
5    A.  No.
6    Q.  The art, the GDS art magazine was
7  limited to just the artwork of your students; is
8  that right?
9    A.  No.
10    Q.  Was it limited to the artwork of
11  your students and Nick Ryan's students?
12    A.  It's -- no.
13    Q.  Let me -- was it, did it include any
14  of the artwork of students of Laura Tolliver?
15    A.  Yes.
16    Q.  All right.  Maybe my question wasn't
17  clear.  I was trying to understand whether -- the
18  art magazine was supposed to reflect the creative
19  work of students who took courses from each of
20  the three faculty members in the art department.
21    A.  The entire art department, yes.
22    Q.  Okay.  And you said that there were

Page 525

1  some, some of the art that appeared in the art
2  magazine was done by a student in one of Laura
3  Tolliver's classes; is that right?
4    A.  Yes.
5    Q.  Now, prior to the time when the
6  printing contractor delivered the box of art
7  magazines, had you showed Ms. Tolliver proofs of
8  the magazine?
9    A.  No.
10    Q.  You hadn't shown her any proofs of
11  the work that included work done by her students?
12    A.  No.
13    Q.  Okay.  Did either Mr. Ryan or
14  Ms. Tolliver have any input with respect to which
15  student works were ultimately published in the
16  art magazine?
17    A.  No.
18    Q.  Who decided that?
19    A.  I did, along with students --
20    Q.  But, you were the only --
21    A.  -- in the club.
22    Q.  But, you were the only faculty

Page 526

1  member who --
2    A.  I was the advisor to the club, yes.
3    Q.  Let me finish.  You were the only
4  faculty member who decided which students' work
5  would go into the art magazine?
6    A.  Yes.
7    Q.  And Mr. Ryan and Ms. Tolliver had no
8  input whatsoever as to, if they thought a student
9  had done a really good job or something, they had
10  no role in suggesting to you that you might
11  include that in the art magazine?
12    A.  If they wished they could have.
13  They could have said something, but, they didn't
14  have a formal role in it, no.
15    Q.  Did they have an informal role?
16    A.  They provided me with the best of
17  their student works that they wanted to be
18  considered for the magazine.
19    Q.  And did all of the ones that they
20  considered the best of their student work get
21  published in the art magazine?
22    A.  No.

Page 527

1    Q.  Who decided which ones would and
2  which ones wouldn't?
3    A.  The students' committee and me.
4    Q.  Was there any other faculty member
5  involved in that decision?
6    A.  No.
7    Q.  Where was the box when it was
8  opened, do you remember?
9    A.  In the art office.
10    Q.  And where were you when the box was
11  opened?
12    A.  Next door.
13    Q.  What were you doing?
14    A.  I was probably working on a computer
15  on some class work.
16    Q.  Do you know to whom the box was
17  addressed?
18    A.  Sharon Killian.
19    Q.  Did you witness Ms. Tolliver asking
20  the printing contractor to open the box?
21    A.  No.
22    Q.  So, you don't know whether

41 (Pages 524 to 527)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 528

1  Ms. Tolliver asked the printing contractor to
2  open the box, or whether the printing contractor
3  opened the box on his own?
4       A.   I asked the printing contractor.
5       Q.   And what did he say?
6       A.   She asked him to open the box that
7  he delivered to me so that she could inspect its
8  contents.
9            She told him to open it so she could
10 inspect the content.
11      Q.   Okay.  In the next bullet you say
12 that:  "You were affronted by Laura Tolliver when
13 she asked you did you just answer the phone,
14 Hello, Sharon Killian, Department Head."
15           Do you see that?
16      A.   Yes.
17      Q.   Now, you say you were up appalled
18 and no apologies were offered, when did this
19 incident take place?
20      A.   '97.
21      Q.   Did it happen more than once?
22      A.   Not that particular quote, no.

Page 529

1       Q.   And why was it that you found the
2  incident so appalling, Ms. Killian?
3       A.   There were continuing affronts, and
4  this was one in a series.
5       Q.   But, why did you find this one so up
6  appalling?
7       A.   I mean, how else can I explain what
8  I've written here.
9       Q.   Well, appalling is a pretty strong
10 word.  I'm just asking you to give a little bit
11 more detail or sense of why you felt it was
12 appalling what she had done.
13      A.   There have been insults and
14 rudenesses, and here was one more thing that said
15 that I, as if I didn't know, did I not know my
16 place, are you saying that you're the department
17 head?
18           If I were any other faculty member
19 and made a mistake and said that, you know, was I
20 a department, that I was department head or
21 department chair or whatever, I don't know if
22 anything would have been said about that.

Page 530

1       Q.   Did you actually --
2       A.   That I didn't know my place.
3       Q.   Did you actually say that you were
4  the department head?
5       A.   No.
6       Q.   What did you say when you answered
7  the phone?
8       A.   Probably Hello, Sharon Killian, Art
9  Department, not department head.
10      Q.   Okay.  In the fourth bullet on the
11 second page of Exhibit 39, do you see where it
12 says that new, that:  "New rules that did not
13 apply to anyone else had been made up to thwart
14 my teaching efforts."
15           Do you see that?
16      A.   Yes.
17      Q.   What new rules are you referring to
18 when you made that statement?
19      A.   This particular one I believe I was,
20 it was about this particular one I think is about
21 field trips.
22      Q.   And when were these new rules made

Page 531

1  up?
2       A.   When I needed to do a field trip.
3       Q.   What year was that?
4       A.   That, I would have to, I can't be
5  sure.  '98, '97, '98, something like that.
6       Q.   And how did -- what were the new
7  rules, specifically?
8       A.   That I needed a separate parental
9  signature to go to, to go on a field trip, local
10 field trip.
11      Q.   Do you know whether there were any
12 other teachers who were required to get separate
13 parental signatures to take their students on
14 field trips?
15      A.   To the best of my knowledge, there
16 was no one else.
17      Q.   And how did these new rules thwart
18 your teaching efforts?
19      A.   It certainly wasn't what everybody
20 else had to do.  It made me stay more time.  It
21 changed my whole schedule, and many other myriad
22 of things.

42  (Pages 528 to 531)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 532

1    Q.   Did you ask any other teachers
2  whether they were subject to the new rules?
3    A.   I know that Laura Tolliver wasn't
4  subject to it and neither was Debbie Haynes, and
5  it was not a school-wide thing.  It was just for
6  me.
7    Q.   So, when they said there was a new
8  rule, did they tell you that we've made a new
9  rule that was only going to be applicable to
10 Sharon Killian?
11   A.   No.  They only said Sharon you have
12 to do this.  And when I read the information
13 about what was required, it was something that
14 was special for me.
15   Q.   Did you complain to anybody in the
16 administration at GDS when you were made subject
17 to this new rule?
18   A.   I believe I said something to Paul
19 Levy.
20   Q.   What did you say to him?
21   A.   That there was a new rule for me.
22   Q.   And what was his response?

Page 533

1    A.   I don't recall.  I don't recall,
2  excuse me, sorry.
3    Q.   You don't recall his response?
4    A.   What was Paul Levy's response, I
5  don't recall the specific response to this one.
6  He might have talked to Debbie Haynes or not.
7    Q.   Did the new rules stay in effect
8  just for you, after you spoke to Mr. Levy?
9    A.   I don't think so.  I don't remember.
10 I don't know.
11   Q.   And was such a rule in effect just
12 for you in the 2004/2005 school year?
13   A.   No.
14   Q.   In the next bullet, again this is on
15 the second page of Exhibit 39, you say that:
16 "Meetings I have had with the former principal
17 have been physically interrupted by the former
18 chairperson who came in to say that rather than
19 meeting with the principal, I should have been
20 working on a mailing for her."
21        Now, who was the former chairperson
22 you were talking about?

Page 534

1    A.   Debbie Haynes.
2    Q.   And when did those meetings occur
3  that were interrupted by Debbie Haynes?
4    A.   You mean what month, what year?
5    Q.   What year?
6    A.   Hum, it's, there was a specific
7  incident, and I think it might have been in '98
8  or '99.
9    Q.   And how often did these types of
10 specific incidents occur?
11   A.   What, her interrupting the
12 principal --
13   Q.   Yes.
14   A.   -- and me.  I, that's the only one I
15 remember specifically.
16   Q.   And were there any witnesses to
17 this, to this interruption?
18   A.   Certainly Paul Levy, yes.
19   Q.   Anybody else?
20   A.   We were in a closed door, so I don't
21 know.
22   Q.   When you say you were in a closed

Page 535

1  door, you mean you were in a room where the door
2  was closed?
3    A.   Yes.
4    Q.   Do you know who the other people
5  were who were in the room?
6    A.   I was in the room with Paul Levy
7  when Debbie Haynes came into the room.
8    Q.   All right.  So, are you aware of
9  anybody else who would have witnessed Debbie
10 Haynes coming into the room and interrupting, as
11 you say she did?
12   A.   No.
13   Q.   Now, did you regard the interruption
14 by Debbie Haynes to be racially motivated?
15   A.   Yes.
16   Q.   And what is your basis for thinking
17 that that interruption of your meeting with the
18 principal was racially motivated?
19   A.   More belittling behavior and it
20 doesn't matter who I'm talking to.  More
21 belittling behavior towards me.
22   Q.   But, why did you think the

43  (Pages 532 to 535)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 536

1  belittling behavior was motivated by race?
2     A.   I've never seen it done to anyone
3  who was white. I have never heard her say
4  anything to anybody who was white, faculty, in a
5  belittling fashion, the way she treated me.
6     Q.   Now, you also said that -- I just
7  want to keep you on the same page here. Give me
8  one second.
9         All right, this is on the 7th bullet
10 point, in the top half of the second page of
11 Exhibit 39. It's Bates Page 2643.
12        There you said that: "Nick Ryan
13 said that he knew you had gone to Paul" -- is it
14 Levy or Levy?
15    A.   He pronounced it Levy.
16    Q.   Okay. Let me start again. "Nick
17 Ryan said he knew you had gone to Paul Levy, the
18 principal, and allowed that he knew that
19 everything that you had said to him."
20        And you also say: "This was said in
21 a negative tone that I really had nowhere to go
22 and I was trapped with no resource."

Page 537

1         What do you mean it was said with a
2  negative tone?
3     A.   I can't recall the specific incident
4  that, to which this refers right at the moment.
5         But, it was said in a negative tone,
6  that is, it wasn't, oh, Sharon, I know you've
7  talked to Paul, you know, that's wonderful, you
8  know, continue to explain to him what serious
9  issues there are in this department.
10    Q.   Okay. And what did you mean when
11 you said: "I really had nowhere to go and I was
12 trapped with no resource"?
13    A.   I was told that Paul had an open
14 door policy and that he valued my input and that
15 he wanted to hear from me how I felt, and what
16 was going on.
17        And then if he was telling what I
18 was discussing with him without any protection
19 for me, to my supervisor, and the supervisor was
20 going to come back to me in a negative way, then
21 I felt that I had nowhere to go, at least in that
22 regard.

Page 538

1     Q.   Now, when Mr. Ryan was speaking to
2  you in a negative tone, did he raise his voice
3  when he made this statement?
4     A.   Yes. And -- yes.
5     Q.   Was he physically threatening in any
6  way?
7     A.   Well, he certainly leaned forward.
8     Q.   But, was he physically threatening
9  in any way?
10        If I lean forward and ask you a
11 question, do you regard that as physically
12 threatening?
13    A.   No.
14    Q.   So, I want to ask you, you said he
15 leaned forward, but I'm asking you was he
16 physically threatening in any way when he made
17 this statement to you?
18    A.   He might have leaned forward the way
19 you did, but I'm this far from you, so, maybe you
20 wouldn't hit me.
21        MR. RACIN: We should note the size
22 of the table, for the record.

Page 539

1         THE WITNESS: But, you know, maybe
2  he could have.
3  BY MR. WILLIAMSON:
4     Q.   Did he give you the impression that
5  he was contemplating hitting you?
6     A.   I don't know.
7     Q.   You don't remember?
8     A.   He leaned forward and he was saying
9  it in a negative way.
10    Q.   Did he raise -- I'm sorry, go ahead.
11    A.   Yes. And he raised his voice.
12    Q.   Did he raise his hand?
13    A.   I don't recall him raising his hand,
14 no.
15    Q.   Did he raise his arm?
16    A.   I don't recall. I don't recall
17 that.
18    Q.   Did he make any gesture that
19 suggested that he was going to hit you?
20    A.   Not that I recall.
21    Q.   And when did this incident occur
22 when Mr. Ryan said that he knew you had gone to

44  (Pages 536 to 539)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 540

1  talk to Paul Levy?
2      A.   That was probably 2003/04.
3      Q.   And was this also an example of
4  conduct that you considered racially hostile
5  treatment of you?
6      A.   Yes.
7      Q.   And why was it that you thought
8  Mr. Ryan was motivated by racial hostility when
9  he said to you that he knew you had gone to speak
10 to Paul Levy?
11     A.   It was just one more belittling
12 marginalizing action against me.
13     Q.   Did he say anything specifically
14 racial to you at the time?
15     A.   I don't remember that.
16     Q.   All right.  Let's stay with the
17 second page of Exhibit 39, and let's start
18 looking at the bullet points under the heading:
19 "Speaking About Discrimination and Experiencing
20 Retaliation."
21         Do you see that?
22     A.   Yes, I do.

Page 541

1      Q.   Now, in that headline were you
2  trying to suggest that because you had spoken out
3  about discrimination you had experienced
4  retaliation?
5      A.   Because I think, I'm talking about
6  discrimination and experiencing retaliation here.
7      Q.   And were you trying to suggest that
8  because you had spoken out about discrimination,
9  you had experienced retaliation?
10     A.   I don't know if that, that caused
11 some people to do that.  I don't know.
12     Q.   Okay.  What specifically did you
13 speak out about that you think may have resulted
14 in retaliation against you by the school?
15     A.   I am, in this, in regard to this
16 heading, this describes discrimination and
17 retaliation that I experienced.
18     Q.   Right.  And what I'm trying to
19 understand is what speaking out, or what
20 discrimination are you talking about that
21 resulted in your experiencing retaliation?
22         Or are you saying that those are not

Page 542

1  causally connected?
2      A.   I'm not sure if they're causally
3  connected, I don't know.  They probably are, but,
4  I don't, you know, people's motivations I can't
5  really explain to you people's motivation for
6  everything.
7      Q.   Is there some people's motivation
8  that you're able to explain as being retaliation
9  that was caused by your speaking out about
10 discrimination?
11     A.   I don't know.  I think, you know,
12 you would have to talk to all of the people who
13 were concerned to find that out from them.
14         I doubt if they will tell you.
15     Q.   Who were the people that were
16 concerned?
17     A.   In here, I'm talking about Laura
18 Tolliver, Nick Ryan, Paul Levy, and Elizabeth
19 DiNevy (ph.) and Mari Anna Richards are all named
20 in here.
21         And I've just tried to point out in
22 these items what my experience is with

Page 543

1  discrimination and retaliation.
2      Q.   And, in your view, did, was it Mari
3  Richardson (sic) and Elizabeth DiNevy inflict
4  some sort of retaliation on you?
5      A.   Not that I recall.
6      Q.   Okay.  What precisely was the
7  retaliation that you experienced while you were
8  employed at GDS?
9      A.   Repeat the question, please.
10     Q.   What precisely was the retaliation
11 that you experienced while you were employed at
12 GDS?
13     A.   I know that I have suffered daily
14 insults in front of students, in front of other
15 faculty.
16     Q.   And the daily insults were, is that
17 some of the retaliation you felt you suffered?
18     A.   I'm sure it falls into both
19 categories of discrimination and retaliation.
20     Q.   I just want to focus on retaliation
21 right now.
22         You said there were daily insults,

45 (Pages 540 to 543)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 544

1 and these daily insults were being communicated
2 by whom?
3    A.    Laura Tolliver and Nick Ryan.
4    Q.    And what was, what were the events
5 each day that were triggering this form of
6 retaliation against you?
7    A.    I don't know.  I don't know.
8    Q.    Do you know what retaliation is in
9 the context of a race discrimination lawsuit?
10    A.    Would you explain it to me, please,
11 sir?
12    Q.    No, I'm not going to.  I'm just
13 going to ask you whether you can answer my
14 question.
15    A.    I, since I'm not a lawyer, I depend
16 on my lawyer to be able to listen to what I have
17 to say and to be able to decide whether legally
18 some activity or actions fall within that, within
19 that legal category.
20    Q.    And when you wrote up these talking
21 points, did you discuss them with your lawyer?
22    A.    Did I discuss them to see whether

Page 545

1 there was a legal document or not?
2    Q.    I just want to ask you whether you
3 discussed them at all with your lawyer before you
4 composed them?
5    A.    I gave him a copy of them.
6    Q.    So, you composed them before you
7 showed them to your lawyer; is that right?
8    A.    Yes.
9    Q.    At the time you were writing that
10 you thought you were a victim of retaliation at
11 GDS, what was your understanding of the meaning
12 of retaliation?
13    A.    That some negative action would be
14 done like --
15    Q.    It would be done for what reason?
16    A.    To take something away, to do
17 something untoward, to --
18    Q.    What was -- let's take those
19 examples.
20        What was taken away from you that
21 you considered retaliation?
22    A.    Just about my ability, my ability to

Page 546

1 follow through on my activities smoothly.  My
2 ability to use the resources in the department
3 that would be available to the other teachers --
4    Q.    Anything else?
5    A.    -- without question.  And numerous
6 other things that, I, you know, I've got listed
7 in here that I would have to, you know, I can
8 look at and note to you.
9        There are, you know, there is so
10 much here.  All happened to me.
11    Q.    And those are all, in your view,
12 instances of retaliation?
13    A.    Discrimination and retaliation.
14    Q.    I'm focusing on retaliation.  I want
15 to know which things were retaliation?
16        MR. RACIN:  I'm going to object to
17 the extent you are attempting to elicit from a
18 lay witness in response to a question that
19 requires some understanding of the law of
20 retaliation.
21        MR. WILLIAMSON:  Counsel, all I'm
22 asking is --

Page 547

1        MR. RACIN:  I don't think that's
2 fair.
3        MR. WILLIAMSON:  At this point we
4 went back and I asked her did she write this
5 phrase or use this language retaliation before
6 she had spoken to her lawyer.
7        And I asked her what she meant when
8 she was using that phrase.  And that's all I want
9 to understand, really, at this point, is to
10 understand what she meant by the use of the
11 phrase.
12        MR. RACIN:  The question on the
13 table now is what did you understand when you
14 used the word retaliation.
15        MR. WILLIAMSON:  Right.  That's
16 right.
17 BY MR. WILLIAMSON:
18    Q.    Let me go at it another way.  Did
19 you understand retaliation as something that
20 resulted from your engaging in any specific type
21 of conduct that you should have been allowed to
22 engage in?

46  (Pages 544 to 547)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 548

1    A.    Yes.
2    Q.    And what was that conduct?
3    A.    Being able to go to the principal
4  and talk with the principal about whatever
5  concerns me without feeling like I'm going to
6  suffer for it.
7    Q.    And who made you feel like you were
8  going to suffer for talking to the principal?
9    A.    Nick Ryan, Laura Tolliver, Debbie
10  Haynes.
11    Q.    And what did they do to make you
12  suffer as a result of your talking to the
13  principal?
14        Let me go, before I ask that --
15    A.    Creating --
16    Q.    In your paper here you talked about
17  Nick Ryan saying something to you about speaking
18  to Paul Levy.
19        Did Laura Tolliver say that she
20  thought it was wrong for you to speak to Paul
21  Levy?
22    A.    No.

Page 549

1    Q.    And did -- who was the other person
2  you said?
3    A.    Debbie Haynes.
4    Q.    Did Debbie Haynes say that she
5  thought it was wrong for you to speak to Paul
6  Levy?
7    A.    Yes.
8    Q.    When did she say that?
9    A.    Was it -- she -- '97, '98?
10    Q.    Okay.
11    A.    When she was there.
12    Q.    And then other than in this specific
13  incident described in your paper about Mr. Ryan
14  when you spoke to Paul Levy, was it your earlier
15  testimony that there were no other incidents
16  where he complained to you about speaking to
17  Mr. Levy?
18    A.    I don't recall any other incidents
19  where he said I couldn't talk to, or that he
20  found that to be something negative.
21    Q.    All right.  So, is there any other
22  conduct that you thought you should have been

Page 550

1  allowed to do that triggered retaliation against
2  you?
3    A.    My desire to be an equal part in the
4  department.
5    Q.    And did you communicate that to
6  somebody at GDS, who then retaliated against you
7  for expressing that desire?
8    A.    Nick Ryan, Laura Tolliver, my --
9  also.
10    Q.    When was the most recent time that
11  you told Mr. Ryan that you wanted to be an equal
12  in the department and that he retaliated against
13  you for saying that?
14    A.    2004/05.  2004/05.
15    Q.    Can you describe the specific
16  incident?
17    A.    I'm not sure if I could, if I can
18  include his ability to believe that he could bend
19  down low to the ground gesticulating like an ape,
20  and saying to me that he can't bend low enough to
21  the ground to understand me.
22    Q.    That was the retaliation?

Page 551

1    A.    The fact that he could do that, and
2  he felt that he could do that.
3    Q.    And did that occur in 2004/2005?
4    A.    Yes.
5    Q.    Do you remember when?
6    A.    It was about springtime.
7    Q.    Spring of 2005 it occurred?
8    A.    I believe it happened around
9  February, February 20th or so.
10    Q.    Are you sure that wasn't in 2004,
11  based on your earlier testimony?
12    A.    2004, yes.  That was 2004, I
13  believe.
14    Q.    Okay.  Staying on the second page of
15  Exhibit 39, you say in the first bullet there's a
16  reference to "recovering racist:
17    A.    Yes.
18    Q.    And that was a phrase that was used
19  by Mr. Levy talking about himself; is that right?
20    A.    Yes.
21    Q.    What is your understanding of how
22  Mr. Levy used the term "recovering racist" as

47  (Pages 548 to 551)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 552

1  applied to himself?
2      A.    That he's a recovering racist.  That
3  he's a racist who is recovering.
4      Q.    Okay.  And was Mr. Levy ever
5  racially hostile to you?
6      A.    Yes.
7      Q.    And what would be an example or two
8  of when he acted in a racially hostile way toward
9  you?
10     A.    "There are no qualified black
11 teachers," directed to me, "there are no
12 qualified black teachers."
13     Q.    When did he say that?
14     A.    Maybe 1999.
15     Q.    Any other example?
16     A.    I don't remember exactly what date
17 it is, but, he approved a meeting of parents of
18 color, but the two, you had to include the two
19 white parents who were head of the parent service
20 association to monitor the meeting.
21     Q.    And you regard that as racially
22 hostile treatment of you?

Page 553

1      A.    Yes.
2      Q.    Why is that?
3      A.    I am a black teacher and I'm a
4  qualified black teacher.  And I'm not the only
5  one.
6          It was hostile to be told that there
7  are no other black teachers of, qualified black
8  teachers.
9      Q.    I thought you were saying that there
10 was a meeting where he had either authorized or
11 organized the black parents getting together and
12 you said that there were a couple of whites who
13 were permitted to attend.
14     A.    No.  I didn't say that.
15     Q.    Okay.
16     A.    I said that I, he approved my having
17 a meeting of parents of color.
18     Q.    Right.
19     A.    And he said that it would be okay to
20 meet as long as these two people are there to
21 monitor the meeting.
22     Q.    Right.  And you regarded that as

Page 554

1  racially hostile toward you; is that right?
2      A.    Yes.
3      Q.    Now, did Mr. Levy, in your
4  experience as a teacher, ever intentionally
5  discriminate against you?
6      A.    I don't know.
7      Q.    Now, you see in the next bullet that
8  you say: "Mr. Ryan gesticulated as he said to
9  you in front of Laura Tolliver, Sharon, I can't
10 bend low enough to the ground to understand you."
11     A.    Yes.
12     Q.    And do you remember at the end of
13 your first day of deposition, your counsel asked
14 you some questions about that remark?
15     A.    Yes.
16     Q.    And how you interpreted it?
17     A.    Yes.
18     Q.    And you interpreted Mr. Ryan's
19 statement to be equivalent to calling you an ape;
20 is that right?
21     A.    Well, he certainly bent down as if
22 he were gesticulating like an ape.

Page 555

1      Q.    Let me ask, did you interpret his
2  doing that as his intending to call you an ape?
3      A.    It was animal-like, it was ape-like
4  to me.
5      Q.    I understand that.  But, I want to
6  know whether you interpreted his doing that as
7  his saying to you that he thought you were an
8  ape?
9      A.    Sir, that is, I've just told you
10 what he did.
11     Q.    But, I want to know how you
12 interpreted what he did.  You're the only person
13 who can tell us, you know, how you evaluated or
14 interpreted what he did.
15         And specifically I want to know
16 whether you interpreted that conduct as meaning
17 that he was intending to call you an ape?
18     A.    Or, there are other animals who, the
19 monkeys, ape, I don't know, which one
20 necessarily, but, yes.  Yes.
21     Q.    Okay.  Now, did he ever actually
22 call you an ape?

48  (Pages 552 to 555)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 556

1    A.   No.
2    Q.   Did anyone else ever tell you that
3  they heard Mr. Ryan refer to you as an ape?
4    A.   No.
5    Q.   And was there ever any other
6  occasion that Mr. Ryan gesticulate in a fashion
7  that you interpreted as ape-like behavior?
8    A.   Not that I recall, no.
9    Q.   Now, in the next bullet you say:
10  "Laura Tolliver and Nick Ryan reserved their
11  disrespect and mistreatment for you and seemed to
12  have a cordial and collegial relationship with
13  each other and with the other white faculty and
14  staff at the high school."
15       Do you see that?
16    A.   I'm getting to it, please.
17    Q.   Yes.  Do you know whether Laura
18  Tolliver and Nick Ryan have a cordial or
19  collegial relationship with any of the other
20  African-American staff at the high school?
21    A.   No.
22    Q.   No, they do not, or no, you don't

Page 557

1  know?
2    A.   I don't know.
3    Q.   Do you know if either Mr. Tolliver
4  or Mr. Ryan has a less than cordial relationship
5  with any of the other white faculty and staff at
6  the high school?
7    A.   No.
8    Q.   No, they don't, or no, you don't
9  know?
10    A.   No, I don't know.
11    Q.   Okay.  Do you know specifically
12  whether Laura Tolliver and Nick Ryan have shown
13  disrespect or mistreated any other
14  African-American faculty or staff person at the
15  GDS High School?
16    A.   I -- yes.
17    Q.   And who would be other
18  African-American faculty or staff who have been
19  shown disrespect or mistreatment by either
20  Ms. Tolliver or Mr. Ryan?
21    A.   At least on one example is I know
22  there is an English teacher who offered to

Page 558

1  correct the name, the spelling of Audrey Lord's
2  name on a banner that Nick Ryan was putting up.
3       And the teacher was told that, you
4  know, by Nick Ryan that he got that name, he got
5  that spelling off the web.
6       That even though this English
7  teacher was saying "Audrey Lord's name is spelled
8  with an E," he was not going to, he was not going
9  to change it.
10    Q.   And who was that English teacher?
11    A.   Haze Davis.
12    Q.   And is it your experience that
13  English teachers always know the correct
14  spellings of words?
15    A.   No.
16    Q.   Any other African-American faculty
17  member or staff member who was, that you know,
18  was disrespected or mistreated for racial reasons
19  by either Laura Tolliver or Nick Ryan?
20    A.   None that I know of right now.
21    Q.   You say none that you know of right
22  now.

Page 559

1       Are there some that you could know
2  of at some other time?
3    A.   No.
4    Q.   What is your understanding of the
5  statement that you quote in the bottom of the
6  second page of Exhibit 39, where you say that is
7  it Mari Anna Richards and Elizabeth DiNevy have
8  said to you "Nick was only working from a
9  position of white privilege and white
10  superiority."
11    A.   Yes.
12    Q.   First of all, remind me again who
13  are Mari Anna Richards and Elizabeth DiNevy?
14    A.   Mari Anna Richards and Elizabeth
15  DiNevy are GDS diversity officers, co-directors
16  of diversity.
17    Q.   And what did you understand them to
18  be saying when, according to you, they said:
19  "Nick was only working from a position of white
20  privilege and white superiority"?
21    A.   That the way he was treating me was
22  based on a position of white privilege and white

49  (Pages 556 to 559)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 560

1 superiority. That's what they told me.
2    Q.   Did they say to you that they
3 believed Nick Ryan was acting toward you with the
4 intent of creating a racially hostile environment
5 at GDS?
6    A.   I don't recall that.
7    Q.   At the top of the third page of
8 Exhibit 39, you say: "I was told by both Debbie
9 and Laura, in the presence of Paul Levy, that
10 they liked me better when I asked them how to do
11 this or that, i.e., knew my place."
12       Do you see that?
13    A.   Yes.
14    Q.   When was it that Debbie and Laura
15 made this statement to you?
16    A.   It was '97, I think.
17    Q.   Were there any witnesses to that
18 statement?
19    A.   Yes.
20    Q.   Who were the witnesses?
21    A.   Paul Levy and Bill Licamelli (ph.),
22 M.D.

Page 561

1    Q.   Anybody else?
2    A.   None that I know of.
3    Q.   What was the context in which the
4 statements were made?
5    A.   Meeting about the disparity and the
6 problems that I was having in the office.
7    Q.   Was Dr. Licamelli being brought in
8 to act as some sort of mediator?
9    A.   A listener, I think, at least. Yes.
10    Q.   Is he a psychiatrist?
11    A.   Yes.
12    Q.   Did they actually say they liked you
13 better when you knew your place, or is that your
14 interpretation of their statement that they liked
15 you better when you asked them how to do this or
16 that?
17    A.   They liked me better when I asked
18 them how to do this or that.
19    Q.   So, did they actually say to you
20 they liked you better when you knew your place?
21    A.   No, I said that is, i.e., that is,
22 knew my place. That's what I -- that's what it

Page 562

1 meant to me.
2    Q.   That's how you interpreted it?
3    A.   Yes.
4    Q.   Okay. Do you see on the second
5 bullet of the fourth page now of Exhibit 39,
6 still on Exhibit 39. Go to the fourth page.
7    A.   The fourth page?
8    Q.   Yes.
9    A.   Okay.
10    Q.   Where it says: "Around 2000, while
11 I was chair of the GDS diversity task force
12 recruitment and retention subcommittee" --
13    A.   Sorry, which bullet?
14    Q.   Turn to the fourth page, which is
15 going to be Bates numbered?
16    A.   One, two, three, fourth page is 120.
17    Q.   Let me see if we've got the right
18 page. Make it the third page, make it Bates
19 number 2644.
20       I'm sorry I created the confusion
21 there.
22    A.   Okay. Sorry.

Page 563

1    Q.   You see there in the second bullet
2 there where it says: "Around 2000, while I was
3 chair of the GDS diversity task force recruitment
4 and retention subcommittee."
5       Do you see where it says that?
6    A.   Yes.
7    Q.   And "you had made a suggestion that
8 GDS hire more teachers of color and Paul Levy
9 said there are no qualified black teachers out
10 there.
11       "He added that he has attended
12 recruitment meetings and some of the D.C.
13 teachers can't even speak English well."
14       When was that statement made to
15 you by Paul Levy?
16    A.   Earlier I had said something about
17 '99.
18    Q.   Okay.
19    A.   And here it says around 2000, so,
20 maybe it was '99, 2000, that some time during
21 that academic year.
22    Q.   That academic year, okay. Is

50 (Pages 560 to 563)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 564

1  Mr. Levy still employed by GDS?
2      A.   No.
3      Q.   Okay.  Do you know whether the
4  current administration of GDS believes there are
5  no qualified black teachers out there?
6      A.   I don't know.
7      Q.   You heard this statement earlier around
8  2000; is that correct?
9      A.   Yes.
10     Q.   And this is something we touched on
11 before, but, didn't you testify earlier that GDS
12 has increased the number of teachers of color at
13 the school since 2000, including the number of
14 African-American teachers?
15     A.   Yes.
16     Q.   Now, if the school, or since the
17 school has increased the number of teachers of
18 color since 2000, would that indicate to you that
19 the administration of GDS believes there are
20 qualified teachers of color out there?
21     A.   Yes.
22     Q.   Do you know whether GDS has hired

Page 565

1  any teachers from the D.C. Public Schools since
2  2000?
3      A.   I don't know.
4      Q.   Okay.  Ms. Killian, I would like you
5  to look at the third bullet point on this Page
6  2644 of Exhibit 39.
7          In the last couple of sentences you
8  say: "Laura and Nick switch artwork between them
9  with ease and their interchanges about this do
10 not happen in meetings when I am in attendance.
11         "These approvals must occur in the
12 informal meetings from which I am excluded."
13         My question is what types of
14 meetings are you referring to when you refer to
15 informal meetings?
16     A.   Meetings where department business
17 is taken care of, you know, while walking to the
18 coffee, or to the water, or you know, and the
19 chats that occur outside of formal meetings.
20     Q.   And you feel that you were being
21 improperly excluded from those informal meetings?
22     A.   I don't, I'm not sure how to explain

Page 566

1  this.  Informal meetings may be had, but, the
2  discussions need to be open and brought inside a
3  meeting where I would be present as a department
4  member.
5      Q.   When there were the regular
6  department meetings, did you attend?
7      A.   Yes.
8      Q.   And were discussions held there
9  about whether artwork should be placed in
10 different parts of the school, or exchanged with
11 other artwork?
12     A.   Yes.
13     Q.   And were you allowed to participate
14 in those discussions?
15     A.   Yes.
16     Q.   Now, back in February of 2002, was
17 there an occasion when you had exchanged your
18 students' artwork with that of one of Laura
19 Tolliver's students, and you sought out Tolliver
20 to let her know what you had done?
21     A.   No.
22     Q.   You don't recall giving testimony

Page 567

1  where you said you had tried to reach Laura
2  Tolliver on a Friday about some artwork that you
3  wanted to remove and replace with artwork of your
4  students?
5      A.   It wasn't artwork of my students.
6  It was artwork from a gallery.
7      Q.   All right.  That you wanted to
8  replace with artwork of a gallery.
9          Do you remember?
10     A.   For black history month, yes.
11     Q.   Do you remember that?
12     A.   Yes.
13     Q.   All right.  And, if you had, you
14 didn't succeed in reaching Ms. Tolliver before
15 you went ahead and exchanged the artwork, right?
16     A.   Right.
17     Q.   Now, let's say if you, did you feel
18 that if you had been able to reach Ms. Tolliver,
19 that -- well, yes.
20         Let me just look at this.  Hold on
21 one second?
22         MR. RACIN:  I'm going to object on

51  (Pages 564 to 567)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 568

1  the record to a line of questioning that we
2  covered during the first day.
3          MR. WILLIAMSON:  These questions are
4  different.  Just hang with me and you will see.
5  BY MR. WILLIAMSON:
6      Q.   Did you intend to include Nick Ryan
7  in the conversation that you were going to have
8  with Ms. Tolliver about exchanging the artwork
9  from the gallery for her student's artwork?
10     A.   At the time of day it was, it was
11 past time.  It was not, he wasn't available,
12 either.
13     Q.   Okay.  And if you had been able to
14 reach Ms. Tolliver and get her consent, do you,
15 were you thinking that would have been sufficient
16 to exchange the artwork?
17     A.   Yes.
18     Q.   And with regard to these
19 interchanges between Nick Ryan and Laura Tolliver
20 involving the switching of artwork, do you
21 consider those activities by Nick -- or by Ms. --
22 or by Mr. Ryan and Ms. Tolliver to be examples of

Page 569

1  racially hostile treatment of you?
2      A.   Their ability to switch between
3  themselves?
4      Q.   To have informal conversations where
5  they work out those arrangements, do you regard
6  that as evidence of racially hostile treatment of
7  you?
8      A.   When it, when I don't get the
9  opportunity to hang works, perhaps, yes.
10     Q.   And were they doing this in a way
11 that prevented you from having the opportunity to
12 hang works?
13     A.   Yes.
14     Q.   Okay.
15         MR. WILLIAMSON:  I think the
16 videographer wants to take a break, but I have a
17 follow-up question about that.
18         Do you want to take a five or
19 10-minute break here.
20         THE WITNESS:  Sure.  Sure.
21         THE VIDEOGRAPHER:  We're going off
22 the record at 3:16:58.  End of tape 2.

Page 570

1          (Recess -- 3:16-3:37 p.m.)
2          THE VIDEOGRAPHER:  Going back on the
3  record at 3:37:59.
4  BY MR. WILLIAMSON:
5      Q.   Ms. Killian, I think when we were
6  ending you said something about how Mr. Ryan and
7  Ms. Tolliver were having informal meetings about
8  exchanging artwork and that prevented you from
9  hanging your artwork.
10         When were you prevented from hanging
11 your artwork as a result of these informal
12 exchanges between Mr. Ryan and Ms. Tolliver?
13     A.   If I said prevented, if I said that
14 it prevented me from hanging my artwork, and I
15 don't remember whether that was -- those were my
16 exact words, but what a collegial, a collective
17 meeting with all of the members of the department
18 does is gives everyone the opportunity to hang
19 artwork in different places, or to help each
20 other in some way, to help the department.
21         And I was not included in many of
22 those discussions, as you've just said, and, so,

Page 571

1  perhaps I wanted to hang my artwork in a place
2  that, you know, either of them would be using,
3  suppose I wanted to use that space.
4          When that exchange occurred between
5  them, I didn't have the opportunity to say, you
6  know, can we switch, or, can we do this instead.
7      Q.   Do you remember any instance when
8  you were prevented from hanging your artwork in a
9  location that you wanted to because they had made
10 some informal arrangement that precluded that?
11     A.   I don't recall.
12     Q.   And did you think they had these
13 informal conversations because that was just a
14 convenient way for them to operate?
15     A.   I don't know.
16     Q.   Did you think that they had these
17 informal conversations with the expressed purpose
18 of excluding you because they were racially
19 prejudiced against you?
20     A.   I don't know.
21     Q.   Now, I'm going to go to a little
22 different topic, but I wanted to go back to an

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 572

1  earlier question that I had asked you earlier, a
2  line of questions.
3        Remember we were talking about your
4  having been excluded from a theater performance
5  by Ms. Rosberg?
6     A.  Uh-huh.
7     Q.  Did you observe whether Ms. Rosberg
8  permitted any white individuals to come into the
9  performance after she told you there was no room
10 for you to come in?
11    A.  I don't recall, I don't know.
12    Q.  Let's go back to Exhibit 39, and I
13 want to talk about the next bullet point on the
14 page that's Bates numbered 2644.
15    A.  Uh-huh.
16    Q.  It's where you say that "Debbie
17 Haynes had been given permission to get rid of
18 you."
19        Do you see that?
20    A.  Page 1 -- 2644, yes.  Let me read
21 that bullet.
22    Q.  Do you see that?

Page 573

1     A.  Yes.
2     Q.  Is Debbie Haynes still an employee
3  of GDS?
4     A.  No.
5     Q.  Isn't it true that Debbie Haynes was
6  required to resign as an employee of GDS after
7  the 2000/2001 school year?
8     A.  I don't know.
9     Q.  Do you know when her employment at
10 GDS terminated?
11    A.  That -- yes, the school year you
12 just mentioned.
13    Q.  2000/2001?
14    A.  Uh-huh.  Yes.
15    Q.  Now, before Debbie Haynes was
16 terminated as an employee of GDS, had she been
17 able to make arrangements for you to be
18 terminated as an employee of GDS?
19    A.  I don't know.
20    Q.  What's your basis for saying that
21 Ms. Haynes was given permission to get rid of
22 you?

Page 574

1     A.  She told me that.
2     Q.  And then you say that "Paul Levy
3  confirmed that he had given Debbie permission to
4  design her own outcome for me."
5     A.  Yes.
6     Q.  That sounds kind of ominous, what do
7  you mean by that?
8     A.  That he, according to Paul, he did
9  say that he did tell Debbie Haynes that if she
10 wanted to get rid of me, she could do it.
11    Q.  And did Debbie Haynes do anything to
12 try to get rid of you?
13    A.  I don't know.
14    Q.  When did Paul Levy say that to you?
15    A.  I don't remember the exact year.  I
16 have to look at -- I don't remember.
17    Q.  Did you, did he say why he told her
18 that she could design her own outcome for you?
19    A.  No.
20    Q.  Was it an authority that he gave her
21 around the same time that the school was deciding
22 to terminate Ms. Haynes?

Page 575

1     A.  I don't know.  Probably a little
2  earlier, I think, if I recall.
3     Q.  How much earlier?
4     A.  Maybe a year or two years or
5  something like that.
6     Q.  So, that would be 1998 or 1999?
7     A.  '98, something like that.  I believe
8  it was around that time.
9     Q.  Okay.  And then you say, in the next
10 bullet on this page of Exhibit 39 that:  "Your
11 involvement in multicultural and extracurricular
12 affairs at the school have been frowned upon and
13 belittled by Debbie."
14        Do you see that?
15    A.  Yes.
16    Q.  How did Debbie Haynes do or say to
17 make you think that your involvement in those
18 activities was being frowned upon and belittled
19 by her?
20    A.  Laughingly, saying that, you know,
21 each of them are as much a minority as anyone
22 else like me because, you know, Laura said she's

53 (Pages 572 to 575)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 576

1  Hispanic and Debbie says she was an Iroquois and,
2  you know, that's not so important.
3          And also the work that I was
4  doing -- there weren't any accommodations to help
5  a fellow faculty member, as I remember, me being
6  the fellow faculty member, get through any of
7  the, anything that might hinder my progress.
8      Q.   What sort of accommodations were you
9  denied?
10     A.   Actually, I was able to take care of
11 everything without accommodations at all.
12         So, it's, you know, so, having to
13 teach first period class every day, whether I'm
14 working at 10 o'clock at night at school, or
15 whether I had to take my kid home and come back
16 out if I had to, you know, I dealt with all of
17 those things.
18         So, perhaps I shouldn't talk about
19 that.
20     Q.   In the next bullet you say that:
21 "In a meeting of school-wide department staff,
22 Debbie has called me the Jeffrey Holder of the

Page 577

1  art department."
2          When did that occur?
3      A.   Oh, gosh.  That -- what bullet are
4  you looking at?  Oh, here it is, second to the
5  last.
6      Q.   We're still on Exhibit 39, yes,
7  Bates Page Number 2644.
8      A.   Somewhere around '97, I guess.
9      Q.   And what did you mean by, or what do
10 you think she meant by the statement that you
11 were the Jeffrey Holder of the art department?
12     A.   Well, I don't really quite
13 understand it myself except I'm the only black
14 person in that whole, I was the only black person
15 in that whole school-wide art department.
16         Theater -- well, not theater, we met
17 as the studio of the middle school, so, middle
18 and lower school.
19         And we had to look and see what
20 Jeffrey Holder does.  He did the ha, ha, ha, ha
21 commercial.
22     Q.   Is Jeffrey Holder an actor?

Page 578

1      A.   An actor, an actor.  And I don't
2  really quite, he's a black actor, I don't really
3  quite understand it myself.
4      Q.   Okay.  We don't understand it,
5  either, so, it seems like there's a consensus on
6  that.
7          Did you ever ask her what she meant
8  by that?
9      A.   No.  Because -- well, it was kind of
10 embarrassing and it had come on the heels of all
11 of these other things that were occurring, so, I
12 didn't.
13     Q.   And I already asked you about the
14 timing of, that was on the document, I think it
15 was '97, right?
16     A.   Uh-huh.
17     Q.   Okay.  You say, in the bottom bullet
18 of this page of Exhibit 39, that's Bates Number
19 2644, that:  "After parent conferences several
20 years ago, Debbie said she was afraid to talk
21 truthfully to Raji's father because he looked
22 like he could be a terrorist or something."

Page 579

1      A.   Yes.
2      Q.   When was that statement made?
3      A.   I don't remember exactly when.  Raji
4  Hakki (ph.) was a student who is, I think he
5  might even be from Iraq.
6      Q.   Was Raji an African-American?
7      A.   No.
8      Q.   Was that statement made some time in
9  1997?
10     A.   Some time probably around '97 or
11 '98, I think, something like that.
12     Q.   And you think, did you regard that
13 statement as communicating -- wait a minute.
14         You said Raji was not an
15 African-American?
16     A.   No, he was Iraqi.
17     Q.   Okay.  Did you regard that statement
18 as communicating racial hostility to you as an
19 African-American?
20     A.   No.  Not to me as an
21 African-American.
22     Q.   Okay.  On the next page of

54  (Pages 576 to 579)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 580

1  Exhibit 39 at the top, do you see where it says:
2  "It seems that their goal has been to diminish my
3  work at all costs."
4      A.   Yes.
5      Q.   What is the "it" that you're talking
6  about?
7      A.   It seems that their goal has been to
8  diminish my work at all costs.  And you are
9  asking me it, what "it" means here?
10     Q.   Yes.
11     A.   It is essentially my experience
12  throughout, in the art department.
13     Q.   And when you say "their goal," who
14  are the people who are referenced by their?
15     A.   Laura Tolliver and Nick Ryan.
16     Q.   Anybody else?
17     A.   I'd say that, in this situation, in,
18  right now, in this situation, I'm talking about
19  Nick Ryan and Laura Tolliver.
20     Q.   And how is it that these, "they have
21  sought to diminish your work at all costs."
22         What did you mean by that reference

Page 581

1  to "at all costs"?
2      A.   When you, when one, when a teacher's
3  work is affected, it affects students.  And when
4  it comes to students, I think that's the highest
5  cost you can have.  And, so, that's my thinking
6  on that.
7      Q.   Okay.  Now, in the next bullet you
8  say that:  "Tolliver and Ryan practiced
9  systematic deception by telling students and
10 parents during curriculum events that students
11 can take AP photography."
12         Why do you regard that as systematic
13 deception?
14     A.   Well, first of all, there's no such
15 thing as AP photography.
16         And secondly, this is again a way of
17 diminishing the AP course proper by including
18 that option in other courses that are not
19 supposedly AP courses.
20     Q.   And were there students who told you
21 that Tolliver or Ryan informed them that they
22 could take a course called AP photography?

Page 582

1      A.   Yes.  And I also heard it from her,
2  during these curriculum minutes.
3      Q.   Was there any course that was
4  entitled AP photography?
5      A.   No.
6      Q.   When was the most recent time that
7  you heard Ms. Tolliver say to a student that the
8  student could take a course entitled AP
9  photography?
10     A.   Probably the 2004/05 academic year.
11     Q.   And when you say probably, do you
12 remember any specifics?
13     A.   It would have been the curriculum
14 night, 2004/05 would be the most recent one.
15     Q.   And what time of the year would that
16 curriculum night occur?
17     A.   It would be September or October,
18 something like that.
19     Q.   Do you remember the student who was
20 told that?
21     A.   No.  I don't.  All of the parents
22 were told that.

Page 583

1      Q.   I'm sorry, do you remember any
2  parent who was told that?
3      A.   It would be all of the parents of
4  students in, you know, one or more of her
5  classes.  I don't know specifically.
6      Q.   Are students able to submit a
7  portfolio for the AP 2D test that consists
8  entirely of photographs?
9      A.   Yes.
10     Q.   Do you have, do you consider it
11 systematic deception to refer to an AP 2D design
12 portfolio consisting entirely of photographs as
13 an AP photography portfolio?
14     A.   Would you rephrase that or repeat
15 that, please.
16     Q.   Yes.  Do you consider it systematic
17 deception to refer to an AP 2D design portfolio
18 consisting entirely of photographs as an AP
19 photography portfolio?
20     A.   Set aside alone, say if it were to
21 happen in my class, if I submitted a student's
22 work called AP 2D design portfolio, and because

55  (Pages 580 to 583)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 584

1  all of the works are photographs and somebody
2  made the mistake and called it an AP photography
3  portfolio, it would just be a mistake.
4      Q.   Could a student submit such a
5  portfolio after taking Tolliver's advanced photo
6  class?
7      A.   Yes.  Yes.
8      Q.   Okay.  Now, do you feel that
9  Tolliver and Ryan's statements to students and
10 parents relating to AP photography constitute an
11 example of their resentment for your perceived
12 role in the departure of Ms. Haynes from GDS?
13     A.   I don't know.
14     Q.   Do you feel that those statements to
15 students and parents in this regard constitute an
16 example of racially hostile treatment of you?
17     A.   Yes.
18     Q.   And what's your basis for thinking
19 that?
20     A.   The same marginalization as has been
21 occurring for years.
22     Q.   Can you remember any student, any

Page 585

1  specific student, who has come to you and said
2  that they decided not to take your course because
3  of information that he or she had received from
4  Ryan or Tolliver?
5      A.   Not that I recall.
6      Q.   Is there anybody who would be able
7  to help you recall such a student?
8      A.   No.  I don't think so.
9      Q.   Now, the next heading in Exhibit 39
10 is "Denial of Resources, Their Sense of Ownership
11 and me as an Outsider."
12         Do you see that?
13     A.   Yes.
14     Q.   Okay.  Now, on the topic of their
15 sense of ownership, you've alleged that
16 Ms. Tolliver took some of your photographic paper
17 in the 2003/2004 school year.
18         And that this was an example of
19 racial harassment that you referred to in the
20 first day of your deposition; is that right?
21     A.   I believe so.
22     Q.   Do you recall approximately when

Page 586

1  during the academic year this incident occurred,
2  or when during the year it occurred?
3      A.   No.  I don't know.
4      Q.   Is it possible that it occurred in
5  2003?
6      A.   It happened every year, just about,
7  in a different way.
8      Q.   So, did it happen in August of 2003?
9      A.   It depends on which instance we're
10 talking about.
11     Q.   The 2003 instance.
12     A.   There's a 2003 instance, when it
13 happened in 2003/2004 academic year?
14     Q.   Right.  Well, would you count
15 August 2003 as part of the 2003/2004 academic
16 year?
17     A.   Yes.
18     Q.   Okay.  That's the instance that I'm
19 asking about.
20     A.   Okay.  What's the question again?
21     Q.   Well, in that year you and
22 Ms. Tolliver ordered your photographic paper from

Page 587

1  Penn Camera; is that right?
2      A.   Yes.
3      Q.   All right.  Would you take a look at
4  a document that we're going to mark as
5  Exhibit 70.
6      A.   Okay.
7      Q.   And then we're also going to give
8  you another document that's marked as Exhibit 63.
9          (Killian Exhibit Numbers 63 & 70
10         marked for identification.)
11 BY MR. WILLIAMSON:
12     All right, do you know what
13 Exhibit 70 is?
14     A.   It looks like an e-mail.
15     Q.   It's a document that you produced in
16 this litigation, isn't it?
17     A.   It could be.
18     Q.   Okay.  I think --
19     A.   Let's see, yes, there's the number.
20     Q.   When you see those large numbers,
21 that means you produced it.
22     A.   Yes.

56  (Pages 584 to 587)

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

Page 588

1    Q.    Now, if you look at -- and, what is
2    the document?
3        A.    It is an e-mail and it is hard to
4    read the gray stuff up here.  But, it looks like
5    it is from Sharon, that's me, re:  the missing
6    paper.
7        Q.    Can you get a date off of that?
8        A.    August 2003.  Okay.
9        Q.    Can you tell what date in August?
10       A.    Wednesday, 27 August .
11       Q.    All right.  Would you take a look at
12   Exhibit 63, please.
13       A.    Yes.
14       Q.    All right.  Is Exhibit 63 a clearer
15   copy of Exhibit 70?
16       A.    Yes.
17       Q.    All right.  I didn't mean to be
18   difficult, but we need to just start with what
19   you had produced.
20       A.    Okay.
21       Q.    And what I'm asking you is, is that
22   the same document in clearer copy form as

Page 589

1    Exhibit 70?
2        A.    Yes.
3        Q.    Okay.  Now, who was Art Garroway
4    (ph.)?
5        A.    The salesperson at Penn Camera.
6        Q.    And what was this e-mail about?
7        A.    I had, I believed I had called him
8    to find out where are, where are the boxes of
9    paper that I ordered.
10       Q.    And is this e-mail about the
11   incident that you described earlier where
12   Ms. Tolliver took some of your photographic
13   paper?
14       A.    For the one that says August, if it
15   says August 2003, then, this would be, yes.
16       Q.    Okay.  Now, can you read the portion
17   of the e-mail from Mr. Garroway?
18       A.    Did you physically -- "Hello, did
19   you physically open all of the cases of paper?
20   One case had two boxes of glossy and two of silk
21   in it.  Could Laura have received part of your
22   order?"

Page 590

1        Q.    Isn't it true that Penn Camera
2    indicated that your paper had been shipped in a
3    box addressed to Ms. Tolliver?
4        A.    No.  They said it could, that Laura
5    could have received part of my order.
6        Q.    How would she have received part of
7    your order?
8        A.    I don't know.
9        Q.    Is it possible that's because Penn
10   shipped it in a box shipped to her?
11       A.    In this case, I believe my name was
12   on the box or the boxes.
13       Q.    Do you know if Laura Tolliver's name
14   was on the box?
15       A.    She received an order, she said,
16   with her name on the box.  But, she had received
17   an order.  She had taken an order that also had
18   Sharon Killian on the box.
19       Q.    Why do you think Mr. Garroway was
20   asking the question about whether Laura could
21   have received part of your order?
22       A.    Because I had asked Laura whether

Page 591

1    she had it and she insisted that she did not have
2    it.  She looked and she didn't have it.
3            And I said to him she didn't get it
4    and I need it.  And he said we have record that
5    we sent you your order.
6            So, could she have maybe received
7    it?  That's what his subsequent follow-up is.
8        Q.    And what was your response to
9    Mr. Garroway?
10       A.    "Art, thanks.  Laura found them in
11   her order."
12       Q.    What did you mean, and that was your
13   response?
14       A.    Yes.
15       Q.    And what did you mean when you said
16   that?
17       A.    That she found them in her order.
18       Q.    Does that mean that the materials
19   were shipped in the order that was shipped to
20   her?
21       A.    No.
22       Q.    But, what did you mean when you said

57  (Pages 588 to 591)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 592

1 Laura found them in her order?
2     A.   Well, I, and I don't know if it's
3 bad or good, but, I wouldn't go to a contractor
4 and tell them that my colleague took my paper
5 even though it was labeled with my name, she
6 took, she found them.
7        So, all he was going to find out
8 from me was that she, Laura, found them in her
9 order.
10    Q.   But that wasn't an accurate
11 statement?
12    A.   Well, I -- she found them, and she
13 had them in her cabinets.  I didn't tell him that
14 she had them in her cabinets.  I could have said
15 she had them in her cabinets, but I didn't do
16 that.
17    Q.   You said that she found them in her
18 order.
19    A.   Uh-huh.
20    Q.   Why was it you chose to phrase it
21 that way?
22    A.   As I said before, I had already gone

Page 593

1 back and forth with the gentleman about the
2 paper, and Laura had already looked and didn't
3 find them.  And I didn't want to elaborate.
4    Q.   Well, why would you have had to
5 elaborate if you just said you found them in her
6 cabinets?
7    A.   I don't know.
8    Q.   You specifically said she found them
9 in her order.
10    A.   Uh-huh.
11    Q.   That was your language, right?
12    A.   Yes.
13    Q.   Now, you say in the second bullet on
14 page, the big number is 121, but the Bates number
15 is 2646.
16        You say that you, quote, "have been
17 limited to a minimum of computer space."
18    A.   Which number are you looking at --
19 oh, second bullet?
20    Q.   Yes, second bullet.  What did you
21 mean by a minimum of computer space?
22    A.   I believe that I, I did talk about

Page 594

1 this in our last meeting.  I don't remember how I
2 phrased it from the last meeting.
3        MR. RACIN:  And I will say, for the
4 record, that as to computer resources, megabyte
5 two, you know, we've been round and round about
6 this at some length.
7        I think it's unfair in the context
8 of the second day, concerning the subject matter,
9 that's clearly very difficult for the witness, as
10 a general proposition.
11        It's unfair to belabor this subject.
12        MR. WILLIAMSON:  All right, counsel.
13        MR. RACIN:  Computer resources.
14        MR. WILLIAMSON:  We don't intend to
15 belabor it.  This is a different document than
16 what was discussed before.
17        MR. RACIN:  Same subject matter.
18        MR. WILLIAMSON:  Right.  And the
19 phrasing is different and we want to be sure we
20 understand what Ms. Killian means.
21        We're not going to go through the
22 gigabyte detail that we did before.

Page 595

1 BY MR. WILLIAMSON:
2    Q.   But we just want to know, what is
3 your definition of a minimum of computer space?
4    A.   I need to look, because you're
5 asking me to come up with a number for you.
6    Q.   Not, well, I'm asking you what you
7 meant by this phrase a minimum of computer space.
8        It's your language, and you say you
9 were limited to a minimum of computer space.  If
10 you can answer it with a number, fine.
11        If you have another way of answering
12 it, I'd like to know what the other way is.
13    A.   Yes.  I don't remember whether all
14 of teachers were limited to 120 megabytes or not,
15 and it's some, it was small.
16        If you want me to find a number, I'd
17 have to look to maybe, what's the number of that
18 document that we started with.
19    Q.   Exhibit 13?
20    A.   I'd have to look at Exhibit 13 and
21 see if I may have mentioned something that's more
22 specific.

58  (Pages 592 to 595)

## Sharon Killian

Page 596

1    Q.   Okay.
2    A.   Okay, in Exhibit 108 -- I'm sorry,
3  Exhibit 13, there's something in here that says:
4  "My limit for most of last year, while managing
5  the yearbook and teaching, was 10 gigabytes
6  resulting from begging the technology on a daily
7  basis."
8         Is that sufficient?  To -- "from
9  begging the technology on a daily basis to give
10 me more disk space from my originally allotted
11 two gigabytes."
12        Does that answer your question, sir?
13   Q.   Well, is that what you, is 10
14 gigabytes what you meant by a minimum of computer
15 space?
16   A.   It may have been two gigabytes,
17 because then I had to beg for to up to 10.  So,
18 let's say two, then.
19   Q.   But, you weren't limited to two
20 gigabytes, were you?
21   A.   Since I ended up with, is that what
22 you're asking me, since I ended up with 10

Page 597

1  gigabytes that year that I wasn't limited to two?
2    Q.   I just asked you, I didn't say
3  whether you ended up with 10.
4         I just asked you is it your
5  testimony that you were, when you say that you
6  were limited to a minimum of computer space, are
7  you saying in this document that you were limited
8  to two gigabytes or did you have some higher
9  amount of computer space?
10       MR. RACIN:  Which document?
11       MR. WILLIAMSON:  Well, we're trying
12 to see if we can understand the relationship
13 between what was said in Exhibit 39 and at least
14 part of what was said in Exhibit 13.
15 BY MR. WILLIAMSON:
16   Q.   Can you answer the question whether,
17 when you said in Exhibit 39 that you were limited
18 to a minimum of computer space, you meant that
19 you were limited to just two gigabytes?
20   A.   Yes.  Because the -- yes.  I was
21 afforded two gigabytes of space.
22   Q.   And isn't it true that you gave

Page 598

1  testimony in the last deposition about other
2  capacity that you were provided?
3    A.   I requested and requested, and then
4  I, and they, as I kept requesting, it kept, yes,
5  up to 10, as I said in 13.
6    Q.   Didn't it go up to 20, as you said
7  in Exhibit 13?
8    A.   It, and it went up, I kept asking,
9  yes.
10   Q.   And did you end up with enough
11 computer space to run your courses while you were
12 teaching at GDS?
13   A.   Eventually.
14   Q.   Now, earlier you mentioned, I
15 believe this was in the first day of deposition,
16 that some courses were digitally-based courses;
17 is that right?
18   A.   Yes.
19   Q.   And is a digitally-based course one
20 that primarily uses computers?
21   A.   Yes.
22   Q.   Would it be fair to say that you

Page 599

1  really, you can't teach a digitally-based course
2  without computers?
3    A.   Yes.
4    Q.   And would it be correct to say that
5  in a nondigitally-based course the use of
6  technology can enhance the curriculum, but it's
7  not necessary in order to conduct the course?
8    A.   It depends on what your focus is,
9  what you're trying to do in that course.
10   Q.   Generally speaking, if it's a
11 nondigitally-based course, is it essential that
12 you have a computer?
13   A.   In today's age, really.
14   Q.   In today's age, it's essential that
15 you have a computer for all nondigitally-based
16 courses, is that your testimony?
17   A.   Yes.  Yes, it is.
18   Q.   And would you need this same amount
19 of computer capacity as you would need for a
20 digitally-based course?
21   A.   Perhaps not.
22   Q.   Did you ever teach a digitally-based

59  (Pages 596 to 599)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 600

1   course at GDS?
2       A.   No.  I would, I guess I was about to
3   in 2005/06.  No.
4       Q.   And you've never taught a course
5   that was listed in the GDS course of study as a
6   technology course, right?
7       A.   Right.
8       Q.   Now, technology for the studio arts,
9   advanced technology for the studio arts, graphic
10  design, and digital color photo were all
11  digitally-based courses, right?
12      A.   They were all taught as such, yes.
13      Q.   And Laura Tolliver is the only
14  teacher from 2000, from the 2002/2001 to the
15  2004/2005 school year who taught those courses,
16  right?
17      A.   Repeat that again for me.
18      Q.   I said Laura Tolliver is the only
19  teacher from 2000 to 2005 who taught those
20  courses, right?
21      A.   I believe so.
22      Q.   And all of those courses were listed

Page 601

1   in the course of study as technology courses,
2   weren't they?
3       A.   I believe so.
4       Q.   In the next bullet on Exhibit 39, I
5   want to be sure we're back on this same page.
6   It's back on Page 2646 or Page 121.
7           If you would go to the bullet that
8   says -- it's the second bullet on that page.
9           Do you see that?
10      A.   Yes.
11      Q.   And you say:  "I have been limited
12  to a minimum of computer space and this has been
13  encouraged by Nick Ryan and Laura Tolliver."
14          What time period were you talking
15  about when you said you had been limited to a
16  minimum of computer space?
17      A.   I have always been limited to a
18  minimum of computer space.  But, in 2000 --
19  2002/2003, I worked on the yearbook, the GDS
20  yearbook.
21      Q.   And were you limited to a minimum of
22  computer space in 2002/2003?

Page 602

1       A.   Yes.
2       Q.   Would you say you were limited to a
3   minimum, was there anybody else who had more
4   computer space than you did on the faculty at
5   that time?
6       A.   Besides Laura Tolliver, I don't
7   know.
8       Q.   And Laura Tolliver had more computer
9   space in connection with those technology courses
10  she was teaching?
11      A.   I don't know.
12      Q.   Would you have had the same or
13  greater amount of computer space than Laura
14  Tolliver had in those years, if you had come back
15  to teach at GDS in the 2005/2006 school year?
16      A.   I don't know.
17      Q.   Do you know if the computer space
18  that she was allocated was related to the
19  courses, the digital courses that she was
20  teaching in those years?
21      A.   I don't know.
22      Q.   Were you scheduled to teach digital

Page 603

1   courses in the 2005/2006 school year?
2       A.   Yes.
3       Q.   Which ones?
4       A.   Film and video, and graphic design.
5       Q.   Now, on the last bullet, under this
6   heading in the middle of this Page 2646 of
7   Exhibit 39 you say:  "Though I asked for a
8   computer upgrade to perform my job, I was refused
9   until Laura and Nick's newer computers were
10  upgraded."
11          Are you suggesting that you had an
12  older computer than Laura and Nick?
13      A.   Oh, I did, yes.
14      Q.   What was the type of computer you
15  had compared with what they had?
16      A.   I don't remember exactly.  But, GDS
17  would probably have that information.
18      Q.   Did you ever request an upgrade in
19  your computer in writing?
20      A.   I don't remember.
21      Q.   Is there anything that would help
22  you to remember whether you ever made such a

60  (Pages 600 to 603)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 604

1  request?
2      A.    Maybe something from Nick Ryan
3  saying I asked for it, or Bruce Ruble saying I
4  asked.
5      Q.    Is there anything that you possess
6  or you remember writing that would refresh your
7  recollection about that?
8      A.    No.  Not that I recall.
9      Q.    And, if you had made such a request,
10  to whom would you have made the request?
11     A.    I would have asked the chairperson
12  of my department and --
13     Q.    Is that Nick Ryan?
14     A.    Nick Ryan.  And --
15     Q.    Is it your position that you should
16  have been given an upgrade in your computer
17  sooner than Laura and Nick's computers were
18  upgraded?
19     A.    No.
20     Q.    All right.  The last heading on this
21  Exhibit 39 is "Disrespect for my Professional
22  Capacity and Activities."

Page 605

1          Do you see that?  We're still on
2  Page 2646 --
3      A.    Yes.
4      Q.    -- of Exhibit 39.
5      A.    Yes.
6      Q.    In the first bullet point you say:
7  "There were disproportionate and inequitable
8  allocation of supplies, especially for larger
9  expenditures from capital budget items, but
10  including almost trivial items that are requested
11  for my classes, showing me where the power
12  resides."
13          What specific examples are you
14  talking about when you refer to disproportionate
15  and inequitable allocation of supplies especially
16  for larger expenditures from the capital budget
17  items?
18     A.    I've asked for a 35-millimeter
19  camera for, to shoot slides for my students'
20  works, or students' works, not just my students'
21  works.
22     Q.    When did you ask for that?

Page 606

1      A.    2001, 2002, probably, 2003.  More
2  than one occasion.
3      Q.    Any other examples?
4      A.    I have asked for easels for the
5  darkroom.
6      Q.    And was your request rejected?
7      A.    Yes.
8      Q.    When was that?
9      A.    It was probably 2002, 2003,
10  something like that.
11     Q.    Any other example?
12     A.    Not right now.
13     Q.    When you say not right now, is there
14  some other time when you would be able to give us
15  additional examples?
16     A.    No.  No other examples.
17     Q.    When you use the term
18  disproportionate and inequitable, what is your
19  base of comparison for disproportionate?
20     A.    The capital budget allocations that
21  were approved in the studio.
22     Q.    What would you have considered a

Page 607

1  proportionate allocation for you?
2      A.    I don't know.
3      Q.    You have no idea?
4      A.    No.
5      Q.    And when you made the statement that
6  "There was a disproportionate and inequitable
7  allocation with respect to capital budget
8  requests," had you looked at any GDS purchase
9  orders that provide documentation of expenditures
10  for capital budget items?
11     A.    It may have been that, or, what
12  items were approved for the department.
13     Q.    You say you may have looked at
14  purchase orders?
15     A.    The purchase orders were after, I
16  guess, 2004, I think, in a folder.  And so, I had
17  access to those.
18          So, I may have seen that, or, more
19  than likely it would have been a note or
20  something saying what was approved for capital
21  budget.
22     Q.    Were the capital budget requests

61 (Pages 604 to 607)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 608

1  allocated in a disproportionate and inequitable
2  manner for the 2004/2005 school year, that's the
3  last year you worked at GDS?
4      A.  I don't know.
5      Q.  Why don't we take a look at that
6  document that we're going to mark as Exhibit 48,
7  and see if we can help refresh your recollection
8  about that.
9      A.  Okay.  Is this the same question, I
10  was going to say may I take a break, but if this
11  is the same question, I will try to hold myself.
12          (Killian Exhibit Number 48
13          marked for identification.
14  BY MR. WILLIAMSON:
15      Q.  Have you had a chance to look at
16  Exhibit 48?
17      A.  Yes.
18      Q.  What is Exhibit 48?
19      A.  It's an e-mail message from Nick
20  Ryan, Subject -- actually June 9th, 2004, to me
21  and to Laura Tolliver.
22      Q.  And what is it talking about?

Page 609

1      A.  Capital budget.
2      Q.  Is it talking about the capital
3  budget requests that were granted?
4      A.  It says: "Reminder:  The capital
5  budget committee has granted the following
6  requests from the art department," right.
7      Q.  And you received this e-mail
8  approximately two months before you wrote
9  Exhibit 39; is that right?
10      A.  June 2004, yes.
11      Q.  And which of these items that were
12  approved by the capital budget committee did you
13  request?
14      A.  I requested the N2O2s, the Kodak
15  Carousel slide projector for the department and
16  the HP Deskjet 9650 printer.
17      Q.  And what is the total cost of the
18  capital budget requests you made that were
19  approved by the capital budget committee?
20      A.  Shall we add that up for me?  2009,
21  may I borrow your pen, please?
22          It looks like $4,000.

Page 610

1      Q.  Is it $4,040?
2      A.  $4,040.
3      Q.  Now, what does this document say is
4  the cost of the capital budget request made by
5  Ms. Tolliver that were approved?
6      A.  $4,050.
7      Q.  And what does this document, that's
8  been marked as Exhibit 48, say is the cost of the
9  capital budget requests made by Mr. Ryan that
10  were approved?
11      A.  $3,000.
12      Q.  Okay.  Do you believe that it was
13  inequitable that the capital budget committee
14  approved $4,050 in capital budget requests for
15  Ms. Tolliver, and only $4,040 in capital budget
16  requests for you?
17      A.  No.
18      Q.  And do you believe it was
19  inequitable that the capital budget committee
20  approved only $3,000 of Mr. Ryan's capital budget
21  requests as compared with 4,040 for your capital
22  budget requests?

Page 611

1      A.  No.  But, this, you know -- no.
2      Q.  Do you believe that the allocation
3  of approved capital budget requests for 2004 or
4  2005 was an example of racial hostility towards
5  you on the part of GDS?
6      A.  No.
7      Q.  And when you say, going back to
8  Exhibit 39, that Page 2646 in the first bullet,
9  when you say, quote:  "Almost trivial items that
10  are requested for my classes are subject to,
11  quote, 'disproportionate and inequitable
12  allocation,'" what are you referring to?
13      A.  I have been working there for
14  12 years.
15      Q.  Well, are you referring to the art
16  department supply budget?
17      A.  The art department, the capital
18  budget.
19      Q.  The trivial items --
20      A.  The trivial items some of that is
21  the, would be the, would be the budget for
22  individual courses.

62  (Pages 608 to 611)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 612

1    Q.   Would that be the art department
2  supply budget?
3    A.   It would be in part of that, yes.
4    Q.   And what is your base of comparison
5  for inequitable allocation of supplies in the art
6  department supply budget?
7    A.   I had mentioned, before the quote,
8  unquote, "trivial item" that could be represented
9  by the art, the darkroom easel.
10   Q.   Now, is it your view that the art
11 department supply budget at GDS was allocated
12 inequitably within the department while you were
13 working there?
14   A.   Not all, no.  Not all of the time,
15 no.
16   Q.   Who decides how the art department's
17 supply budget is allocated?
18   A.   I believe that Nick Ryan and the
19 principal do.
20   Q.   Now, you said that the, you did not
21 believe the art department's supply budget was
22 allocated inequitably all of the time.

Page 613

1         Was there some time when you thought
2  it was?
3    A.   There was.
4    Q.   When was that?
5    A.   There was a time when Laura Tolliver
6  and I were both teaching photography.  Well,
7  first year photography she continues to teach.
8    Q.   When was that time?
9    A.   I think maybe 2002 and 2003, because
10 she continues to teach photography.
11   Q.   And during that time you felt the
12 art supply budget was allocated inequitably?
13   A.   And there were --
14   Q.   Can you answer the question?
15   A.   During that time you said, during
16 2000 --
17   Q.   Yes.
18   A.   During 2000, I don't remember the
19 exact dates.  But, there were, there was a time
20 when the photography budget was something that I
21 had to request out of, from Laura Tolliver.
22   Q.   Okay.  I think the videographer

Page 614

1  needs to take a break, and you had said you had
2  wanted to take a break.
3    A.   Yes.
4         MR. WILLIAMSON:  I've got a few more
5  questions on this subject, but why don't we take
6  a break now.
7         THE VIDEOGRAPHER:  Going off the
8  record at 4:32:29.
9         (Recess -- 4:32-4:45 p.m.)
10        THE VIDEOGRAPHER:  Going back on the
11 record at 4:45:18.
12 BY MR. WILLIAMSON:
13   Q.   Ms. Killian, how was the art
14 department supply budget allocated among the
15 teachers of GDS, or how was it allocated when you
16 were a teacher there?
17   A.   At the last, during the last school
18 year, I believe it was in three parts.
19   Q.   Was it in three equal parts?
20   A.   I believe so.
21   Q.   And was that the way it was
22 allocated throughout the time that Mr. Ryan was

Page 615

1  the art department chair?
2    A.   I don't know.
3    Q.   Do you remember what your allocation
4  was in the 2004/2005 school year, from the art
5  department supply budget?
6    A.   No.
7    Q.   Do you remember whether that budget
8  was about $33,000 for three teachers and each
9  teacher was allocated $11,000?
10   A.   That sounds like it could be so.
11   Q.   Do you know of any years under
12 Mr. Ryan when the art department teachers did not
13 get an equal share of the supply budget?
14   A.   I don't recall.
15   Q.   And after you got your allocation of
16 your equal share from the art department supply
17 budget, did you need to seek anyone's approval
18 when you were purchasing supplies with those
19 monies?
20   A.   Nick Ryan signed the purchase
21 orders.
22   Q.   Were the purchases that you made out

63 (Pages 612 to 615)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 616

1  of your allocation from the art department supply
2  budget ever denied or rejected by any other
3  official at GDS?
4      A.    Not that I recall.
5      Q.    Now, in a given year, does each
6  teacher, does each art teacher at GDS have the
7  same total number of students that they are
8  teaching?
9      A.    I don't know.
10     Q.    Were there some years where the
11 total number of students you were teaching was
12 smaller than the total number of students that
13 Ms. Tolliver and Mr. Ryan were teaching?
14     A.    Probably.
15     Q.    Would that have been true in your
16 last year at the school, 2004/2005?
17     A.    There -- yes, I believe that's the
18 year.
19     Q.    Is it fair to say -- I'm sorry, did
20 you say -- what did you say?
21     A.    I said I believe that was the year
22 that -- yes.  Yes.

Page 617

1      Q.    Yes that?
2      A.    Last year I had the small, a really
3  small class.
4      Q.    Were there any other years when you
5  had a smaller group of students than Mr. Ryan and
6  Ms. Tolliver were teaching?
7      A.    I don't recall.
8      Q.    Is it fair to say that since each
9  teacher was allocated the same amount out of the
10 art department supply budget, a teacher who was
11 responsible for teaching fewer students would
12 effectively be allocated more money per student
13 for art supplies?
14     A.    I don't know.
15     Q.    What is it you would need to know to
16 figure that out?
17     A.    In regard to -- and I hate to take
18 you through all of this.  But, in regard to the
19 class that was the really small class, the
20 advanced drawing and painting class,
21 notwithstanding that there's a smaller number of
22 students, or a fewer, you know, fewer students,

Page 618

1  the materials would be bought and actually shared
2  by Nick Ryan who was teaching a first year
3  painting class.
4      So, it all depended on what was
5  needed in there.  But --
6      Q.    But, as a general matter, would it
7  be fair to say that if each teacher got an equal
8  share of the art supply budget, but one of the
9  teachers had a smaller number of students, then
10 the others, then the monies that the teacher with
11 the smaller number of students had would mean
12 that the average amount that that teacher had for
13 each student was higher compared with the other
14 teachers?
15     A.    That sounds correct.
16     Q.    In connection with this Exhibit 39,
17 or any of the other documents that we've been
18 discussing during this deposition, did you review
19 the art department purchase orders to determine
20 how much money each teacher spent on supplies for
21 his or her classes?
22     A.    Regarding the, any of these

Page 619

1  documents here you're saying?
2      Q.    Regarding these, yes, any of the
3  documents that you have produced in the
4  litigation, or that we've, yes, that's what I
5  want, really, in connection with the complaint
6  that you filed as the basis for your lawsuit, and
7  any of the documents that you've produced in this
8  litigation, but particularly Exhibits 13 and
9  39 --
10     A.    Uh-huh.
11     Q.    -- did you review the art department
12 purchase orders to determine how much money each
13 teacher spent on supplies for his or her class?
14     A.    I may not have done it like in a
15 formal manner all at once or whatever.
16     But, yes, you know, these, by the
17 time that equity started to show up and people
18 were being recommended to my classes, or to my
19 class, I had already, I had gone to the diversity
20 people to talk about Nick Ryan bending low to the
21 ground it seems to me.
22     Q.    When did equity start to show up?

64  (Pages 616 to 619)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 620

1    A.   I can tell you that it seemed a lot
2  easier to get some of the things I was asking for
3  once that happened.
4    Q.   And when was that?
5    A.   In February 2004.
6    Q.   I want to get back to this question
7  I asked before.
8         Were you saying that you did or did
9  not review the art department purchase orders to
10  determine how much money each teacher spent on
11  supplies for his or her classes?
12    A.   I'm not sure I did a formal tally.
13    Q.   Did you do an informal review?
14    A.   Probably an informal review.
15    Q.   Okay.  And did --
16    A.   Where are we right now?  Are we on
17  Page 120, I mean, 2645 of the Document Number 39,
18  Exhibit 39?
19    Q.   We're not on a specific page.  I'm
20  really just trying to understand what your
21  position is about the equity of the budget
22  allocation for art supplies.

Page 621

1         That's the subject that we are
2  talking about.
3    A.   Okay.
4    Q.   And after you did your informal
5  review of these department purchase orders, what
6  did you conclude about the fairness of the
7  allocation of budget for art supplies.
8         MR. RACIN:  Objection to the extent
9  the question assumes facts not in evidence.  I
10  don't know that there was testimony about
11  reviewing purchase orders.
12  BY MR. WILLIAMSON:
13    Q.   I thought -- tell me, I'm glad your
14  counsel pointed that out.
15         Did you say that you had done an
16  informal review of purchase orders before you
17  made a judgment about whether the budget for art
18  supplies was being equitably allocated?
19    A.   I said I looked at them informally.
20  I didn't do a study of them.
21    Q.   Okay.  When you looked at them
22  informally, what did you conclude about whether

Page 622

1  the art supply budget was being equitably
2  allocated?
3    A.   The art department budget division
4  was, I could see whatever was afforded to each
5  faculty member to spend during that period,
6  during whatever periods were covered that I saw.
7    Q.   And did you conclude that was a fair
8  and equitable allocation?
9    A.   It wasn't always that way throughout
10  these 12 years.  But, there's a point at which
11  there was a division of the art department budget
12  in three ways.
13    Q.   In three equal ways?
14    A.   I believe so.
15    Q.   And at what point was that?
16    A.   It was -- I'm not sure, at some time
17  after 2000, maybe 2001, 2002.
18    Q.   Did you conclude that the allocation
19  of funds from the art supply budget was based on
20  racial hostility towards you after the year 2000?
21    A.   The division of the budget, no.
22    Q.   Now, in the second bullet on that

Page 623

1  page of Exhibit 39, that's got the Bates Number
2  2646, you say that you had been excluded from
3  decision-making about curriculum and course
4  assignments; is that right?
5    A.   Yes.
6    Q.   Are there any decisions about
7  curriculum and course assignments from which you
8  were excluded that we have not already discussed
9  in this deposition?
10    A.   I don't know.
11    Q.   What would allow you to figure that
12  out?
13    A.   I don't know.
14    Q.   Is there any instance of exclusion
15  from decisions about curriculum and course
16  assignments that you think supports your claim of
17  discrimination in this case that we have not
18  discussed either today or during the previous day
19  of your deposition?
20    A.   Not that I'm aware right now.
21    Q.   You say not that you're aware right
22  now.  Do you know what I'm going to ask you then?

65  (Pages 620 to 623)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 624

1    A.   Yes, yes.  What would make me aware.
2  I don't know.  I don't know.  I don't know.
3         I have told you all that I could
4  elicit out of myself, you know, with all of the
5  things that have occurred over these past
6  12 years.
7         And I've tried to make aware, you
8  know, make you aware of the things that I know.
9  And that's, I don't know anything else right now.
10   Q.   Again, when you say right now, is
11  there --
12   A.   I don't know anything, no.  That's
13  because I'm a learner.  But, no.  I don't know.
14   Q.   I want to stick with Exhibit 39,
15  this same Page 2646 as the Bates number.
16   A.   Okay.
17   Q.   In the third bullet point there's a
18  reference to a meeting with Susie Ryan that we
19  discussed earlier today.
20   A.   Uh-huh.
21   Q.   Is that reference on Exhibit 39
22  about this same meeting that we discussed earlier

Page 625

1  today?
2    A.   Yes.
3    Q.   Now, in the last sentence on that
4  page of Exhibit 39, you say that:  "You found out
5  about the meeting by accident."
6         What was the accident that allowed
7  you to find out about that meeting that Susie
8  Ryan was arranging to talk about broader
9  involvement of alumni with the art magazine?
10   A.   Because I happened to call.  Nobody
11  called me or told me anything, I happened to call
12  Susie Ryan at the time that I did.
13   Q.   So, that was?
14   A.   And that's how I found out.
15   Q.   And that was the accident that you
16  were referring to?
17   A.   Yes.
18   Q.   And was that accident a call that
19  you had made in response to the message that had
20  been left on your school phone?
21   A.   Yes.
22   Q.   Let me look at the, on the last

Page 626

1  bullet point of Exhibit 39.  Can you take a look
2  at that, please.
3    A.   Repeat that, please.
4    Q.   I want to you take a look at the
5  last bullet point of Exhibit 39.
6         It's the last bullet point on the
7  Page 2646 under the heading "Disrespect for my
8  Professional Capacity and Activities."
9    A.   Yes.
10   Q.   Have you had a chance to read that?
11   A.   I'm reading.  Yes.  I've read it.
12   Q.   Thank you.  What are instances of
13  calls that Laura Tolliver or Nick Ryan have taken
14  and that you have later felt demeaned because
15  someone said they have already spoken to the
16  person in charge?
17   A.   Certainly the art magazine.
18   Q.   Any other example?
19   A.   When I started to do the yearbook,
20  the contact person at the publisher, who had
21  worked with Tolliver previously, called and
22  talked to Laura Tolliver, and then I would not

Page 627

1  get the information.
2    Q.   Who was that person?
3    A.   What's -- I don't remember his name.
4  He worked with Jostens' Publishing Company.
5    Q.   And had he been informed that there
6  was a change in responsibility from Ms. Tolliver
7  to you for the year book?
8    A.   Yes.
9    Q.   Who informed him of that?
10   A.   Paul Levy would have.  And that's
11  all I would know.
12   Q.   But, you can't remember the
13  individual's name?
14   A.   No.
15   Q.   Does Tim Ford sound like the name?
16   A.   Yes.  Yes.
17   Q.   And is it your testimony that
18  Mr. Ford was told that you were in charge of the
19  yearbook, but that he did not call you to discuss
20  matters relating to the yearbook?
21   A.   He, I mean, there are occasions
22  where he did, yes, talk to me.  But, there have

66  (Pages 624 to 627)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 628

1    been occasions.
2           You asked me about whether there
3    were times when calls were directed to Laura
4    Tolliver and critical information would be
5    discussed.
6           And that I wouldn't, I would not get
7    the information.  And it had occurred with Tim
8    Ford and Laura Tolliver in this regard, before,
9    not every time.
10   Q.    Did it occur shortly after the
11   transition had been made?
12   A.    I don't know.  Within the next year,
13   yes.
14   Q.    What was the most recent time when
15   one of these incidents occurred involving Tim
16   Ford and Laura Tolliver?
17   A.    It was the 2002/2003 academic year.
18   Q.    And has it occurred since then?
19   A.    No.
20   Q.    Any other examples?
21   A.    Not that I know.
22   Q.    I beg your pardon?

Page 629

1    A.    No.
2    Q.    And what's your basis for thinking
3    that the taking of these calls by Mr. Ryan and
4    Ms. Tolliver were motivated by racial prejudice
5    against you?
6    A.    Because this happened to me and no
7    one else in that department, and consistently
8    occurred over and over, this marginalization.
9    That's my feeling about that.
10   Q.    Can you give any more specific
11   reason?
12   A.    No.
13   Q.    Ms. Killian, you currently reside in
14   Fayetteville, Arkansas, don't you?
15   A.    Yes.
16   Q.    Before you moved to Arkansas, where
17   did you live?
18   A.    7101 Algeron in Falls Church.
19   Q.    Is that in Virginia?
20   A.    Yes.
21   Q.    And when did you decide that you
22   were going to move to Arkansas?

Page 630

1    A.    When we decided to sell our house,
2    we were going to relocate.
3    Q.    And when was that?
4    A.    April, the house was sold, was put
5    on the market.  And, yes.
6    Q.    Was it put on the market about
7    April 14, 2005?
8    A.    Yes.
9    Q.    And how long before April 14, 2005,
10   did you, or you and your husband decide that you
11   were going to move to Arkansas?
12   A.    Not long, not long before that.
13   Q.    Was it a few days, or a few weeks,
14   or a month?
15   A.    No.  You know, GDS and I were in
16   what were to have been some negotiations.  They
17   had asked me previously about the option of not
18   coming back to school as one of the things that
19   I, that could be part of a settlement agreement.
20          So, it wasn't unusual that that
21   could be a possibility.  We were, the market was
22   great, and we sold our little house.

Page 631

1    Q.    You say the market was great, how
2    long was the house on the market before a
3    purchaser signed a contract on the house?
4    A.    I think that it was within a week
5    that it was sold.
6    Q.    April 20th sound about right,
7    April 20, 2005?
8    A.    Something like that, uh-huh.
9    Q.    Keep in mind we have to have one
10   person talking at a time.  I know you're trying
11   to be responsive.
12   A.    Sorry.
13   Q.    But our reporter has persevered very
14   graciously with us and we don't want to tamper
15   with that as we go down the stretch here.
16   A.    Yes.
17   Q.    Now, when you -- and what was the
18   close date for the sale of the house?
19   A.    July 17th or some thereabouts, or
20   14th.  I don't remember exactly.
21   Q.    July 14th, 2005?
22   A.    2005.

67  (Pages 628 to 631)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 632

1    Q.    That sound about right?
2    A.    Yes.
3    Q.    What did you do with your personal
4 belongings and household furnishings?
5    A.    When?
6    Q.    During the, or after you sold the
7 house?
8    A.    They were in storage.
9    Q.    Where were they in storage?
10    A.    In Falls Church.
11    Q.    Are they still in storage?
12    A.    No. Moved them to Fayetteville.
13    Q.    When was that?
14    A.    In July.
15    Q.    Have you bought a house in
16 Fayetteville, Arkansas?
17    A.    No.
18    Q.    Where do you live in Fayetteville?
19    A.    I'm living with, we're living with
20 my husband's parents.
21    Q.    Is it your intention to stay in
22 Arkansas as your residence?

Page 633

1    A.    Currently, yes.
2    Q.    Did you start living with your
3 in-laws in Arkansas immediately upon your arrival
4 there?
5    A.    Yes.
6    Q.    Now, when you decided to sell your
7 home in Falls Church, back in April of 2005, and
8 moved to Arkansas, were you still planning to
9 teach at the Georgetown Day School during the
10 2005/2006 school year?
11    A.    I definitely saw that as a
12 possibility, yes.
13    Q.    And, if so, where were you planning
14 to live in the D.C. area?
15    A.    There are quite a number of rental
16 places in Virginia, apartments.
17    Q.    And what arrangements did you make
18 for renting apartments in Virginia?
19    A.    And found out that there are leases
20 that could be had within a short period of time.
21    Q.    Did you make any arrangements for
22 renting housing in Virginia after you sold your

Page 634

1 house in April, or after you signed the contract
2 to sell your house in April of 2005?
3    A.    Actually, I didn't sign a lease for,
4 you know, starting in the fall. But, I did have
5 a place to stay. I did have a place to stay in
6 the fall.
7    Q.    Where was that?
8    A.    My friend Ann Fragale has an unused
9 apartment, space that I was going to use. That
10 was offered to me, if I had to. I would have
11 probably rented.
12    Q.    Are there any documents that
13 indicate you had an arrangement with -- who was
14 your friend?
15    A.    Ann Fragale.
16    Q.    Ann Fragale. How do you spell her
17 name?
18    A.    F-R-A-G-A-L-E.
19    Q.    And how do you spell her first name?
20    A.    I believe it's no E, Ann.
21    Q.    And where does she live?
22    A.    She lives in Great Falls, Virginia.

Page 635

1    Q.    And you were planning to live in the
2 same house where she lived or she owned property
3 some place else?
4    A.    She has -- no, sorry, I interrupted
5 you again I apologize. Sorry. It's in the same
6 house.
7    Q.    And was there anything in writing
8 that you communicated to her about your intention
9 to live in her house?
10    A.    No.
11    Q.    When did you first notify Georgetown
12 Day School that you were moving to Arkansas?
13    A.    I don't think I notified Georgetown
14 Day School that I was moving to Arkansas.
15    Q.    After you had moved to Arkansas, did
16 you give GDS a Tyson's Corner P.O. Box as your
17 mailing address?
18    A.    Yes.
19    Q.    And why did you do that instead of
20 giving GDS your Arkansas address?
21    A.    Everybody, my bill paying, everybody
22 had my box number, because there was definitely a

68  (Pages 632 to 635)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 636

1  possibility that I would be back.
2         As far as I knew, the Fayetteville
3  address was going to be my summer residence.
4      Q.   You said your intention was to just
5  stay in Fayetteville for the summer?
6      A.   As far as I knew at the time,
7  Fayetteville, Arkansas could be my summer
8  residence.
9      Q.   Didn't you testify earlier that you
10 moved to your household belongings to Arkansas in
11 July of 2005?
12     A.   Yes.
13     Q.   And if you were just going to, if
14 you were just contemplating that Arkansas would
15 be your summer residence, why is it that you
16 moved your household furnishings to Fayetteville?
17     A.   My husband would stay in
18 Fayetteville.  And I would be commuting to and
19 from, for the period that I would have to.  That
20 was the plan.
21     Q.   So, the plan was that your husband
22 would establish permanent residence, and that you

Page 637

1  would commute to the Washington area after the
2  summer?
3      A.   That was the plan.  If everything,
4  if that's what I had to do, yes.
5      Q.   Now, did you understand in July of
6  2005 that, based on your, the contract you had
7  signed with GDS in February of 2005, that GDS was
8  expecting you to teach at the school during the
9  2005/2006 school year?
10     A.   Yes.
11     Q.   When did you first decide that you
12 were not coming back to teach at GDS in the
13 2005/2006 school year?
14     A.   It wasn't so much as a decision as a
15 compelling illness that made it happen, that I
16 couldn't come back.
17     Q.   When did -- well, we'll get to some
18 questions about that in a moment.
19         Do you know what staff week is at
20 GDS?
21     A.   Yes.
22     Q.   What is it?

Page 638

1      A.   It's a period before classes begin
2  where a faculty and staff come to school and
3  prepare.
4      Q.   Does it normally occur around the
5  last week of August before school starts?
6      A.   Yes.
7      Q.   When did you inform GDS that you
8  would not be attending staff week in August of
9  2005?
10     A.   It was, it may have been the day
11 that, the Friday before staff week, something
12 like that.
13     Q.   Would that have been around
14 August 24, 2005?
15     A.   Somewhere around there.
16     Q.   On the --
17     A.   I'm not looking at a calendar.
18     Q.   On the day before you informed GDS
19 that you were not going to be coming for staff
20 week -- well, who was the person you spoke to at
21 GDS, was that Janice Webb?
22     A.   I think I left a message.

Page 639

1      Q.   Okay.  On the day before you left
2  your message, were you still planning to return
3  to GDS to work during the 2005/2006 school year?
4      A.   I was planning on it until I felt so
5  horrible -- by emotionally -- emotionally drained
6  and emotionally ill from the outcome of my wait
7  and trust of the school to talk with us freely.
8      Q.   Explain that a little bit more.
9      A.   I had every intention on coming back
10 until I was sick, until I became sick.
11     Q.   Did you make any travel arrangements
12 to come back in August of 2005?
13     A.   I -- you know, I would have driven
14 is how I would have done it, driven.  I don't
15 usually make, you know, you don't have to do too
16 much to do that.
17     Q.   When you went out to Arkansas, did
18 you drive out there?
19     A.   Uh-huh.
20     Q.   And how many cars do you own?
21     A.   One now.  One.
22     Q.   And does your husband use the car?

69 (Pages 636 to 639)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 640

1     A.   We both use the car.
2     Q.   But, does your husband, does he use
3 the car in Arkansas?
4     A.   Yes. Yes.
5     Q.   And it's your testimony that if you
6 had come to staff week, you would have taken your
7 only car and driven it to Washington?
8     A.   Yes.
9     Q.   And what would your husband have
10 used for transportation in Arkansas?
11     A.   He has access to other vehicles.
12     Q.   And you knew that teachers are
13 normally expected to be present at staff week;
14 isn't that right?
15     A.   Yes.
16     Q.   Would you say that's something that
17 is covered under your, or within your contractual
18 responsibilities to be a teacher at GDS?
19     A.   I believe so.
20     Q.   And prior to that call you made in
21 August 24th, about not coming to the staff week,
22 did you contact anyone at GDS during the summer

Page 641

1 of 2005 and request to be excused from staff
2 week?
3     A.   No.
4     Q.   Were you also scheduled to be the
5 faculty year book advisor during the 2005, 2006
6 GDS school year in addition to being a member of
7 the art department faculty?
8     A.   Yes.
9     Q.   And what are the responsibilities of
10 the faculty year book advisor?
11     A.   There are numerous.
12     Q.   Can you summarize what they are,
13 please?
14     A.   To advise and direct the production
15 of a yearbook for the school.
16     Q.   And in 2004/2005, you confirmed
17 earlier that you were paid extra salary in the
18 amount of about $5,400 to serve as the faculty
19 yearbook advisor; is that right?
20     A.   Uh-huh, yes.
21     Q.   And had you supervised the yearbook
22 for the 2005/2006 school year, would you expect

Page 642

1 to have been paid a stipend similar to that which
2 you received for the 2004/2005 school year?
3     A.   Yes.
4     Q.   Okay.  When did you first notify GDS
5 that you would not be returning to the school to
6 serve as the faculty yearbook advisor?
7     A.   I think that if I notified the
8 school that I am sick and that I cannot come to
9 school, and since I'm the same person who would
10 be doing the yearbook advising, that they would
11 assume that I couldn't do it from afar.
12     Q.   And when was it that you provided
13 that notification?
14     A.   I -- you said the 24th of August.
15     Q.   Well, that's when you said you
16 weren't coming for the staff week.
17     A.   I don't remember the exact date.
18     Q.   Was it some time after August 24th?
19     A.   I don't remember.  Would you refresh
20 my memory?
21     Q.   Well, I'm not sure whether we can on
22 that one or not.

Page 643

1        We'll go a little further along in
2 the outline and we will see if we can get back to
3 that.
4        Were you also scheduled to supervise
5 students in independent studies during the
6 2005/2006 school year?
7     A.   I do believe that, in addition to my
8 classes during, that were held during class
9 periods, there were one or two students who were
10 going to meet independently working on courses,
11 yes.
12     Q.   Do you remember the names of those
13 students?
14     A.   No.
15     Q.   Does Sophia Maravel sound like the
16 name of one of them?
17     A.   Yes.
18     Q.   What about Rebecca Russell Einhorn.
19     A.   Yes.
20     Q.   Anybody else that you can remember?
21     A.   No.
22     Q.   And did you inform GDS during the

70  (Pages 640 to 643)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 644

1 summer of 2005 that you would not be available to
2 teach those independent study students?
3      A.   No.
4      Q.   You sent an e-mail on August 23,
5 2005, discussing or -- let me start that again.
6         You sent an e-mail to Sophia Maravel
7 on August 23, 2005, discussing Ms. Maravel's
8 independent study course proposal, didn't you?
9      A.   I -- if you say that I, that there
10 is an e-mail that is --
11     Q.   I don't want you to rely on what I
12 say.  I want you to rely on your memory, or if
13 you can't remember, then we'll see if we can
14 refresh your recollection.
15     A.   I do believe that I sent something
16 to Sophia about her course work.
17     Q.   I'm going to ask you to take a look
18 at a document that we're going to mark as
19 Exhibit 66.
20         (Killian Exhibit Number 66
21          marked for identification.)
22 BY MR. WILLIAMSON:

Page 645

1      Q.   Have you had a chance to look at
2 Exhibit 66?
3      A.   Yes.  I'm still reading it.  Okay.
4      Q.   What is Exhibit 66, Ms. Killian?
5      A.   It's an e-mail message from me to
6 Subject:  AP Independent Study, to Sophia
7 Maravel.
8      Q.   What is the date?
9      A.   August 23rd.
10     Q.   What do you say in that e-mail?
11     A.   I'm responding to Sophia, who
12 apparently did not get the proper listing of art
13 on her schedule for school.  And she's telling me
14 what she had need to do.
15         And I am writing her back to
16 essentially ask -- well, not essentially, to ask
17 her whether she had written the two paragraphs
18 concerning the agreement to do independent study
19 and given it to Tom Yoder, which she was supposed
20 to do.
21         And if she, I had already spoken
22 with Tom about the plan for her independent study

Page 646

1 and what she was planning to do.  And, you know,
2 essentially did you write those two paragraphs.
3      Q.   Did you mention anywhere in this
4 e-mail, that has been marked as Exhibit 66, that
5 you thought you might be unable to return to GDS
6 for the 2005/2006 academic year?
7      A.   No.
8      Q.   Do you also recall sending an e-mail
9 to Zak Velazquez, another GDS student on
10 August 23, 2005?
11     A.   I know Zak Velazquez.  I don't
12 recall whether, if you say that I sent one, then
13 I probably did.  Zak Velazquez was a student of
14 mine.
15     Q.   I'm not saying you sent one, I'm
16 asking whether you did.
17     A.   I may have sent one to Zak
18 Velazquez.
19     Q.   Let's take a look at a document that
20 will be marked as Exhibit 67?
21         (Killian Exhibit Number 67
22          marked for identification.)

Page 647

1 BY MR. WILLIAMSON:
2      Q.   Mr. Killian, what is Exhibit 67?
3      A.   It is an e-mail message, August 23,
4 2005, from me, I think it's to Zak --
5      Q.   Zak Velazquez?
6      A.   -- Velazquez regarding his classes.
7      Q.   Is he another GDS student?
8      A.   Yes.
9      Q.   And you sent this on August 23,
10 2005?
11     A.   Yes.
12     Q.   And is it accurate to say that in
13 this e-mail you advised Zak Velazquez with
14 respect to which high school courses might be
15 most appropriate for him to take?
16     A.   I'll read it.
17     Q.   Have had you a chance to read it?
18     A.   I have read my part.  I'm reading
19 his part now.  Okay.  I've read it.
20     Q.   Was advising students one of your
21 regular duties as a faculty member at GDS?
22     A.   Yes.

71 (Pages 644 to 647)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 648

1    Q.    Did you inform Zak Velazquez that
2  you might not be able to return for the 2005/2006
3  academic year in the -- I'm sorry, one second.
4        We need to go back, apparently I
5  didn't follow-up on an earlier question. So,
6  we'll try and do it again.
7        Is it accurate to say that in this
8  e-mail you advised a GDS student with respect to
9  which high school courses might be most
10  appropriate for him to take?
11    A.    Yes.
12    Q.    And you testified earlier that
13  advising students was one of your regular duties
14  as a faculty member at GDS; is that right?
15    A.    Yes. I said yes.
16    Q.    Did you inform Zak Velazquez, in
17  this e-mail that you sent on August 23, 2005,
18  that you might not be able to return for the
19  2005/2006 academic year?
20    A.    No.
21    Q.    When did you first tell GDS that you
22  would not be returning to supervise your

Page 649

1  independent study students?
2    A.    I don't recall the exact date. But,
3  if I were sick, as I was, and I could not come to
4  staff week, they would, the assumption would be
5  that I couldn't be there to do independent study.
6    Q.    Why is it that, if you couldn't come
7  for one week of school because of illness, the
8  school would assume that you would not be there
9  for the rest of the academic year?
10    A.    I believe that I would have called
11  the school to say that I was not well. And I
12  believe I did do that.
13    Q.    Did you tell them that you were not
14  going to be well for the entire academic year?
15    A.    No, because I didn't expect to be,
16  not to be well for the entire academic year.
17    Q.    How long did you expect that you
18  wouldn't be well for?
19    A.    Gosh. I don't know. At that point,
20  short-term disability would have been something
21  like the end of the first semester.
22        But, I, you know, I was not well,

Page 650

1  and I didn't know.
2    Q.    Am I correct that you didn't tell
3  your students Sophia Maravel and Rebecca Russell
4  Einhorn, that is your independent study students,
5  that you would not be available to supervise them
6  in the 2005/2006 school year until September 9,
7  2005?
8    A.    I don't believe I told the students
9  individually anything.
10    Q.    All right. Would you take a look at
11  a couple of documents that we're going to mark as
12  Exhibits 50 and 51.
13    A.    Okay.
14    Q.    Why don't you take a look at those
15  and I'll ask you a few questions about them.
16    A.    Okay.
17        (Killian Exhibit Numbers 50 & 51
18          marked for identification.)
19  BY MR. WILLIAMSON:
20    Q.    Have you looked at them?
21    A.    Yes.
22    Q.    Now, is it still your testimony --

Page 651

1  well, can you tell me what is Exhibit 50?
2    A.    Exhibit 50 is September 9th, an
3  e-mail to --
4    Q.    What year?
5    A.    2005. From me paragraphs for
6  independent study, Sophia Maravel, cc Nick Ryan.
7        "Hi, Sophia, I just read your
8  proposal and it seems just right. Because of
9  health issues, my status is uncertain so you
10  should make arrangements with a substitute AP
11  teacher through Nick Ryan. Sharon."
12    Q.    Is it still your testimony that you
13  did not individually notify this student that you
14  would not be coming back because of health
15  issues?
16    A.    I said I did not believe. And I
17  thank you for correcting that. I see that I have
18  done this, September 9th, 2005.
19    Q.    All right. What about Exhibit 51?
20    A.    E-mail message from Sharon Killian,
21  Philbin Video, Rebecca Russell Einhorn, cc Nick
22  Ryan.

72 (Pages 648 to 651)

Sharon Killian

Page 652

1    "Hi, Becca.  Thanks for your good
2  wishes.  My status is quite uncertain in light of
3  health issues.  Under the circumstances you
4  should coordinate your independent study through
5  Nick Ryan and the person teaching the course in
6  my absence."
7    Q.   Okay.  Am I correct that you didn't
8  tell Sophia Maravel or Rebecca Russell Einhorn,
9  your independent study students, that you would
10  not be available to supervise them in the
11  2005/2006 school year until September 9, 2005?
12    A.   Yes.
13    Q.   Now, did GDS have to hire substitute
14  teachers to replace you in 2005?
15         MR. RACIN:  Excuse me, I should have
16  objected to the last question on the grounds that
17  it mischaracterized the document.  But, continue.
18  BY MR. WILLIAMSON:
19    Q.   Did GDS have to hire substitute
20  teachers to replace you for the 2005/2006 school
21  year?
22    A.   I believe that substitute teachers

Page 653

1  were hired.
2    Q.   What's the basis for your belief?
3    A.   There may have been a memo from --
4  there had been a memo from Kevin Barr and I
5  believe that's it.  A memo from Kevin Barr.
6    Q.   Do you know if they hired one person
7  or two people to substitute for you?
8    A.   I believe there were two
9  substitutes.
10    Q.   Do you know if those two substitutes
11  are minorities or people of color?
12    A.   No.
13    Q.   Do you know if any one of the
14  substitutes is an African-American?
15    A.   I don't recall anyone, I don't
16  recall them telling me that.
17    Q.   I would like you to take a look at a
18  document that's been marked as Exhibit 53.
19    A.   Is this sunset?  What is going on,
20  or is it overcast?
21         (Killian Exhibit Number 53
22            marked for identification.

Page 654

1         MR. WILLIAMSON:  Let's go off the
2  record for a second.
3         THE VIDEOGRAPHER:  Going off the
4  record at 5:35:11.
5         (Recess -- 5:34:11-5:35:38 p.m.)
6         THE VIDEOGRAPHER:  Going back on the
7  record at 5:35:38.
8  BY MR. WILLIAMSON:
9    Q.   Have you had a chance to look at
10  Exhibit 53?
11    A.   I haven't looked at every single
12  page again, but, yes.
13    Q.   Are you familiar with that document?
14    A.   Yes.
15    Q.   What is Exhibit 53, Ms. Killian?
16    A.   It's a long-term disability claim
17  statement.
18    Q.   And if you would turn to the third
19  page of Exhibit 53, the Bates number is 2898.
20    A.   Okay.
21    Q.   Do you see there is, it says:
22  "Signature of an insured/member or legal personal

Page 655

1  representative."
2         Do you see that?
3    A.   Yes.
4    Q.   And whose signature is that?
5    A.   Mine.
6    Q.   And what is that dated?
7    A.   November 18th, 2005.
8    Q.   And what is Exhibit 53?
9    A.   It's a long-term disability claim
10  statement.
11    Q.   So, that's an application for a
12  long-term disability coverage; is that right?
13    A.   I believe so.
14    Q.   Okay.  Now, did you understand that
15  you had a duty to provide accurate information on
16  your application for disability insurance?
17    A.   Yes.
18    Q.   And did you provide truthful and
19  accurate information about yourself, on
20  Exhibit 53?
21    A.   Yes.
22    Q.   And you understand that if you did

73  (Pages 652 to 655)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 656

1  not provide accurate information, you could be
2  liable for insurance fraud, correct?
3      A.   Yes.
4      Q.   Now, would you please turn to the
5  page that has the Bates Number 2899 in the lower
6  right-hand corner.
7      A.   Yes.
8      Q.   Do you see the section Roman Numeral
9  II, Number 1?
10     A.   Yes.
11     Q.   I want to direct your attention to
12  that.
13         Can you please read the question and
14  your response?
15     A.   Section II, Number 1?
16     Q.   Yes.
17     A.   "Nature of illness and when symptoms
18  first appeared or describe how and where the
19  accident occurred.
20         "Hypertension, controlled,
21  depression, anxiety, insomnia, colitis, nausea
22  and diarrhea, April 2005."

Page 657

1      Q.   Were you telling the truth when you
2  provided that information?
3      A.   Yes.
4      Q.   Does April 2005 refer to when your
5  symptoms first appeared?
6      A.   The depression, the serious
7  depression hyped up, as far as I'm concerned,
8  yes.  I had, the hypertension was ongoing.
9  Insomnia definitely started to increase in 2005.
10     Q.   Was that in April of 2005?
11     A.   April 2005.  I think there was
12  another incident at school that -- well --
13     Q.   What incident was that Ms. Killian?
14     A.   It was something about I would be
15  the only person in the office without access to
16  the key to the department resources.
17         Like the two white people could have
18  access to the key, but the black person couldn't
19  have access to the key to the resources.
20     Q.   Was that the incident that you
21  discussed in your deposition on the first day
22  where you said it was worked out that you would

Page 658

1  be given access to the key?
2      A.   That -- eventually.
3      Q.   When you say eventually, when was it
4  that you were given access to the key?
5      A.   I don't remember exactly, but the
6  resolution was that, the resolution based on the
7  meeting with Kevin Barr and Tom Yoder and Nick
8  Ryan and Laura Tolliver and me would be that I
9  would not have the key, and the two white people
10  in my office would have the key.
11         And I would have to ask permission
12  to use the key to get to equipment and I believe
13  my lawyer talked to Carin Pass or something at
14  that time and eventually somebody, I think Kevin
15  Barr, changed his mind and decided that -- it
16  didn't all go away.  When I got handed the key,
17  it didn't all go away.
18     Q.   And when you say eventually, when
19  was it that you were given the key?
20     A.   I don't remember the exact date.
21     Q.   What is the approximate date?
22     A.   It's something around April or May,

Page 659

1  I believe.
2      Q.   Of 2005?
3      A.   2005.
4      Q.   Okay.  Was that the incident that
5  precipitated your symptoms in April, 2005?
6      A.   Ongoing, ongoing incidents and that
7  was a shocker, that was a shocker, yes.
8      Q.   What were the other ongoing
9  incidents in April of 2005 that triggered your
10  symptoms?
11     A.   I don't even recall having written
12  down everything because I mean, I still had to
13  teach my classes.
14         I had shows going on, my kids were
15  participating in the auction, and, you know, I
16  was trying to do the best I could.
17         And another wrench was thrown in,
18  and a pretty big wrench.  And my body -- my --
19  my -- I responded.
20     Q.   And you felt like you were under a
21  lot of pressure at that time because of these
22  other responsibilities?

74  (Pages 656 to 659)

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

Page 660

1    A.   When it all culminated in that, that
2  I would be the only person, that the black person
3  without the key in the office of two white people
4  and one black person.
5    Q.   Was there any -- when you say
6  ongoing incidents, at that time can you give me
7  an example of other ongoing incidents that
8  contributed to your symptoms in April of 2005?
9    A.   Not at this time, no, I can't.  No.
10    Q.   Is there any way that we could
11  refresh your recollection about other incidents
12  that were occurring in April of 2005 that
13  triggered your symptoms?
14    A.   There was a lot of stress because of
15  what I was dealing with in my department, and
16  then it all culminated with this.
17    Q.   What was the stress that you were
18  dealing with in your department in April of 2005?
19    A.   The fact that I, that the decision
20  was still not to allow me to have a key, in that
21  office, was just the cusp, just of all of that I
22  had been experiencing.

Page 661

1      The continual intimate meetings
2  between Laura Tolliver and Nick Ryan.
3    Q.   You said they have intimate meetings
4  what, did you mean by?
5    A.   Intimate is not the correct word for
6  that.  What did I say, meetings where it is just
7  between them, informal meetings between them and
8  not with me, still occurring.
9    Q.   Anything else in April of 2005?
10    A.   And just because I cannot enumerate
11  them, separate them out to individual bullets,
12  doesn't mean that the stress was not ongoing and
13  continuous.
14    Q.   Was there any stressor, did you say
15  earlier there was stress stemming from family
16  responsibilities as well?
17    A.   No.  I don't think so.  Did I say
18  that?
19    Q.   I thought you said something about
20  something going on with your children.  Was there
21  any --
22      MR. RACIN:  She said kids were in an

Page 662

1  auction.
2      MR. WILLIAMSON:  Her kids in an
3  auction, something like that.
4      THE WITNESS:  No, my students,
5  sorry.
6  BY MR. WILLIAMSON:
7    Q.   Your students, okay.  You were, at
8  the same time you proceeded to sell your house;
9  is that correct?
10    A.   Yes.
11    Q.   And was that any source of stress to
12  you.
13    A.   Whether it would sell or not?  No.
14    Q.   Okay.  You felt that these other
15  pressures didn't affect your decision about, or
16  did these other pressures you were talking about
17  affect your decision that you were going to sell
18  your house and move your residence to Arkansas?
19    A.   No.
20    Q.   Did you go see a doctor for
21  treatment of these symptoms in April of 2005?
22    A.   I don't remember whether it was

Page 663

1  April or May, or, I saw my doctor who, in Falls
2  Church, who was aware of my hypertension, and who
3  knew there was a lot of anxiety going on.
4      But, I did not go to -- yes.
5    Q.   What doctor was that?
6    A.   I should know her name.  Marianne
7  Giordano.
8    Q.   Did you see Dr. Marianne Giordano in
9  April of or May of 2005?
10    A.   I just said I'm not sure if I saw
11  her before, that month before or after.
12    Q.   You said earlier you weren't sure if
13  it was April or May of 2005.
14      Isn't it true that you did not see
15  Dr. Giordano in either April or May of 2005?
16    A.   Did I see her in March, I know I saw
17  her that spring.  Did I --
18    Q.   Spring would be, what spring starts
19  March 20th?
20    A.   I don't know.
21    Q.   You're saying you saw her some time
22  after March 20th, 2004?

75  (Pages 660 to 663)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 664

1    A.   I can't tell you specifically
2  March 20, 2004.
3    Q.   I'm saying did you see her --
4    A.   I don't have that in front of me
5  about my schedule to see her.  I didn't bring
6  those, you know.
7    Q.   Isn't it true, Ms. Killian, that you
8  did not go see Dr. Giordano in April, May, June
9  or July of 2005, after these symptoms that you
10 have described first appeared?
11   A.   That's probably, possibly true, yes.
12   Q.   And you didn't see -- again, you
13 left the area in July, so, you didn't see her in
14 August, did you?
15   A.   I don't recall that I saw her in
16 April, May, June, or July.  I didn't see her in
17 August because I wasn't here.
18   Q.   Did you see any doctor for treatment
19 of these symptoms in May, June, July, or
20 August of 2005?
21   A.   I don't believe so.  I don't recall.
22   Q.   I already asked you that.  You

Page 665

1  didn't see any doctor in April of 2005 for these
2  symptoms, right?
3    A.   Right.
4    Q.   Did you first see a doctor for your
5  disability symptoms in September of 2005?
6    A.   I saw Marianne Giordano about the
7  hypertension.
8    Q.   In September of 2005?
9    A.   And that was before 2005.  You said
10 did I first see a doctor about --
11   Q.   No.  For the symptoms that you
12 describe as first appearing in April 2005 --
13       MR. RACIN:  Counsel, I want to
14 object at this point.  This is not fair.  There's
15 testimony that she saw --
16       MR. WILLIAMSON:  Counsel, if you
17 want to make an objection --
18       MR. RACIN:  -- Dr. Giordano.
19       MR. WILLIAMSON:  -- make an
20 objection.  I let you go on speaking objections
21 all day, but we need to draw the line here.
22       MR. RACIN:  This is not fair.

Page 666

1        MR. WILLIAMSON:  We don't need to
2  have testimony -- then you make an objection, you
3  don't think it's fair.
4        MR. RACIN:  It's not fair.
5  BY MR. WILLIAMSON:
6    Q.   Would you answer the question,
7  please.
8    A.   Would you repeat the question.
9    Q.   I think we're going to need to let
10 the videographer change the tape and then we'll
11 repeat the question.
12       THE VIDEOGRAPHER:  Going off the
13 record at 5:50:14.  End of Tape 3.
14       (Recess -- 5:50-5:58 p.m.)
15       THE VIDEOGRAPHER:  Going back on the
16 record at 5:58:30.  Beginning of Tape 3 -- I'm
17 sorry, beginning of Tape 4.
18 BY MR. WILLIAMSON:
19   Q.   Okay.  Ms. Killian, we were talking
20 about these symptoms that are described in
21 Section II, Number 1 of Exhibit 53, Bates number
22 Page 2899, where you're describing the nature of

Page 667

1  your illness and when symptoms first appeared.
2    A.   Uh-huh.
3    Q.   And the question that I asked you
4  was whether you went to see any doctor for
5  treatment of these symptoms in May, June, July,
6  or August of 2005?
7    A.   Not that I recall.
8    Q.   Is there any record or document that
9  would help refresh your recollection about
10 whether you did?
11   A.   You have a record of, I'm sure the,
12 my health records some place, I guess I have to
13 just look at those.
14       I think you have them, though.  That
15 would probably refresh my memory.
16   Q.   Is there anything that you think is
17 in your health records that indicates that you
18 went to see a doctor for treatment of the
19 symptoms described in this disability insurance
20 application during May, June, July or August of
21 2005?
22   A.   As I said, I don't recall.

76  (Pages 664 to 667)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 668

1    Q.   Okay.
2    A.   I don't recall.
3    Q.   Isn't it true -- go ahead, did you
4  want to say something else?
5    A.   No.
6    Q.   Isn't it true that you didn't first
7  see a doctor for your disability symptoms, as
8  described in this long-term disability claim
9  statement, until September of 2005?
10      MR. RACIN:  Objection as to form and
11  the characterization of disability symptoms.
12      Instead of simply the symptoms
13  listed on the --
14  BY MR. WILLIAMSON:
15    Q.   What was the purpose of listing
16  these symptoms on Page 2899 of Exhibit 53?
17    A.   This is an application for long-term
18  disability.
19    Q.   Okay.  Now, would you answer my
20  question about, or my question, which was that --
21  let me start this one again.
22      Isn't it true that you did not see a

Page 669

1  doctor about the symptoms that you've listed in
2  this disability insurance application starting in
3  April of 2005, until September of 2005?
4    A.   I believe I answered the question
5  before that I don't recall whether I saw anyone
6  in April through August.
7      And you're on to a new question.
8    Q.   Yes.  The new question is, let me go
9  on to that new question.
10      Did you see a doctor for these
11  symptoms that we've been discussing in September
12  of 2005?
13    A.   Yes.
14    Q.   And was that doctor a Dr. Fran
15  Pearson in Fayetteville, Arkansas?
16    A.   Yes.
17    Q.   What type of doctor is Dr. Pearson?
18    A.   She's an internal medicine doctor.
19    Q.   And how did you choose Dr. Pearson
20  to consult about your symptoms listed in this
21  disability application?
22    A.   I looked through my health insurance

Page 670

1  for doctors in Fayetteville, Arkansas.
2    Q.   Were you acquainted with Dr. Pearson
3  prior to your consultation in September of 2005?
4    A.   No.
5    Q.   And what caused you to see
6  Dr. Pearson on September -- or isn't it true that
7  you saw Dr. Pearson on September 7, 2005?
8    A.   Yes.
9    Q.   And what caused you to see
10  Dr. Pearson on that date?
11    A.   I felt that my blood pressure had
12  spiked, I couldn't sleep.  I had anxiety, I was
13  having diarrhea and nausea and I was feeling
14  pretty depressed.
15    Q.   Okay.  Let's take a look at
16  Exhibit 53, the Bates number 2901.
17    A.   2901.
18    Q.   Yes.  Look in the lower right-hand
19  corner.
20    A.   Okay.  Okay.
21    Q.   Let me see if I can find my place
22  here.  I'm sorry, go to Page 2902.

Page 671

1      This is a section that's filled out
2  by the doctor, Pearson; is that right?
3    A.   Yes.
4    Q.   And do you see where it says or
5  where Dr. Pearson is saying:  "Physical symptoms
6  of diarrhea and headache restrict her ability to
7  teach."
8    A.   Uh-huh.
9    Q.   Do you see that?
10    A.   Yes.
11    Q.   Is that an accurate statement?
12    A.   Yes.
13    Q.   Okay.  Now, would you go back to
14  Page 2899 of Exhibit 53.
15    A.   Okay.
16    Q.   That Part II, Number 1.
17    A.   Uh-huh.
18    Q.   Do you see where you describe when
19  symptoms first appear you mention diarrhea?
20    A.   Yes.
21    Q.   But, you don't say anything about
22  headaches, right?

77  (Pages 668 to 671)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 672

1    A.    Yes.
2    Q.    When did you start having headaches
3  as a symptom?
4    A.    I would say that I have had
5  recurring headaches, but certainly after April
6  2005.
7    Q.    And did you seek any medical
8  treatment for your headaches after April 2005?
9    A.    I was just doing Aleve, I was doing
10 Aleve.
11   Q.    What do you mean doing Aleve?
12   A.    It's a medicine that you can buy
13 over-the-counter.
14   Q.    Oh, Aleve was a product that --
15   A.    Yes.
16   Q.    So, you were taking Aleve for your
17 headaches?
18   A.    Yes.
19   Q.    But, you didn't go see a doctor?
20   A.    No.  Not that I recall about the
21 headaches.
22   Q.    All right.  And so is it accurate to

Page 673

1  say that you did not seek any medical treatment
2  for headaches between April of 2005 and
3  September 7, 2005?
4    A.    Nothing that I recall except for
5  over-the-counter medications.
6    Q.    Okay.  Now, I want to stick with
7  this Section II, but I want to go down to Number
8  2, do you see where -- or can you read the box
9  for Roman Numeral II, and then Arabic Number 2?
10   A.    Which page is that again, 29.
11   Q.    2899.
12   A.    Oh.  2899, okay.  Number 2?
13   Q.    Yes.
14   A.    Okay.  First unable to work because
15 of this disability, August 29th.
16       Is that what you're asking me?
17   Q.    Yes.
18   A.    August 29, 2005.
19   Q.    Is that an accurate and truthful
20 statement?
21   A.    Yes.
22   Q.    Now, you continued performing your

Page 674

1  teaching duties at GDS on a regular basis in
2  April, May, and June of 2005; is that correct?
3    A.    Yes.
4    Q.    And do you remember a document that
5  had been marked as Exhibit 7, which was an
6  evaluation that was done of you where you
7  provided some comments on the evaluation that
8  then Nick Ryan responded to?
9    A.    I don't remember every word.
10   Q.    Well, I'm not going to ask you to
11 remember every word.  But, we'll give you a copy
12 of Exhibit 7.
13   A.    Okay.  Thanks.
14   Q.    Do you remember that document now,
15 in particularly the comments that you made, in
16 June of 2005?
17   A.    I'm looking for my comments, I am
18 going to look for my comments to refresh my --
19       (Pause while reading.)
20       I see it, yes.
21   Q.    In the comments that you've provided
22 about your evaluation in Exhibit 7, you did not

Page 675

1  mention anything in your comments about any
2  disability that would prevent you from teaching,
3  did you?
4    A.    No.  I didn't mention anything in
5  here.
6    Q.    Now, what did you do after the
7  school year ended in early June of 2005, or what
8  did you do between the end of the school year,
9  and June of 2005 and August 29, 2005?
10   A.    I --
11       MR. RACIN:  Objection.  Vague.
12 BY MR. WILLIAMSON:
13   Q.    Did you move to Arkansas?
14   A.    Between June and -- you asked me
15 between June and --
16   Q.    Things that you did between June,
17 the end of school in June of 2005 and August 29,
18 2005?
19       MR. RACIN:  Objection on the same
20 ground.  That's a mighty broad question.
21 BY MR. WILLIAMSON:
22   Q.    Did you move to Arkansas during that

78 (Pages 672 to 675)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 676

1  time period?
2      A.   I moved to Arkansas in July.
3      Q.   Okay.  Did you go on any vacation
4  during that time period?
5      A.   No.
6      Q.   Do you remember about when you moved
7  to Arkansas?
8      A.   It was about July 17th.
9      Q.   Okay.  And once you got to Arkansas,
10  you moved in with your in-laws, right?
11      A.   Yes.
12      Q.   Did you take any vacations or go on
13  any excursions, leisure activities while you were
14  in Arkansas?
15      A.   No.
16      Q.   What would you sort of do in a
17  typical day in Arkansas after you moved there?
18      A.   I have gone, I have gone to a farm
19  and tried to relax.
20      Q.   What farm?  What farm did you go to?
21      A.   A farm with cattle on it.
22      Q.   Where was that?

Page 677

1      A.   In Arkansas, in Fayetteville,
2  Arkansas.
3      Q.   What did you do to try to relax
4  there?
5      A.   Walk the landscape to try to relax.
6      Q.   After the end of the school year in
7  June of 2005, did you spend any more time at GDS
8  before you went to Arkansas?
9      A.   After the what date?
10      Q.   After the school year ended in June
11  of 2005.
12      A.   Yes.
13      Q.   What did you do?
14      A.   I did some of what I would normally
15  do, which is to backup some of my files, check
16  student work, make sure things were where people
17  could find them.
18          I packed up some of my books and I
19  ordered supplies and so on.
20      Q.   Did you have any contact with
21  members of the art department at GDS or the
22  administration during the time between early June

Page 678

1  and August 29th of 2005?
2      A.   I don't recall.
3      Q.   Did anyone at GDS do anything to you
4  during that June to August period that you
5  regarded as a form of racial harassment?
6      A.   I don't even know if anybody was
7  there -- you said between the end of school and
8  July 17th?
9      Q.   No.  End of school and August 29th
10  of 2005?
11      A.   No.
12      Q.   And other than the incident relating
13  to the key that you've described before, were
14  there any racial harassment incidents at GDS with
15  respect to you between April and June of 2005?
16      A.   Between April and June of 2005?
17      Q.   Yes.
18      A.   Not with, you said notwithstanding
19  the key incident?
20      Q.   I just said, other than the key
21  incident.
22      A.   Uh-huh.  Laura Tolliver just about

Page 679

1  called me a thief.
2      Q.   When was that?
3      A.   Around the key incident time, it's
4  not, you know, the key incident proper.  But --
5      Q.   Are you sure this was something that
6  happened between April and June of 2005?
7      A.   It might have happened in March or
8  beginning April, where --
9      Q.   What did she say?
10      A.   She was looking for -- I -- and this
11  isn't documented, I had borrowed a camera which I
12  returned to her and she insisted that I had not
13  done that.
14      Q.   And how was that resolved?
15      A.   It wasn't.  I didn't get an apology,
16  nothing.
17      Q.   Did you complain to anybody?
18      A.   I said something to Kevin Barr.
19      Q.   And what was his response?
20      A.   I didn't get an apology from that or
21  nothing about that camera, which rolled into the
22  key incident I guess.

79  (Pages 676 to 679)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 680

1    Q.   But, you're not able to remember the
2  date of the camera incident?
3    A.   Not now, no.
4    Q.   Would Kevin Barr be somebody who
5  might be able to refresh your recollection?
6    A.   Sure.
7    Q.   Anybody else?
8    A.   I don't know, Laura Tolliver.
9    Q.   And is there any document that could
10 refresh your recollection about the date of that?
11   A.   There probably is something, yes.
12   Q.   What document is that?
13   A.   It might be an e-mail that says I
14 was just about called a thief.
15   Q.   Any other incident, during that
16 period from April to June of 2005, that you can
17 recall?
18        Actually, before you answer the any
19 other question, can you tell me was there, did
20 Laura Tolliver say that she thought you had not
21 returned the camera for any racial reason?
22   A.   Since -- she didn't say that, she

Page 681

1  didn't say that, but it was one more --
2    Q.   She didn't say what?
3    A.   What you just said.  She didn't say
4  she was doing it for any racial reason.  She
5  didn't say that to me.
6    Q.   Did she say anything racial that
7  suggested that was what was motivating her?
8    A.   I just know that faculty, the white
9  faculty have been lent cameras and probably not
10 even returned cameras quote, unquote, "on time,"
11 and I would doubt if one would say to you that
12 they have been accused of stealing a camera.
13   Q.   Did you sign the camera out when you
14 took it?
15   A.   There was no sign-out system, I
16 don't think.
17   Q.   You don't think so?
18   A.   No, there wasn't.
19   Q.   Are you sure about that?
20   A.   She lent me a camera.
21   Q.   Okay.  Do you know for sure that
22 she's never said anybody else, that they didn't

Page 682

1  return something that they had borrowed from her?
2        MR. RACIN:  Objection as to form.
3  Calls for speculation.
4  BY MR. WILLIAMSON:
5    Q.   Go ahead and answer.
6    A.   Repeat the question.  Please.
7    Q.   Do you know for certain whether
8  there has been any instance where Ms. Tolliver
9  has said to some other faculty member that she
10 thought they had failed to return something she
11 had loaned to them?
12   A.   I don't know.
13   Q.   Ms. Killian, how did you know on
14 August 25, 2005 that you would be unable to work
15 at GDS?
16        MR. RACIN:  Objection.  Lack of
17 foundation.  Assumes facts not in evidence.
18        MR. WILLIAMSON:  Counsel, the
19 witness has already confirmed that she completed
20 an application form for long-term disability
21 where she filled in the blank that asked about
22 date first unable to work because of this

Page 683

1  disability as August 29, 2005.
2        So, we certainly have a fact in
3  evidence.
4  BY MR. WILLIAMSON:
5    Q.   Now, would you answer the question.
6        MR. RACIN:  I'm sorry, would you
7  read the question for me, ma'am?
8        (Record read.)
9        MR. RACIN:  Did you say August 25?
10       MR. WILLIAMSON:  I said August 25?
11 Let me correct it then.
12 BY MR. WILLIAMSON:
13   Q.   Ms. Killian, how did you know on
14 August 29, 2005 that you would be unable to work
15 a GDS because of your disability?
16       MR. RACIN:  Same objection on the
17 grounds the application is filled out
18 November 18th.
19 BY MR. WILLIAMSON:
20   Q.   Would you answer the question?
21       MR. RACIN:  So, assumes facts not in
22 evidence.  Lack of foundation.

80  (Pages 680 to 683)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 684

1  BY MR. WILLIAMSON:
2      Q.   Okay.  Would you answer the question
3  now?
4      A.   I don't know.
5      Q.   Is it -- you don't know how you knew
6  that you were unable to work on August 29, 2005?
7          Or let me ask it another way.
8          Did you know on August 29, 2005,
9  that you would be unable to work at GDS because
10 of your disability?
11     A.   I know that I was sick.  I know that
12 I was sick.  And I had already filed for a
13 short-term disability application with the
14 school.  So, I was sick.
15     Q.   Why did you put August 29, 2005, on
16 to this Exhibit 53 in response to the question
17 date first unable to work because of this
18 disability?
19     A.   I'm not sure whether that's a date,
20 a start date of school or something like that, or
21 what.
22     Q.   Do you know if that's the date when

Page 685

1  your disability was so serious that you would not
2  be able to work?
3          That says date first unable to work,
4  do you know if August 29, 2005 is the date that
5  you were first unable to work because of your
6  disability?
7      A.   I was sick.  I still am.
8      Q.   I know you're sick, but I want you
9  to answer the question that's directed at a form
10 that you filled out --
11     A.   Yes.
12     Q.   -- and tell me, why is it that you
13 indicated August 29, 2005 as the date you were
14 first unable to work because of your disability?
15     A.   I don't know.
16     Q.   Is there any way that we could
17 refresh your recollection about why you picked
18 that date?
19     A.   No.
20     Q.   Now, did you also apply for
21 long-term disability in 2005?
22     A.   That's what this application is.

Page 686

1      Q.   So, the answer to the question is
2  what?
3      A.   Yes.
4      Q.   And when did you do that?
5      A.   November 18, 2005.
6      Q.   And did you request that GDS provide
7  you with the necessary forms so you could apply
8  for long-term disability?
9      A.   I believe so, to the best of my
10 recollection.
11     Q.   And did GDS provide you with the
12 application forms you requested?
13     A.   Yes.  I believe so.
14     Q.   And in your application form for
15 long-term disability, did you assert that you
16 were unable to work?
17     A.   I believe so, yes.  Yes.
18     Q.   And does that mean you were unable
19 to work at GDS or unable to work anywhere?
20     A.   Well, I am unable to work anywhere.
21     Q.   Now, you signed a contract to teach
22 at GDS during the 2005/2006 school year, didn't

Page 687

1  you?
2      A.   Yes.
3      Q.   And GDS was expecting you to attend
4  the staff week during the last week of
5  August before classes, correct?
6      A.   Yes.
7      Q.   But, you testified earlier that you
8  did not appear for staff week; is that right?
9      A.   Yes.
10     Q.   And you informed GDS that you were
11 not going to be able to attend staff week on
12 August 24, 2005, the Friday before staff week was
13 to begin?
14     A.   Yes.
15     Q.   Now, did GDS ask you to inform them
16 when you would be able to report to work as a
17 teacher in September of 2005?
18     A.   I believe so.  Yes.
19     Q.   Do you remember when GDS asked you
20 about your expected return date?
21     A.   No.
22     Q.   Do you remember what response you

81  (Pages 684 to 687)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 688

1  gave to GDS when they inquired about when you
2  would report to work for the 2005/2006 school
3  year?
4      A.   No.
5      Q.   During 2005, did you ever give GDS a
6  specific date when you would be able to report to
7  work as a teacher in the 2005/2006 school year?
8      A.   I don't recall.
9      Q.   You never gave GDS a date for your
10 return to work in the 2005/2006 school year
11 because you had concluded that you were going to
12 apply for long-term disability; is that right?
13     A.   Because I was sick.
14     MR. RACIN:  Objection as to form.
15 Leading.  You may answer.
16     THE WITNESS:  Because I was sick.
17 BY MR. WILLIAMSON:
18     Q.   Were you --
19     A.   I didn't know when I could return to
20 work.
21     Q.   Were you so sick that you felt you
22 were going to need to apply for long-term

Page 689

1  disability?
2      A.   Yes.
3      Q.   Now, did you ever tell GDS that if
4  your application for long-term disability was
5  denied, you would be ready to come back and teach
6  at GDS?
7      A.   I don't recall being asked the
8  question.
9      Q.   I'm not asking you whether you were
10 asked the question.  I'm asking you whether you
11 ever told that to GDS.
12     A.   I don't recall.
13     Q.   Okay.  And how long did GDS wait
14 between the beginning of the 2005, the beginning
15 of the 2005/2006 school year and the date you
16 were terminated for not coming to work?
17     A.   Repeat that question.
18     Q.   How long did GDS wait between the
19 beginning of the 2005/2006 school year, and when
20 you were informed that you were going to be
21 removed from the employee roster of GDS?
22     A.   Short-term disability ended in

Page 690

1  November some time.  And about a month later, or
2  less than a month later, I was removed from the
3  employee roster.
4      Q.   Was that about December 16th, 2005?
5      A.   Either December 6th or 16th, I don't
6  remember the exact date.
7      Q.   Was that about three and a half
8  months after the beginning of the school year?
9      A.   It is about a month after my
10 short-term disability, less than a month after my
11 short-term disability ended.
12     Q.   How many months after the beginning
13 of this school year was it?
14     A.   That would be three months.
15     Q.   Okay.
16     A.   About three months.
17     Q.   And during that time, did you ever
18 make any attempt to come to GDS and teach your
19 classes?
20     A.   No.  I was on short-term disability.
21     Q.   I understand that.  And during that
22 time, from late August to mid-December 2005, were

Page 691

1  you subjected to any form of racial harassment by
2  the faculty or staff at GDS?
3      A.   No.  Not that I know of, no.
4      Q.   And during that time, have you
5  already acknowledged it was necessary for GDS to
6  hire substitute teachers to teach your classes?
7      A.   I assumed that if a teacher is sick,
8  that the school has to get faculty in place to
9  teach those classes.
10     Q.   Are you just assuming that, or do
11 you know that that's what a school has to do?
12     MR. RACIN:  Objection.  It's already
13 in the record.  It's asked and answered recently.
14 BY MR. WILLIAMSON:
15     Q.   Didn't you actually send e-mails to
16 GDS talking about substitute teachers around
17 September 9th of 2005?
18     A.   I responded to a memo from Kevin
19 Barr, I believe, asking me about substitute
20 teaching.
21     Q.   So, was it --
22     A.   Asking me about a substitute

82  (Pages 688 to 691)

88cd248e-20b6-454d-a261-c2a3789a6e43

# Sharon Killian

|  | Page 692 |
|---|---|
| 1 | teacher, if I knew of anybody. |
| 2 | Q.   So, it's fair to say that you |
| 3 | understood that GDS needed to hire substitutes |
| 4 | because you were not coming back to teach your |
| 5 | classes; is that right? |
| 6 | A.   I was on sick leave. |
| 7 | Q.   Can you answer the question? |
| 8 | MR. RACIN:  She's answered it two or |
| 9 | three times. |
| 10 | THE WITNESS:  What else can I say. |
| 11 | BY MR. WILLIAMSON: |
| 12 | Q.   Just yes or no. |
| 13 | MR. RACIN:  Counsel, we've gone all |
| 14 | day.  We've all done very well, it seems to me, |
| 15 | but, this is getting, it's borderline abusive |
| 16 | now. |
| 17 | MR. WILLIAMSON:  It's not abusive. |
| 18 | It's a yes or no question.  We've got a witness |
| 19 | who's saying she's making an assumption in |
| 20 | response to a question.  I want to clarify |
| 21 | whether she's just making an assumption or |
| 22 | whether she knew -- |

|  | Page 693 |
|---|---|
| 1 | MR. RACIN:  She's testified to the |
| 2 | fact already. |
| 3 | MR. WILLIAMSON:  I'm not looking for |
| 4 | testimony from counsel. |
| 5 | THE WITNESS:  I feel badgered, I do. |
| 6 | I do. |
| 7 | BY MR. WILLIAMSON: |
| 8 | Q.   Do you want to o a break before we |
| 9 | conclude this? |
| 10 | MR. RACIN:  Why don't we take |
| 11 | another break. |
| 12 | BY MR. WILLIAMSON: |
| 13 | Q.   Because I don't want you to feel |
| 14 | uncomfortable during the questioning. |
| 15 | A.   Is there another question on the |
| 16 | table that I'm supposed to answer before I leave |
| 17 | the table? |
| 18 | MR. RACIN:  We don't want a pending |
| 19 | question, so -- |
| 20 | THE WITNESS:  I don't want a pending |
| 21 | question. |
| 22 | MR. RACIN:  So, answer this question |

|  | Page 694 |
|---|---|
| 1 | one more time. |
| 2 | THE WITNESS:  I feel badgered. |
| 3 | Repeat the question, please. |
| 4 | BY MR. WILLIAMSON: |
| 5 | Q.   During this time, from late |
| 6 | August to December of 2005, to your knowledge, |
| 7 | was it necessary for GDS to hire substitute |
| 8 | teachers to teach your courses? |
| 9 | A.   Yes. |
| 10 | Q.   Okay. |
| 11 | MR. WILLIAMSON:  Why don't we take a |
| 12 | break now? |
| 13 | THE VIDEOGRAPHER:  Going off the |
| 14 | record at 6:28:57. |
| 15 | (Recess -- 6:28-6:37 p.m.) |
| 16 | THE VIDEOGRAPHER:  Going back on the |
| 17 | record at 6:37:46. |
| 18 | BY MR. WILLIAMSON: |
| 19 | Q.   Ms. Killian, what procedures or |
| 20 | opportunities did GDS offer for employees to |
| 21 | complain about racial harassment in the |
| 22 | workplace? |

|  | Page 695 |
|---|---|
| 1 | A.   Are you asking me about written |
| 2 | procedures? |
| 3 | Q.   Written and anything that wasn't |
| 4 | written, both. |
| 5 | A.   And are you asking me with a date in |
| 6 | mind, or is this over my 12-year period? |
| 7 | Q.   Let's say during the past |
| 8 | five years -- well, let's say over your 12-year |
| 9 | period, that's fine. |
| 10 | A.   Well, I believe there is one can |
| 11 | talk to, if there is an individual that's causing |
| 12 | an issue, or whatever, you know, one can talk to |
| 13 | that individual. |
| 14 | And then if that doesn't work, and |
| 15 | you could talk to your supervisor, or your |
| 16 | chairperson.  And then if that doesn't work, then |
| 17 | you can talk to the principal. |
| 18 | And if that doesn't work, you can |
| 19 | talk to the head of school and indeed the head of |
| 20 | school, the principal would say there's an open |
| 21 | door policy, the head of school would say there |
| 22 | is an open door policy to talk. |

83  (Pages 692 to 695)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 696

1    Q.   So, you could go to them about a
2  racial harassment complaint?
3    A.   Yes.  And also to the diversity
4  coordinators, who are there, too.  And that's,
5  those are the various avenues that I'm aware of.
6    Q.   Did GDS have a policy prohibiting
7  racial harassment to your knowledge?
8    A.   I do believe that there is something
9  on the books.
10   Q.   Okay.  Did you ever receive a copy
11 of the GDS High School Personnel Policies &
12 Practices Handbook?
13   A.   Yes.
14   Q.   Now, whom did you first speak to
15 when you felt the need to complain about racial
16 harassment at GDS?
17   A.   When it first happened, when I
18 thought so, was Paul Levy.
19   Q.   And when was that, about what year?
20   A.   '97, '98, something like that.
21   Q.   And do you remember what the
22 specific complaint was at that time?

Page 697

1    A.   No.
2    Q.   Anything that would refresh your
3  recollection?
4    A.   I think there's something in your
5  file probably about a memo to Paul, to Debbie
6  Haynes, it's about marginalization.
7         If you know Bill Licamelli's name,
8  it's all involved in some of that stuff there.
9    Q.   At that time, did you speak about
10 racial harassment?
11   A.   I did say, I wondered whether that
12 was the problem.  Yes, I did.
13   Q.   You said that to Dr. Licamelli?
14   A.   I said that to Paul Levy.
15   Q.   Okay.  And when you testified
16 earlier, you say you consulted at some points
17 with Mari Richards and Elizabeth DiNevy; is that
18 right?
19   A.   DiNevy, yes.
20   Q.   Did they ever try to arrange any
21 sort of mediation between you and other members
22 of the art department?

Page 698

1    A.   Kevin Barr referred me to Mari Anna
2  Richards and Elizabeth DiNevy.
3    Q.   When was that?
4    A.   That was after the "I can't bend low
5  enough to the ground to understand you" incident.
6    Q.   About when did that happen?
7    A.   That was 2004 I think we confirmed.
8    Q.   Okay.  Did Paul Levy play any role
9  in arranging that mediation?
10   A.   I don't know.
11   Q.   Okay.  So, you think, your
12 recollection is that the mediation was arranged
13 by Kevin Barr; is that right?
14   A.   Yes.
15   Q.   And was there any other issue
16 besides the "I can't bend so low" issue that the
17 mediators were trying to help the art department
18 resolve with you?
19       MR. RACIN:  Objection.  Lack of
20 foundation as to the phrase mediators.
21       Are we talking coordinators?  Is
22 that a misstatement?

Page 699

1  BY MR. WILLIAMSON:
2    Q.   The issues that Ms. Richards and
3  Ms. DiNevy were trying to help resolve, what were
4  those issues, or were there any issues other than
5  the remark about bending low enough to please
6  you.
7    A.   They didn't say please me, you said
8  something about please me.  He said he couldn't
9  "bend low enough to the ground to understand me."
10   Q.   Okay.  Any other issue that
11 Ms. Richards and Ms. DiNevy were trying to help
12 you in the art department address?
13   A.   That was the primary crux and there
14 were sure issues surrounding all of that.  And,
15 subsequent to that time, I believe the art
16 magazine issue came up after that time.
17       So, perhaps they were thinking about
18 that as well.
19   Q.   And, in those discussions -- or did
20 you participate in these mediation efforts?
21   A.   I met with Mari Anna Richards.
22   Q.   And when you met with Mari Anna

84  (Pages 696 to 699)

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376 MD 1-800-539-6398 VA 1-800-752-8979

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 700

1  Richards, did you express to her your view that
2  you were being subjected to racially hostile
3  treatment by members of the art department?
4      A.   Yes.
5      Q.   And did you specifically reference
6  racial discrimination and racial prejudice as
7  motivating factors in the treatment you were
8  receiving?
9      A.   Yes.
10     Q.   Did you -- there's a document I
11 should have asked you to take a look at to move
12 this along.
13         We're going to mark it as
14 Exhibit 52.
15         (Killian Exhibit Number 52
16            marked for identification.)
17         THE WITNESS:  I should read it.
18 BY MR. WILLIAMSON:
19     Q.   Take a look at it.
20         MR. RACIN:  I'll note, for the
21 record, the document seems incomplete.  It says
22 Page 1 of 3, and there's 2 of 3, and there's

Page 701

1  no -- is that inadvertent, my copy?
2          MR. WILLIAMSON:  We will
3  double-check it, counsel.  At times we find we
4  get documents where the third page doesn't
5  actually have any information on it.
6          But, we will check for that.
7          MR. RACIN:  Thank you.
8          MR. WILLIAMSON:  We got it from
9  Ms. Richards and so it is a complete version of
10 what she gave us.
11         MR. RACIN:  Thank you.
12 BY MR. WILLIAMSON:
13     Q.   Can you tell us what Exhibit 52 is?
14     A.   It is an e-mail dated Wednesday,
15 March 31, 2004, from me in, from me to Mari Anna
16 Richards.
17     Q.   And what is it about?
18     A.   Mari Anna Richards, I was sending
19 Mari Anna Richards and Elizabeth DiNevy, "Thanks
20 for your work.  I have made a few notes below and
21 would like to stop by later to discuss them.
22 Thanks again.  Sharon."

Page 702

1          And it was in response to an e-mail
2  that Mari Anna Richards wrote saying:  "As
3  Elizabeth and I promised, we are forwarding a
4  copy of what we would like to share with Laura
5  and Nick.
6          "We have also included two themes
7  that were present in everyone's session.  If you
8  have any comments or changes to make, feel,
9  please feel free to contact us."
10     Q.   And you made comments; is that
11 right?
12     A.   Yes.
13     Q.   Did you stop by and speak to Mari
14 and Elizabeth about your comments?
15     A.   I believe I did stop by to see Mari
16 Anna Richards and Elizabeth DiNevy.
17     Q.   And what did you say to them, do you
18 remember?
19     A.   Well, I had already sent them this
20 e-mail.  And one of the things that Mari Anna
21 Richards and Elizabeth DiNevy said to me, that I
22 distinctly remember, is that Nick Ryan is working

Page 703

1  from a position of white privilege and white
2  superiority.
3      Q.   In this e-mail that you sent, or
4  this string of e-mails that are Exhibit 52, did
5  you make any reference to racial harassment in
6  your comments?
7      A.   I just read it a moment ago and I
8  didn't see the word race in here.  But, maybe I'm
9  wrong.
10     Q.   And also in Exhibit 52, did you make
11 any reference to racial discrimination in your
12 comments?
13     A.   Did you just ask me about 52 or
14 something else?
15     Q.   No, it's the same one.  I just --
16 first I asked you whether there was any reference
17 to racial harassment, and now I'm asking you
18 whether there was any reference to racial
19 discrimination in the comments that you provided
20 in Exhibit 52.
21     A.   I didn't name it in, with that name.
22     Q.   Is the answer yes or no to the

85  (Pages 700 to 703)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 704

1    question?
2        A.    No.
3        Q.    Now, would you take a look at Page
4    2859 of Exhibit 52.  I guess it's the second
5    page.
6        A.    Yes.
7        Q.    And do you see where it says toward
8    the bottom, it says "other defining moments."
9        A.    Yes.
10       Q.    Why did you add as a key defining
11   moment "Nick tells me that I'm not going to drive
12   him out of the department as I did Debbie"?
13       A.    I don't know why he said that to me.
14       Q.    Why did you regard that as a key
15   defining moment?
16       A.    Because Debbie Haynes left GDS and
17   he came in to take her place.
18            And he said that I drove Debbie out.
19   That was a shock to me.  It's a defining moment
20   to me, because it doesn't -- it shocked me.
21       Q.    Okay.  Now, do you know who Carin
22   Pass is?

Page 705

1        A.    Yes.
2        Q.    Is she a GDS employee?
3        A.    I don't know.
4        Q.    Do you know if she's an outside
5    lawyer who was retained by GDS?
6        A.    I know that Carin Pass is a lawyer
7    and she worked as a consultant for GDS, is my
8    understanding.
9        Q.    But, she wasn't on the staff of GDS
10   was she?
11       A.    She didn't work on a daily basis at
12   GDS, if that's your question.
13       Q.    And how did you come to meet her?
14       A.    Through my attorney, who was asked
15   by Peter Branch to meet with her.
16       Q.    Was Ms. Pass hired, to your
17   knowledge, was she hired to do an investigation
18   of complaints you had made about the working
19   environment at GDS?
20       A.    Perhaps that's how it was phrased to
21   her, yes.  I don't know.  I don't know.
22       Q.    How was it phrased to you or what

Page 706

1    was your understanding of what she was hired to
2    do?
3        A.    What I recall, without looking at
4    Peter Branch's letter, what I recall is that she
5    was being retained to investigate the situation
6    at GDS.
7        Q.    What situation?
8        A.    The racial harassment and the racial
9    climate at GDS.
10       Q.    Based on whose complaints?
11       A.    Well, I'm the one who brought the
12   complaint.  So, it must be based on my complaint.
13       Q.    Did you cooperate in the
14   investigation that Ms. Pass conducted?
15       A.    Yes.
16       Q.    Were you represented by counsel
17   during that investigation?
18       A.    I had counsel.
19       Q.    Who was that?
20       A.    John Racin.
21       Q.    Did you explain to Ms. Pass why you
22   thought race was motivating your mistreatment as

Page 707

1    a GDS faculty member?
2        A.    I believe I did that.
3        Q.    What did you say to her were the
4    reasons that race was behind your mistreatment?
5        A.    As enumerated in my talking points
6    and with, as enumerated in the other documentary
7    evidence that you have that was shared with her.
8        Q.    Is there anything else that we
9    haven't shown to you that you were pointing to as
10   a reason that race was behind your alleged
11   mistreatment?
12       A.    I don't know.
13       Q.    Okay.  Now, did Ms. Pass attempt to
14   mediate your concerns about your treatment at
15   GDS?
16       A.    I don't know.
17       Q.    Did she make any efforts to bring
18   you to, to talk to you about how your concerns
19   could be resolved through better understanding
20   among the members of the art department at GDS?
21       A.    I don't recall that.
22       Q.    Did Ms. Pass ask you what could be

86  (Pages 704 to 707)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 708

1  done or what changes at GDS could be made to
2  address your concerns?
3      A.  I don't recall.
4      Q.  You don't remember Ms. Pass ever
5  asking you that?
6      A.  I don't remember exactly all of her
7  questions.
8      Q.  I'm not asking you whether you
9  remember exactly.
10      I just, do you remember her asking
11  you what you thought needed to be done to correct
12  the racial harassment that you felt was in the
13  environment at GDS?
14      A.  I don't recall.
15      Q.  Is there anybody who could refresh
16  your recollection about that?
17      A.  As I said, I didn't keep any notes.
18  Maybe Carin has some notes on that.
19      Q.  You say Carin, are you referring to
20  Carin Pass?
21      A.  Carin Pass.
22      Q.  Did you regard Ms. Pass as someone

Page 709

1  who treated you in a racially hostile manner?
2      A.  No.
3      Q.  Did you feel that Ms. Pass was
4  racially prejudiced against you?
5      A.  No.
6      Q.  Did Ms. Pass communicate to you any
7  of the results of her investigation?
8      A.  No.
9      Q.  Do you remember about when Ms. Pass
10  completed her investigation and her -- yes,
11  completed her investigation?
12      A.  No.  Typically it was about
13  six months or more, I think.  I don't remember
14  exactly.  No.
15      Q.  Can you estimate approximately?
16      A.  In regard to -- no.  I can't, no.
17  I would be speculating again on the date.  I
18  don't --
19      Q.  Okay.  What was your understanding
20  of the role of the diversity staff at GDS?
21      A.  As co-directors of diversity, I
22  believe that they might have had a preamble or an

Page 710

1  announcement saying what they were there for.  I
2  can't really tell you verbatim.
3      But, considering that they are
4  diversity coordinators, I think that they would
5  be interested in issues affecting diversity at
6  GDS.
7      Q.  Okay.  And what was your assessment
8  of how effectively the diversity staff performed
9  their responsibilities while you were employed at
10  GDS?
11      A.  You're asking me to rate them, how
12  good they were at their jobs?
13      Q.  What did you think of how well they
14  did their job?
15      A.  I don't know how well they did their
16  job.  I don't know.
17      Q.  Based on your experience with them
18  relating to the concerns you expressed, how would
19  you rate them?
20      A.  I really don't know.  I really don't
21  know.
22      Q.  You don't know if they did an

Page 711

1  adequate job, whether they were deficient, or
2  whether they did an outstanding job?
3      Could you put them in any one of
4  those categories?
5      A.  I don't know, because I -- I don't
6  know.
7      Q.  Okay.  Do you remember what the
8  diversity programs at GDS were when you were
9  employed there?
10      A.  I -- are you talking about programs
11  on the calendar?
12      Q.  No.  Sort of things like the office
13  of diversity, were you aware of that, you were
14  aware of that, right?
15      A.  Yes, sir.
16      Q.  What about diversity connections,
17  parents of students of color?
18      A.  Yes.
19      Q.  Students of color mentoring program?
20      A.  Yes.
21      Q.  Parent gay/straight alliance?
22      A.  Yes.

87 (Pages 708 to 711)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 712

1    Q.    Board diversity committee?
2    A.    Yes.
3    Q.    You were aware of all of those
4    programs?
5    A.    Yes.
6    Q.    What about the parent diversity
7    discussion series.
8    A.    Yes.
9    Q.    Do you know what SEED was, S-E-E-D?
10    A.    Yes.
11    Q.    What was that?
12    A.    That was a training program I
13    believe that staff could participate in.
14    Q.    What about faculty discussion groups
15    about diversity?
16    A.    That wasn't a standard.  As far as I
17    remember, that wasn't a standard faculty
18    discussion group about diversity.
19    Q.    Was it an ad hoc diversity group?
20    A.    But, there were groups of people who
21    talk about diversity.
22    Q.    Were there affinity groups for staff

Page 714

1    Q.    Was that being more than a member?
2    A.    Yes.  But you didn't mention the
3    Black Culture Club just now.
4    Q.    Well, if there's something I forgot,
5    is there some other diversity activity that I
6    didn't mention that you recall?
7    A.    Repeat the category that you named
8    that those --
9    Q.    Well, I have diversity connections,
10    parents of students of color, students of color,
11    mentoring program, students of color mentoring
12    program, parent gay/straight alliance, board
13    diversity committee, parent diversity discussion
14    series, SEED, faculty discussion groups.
15    A.    I was, at one time, chair of the
16    recruitment and retention committee of the
17    subcommittee of the board.
18    Q.    Okay.  Were you involved with the
19    equity and justice committee of the board?
20    A.    No.  It was the recruitment and
21    retention.
22    Q.    What about --

Page 713

1    of color and gay and lesbian and staff?
2    A.    Yes.
3    Q.    Did you participate in any of the
4    diversity groups or programs?
5    A.    Yes.
6    Q.    Which ones?
7    A.    Staff of color.
8    Q.    Were you a member of that group?
9    A.    Yes.
10    Q.    Is it staff of color, or is it
11    faculty of color?
12    A.    It's really staff of -- maybe it's
13    staff and faculty of color, because everybody,
14    whether you teach or not, or taught or not.
15    Q.    Any others?
16    A.    I have a attended various and sundry
17    of those, not necessarily as a member, but as
18    somebody who had visited, or sitting in on a
19    meeting.
20    Q.    Were you the former advisor to the
21    Black Culture Club?
22    A.    Yes.

Page 715

1    A.    Equity, I had participated in the
2    meetings of the equity and justice committee,
3    yes.
4    Q.    What about the board diversity task
5    force?
6    A.    Yes.  Where the subset I think was
7    the recruitment and retention committee of the
8    task force.
9    Q.    And you said you were involved with
10    the staff and faculty of color organization.
11        Were you also a member of the
12    parents of students of color?
13    A.    I didn't frequent those meetings.  I
14    have attended those, but, I wasn't, I didn't
15    frequent the meetings.
16    Q.    Okay.  What was your assessment of
17    the effectiveness of these programs while you
18    were at GDS, in terms of promoting diversity?
19    A.    I don't know.
20    Q.    Did you receive comments on your
21    participation in diversity activities in your
22    evaluations at GDS?

88  (Pages 712 to 715)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 716

1      A.    There may have been one comment in
2  the history of my participation.  I don't recall
3  specifically.
4      Q.    Was that comment supportive of your
5  participation and contributions to GDS' diversity
6  efforts?
7      A.    Yes.
8      Q.    Okay.  Are you currently employed,
9  Ms. Killian?
10     A.    No.
11     Q.    What are your current means of
12  financial support?
13     A.    My husband works.
14     Q.    And about how much does he make a
15  year?
16     A.    Oh, not much at all.
17     Q.    In dollars?
18     A.    In dollars, about projected to be
19  about $40,000 a year.
20     Q.    Do you have to pay rent for your
21  housing with your in-laws?
22     A.    Currently, no.

Page 717

1      Q.    Okay.  What's the total amount of
2  dollar damages you are claiming against GDS in
3  this lawsuit?
4      A.    I don't believe we've talked about a
5  dollar damages.
6      Q.    Okay.  What is it that you think
7  your dollar damages are?
8          In your complaint you say that you
9  have suffered monetary damages, what are those
10  damages?
11     A.    I haven't calculated it, so I really
12  can't give you a dollar figure, and what I expect
13  is that I would accept whatever a jury decides.
14     Q.    Okay.  How much money would GDS have
15  to pay you to avoid having to go to trial in this
16  matter?
17     A.    I haven't thought of that, sir.
18     Q.    You have no idea whatsoever?
19     A.    I have not thought of that, sir.
20     Q.    And have you given any thought to
21  what the bases would be for your claims for
22  monetary damages?

Page 718

1      A.    No.  I haven't really discussed that
2  part.
3      Q.    So, when you filed the complaint,
4  you had not given any thought to how much you
5  were seeking from GDS or what the bases would be
6  for monetary damages, is that your testimony
7  today?
8      A.    Yes.
9      Q.    Now, in your complaint, I'll ask you
10  to take a look at a document we're going to mark
11  as Exhibit 55.
12          (Killian Exhibit Number 55
13          marked for identification.)
14  BY MR. WILLIAMSON:
15     Q.    Can you tell us what Exhibit 55 is?
16     A.    It's a Consent Motion for Relief to
17  File, First Amended Complaint, or should I be
18  going up to the top?
19     Q.    Well, look at the second page,
20  that's the part that we're really more interested
21  in, what's the title there?
22     A.    U.S. -- United States District Court

Page 719

1  for the District of Columbia, First Amended
2  Complaint.
3      Q.    And who is the plaintiff?
4      A.    Sharon Killian, Plaintiff.
5      Q.    And who is the Defendant?
6      A.    Georgetown Day School.
7      Q.    Would you go to Paragraph 8 of the
8  complaint.
9          Do you see where it says as a
10  direct -- this is the complaint that's the
11  subject of the lawsuit relating to today's
12  deposition; is that right?
13     A.    I believe so.
14     Q.    If you look at Paragraph 8, it says,
15  "As a direct and proximate result of regular
16  pervasive and racially motivated hostile
17  treatment from white colleagues as aforesaid,
18  Killian suffered racial discrimination, physical
19  injury and mental distress, such that she was
20  unable to return to school for the 2005/06
21  academic year and forced to take leave prescribed
22  by GDS policy and practice."

89 (Pages 716 to 719)

88cd248e-20b6-454d-a261-c2a3789a6e43

## Sharon Killian

Page 720

1          Can you tell us, can you tell me
2     what physical injury that you suffered as a
3     result of your employment at GDS?
4          A.   High blood pressure, constant.
5          Q.   Did you have high blood pressure
6     before you came to work at GDS?
7          A.   I don't believe so.  I believe I
8     developed that there.
9          Q.   Okay.  And you believe, what's your
10    basis for saying that your high blood pressure
11    was a result of your work at GDS?
12         A.   Because I didn't have high blood
13    pressure before I came to GDS, and it kept
14    escalating and escalating, yes.
15         Q.   And is there any other physical
16    injury that you suffered as a result of your
17    employment at GDS?
18         A.   There's my diarrhea and the
19    headaches that I've had, the sleeplessness, all
20    of those things I feel are attributable to that.
21         Q.   And did you list high blood pressure
22    as one of the symptoms on your complaint for

Page 721

1     disability relating to your employment at GDS?
2          A.   Yes.
3          Q.   What category is the high blood
4     pressure category?
5          A.   The physical, is that what you're
6     asking me, sir?
7          Q.   Yes.
8          MR. RACIN:  Counsel, are you
9     reviewing from an exhibit that she should review?
10         MR. WILLIAMSON:  She's seen it.
11    This is Exhibit 53.
12         MR. RACIN:  Okay.
13         THE WITNESS:  I happened to flip to
14    it because I saw him flipping to it.
15    BY MR. WILLIAMSON:
16         Q.   Is high blood pressure listed as one
17    of your symptoms?
18         A.   Yes, sir.  Hypertension.
19         Q.   That's the category that you relate
20    to high blood pressure?
21         A.   Yes.  Hypertension.
22         Q.   Is there any other physical injury

Page 722

1     that you are claiming you suffered as a result of
2     your employment at GDS?
3          A.   The nausea and diarrhea, and I don't
4     know of any other injuries at this time.
5          Q.   And did you seek medical treatment
6     for these physical injuries?
7          A.   Yes.
8          Q.   When did you do that?
9          A.   I've done that routinely over the
10    years for the hypertension.  The colitis and the
11    nausea and the diarrhea started around April
12    2005.
13         And so -- and I haven't -- I don't,
14    to the best of my recollection, nothing on that.
15         Q.   Have you ever been given a medical
16    diagnosis that stated that the reason for your
17    hypertension was related to your employment at
18    GDS, or was caused by your employment at GDS?
19         A.   I don't know if that's how medical
20    diagnoses are stated.
21         Q.   Well, I'm just asking whether
22    there's any doctor ever told you that, thought

Page 723

1     your hypertension was caused by your employment
2     situation at GDS?
3          A.   I think Dr. Giordano asked me why,
4     what is stressing me so.  She did.
5          Q.   And what mental and emotional
6     injuries have you suffered as a result of your
7     employment at GDS?
8          A.   Severe anxiety, depression.
9          Q.   And have you sought medical
10    treatment for your severe anxiety and depression?
11         A.   Yes.
12         Q.   Whom did you seek that treatment
13    from?
14         A.   Fran Pearson, Dr. Fran Pearson.
15         Q.   And is Dr. Pearson a psychiatrist?
16         A.   No.  She's an internal medicine
17    doctor.
18         Q.   And did you, did she refer you to a
19    psychiatrist?
20         A.   Not yet.  Not yet.
21         Q.   Not yet?  Does that mean she was
22    planning to refer you?

90  (Pages 720 to 723)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 724

1    A.   I don't know what the plan is.  If
2 she thinks I believe that she can't help me, then
3 she'll, she will refer me, if she thinks she
4 can't help me.
5    Q.   And the first time you consulted her
6 was September 7th, no, September of 2005; is that
7 right?
8    A.   Yes.
9    Q.   Have you ever been diagnosed with
10 any psychological behavioral or personality
11 disorders?
12    A.   Personality disorder, I don't think
13 so.
14    Q.   What about any behavioral disorder?
15    A.   I don't think so.
16    Q.   Any psychological disorder?
17    A.   I'm depressed.  I don't know if
18 that's a psychological disorder or not.
19 Depressed.
20    Q.   Did you ever visit a Dr. Hertzman at
21 the Center for Behavioral Health?
22    A.   Hertzman?  I don't recall that name.

Page 725

1    Q.   Do you recall ever referring to a
2 Dr. Hertzman and the Center for Behavioral Health
3 in a diary that you maintained?
4    A.   No.  Hertzman.  Which year?
5    Q.   Dr. Hertzman.  Do you ever recall
6 referring to any doctor at the Center for
7 Behavioral Health in your personal diary?
8    A.   Where is that?  Do you know where
9 the Center for Behavioral Health is?
10    Q.   It's in Rockville, Maryland.
11    A.   No.  Are you looking at anything
12 that relates to my children?
13    Q.   I think we're looking at a diary
14 that you produced in this litigation.
15    A.   Yes.  I -- could you show me the
16 page, please?
17    Q.   I don't think we have it here.  But,
18 I believe that's where the information comes
19 from.
20         Could you, would you be willing to
21 check or, would you be willing to check whether
22 you have any medical records from the offices of

Page 726

1 a Dr. Hertzman or any other doctor at the Center
2 for Behavioral Medicine?
3         MR. RACIN:  We acknowledge, for the
4 record, we are under a continuing duty to
5 supplement, and if we become aware of any such
6 records, that would be subject to production.
7         THE WITNESS:  Would you write it
8 down for me, so I can see it, too.
9         MR. RACIN:  Just refer me to --
10 BY MR. WILLIAMSON:
11    Q.   We'll send a note to your counsel.
12    A.   Okay.  Thank you.
13         MR. WILLIAMSON:  I think we're about
14 done.  I just want to take a break with my
15 colleague and see if there's any, just any other
16 follow-up, but I think we're either done or very,
17 very close to done.
18         THE WITNESS:  Okay, thank you.
19         THE VIDEOGRAPHER:  Going off the
20 record at 7:17:44.
21         (Recess -- 7:17-7:28 p.m.)
22         THE VIDEOGRAPHER:  Going on the

Page 727

1 record at 7:28:28.
2 BY MR. WILLIAMSON:
3    Q.   I'm going to be very brief.  There's
4 one more exhibit that we wanted to ask you to
5 take a look at.
6         It's going to be marked as
7 Exhibit 62.
8         (Killian Exhibit Number 62
9          marked for identification.)
10 BY MR. WILLIAMSON:
11    Q.   Do you recognize Exhibit 62?
12    A.   Yes.
13    Q.   What is Exhibit 62, Ms. Killian?
14    A.   It says Georgetown High School,
15 Third Floor.
16    Q.   And does that third floor include
17 the art department classrooms and facilities?
18    A.   Yes.
19    Q.   And is Exhibit 62, does that appear
20 to you to be an accurate layout or floor plan for
21 the third floor and the various spaces for the
22 art department?

91 (Pages 724 to 727)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 728

1     A.   Yes.  Yes.
2     Q.   All right.
3          MR. WILLIAMSON:  No further
4     questions.
5          MR. RACIN:  No cross.
6          THE VIDEOGRAPHER:  Going off the
7     record, at 7:30:06.  End of the deposition.
8     (Whereupon, signature not having been waived, the
9     deposition concluded at 7:30 p.m.)
10               * * *
11
12
13
14
15
16
17
18
19
20
21
22

Page 730

1          CERTIFICATE OF COURT REPORTER
2     UNITED STATES OF AMERICA  )
3     DISTRICT OF COLUMBIA      )
4          I, LORI G. MACKENZIE, the reporter before
5     whom the foregoing deposition was taken, do
6     hereby certify that the witness whose testimony
7     appears in the foregoing deposition was sworn by
8     me; that the testimony of said witness was taken
9     by me in machine shorthand and thereafter
10    transcribed by computer-aided transcription; that
11    said deposition is a true record of the testimony
12    given by said witness; that I am neither counsel
13    for, related to, nor employed by any of the
14    parties to the action in which this deposition
15    was taken; and, further, that I am not a relative
16    or employee of any attorney or counsel employed
17    by the parties hereto, or financially or
18    otherwise interested in the outcome of this
19    action.
20               LORI G. MACKENZIE
                 Notary Public in and for the
21               District of Columbia
22    My Commission expires April 14, 2011

Page 729

1          ACKNOWLEDGEMENT OF DEPONENT
2     I, SHARON KILLIAN, do hereby acknowledge I have
3     read and examined the foregoing pages of
4     testimony, and the same is a true, correct and
5     complete testimony given by me, and any changes
6     or corrections, if any, appear in the attached
7     errata sheet signed by me.
8
9
10    Sharon Killian          Date
11
12
13
14
15
16
17
18
19
20
21
22

Page 731

1     May 26, 2006
2     SHARON KILLIAN
      c/o JOHN P. RACIN, Esquire
3     Law Offices of John P. Racin, LLP
      1721 Lamont Street, N.W.
4     Washington, D.C. 20010
5
      Re: KILLIAN V. GEORGETOWN DAY SCHOOL
6     Witness:  SHARON KILLIAN, VOLUME II
      Date taken:  May 17, 2006
7
      Dear Ms. Killian,
8
      We enclose for your review and signature a copy
9     of the above-referenced transcript.  We ask that
      you read the transcript carefully.  If it is
10    necessary to make any corrections, please do so
      on the enclosed errata sheet, indicating the
11    page, line number, correction, and reason for
      such correction.  The errata sheet must be signed
12    and dated.  Also, you must sign the certificate
      of deponent enclosed in the transcript.
13
      If you do not complete the reading and signing
14    within 30 days, you will be deemed to have waived
      your right to make corrections.  Please return
15    the certificate of deponent and errata sheet to
      Esquire Deposition Services, 1020 19th Street,
16    N.W., Suite 620, Washington, D.C., 20036.
17    Very truly yours,
18
      Esquire Deposition Services
19
20
21
22

92  (Pages 728 to 731)

88cd248e-20b6-454d-a261-c2a3789a6e43

Sharon Killian

Page 732

1  ESQUIRE DEPOSITION SERVICES
   1020 19TH STREET, N.W., SUITE 620
2  WASHINGTON, D.C.  20006
   (202) 429-0014
3
           ERRATA SHEET
4
   Case:  KILLIAN V. GEORGETOWN DAY SCHOOL
5  Witness:  SHARON KILLIAN, VOLUME II
   Date Taken:  May 17, 2006
6  Job No.:  174674
7  Page No.  Line No.  Change
8
9
10
11
12
13
14
15
16
17
18
19
20
21
   Sharon Killian          Date
22

93  (Page 732)

88cd248e-20b6-454d-a261-c2a3789a6e43

# E X H I B I T   6

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF COLUMBIA

----------------------------------

SHARON KILLIAN

Plaintiff,

v.

GEORGETOWN DAY SCHOOL

Defendant.

----------------------------------

Civil Action NO.

05-1925(EGS)

Deposition of Nicolas Ryan

Washington, D.C.

Monday, October 2, 2006

10:00 a.m.

Job No.:2-87401

Pages 1 - 136

Reported by:  Jennifer A. Bosley

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

---

**Page 2**

1 Deposition of Nicolas Ryan, held in the:

2

3         Offices of

4         L.A.D. Reporting Company

5         Suite 850

6         1100 Connecticut Avenue, Northwest

7         Washington, D.C. 20036

8

9         Pursuant to notice, before Jennifer A.

10 Bosley, Court Reporter and Notary Public in and for the

11 District of Columbia, when were present:

12

13

14

15

16

17

18

19

20

21

22

---

**Page 3**

1         A P P E A R A N C E S

2 ON BEHALF OF THE PLAINTIFF:

3         JOHN P. RACIN, ESQUIRE

4         Law Offices of John P. Racin

5         1721 Lamont Street, Northwest

6         Washington, D.C. 20010-2601

7         (202)265-2516

8

9

10 ON BEHALF OF THE DEFENDANT:

11         THOMAS S. WILLIAMSON, JR., ESQUIRE

12         Covington & Burling, LLP

13         1201 Pennsylvania Avenue, Northwest

14         Washington, D.C. 20004-2401

15         (202)662-5438

16

17

18 ALSO PRESENT: Sharon Killian

19

20

21

22

---

**Page 4**

1         C O N T E N T S

2 EXAMINATION OF NICOLAS RYAN            PAGE

3 By Mr. Racin                    5

4 By Mr. Williamson              128

5

6

7         E X H I B I T S

8         (Attached to the Transcript)

9 RYAN                        PAGE

10 1 5/7/02 Email From Ryan to Killian & Tolliver  18

11 2 3/6/02 Email From Ryan to Levy            22

12 3 Floor Plan                        31

13 4 3/6/02 Email From Ryan to Killian        55

14 5 2/20 Memo                        75

15 6 Marriama Richards' Handwritten Notes      93

16 7 3/1/04 Handwritten Notes of Elizabeth Denevi 100

17 8 Compilation of Documents            105

18 9 Ryan Summary of Observations        119

19 10 2/26/04 Email Ryan to Killian & Tolliver  124

20

21

22

---

**Page 5**

1         P R O C E E D I N G S

2         NICK RYAN

3    having been duly sworn, testified as follows:

4         EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5 BY MR. RACIN:

6    Q   Please state your name for the record, sir.

7    A   Nicolas Ryan.

8    Q   And how do you spell your last name?

9    A   R-Y-A-N.

10   Q   Sir, my name is John Racin also for the

11 record.  I represent Sharon Killian in a case that she

12 has brought against the Georgetown Day School.

13        The purpose of the deposition as I'm sure

14 your able counsel has covered with you is to elicit

15 information that you may have that bear on the case.

16        My questions, your answers will one day

17 appear in transcript form.  It's important that you

18 understand the question and answer to the best of your

19 ability.

20        Sometimes as Mr. Williamson can certainly

21 attest I don't ask a question in an altogether clear

22 way.  And should that happen, simply ask me to

---

2  (Pages 2 to 5)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

### Page 6

1 restate. I'll be happy to restate. I'll be happy to
2 do that.
3     If at any point you need a break, simply
4 indicate that. And we'll break. I would simply ask
5 if there is a pending question at that point that you
6 would answer the question before the break.
7     A   All right.
8     Q   Would you describe your education after high
9 school, please.
10    A   I went to Connecticut College, received a BA
11 degree.
12    Q   In what year?
13    A   Graduated from Connecticut College in 1978
14 with a BA. Spent my junior year of my college career
15 at the California College of Arts and Crafts. And
16 those credits were transferred back to Connecticut
17 College which I graduated.
18    And then from 1978 to 1980, I went to Pratt
19 Institute and earned a master's degree, master of fine
20 arts.
21    Q   Did you obtain employment thereafter?
22    A   Yes.

### Page 7

1     Q   Describe your employment background briefly.
2     A   My first teaching job was at the Winchendon
3 School in Winchendon, Massachusetts where I was
4 chairman of the art department, dormitory parent, and
5 coach.
6     I left that school and went to St. Edwards
7 School in Vero Beach, Florida. Taught there for one
8 year also as chairman of the art department.
9     Left that school and went to St. Margaret's
10 McTernan School in Waterbury, Connecticut. Taught
11 there roughly 18 to 20 years as an art teacher, coach,
12 yearbook advisor, school photographer.
13    Q   There came a time when you left that
14 position?
15    A   Yes and then went to Georgetown Day School.
16    Q   I'm sorry, could you restate the name of the
17 school you were teaching at before you came to
18 Georgetown Day?
19    A   It was previously called St. Margaret's
20 McTernan School in Waterford, Connecticut. It's now
21 called Chase Collegiate School.
22    Q   Now, at the time of your departure, who was

### Page 8

1 your supervisor?
2     A   You mean the head of the school?
3     Q   Yes.
4     A   At that time, there were three heads of the
5 school at that time. I'm trying remember who it was.
6 Her name escapes me. I could get you that
7 information.
8     Q   Do you recall who evaluated your
9 performance?
10    A   The department chair, Russ Brockmann.
11    Q   And who is that?
12    A   Russell Brockmann.
13    Q   Could you spell that name for the record.
14    A   B-R-O-C-K-M-A-N-N.
15    Q   Was your departure from the school entirely
16 voluntary at the time?
17    A   Yes.
18    Q   Now, there came a time when you accepted a
19 position at the Georgetown Day School; is that right?
20    A   Correct.
21    Q   And what position was that?
22    A   The head of the art department.

### Page 9

1     Q   And what year was that?
2     A   The job was offered to me in the spring of
3 2000. And I started employment in the fall of 2000.
4     Q   Now, who was in the art department at the
5 time you accepted the position?
6     A   Sharon Killian.
7     Q   By that, I mean faculty members in the art
8 department.
9     A   Sharon Killian, Laura Tolliver, and Deborah
10 Haynes.
11    Q   Now, at the time you came on board as chair,
12 did you have any reason to know of any existing
13 tensions between faculty members; and, if so, what did
14 you know in that respect?
15    A   Nothing specific.
16    Q   Anything general?
17    A   I think Paul had mentioned that there was
18 some tension within the department. But he didn't
19 elaborate. He said it would be something that he
20 hoped I would come in as a clean slate.
21    Q   Now, after you arrived as chair, did you
22 become aware of tension in the department?

3  (Pages 6 to 9)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 10

1    A   Yes.
2    Q   And describe those tensions.
3    A   The first tension was where Debbie Haynes'
4   office was going to be.
5    Q   Now, who is Debbie Haynes?
6    A   Debbie was previous chair of the department.
7    Q   And she had been chair for quite some time;
8   is that right?
9    A   I actually don't know how long she had been
10  chair, but I assume so.
11   Q   She had been at the school for quite some
12  time?
13   A   Yes.
14   Q   And she was your immediate predecessor as
15  chair of the department?
16   A   Yes.
17   Q   And what was the tension involving Debbie
18  Haynes' office?
19   A   We had an art office, small space.  And
20  there were three desks in it.  And because we were a
21  three-person department and with me being hired, there
22  was then going to be a four-person department with

Page 11

1   Debbie being part-time.
2        And there was tension as to where Debbie's
3   desk was going to be, whether she would have a desk in
4   the art office or in the art room or some other
5   location.
6    Q   How was that resolved?
7    A   I asked Debbie where she would like her desk
8   to be.  And she said, Well, I'm really not comfortable
9   with it being in the art office.
10       I said, Where would you like to be.  She
11  said, In the art room.  Sharon said she wasn't
12  comfortable with that.
13       So I said, What are the other solutions.
14  And I walked around with Debbie.  And we found a
15  space, a windowless, room off the ceramic studio.
16   Q   Now, did Ms. Haynes say why she wasn't
17  comfortable in the art office?
18   A   At that time, I had no idea.
19   Q   Did there come a time when you --
20   A   I grew to see --
21   Q   -- got an idea?
22   A   Tension between Sharon and Debbie.

Page 12

1    Q   And can you describe that tension and
2   reasons for it as best you can testify.
3    A   I really wasn't there for the history of why
4   that tension existed.  But I think most of it occurred
5   before I arrived.  So it would be hard for me to
6   describe.
7    Q   Did you come to understand anything about it
8   herein or describe it?
9        MR. WILLIAMSON:  Objection, compound.
10   A   Can --
11  BY MR. RACIN:
12   Q   I'll restate.  That may be one of my less
13  than clear questions.
14       Did there come a time when you came to
15  understand what the basis of the tension was between
16  Mrs. Haynes and Mrs. Killian?
17   A   I don't think I really ever quite fully
18  understood the tension between the two.
19   Q   You simply knew it existed?
20   A   Yes.
21   Q   And how was it expressed?
22   A   Communication between the two was awkward.

Page 13

1   Stilted.
2    Q   Now, the other member of the art department
3   is Laura Tolliver; is that right?
4    A   Correct.
5    Q   And what was the relationship between
6   Deborah Haynes and Laura Tolliver as best you know?
7    A   She was another art teacher in the
8   department.
9    Q   Well, can you describe the relationship
10  between Laura Tolliver and Debbie Haynes as you saw it
11  after your arrival?
12       MR. WILLIAMSON:  Objection to the form,
13  vague.
14  BY MR. RACIN:
15   Q   Did it seem to be a good relationship?
16   A   Yes.
17   Q   Did you ever hear it said that they were
18  related by marriage?
19   A   No, I wasn't completely aware I knew there
20  was some -- that someone had been related.  But I
21  didn't know whether it was an in-law or I honestly
22  didn't care.  It didn't make any difference to me.

4  (Pages 10 to 13)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 14

1  So --
2      Q    It seemed to you they were friends?
3      A    They seemed friends.  That was really the
4  extent of it.  I never really was made aware of what
5  the specific relationship if there was one between
6  them.
7      Q    And during your first year as chair of the
8  department, is it fair to say you knew that the
9  relationship between Laura Tolliver and Debbie Haynes
10  was friendly?
11      A    Yes.
12      Q    And is it also fair to say you knew the
13  relationship between Sharon Killian and Debbie Haynes
14  was not friendly?
15      A    I don't know that I would describe it as not
16  friendly.  I would describe it as strained.
17      Q    Now, Deborah Haynes retired after your first
18  year as chair of the department; is that right?
19      A    Well, she retired as chair with my arrival.
20  And then she retired from her position as part-time
21  teacher of the school in that spring of 2001.
22      Q    Thank you for clarifying that.

Page 15

1          Now, after Ms. Haynes' departure, a decision
2  was taken to honor her by naming a student award for
3  excellence after her; is that right?
4      A    Yes.
5      Q    And who was responsible for that decision?
6      A    Paul Levy and I were responsible for that
7  decision.
8      Q    Did you consult anyone in the department
9  before making that decision?
10      A    No.
11      Q    And, again, before you and Mr. Levy I should
12  have said made that decision.
13          That was a joint decision between you and
14  Paul Levy; is that fair to say?
15      A    Correct.
16      Q    Now, at the time, you had no reason to
17  believe that Laura Tolliver would have any objection;
18  isn't that right?
19          MR. WILLIAMSON:  Objection, foundation.
20  BY MR. RACIN:
21      Q    Is it fair to say that at the time you and
22  Mr. Levy made that decision, you had no reason to

Page 16

1  believe that Laura Tolliver would object to that, to
2  designating an award in Debbie Haynes' honor?
3      A    I had no feelings that anyone would object
4  to anyone having that award named in their honor.
5      Q    Well, you knew that -- I think you testified
6  that Mrs. Killian had a strained relationship with
7  Debbie Haynes; is that right?
8      A    Correct.
9      Q    And it never occurred to you that she might
10  object?
11      A    No.
12      Q    Did there come a time when you became aware
13  that she had problems with it?
14      A    Long after the fact, yes.
15      Q    Now, this decision meant that each and every
16  year throughout the rest of her career at GDS, Sharon
17  Killian was going to have to nominate a student for a
18  Debbie Haynes award; is that right?
19      A    Not completely.
20      Q    Okay.  In what respect is that inaccurate to
21  say?
22      A    There are -- there is an award -- well,

Page 17

1  there are almost unlimited number of art awards that
2  can be given by an art teacher.
3          So the teachers nominate students who they
4  feel are deserving of awards.  And they can choose
5  which award they get whether it be a painting award, a
6  photography award, and award for -- at that point we
7  had a Technology in the Art Class, something along
8  those lines.
9          So you can choose that, or you could choose
10  the Haynes award for excellence in art.
11      Q    Is the Haynes award for excellence in art
12  one of the leading awards in the art department?
13      A    I never quantified them in terms of one
14  being higher than the other.
15      Q    Do you know the number of awards conferred
16  by the department?
17      A    It varies from year to year.  I think as
18  many as six one year to either one or zero last year.
19      Q    Since the creation --
20      A    One I think last year.
21      Q    Have you completed your answer?
22      A    Yes.

5 (Pages 14 to 17)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

**Page 18**

1  Q   Since the creation of the Haynes award, has
2  there ever been a year that the Haynes award has not
3  been conferred do you know?
4  A   I don't know off the top of my head.
5  Q   Let me hand you something.  I'd like this
6  marked as Ryan 1, please.
7  (Ryan Exhibit Number 1 was marked for
8  identification and was attached to the
9  transcript.)
10  BY MR. RACIN:
11  Q   Could you identify Ryan 1 for the record,
12  please.
13  A   I recognize it, yes.
14  Q   It's an Email from you to Sharon Killian and
15  Laura Tolliver dated of May 7, 2004; is that right?
16  A   Correct.
17  Q   And how is the Haynes award described?
18  What's the name?
19  A   Deborah Haynes Award for Excellence in
20  Achievement in Studio Art.
21  Q   Now, was this the first year that the award
22  was conferred do you know?

**Page 19**

1  A   No, I believe it was the second year because
2  Debbie retired in 2001.  So I believe that the first
3  year -- I could be mistaken; but I believe the first
4  year was spring of 2001, the year she left.
5  Q   You came on in the 2001, '02 academic, 2001
6  academic year; is that right?
7  A   '01, '02 was my first year -- sorry, 2000,
8  2001 was the first year I taught at the school.
9  Q   And after that you and Ms. Haynes parted?
10  A   She left that spring, yes.
11  Q   So the '01, '02 academic year would have
12  been the first year that Haynes wasn't there, right?
13  A   Yes.  But I don't recall whether it was '01,
14  '02 or it was that '01, that spring that she left that
15  we named the award after.
16  I believe it was that spring.  And I believe
17  we granted it that first year.  But my memory is not
18  clear on that.
19  Q   Now, at the time you dominated the award --
20  you participated in the process leading to the
21  creation of the Haynes award, you knew she had done
22  terrible things; is that right?

**Page 20**

1  MR. WILLIAMSON:  Objection, argumentative,
2  vague and also form, vague.
3  A   No.
4  BY MR. RACIN:
5  Q   And at the time of creation of the Haynes
6  award, you didn't think it was any of Mrs. Killian's
7  business whether she got an award or not; is that
8  right?
9  MR. WILLIAMSON:  Objection, argumentative,
10  foundation.
11  BY MR. RACIN:
12  Q   You can answer.  I should say for the record
13  that occasionally your counsel as we have seen will be
14  objecting to questions, the manner I propound them or
15  their relative propriety or not.
16  Unless you're instructed not to answer once
17  Mr. Williamson has stated the objection for the
18  record, then you are free to answer.
19  MR. WILLIAMSON:  Could you restate the
20  question for me.
21  THE COURT REPORTER:
22  "QUESTION:  And at the time of creation

**Page 21**

1  of the Haynes award, you didn't think it was any
2  of Mrs. Killian's business whether she got an
3  award or not; is that right?"
4  MR. WILLIAMSON:  We renew our objection,
5  foundation.
6  BY MR. RACIN:
7  Q   I'll withdraw it on the ground it's badly
8  framed.  Let me try to restate.
9  Is it fair to say that at the time of the
10  creation of the Haynes award, you didn't think the
11  matter was any of Mrs. Killian's business?
12  MR. WILLIAMSON:  Objection, foundation.
13  A   Is there a way to -- I probably -- the way
14  the question is asked because the question doesn't
15  reflect what I was feeling, how I viewed the
16  situation.
17  BY MR. RACIN:
18  Q   Well, did you think it was any of her
19  business?
20  MR. WILLIAMSON:  Objection, foundation --
21  I'm sorry, withdraw that objection.
22  A   My feeling is that it was a matter between

6  (Pages 18 to 21)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 22

1  the administration and the department head.  And it
2  was in recognizing extensive years of service to the
3  school.
4      I think it was approaching 30 years of
5  service to Georgetown Day School for Mrs. Killian -- I
6  mean for Debbie Haynes.
7  BY MR. RACIN:
8      Q   I want to direct your attention to the 2001,
9  2002 academic year, specifically February of that year
10  which I believe is Black History Month; is that right?
11  Is February of each year Black History Month?
12     A   Yes, it is.
13         (Ryan Exhibit Number 2 was marked for
14  identification and was attached to the
15  transcript.)
16  BY MR. RACIN:
17     Q   Please review what was been marked as Ryan
18  Exhibit 2 which appears to be an Email from you to
19  Paul Levy, date Wednesday, March 6, 2002.
20     A   I finished reading the document.
21     Q   Now, referring to the introduction, My
22  summary of the events at 6:30 p.m. Tuesday,

Page 23

1  March 5th while the matter is still fresh in my mind.
2      Did I read that correctly?
3      A   Yes.
4      Q   The events in question had happened more
5  than a week before; isn't that right?
6          You began the narrative with, Friday,
7  November 22nd when Mrs. Killian took a sick day; is
8  that right?
9      A   Sharon didn't show up for work on
10  February 22nd, correct.
11     Q   Was that a rare occurrence for Mrs. Killian
12  to miss work?
13     A   Actually, I'd have to check the records as
14  to -- but I don't remember Sharon missing any
15  extensive number of classes.  What was unusual was not
16  receiving any notification, so there was no one there
17  to teach the class.  So I had to cover the class
18  unexpectedly.
19     Q   This is a difficult period in Mrs. Killian's
20  life; isn't that right?  Well, you knew she had lost
21  her brother within weeks this event, right?
22     A   Yes.

Page 24

1      Q   And you knew that was an unexpected event,
2  right?
3      A   Yes.
4      Q   And she took a sick day on Friday,
5  February 22nd without notice to you.  That's your
6  testimony?
7      A   Yes.
8      Q   Now, my question is wasn't it a rare event
9  for Sharon Killian to miss work at GDS?
10         MR. WILLIAMSON:  Objection, asked and
11  answered.
12  BY MR. RACIN:
13     Q   I should say at -- I do my best to let folks
14  finish questions.  And sometimes I take a while to get
15  a question out.  So if we could make an effort not to
16  speak over each other, that would certainly ease the
17  job of our court reporter.
18         The question again didn't you know that
19  Mrs. Killian was one who rarely missed work?
20         MR. WILLIAMSON:  Objection, asked and
21  answered.
22  BY MR. RACIN:

Page 25

1      Q   Again, absent an instruction not to answer,
2  you're free to answer the question.
3      A   I would say that my memory is that Sharon
4  did not miss an extraordinary number of classes.  She
5  was usually there to teach her class.  It wasn't an
6  issue in my mind.
7      Q   We can skip to the fourth sentence,
8  "Additionally, over the weekend Sharon evidently came
9  into school and removed a student's photography
10  exhibit (Jon Kelman's) from the first floor display
11  boards and hung art work from the Ramee Art Gallery in
12  its place (in anticipation of the BCC assembly the
13  following Friday, March 1st)."
14         Do you see that?
15     A   I do.
16     Q   When did you notice that had been done?
17     A   As soon as I walked into the school.
18     Q   Is it your routine to come in the front
19  entrance of the school?
20     A   Yes.
21     Q   And is that where this art work was hung?
22     A   Yes.

7 (Pages 22 to 25)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 26

1    Q    And as you saw that, did that seem
2    inappropriate to you that she had hung that art work?
3        MR. WILLIAMSON:  Objection, foundation.
4    A    I didn't think it was so much inappropriate
5    as I was surprised that an exhibit that had just gone
6    up had been taken down.  And we had had a department
7    meeting earlier in the week.  And no mention of the
8    shift in artwork had occurred during that meeting.
9    BY MR. RACIN:
10    Q    Did you understand this artwork was for an
11    upcoming assembly to honor Black History Month?
12    A    I didn't at the time, no, because we had had
13    a department meeting earlier in the week.  And no
14    mention of that occurred and that seemed to me a
15    reasonable time to say, I'm going to be changing the
16    exhibit.  Otherwise Laura Tolliver wouldn't have hung
17    the exhibit later in that week to have it come down
18    two days later.
19    Q    Was it not a routine at the school to put up
20    art work in connection with Black History Month?
21    A    I believe it was.
22    Q    And did you understand that Mrs. Killian

Page 27

1    generally took charge of that effort?
2    A    I don't know who did it actually from year
3    to year.  This was only my second year of working at
4    the school.  So this is the second February I had been
5    there.
6    Q    Well, the first February, February '01, do
7    you recall --
8    A    I don't remember honestly at that point.
9    Everything was very new to me my first year at the
10    school.
11    Q    As you entered the school that day, it was
12    apparent to you Mrs. Killian must have come in over
13    the weekend for this purpose to place this artwork; is
14    that right?
15    A    Yes.
16    Q    Then continuing, quote, "I arrived at school
17    at 7:30 a.m. Monday and encountered banners from a
18    weekend dance hanging from the art room windows and
19    riser steps in the studio gallery that evidently were
20    in the process of being painted - clearly an
21    unfinished student project from the weekend."
22        Did I read that correctly?

Page 28

1    A    Yes, you did.
2    Q    So it seems as if you proceeded from the
3    entrance of the school to your office, and you
4    encountered these banners?
5    A    I noticed the banners when I was driving up
6    to the school.
7    Q    Oh, I see.  And where were the banners?
8    A    Hanging from the second floor windows of the
9    art room -- third floor windows, I'm sorry.
10    Q    What did these banners look like?
11    A    They were paper banners 36 inches wide and
12    maybe 8 feet long.  I can't remember whether it was
13    one or two of them.
14        Students make banners on a regular basis for
15    dances.  They'll do it for a birthday.  They'll do it
16    for ecology, a birthday, any kind of event, gay pride
17    week.  And they'll hang them either in the stairwell,
18    various locations for brief time the event occurs.
19    Then they take them down and throw them away.
20    Q    Do you know why these banners were there
21    this particular morning?
22    A    This was for the dance that occurred over

Page 29

1    the weekend.
2    Q    And as you saw those banners, do you recall
3    having any particular reaction to them?
4    A    No.
5    Q    Okay.  Now you go on to say, "Since it was
6    windy and the dance was over, George Buckwalter and I
7    removed the tattered dance banners from the art room
8    windows - I thought little of this, students often use
9    art room materials for school events so this was
10    nothing unusual."
11        Did I read that correctly?
12    A    Yes, you did.
13    Q    Who is George Buckwalter?
14    A    George Buckwalter is one of the maintenance
15    men at the school.
16    Q    Do you recall if -- did you call
17    Mr. Buckwalter?
18    A    No, I believe he is -- he will in the
19    mornings do what I would call a walk-through through
20    the school.
21        So he -- not every morning, but he'll pass
22    through the various floors.  And he came into the art

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 30

1  room and helped me pull those in.  Whether he had seen
2  the banners and was on his way up or whether he just
3  happened upon it and began helping me, I'm not sure.
4      Q   And you go on to say, "I was in a rush to
5  get ready for my photography class at 8:15 a.m., a few
6  students were already showing up, so I neglected to
7  put the paper banners in the trash cans."
8          Where did you leave the banners?
9      A   We opened -- George and I opened the
10  windows.  We pulled the banners in, put them on the
11  floor.  George might have -- we might have put one of
12  them in the trash already, or we might have just left
13  them on the floor.  It's hard to say which the -- I
14  know one was just left basically in tact on the floor.
15          And then I had to go mix -- for the
16  beginning of class, there are various chemicals one
17  mixes up especially on a Monday morning you need to
18  make fresh chemicals for the darkroom trays.
19          So I had to get that ready for my students
20  coming to class.  That was my first priority.
21      Q   Let me hand you what was introduced during
22  the course of Mrs. Killian's deposition as Exhibit 62.

Page 31

1  I guess remark as Ryan 3.
2          (Ryan Exhibit Number 3 was marked for
3  identification and was attached to the
4  transcript.)
5  BY MR. RACIN:
6      Q   Ryan 3 purports to be the third floor of the
7  Georgetown Day High School, a depiction of the floor
8  plan; is that right?
9      A   Yes, it is.
10      Q   Can you describe for the record where the
11  banners were.
12      A   The banners were on the side of the school
13  facing Davenport Street hanging from the third floor
14  windows.
15      Q   If you could refer to this floor plan, if
16  you would, where were the banners?
17      A   Well, the 42nd Street which isn't pictured
18  on here runs along the side of the floor plan from the
19  art studio to the gymnasium.  So it's on the top of
20  the floor plan, that entire side of the school is
21  Davenport Street.  And so in the art studio area, the
22  windows, they're all along the entire side of both

Page 32

1  sides of the studio.  But on the side that faces
2  Davenport Street, there were windows from which the
3  banners hung.
4      Q   Did the banners, were they just on the
5  windows of the art studio?  Did they continue any
6  further?
7      A   They hung -- they were anywhere six to eight
8  to ten feet paper banners hanging from the third-floor
9  windows.  So how far they hung down, I don't know.
10  They weren't attached.  They were just hanging,
11  blowing in the wind.
12      Q   The top left of the floor plan, the art
13  studio, it would be --
14      A   Do you want me to mark it with an "X"?
15      Q   If you would, sure.  With an "X," mark where
16  the banners were.
17      A   Roughly here.  If there are two, it would be
18  there.  If it was one, it would be somewhere between
19  these two.
20          Here is bookshelves, computer station.  And
21  this area is -- over here is a solid wall and some
22  easles.  So this is the only place where there is

Page 33

1  really access to the windows, easy access to the
2  windows.
3      Q   Would you clearly denote where the banners
4  were and just write, "banners" on that exhibit so
5  we'll have.
6          Now, where was your office?
7      A   The art office.  It's marked right there.
8      Q   Where was your class going to be taught?
9      A   In the photo lab.
10      Q   And referring to the floor plan again, you
11  approach the art office by walking along the
12  gallery --
13      A   Yes.
14      Q   -- depicted.
15          Now, after you and Mr. Buckwalter together
16  removed the banners; is that right?
17      A   Yes.
18      Q   And you say you neglected to put the paper
19  banners in the trash cans.
20          Where were the trash cans you're referring
21  to by reference of this exhibit?
22      A   The trash cans are on wheels.  So they can

9 (Pages 30 to 33)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 34

1  be scattered around the art studio in any -- it
2  depends where the cleaning crew leaves them.
3      So they would never be in a set location, so
4  the big thirty gallon things on rollers. So they were
5  anywhere. Where they were at that time, I don't know.
6      Q   Okay. Well, do you know why Mr. Buckwalter
7  didn't arrange for the removal of the banners?
8      A   He could have gotten a call to take care of
9  another matter in the building.
10     Q   And where were the banners left? Where were
11 they when you left to prepare for class?
12     A   In the -- adjacent to that wall on the -- I
13 guess if I knew what direction they were facing. I
14 believe this side faces west. This side faces north.
15 So it would be on the north side.
16     Q   Would you depict on Ryan 3, the floor plan,
17 where you left the banners when you went off to class.
18     A   (The witness wrote.)
19     Q   Now, you have confronted -- when you entered
20 school that day, you testified you confronted artwork
21 that you assume Mrs. Killian had placed in the
22 entrance of the school, right?

Page 35

1      MR. WILLIAMSON: Objection, foundation,
2  form.
3  BY MR. RACIN:
4      Q   I guess you couldn't know. I'll withdraw
5  it.
6      Did you encounter artwork in the entrance of
7  the school that you assumed Mrs. Killian --
8      A   I walked in.
9      Q   -- had placed over the weekend.
10     A   I saw that John Kelman's exhibit was taken
11 down and that there was artwork that was not done by
12 students at our school, framed. It was different in
13 terms of it being framed from a gallery.
14     And I was unfamiliar with it. So I said,
15 Oh. My first reaction was, Wow, where did this come
16 from.
17     Q   Did it seem to you it had some connection to
18 Black History Month?
19     A   At that moment, no, it didn't. I didn't see
20 any -- there was nothing specific to the imagery that
21 I could connect. There was no sign identifying
22 anything about the artwork.

Page 36

1      The artwork was hung, and that was it.
2  There was no cards, no name plates, nothing.
3      Q   Do you recall the subject matter of any of
4  the artwork?
5      A   No.
6      Q   Artist's names?
7      A   No.
8      Q   Do you recall feeling annoyed as you
9  proceeded through?
10     A   I was simply puzzled by the fact that this
11 artwork was up and wondered where it had come from.
12 But I wasn't annoyed.
13     Q   Now, you proceeded into the art area of the
14 school.
15     And did the banners in place at that point
16 annoy you in any way?
17     A   No.
18     Q   Refer down to the bottom of Ryan 2 again,
19 ninth line up bottom of Ryan 2.
20     MR. WILLIAMSON: What's the Bates number of
21 the page?
22     MR. RACIN: 2866.

Page 37

1      MR. WILLIAMSON: Thank you.
2  BY MR. RACIN:
3      Q   The sentence beginning, "Sometime after
4  8 a.m. Sharon arrived in the art room and asked about
5  the banners on the floor and the riser steps. I
6  passed on what I knew and shrugged. I said George and
7  I had taken the banners in and apologized that I
8  hadn't managed to put them in the trash yet, but I
9  recall adding that it was 'no big deal.'"
10     Have I read that correctly?
11     A   Yes, you have.
12     Q   Now, when Mrs. Killian came to work that
13 day, do you know where she encountered the banners?
14     A   Where I left them.
15     Q   Do you know what she would have seen on the
16 floor of the art studio?
17     MR. WILLIAMSON: Objection, foundation.
18 BY MR. RACIN:
19     Q   On the floor of the art studio?
20     A   Where I had left them, yes.
21     Q   Continuing, "All in all I thought no harm
22 done - Sharon and I had both looked at the steps and

10  (Pages 34 to 37)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 38

1  noted the paint on the floor - she seemed far more
2  concerned than I - she even remarked that, 'they
3  should have done that in the drama work area.' After
4  my photography class while returning to my desk, I
5  overheard Sharon asking someone (I assumed George
6  Buckwalter) to remove the steps from the gallery."
7      And continuing on Bates 2867. "Shortly
8  thereafter I mentioned to Sharon that Laura Tolliver
9  was probably unhappy that an art exhibit of one of her
10 students had been taken down after only being up for
11 three days."
12     Did I read that correctly?
13  A  Yes.
14  Q  At the time of this conversation with
15 Mrs. Killian, had you talked to Laura Tolliver?
16  A  I don't recall.
17  Q  So --
18  A  Because I was in class.
19  Q  So when you said to her that Laura Tolliver
20 was probably unhappy that an art exhibit of one of her
21 students had been taken down after only being up for
22 three days, you were assuming that Ms. Tolliver was

Page 39

1  probably unhappy?
2      MR. WILLIAMSON:  Objection,
3  mischaracterization of prior testimony.
4  A  Can you rephrase that in some way.
5  BY MR. RACIN:
6  Q  Let me try that.
7      Do you know if you had spoken with Tolliver
8  at this point?
9      MR. WILLIAMSON:  Objection, asked and
10 answered.
11  A  I don't recall whether I had.  I think I
12 stated that.  I do recall remembering that Laura had
13 just put up the artwork downstairs.  And then I
14 gathered that Sharon had exchanged it with this
15 artwork from the Ramee Art Gallery.
16 BY MR. RACIN:
17  Q  Continuing, "It seemed to me that Sharon had
18 neglected to inform anyone of her intention to change
19 the first floor display during our art department
20 meeting earlier that week (my recollection is we met
21 either on Monday or Tuesday during lunch).  I quite
22 gently suggested that she might want to speak with

Page 40

1  Laura and try to smooth things over."
2      Do you recall saying that to Mrs. Killian?
3  A  Yes.
4  Q  That she might want to try to smooth things
5  over?
6  A  I don't know if I used that words --
7  Q  But in affect you said something --
8      MR. WILLIAMSON:  Counsel, would you, please,
9  allow the witness to finish his answer?
10     MR. RACIN:  I shall.  Clearly inadvertent on
11 my part.
12 BY MR. RACIN:
13  Q  I'm trying to be as courteous as I can.  I
14 apologize for having interrupted you, Mr. Ryan.  And
15 if at any point you feel that I haven't given you a
16 fair opportunity to answer, simply say so for the
17 record.  I will sit back, and you can answer at length
18 at leisure.
19  A  I believe the question was what I said to
20 Sharon.  And at the time, I suggested to Sharon that
21 she might want to say, you know, I took down the
22 artwork.  It would have been nice to let you know.  I

Page 41

1  was busy, whatever it was.
2      I didn't think it was a big matter.  But I
3  thought it was just something if you just touch base
4  with somebody, then that would begin to establish a
5  more collegiate relationship within the department.
6  Q  Did you raise your voice while making that
7  suggestion to Mrs. Killian?
8  A  No.
9      MR. WILLIAMSON:  In a reciprocal way, you
10 should be sure you let counsel finish asking the
11 question before you answer it.
12  A  Okay.
13 BY MR. RACIN:
14  Q  Continuing, "I added that she needed to be
15 more forthcoming and that simply taking down a
16 student's display was hurtful to the student as well
17 as Laura with whom Sharon has a marginal collegial
18 relationship."
19     Did I read that correctly?
20  A  Yes, you did.
21  Q  Now, when you said she needed to be more
22 forthcoming, what did you mean?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 42

1    A   That was in reference -- we had had a
2  department meeting earlier in the week.  That would
3  have been an ideal time for Sharon to have mention
4  that it's Black History Month.  I'm going to be
5  changing the exhibit.  Or I would like to place the
6  exhibit downstairs from the Ramee Art Gallery.
7       And had she done that, Laura would not have
8  hung Jon Kelman's artwork up on Thursday, Wednesday or
9  Thursday of that week to have it taken down.
10      So it's just a matter of one person not
11 communicating what they plan to do.
12      Q   Is it your testimony that Laura Tolliver
13 expressed unhappiness about what Mrs. Killian had done
14 with respect to placing the artwork?
15      MR. WILLIAMSON:  Objection,
16 mischaracterization of prior testimony.
17      A   I think we have established that Laura had
18 just hung up this artwork.  So what would be the point
19 of hanging up artwork and taking it down two days
20 later.
21 BY MR. RACIN:
22      Q   Did Mrs. Tolliver ever say to you she was

Page 43

1  unhappy about that, about the fact that Mrs. Killian
2  had placed the artwork in those circumstances?
3       MR. WILLIAMSON:  Objection, asked and
4  answered.
5  BY MR. RACIN:
6       Q   I don't think I have gotten an answer to
7  this question.
8       Did Mrs. Tolliver ever express unhappiness,
9  complain, about Mrs. Killian's placement of artwork in
10 the entrance of the school on this occasion?
11      A   Laura expressed concern that Jon Kelman
12 would be disappointed that his exhibit had only been
13 up for a day and a half.
14      And I think that was her major concern, that
15 we had gone through the effort of putting something up
16 to have it taken down where we could have easily have
17 postponed hanging Jon Kelman's artwork -- she could
18 have postponed hanging Jon Kelman's artwork up had she
19 known that Sharon was going to change the exhibit over
20 the weekend.
21      Q   Well, in your mind, was it important that
22 there be artwork acknowledging Black History Month,

Page 44

1  honoring Black History Month at the entrance of the
2  school in preparation for the assembly that was to
3  take place that week?
4       MR. WILLIAMSON:  Objection, relevance, calls
5  for speculation.
6  BY MR. RACIN:
7       Q   You may answer.
8       A   I think given the mission of the school,
9  it's important to have diverse artwork on display.
10 And I support that.  I have always supported that.
11      Q   But do you think it's especially important
12 during Black History Month?
13      MR. WILLIAMSON:  Objection, form, vague and
14 relevance, and asked and answered.
15      A   I'd give you the same answer which is I
16 think it's important that the school always hang
17 diverse artwork up.
18      But I also think it's important for people
19 to communicate what they plan to do if they wish to
20 maintain a collegial relationship and to respect other
21 students in the school.
22 BY MR. RACIN:

Page 45

1       Q   Do you think it more important to have
2  artwork honoring accomplishments of African Americans
3  in our history displayed in the school during Black
4  History Month than in other months?
5       MR. WILLIAMSON:  Objection to the form,
6  incomprehensible, counsel.
7  BY MR. RACIN:
8       Q   You may answer if you understand it.
9       A   I suppose there is a greater incentive to
10 have a display during Black History Month than at
11 other times.  But given the mission of the school,
12 diversity is always a topic at Georgetown Day School.
13      So it's not something that we address merely
14 in one month.  We address it during the entire school
15 year.
16      Q   Now returning to the sentence I last asked
17 you about that is, "I added that she needed to be more
18 forthcoming and that simply taking down a student's
19 display was hurtful to the student as well as Laura
20 with whom Sharon has a marginal collegial
21 relationship."
22      Asked about the phrase "marginal collegial

12  (Pages 42 to 45)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 46

1  relationship," what were you referring to there?
2      A   Well, I think the very fact that Sharon had
3  not even bothered to mention it to Laura during the
4  department meeting indicates a marginal collegial
5  relationship that didn't express concern for what she
6  may or may not have planned to do.
7          So, you know, it's a simple matter of
8  someone goes to the effort of doing something and
9  you're not caring about what they do.
10     Q   So the phrase, "marginal collegial
11  relationship," didn't refer to any prior incidents
12  involving Mrs. Killian and Mrs. Tolliver?
13         MR. WILLIAMSON: Objection, argumentative,
14  mischaracterization of prior testimony.
15  BY MR. RACIN:
16     Q   Well, the phrase "with whom Sharon has a
17  marginal collegial relationship," doesn't that suggest
18  to you that there have been issues between them prior
19  to this time?
20         MR. WILLIAMSON: Objection, argumentative.
21     A   I would say the relationship was terse.
22  BY MR. RACIN:

Page 47

1      Q   Why would you say that?
2      A   Because that's what I observed.
3      Q   And can you give specific instances that
4  suggested to you that the relationship was terse?
5      A   Well, I think this is a perfect example of
6  that.
7      Q   Any examples prior to the artwork on Black
8  History Month?
9          MR. WILLIAMSON: Objection as to form,
10  incomprehensible.
11     A   I mean if you have a document or something
12  for me to look at -- for me to list off things from
13  the past that I'm trying to recall in 2006 what
14  happened in 2001, 2002 specific instances, that's very
15  difficult.
16  BY MR. RACIN:
17     Q   So as you sit here today, you can't recall
18  any episodes prior to Black History Month 2002 which
19  would suggest a marginal collegial relationship
20  between Sharon Killian and Mrs. Tolliver; is that
21  right?
22     A   No. I would say I can recall that during

Page 48

1  department meetings the relationship between the two
2  was terse and tense over matters relating to how the
3  photo lab was used, how supplies were ordered, that
4  sort of thing, simple basic mechanics in the
5  department.
6      Q   Thank you. At one point you say referring
7  back to the memo, "I could sense Sharon was getting
8  emotional and in fact she started to cry."
9          Do you see that?
10     A   Yes, I do.
11     Q   Do you have an understanding why she was
12  crying?
13     A   Because she was being emotional. Unless
14  you're that person, it's hard to know exactly why. I
15  can make assumptions or guesses as to why.
16     Q   Well, you quote yourself saying, "Sharon,
17  don't worry about it. None of this was a big deal.
18  You were feeling sick. You lost a family member. In
19  the grand scheme of things, family always comes
20  first."
21     A   Correct.
22     Q   You said that to her at the time?

Page 49

1      A   I did.
2      Q   So you believed she was feeling sick?
3      A   Well, she had been out sick on the Friday,
4  right?
5      Q   Right.
6      A   So she had missed a day without notice
7  Friday. Earlier in the month, Sharon's brother had
8  passed away. And that's what I was referring to.
9          And my belief is that family does come
10  first. Nothing that transpired that day was
11  monumental in any way, shape, or form, that these were
12  small matters that were exacerbating the mechanics of
13  the department.
14     Q   As you sit here today, can you say why you
15  didn't just hold off raising these issues with her
16  until sometime after, until sometime later?
17     A   I'd be speculating.
18     Q   We don't want you to speculate.
19     A   You address them when you feel it's
20  appropriate to address them. You know, I had an
21  employee who didn't show up for work on Friday.
22         Monday we had an issue about artwork. I

13  (Pages 46 to 49)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 50

1  thought that was an appropriate time to do it.  And I
2  did it in a very gentle compassionate way as I have
3  stated here.
4      Q   Did you ever compliment her for making the
5  extra added effort for coming in over a weekend to
6  ensure that artwork would be in place to honor Black
7  History Month?
8          MR. WILLIAMSON:  Objection, foundation.
9  BY MR. RACIN:
10     Q   You may answer.
11     A   I think if you look at the various teacher
12  evaluations I did with Sharon, extensive compliments
13  as to her ability as a teacher and her extra efforts
14  on behalf of the department in various areas whether
15  it was an exhibit outside of school or in the school.
16     Q   You refer to your Email to Mr. Levy of March
17  6, Bates 2868.  Again --
18         MR. WILLIAMSON:  Counsel, before you go too
19  far on that, this is a full single-spaced typed page
20  on 2868.  Can you give us a little more focus on what
21  you're asking the witness to comment on here?
22         MR. RACIN:  Sure.

Page 51

1  BY MR. RACIN:
2      Q   Have you had an adequate opportunity to
3  review this prior to this line of inquiry?
4      A   We read it when you first gave it to me.
5  But now it's several minutes later.  It would be nice
6  to know which section you're going to refer to.
7      Q   Do you want to read over it?
8      A   If you would help me as I'm reading through
9  to know what you're going to refer to first.  That way
10  I can focus my attention.
11     Q   It begins, fifth line down first full
12  sentence, "I was fed up.  I felt Sharon's tone of
13  voice was hostile and as department head I deserved
14  more respect and consideration."
15         Do you recall writing those lines?
16     A   I wrote this whole document.
17     Q   Right, exactly.  And now, you say you were
18  fed up.
19         Did that mean you were feeling a little
20  angry?
21     A   What I said is what I felt.  That's it.
22     Q   And you felt you deserved to more respect

Page 52

1  and consideration?
2          MR. WILLIAMSON:  Objection.  Counsel, the
3  document speaks for itself.
4          MR. RACIN:  It does.
5  BY MR. RACIN:
6      Q   Did you feel at the time that you deserved
7  more respect and consideration?
8      A   That's what the document states.
9      Q   Did you then begin to feel some anger?
10     A   No.
11     Q   Despite feeling fed up and despite feeling
12  you weren't getting the respect and consideration you
13  deserved, your testimony is that you felt no anger at
14  that point?
15         MR. WILLIAMSON:  Objection, argumentative,
16  asked and answered.
17  BY MR. RACIN:
18     Q   Is that your testimony?
19     A   I stand by what I just said.
20     Q   You say, "In addressing Sharon I said 'you
21  both need to work it out and start communicating.'
22  And Sharon responded that 'there must be something

Page 53

1  wrong with you - there must be something in your
2  personal life.'"
3          Did the reference to work it out and start
4  communicating refer to Laura Tolliver?
5      A   I addressed that to both of them.
6      Q   Now, it follows a description of
7  conversations you had with others at the school for
8  example, "I searched out Norrine to get some support
9  and simultaneously encountered Laura.  I shared my
10  frustrations, laura, shared hers, and we had a good
11  talk about what needed to change."
12         Now, what frustrations did you share?
13     A   My frustration was that the two of them were
14  not adequately communicating with one another.
15     Q   Do you recall Laura's frustrations that she
16  shared?
17     A   The specifics, no.  But I do recall that she
18  shared, you know, her frustrations as well, that the
19  gallery thing being one of them, exchange of exhibits.
20     Q   "We had a good talk about what needed to
21  change."
22         What was that talk about?  What needed to

L.A.D.  REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 54

1  change?
2      A    The level of communication within the
3  department.
4      Q    You say, "Later that day I spoke with Paul
5  Levy, principal, and shared this sequence of events
6  and my feelings of frustration."
7          Had you ever gone to Mr. Levy before
8  concerning dynamics in the department?
9      A    Yes.
10     Q    At this point, did you have reason to
11 believe that Mrs. Killian had also gone to Mr. Levy to
12 share concerns about dynamics in the department?
13     A    I don't know.
14     Q    Did Mr. Levy ever say that to you?
15     A    That Sharon had come to him?
16     Q    Yes.
17     A    At that time, I don't recall.
18     Q    Midway down through the document you say,
19 "Tuesday, March 5th about 4 p.m. as I sat at my
20 desk Sharon sent me an Email."
21         Do you recall receiving an Email that
22 afternoon?

Page 55

1      A    I must have if that's what I wrote in the
2  summary.
3          (Ryan Exhibit Number 4 was marked for
4  identification and was attached to the
5  transcript.)
6          (A brief break was taken.)
7  BY MR. RACIN:
8      Q    Mr. Ryan, if you would refer to exhibit
9  that's been marked as Ryan's Exhibit 4 and review
10 that.
11     A    Okay, I have read the document.
12     Q    The Ryan Exhibit 4 appears to be an Email
13 exchange the between you and Mrs. Killian that you
14 forwarded to Paul Levy on Wednesday, March 6th; is
15 that right?
16     A    Yes.
17     Q    Now, is the Email to Nick from Sharon the
18 Email that you referred to in Ryan 3, Bates number
19 2868 halfway down?
20         I had asked you about that previously, about
21 halfway down the page, "Tuesday March 5th at about
22 4 p.m. as I sat at my desk Sharon sent me an Email."

Page 56

1      A    I believe it is.
2      Q    Let's go over the Email from Mrs. Killian to
3  you.  And the first paragraph I would ask if there was
4  anything in paragraph -- in the first paragraph of the
5  Email that you take issue with at this point?
6          MR. WILLIAMSON:  What page are we talking
7  about, counsel?
8          MR. RACIN:  Bates 2864, Ryan 4.
9          MR. WILLIAMSON:  Objection as to form.
10         THE WITNESS:  Which paragraph are you
11 referring to?
12 BY MR. RACIN:
13     Q    The first paragraph.
14     A    The one that I wrote?
15     Q    No, the one that Mrs. Killian wrote you.
16         MR. WILLIAMSON:  Objection as to form.
17 BY MR. RACIN:
18     Q    Describe for the record what this exchange
19 of Emails is.
20         MR. WILLIAMSON:  Counsel, I'd just like to
21 complete the objection.
22         MR. RACIN:  Sure.

Page 57

1          MR. WILLIAMSON:  That the first paragraph on
2  2864 is an Email from Mr. Ryan.  And the objection is
3  that it's confusing if -- you seem to be saying that
4  you wanted to know whether he took exception to
5  anything in the first paragraph.
6          And the witness asked you are you
7  talking about the one that I wrote.  And you said,
8  No.  So I think we got confused record here as to
9  which paragraph you're talking about on 2864.
10         MR. RACIN:  I think the point is well taken.
11 And we want the record to be clear.
12 BY MR. RACIN:
13     Q    I'm referring to the responsive Email
14 from -- what appears to be a responsive Email from
15 Mrs. Killian to you; is that right?
16     A    Yes.
17     Q    And I'm asking about the first paragraph of
18 the responsive Email, Nick.  Could you read that into
19 the record.  I'm getting a sore throat.
20         MR. WILLIAMSON:  Counsel, we'll stipulate
21 that the document speaks for itself.
22 BY MR. RACIN:

15  (Pages 54 to 57)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 58

1    Q   I'm asking based on that stipulation, do you
2  take issue with as you sit here today with anything
3  Mrs. Killian said --
4        MR. WILLIAMSON:  Objection as to form.
5  BY MR. RACIN:
6    Q   -- to you on that occasion?
7        MR. WILLIAMSON:  Objection as to form
8  particularly the phrase, "take issue with."
9  BY MR. RACIN:
10   Q   She reports she returned to work last week
11 to find three complaints directed at her.  The Black
12 Culture Club left riser-steps and banners hanging in
13 the art space during the period that I was out of the
14 office.
15       That was a complaint directed at her, right?
16   A   No.  I didn't lodge a complaint.  That is
17 not what I did.  There was no complaint.
18   Q   You had no criticism --
19   A   Of the banner, no.  Or the riser steps, no.
20   Q   Or the fact that the banners had been left
21 over the weekend?
22   A   No, not at all.

Page 59

1    Q   By the way, you understood these banners had
2  been prepared by the Black Culture Club at the school,
3  right?
4    A   I didn't understand who made them.  I
5  assumed since they were announcing the dance that
6  that's probably who made them.  But I didn't see them
7  being made, so I had no idea.
8    Q   And do you know if the banners refer to any
9  activity that had not taken place yet at the school?
10   A   No, they were about the dance.
11   Q   And you're sure of that?
12   A   Yes.
13   Q   Referring to the second issue Mrs. Killian
14 describes as a complaint, "My hanging on the first
15 floor of artwork by African-American artists did not
16 have prior approval."
17       That was a complaint on your part, right?
18   A   I wasn't complaining about the artwork
19 hanging.  I was complaining about the fact that no one
20 knew that that artwork was going to be hung at that
21 time.
22   Q   Right.  Well, it did not have prior

Page 60

1  approval.  That was the confusion?
2    A   It wasn't a matter of really approval.  It
3  was more of a matter that no notice had been give that
4  that was going to happen.
5    Q   And, three, photography supplies were left
6  out Monday afternoon.
7        And that had been the basis of a criticism
8  on your part, right?
9    A   It was a question put to both Laura and to
10 Sharon as to whether it had been a student's in their
11 class or an adult who had been responsible.
12       And I believe my Email indicates.  So if
13 it's a student who's responsible, then speak to that
14 student.  But if it's an adult, then people need to be
15 accountable.
16   Q   Now, the next sentence she says in part,
17 "you brought me to tears with your chastisements."
18       And that was true, wasn't it?
19   A   No.
20   Q   You referred to Mrs. Killian crying in your
21 Email, don't you?
22       MR. WILLIAMSON:  Objection, foundation,

Page 61

1  form.
2  BY MR. RACIN:
3    Q   Well, your Email described Mrs. Killian
4  breaking down in tears; did it not?
5        MR. WILLIAMSON:  Counsel, let me object.
6  What Email are you talking about, counsel?
7        MR. RACIN:  Ryan 2 which we have just been
8  over at my impression was possibly over extended
9  length.
10 BY MR. RACIN:
11   Q   Let's refer back to Ryan 2, Bates 2867,
12 about a third of a way down, "I said I covered the
13 class and let the matter rest - I could sense Sharon
14 was getting emotional and in fact she started to cry."
15       So you had described her crying in your
16 Email?
17   A   She had some tears in her eyes.  I wouldn't
18 say it was crying, sobbing.  But she was -- but I
19 don't believe it was because of my chastisements
20 because I didn't chastise her.
21   Q   Okay.  What did you understand her tears to
22 be brought on by?

16  (Pages 58 to 61)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 62

1    A   Well, if you look at the series of events,
2   her brother had passed away, she had missed a day of
3   work and not given me notice.  So she might have felt
4   some anxiety over that.  And then I had pointed out
5   that she had changed artwork downstairs and hadn't
6   notified or let Laura know that she had planned to do
7   that.
8    Q   And those weren't chastisements?
9    A   Well, chastisement is -- no, I don't believe
10  that -- I don't believe I did it in that use a tone of
11  voice that I would characterize as chastisement.
12       I offered what I would say was collegial
13  advice in a very caring and responsive way.  I was
14  trying to offer guidance to a fellow department member
15  as a department head so I could further collegiality
16  within the department.
17   Q   The beginning of the next paragraph in your
18  Email, the first sentence, "I understand you were
19  angry about all the activities surrounding the Black
20  Culture Club use of the art studio in preparation for
21  the Assembly on Friday."
22   A   2864?

Page 63

1    Q   2864 referring back to Ryan 4.
2    A   And your question is?
3    Q   Was that accurate on her part?
4    A   No.
5    Q   Did she have reason to believe you were
6   angry about all the activities surrounding the Black
7   Culture Club?
8    A   No.
9    Q   Did you have any idea what that referred to?
10   A   No, frankly, no, because I wasn't angry.
11   Q   And then the third full sentence, "Nick, the
12  tantrum that you had, tearing down the posters and
13  leaving them all over the floor of the art room was an
14  inappropriate response and your blaming me without
15  question was wrong - even had I told the BCC they
16  could use the art room to paint and hang in the window
17  their posters for the dance."
18       Now, as you sit here now, do you think
19  Mrs. Killian had reason to think you had thrown a
20  tantrum?
21   A   No.
22   Q   And she came into work and found these

Page 64

1   things all over the floor, right?
2        MR. WILLIAMSON:  Objection to form, vague.
3   BY MR. RACIN:
4    Q   Let's move on to 2865.  Same Email looks
5   like the next full paragraph, "You were also angry
6   about my taking down Laura's student's work from the
7   first floor lobby to put up artwork in commemoration
8   of Black History Month."
9        Do you think that was a fair account of your
10  reaction?
11   A   No.
12   Q   Because you have not been angry?
13   A   No.
14   Q   Now, do you believe that Mrs. Killian had
15  the intention to share her Email to you with anyone
16  else?
17       MR. WILLIAMSON:  Objection, calls for
18  speculation.
19  BY MR. RACIN:
20   Q   Did you think at the time that she might
21  share a copy of the Email to somebody else outside of
22  the department?

Page 65

1        MR. WILLIAMSON:  Objection, it calls for
2   speculation.
3   BY MR. RACIN:
4    Q   Did it cross your mind?  That's not
5   speculation.
6    A   I'm not sure what you're asking me.
7    Q   Did it occur to you that Mrs. Killian might
8   forward the Email to you to anyone else?
9        MR. WILLIAMSON:  Counsel, it calls for
10  speculation in the sense that it calls for the witness
11  to give some answer about the state of mind of the
12  plaintiff.
13       MR. RACIN:  I'm talking about his state of
14  mind.
15   A   I don't know what Sharon's state of mind
16  was.
17  BY MR. RACIN:
18   Q   I'm asking about your state of mind.
19   A   I'm not even clear from your question which
20  part of this Email you're talking about forwarding.
21   Q   The entire Email.  Did it occur to you that
22  she might forward that to anyone?

17 (Pages 62 to 65)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 66

1    A   This whole thing?
2    Q   Yes.
3    A   I never thought about it one way or the
4  other.
5    Q   Well, isn't this Email the reason that you
6  sat down on the evening of March 5th, 2002 and
7  prepared Ryan 2?
8        MR. WILLIAMSON:  Counsel, just for the
9  record, when you said, "this Email," you pointed to a
10  document that isn't going to be clearly reflected in
11  the transcript.  Can we get an exhibit number and
12  Bates number?
13        MR. RACIN:  Yes.
14  BY MR. RACIN:
15    Q   Isn't it true that the Email from
16  Mrs. Killian to you depicted in Ryan 4 was the reason
17  that you sat down on Tuesday at 6:30 and prepared the
18  Email to Mr. Levy depicted as Ryan 2?
19        MR. WILLIAMSON:  Objection, asked and
20  answered.
21    A   We have already stated that.  You have asked
22  me that question.  I have answered it before.

Page 67

1  BY MR. RACIN:
2    Q   I don't recall the answer.  I don't think
3  that's right.  I know my memory is bad; it's not that
4  bad.  Could we scroll to -- I'm sorry, to the previous
5  answer before the objection about clarity.
6        MR. WILLIAMSON:  Counsel, I think there was
7  an earlier point where you asked specifically whether
8  Ryan Number 4, the witness's Email the top of the
9  Page 2864, related to the Email that was sent by
10  plaintiff.  And it was reflected in Ryan Number 2.
11        Unless my client is going to tell me I'm
12  wrong, we're willing to stipulate to that.  But it
13  was already asked and answered.
14        MR. RACIN:  I seek the future Court's
15  indulgence to repeat the question, ideally get an
16  answer.
17        MR. WILLIAMSON:  Go ahead and answer.
18    A   The document 2868 I refer to the Email.
19        MR. WILLIAMSON:  When you give that, you
20  have to say what 2868 is part of.
21    A   Exhibit Number 2 in the middle of the page,
22  "Tuesday, March 5th at 4 p.m. as I sat at my desk

Page 68

1  Sharon sent me an Email."  The Email referred to is
2  Exhibit 4.
3  BY MR. RACIN:
4    Q   And if you refer the front page of Ryan 2,
5  Bates 2866, it says "I am writing this summary of
6  events at 6:30 p.m. on Tuesday, March 5th while the
7  matter is still fresh in my mind."
8        Isn't it true that you sat down to prepare
9  this document, Ryan Exhibit 2, two-and-a-half hours
10  after receiving Mrs. Killian's Email?
11    A   I didn't see a time on this that indicates.
12    Q   Again 2868 --
13    A   Two hours.
14    Q   2868 halfway down you just read it, "Tuesday
15  March 5th at about 4 p.m. as I sat at my desk Sharon
16  sent me an Email."
17    A   Okay.
18    Q   And you have testified that that Email is
19  what appears now as a part of Ryan 4?
20    A   I don't have a date on -- Exhibit 4, there
21  is no time other than March 6, 8 a.m.  So?
22    Q   Sir, your testimony is that --

Page 69

1    A   That's what -- I'm just pointing that out
2  because there are no times on this that verify what
3  you're asking me is a two-hour delay or two-hour space
4  of time.
5    Q   Just so the record is clear, again, Ryan 2
6  halfway down, Bates 2868, the third page of Ryan 2,
7  you say halfway down, "Tuesday, March 5th at about
8  4 p.m. as I sat at my desk Sharon sent me an Email."
9    A   I don't have that Email in front of me
10  though.
11    Q   You have testified that that Email is --
12    A   I have the Email that I sent to Paul Levy.
13  I don't have the original Email with the date and time
14  that Sharon sent it to me.
15    Q   But your testimony is that -- you have
16  testified that this is that Email, the Email depicted
17  as a part of Ryan 4.
18        You have already testified to that fact;
19  isn't that right?
20    A   Yes.
21    Q   And you received that --
22    A   Yes.

18 (Pages 66 to 69)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 70

1    Q    -- on March 5th at about 4 p.m.?
2    A    At about 4 p.m. You're asking me --
3    Q    Your point was it wasn't exactly
4    two-and-a-half hours later?
5    A    You seemed to be focussing on the time. And
6    I'm just telling you, I can't -- I'm remembering
7    roughly 4 p.m. And you're telling me two hours
8    exactly I drafted this. So I just want to point out
9    that we don't have the original document that gives me
10   the time.
11   Q    Oh, I see.
12   A    That's my point.
13   Q    I'm concerned more about sequence than the
14   exact time involved. You drafted the three-page Email
15   to Paul Levy after receiving the Email from
16   Mrs. Killian which is a part of Ryan 4, right?
17        MR. WILLIAMSON: Counsel, I'm going to
18   object again. If we don't refer to these Emails as
19   exhibits, I don't think anybody is ever going to be
20   able to make sense of this transcript.
21   BY MR. RACIN:
22   Q    I have referred to Mrs. Killian's Email as a

Page 71

1    part of Ryan 4. And the Email transmission of
2    March 6th to Paul Levy refers to a summary of events
3    written at 6:30 p.m. on Tuesday, March 5th, while the
4    matter is still fresh in my mind, right?
5    A    In Exhibit Number 2?
6    Q    Right.
7    A    So the question is what?
8    Q    You drafted the memo to Paul Levy to rebut
9    Mrs. Killian's Email to you of a couple hours before?
10        MR. WILLIAMSON: Objection as to foundation
11   and form.
12   A    I would take issue with the word "rebut."
13   BY MR. RACIN:
14   Q    The memorandum dated Tuesday, March 5th,
15   2002 regarding personnel issues which you transmitted
16   by Email to Paul Levy the morning of March 6th,
17   2002, was prompted by Mrs. Killian's Email to you of
18   the preceding afternoon?
19   A    Correct.
20   Q    Now, if you refer to Ryan 2, third page of
21   the document, Bates 2868, you had, "An addition,
22   Wednesday morning 8 a.m." -- this goes over two pages

Page 72

1    2868, 6869. "This morning upon re-reading Sharon's
2    Email I am stunned by the approach. I can find no
3    basis to accept her version of events on Monday. I
4    feel like every possible attempt has been made to
5    misrepresent my thoughts and words and I am frankly
6    deeply concerned."
7        Did I read that correct?
8    A    Yes, you did.
9    Q    Now, with respect to "Every possible attempt
10   has been made to misrepresent my thoughts and words,"
11   what were you referring to in the Email which is a
12   part of Ryan 4?
13   A    In Paragraph 1 of Sharon's Email on
14   Exhibit 4 the entire first paragraph misrepresents.
15   And there are subsequent conclusions or assertions
16   that Sharon makes throughout this Email that
17   misrepresent either what occurred or what she claims I
18   said.
19   Q    I'd like you to identify those
20   misrepresentations.
21   A    I have done some of them already before.
22   There were no complaints directed.

Page 73

1    Q    Referring to Paragraph 1 of her Email to
2    you, Ryan 4, Bates 2864.
3    A    And the paragraph that Sharon writes, I did
4    not complain.
5        I did not chastise. I was not angry about
6    the activity surrounding the Black Culture Club use of
7    the studio.
8    Q    Referring to --
9    A    Paragraph 2.
10   Q    First sentence of Paragraph 2.
11   A    I did not make any conclusions as to who had
12   given permission to faculty or students. That was
13   never an issue, never brought up, never discussed.
14        I did not have a tantrum. I did not tear
15   down the posters. George Buckwalter and I took them
16   out of the windows, placed them on the floor.
17        There was no inappropriate response. I did
18   not blame anyone. Continuing on Page 2865, I was not
19   angry about the artwork being changed on the first
20   floor. Anger is an inappropriate description of what
21   happened.
22        I did not suggest that Sharon get

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 74

1  permission.  Permission would not be the word I would
2  use.  I would say notifying that that's what she
3  intended to do.  So notification to Laura she
4  intended to change the display for Black History Month
5  during our regular department meeting.
6      I did not make a sweeping accusation.  I
7  posed a question to both Laura and to Sharon about the
8  condition of the darkroom.  That's in paragraph -- I
9  don't know if that's a separate paragraph, but it's in
10  the middle paragraph of 2865.
11      And I believe in the largest, the third
12  paragraph down, the large paragraph the suggestion
13  that I am not sensitive to either Laura or Sharon in
14  the care of their children is inaccurate.
15      I have given extensive leeway to both
16  individuals in that respect.  And there was no
17  intention to suggest otherwise in any of my Emails.
18  And I also believe that I am sensitive.  And I do not
19  misrepresent.
20      Q   In the discussion with Mrs. Killian about
21  the banners that had been taken down, did you ever say
22  in words substance in affect that she was not going to

Page 75

1  get you fired in the manner that she had gotten Debbie
2  Haynes fired?
3      A   No.
4      Q   And you're quite sure of that?
5      A   That was not the discussion about the
6  banners.  There was no discussion about the banners.
7  Sharon came in.  And I said, I'm sorry we didn't get
8  the banners put away before her class started.
9      Q   Have you completed your answer?
10      A   I have.
11      Q   Did you have any reason to believe that
12  Mrs. Killian was responsible for Debbie Haynes'
13  departure from the school?
14      A   No.
15      Q   Direct your attention to the 2003, 2004
16  academic year, February of that year.
17      (Ryan Exhibit Number 5 was marked for
18  identification and was attached to the
19  transcript.)
20  BY MR. RACIN:
21      Q   Ask you to read Ryan 5, a two-page document,
22  Bates numbers 1396 headed, Friday, February 20th and

Page 76

1  ask you to review it.
2      A   Okay.  I have finished reading it.
3      Q   Did you prepare Ryan Exhibit 5?
4      A   Yes, I did.
5      Q   When did you prepare it?
6      A   Friday, February 20th.
7      Q   Why did you prepare it?
8      A   I was concerned about the tone that Sharon
9  had taken upon reading the technology report that I
10  had prepared for Dutch Dresser, a tech consultant the
11  school had hired to plan a new addition to the school.
12      Q   Had you ever shared the memo marked Ryan
13  Exhibit 5 with anyone?  If so, who?
14      A   I don't recall if I ever have.
15      Q   Did you ever forward it to the co-directors
16  of Diversity of the school?
17      A   I honestly don't remember.  I don't know.  I
18  remember writing it.  But how you got a copy of that
19  beyond it being in my computer for my records, I don't
20  know.  It's possible.  It's not -- this is a document,
21  not in an Email.
22      Q   The document refers to a comment you made to

Page 77

1  Mrs. Killian; is that right?  It appears on Bates
2  1397, refers -- it appears in the middle of the page,
3  "I don't have a problem Sharon.  You seem to want to
4  argue and I feel like I can't lower myself enough to
5  please you."
6      Did you see that?
7      A   I'm trying to find that sentence.  Where did
8  you start reading again?  Sorry.
9      Q   About halfway down.  You quote yourself I
10  said -- a third of the way down.
11      A   Oh, I see, I said, yeah.
12      Q   "I don't have a problem Sharon.  You seem to
13  want to argue and I feel like I can't lower myself
14  enough to please you."
15      Do you see that?
16      A   I do.
17      Q   Then a little further down you say, "I
18  attempted to explain what I meant.  She clearly
19  misunderstood the intent of my remark."
20      Did you attempt to explain what you meant?
21      A   Yes.
22      Q   And what did you say?

20  (Pages 74 to 77)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 78

1    A    The exact words, I can't recall.
2    Q    In substance?
3    A    In substance I felt that Sharon was
4  focussing on information that was being presented to
5  Dutch Dresser about the AP curriculum and interpreting
6  that as a course proposal.
7        That wasn't the case.  Dutch Dresser was
8  an outside consultant.  And so I was trying to correct
9  that.  And that's what I was trying to explain.
10    Q    Have you finished?
11    A    Yeah.
12    Q    You go on to say, "She clearly misunderstood
13  the intent my remark."
14        Doesn't that refer to your remark?
15    A    Yes.  But I think she misunderstood the
16  entire gist of the report I had written that I was
17  asking for input on.  And then subsequently
18  misunderstood my remark.
19    Q    Sir, didn't Mrs. Killian come to you to ask
20  you about the exchange of a course -- the change of a
21  course title?  Wasn't that Mrs. Killian's concern that
22  day?

Page 79

1    A    No, I don't believe so.  I don't believe --
2  I believe this summary is all about the technology
3  report that I was asking for input on that I had sent
4  out to them and was reviewing before I presented to
5  Dutch Dresser.  And I was asking for input from both
6  faculty members.
7        And at the last minute, Sharon said she
8  wanted to talk about it.  I said, Fine, the document
9  is open on my computer.  What ideas do you have.  How
10  can we incorporate what suggestions you have into the
11  document.
12    Q    Don't you recall that she raised with you
13  the question why the course, Technology for the Studio
14  Arts had been changed to Graphic Design?
15        MR. WILLIAMSON:  Objection, argumentative.
16  And I think it's a matter of form that the two
17  different topics being conflated here the witness has
18  tried to explain.
19  BY MR. RACIN:
20    Q    Do you recall that on the occasion of the
21  discussion represented in Ryan 5 that during that
22  discussion Mrs. Killian raised with you the question

Page 80

1  why the course title had been changed, to wit,
2  Technology for the Studio Arts to Graphic Design?
3        MR. WILLIAMSON:  Objection, asked and
4  answered.
5    A    I don't recall that.  I recall an argument
6  or an objection by Sharon and her using forceful and
7  somewhat hostile tones with me saying as it states
8  here, stated angrily.
9  BY MR. RACIN:
10    Q    Where --
11    A    Stated angrily on Page 1396, "This
12  discussion evolved into an explanation by me that
13  anyone could take an AP exam."  That is college
14  boards, stated policy by the way.
15        "She immediately reacted with what I would
16  describe as a rage, Stating angrily, 'So you decided
17  that?  Did you decide that on your own?  That's your
18  policy?'?
19        "I answered calmly that it was established
20  school policy and quite probably the law."
21        Later checked that is the law.  Anyone can
22  take an AP exam.  You don't have to be taking an AP

Page 81

1  course.  So we can't tell them not to do that.  And
2  that was the point.
3    Q    Now, did you ever raise your voice to
4  Mrs. Killian?
5    A    In that instance, no.
6    Q    At any point during this conversation?
7    A    No.
8    Q    Now, referring again to 1397 the two
9  sentences, "I attempted to explain what I meant.  She
10  clearly misunderstood the intent of my remark."
11        What did it seem to you that she had
12  misunderstood?
13    A    I was trying to address -- clearly from what
14  we had just reviewed, Sharon was becoming emotional
15  about the information she was reading.
16        And I was trying to defuse the situation.
17  And rather than defuse it, I feel like I inflamed her
18  emotions.
19        That was what I was trying to address, to
20  defuse the emotional situation that Sharon was -- the
21  emotions that Sharon seemed to be exhibiting.
22    Q    Referring again to the "I don't have a

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 82

1  problem Sharon.  You seem to want to argue and I feel
2  like I can't lower myself enough to please you."
3      You say what you mean is, "My meaning here
4  was that I felt Sharon did not respect me, accept my
5  role as leader of the department despite my many
6  attempts to be inclusive in all decisions.  Sharon
7  responded to my statement by yelling, 'What did you
8  say?  What did you say to me?  You speak to me in
9  those words.  I can't believe you address me like
10  that!  You speak to members of your department like
11  that?'"
12      You understood her to be referring to, "I
13  can't lower myself enough to please you," didn't you?
14      MR. WILLIAMSON:  Objection, argumentative,
15  foundation.
16      A  I believe she was referring to the entire
17  discussion.
18  BY MR. RACIN:
19      Q  So you never attempted to clarify what you
20  meant by "I feel like I can't lower myself enough to
21  please you"?
22      MR. WILLIAMSON:  Objection, foundation.

Page 83

1      A  I just answered that.  I said I did.  I
2  tried to diffuse her emotional response as best I
3  could.
4  BY MR. RACIN:
5      Q  There came a point where Mrs. Killian left
6  the art area; is that right?
7      A  Yes.
8      Q  She was upset?
9      A  Yes.
10     Q  And can you say relatively -- very upset,
11  moderately upset?
12      MR. WILLIAMSON:  Objection, calls for
13  speculation.
14  BY MR. RACIN:
15     Q  Was she in tears?
16     A  I don't believe so.
17     Q  Now, what, if anything, did you do after,
18  after she left?
19     A  I believe I spoke -- I went downstairs and
20  looked for -- at that time that would have been Kevin
21  Barr was principal.  And I went to speak with him.
22     Q  And how soon after Mrs. Killian left the art

Page 84

1  area did you go to see Kevin Barr?
2      A  Within five minutes.
3      Q  Why did you do that?
4      A  Because I thought that her emotional
5  response to the memo showed a complete
6  misunderstanding and a hostility that I thought I
7  needed to address with administration.
8      Q  Did you understand that Mrs. Killian
9  believed that you had said something fundamentally
10  racist to her?
11      A  No.
12      Q  You didn't have that understanding?
13      MR. WILLIAMSON:  Objection, asked and
14  answered.
15      A  No, I didn't.
16  BY MR. RACIN:
17      Q  When you went to Kevin Barr's -- did you go
18  to his office?
19      A  As best I recall, I walked downstairs and
20  either encountered him in the hallway or in the
21  office.
22      Q  Was anyone with him when you saw him for the

Page 85

1  first time?
2      A  I don't know whether -- it's hard to recall
3  whether he was with -- I know that Marriama Richards
4  and, or Elizabeth Denevi were there.  And Sharon was
5  speaking with them.  But I don't recall whether he was
6  in the office as well or --
7      Q  And who are Marriama Richards and Elizabeth
8  Denevi?
9      A  They are co-directors of Diversity of the
10  school.
11      Q  Did their presence suggest to you that
12  Mrs. Killian's concern was racial discrimination?
13      A  No.
14      Q  What, if anything, did you understand about
15  why they were there?
16      A  They were in their office -- in an office.
17  I don't recall whether it was their office.  They were
18  in an office.  That's it.  Their presence --
19      Q  When you saw Barr for the first time --
20      MR. WILLIAMSON:  Counsel, the witness was
21  trying to answer.
22      MR. RACIN:  I'm sorry.

22  (Pages 82 to 85)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 86

1    A   I believe they were in Vincent Rowe's
2  office.  He was director of admissions.
3  BY MR. RACIN:
4    Q   What's his name?
5    A   Vincent Rowe, R-O-W-E.
6    Q   And who was in the office?
7    A   Mari and, or Elizabeth or -- one or both of
8  them, I don't recall, and Sharon.
9    Q   Anyone else?
10   A   I don't know whether Kevin was in the
11  hallway or in the office or --
12   Q   Okay.  And what happened when you got there?
13   A   I spoke with Kevin.  Kevin invited me to
14  speak with Marriama and Elizabeth or whoever was in
15  the room with Sharon.  Sharon objected to me coming
16  into the room.  And I left the room.
17   Q   Did she still seem upset?
18   A   Yes.
19   Q   "She," Mrs. Killian?
20   A   Yes.
21   Q   And at that moment, what did you understand
22  her to be upset about?

Page 87

1        MR. WILLIAMSON:  Objection, asked and
2  answered.
3    A   Yeah.  I believe she was upset about the
4  entire document.  And it seemed to me that the AP
5  question she was misinterpreting the whole -- that I
6  was presenting a course to Dutch Dresser which he
7  doesn't approve or disapprove courses or curriculum at
8  our school.
9        I was describing for him how curriculum and
10  technology is used in curriculum in the art
11  department.  I had invited Sharon to give me some
12  input.
13  BY MR. RACIN:
14   Q   There came a time when you became aware that
15  Mrs. Killian reported that you said, I can't bend down
16  low enough to understand you, while making gestures
17  with your hands while bending low?
18   A   That, I have never heard anything along the
19  lines of me making gestures.
20   Q   Had you heard anything along the lines of, I
21  can't bend down low enough to understand you?
22   A   I believe I heard Sharon repeat back to me

Page 88

1  that that's what I said.
2    Q   And where did you hear that?
3    A   From Sharon.
4    Q   Where physically at the time, in Vincent
5  Rowe's office that afternoon?
6    A   It might have been in Vincent Rowe's office.
7  It might have been in the other office.
8    Q   It might have been where?  I'm sorry.
9    A   In the art office where we first had the
10  meeting.  We were sitting at our desks.  Our desks are
11  right next to one another as close as we are right
12  now.
13   Q   That is during the course of your original
14  conversation?
15   A   Yes.  So from here to there.
16   Q   Now, going back to the original conversation
17  for a second.
18       About what time of day did this happen; do
19  you recall?
20   A   Does it say in to the memo?  It was after
21  classes.  It doesn't mention in the document.  I would
22  say certainly after 3:15, probably late in the

Page 89

1  afternoon.  How late, I don't know.
2    Q   What time is the close of business at GDS
3  generally?
4    A   Classes end at 3:15.  The school stays open
5  the until 10 p.m.
6    Q   Until 10:00 at night?
7    A   Yes.
8    Q   When do you normally depart?
9    A   It depends on meetings that are called.
10  We're expected to be there until 4 o'clock.
11   Q   Is there an average time assuming no
12  meeting?
13   A   For me, 4:30 probably.
14   Q   Now, Mrs. Killian approached you to initiate
15  this conversation on February 20th, right?
16   A   Well, I had sent an Email requesting her
17  input on the document that was being presented to
18  Dutch Dresser.  So I invited her to give me some
19  input.
20   Q   And she -- where did she find you?
21   A   I was at my desk.  And she was at her desk.
22  And she responded to an Email -- to the document that

23  (Pages 86 to 89)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 90

1  I Emailed earlier in the week by sending me an Email.
2      Q    If we could refer briefly back to Ryan 3,
3  the floor plan.
4      A    Yes.
5      Q    Just to give a sense where your desks were
6  in reference to Ryan 3.
7      A    Put an "X."
8      Q    Could you.
9      A    Sharon's desk is right here. My desk is
10  right here. Filing cabinets surround us. Laura's
11  desk is right there.
12     Q    Are there partitions between your desks?
13     A    No, a very small room.
14     Q    You all shared the same office?
15     A    Yes.
16     Q    Was anyone else in the office at the time?
17     A    No.
18     Q    Do you know if anyone -- the door opens into
19  the art studio?
20     A    Yes.
21     Q    And do you know if anyone was in the art
22  studio at the time?

Page 91

1      A    No.
2      Q    Did you ever become aware that anyone had
3  overheard that conversation?
4      A    No.
5      Q    So you became aware of during the course of
6  the conversation that Mrs. Killian thought you had
7  said, I can't bend down low enough to the ground to
8  understand you; is that right?
9      A    As Sharon packed up her materials and exited
10  the room stating what I have stated here, I believe
11  she stated something to that affect.
12     Q    Did you ever attempt to persuade her that's
13  not what you said?
14     A    Yes.
15     Q    What did you say?
16     A    The exact words, I don't recall.
17     Q    In affect?
18     A    In affect I tried to explain that I was
19  merely preparing a document, wanted her input, was
20  frustrated with the situation and didn't understand
21  why she was focussing in on this AP thing when this is
22  a technology issue. And I was trying to get her

Page 92

1  input.
2          So my reaction was -- what I meant was that
3  I didn't feel that she was acknowledging my role as
4  department head. I was trying to explain that to her.
5  That's what the feeling came from.
6      Q    Now, did you understand her to believe at
7  the time that the comment was racist, that the comment
8  that she thought she heard was racist?
9          MR. WILLIAMSON: Objection, asked and
10  answered, calls for speculation.
11     A    I have already said no.
12  BY MR. RACIN:
13     Q    Did you ever express the fear that
14  Mrs. Killian could get you fired?
15     A    I don't think so. I mean, I don't -- it's
16  possible it might have come up in discussions with
17  Mari and Elizabeth. But I don't recall anything
18  specific.
19     Q    Now, Ms. Richards and Ms. Denevi have
20  actually interviewed folks in the art department; is
21  that right?
22     A    Yes.

Page 93

1      Q    What did you understand their purpose to be?
2      A    At that point, Sharon had stopped speaking
3  to people in the department. She was ignoring Emails.
4  And it was very difficult to run the department under
5  those circumstances.
6          So in order to get things done, it was
7  either Paul or Kevin -- I can't remember who was head
8  of the school at that point, probably Kevin --
9  invited -- maybe it was Paul -- invited Mari and
10  Elizabeth to come in and mediate and offer some advice
11  as counselors. They're both trained counselors.
12     Q    And did you meet where them?
13     A    I did.
14     Q    Did you take notes during the course of
15  those meetings with Ms. Richards and Ms. Denevi?
16     A    If I did, I didn't save them. I don't
17  recall keeping notes. I believe they were keeping
18  notes. But I was just going into it.
19     Q    Let me hand you a three-page exhibit,
20  handwritten notes Bates 2847, 2851, 2852.
21          (Ryan Exhibit Number 6 was marked for
22  identification and was attached to the

24  (Pages 90 to 93)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 94

1  transcript.)
2  BY MR. RACIN:
3      Q   I'll represent to you there has been
4  previous testimony that these are notes prepared by
5  Marriama Richards during discussions with you during
6  the course of these discussions with you.
7          Just take a second to review if you would.
8      A   Okay.
9      Q   Refer if you would to Bates 2851. It's
10 headed, Art Department, D-E-P-T, Mediation, Nick,
11 March 1, 2004.
12         And refer, if you would, to the bottom of
13 the page six lines up. And there is a parentheses,
14 "Fear Sharon could have him fired."
15         Now, does this refresh your recollection
16 that you did discuss with the co-directors of
17 Diversity the fear that Mrs. Killian could have you
18 fired?
19     A   No. This strikes me as Marriama's -- maybe
20 she read that she thought I was worried along those
21 lines. But I don't recall saying that. So this might
22 have been her conclusion based on my anxiety about the

Page 95

1  situation.
2      Q   But you don't recall ever having said that?
3      A   I don't.
4      Q   During the course of this mediation?
5      A   No.
6      Q   If you refer to 2847, the first page of this
7  three-page compilation. And the middle paragraph is
8  an account of the discussion and the comment at issue;
9  is that right?
10         MR. WILLIAMSON: I'm sorry, counsel, what
11 was the question again?
12 BY MR. RACIN:
13     Q   I'm just asking if the middle paragraph
14 refers to the discussion between Mrs. Killian and the
15 witness that includes an account of what you said to
16 her at the time, right?
17     A   The discussion that we were talking about in
18 the previous document? Is that what you were
19 referring to, the Dutch Dresser?
20     Q   Yes.
21     A   This is Marriama's notes about her summary.
22     Q   Does anything sound unfamiliar to you? Do

Page 96

1  you think anything wasn't said that is reflected?
2      A   Well, these aren't my words.
3      Q   I understand. Referring -- you see the
4  comment, the line beginning, "He asked, 'what do you
5  want? I can't lower myself enough to please you.'"
6          Do you see that?
7      A   I do.
8      Q   And then, "He regrets this comment."
9          Do you see that?
10     A   Yes.
11     Q   Did you ever indicate during the course of
12 any meeting with Ms. Richards and Ms. Denevi that you
13 regretted the comment?
14     A   Yes, I believe I did.
15     Q   Did you ever express regret to Mrs. Killian?
16     A   I did at the very time that I -- we had the
17 discussion. I regretted it because it inflamed her
18 emotional response to the technology report that I had
19 given. And what I meant to do was to explain the
20 situation. And my words inflamed her response rather
21 than --
22     Q   At any time after that, did you express

Page 97

1  regret about it to Mrs. Killian?
2      A   I don't recall.
3      Q   If you refer to the last pages, three-page
4  compilation, Bates 2852, paragraph at the top that
5  begins, "Art award named after Debbie for 36 years of
6  service. Sharon was furious. He felt that the
7  decision was made unilaterally. He was annoyed with
8  her tone demeanor. He felt disrespect. He was trying
9  to do something for Debbie, did not feel like it was
10 her business."
11         Did I read that correctly?
12     A   You did.
13     Q   Do you disagree with any of the
14 characterization represented by these notes? And
15 that's very unclear. I'm sorry. So I'll withdraw it.
16         Is anything said there inaccurate?
17     A   At the time of the naming the award, I had
18 no awareness that Sharon was furious about it. I
19 don't know that I would describe her as, you know --
20 that she accused me of making the decision all on my
21 own. And I said I had made it in concert with Paul
22 Levy in recognition of Debbie's 30-some-odd years of

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 98

1  service to the school.
2      Q    And your testimony is you never consulted
3  with Laura Tolliver?
4      A    No.
5      Q    Now, did you say to Ms. Richards and
6  Ms. Denevi that you were annoyed with her tone,
7  demeanor, felt disrespect?
8      A    I don't know whether I used those words or
9  not. That's their reading of what I felt. You're
10 asking me to remember a meeting ages ago.
11     Q    I understand. So you don't recall saying
12 anything like that to them --
13         MR. WILLIAMSON: Objection to the form,
14 vague.
15 BY MR. RACIN:
16     Q    As you sit here today?
17         MR. WILLIAMSON: Objection to the form,
18 vague.
19 BY MR. RACIN:
20     Q    Do you recall saying that you were annoyed
21 with Mrs. Killian's tone on the occasion of the Haynes
22 award?

Page 99

1      A    I was I believe I expressed in that meeting
2  that I was puzzled that she was objecting to honoring
3  somebody's service to the school after 30 years.
4      Q    Did you say to them that you felt
5  disrespect?
6      A    I may have. I don't recall.
7      Q    Well, did you feel disrespect at the time?
8      A    I felt it was a matter that really was
9  administrative. It was -- there are matters that deal
10 with teaching. And there are matters that deal with
11 administration of the department.
12         I am department head. And I felt this was
13 an administrative matter that I would make in concert
14 with the larger administration of the school.
15         Matters that dealt with teaching, education,
16 what goes on in the classroom are matters that I would
17 be consulting with Laura and Sharon on.
18     Q    Do you recall saying in substance to them
19 that you did not feel like it was her business?
20     A    I honestly don't recall. What I felt was
21 that it was an administrative decision that a
22 department head would make in concert with the

Page 100

1  principal of the school.
2          And if the principal of the school thought
3  it was appropriate, then it would go ahead. And if it
4  wasn't, then it wouldn't go ahead. I relied on the
5  judgment of Paul Levy in that regard.
6          (Ryan Exhibit Number 7 was marked for
7  identification and was attached to the
8  transcript.)
9          THE WITNESS: Are there any copies without
10 the whole top paragraph being blurred out?
11 BY MR. RACIN:
12     Q    I anticipated that this may be a clearer
13 version. It's a Xerox. And the Xerox is the problem.
14 I'm actually not going to examine it probably.
15     A    Can I read this one?
16     Q    Is that a useful aid or not?
17     A    If I'm going to be called to speak about the
18 first four lines of every page. I can't make out the
19 first page. Whatever that shows is unreadable.
20         And whatever -- you know, unless you get
21 that -- I mean, it starts, Art Award Named for Debbie.
22 Then you can't read it. And this is unreadable.

Page 101

1  That's unreadable. And a good portion of that is
2  unreadable. So as long as we don't talk about those.
3      Q    We will. But why don't you keep the clearer
4  version anyway.
5      A    So I should read these?
6      Q    If you would. I'll represent this
7  compilation of handwritten notes, Bates 2788 through
8  2793, have been testimony that these are handwritten
9  notes prepared by Elizabeth Denevi in her capacity as
10 co-director of Diversity.
11     A    Okay.
12     Q    Referring to Ryan Exhibit 7, Bates 2788
13 appears it's dated 3/1/04, Nick, at the top.
14         And then you see the bracketed line one of
15 the first legible lines, "Debbie: part-time when Nick
16 came," closed bracket?
17     A    Yes.
18     Q    Did that refer to Debbie Haynes?
19     A    It did.
20     Q    There is an arrow under, Debbie, "did do
21 terrible things."
22         Do you see that?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410    (800) 292-4789    (301) 762-8282    (703) 288-0026    (410) 539-3664

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 102

1    A   I did.
2    Q   Do you recall saying that Debbie did
3  terrible things to the Diversity coordinator, to the
4  co-director of Diversity?
5    A   That Debbie did terrible things.
6    Q   There is an arrow and, "did do terrible
7  things."
8        Do you know what that refers to?
9    A   No -- I'm puzzled as to what your question
10  is though.  Who did terrible things, Debbie?  Is that
11  what you're asking?
12    Q   I don't know.  "Debbie," there is an arrow.
13  And under the arrow, "did do table things."
14        Do you have any idea what the reference is?
15    A   No.  I didn't perceive Debbie as doing
16  terrible things, not in the brief time that she was
17  there that I was there I didn't witness terrible
18  things.
19    Q   And you never said to the co-directors of
20  Diversity in substance in affect that Debbie Haynes
21  did do terrible things?
22        MR. WILLIAMSON:  Objection, asked and

Page 103

1  answered.
2  BY MR. RACIN:
3    Q   See under that, "wanted to stay, didn't want
4  to leave."
5        Do you know what that refers to?  Did you
6  say anything like that to them?
7    A   As the spring -- as we entered spring,
8  Debbie floated the idea of remaining on in some
9  part-time capacity.
10        But employment is an administrative
11  decision, not a department head decision.  So that was
12  something they had -- this was all done prior to my
13  arrival at the school.
14    Q   And you also say, "admin had to make the
15  decision," is that right?
16    A   Administration, yes.  It's an administrative
17  decision.
18    Q   Does that sound familiar?  Would you say
19  something like that to them?
20    A   Well, the administration does make the
21  hiring, firing decisions at the school.
22    Q   Do you have any knowledge of the basis for

Page 104

1  the decision not to have Debbie Haynes there?
2    A   No, I don't.
3    Q   Okay.  Now, in your meetings with the
4  Diversity coordinator were you ever told that Sharon
5  Killian had heard you say, I can't bend down -- in
6  affect, I can't bend down low enough to the ground to
7  understand you?
8    A   Were you referring to a certain page?
9    Q   No.
10    A   Can you state the question one more time.
11    Q   During the course of your meetings with the
12  Diversity folks, Ms. Denevi and Ms. Richards, did they
13  ever indicate to you that Mrs. Killian had heard you
14  say, had reported hearing, I can't bend down low
15  enough to the ground to understand you?
16    A   I believe they expressed to me that Sharon
17  was presenting her version of what I had said.  And my
18  version of what I said were different.  What exact
19  words, they told me at that time.  I don't know other
20  than what's on these notes here.  All I know is what I
21  said.
22    Q   Okay.

Page 105

1        (Discussion off record.)
2        (A lunch break was taken from 12:42 to 1:38.)
3  BY MR. RACIN:
4    Q   Mr. Ryan, did you furnish any documentary
5  material to the co-directors of Diversity at the
6  school in connection with their mediation efforts do
7  you recall?
8    A   I don't recall specifically which documents
9  I may or may not have sent to them.  They would have
10  those.  But I don't remember what I -- I didn't keep
11  an inventory.
12    Q   Let me hand you a couple that may refresh
13  your memory.
14        (Ryan Exhibit Number 8 was marked for
15  identification and was attached to the
16  transcript.)
17  BY MR. RACIN:
18    Q   Ryan 8 is a compilation of documents.
19  Review Page 2853 to -- they're not sequential.  These
20  were furnished I think out of order to us.  And we
21  have tried to compile them in an order that I think
22  they may have been submitted.  You can help us with

27  (Pages 102 to 105)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 106

1  that.
2      A    This document?  This is the same document I
3  believe.
4          MR. WILLIAMSON:  When you refer to
5  documents, you have to identify them by Exhibit if
6  they have been marked.
7          THE WITNESS:  I want to make sure this is
8  not another version of this.  Okay.
9  BY MR. RACIN:
10     Q    Can you identify a document appearing as
11  2853 on the first of the pages I have just handed you?
12     A    Can I identify it?
13     Q    Do you recognize it?
14     A    Yes, that's my signature on it.
15     Q    What is it?
16     A    It's a note attached to two documents.
17     Q    What are those two documents?
18     A    One is part of but not all of the technology
19  summary given to Dutch Dresser.
20     Q    And identify those by Bates numbers if you
21  would.
22     A    2854 and 2855 are two of the pages from a

Page 107

1  longer document that was sent to Dutch Dresser.  2848,
2  2849, and 2850 are a copy of a word document that was
3  previously referred to as Exhibit Number 2.  It is now
4  labeled Exhibit Number 8.  But it's in word document
5  form versus Email form.
6      Q    So you're saying 2848, 2850 regarding
7  personnel issues regarding Sharon Killian, date
8  written on, Tuesday, March 5th, 2002, appears to be
9  the text of the Email forwarded to Paul Levy on
10  March 2nd, 2002; is that right?
11     A    I believe so.
12     Q    Now, let's refer, if you would, to Bates
13  2854.
14     A    Yes.
15     Q    At the top of the page appears, Advanced
16  Technology for the Studio Arts - one section of
17  students, (renamed Advanced Graphic Design for '04,
18  '05); is that right?
19     A    Yes.
20     Q    In your experience as chair of the
21  department, have course titles been changed routinely?
22          MR. WILLIAMSON:  Objection to the form.

Page 108

1      A    Can you clarify what "routinely" means?
2  BY MR. RACIN:
3      Q    Well, do you recall any other occasion when
4  a course title has been changed in the department?
5      A    I think -- yes, I can.
6      Q    Okay.  And what instances can you recall?
7      A    Ceramics/Sculpture, I believe that course
8  title was slightly different.  I think
9  Drawing/Painting didn't have the term, Intro,
10  Introduction to Drawing and Painting.
11         So one of the things I did as department
12  head was when I was asked to review the curriculum
13  every year is to look through and see how -- in fact,
14  Paul asked me to do this, make sure that the course
15  descriptions match the titles, the title reflects
16  what's in the course description, and that the
17  descriptions indicate clearly what level the courses
18  are.
19         So if a course, for instance, Drawing and
20  Painting doesn't have the word "Intro" on it, an
21  incoming student appearing from outside the school
22  might not be able to differentiate what that is.  So I

Page 109

1  made subtle changes like that to indicate --
2      Q    Now, can course titles be changed by
3  departmental action alone; or do you need to involve
4  the administration in any way?
5      A    Generally you run it by the administration.
6      Q    Where do you take it there, what unit?
7      A    Director of Studies.
8      Q    And around this time, that is in March 2004,
9  who was Director of Studies?
10     A    I believe at that point it was Kevin Barr.
11  But he might have been principal at that time.  I'm
12  not sure.
13     Q    Do you know who took his place as Director
14  of Studies?
15     A    Mary Fielder.  But she didn't start until
16  after -- until last year.  So there was a time when I
17  don't know whether that gap -- you'd have to ask
18  somebody in the administration -- or there was also a
19  time where Kevin suffered a loss in his family, his
20  brother died, so he was although Director of Studies
21  he was, for lack of a better expression, not able to
22  attend to all the activities that was required.

28  (Pages 106 to 109)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 110

1    Q   Do you recall whether the Director of
2  Studies or anyone else in the administration was
3  involved in the process of changing the title of this
4  course we're referring to, Advanced Technology for the
5  Studio Arts to Advanced Graphic Design?
6    A   The first part of the question.
7    Q   In this instance, do you recall whether
8  anyone in the administration was involved, gave
9  approval?
10   A   I can't recall one way or the other.
11   Q   Who in the department was involved in
12  that --
13   A   I was.
14   Q   -- in the decision?  And did you do this on
15  a unilateral basis, or were colleagues in the
16  department involved?
17   A   We had an accreditation report.  Every ten
18  years private schools are evaluated by the Middle
19  States Evaluation Committee.
20       One of the recommendations of the committee
21  was to address the disproportionate number of the
22  females versus males in some of the classes,

Page 111

1  specifically Advanced Technology of the Studio Arts.
2        And one of the things that I noticed was
3  that any class that seemed to have a technology title
4  tended to have fewer females enrolled.
5        So I thought that might be one strategy to
6  address that disproportionate females to males or more
7  males in the class.  And we wanted to get a more
8  balanced female to male radio.
9        The other is the introductory sentence to
10  the Advanced Technology of the Studio Arts curriculum
11  description references the word graphic design in the
12  first sentence.  So I thought since graphic design is
13  the basis of the course, it should be in the title.
14   Q   Now, did you involve anyone else in the
15  department in the decision making -- in the process of
16  changing the title of this course?
17   A   I believe I asked Laura Tolliver since she
18  taught the class what she thought about it, if it was
19  a good strategy for increasing female enrollment in
20  the class.
21   Q   Did you ask Mrs. Killian how she felt about
22  it?

Page 112

1    A   No.
2    Q   Any particular reason not to involve her?
3    A   No.
4    Q   Do you recall why you did not in this
5  instance involve Mrs. Killian?
6    A   I thought it was an administrative matter
7  and not a matter that really involved a teacher of
8  another class.  If it had been Sharon's class, I would
9  have, of course, asked her what she thought about it.
10  But since it wasn't Sharon's class, I didn't think it
11  was relevant.
12   Q   If you would refer to the cover, the first
13  page of Ryan Exhibit 8, Bates 2853, this is your memo
14  of March 2nd, 2004 to Mari, M-A-R-I.
15       Is that Marriama Richards?
16   A   Yes.  Her nickname is Mari.
17   Q   And Elizabeth.  You make reference to the
18  attached documents; do you not?
19   A   I do.
20   Q   You say, "One is the recent text summary for
21  Dutch Dresser.  The other is a summary I wrote in
22  March of 2002.  In re-reading it there is nothing I

Page 113

1  would change but I would add that have never shared
2  this with the anyone (except a verbal version with
3  Paul at that time - he advised I'd like something for
4  my records) and I am hesitant to do so now.  It was
5  even a bit difficult to read because it brought me
6  right back to an episode I would rather get passed.  I
7  offer to you both in this light and trust you will
8  consider it as necessary."
9        Did I read that correct?
10   A   You did.
11   Q   As I think you already said, the memo that
12  now appears as Bates 2848 and 2850 headed, Personnel
13  issues, was transmitted by Email to Paul Levy on
14  March 6th, 2002, right?
15   A   Yes.
16   Q   It wasn't accurate to say that you had never
17  shared it with anyone; isn't that right?
18   A   To the best of my memory at the time I
19  thought that's what I had done, that I had not shared
20  the written version, I had only spoken to Paul.
21   Q   Now, do you recall why it would be
22  significant to note that you had never shared it with

29 (Pages 110 to 113)

47950fa9-3b42-47d7-85d1-31e36500af65

# DEPOSITION OF NICOLAS RYAN
## CONDUCTED ON MONDAY, OCTOBER 2, 2006

### Page 114

1 anyone?

2    A  Because I believe these were my thoughts.
3 This is a summary of events that I found troubling.
4 And I didn't think it was appropriate that I would be
5 sharing that with the greater faculty certainly.

6       And I think that's probably that I was
7 trying to convey to them that this was not something I
8 would have handed out to various faculty members,
9 perhaps to a -- and clearly I did, Paul Levy, the
10 principal, sought his guidance.  But that's it.

11    Q  Now --

12    A  I certainly wasn't attempting to deceive
13 anyone with that statement.

14    Q  Well, you agree it was inaccurate?  It's an
15 inaccurate statement; is that right?

16    A  It's was as accurate as my memory served me
17 at that point.

18    Q  Well, as of March 2nd, 2004, was Paul Levy
19 principal?

20    A  Honestly I don't remember when Paul retired.
21 I don't keep a history of the school and who retires
22 when.  So somewhere I'm sure there is a record of when

### Page 115

1 Paul retired and when Kevin Barr came in.  But I'm not
2 the person who can give you that date.

3    Q  Well, the month prior to -- in
4 February 2004, I think you have testified you went to
5 Kevin Barr after this conversation, right?  And I
6 think you testified he was principal of the school?

7    A  That would be something administration would
8 know.  I don't keep a running history and notes about
9 the dates when people come in and retire.

10       It could be.  And if I said so, that's the
11 best of my ability.  But right now unless I have it
12 down on a piece of paper in front of me with these
13 dates, I cannot verify as to when Paul Levy retired
14 and when Kevin Barr came over.

15    Q  Well, as of March 2nd, 2004, you knew who
16 the principal of the school was?

17    A  I suppose I did.

18    Q  Mr. Ryan, do you yell when you get angry or
19 frustrated?

20    A  No.

21    Q  Have you ever yelled at Sharon Killian?

22    A  No.

### Page 116

1    Q  Have you ever yelled at Laura Tolliver?

2    A  No.

3    Q  Have you ever yelled at a member of the
4 faculty or the staff at GDS?

5    A  No.

6    Q  Have you ever yelled at a student?

7    A  I have raised my voice with a student to get
8 their attention.  But usually it would be in the
9 context of we all need to listen, pay attention, that
10 sort of thing.

11    Q  Do you recall any particular students you
12 have yelled at?

13    A  No.

14    Q  Have you ever yelled at a parent of a
15 student?

16    A  No.

17       (Discussion off record.)

18 BY MR. RACIN:

19    Q  Who is Nina Grillo?

20    A  Nina Grillo-Balthrop is her name.  She was
21 an advisee of mine, a student at Georgetown Day
22 School.

### Page 117

1    Q  Could you spell the last name for the
2 record.

3    A  It's a hyphenated name, G-R-I-L-L-O, hyphen,
4 B-A-L-T-H-R-O-P.  I believe that's correct.

5    Q  What is the student's race?

6    A  Specifically, I don't know whether she is
7 African American or Carribean decent or a mixture of.
8 I don't specifically know.

9    Q  Would you say she's a minority person?

10    A  I would say she is a person of color.

11    Q  And do you know her mother?

12    A  I would say the same that she's a person of
13 color.

14    Q  Do you know who she is?

15    A  I do.

16    Q  What's her name?

17    A  Rosa.

18    Q  And she's a person of color as well
19 obviously?

20       MR. WILLIAMSON:  Now that we have
21 established the identity of these two individuals, we
22 would like to make a standing objection for the record

30 (Pages 114 to 117)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 118

1  on the grounds of relevancy to questions relating to
2  the student, Nina Grillo-Balthrop and related to her
3  mother, Rosa Grillo.
4  BY MR. RACIN:
5      Q  Do you recall having any discussions with
6  Rosa Grillo about her daughter, Nina?
7      A  As advisor, yes.
8      Q  And do you recall on at least one occasion
9  yelling at her?
10     A  No.
11     Q  On occasion involving a question on your
12 part, Why can't you be like -- another parent?
13        MR. WILLIAMSON:  Objection to the form,
14 vague, incomprehensible.
15 BY MR. RACIN:
16     Q  I'm just trying to refresh recollection.
17     A  There's nothing to remember in that regard.
18 That didn't happen.
19     Q  So you have never yelled at Rosa Grillo over
20 the telephone in any connection for any reason?
21     A  No.
22     Q  Did you ever become aware that Rosa Grillo

Page 119

1  had reported to a member of the administration that
2  you had yelled at her?
3      A  No.
4      Q  Did you ever become aware that she had
5  reported that she believed it was racist?
6      A  No.
7      Q  Did either co-director of Diversity at the
8  school ever share with you the fact that Rosa Grillo
9  had complained about an episode in which you yelled at
10 her?
11     A  No.
12        (Ryan Exhibit Number 9 was marked for
13 identification and was attached to the
14 transcript.)
15 BY MR. RACIN:
16     Q  Would you identify Ryan Exhibit 9 for the
17 record.
18     A  It's a summary of events and observations.
19     Q  Do you know who prepared it?
20     A  I did.
21     Q  Two-page document bearing Bates numbers 1398
22 and 1399, right?

Page 120

1      A  Correct.
2      Q  When did you prepare it?  About when?
3      A  It had to be spring of '04.
4      Q  Why did you prepare it?
5      A  Because of the issues that I've numerate
6  here.
7      Q  Did you share this memorandum with anyone?
8      A  I don't know.
9      Q  Referred to the last paragraph, "I need a
10 healthy productive professional work environment.  I
11 cannot continue to work in a hostile work space."
12        MR. WILLIAMSON:  Counsel, what page are you
13 reading from?
14        MR. RACIN:  1398.  I'm sorry, Bates 1398.
15 BY MR. RACIN:
16     Q  "I'm being harassed, marginalized,
17 disrespected, and ignored."
18        Who did you believe was subjecting you to a
19 hostile work space?
20     A  I believe that Sharon had created a hostile
21 work environment.
22     Q  And what was the basis for that statement?

Page 121

1      A  Well, we have looked at a number of exhibits
2  today that talk about issues relating to her version
3  of events that I found to be unconnected with reality
4  around the banners, about the risers, about the course
5  change, about the Dutch Dresser technology report,
6  about the AP curriculum discussions, about what I said
7  in the art room, and on and on and on.
8      Q  You say, "I'm being harassed."
9         On what basis were you being harassed do you
10 believe?
11        MR. WILLIAMSON:  Objection, asked and
12 answered.
13     A  I would say the following things I just
14 enumerated constituted harassment.
15 BY MR. RACIN:
16     Q  Do you believe she was harassing you because
17 you're a white person?
18     A  I didn't speculate in my mind as to why.
19     Q  Now, had Sharon Killian ever said to you
20 that she felt she was being marginalized?  Did she
21 ever use the word "marginalized" with you?
22     A  I don't recall ever hearing that word.

31 (Pages 118 to 121)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 122

1    Q   Then a sentence beginning of 1398,
2  continuing 1399, "It is about the student's not about
3  the teacher's issues particularly when 90 percent of
4  those issues have no validity in the context of
5  current events."
6        Did I read that correctly?
7    A   You did.
8    Q   What 10 percent of issues did have validity?
9  Did any issues raised by Sharon Killian have validity?
10       MR. WILLIAMSON:  Objection, foundation,
11  compound.
12  BY MR. RACIN:
13   Q   You can answer if you can.
14   A   I would say that the phrase, "particularly
15  when 90 percent of issues have no validity," is a
16  expression of frustration that it would be hard to
17  quantify a percentage like that.
18       I think that mirrors my sense that what most
19  of what I'm hearing didn't relate to what was going on
20  in the classroom and how the department should
21  properly be run.
22       They were events that had no bearing in

Page 123

1  reality and were taking up time.  Rather than us
2  planning a curriculum, we were dealing with personal
3  issues and emotions.
4  BY MR. RACIN:
5    Q   Did any issues raised by Mrs. Killian during
6  your experience with her have validity?
7    A   Sharon was a good teacher.  And she raised
8  some -- during department meetings raised some good
9  issues how we could improve the department, how to
10  bring technology in, what sort of equipment is needed,
11  how to strengthen teaching the AP program.
12   Q   Now, the last sentence again, "Not one
13  example of bias has been explained to me."
14       By "bias," you meant racial bias; isn't that
15  right?
16       MR. WILLIAMSON:  Objection, argumentative,
17  foundation.
18   A   I don't think it was racial bias that I was
19  referring to.  What I'm referring to is that I was not
20  even-handed.  That's what I feel was always being
21  thrown in my face, that I was treating one person one
22  way and another person another.

Page 124

1        And in my view, we had treated the
2  department equally.  We divided the budget equally,
3  assigned classes equally.
4        Sharon got two advanced classes, two intro
5  classes, Laura got two advanced classes, two intro
6  classes.  I had four intro classes.  I was the only
7  department head who taught four classes along with my
8  teachers.  Other department heads taught three.
9        There were a number of things that I thought
10  were very even-handed in the way I ran the department.
11  BY MR. RACIN:
12   Q   Your testimony is you prepared this sometime
13  in the spring 2004?
14   A   Yes.
15   Q   It's your testimony that by that time you
16  did not understand that Sharon Killian had raised
17  concerns of racial bias in the art department of GDS?
18   A   No.  That's correct, I had was not aware
19  that she had raised those concerns.
20   Q   This may have been introduced in another
21  deposition, but we'll do it again.
22        (Ryan Exhibit Number 10 was marked for

Page 125

1  identification and was attached to the
2  transcript.)
3  BY MR. RACIN:
4    Q   Please read Ryan 10, Bates 3433, 3434.
5    A   Okay.
6    Q   What is Ryan Exhibit 10?
7    A   It's an Email to both Sharon and Laura
8  Tolliver.
9    Q   Referring to the first item regarding
10  department heads meeting update, could you review that
11  paragraph, please.
12   A   What do you mean?
13   Q   You prepared the Email 10:08 in the morning,
14  February 26, 2004; is that right?
15   A   Correct.
16   Q   Do you recall about when the department
17  heads meeting would have taken place?
18   A   The department heads meeting is every
19  Wednesday -- well, not every Wednesday.  It's every
20  second or third Wednesday.  Usually it starts at 3:30
21  and runs until 4:30 or 5:00.
22   Q   Do you think -- was this prepared the day

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 126

1   after the department heads meeting?
2       A   Yes, I would say it was.
3       Q   Now, as you review that first item,
4   Department heads meeting update, do you believe it was
5   true and accurate at the time?  Is that a true and
6   accurate indication of the information Paul conveyed
7   at the meeting of department heads?
8           MR. WILLIAMSON:  Objection, relevance.
9       A   When you say accurate, what --
10  BY MR. RACIN:
11      Q   Let's go over each item.  Now, Paul refers
12  to Paul Levy, right?
13      A   Yes.
14      Q   Then principal of the school?
15      A   Yes.
16      Q   "Paul conveyed the following information
17  which department heads have been told to share with
18  faculty - all inquiries about GDS from the news media,
19  lawyers, or other 'curious people' to be immediately
20  referred to Wes Gibson."
21          MR. WILLIAMSON:  Objection, foundation and
22  relevance -- relevance and foundation is really the

Page 127

1   proper order.
2   BY MR. RACIN:
3       Q   Is that information Paul Levy asked you to
4   convey to the department?
5       A   Yes.
6       Q   Next bullet item, "no faculty or staff
7   member should comment or respond to questions posed in
8   these instances."
9           MR. WILLIAMSON:  Objection, relevance and
10  foundation.
11  BY MR. RACIN:
12      Q   Was that an accurate account of what Paul
13  Levy had asked department heads to communicate?
14      A   In reference to the media, yes.
15      Q   Next bullet item, "all faculty and staff
16  should immediately report any and all contact from
17  media, lawyers, etcetera to Paul."
18          MR. WILLIAMSON:  Objection, relevance and
19  foundation.
20  BY MR. RACIN:
21      Q   Was that an accurate account of what Paul
22  Levy had asked you to convey to the department?

Page 128

1       A   Yes.
2       Q   And final bullet item, "more specifically,
3   no faculty or staff should engage in conversation
4   with" -- the name has been redacted -- "family, their
5   lawyers, or the media."
6           MR. WILLIAMSON:  Objection, relevance
7   foundation.
8   BY MR. RACIN:
9       Q   Was that an accurate statement of what Paul
10  Levy asked you to relay to the art department?
11      A   Yes, it was.
12      Q   I think that's just about all I have.  If I
13  can have about five minutes with Mrs. Killian.
14          MR. WILLIAMSON:  Okay.
15          (A brief break was taken.)
16          MR. RACIN:  I have no further questions,
17  Mr. Ryan.  Thank you for coming today.
18          THE WITNESS:  You're welcome.
19          EXAMINATION BY COUNSEL FOR THE DEFENDANT
20  BY MR. WILLIAMSON:
21      Q   Give me a second, I have just got a few
22  questions here.

Page 129

1           Mr. Ryan, Mr. Racin, the plaintiff's
2   counsel, had asked you some questions earlier about
3   the process that you went through to change the name
4   of a course from Technology to Graphic Design; do you
5   remember that?
6       A   I do.
7       Q   And he asked you whether you had consulted
8   with Mrs. Killian before making that change.
9           Do you remember that?
10      A   I do.
11      Q   And you gave -- and then he further asked
12  you whether there was any particular reason why you
13  had not consulted with her.
14          And you answered, No; is that right?
15      A   Yes, that is right that I had answered, No.
16      Q   Is that an accurate answer to that question?
17      A   No, it's not.
18      Q   Why is it not?
19      A   Because I did consult the teacher of the
20  class from whom the course was changed.  So there was
21  a reason to consult someone about the course change
22  title.

33 (Pages 126 to 129)

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 130

1    Q    When you say "someone," do you mean someone
2    in the art department faculty?
3    A    Yes.
4    Q    And who was that person?
5    A    Laura Tolliver.
6    Q    There was another, let me just -- was it
7    fair to say -- what was the particular reason, then,
8    that you did not consult with Mrs. Killian about
9    changing the course title?
10   A    She wasn't a teacher of that class.  So I
11   consulted the person who taught the class for whom the
12   change in title would have some relevance.
13       The person who wasn't teaching the class I
14   didn't consult because I didn't think it was relevant.
15   Q    Now, there is a document that was marked as
16   Ryan Exhibit 10.  Would you take a look at that again,
17   please.
18       And you were asked by Mr. Racin some
19   questions about the first heading of that document on
20   Page 3433 under, Re: Department Heads Meeting Update.
21       Do you remember that?
22   A    I do.

Page 131

1    Q    And he asked you whether the information
2    provided in each of the bullets under that heading was
3    accurate information?
4    A    Yes, I remember that.
5    Q    Including the bullet at the end that said
6    more specifically, "No faculty or staff should engage
7    in conversation with --" and then the name of the
8    student is blanked out -- "family, their lawyers, or
9    the media," is that right?
10   A    Yes.
11   Q    Did that guidance relate to a student who
12   had been expelled from the school during the 2003,
13   2004 school year?
14   A    Yes, it did.
15   Q    And at the time that you conveyed the
16   message or guidance that's in Exhibit 10, was the
17   student present and enrolled at GDS?
18   A    No.
19   Q    And why is it that he was not?
20   A    The student had been expelled for
21   disciplinary action.  And we were told that in
22   observation of his right to privacy, his family's

Page 132

1    right to privacy that we should not engage in
2    conversations with the media in general.
3    Q    And was there any legal proceeding going on
4    at that time?
5    A    I believe there was pending legal matter
6    between the school and the family.
7    Q    Nothing further.
8        MR. RACIN:  Thank you for you attention and
9    coming.
10       THE WITNESS:  You're welcome.
11       (Signature having not been waived, the
12   deposition of Nicolas Ryan was concluded at 2:30
13   p.m.)
14
15
16
17
18
19
20
21
22

Page 133

1        ACKNOWLEDGMENT OF DEPONENT
2        I, Nicolas Ryan, do hereby acknowledge
3    that I have read and examined the foregoing
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given by
6    me and any corrections appear on the attached
7    Errata sheet signed by me.
8
9    _____    _____
10   (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

47950fa9-3b42-47d7-85d1-31e36500af65

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006

Page 134

1           CERTIFICATE OF NOTARY PUBLIC
2       I, Jennifer A. Bosley, do hereby certify
3   that the witness, Nicolas Ryan, personally
4   appeared before me; that said witness was duly
5   sworn by me; and that I am neither counsel for or
6   related to, nor employed by any of the parties to
7   this case and have no interest, financial or
8   otherwise, in its outcome.
9           IN WITNESS WHEREOF, I have hereunto set
10  my hand and affixed my notarial seal this 11th day
11  of October 2006.
12  My commission expires:
13  January 14, 2009
14
15  _____
16  NOTARY PUBLIC IN AND FOR THE
17  THE DISTRICT OF COLUMBIA
18
19
20
21
22

Page 135

1           E R R A T A   S H E E T
2       IN RE:  Killian v. Georgetown Day School
3   RETURN BY:
4   PAGE    LINE        CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22  (DATE)        (SIGNATURE)

Page 136

1           E R R A T A   S H E E T
2       IN RE:  Killian v. Georgetown Day School
3   RETURN BY:
4   PAGE    LINE        CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  (DATE)        (SIGNATURE)
22

35 (Pages 134 to 136)

47950fa9-3b42-47d7-85d1-31e36500af65

# E X H I B I T  7

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT

OF COLUMBIA

----------------------------------

SHARON KILLIAN

Plaintiff,

v.

GEORGETOWN DAY SCHOOL

Defendant.

----------------------------------

Civil Action NO.

05-1925(EGS)

Deposition of Laura Tolliver

Washington, D.C.

Thursday, September 28, 2006

10:02 a.m.

Job No.:2-87188

Pages 1 - 44

Reported by:  Jennifer A. Bosley

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

f8ce6e11-5bca-4658-b8d0-948c133ca632

# DEPOSITION OF LAURA TOLLIVER
## CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

---

**Page 2**

1  Deposition of Laura Tolliver, held in the:

2

3       Offices of

4       L.A.D. Reporting Company

5       Suite 850

6       1100 Connecticut Avenue, Northwest

7       Washington, D.C.  20036

8

9       Pursuant to notice, before Jennifer A.

10  Bosley, Court Reporter and Notary Public in and for the

11  District of Columbia, when were present:

12

13

14

15

16

17

18

19

20

21

22

---

**Page 4**

1           C O N T E N T S

2  EXAMINATION OF LAURA TOLLIVER          PAGE

3  By Mr. Racin                5

4

5

6

7           E X H I B I T S

8       (Attached to the Transcript)

9  TOLLIVER              PAGE

10  1  Course Description          25

11  2  Handwritten Notes          36

12

13

14

15

16

17

18

19

20

21

22

---

**Page 3**

1           A P P E A R A N C E S

2  ON BEHALF OF THE PLAINTIFF:

3       JOHN P. RACIN, ESQUIRE

4       Law Offices of John P. Racin

5       1721 Lamont Street, Northwest

6       Washington, D.C.  20010-2601

7       (202)265-2516

8

9

10  ON BEHALF OF THE DEFENDANT:

11       THOMAS S. WILLIAMSON, JR., ESQUIRE

12       Covington & Burling, LLP

13       1201 Pennsylvania Avenue, Northwest

14       Washington, D.C.  20004-2401

15       (202)662-5438

16

17

18  ALSO PRESENT:  Sharon Killian

19

20

21

22

---

**Page 5**

1           P R O C E E D I N G S

2           LAURA TOLLIVER

3       having been duly sworn, testified as follows:

4       EXAMINATION BY COUNSEL FOR THE PLAINTIFF

5  BY MR. RACIN:

6       Q   Please state your name for the record and

7  spell your last name for the court reporter.

8       A   Laura Tolliver, T-O-L-L-I-V-E-R.

9       Q   Ms. Tolliver, my name is John Racin.  And I

10  represent Sharon Killian in a matter she's brought

11  against the Georgetown Day School.

12       In the process of deposition, I'll be asking

13  you a series of questions today.  I would ask you to

14  respond.  Your answers will one day appear in

15  transcript form, so you obviously want to understand

16  the question before you answer.

17       As Mr. Williamson will attest, I'm

18  occasionally less than clear.  If that should happen,

19  simply ask for clarification.  I'll be happy to

20  rephrase and make it as clear as I can and ask that

21  you respond.

22       If you need a break at any time, just say

---

2  (Pages 2 to 5)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 6

1  so; we'll break. And I would ask in that connection
2  you answer the pending question.
3      A  Okay.
4      Q  Have you testified in a deposition before,
5  ma'am?
6      A  Yes.
7      Q  In what connection?
8      A  Car accident that I was in.
9      Q  Is that the only instance?
10     A  Yes.
11     Q  Thank you. Would you describe your
12  educational background after high school. I'm not
13  interested in high school.
14     A  I took classes. I graduated from the
15  University of Maryland. But I also went to school at
16  Kansas City Art Institute for ceramics classes and
17  Jacksonville University.
18     Q  When did you attend the University of
19  Maryland?
20     A  I graduated I think in 1980. I'm not sure
21  of the exact date.
22     Q  What did you take your degree in?

Page 7

1      A  I have a BS in psychology and a minor in
2  art.
3      Q  And you describe some post-graduate training
4  in art?
5      A  Yes -- not in art, actually in counselling
6  at Johns Hopkins.
7      Q  During what period of time?
8      A  Must have been in -- it was a couple years
9  after I graduated from Maryland, maybe '83, '84. I'm
10  not sure of the exact date.
11     Q  And did you take a degree at Johns Hopkins?
12     A  No.
13     Q  Are you employed at the Georgetown Day
14  School now?
15     A  I am.
16     Q  In what capacity?
17     A  I am an art teacher.
18     Q  What department is that?
19     A  It is the art department.
20     Q  Do you have colleagues in the art
21  department?
22     A  I do.

Page 8

1      Q  And who are they?
2      A  At present, it's Nick Ryan, Michelle Cobb,
3  and Nguyen Nguyen.
4      Q  Would you spell the last name for the court
5  reporter.
6      A  I don't have his last name. I'm not sure.
7  It's Asian, and I'm not sure of the spelling.
8      Q  And Nick Ryan is the department chair; is
9  that right?
10     A  Yes.
11     Q  What is Mr. Ryan's race?
12     A  His race?
13     Q  Right.
14     A  He's Caucasian.
15     Q  And what is Michelle Cobb's race?
16     A  She's African American.
17     Q  What is your race for the record?
18     A  Caucasian.
19     Q  Have you ever said to Mrs. Killian that you
20  have a minority background, a Hispanic background?
21     A  I do.
22     Q  And what is that background?

Page 9

1      A  My father was Spanish. My maiden name is
2  Sanchez.
3      Q  Is that, S-A-N-C-H-E-Z, for the record?
4      A  Yes.
5      Q  And was your father born in America?
6      A  He was. His parents had just moved here
7  when he was born here. He grew up in Brooklyn, yes.
8      Q  Where were his parents from?
9      A  Spain.
10     Q  What courses are you teaching for the
11  academic year '06, '07?
12     A  I'm teaching photography courses.
13     Q  Can you be more specific?
14     A  Two intro photo, one digital photo, and one
15  advanced photo.
16     Q  Are AP courses being offered in the
17  department this academic year?
18     A  Yes.
19     Q  And what are they if you know?
20     A  Well, the students in photography are
21  doing -- I have advanced photo and AP students in that
22  class if they choose to do the AP.

3 (Pages 6 to 9)

f8ce6e11-5bca-4658-b8d0-948c133ca632

# DEPOSITION OF LAURA TOLLIVER
## CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 10

1 And then Michelle Cobb is teaching AP
2 painting, drawing.
3    Q  Thank you.  Now, do you know who's in charge
4 of the yearbook at the school this year?
5    A  Michelle Cobb and David is also in the
6 technology office.
7       (Discussion off record.)
8 BY MR. RACIN:
9    Q  Have you been in charge of the yearbook
10 before?
11   A  Yes.
12   Q  Do you recall when?
13   A  From 1979 until 1990-what, whenever Sharon
14 took over.  I'm not sure what year it was, maybe '98.
15 I'm not sure of the date.
16   Q  Now, when you were in charge of the
17 yearbook, were you compensated an amount in addition
18 to your regular salary for that work?
19   A  I was in the later years, not in the early
20 years.
21   Q  Beginning about when were you compensated an
22 additional amount?

Page 11

1    A  Let me see, maybe about five years into when
2 I was doing it -- I don't remember the exact amounts.
3    Q  I know it's been some time.
4    A  Yes.
5    Q  Do you know if Ms. Cobb is being compensated
6 an amount in addition to her regular salary for her
7 work on the yearbook?
8    A  I assume.  I don't know.  I assume she is.
9    Q  Now, does the art department produce a
10 magazine?
11   A  It does the -- well, it doesn't this year.
12 It did not last year.
13   Q  I didn't quite understand that.  It does?
14   A  In the past it had an art magazine.
15   Q  Does it any longer?
16   A  No.
17   Q  When did that end --
18   A  Sharon was the last one to produce the
19 magazine.
20   Q  So that ended with Mrs. Killian's departure?
21   A  Yes.
22   Q  Do you have children, ma'am?

Page 12

1    A  I do.
2    Q  How many?
3    A  Two.
4    Q  And have your children attended GDS?
5    A  They do.
6    Q  They do at present?
7    A  Yes.
8    Q  Now, as a faculty member, are you entitled
9 to a break in tuition by virtue of your faculty
10 status?
11   A  Yes.
12   Q  And have you obtained a break in tuition
13 every year that your children have been students at
14 GDS?
15   A  Yes.
16   Q  Who is Deborah Haynes?
17   A  She used to be our department head.
18   Q  Are you related in any way to Deborah
19 Haynes?
20   A  Not to Debbie by blood, no.
21   Q  Did you have a relationship of any kind?  I
22 understand it may be fairly complicated.

Page 13

1    A  My sister was married to Debbie's husband --
2 I'm sorry, I take that back.  My sister was married to
3 Debbie's husband's brother.
4    Q  And is that a current relationship?
5    A  No, they are divorced.
6    Q  Did you regard Debbie Haynes as your
7 sister-in-law?
8    A  No -- distant family, not sister-in-law
9 really.
10   Q  Did you ever introduce her at GDS as your
11 sister-in-law?
12   A  I don't remember, no.
13   Q  How would you describe your relationship
14 with Debbie Haynes?
15   A  We were close friends.
16   Q  Were close friends?
17   A  I don't see much of her anymore.  She moved.
18   Q  When did Ms. Haynes move?
19   A  Maybe three years ago.  I don't know the
20 dates.
21   Q  Do you know where she moved?
22   A  Yes.

4 (Pages 10 to 13)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 14

1    Q   Where did she move?
2    A   Eastern Shore.
3    Q   Now, Ms. Haynes was Nick Ryan's immediate
4  predecessor as department chair; is that right?
5    A   Yes.
6    Q   Do you know about when she stepped down from
7  that position?
8    A   I'm thinking has Nick been there five years.
9  It would have been four years ago.  It's the year
10  after Nick joined us.
11    Q   When Nick joined the department, he joined
12  as chair; is that right?
13    A   Yes.
14    Q   Did Haynes stepping down as chair coincide
15  with Nick Ryan's arrival?
16    A   I believe so.
17    Q   Now, did you believe that Sharon Killian was
18  in any way responsible for the end of Debbie Haynes'
19  tenure as chair of the art department at GDS?
20    A   No.
21    Q   Have you heard it said by anyone at GDS that
22  Sharon Killian was responsible for the end of Debbie

Page 15

1  Haynes' tenure as chair?
2    A   No.
3    Q   Deborah Haynes continued as a member of the
4  department for a time after Nick Ryan's arrival; is
5  that right?
6    A   Yes.
7    Q   And for how long a period was that?
8    A   One academic year.
9    Q   Now, during that period, do you recall ever
10  spending time socially with Nick Ryan and Deborah
11  Haynes away from GDS?
12    A   No.
13    Q   Do you recall introducing Ms. Haynes as your
14  sister-in-law at any time during that period?
15        MR. WILLIAMSON:  Objection, asked and
16  answered.
17  BY MR. RACIN:
18    Q   You may answer.
19    A   I don't remember saying it.
20    Q   Do you believe that Mr. Ryan knew you all
21  were friends?
22    A   Yes.

Page 16

1    Q   Now, Deborah Haynes left GDS after that one
2  academic year Nick Ryan served as chair; is that
3  right?
4    A   Yes.
5    Q   Now, did you in any way attribute Deborah
6  Haynes' departure from GDS to Sharon Killian?
7    A   No.
8    Q   Did you ever hear it said that Sharon
9  Killian was in way responsible for Deborah Haynes'
10  departure?
11        MR. WILLIAMSON:  Objection, asked and
12  answered.
13    A   No.
14  BY MR. RACIN:
15    Q   I believe the first question referred to the
16  end of the chairpersonship.  This related to her
17  departure from GDS.
18        MR. WILLIAMSON:  I see.
19    A   No.
20  BY MR. RACIN:
21    Q   Same answer.  Thank you.
22        Now, following Deborah Haynes' departure

Page 17

1  from the school an award in the art department was
2  named for her; is that right?
3    A   Yes.
4    Q   Do you know who was responsible for that
5  decision?
6    A   No.
7    Q   How did you find out about it?
8    A   It was discussed, but I don't know who
9  brought it up.  I don't remember who suggested it or
10  where it came from.
11        But it is not uncommon.  There are a number
12  of teachers who had been there for many years.  Debbie
13  was at the school for 20 -- well, she was there since
14  1974 I believe.
15        So it's not unusual for a teacher to have
16  been there that long.  Dorothy Jackson I think there
17  is an award who was there for a long time.  Teachers
18  that have been there for a long time, usually there is
19  an acknowledgement of their service to the school.
20    Q   Do you recall feeling at the time that was
21  an appropriate thing to do to honor Debbie Haynes in
22  that way?

f8ce6e11-5bca-4658-b8d0-948c133ca632

# DEPOSITION OF LAURA TOLLIVER
## CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 18

1    A   Yes.
2    Q   Were you ever consulted about it?  Were you
3  ever asked your opinion?
4    A   No.  My opinion, no, I don't think.
5    Q   Were you involved in discussions about it?
6  Do you recall being involved in discussions?
7    A   Discussions, no.
8    Q   In any interchange about it?
9    A   I thought it was a great idea when I heard
10  about it.
11   Q   Did you express that opinion at the time?
12   A   Probably, yes.
13   Q   And do you think you expressed that opinion
14  to Nick Ryan?
15   A   Probably, yes.
16   Q   Now, do you know whether Sharon Killian had
17  any problem with that designation at the time?
18   A   I don't know.
19   Q   Did you ever become aware that she had a
20  problem with that?
21   A   No.
22   Q   As you sit here today, can you say whether

Page 19

1  you think Sharon Killian should have been part of any
2  process to designate an award in honor of Mrs. Haynes?
3    A   No.  I thought it was administrative.  I
4  don't think it had anything to do with our department,
5  per se.
6    Q   That is your understanding why the decision
7  was made outside the department?
8    A   I don't know.
9    Q   Now, during the period Debbie Haynes was
10  chair, did you ever become aware of instances in which
11  Sharon Killian complained about being denied access to
12  space or resources in the department on an equal
13  basis?
14   A   Could you say that again, just -- I'm sorry.
15   Q   It was a long question.
16   A   It was a long question.
17   Q   I'll break it down.  I'm referring to the
18  period of Debbie Haynes tenure as department chair.
19   A   Right.
20   Q   Now, during that period, did you ever become
21  aware of any complaints from Sharon Killian, period,
22  that question?

Page 20

1    A   Yes.
2    Q   And do you recall what the nature of those
3  complaints were?
4    A   There was a number of issues I guess with,
5  I'm not sure, using studio space or maybe the cleanup
6  of space, things like that.
7    Q   Do you recall that Mrs. Killian ever
8  complained about Debbie Haynes feeling proprietary
9  about her classroom space?
10   A   I don't recall Sharon saying anything to me
11  directly, no.
12   Q   Do you recall --
13   A   Not to me, not direct to me.  I mean, in
14  department meetings, there would be discussion about
15  use of space and cleanup on occasion but not directly
16  to Sharon, it was to all of us.
17   Q   That is directly to Debbie Haynes you mean?
18   A   Well, Debbie and I shared ceramic space.  We
19  were team teaching in there.  There was issues.  We
20  had to take turns with the cleaning in that space.  It
21  was in general just being aware of each other.
22   Q   Now, during the Haynes regime, so to speak,

Page 21

1  that is the period that she was department chair, do
2  you recall becoming aware of any complaints of
3  Ms. Haynes had about Mrs. Killian?
4    A   No.
5    Q   Did you have any complaints about
6  Mrs. Killian during that period that you recall now?
7    A   We had a few -- a few things came up that
8  needed to be worked out as far as, you know, using the
9  facility and sharing when we had 60 students using the
10  same space during the day.
11   Q   Did you regard any of those issues as
12  particularly serious --
13   A   No.
14   Q   -- during the Haynes tenure as chair?
15   A   No.
16   Q   It took a long time getting that question
17  out.  That can be another problem.
18        Now, I direct your attention to the 2001,
19  2002 academic year -- and it's been some time -- and
20  February of that year.
21        And isn't February the month in which black
22  history is recognized and honored in our country?

6  (Pages 18 to 21)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 22

1    A   Yes.
2    Q   And do you recall in that particular black
3  history month an instance in which Mrs. Killian
4  replaced student artwork in the entrance to the school
5  with work by African American artists in recognition
6  of black history month?
7    A   I do.
8    Q   What do you recall about that episode?
9        MR. WILLIAMSON:  Objection, vague.
10   A   Can you be more specific.  I mean, what
11 do --
12 BY MR. RACIN:
13   Q   Well, during that black history month, did
14 you become aware that Sharon Killian had replaced
15 certain artwork at the entrance of the school with
16 work by African American artists?
17   A   Yes.
18   Q   Did you have any particular problem with
19 that?  And if so, what?
20   A   I did not really have a problem with it.  I
21 had put up an art exhibit I believe on the Thursday or
22 Friday before of student artwork.

Page 23

1        And when I came into school, the art -- my
2  artwork wasn't there.  The artwork from I guess it was
3  an artist from a gallery was up instead that Sharon
4  had placed.
5        And I didn't say anything to anybody.  I
6  think Nick came to me and told me what had happened,
7  that Sharon had put it up because she had set up to
8  have this show exhibited.  I don't remember saying
9  anything to Sharon.  And I did not complain about it.
10   Q   But did you have a particular problem with
11 it?
12   A   No, I understood.  I mean, I would not -- if
13 I had known the art exhibit was going up on Monday, I
14 would not have put my exhibit up on Thursday because
15 it was a waste.  It was only up for a couple days.
16 But I can go --
17   Q   What was the artwork --
18       MR. WILLIAMSON:  Excuse me, counsel, could
19 you let her complete the answer.
20 BY MR. RACIN:
21   Q   I'm sorry.  I will certainly let you
22 complete the answer.

Page 24

1    A   I was just saying it was not that big a deal
2  to me, whatever, you know.  I mean, I -- it would have
3  been nice to have when the other exhibit came down to
4  have help putting it back up again.  But I didn't ask
5  for it, and I didn't think of it at that time.
6    Q   Now, what was the particular artwork
7  involved that you put up?
8    A   It was probably photography work that I put
9  up because that's usually what I put on those boards.
10   Q   And photography work completed by whom?
11   A   I don't remember.
12   Q   Your students?
13   A   My students.
14   Q   Now, you never complained, then, about
15 Mrs. Killian having taken that work down and replaced
16 it with artwork by African American artists?
17   A   I didn't need to complain.  I mean, it was a
18 done deal by the time I got to school.
19   Q   Right.  So you expressed no unhappiness to
20 Mrs. Killian?
21   A   I don't remember.
22   Q   Or to Mr. Ryan?

Page 25

1    A   I don't remember being upset and saying
2  anything to him.  I may have been exasperated.  But it
3  was not a big deal in my eyes.
4    Q   Thank you.  Directing your attention to the
5  2003, '04 academic year also some time ago and ask if
6  you recall being involved in an effort to change the
7  name of a course from Technology and the Studio Arts
8  to Graphic Design?
9    A   Yes.
10   Q   Let's mark this as Tolliver 1.
11       (Tolliver Exhibit Number 1 was marked
12 for identification and was attached to the
13 transcript.)
14 BY MR. RACIN:
15   Q   Ask you to review the document which bears
16 the Bates stamp on the bottom right, 2854.  It's
17 headed with the words, Advanced Technology for the
18 Studio Arts; is that right?
19   A   Uh-huh.
20   Q   Do you recognize this document?
21   A   I don't remember it.  I probably saw it, but
22 I don't remember it.

7 (Pages 22 to 25)

f8c6e11-5bca-4658-b8d0-948c133ca632

# DEPOSITION OF LAURA TOLLIVER
## CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 26

1    Q   Did you have reason to believe this is the
2    course involved in the name change I asked about?
3    A   Yes.
4    Q   Now, what do you know about how this process
5    of changing the name of the course came about?
6    A   At the beginning of the year, we need to
7    submit goals to our department heads.  And one of the
8    concerns I had for the Advanced Technology for the
9    Arts Class I was teaching was that there were not a
10   lot of girls in the class.
11       There had not been for a number of years.
12   It was almost all boys.  I think I taught maybe two
13   girls, three girls over three or four years.
14       So I was trying to figure out a way of
15   getting more students equally distributed in there.
16   So one of my goals at the beginning of the year in
17   September was to figure out a way of changing the
18   gender balance in the class.
19       And so towards the end of the year when we
20   were talking about when we had to do our submissions
21   for our course descriptions, I thought since graphic
22   design was one of the main elements of the class, it

Page 27

1    was in the course description, that would be a good
2    name.
3        Nick and I talked about it during a
4    department meeting I'm sure.  And it was done.  I
5    mean, we had to get it in within a certain amount of
6    time.  We had to get the descriptions in, so we did.
7    Q   Do you recall that Mrs. Killian was involved
8    in any discussion concerning the name change?
9    A   Well, it was during department meeting time.
10   She should have been there.  I don't know if she was
11   or not.  She sometimes didn't come to the meetings.
12   But we tried to have meetings every week so we could
13   deal with things like this.
14   Q   Did you ever become aware that she objected
15   to the name change?
16   A   After the fact, yes.
17   Q   How did you become aware of that?
18   A   She said that she was not happy with it.
19   Q   Did she say that to you?
20   A   I think she said it at a department meeting
21   I believe it was.
22   Q   And do you recall about when that meeting

Page 28

1    took place?
2    A   It was after -- I believe it was after the
3    book came out with the course descriptions and the
4    name change I believe.
5    Q   Now, in order to change the name of courses
6    at the school, do you have to involve the
7    administration in any way?
8    A   I'm not sure how that was done.  I talked to
9    Nick about it, and Nick dealt with it.
10   Q   Okay.  But do you know in the normal course
11   whether such a request goes from the departmental
12   level to an administrative?
13   A   I don't know.  In the past it wasn't
14   necessary.  But it may have been -- I don't know if it
15   is now.  Things have changed over the past five years.
16   Q   Had you known of any other change in course
17   titles since you had been there?
18   A   Yes.
19   Q   And you say it happened frequently?
20   Routinely?
21   A   Like the Intro to Photography was changed to
22   Fine Arts Photography, and it wasn't any -- I mean,

Page 29

1    just subtle little changes to help describe it better.
2    Q   And about when did that happen?  Do you
3    recall when the Introduction to Photography?
4    A   I don't remember.  I mean, I was there for
5    27 years.  It was some time ago.
6    Q   I understand.  It's been a long time.
7        Now, in that same academic year, did you
8    ever become aware that Sharon Killian objected to a
9    comment by Nick Ryan that she found offensive?
10   A   No.
11   Q   No?
12   A   I don't know what comment.  I don't know.
13   Can you be more specific?
14   Q   Did you ever become aware that Sharon
15   Killian said Nick Ryan said words to the affect, I
16   can't bend down low enough to the ground to understand
17   what you're saying?
18   A   No.
19   Q   You never heard that said during that year?
20   A   No.
21   Q   Did you ever during the course of that
22   academic year meet with the co-directors of Diversity

8 (Pages 26 to 29)

f8c6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 30

1   at the school?
2      A   Yes.
3      Q   And for what purpose did you meet with them?
4      A   There was tension in the -- in our
5   department.  Sharon I think had made some complaints.
6      Q   And do you know what the nature of those
7   complaints were?
8      A   Specifically, it was -- no.  Specific
9   complaints that she talked about, I don't know.
10     Q   Those were never shared with you?
11     A   We -- well, in the meetings with Mari and
12  Elizabeth, they asked the history of the relationship
13  of everybody in the department.  And a lot of
14  information was brought up.
15     Q   Has Nick Ryan ever screamed at you?
16     A   No.
17     Q   Have you ever observed Nick Ryan scream at
18  anyone?
19     A   No.
20     Q   You have never seen him scream at Sharon
21  Killian necessarily?
22     A   No.

Page 31

1      Q   Deductive reasoning.
2          Now, you say you participated in a mediation
3   process?
4      A   Yes.
5      Q   With the co-directors of Diversity at the
6   school?
7      A   Yes.
8      Q   What was your understanding of the purpose
9   of that effort?
10     A   To try to make it a more pleasant work
11  environment that people were not tense with each
12  other, and we could get a long a little bit better.
13     Q   Now, I think you testified that during
14  the -- to the end of the Haynes tenure as chair of the
15  department you didn't think that there had been any
16  serious problems involving you and Mrs. Killian; is
17  that right?
18     A   Nothing of major importance.  I mean, minor
19  things of working with somebody, you know, but nothing
20  major.
21     Q   And by the time this mediation effort took
22  place during the '03, '04 academic year, had problems

Page 32

1   emerged that you found significant?
2      A   There were some issues I think of not
3   trusting I felt.
4      Q   And was that an issue on your part?
5      A   Not -- no.
6      Q   Then the issue was on Mrs. Killian's part
7   you felt?
8      A   Yeah, I felt that she didn't -- yeah.
9      Q   And how was that expressed?
10     A   She got upset because when -- like when I
11  opened up the supplies and accidentally took some of
12  her paper and stored it away because I was opening a
13  lots of boxes.  She became upset.  She thought I
14  apparently, you know -- she became, you know -- and I
15  thought it was an honest mistake, so --
16     Q   And when did that happen?
17     A   I think it was that year.  I can't remember
18  the exact dates.
19     Q   And what did she do, if anything, did she do
20  at that time?
21     A   She just -- she seemed very upset about it.
22  She wouldn't speak to me that much.  I mean, she would

Page 33

1   not speak.  She would just --
2      Q   Do you know if she complained to anybody
3   else about that?
4      A   I assume she did because she would speak
5   to -- she would complain when things went wrong.
6      Q   And who would she complain to?
7      A   I don't know, maybe Paul, maybe.  I don't
8   know.
9      Q   By Paul, you're referring to Paul Levy,
10  L-E-V-Y, I believe?
11     A   Yes.
12     Q   Do you recall instances in which you became
13  aware that Mrs. Killian had gone to Mr. Levy to
14  complain about anything in the art department?
15     A   I don't know what Sharon talked about with
16  Paul.  I just assumed she did.  I don't know what
17  she did because she would go in to talk to him.
18         And then usually we would need to sort
19  things out.  And then there was a recommendation for
20  us to meet with Mari and Elizabeth.  So I assume that
21  came from Paul, so she must have talked to him.
22     Q   Now, what was your understanding -- and I

9  (Pages 30 to 33)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 34

1 may have asked this. This may be a senior moment on
2 my part, so I apologize in advance if I'm asking it
3 again.
4          But what was your understanding of the
5 purpose of the mediation effort undertaken by the
6 co-directors of Diversity of the school?
7          MR. WILLIAMSON: Objection, asked and
8 answered.
9 BY MR. RACIN:
10    Q   Thank you. And preliminarily, who were the
11 co-directors of Diversity at the school at the time?
12    A   It would have been Marriama and Elizabeth
13 Denevi, Marriama Richards.
14    Q   We'll spell those later.
15          What did you understand the purpose of the
16 mediation to be?
17          MR. WILLIAMSON: Objection, asked and
18 answered.
19    A   For art department not to have so much
20 tension so we could have department meetings and get
21 more work done. Everybody would cooperate and make it
22 a more -- a place where the -- it would -- our

Page 35

1 personal differences would not interfere with the
2 teaching of the students, that everybody would get
3 along and get the job done.
4 BY MR. RACIN:
5    Q   Did you think there was tension in the
6 department?
7    A   Yes.
8    Q   What did you think the reason for the
9 tension was, reason or reasons?
10    A   I often did not know what the reasons were.
11 I did not know. I mean, like the paper incident
12 caused a lot of tension for a long time. I don't know
13 what precipitated things that were going on.
14    Q   Did you feel any tension coming from Nick
15 Ryan?
16    A   Not tension. There were things he asked us
17 to do which needed to be done in the department. It
18 wasn't tension. It was just normal job tasks that
19 needed to be taken care of.
20    Q   Now, did the level of tension seem to you
21 such that it had to be addressed in a -- that it ought
22 to be addressed in a mediation effort from your point?

Page 36

1    A   Yes.
2    Q   Now, were you interview by the co-directors
3 of Diversity at any point?
4    A   I was.
5          (Tolliver Exhibit Number 2 was marked
6 for identification and was attached to the
7 transcript.)
8 BY MR. RACIN:
9    Q   Let me hand you what I think was marked
10 yesterday as R1. I don't know if you have a record.
11 Maybe ought to -- since I'm not absolutely certain,
12 but I think it was R1, Richards 1. It's been marked
13 in a previous deposition.
14          Let me hand you a compilation of handwritten
15 notes bearing Bates numbers -- I guess these are not
16 consecutive. Bates numbers 2844, 45, 46, 47, 51, 52,
17 56, and 57.
18          And I'll represent to you that Marriama
19 Richards has testified that the handwriting is hers.
20 And these were notes prepared in connection with
21 interviews taken during that mediation effort.
22    A   I need to read this?

Page 37

1    Q   Well, I'm referring your attention to 2845,
2 the second page of the document which is headed,
3 Laura. And I ask you to review that.
4    A   Yeah, I'm okay.
5    Q   I should have asked you to acknowledge that
6 for the record.
7          You have reviewed?
8    A   I have.
9    Q   I'll further represent the testimony was
10 that these notes were prepared after an interview with
11 you. I would ask if the recounting of the interview
12 now sounds to you familiar, looks to you familiar?
13    A   It's familiar, but it doesn't say who's
14 saying what on some of this because it's notes. It's
15 not clear.
16    Q   I understand. Now, let me refer your
17 attention halfway down the page, a bullet item which
18 seems to read, Keep us all separate is the only
19 solution, hyphen, sharing with her is the worst --
20    A   Where is this?
21    Q   Halfway. Keep us all separate is the only
22 solution, hyphen, sharing with her is the worst thing

10  (Pages 34 to 37)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 38

1  ever, closed quote.
2      Did I read that accurately?
3      A  You did read that.
4      Q  Do you recall saying anything like, Keep us
5  all separate is the only solution, to the co-directors
6  of Diversity?
7      A  I was referring to the supplies in the photo
8  department and sharing them with Sharon because I
9  mean, there was a lot of tension of whose paper is
10  what, who's film is what, all that kind of thing,
11  who's mixing up the chemicals.
12      And it's impossible when you have that many
13  kids going in and using it during the day to balance
14  who does what share of the work.
15      Q  Now, in your view, was there a feasible way
16  to work that kind of separation out?
17      A  I would have liked to have made things more
18  open and not have to put our names on our packs of
19  paper and the film and all that.
20      I would rather we just have a supply cabinet
21  for student use.  And we give it out to the students
22  as they need it and not have to be carrying the paper,

Page 39

1  locking it up, and hiding it in our office, and
2  bringing it back in which seemed to be the case, yeah.
3      Q  Do you recall saying anything like --
4  expressing a sentiment anything like, Sharing with her
5  is the worst thing ever?
6      A  That's paraphrased, and that's not what I
7  said.  I mean, it was difficult to work it out.  I
8  don't remember saying, The worst thing ever.  I think
9  that's paraphrased.
10      Q  Thank you.  Did you believe around the time
11  of this mediation effort that Sharon Killian's
12  continued service in the art department was a tenable
13  idea?
14      MR. WILLIAMSON:  Objection, vague.
15      A  Could you be more clear.
16  BY MR. RACIN:
17      Q  Did you believe that at this time, at the
18  time the mediation took place, that Mrs. Killian's
19  continued service was tenable?
20      MR. WILLIAMSON:  Objection to the form,
21  vague.
22      A  I'm not sure what you mean, that she should

Page 40

1  stay there?
2  BY MR. RACIN:
3      Q  Yes.
4      A  Yes.
5      Q  And did you think there was a basis to have
6  a good working relationship as of that time?
7      A  Yes.
8      Q  Thank you.  That's about all I have.
9      MR. WILLIAMSON:  Let me just have a moment
10  with my client.
11      MR. RACIN:  I know it's a surprise.
12      MR. WILLIAMSON:  Yes.
13      (A brief break was taken.)
14      MR. RACIN:  I have nothing further.  Thank
15  you very much.
16      MR. WILLIAMSON:  We don't have any
17  questions.
18      (Signature having not been waived, the
19  deposition of Laura Tolliver was concluded at
20  10:43 a.m.)
21
22

Page 41

1      ACKNOWLEDGMENT OF DEPONENT
2      I, Laura Tolliver, do hereby acknowledge
3  that I have read and examined the foregoing
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by
6  me and any corrections appear on the attached
7  Errata sheet signed by me.
8
9  _____   _____
10  (DATE)            (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

11  (Pages 38 to 41)

f8ce6e11-5bca-4658-b8d0-948c133ca632

DEPOSITION OF LAURA TOLLIVER
CONDUCTED ON THURSDAY, SEPTEMBER 28, 2006

Page 42

1           CERTIFICATE OF NOTARY PUBLIC
2        I, Jennifer A. Bosley, do hereby certify
3     that the witness, Laura Tolliver, personally
4     appeared before me; that said witness was duly
5     sworn by me; and that I am neither counsel for or
6     related to, nor employed by any of the parties to
7     this case and have no interest, financial or
8     otherwise, in its outcome.
9           IN WITNESS WHEREOF, I have hereunto set
10    my hand and affixed my notarial seal this 8th day
11    of October 2006.
12    My commission expires:
13    January 14, 2009
14
15    _____
16    NOTARY PUBLIC IN AND FOR
17    THE DISTRICT OF COLUMBIA
18
19
20
21
22

Page 44

1               E R R A T A  S H E E T
2        IN RE:  Killian v. Georgetown Day School
3     RETURN BY:
4     PAGE    LINE          CORRECTION AND REASON
5     ____  ____  _____
6     ____  ____  _____
7     ____  ____  _____
8     ____  ____  _____
9     ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    (DATE)          (SIGNATURE)
22

Page 43

1               E R R A T A  S H E E T
2        IN RE:  Killian v. Georgetown Day School
3     RETURN BY:
4     PAGE    LINE          CORRECTION AND REASON
5     ____  ____  _____
6     ____  ____  _____
7     ____  ____  _____
8     ____  ____  _____
9     ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    _____  ____
22    (DATE)          (SIGNATURE)

12 (Pages 42 to 44)

f8ce6e11-5bca-4658-b8d0-948c133ca632

# E X H I B I T   8

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


------------------------x

SHARON KILLIAN,

          Plaintiff,

     vs.                    Civil Action

GEORGETOWN DAY SCHOOL,      No. 05-1925(EGS)

          Defendant.

------------------------x




          Deposition of MARIAMA L. RICHARDS

               Washington, D.C.

          Wednesday, September 27, 2006

               1:54 p.m.




Job No. 2-87187

Pages 1 - 57

Reported by Judith F. Richard, RPR

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 2

1    Deposition of MARIAMA L. RICHARDS, held at the
2  offices of:
3    L.A.D. Reporting Company
4    Large Conference Room
5    Suite 850
6    1100 Connecticut Avenue, Northwest
7    Washington, D.C.  20036
8    (202) 861-3410
9
10
11
12
13    Pursuant to notice, before Judith F. Richard,
14  Registered Professional Reporter and Notary Public
15  for the District of Columbia.
16
17
18
19
20
21
22

Page 4

1  C O N T E N T S
2  EXAMINATION OF MARIAMA L. RICHARDS          PAGE
3    By Mr. Racin                5
4    By Mr. Williamson          51
5        - 0 -
6
7
8
9
10  E X H I B I T S
11  (Attached.)
12  RICHARDS DEPOSITION                PAGE
13  No. 1    8-pp handwritten notes        18
14  No. 2    2-pp 3/31/04 messages        31
15  No. 3    2-pp handwritten notes        36
16        - 0 -
17
18
19
20
21
22

Page 3

1      A P P E A R A N C E S
2  FOR THE PLAINTIFF
3    John P. Racin, Esquire
4    Law Office of John P. Racin, LLC
5    1721 Lamont Street, Northwest
6    Washington, D.C.  20010-2601
7  FOR THE DEFENDANT
8    Thomas S. Williamson Jr., Esquire
9    Timothy Clinton, Esquire
10    Covington & Burling LLP
11    1201 Pennsylvania Avenue, Northwest
12    Washington, D.C.  20004-2401
13    (202) 662-6000
14  ALSO PRESENT
15    Sharon Killian
16
17
18
19
20
21
22

Page 5

1      P R O C E E D I N G S
2        MARIAMA L. RICHARDS
3    having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR PLAINTIFF
5  BY MR. RACIN:
6    Q.   For the record, please state your name,
7  which you have already done, I know.
8    A.   My name is Mariama Richards.
9    Q.   Have you give a deposition before?
10    A.   Yes, I have.
11    Q.   In what connection?
12    A.   In what connection?  I was charged to
13  give a deposition during the Michael Martin case
14  against the school.
15    Q.   Needless to say, we're not going to
16  inquire about that subject matter.  I am sure your
17  able counsel has prepared you fully today, but just
18  briefly, I am going to ask questions which will
19  appear in transcript form along with your answers
20  which will also be in record form.  So it's very
21  important to understand what I'm asking.  And
22  occasionally I'm less than clear, so if that's the

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 6

1  case ask me to clarify and I will be happy to do so.
2  If you want a break at any time, just say so and we
3  will break.  I would just ask that you answer any
4  questions pending before we break.
5         Now, you are a co-director of diversity
6  at the Georgetown Day School, is that right?
7     A.  That is my title.
8     Q.  How long have you held that position?
9     A.  I have held that position now for since
10  the beginning of 2003, summer of 2003.
11    Q.  Is your co-director Elizabeth Dinevui?
12    A.  Yes, that is my co-director.
13    Q.  Did there come a time when you became
14  aware that Sharon Killian reported a remark by Nick
15  Ryan that she found to be offensive?
16    A.  Yes.
17    Q.  About when did that happen?
18    A.  I -- my recollection is a little fuzzy of
19  exactly the time period.  I can't give you the exact
20  date but --
21    Q.  Do you recall just how you became aware?
22    A.  Yes.

Page 7

1     Q.  And how was that?
2     A.  Well, I guess I need to ask for
3  clarification in one sense about when you say
4  offensive comment.  You're talking specifically
5  about -- I mean I'd rather -- I don't know what
6  you're referring to specifically.  But.
7     Q.  Do you recall that she reported that Nick
8  Ryan had said something close to I can't bend down
9  low enough to the ground to understand you, while
10  bending down and making gestures with his hands?
11        MR. WILLIAMSON:  Objection.  Foundation.
12        THE WITNESS:  I don't really know
13  anything about a gesture with any hands, and there
14  were two different versions of what was said.
15  I initially heard --
16  BY MR. RACIN:
17    Q.  Do you recall the report, first of all?
18    A.  A report?
19    Q.  Do you recall hearing about the --
20    A.  Oh, yes, but no written report, but yes.
21    Q.  Right.  And how did you hear about the
22  report?

Page 8

1     A.  I was sitting in Kevin Barr's office, who
2  was the director of studies at the time in the high
3  school, and he and I would were chatting and Sharon
4  came into his office.
5     Q.  And what happened when she came in the
6  office?
7     A.  She started to recount her experience
8  upstairs with Nick.  And about, I think about
9  a minute into us talking, Nick came into the room
10  and wanted to relay his portion of the events as
11  well.
12    Q.  And before we get to Nick's arrival, what
13  do you recall about what Mrs. Killian said?
14    A.  Well, I recall that she said that they
15  were in the midst of a discussion about -- I don't
16  recall exactly what specifically they were talking
17  about.  They were having a conversation upstairs in
18  the art room, and her recollection or what she said
19  to me at the time was that things started to get
20  more difficult and more heated.  And then Sharon's
21  side of the -- or her memory of what he said or what
22  she said he stated at the time was that essentially

Page 9

1  that he, that he said that he could no longer ever
2  get as low, as low as she was, that essentially he
3  didn't want -- that he could only get but so low and
4  that she was down very low to the ground.
5     Q.  Now, and you don't recall that she
6  reported that he gestured with his hands as he said
7  these words.
8     A.  That never came up in any discussion.
9     Q.  Did she seem upset as she was recounting
10  this?
11    A.  She seemed upset, yes.
12    Q.  Was she crying, for example?
13    A.  No, not at the time.
14    Q.  Now, did you understand that Sharon had
15  gone to speak with Nick Ryan after meeting with
16  Kevin Barr about the subject matter she intended to
17  take up with Ryan?
18    A.  No, I had no knowledge of that.
19    Q.  At the time did you know the folks in the
20  art department?
21    A.  As colleagues, yes.
22    Q.  Purely as colleagues, no social

378520ba-40c9-468d-ae99-e036c54a708d

# DEPOSITION OF MARIAMA L. RICHARDS
## CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 10

1 relationships outside work?
2    A.   No.
3    Q.   Now, you say that Nick Ryan arrived about
4 a minute after Mrs. Killian?
5    A.   That's my recollection, yes.
6    Q.   And what if anything did he say?
7    A.   Well, at the time we immediately, myself
8 and Kevin, asked him to leave the room.  Between
9 Kevin and I, we believed that Sharon had arrived
10 first, that she had something that she needed to
11 discuss with us, and so our first priority was
12 Sharon.  It was not Nick.
13    Q.   At the time did you understand Mrs.
14 Killian was concerned that the remark was racial in
15 nature?
16    A.   No.
17    Q.   She did not report to you that she felt
18 the comment was racist.
19    A.   No.
20    Q.   Did there come a time when she reported
21 to you that she felt the comment was racist?
22    A.   No.  And in fact, when we asked her --

Page 11

1 I should say Elizabeth asked her specifically as we
2 were going through the mediation process whether or
3 not she felt as though it was racist in background,
4 and her response was no.
5    Q.   Now, you say you gave Mrs. Killian the
6 first opportunity to address you and Mr. --
7    A.   Of course.
8    Q.   -- Barr.  About how long was she in your
9 office?
10       MR. WILLIAMSON:  Objection.
11 BY MR. RACIN:
12    Q.   Not your office -- excuse me -- Mr.
13 Barr's office.
14    A.   I'm again fuzzy.  It was a while ago.
15 I'm guessing probably somewhere around the 15-minute
16 realm, maybe 15 minutes, maybe 20.
17    Q.   At the time did you notice that Mr. Barr
18 was taking any notes as Mrs. Killian was recounting
19 the conversation with Ryan?
20    A.   I did not notice that.
21    Q.   Did you take any notes?
22    A.   No, I did not.  Again, I'll just, you

Page 12

1 know, say again, reiterate that literally Kevin and
2 I were just kind of chatting as colleagues.  We were
3 both on the administrative team.  We were checking
4 in with each other, how are you doing, how was your
5 day.  And it was the end of the day.  We were about
6 to leave school, so this came toward the very end.
7 So this wasn't even a meeting between Kevin and I at
8 the time.
9    Q.   And you say the meeting with Mrs. Killian
10 lasted about 15 minutes?
11    A.   That is what I recall, but I really can't
12 say for sure.
13    Q.   About.  Now, there came a time that she
14 left?
15    A.   Yes.
16    Q.   And did you and Mr. Barr stay in the
17 office?
18    A.   We did stay in the office.  Then Nick
19 came into the office at that time.
20    Q.   Where had he been while --
21    A.   I'm not sure.  I don't know, because
22 I was in the office with Kevin and Sharon.

Page 13

1    Q.   How did he come to the office?  How did
2 he know that Sharon had gone?
3    A.   I don't remember.
4    Q.   Did someone call him or?
5    A.   I honestly do not remember.  I imagine
6 that he was downstairs still, but I don't know.
7 I don't have a recollection of that.
8    Q.   He came into the office.
9    A.   Yes.
10    Q.   At some point.
11    A.   At some point.
12    Q.   And what do you recall Ryan said?
13    A.   Nick started to recall what his
14 recollection of the incident was.
15    Q.   What did he say?
16    A.   He essentially, essentially talked about
17 the same king of conflict, a kind of rising
18 discussion about whatever it was, which I do not
19 know at the time.  And he proceeded to say that he
20 felt as though he could never get low enough to
21 essentially please her, please her, being Sharon.
22    Q.   And that was his account of what he said.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410   (800) 292-4789   (301) 762-8282   (703) 288-0026   (410) 539-3664

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 14

1     A.   That was his account.
2     Q.   Now, did an effort to mediate this
3  dispute follow at some point?
4     A.   It did.
5     Q.   Do you know about how long after this
6  initial couple meetings?
7     A.   It was pretty soon after.  I remember
8  there being kind of a break in the year, but I'm not
9  quite sure exactly when that kind of played itself
10 out.  We had -- because at one point I remember we
11 started the process and we had to kind of slow down
12 again, because there were some other school, either
13 breaks or big meetings that ended up slowing down
14 our process and then we kind of started back up
15 again.  So it happened soon after that initial
16 discussion, but in terms of time period I can't
17 say for sure.
18    Q.   And how did this mediation effort work?
19 What did you do?
20    A.   Well, first off, I should say we kind
21 of -- you know, Elizabeth and I got together and
22 talked about essentially how many people were in the

Page 15

1  department, what the -- you know, what essentially
2  was at play at that point.  And then from there, we
3  started to think about what were the other ways in
4  which we could kind of bring everybody into the
5  dialogue.  Before we even broached the subject of
6  doing it, we actually spoke with the principal of
7  the school, spoke a little bit with our head of
8  school at the time, and I believe we spoke with
9  Sharon briefly about the possibility of whether
10 or or not she would be open to it happening.
11    So really even before we made kind of
12 the initial steps towards whether or not this
13 could be one way to talk about the problems in the
14 department, we kind of consulted multiple people on
15 kind of what this could possibly look like and what
16 we should do to move forward.
17    Q.   You discussed the matter with the
18 principal, Paul Levy, at the time?
19    A.   Yes.
20    Q.   And what was that conversation?
21    A.   My memory, we had weekly or biweekly
22 meetings with, we had them with Paul.  And we --

Page 16

1  essentially, I think I recalled for Paul the two
2  stories that came from the discussion with Sharon,
3  with Nick at the time, and talked to him about the
4  possibility of doing a mediation process between the
5  entire department.  Elizabeth and I had just gone
6  through training, several days' worth of training,
7  and we felt like this was one way in which we could
8  try to work out some of the problems that were
9  happening in the department.
10    Q.   Did you ever find out from Mrs. Killian
11 or Mr. Levy that Mrs. Killian had reported concerns
12 to Levy about Ryan on prior occasions?
13    A.   Yes.
14    Q.   And what did you understand about these
15 reports?
16         MR. WILLIAMSON:  Objection.  Go ahead.
17 BY MR. RACIN:
18    Q.   You can answer if you can.
19    A.   All right.  Well, can you give me a
20 little bit more clarification about what you're
21 asking specifically?
22    Q.   You say you found out that Mrs. Killian

Page 17

1  had gone to Mr. Levy on prior occasions to discuss
2  relationship with Nick Ryan.
3     A.   Mm-hmm.
4     Q.   What do you remember about that
5  information that you obtained?
6     A.   My memory of it is essentially that in my
7  conversations with Nick -- excuse me -- with Paul at
8  the time, we basic -- he just talked about the fact
9  that it had been a continuous problem between the
10 entire department and that there were communication
11 problems, that they had tried once before to do at
12 least a conversation with the entire department, and
13 that still even though they had made these efforts
14 and tried to get to the bottom of what the issues
15 were that it still seemed as though there were
16 problems, even after there was a transition between
17 department chairs.
18    Q.   Now, did Mr. Levy mention that Mrs.
19 Killian had described the problem as one involving
20 race?
21    A.   No, that never came out of Paul's mouth.
22    Q.   Now, in connection with the mediation,

5  (Pages 14 to 17)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 18

1  did you eventually conduct interviews with the
2  members of the department?
3      A.   Yes.
4      Q.   Let me hand you what we will have marked
5  as Richards 1.
6          (Richards Deposition Exhibit No.1 was
7  marked for identification.)
8  BY MR. RACIN:
9      Q.   I pass a compilation of handwritten
10 pages.
11     A.   Yes, pretty much all over the place.
12     Q.   Do you recognize the handwriting?
13     A.   Yes.
14     Q.   Good.  Is it yours?
15     A.   Yes, it is.
16     Q.   And directing your attention to the first
17 page headed Sharon, what is that?
18     A.   And again, I have to apologize because --
19     Q.   Why don't you take a look at it?
20     A.   Yeah, I was going to say let me just kind
21 of, maybe to understand this a little bit more,
22 because it's kind of hard when you hand something

Page 19

1  over to folks.  They're all over the place, but we
2  can talk about that as we get into the specifics.
3      Q.   Richards 1 is a series of handwritten
4  documents, Bates number 1844, 2857, produced for the
5  school during the course of discovery.  And let's
6  begin with the first page.  What is that?
7          MR. WILLIAMSON:  Counsel, you said
8  produced for the school.  Am I correct in saying --
9          MR. RACIN:  By the school.
10         MR. WILLIAMSON:  -- produced by the
11 school?
12         MR. RACIN:  Thank you for that
13 clarification.
14 BY MR. RACIN:
15     Q.   By the school during the course of
16 discovery.  Let's start with that first page headed
17 Sharon.  What is that?
18     A.   I believe -- again, I believe that these
19 were notes that were taken as -- in response to the
20 sheets 2856 and 2857.
21     Q.   I'm sorry.  What was that?  In response
22 to sheets 2856 and 57?

Page 20

1      A.   That's why I said I know that these are
2  going to be kind of hard to deal with, because what
3  you're looking at is a combination of notes that we
4  took during mediation process and then an effort by
5  Elizabeth and I to try to distill some of the things
6  from those discussions into shorter pieces.
7      Q.   Understood.
8      A.   That then we hoped to have shared with
9  the other parties in the department.
10     Q.   So your testimony is that the document
11 headed Sharon, March 15, 2004, based on 2856, 57, is
12 a document prepared prior to the first memorandum.
13     A.   Correct.
14     Q.   Bates number 2844.  Now, referring again
15 to 2844, about halfway down, do you see the bullet
16 point:  Doesn't feel equity in the department?
17     A.   Yes, I see that.
18     Q.   What did that mean?
19     A.   Well, in Sharon's words -- and again,
20 this is trying to distill what I got out of the last
21 discussion -- it was clear to me that she felt like
22 there was kind of this uneven space in terms of how

Page 21

1  each person was set up in the department.
2      Q.   You did not understand that to mean
3  racial equity?
4      A.   No, I did not.
5      Q.   Now, also the last bullet item, comment
6  from Nick, he has not apologized, exclamation point,
7  do you see that?
8      A.   Mm-hmm.
9      Q.   You don't set out the comment from Nick,
10 is that right?  You don't describe the comment Nick
11 made.  Was there any particular reason you didn't
12 describe --
13     A.   No.  Again, this is a distilling of other
14 documents, so I didn't feel the need, particularly
15 because at the time this was for me and Elizabeth
16 and knowing the specifics about what was said or not
17 said.
18     Q.   Refer, if you would, to page 2857.  This
19 is an undated document just headed Nick.  Also your
20 handwriting, correct?
21     A.   No.  I'm not sure what you're talking
22 about.

6  (Pages 18 to 21)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 22

1    Q.  Page 47 -- I'm sorry.  I stand corrected.
2    A.  Yes, and again, these are out of order.
3  So actually, this goes with this and this.  So
4  they're out of order in this packet, but it should
5  be actually 2851 first and then 2847 and then 2852.
6  So it actually is dated.  Its date is March 1st,
7  2004.  I'm going to have to totally apologize.  This
8  was in my folder, and I think they were xeroxed out
9  of order in my folder.
10    Q.  It's no one's fault.  I just didn't quite
11  follow.  You're saying that the document, Nick,
12  March 1, 2004, would be 2851, 2852 --
13    A.  Excuse me?  No.  It would be 2851 would
14  come first, 2847 would come next, and then 2852
15  would come last in this series.
16    Q.  I see.
17    A.  Not that that has to be organized right
18  now, just for.
19    Q.  I understand.  Now, do you recall whether
20  the session of March 1st, 2004, was your initial
21  interview with Nick Ryan?
22    A.  I believe so.

Page 23

1    Q.  Did anyone else attend that interview?
2    A.  Elizabeth Denevi.
3    Q.  If you refer to page 2847, which is the
4  third page, I guess, of the memo, correct?
5    A.  Second.
6    Q.  Second page of the memo, and halfway down
7  the page is a fairly long paragraph and you recount
8  the circumstances leading to the comment as reported
9  by Ryan, is that right?
10    A.  I'm just reading through it real quick.
11    Q.  Sure, please do.
12    A.  Okay, yes.
13    Q.  And you note that he regrets this
14  comment.
15    A.  Mm-hmm.
16    Q.  Now, refer to the last two pages of this
17  compilation, 2856 and 2857:  Sharon, March 15,
18  2004.  I ask you to review this.  My question is:
19  There is no reference to the comment as reported by
20  Mrs. Killian, is that right?
21    A.  There's only one small piece to it, and
22  that is the line that says on the very last three

Page 24

1  lines, which is:  Nick hasn't really apologized
2  since the incident.
3    Q.  But you would agree --
4    MR. WILLIAMSON:  To clarify the record,
5  if you're reading something from the document, would
6  you indicate what page it's on?
7    MR. RACIN:  Thank you.
8    THE WITNESS:  Okay.  It's on page 2857.
9  BY MR. RACIN:
10    Q.  Now, does the absence of any reference to
11  the comment itself suggest to you that Mrs. Killian
12  did not describe the comment during the course of
13  this meeting of March 15, 2004?
14    A.  My recollection is that if it's not in
15  the notes specifically, then it wasn't something
16  that came up in our dialogue.
17    Q.  Now, at any point did you or Ms. Denevi
18  ever share with Mrs. Killian what Ryan's account of
19  his comment was?
20    A.  I really don't have any recollection of
21  it specifically.  What I do remember is that we
22  talked to each of the department members about their

Page 25

1  recounting of events and what they wanted to share
2  and what they didn't want to share.  And that never
3  happened, because we kind of hit a wall with the
4  mediation and it didn't go forward.  So my
5  recollection is that those weren't shared.
6    Q.  Was it your belief that Mrs. Killian
7  somehow misunderstood what Mr. Ryan said in their
8  conversation?
9    A.  My response to that would be that I don't
10  think that we at any time got into the details about
11  what we thought the other or this one or what each
12  other said.  The whole purpose of this was not even
13  to go through the specifics of individual incidents
14  and try to deal with each of them.  It was to talk
15  about dealing with what happened in the past during
16  the context of the time in the art department and
17  what we could do to move beyond it to try to get to
18  a better place.
19    So there wasn't any agenda in the sense
20  of trying to deal with any individual incident, only
21  when the individual members asked us specifically to
22  deal with those things.  When we sat down, we said

7 (Pages 22 to 25)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 26

1  what is your story? We did not say specifically
2  tell me about this particular incident.
3      Q.  Well, you understood, did you not, that
4  Mrs. Killian had objected to particular offensive
5  behavior on Ryan's part?
6          MR. WILLIAMSON: Objection. Foundation.
7          THE WITNESS: I never understood anything
8  about behavior for that particular incident. I
9  understood about words and what she felt like she --
10 how she felt like she was being, you know, made to
11 feel poorly in the context of the department. There
12 was no behavior that was ever brought to my
13 attention.
14 BY MR. RACIN:
15     Q.  Well, verbal content.
16     A.  Okay. Sure.
17     Q.  And she had objected to an offensive
18 comment on Nick Ryan's part, right?
19         MR. WILLIAMSON: Objection. Foundation.
20         THE WITNESS: Yes, she objected to the
21 comment that was made.
22 BY MR. RACIN:

Page 27

1      Q.  Didn't she participate in the mediation
2  so that there would be some kind of action taken
3  with respect to that misconduct?
4          MR. WILLIAMSON: Objection. Foundation.
5  Mischaracterization of prior testimony.
6          THE WITNESS: I'm sorry. Can you repeat
7  the question again, because that kind threw me
8  completely off.
9  BY MR. RACIN:
10     Q.  You were aware that Mrs. Killian believed
11 that Ryan had said something offensive to her,
12 right?
13     A.  Yes.
14     Q.  And she thought he ought to be
15 disciplined for that, isn't that right?
16     A.  Later on once we got into a conversation
17 about her experience in the entire art department,
18 then, yes, there were instances where she brought
19 up where she felt like discipline was necessary.
20     Q.  I mean with respect to this particular
21 comment they he made to her, that is, I can't bend
22 low enough to the ground to understand you, as

Page 28

1  recounted by her.
2      A.  In our conversation, and you will see in
3  the notes from what I remember, there was a piece of
4  talking about an apology around the incident and
5  where we didn't feel like that was necessary. And
6  that's why I wrote that specifically down. It had
7  everything to do with us having a conversation about
8  what we needed to do to move forward. So you will
9  see that there is a list of things there that she
10 said she wanted. I said, how could it be made
11 right? And then there were three things that were
12 laid out there in terms of a disciplinary fashion.
13         MR. WILLIAMSON: Ms. Richards, when you
14 read from the document, be sure to mention the page
15 number and the exhibit that you're reading from.
16         THE WITNESS: Sorry. So again, I'm
17 talking about page 2857, the last four lines of the
18 document of how could it be made right, and those
19 being specific things that Sharon indicated in our
20 conversation about ways in which we could move
21 forward some resolution.
22 BY MR. RACIN:

Page 29

1      Q.  Did you ever recommend that Ryan
2  apologize?
3      A.  We talked about whether or not he had
4  apologized in my conversation with him about the
5  incident.
6      Q.  And what did he say?
7      A.  He said at the time that he had not.
8      Q.  Did you ever become aware that he had?
9      A.  No.
10     Q.  Now, again, do you know whether Mrs.
11 Killian ever found out during this period, that is,
12 the period of the events in question, what Nick Ryan
13 said about his own comment, that is, what Nick
14 Ryan's version was?
15     A.  I believe you asked me that question
16 already, and it's the same response, which is no.
17 My recollection is that in the process of us getting
18 to the point of trying to share information across
19 the department that we kind of hit a wall in terms
20 of communication. And then we never moved forward
21 with that.
22     Q.  At the risk of an objection on the ground

8 (Pages 26 to 29)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 30

1  of asked and answered, if you would refer to the
2  first page again, I would appreciate it.
3      A.  I believe that would be 2844.
4      Q.  Thank you so much.
5      A.  No problem.
6      Q.  And again, the comment from Nick is not
7  described, right?
8          MR. WILLIAMSON:  Objection.  Asked and
9  answered.
10         THE WITNESS:  No.
11 BY MR. RACIN:
12     Q.  And --
13     A.  Because again, we were talking about
14 Sharon, not talking about Nick.
15     Q.  But the entire effort had been triggered
16 by Mrs. Killian's report of an offensive comment
17 from Mr. Ryan, right?
18         MR. WILLIAMSON:  Objection.  Foundation.
19 Mischaracterization of prior testimony.
20         THE WITNESS:  No.  Our conversation --
21 our whole process of coming together, yes, that was
22 part of one of the things that it was kind of like

Page 31

1  wow, we're here again and we need to have an open
2  dialogue with the entire department about what we
3  need to do to move forward.  This was a process of
4  trying to mediate a situation between the entire
5  department, that in part I felt my first and
6  foremost duty at that moment was to try to support
7  Sharon because she had come to me initially even
8  prior to this and said about how she was unhappy in
9  the department.
10 BY MR. RACIN:
11     Q.  As you sit here now, do you find it odd
12 that there was no account of Mrs. Killian's version
13 of the comment but there is a lengthy account of
14 Nick Ryan's version?
15         MR. WILLIAMSON:  Objection as to form,
16 vague, argumentative.
17         THE WITNESS:  I'm not sure of what your
18 question is, sir.
19         MR. RACIN:  I'll withdraw it.  Thank
20 you.  Let me have this marked as Richards 2, I
21 believe.
22         (Richards Deposition Exhibit No. 2 was

Page 32

1  marked for identification.)
2  BY MR. RACIN:
3      Q.  I hand you what has been marked as
4  Richards 2 and ask you to take a look at that.  Have
5  you read it?
6      A.  Mm-hmm.
7      Q.  If you would refer to the last paragraph,
8  I would appreciate it.
9      A.  On what page, sir?
10     Q.  On page 2858.
11     A.  The first page?  Okay.
12     Q.  And I assume the second paragraph
13 reflects something that you said to Mrs. Killian.
14         MR. WILLIAMSON:  Counsel, could you
15 please clarify what paragraph you're referring to
16 when you say the second paragraph?
17         MR. RACIN:  The paragraph denominated
18 Number 2, Mariama Richards writes:  Sharon.
19 BY MR. RACIN:
20     Q.  I should clarify:  This is a responsive
21 E-mail from Sharon Killian to you, is that right?
22     A.  Mm-hmm.

Page 33

1      Q.  In response to an E-mail you drafted to
2  her.
3      A.  Yes.
4          MR. WILLIAMSON:  Excuse me.  Is this the
5  numbered Paragraph 2 on page 2858 of Richard Exhibit
6  2?
7          MR. RACIN:  Yes.
8          MR. WILLIAMSON:  Thank you.
9  BY MR. RACIN:
10     Q.  And paragraph 2 is something that you had
11 sent -- you said to Killian, right?  Quote, there is
12 an inability to really acknowledge and understand
13 the weight of past events and how they have affected
14 present circumstances.  The history of relationship
15 within the department is driving the current
16 conflict.  This reality needs to be acknowledged
17 before present attitudes can be understood and
18 improved, close quote.  Did I read that correctly?
19     A.  Yes.
20     Q.  Now, was that something that you said to
21 Killian?
22     A.  Yes.

9 (Pages 30 to 33)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 34

1    Q.   And then the last paragraph below that is
2 her response to you, is that right?
3    A.   Correct.
4    Q.   I'm not sure about this.  Paul tried to
5 treat this problem before, and it sure doesn't feel
6 good to see this shaping up as, quote, let's all get
7 together and understand each other, close quote,
8 scenario.  It's not about attitude.  It's about
9 offensive behavior.  I expected a real apology, some
10 sort of reprimand of Nick for his behavior, not
11 another, quote, let's feel good discussion, close
12 quote.
13        Now, do you recall receiving this back
14 from Mrs. Killian?
15    A.   Yes.
16    Q.   And what did you understand her to mean
17 by offensive behavior?
18    A.   If you go through our notes of my
19 discussion with Sharon, those kind of three
20 out-ordered pages, there was a culmination of a lot
21 of different things that were all characterized as
22 offensive behavior.  And so in my understanding of

Page 35

1 this, it was about that same process.  If you even
2 look ahead in the other pieces where she is
3 speaking, she's speaking to you, you know, about
4 explicit communication and, you know, and how things
5 are shaping up overall.  We're not talking about
6 a specific incident in this particular E-mail.
7    Q.   You didn't understand that to mean an
8 offensive comment?
9    A.   No, sir, I did not.
10    Q.   If you would look at the next page, 2859,
11 page 2 of 3 of this E-mail exchange -- and frankly,
12 we don't know about three.  The 2860 in the record
13 produced to us is not page 3 of this E-mail, so
14 I don't know why this is page two of three.
15        MR. WILLIAMSON:  Counsel, have you asked
16 us previously whether there was a page missing in
17 production?
18        MR. RACIN:  No, but I just noticed it,
19 frankly, in preparing today for this.  And I'm not
20 suggesting anything other than a possible gap in the
21 record.  Why don't we defer that gap at least for
22 present purposes as we speak.  Richards 3.

Page 36

1        (Richards Deposition Exhibit No. 3 was
2 marked for identification.)
3 BY MR. RACIN:
4    Q.   Don't look at that just yet.  Just keep
5 it over there.  To satisfy counsel that page 3 of 3
6 did not appear as 2859, I believe it was 2860.
7        Now, if you refer to the bottom of page
8 2859, there are other defining moments set out as
9 bullet items.  If you go down to one, two, three,
10 four, one is Laura and Nick taking steps to
11 leave me out, omit me, from decisions pertaining to
12 the art magazine that I founded seven years ago,
13 close quote.  Do you see that reference?
14        MR. WILLIAMSON:  Excuse me, counsel.  Did
15 you say you were going to paragraph 5?
16        MR. RACIN:  The bottom of the page 2859,
17 last paragraph, other defining moments.
18        MR. WILLIAMSON:  Thank you.
19        MR. RACIN:  And the fifth bullet item
20 that I just read.
21        MR. WILLIAMSON:  I'm sorry.  Thank you.
22        MR. RACIN:  Thank you.

Page 37

1 BY MR. RACIN:
2    Q.   Do you know what that referred to?
3    A.   The art mag -- Nick and -- Laura and Nick
4 taking steps to leave me out, omit me, from
5 decisions pertaining to the art magazine that I
6 founded seven years ago?  I took it to mean exactly
7 what she said in that moment.
8    Q.   Well, did you have any personal knowledge
9 of that episode?
10    A.   Of which episode?
11    Q.   That she recounts there.
12        MR. WILLIAMSON:  Foundation.  Objection.
13 Foundation.
14 BY MR. RACIN:
15    Q.   When you read it, did you know what she
16 was referring to?
17    A.   Well, I'm aware of something that went
18 down between Sharon and Nick around the art
19 magazine.  This specifically says Laura, so that's
20 why I'm confused about what you're saying.
21    Q.   Was there an episode where a meeting in
22 connection with the art magazine took place without

10  (Pages 34 to 37)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 38

1 Mrs. Killian?
2       MR. WILLIAMSON: Objection. Vague.
3 BY MR. RACIN:
4    Q.   You say you had some involvement in
5 a matter concerning the art magazine and Nick Ryan
6 and Mrs. Killian. What was that episode?
7    A.   One day I was in my office. I can't,
8 again, recall when. And Sharon came down to the
9 office upset because there had been a meeting that
10 had taken place between Nick, one of our members of
11 the development office that was in charge of alumni
12 relations, and an alum who was an artist.
13    Q.   And who was the person in charge of
14 alumni relations?
15    A.   Her name is Susie Ryan.
16    Q.   And what had happened, as you recall it?
17    A.   Well, from Sharon's perspective, she said
18 that a meeting had been set up or a meeting was
19 supposed to be set up between she and Susie and the
20 alum to discuss a showing of some of the alum's work
21 in our magazine, in the art magazine, and that
22 Sharon was very excited about the prospect of

Page 39

1 meeting with them both to try to get some additional
2 support around the art magazine.
3    Q.   Did you get involved in investigating
4 that in any way?
5    A.   There was no investigation that took
6 place.
7    Q.   Did you have any conversations about this
8 after Mrs. Killian reported it to you?
9    A.   Yes.
10    Q.   And who did you have the conversation
11 with?
12    A.   After Sharon recounted the details of
13 what happened, I spoke with her about ways in which
14 we could resolve it, to kind of open up
15 communications again between her and the development
16 office. I asked her if she would like to go and
17 speak with Susie Ryan. She told me that she did
18 not want to, that she was too upset and that she
19 couldn't do it. And at the time I told her that
20 I would be willing to go and speak with Susie about
21 the incident and what had happened.
22    Q.   And did you go and speak with Susie?

Page 40

1    A.   I did.
2    Q.   Tell us about that conversation.
3    A.   Well, we proceeded to talk about what
4 had gone forth, which was that she had set up the
5 meeting to happen between she and Sharon and the
6 alum, that she had left several messages for Sharon
7 which were not returned over the course of a week,
8 that the alum was in for a specified amount of time,
9 and that she had to get the meeting happening, and
10 after she did not hear from Sharon that she got in
11 touch with Nick Ryan, the head of the department,
12 and set up a meeting with him.
13    Q.   And did you ever express any concern that
14 the matter had not been handled properly?
15    A.   What I said to her was that there were
16 different people that were in charge of different
17 portions of the art department and their
18 publications, and that she may not have known it at
19 the time but that Sharon was in charge of the art
20 magazine and in the future could she just try to
21 make sure that she included Sharon in those
22 meetings. That was all I could say.

Page 41

1    Q.   Now, refer if you would to Richards 3,
2 I believe. Is that it?
3    A.   This it?
4    Q.   Do you recognize it?
5    A.   Yes.
6    Q.   What is it?
7    A.   This again was an attempt to take Nick's
8 notes from documents 2847, 2851 and 2852 and distill
9 them into something that was quick and readable.
10    Q.   Now, it's headed April 8th or 27th, looks
11 like new P.O.S.O.C. meeting?
12    A.   That's a completely different reference.
13 P.O.S.O.C. is our Parents of Students with Color
14 that I wrote on the same sheet.
15    Q.   Then the Major Points. Under Nick you
16 have Major Points, is that right?
17    A.   Mm-hmm.
18    Q.   And then there is a heading, Sharon,
19 right?
20    A.   Mm-hmm.
21    Q.   Just to the right of that, parens, race
22 and paranoia about Debbie, close paren, right?

11 (Pages 38 to 41)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 42

1    A.   Mm-hmm.

2    Q.   What does the reference to race indicate?

3    A.   In the process of talking to Nick, which

4 we probably should pull out of that other document,

5 but in the process of talking to Nick there was

6 a concern that he had.  And he felt like when he

7 went to her and spoke with her about particular

8 things that he felt as though she essentially --

9 again, that her problem with him was because she

10 believed that he was a racist person and that

11 because of the way in which, you know, the

12 communication had essentially fallen off that he

13 felt like she maybe could make a case against him,

14 because she was a person of color and because he was

15 white, that his choices as department chair were

16 based on race rather than what he felt as though

17 were the logical choices as a department chair.

18    Q.   Now, it's your testimony that during this

19 mediation process that Mrs. Killian never expressed

20 the belief that her treatment by Nick Ryan had been

21 affected by her race?

22    A.   Again, I am going to tell you to look at

Page 43

1 the notes in the sense that you see a mention of

2 race in Nick's notes and in this evaluation.  I was

3 just trying to become succinct around the notes,

4 that being here but not there for Sharon.  Again,

5 I wrote specifically around what it is that she said

6 in that mediation process.

7         And in fact, there was one point when

8 Elizabeth asked her straight on did she feel as

9 though this was a racially motivated incident, and

10 her response was no.  And that was in the

11 conversation of that mediation process.  So what

12 you see under race being connected with Nick was

13 specifically because Nick said it.

14    Q.   Let me hand you what has been been marked

15 in Ms. Denevi's deposition as Exhibit 3, if I might

16 have that.

17         MR. RACIN:  Do you have your copy from

18 this morning?

19         MR. WILLIAMSON:  I probably do.  Do you

20 need this copy back?  Is that what you're saying?

21         MR. RACIN:  No.

22         THE WITNESS:  Starts with 2853.

Page 44

1 BY MR. RACIN:

2    Q.   A compilation of documents, it's 2848

3 through 2855.  It looks like 2853 is a cover

4 transmittal memo dated March 2nd, '04, to Mari and

5 Elizabeth.  Is your nickname Mari, M-a-r-i?

6    A.   That is correct.

7    Q.   And you recognize the handwriting at the

8 bottom?

9    A.   Of this?

10    Q.   Right.

11    A.   I don't recognize it.  I assume it's

12 Nick.  That's what it says.

13    Q.   All right.  Do you recall receiving this

14 memo?

15    A.   Yes.

16    Q.   During the course of the mediation

17 process?

18    A.   Yes.

19    Q.   And did you retain a copy of the memo and

20 the supporting documents?  Do you recall?

21    A.   I don't recall.

22    Q.   Now, do you recall reviewing the

Page 45

1 memorandum titled Personnel issues, indicating

2 written on Tuesday, March 5th, 2002, at the time?

3 Do you recall reading it at the time?

4    A.   Oh, yes, yes, yes.  I'm sorry.

5    Q.   Did you ever discuss it with Ms. Denevi?

6 Do you recall?

7    A.   I don't recall whether or not we gave any

8 detailed kind of conversation around it.  No.

9    Q.   How did this happen to come to you, this

10 memo?

11    A.   Nick gave us a copy.

12    Q.   Did you ever inform Ms. Killian that Mr.

13 Ryan had presented any detailed recounting of events

14 of several years before, the recounting represented

15 by the memo of March 5, 2002?

16         MR. WILLIAMSON:  We object to the

17 characterization of several years before, counsel.

18 BY MR. RACIN:

19    Q.   Well, just looking at the front page,

20 2848, personnel issue, date:  Written on Tuesday,

21 March 5th, 2002, is that right?

22    A.   That's what it says at the top, yes, on

12  (Pages 42 to 45)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 46

1  page 2848.
2      Q.   And the transmittal memo on 2853
3  indicates March 2nd, 2004.
4      MR. RACIN:  If the objection is that it's
5  three days short of two years prior, I stand
6  corrected.
7      MR. WILLIAMSON:  No.  The objection is to
8  the characterization of the two-year difference as
9  several years is inaccurate.
10     MR. RACIN:  All right.
11     MR. RACIN:  All right, two-year
12 difference.
13 BY MR. RACIN:
14     Q.   Did you ever make Mrs. Killian aware that
15 Nick Ryan had furnished a detailed memorandum
16 concerning events two years prior?
17     A.   No.
18     Q.   Did you share with her any of Mr. Ryan's
19 perspectives as recounted in this memorandum?
20     A.   No.  As I said before, we got to a place
21 where there was going to be no sharing cross-stories
22 and we didn't share anything cross-story.  You may

Page 47

1  also recall that in Nick's notes, he gave a verbal
2  process around what had happened in the same
3  incident and then furnished us with this soon after.
4  I believe it was the next day, in fact, according to
5  the dates on top of both the sheets.
6      So he had already spoken to us about the
7  incident itself and then gave us this.  I believe at
8  the time Elizabeth and I felt like it was another
9  piece of what the story was that he said the day
10 before.
11     Q.   Now, did you maintain that document in
12 your files as co-diversity director?
13     A.   Co-director of diversity?
14     Q.   Co-director of diversity?
15     A.   I don't remember specifically.  It could
16 have been in my files.  It could have been in
17 Elizabeth's files.  I believe it was one copy, so
18 I'm not quite sure which file it ended up in.
19     MR. RACIN:  Thank you.  I think that's
20 about it, believe it or not, if you let me confer
21 with Ms. Killian for a second.
22     MR. WILLIAMSON:  We will do a little

Page 48

1  conferring also.
2      (Recess was taken, 2:46 to 2:52 p.m.)
3      MR. RACIN:  Back on the record.  I do
4  have a couple more questions.
5  BY MR. RACIN:
6      Q.   If you would refer again to Richards
7  Exhibit 1 and page 2845, which is headed Laura.
8  About halfway down is a bullet item:  Keep us all
9  separate is the only solution, hyphen, sharing with
10 her is the worst thing ever.  Do you recall -- is
11 that Laura Tolliver, by the way?
12     A.   That is Laura Tolliver.
13     Q.   For the record, T-o-l-l-i-v-e-r.  And do
14 you recall her making the statements to that effect?
15     A.   So much so that it's in my notes.
16     Q.   But do you recall now what she was
17 referring to?  Keep us all separate is the only
18 solution, what does she mean by that?  Do you know?
19     A.   Well, further up -- let me see, okay.
20 Further up at the top in the first paragraph of
21 2845, you will see Nick is easygoing, organized,
22 Sharon and her can't share space, that she is making

Page 49

1  a choice, Laura, making a choice to stay out of the
2  space because of the hostility that she feels from
3  Sharon.  So further down when we're talking about
4  this, she's saying -- I said, well, you know, is
5  there a way in which you guys could work together?
6  And her response was the only solution that she
7  could see was working separately.
8      Q.   Is that a practical solution in that
9  department?
10     A.   No, it wasn't a practical solution.
11     Q.   As far as you know?
12     A.   Not to my understanding, no.
13     Q.   And what does sharing with her is the
14 worst thing, what does sharing mean?
15     A.   Sharing space as well as sharing art
16 supplies.
17     Q.   Your further indulgence for a second.
18 Page 2852, which I think you have said is page 3
19 actually of the memo beginning on page 2851, the top
20 paragraph beginning, art award, named after Debbie,
21 her 36 years of service, Sharon was furious.  He
22 felt that the decision was made unilaterally.  He

13  (Pages 46 to 49)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 50

1  was annoyed by her tone, demeanor. He felt
2  disrespected and was trying to do something for
3  Debbie. He did not feel like it was her business,
4  close quote. Did I read that correctly?
5      A.   Correct.
6      Q.   Now, that sentence, he felt that the
7  decision was made unilaterally, is that saying that
8  Ryan felt the decision was made unilaterally?
9      A.   Correct.
10     Q.   What does that mean?
11         MR. WILLIAMSON: Objection. Calls for
12 speculation.
13 BY MR. RACIN:
14     Q.   Yes, if you know, if you know what it --
15     A.   I have a feeling, and yet I cannot speak
16 specific. I think this was a direct quote in terms
17 of the use of unilaterally.
18     Q.   Does that mean it was appropriate to have
19 made the decision unilaterally?
20     A.   I believe that that was his feeling at
21 the time, yes.
22     Q.   Now, the statement, did not feel like --

Page 51

1  last sentence, quote, did not feel like it was her
2  business, close quote, did you have any particular
3  reaction to that comment?
4          MR. WILLIAMSON: Objection as to form.
5  Vague.
6  BY MR. RACIN:
7      Q.   Do you recall discussing that in
8  particular with Mr. Ryan?
9      A.   No.
10     Q.   You just reported what he said.
11     A.   Correct.
12         MR. RACIN: Nothing further. Thank you
13 very much. I'm sorry I don't have more.
14         THE WITNESS: Oh, no. Believe me, this
15 is perfectly fine. Thank you.
16         MR. WILLIAMSON: We just have a few
17 questions.
18     EXAMINATION BY COUNSEL FOR DEFENDANT
19 BY MR. WILLIAMSON:
20     Q.   Ms. Richards, earlier you provided
21 testimony relating to this mediation process that
22 had been undertaken by yourself and Ms. Denevi. And

Page 52

1  at one or two points you said that there was -- you
2  ran into a wall in terms of communication or a wall
3  that prevented you from going forward and sharing
4  information. Can you explain what you meant by
5  that, please?
6      A.   Sure. In the process of -- well, in
7  choosing to do the mediation process, as I said
8  earlier, we had spoken specifically with the
9  principal, with our head of school specifically as
10 well as to Sharon, about whether or not this seemed
11 like something that could happen. In that same
12 vein, we kind of viewed Sharon as kind of like
13 the -- I don't want to use the word litmus test, but
14 kind of like, you know, going back to kind of like of
15 the central figure and the reason why we really
16 wanted to kind of move forward with this.
17         Because she had come to me about several
18 things, I wanted to really use her again as the
19 first point of contact through the department. And
20 it went back to her as we were starting to try to
21 pull the stories together and send out E-mails to
22 the individuals about did we reflect this correctly.

Page 53

1  In sending the E-mail to her, you may see that in
2  one of the documents, I believe it is 2858 and 2859,
3  Richards Exhibit 2, that she wasn't very happy with
4  what we had laid out as kind of part of what, again,
5  her story was from the mediation process.
6          After that, we went back to her and said
7  okay, well, then what would you like to do to move
8  forward, what would you like to see happen. And
9  initially, Sharon said to me that she wanted to have
10 some time off with pay. At the time I said to her,
11 well, Sharon, we don't have a sabbatical program at
12 the institution.
13         And beyond that, my concern was that if
14 she came back to the institution after the period of
15 time of absence that the same issues would still be
16 prominent there, so what should we do to kind of
17 move forward as a department rather than just
18 talking about a time of absence from the department.
19         And her response to me at the time was
20 that I don't have an answer for you. And I went
21 back to her several different times, and she kept
22 saying she didn't have an answer for me. And then

14  (Pages 50 to 53)

378520ba-40c9-468d-ae99-e036c54a708d

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 54

1  finally I said, well, Sharon, I want to know what
2  should we do, should we continue to go forward?
3  And her response to me was that she didn't have an
4  answer for me and that she felt like I was asking
5  her to do my job.
6          And in my understanding of my job, part
7  of it is the process of trying to help mediate
8  a situation, not necessarily just to give someone
9  a solution.  And I really saw looking to her as
10  kind of what are going to be our next steps in
11  this process.
12     Q.  So what did that lead you to conclude
13  about the process?
14     A.  That we had pretty much gotten to
15  a standstill, because if Sharon didn't feel
16  comfortable what sharing her story with the other
17  members with her department, I at that moment, of
18  course, would not then ask the other members of her
19  department to reveal their stories to her without
20  that same reciprocal process.  And so we kind of got
21  stalled in the mediation altogether.
22          MR. WILLIAMSON:  That's all we have,

Page 55

1  counsel.
2          MR. RACIN:  Nothing further.  Thank you
3  very much.
4          THE WITNESS:  Thank you.
5          THE REPORTER:  Mr. Williamson, are you
6  ordering?
7          MR. WILLIAMSON:  Yes, I think it's the
8  standard form of a mini, a regular and an ASCII
9  disk.  We want to read and sign for both witnesses,
10  yesterday included.  I don't think we mentioned it
11  specifically yesterday.  Do we need to call
12  separately, or is that your standard thing to
13  inquire whether somebody wants to read and sign?
14          THE REPORTER:  I'll tell them at the
15  office to tell the reporter.
16          (Signature not having been waived, at
17  3:00 p.m., the deposition of Mariama L. Richards
18  concluded.)
19
20
21
22

Page 56

1       ACKNOWLEDGMENT OF DEPONENT
2
3       DEPOSITION OF MARIAMA L. RICHARDS
4    CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006
5
6          I, MARIAMA L. RICHARDS, do hereby
7    acknowledge that I have read and examined the
8    foregoing testimony, and the same is a true,
9    correct, and complete transcription of the testimony
10    given by me, and any corrections appear on the
11    attached Errata sheet signed by me.
12
13    _____  _____
14
15       (DATE)          (SIGNATURE)
16
17
18
19
20
21
22

Page 57

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Judith F. Richard, Registered
3    Professional Reporter, the officer before whom the
4    foregoing proceedings were taken, do hereby certify
5    that the foregoing transcript is a true and correct
6    record of the proceedings; that said proceedings
7    were taken by me in stenotype and thereafter reduced
8    to computer-aided transcription by me; and that I am
9    neither counsel for, related to, nor employed by any
10    of the parties to the case and have no interest,
11    financial or otherwise, in its outcome.
12          IN WITNESS WHEREOF, I have hereunto set
13    my hand and affixed my notarial seal this 15th day
14    of October, 2006.
15
16
17
18          Judith F. Richard, RPR
19          Notary Public in and for
20          the District of Columbia
21    My commission expires
22    January 14, 2008

15 (Pages 54 to 57)

378520ba-40c9-468d-ae99-e036c54a708d

# L.A.D. REPORTING COMPANY, INC.
## 7654 Standish Place, Rockville, Maryland 20855
(301) 762-8282      (800) 292-4789      FAX (301) 762-0606      E-MAIL danielle@ladreporting.com

October 17, 2006

|  |  |
|---|---|
| **IN RE:** | **Killian v. Georgetown Day School** |
| **DATE:** | **September 27, 2006** |
| **DEPONENT/AFFIANT:** | **Mariama L. Richards** |
| **REPORTER:** | **Judith Richard** |
| **RETURN BY:** | **November 19, 2006** |

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| NUMBER | | |
| 6 | 9 | held that position since the ... |
| 6 | 11 | Elizabeth Denevi |
| 13 | 17 | the same kind of conflict... |
| | | |
| | | |
| | | |
| | | Exhibits - Richards Are still in the |
| | | wrong order. 2851, 2852, 2847 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

11/2/06
(DATE)

_(signature)_
(SIGNATURE)

DEPOSITION OF MARIAMA L. RICHARDS
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

56

1          ACKNOWLEDGMENT OF DEPONENT

2

3          DEPOSITION OF MARIAMA L. RICHARDS

4        CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

5

6          I, MARIAMA L. RICHARDS, do hereby

7    acknowledge that I have read and examined the

8    foregoing testimony, and the same is a true,

9    correct, and complete transcription of the testimony

10   given by me, and any corrections appear on the

11   attached Errata sheet signed by me.

12

13   November 2, 2006

14

15        (DATE)                    (SIGNATURE)

16

17

18

19

20

21

22

# E X H I B I T   9

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

------------------------x

SHARON KILLIAN,

      Plaintiff,

   vs.              Civil Action

GEORGETOWN DAY SCHOOL,    No. 05-1925(EGS)

      Defendant.

------------------------x

Deposition of ELIZABETH A. DENEVI

Washington, D.C.

Wednesday, September 27, 2006

9:34 a.m.

Job No. 2-87187

Pages 1 - 88

Reported by Judith F. Richard, RPR

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 2

1    Deposition of ELIZABETH A. DENEVI, held at the
2    offices of:
3    L.A.D. Reporting Company
4    Large Conference Room
5    Suite 850
6    1100 Connecticut Avenue, Northwest
7    Washington, D.C. 20036
8    (202) 861-3410
9
10
11
12
13    Pursuant to notice, before Judith F. Richard,
14    Registered Professional Reporter and Notary Public
15    for the District of Columbia.
16
17
18
19
20
21
22

Page 3

1         A P P E A R A N C E S
2    FOR THE PLAINTIFF
3       John P. Racin, Esquire
4       Law Office of John P. Racin, LLC
5       1721 Lamont Street, Northwest
6       Washington, D.C. 20010-2601
7    FOR THE DEFENDANT
8       Thomas S. Williamson Jr., Esquire
9       Timothy Clinton, Esquire
10      Covington & Burling LLP
11      1201 Pennsylvania Avenue, Northwest
12      Washington, D.C. 20004-2401
13      (202) 662-6000
14   ALSO PRESENT
15      Sharon Killian
16
17
18
19
20
21
22

Page 4

1         C O N T E N T S
2    EXAMINATION OF ELIZABETH A. DENEVI        PAGE
3       By Mr. Racin          5
4       By Mr. Williamson          83
5              - 0 -
6
7
8
9
10        E X H I B I T S
11   (Attached.)
12   DENEVI DEPOSITION                  PAGE
13   No. 1    12-pp handwritten notes          7
14   No. 2    1-p Race Relations Report title
15        page and 1-p Appendix B          19
16   No. 3    3-pp Personnel issues w/3-pp
17        attachment          66
18              - 0 -
19
20
21
22

Page 5

1         P R O C E E D I N G S
2         ELIZABETH A. DENEVI
3    having been duly sworn, testified as follows:
4       EXAMINATION BY COUNSEL FOR PLAINTIFF
5    BY MR. RACIN:
6       Q.   My name is John Racin.  I represent
7    Sharon Killian in a case that she has brought
8    against Georgetown Day School today.  I'm sure that
9    your able counsel has been over the purpose here
10   today.  But just briefly, I will be asking you
11   a series of questions which will one day appear in
12   transcript form, and your answers will also appear
13   so it's very important that you understand the
14   questions.  And I will try to make them
15   intelligible.  As Mr. Williamson can attest, I don't
16   always meet that standard.  So if I'm less than
17   clear, just let me know and I will rephrase.
18       If you require a break at any time, just
19   let me know as well.  We will certainly break
20   freely.  I would ask that any pending question be
21   asked before break.
22       MR. WILLIAMSON:  You mean answered.

2  (Pages 2 to 5)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 6

1  BY MR. RACIN:
2     Q.  I'm sorry.  Any question be answered
3  before break.  That's an example that I can be less
4  than intelligible at times.  Would you please state
5  your name for the record?
6     A.  Yes.  Elizabeth Denevi.
7     Q.  Have you done anything in preparation for
8  the deposition today?  If so, what?
9        MR. WILLIAMSON:  Objection.  Compound.
10 BY MR. RACIN:
11    Q.  You may answer.  I should say Mr.
12 Williamson will object.  If past is prologue,
13 actually he will object quite frequently.  Unless
14 you're instructed not to answer after an objection,
15 you may proceed to answer the question.
16       What if anything did you do in
17 preparation for your deposition today?
18    A.  I met with both attorneys, and I reviewed
19 my notes.
20       MR. RACIN:  Can we mark these as Denevi
21 1?
22 BY MR RACIN:

Page 7

1     Q.  Well, preliminarily, before we mark them,
2  is this your handwriting?
3     A.  That is not.
4     Q.  I'm glad I asked the question.
5        MR. WILLIAMSON:  While you're getting
6  that, I just want to caution the witness in response
7  to the question about what was done in preparation,
8  we object to the extent that that question is
9  intended to elicit any specifics about what was said
10 between counsel and Ms. Denevi in preparation for
11 the deposition on the grounds that that would be
12 a violation or an effort to invade the
13 attorney/client privilege.
14 BY MR. RACIN:
15    Q.  I just show you what may be marked as
16 Denevi 1.  Is that your handwriting?
17    A.  Yes.
18       MR. RACIN:  Let's mark this as Denevi
19 Exhibit 1.
20       (Denevi Deposition Exhibit No. 1 was
21 marked for identification.)
22 BY MR. RACIN:

Page 8

1     Q.  Did you discuss Mr. Barr's deposition
2  with him?
3     A.  No.
4     Q.  Are you represented by counsel here
5  today?  Are you represented today?
6     A.  Yes.
7        MR. RACIN:  Could we enter several
8  stipulations so I won't have to go over these
9  questions:  one, that the witness does not know when
10 she retained your firm; two, does not know the
11 hourly rate or rates involved; and three, that she
12 has never seen an invoice?
13       MR. WILLIAMSON:  Well, as to one, I think
14 you should ask her, because we don't know the answer
15 to that.  As to two, we object on attorney/client
16 privilege grounds as not really any of plaintiff's
17 business to know what the rate is for our services.
18 It has nothing at all to do with leading to
19 admissible evidence in the case.  And what was the
20 third one?
21       MR. RACIN:  Has never seen an invoice.
22       MR. WILLIAMSON:  She can answer that

Page 9

1  question -- well, no.  We will stipulate that she
2  hasn't seen anything.
3        MR. RACIN:  And does not know the hourly
4  rate involved or rates involved?
5        MR. WILLIAMSON:  I said I don't know if
6  she does or doesn't, but we would object that that
7  sort of specific about the relationship is
8  privileged information.
9  BY MR. RACIN:
10    Q.  I'm not asking about any particular
11 hourly rate, but I would ask without responding if
12 you know, yes-or-no question:  Do you know the
13 hourly rates that have been charged in this case?
14       MR. WILLIAMSON:  You can answer.
15       THE WITNESS:  No.
16 BY MR. RACIN:
17    Q.  Do you know when you retained Mr.
18 Williamson and his firm?
19    A.  I don't understand the question.
20    Q.  Let me ask it this way.  Did you retain
21 Mr. Williamson and his firm to serve as your
22 attorneys in this matter?  If so, when?

3  (Pages 6 to 9)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 10

1    A.   Are you asking me personally?  Or are you
2  asking for Georgetown Day School?
3    Q.   I'm asking you personally.
4    A.   Yes.
5    Q.   And about when did you retain Mr.
6  Williamson and his firm?
7    A.   I don't remember exactly.
8    Q.   Thank you.  Would you briefly describe
9  your employment background after college?
10    A.   After college, I -- after my
11  undergraduate work?
12    Q.   Yes.
13    A.   After my undergraduate work, I taught in
14  an independent school for two years in Colorado.
15  And then I pursued my master's degree, returned
16  to work in independent schools, then went on to
17  complete my PhD.  And now I'm currently again
18  working in an independent school.
19    Q.   When did you complete your PhD?
20    A.   January 2004.
21    Q.   In what field?
22    A.   Education.

Page 11

1    Q.   Congratulations.  When did you go to work
2  at Georgetown Day School?
3    A.   In 2000 and -- this is my fourth year.
4  That should be I started in '03, 2003.
5    Q.   And what you are your primary
6  responsibilities as diversity coordinator at G.D.S.
7    A.   I'm co-director of diversity.  I'm the
8  senior administrator, and I am responsible for the
9  administration of both campuses, pre-K through 12.
10    Q.   What does a diversity coordinator do?
11    MR. WILLIAMSON:  Objection.
12  Mischaracterization of prior testimony.
13  BY MR. RACIN:
14    Q.   What are the primary responsibilities of
15  a diversity coordinator?
16    MR. WILLIAMSON:  Objection.  Foundation.
17  Mischaracterization of prior --
18  BY MR. RACIN:
19    Q.   As a foundation, do you have
20  responsibilities as diversity coordinator?
21    A.   As diversity director, yes.
22    Q.   What is your title?  I'm sorry.

Page 12

1    A.   Co-director of diversity.
2    Q.   Co-director of diversity.  As co-director
3  of diversity, what are your primary
4  responsibilities?
5    A.   My primary responsibilities are to work
6  with all the constituents of the school to uphold
7  the mission of the school.
8    Q.   And who are the school's constituents?
9    A.   Students, staff, parents, and the
10  administration.
11    Q.   And when you say uphold the mission of
12  the school, what do you mean by that?
13    A.   To make sure that the mission is being
14  lived in the school.
15    Q.   Be sure that the mission is being lived
16  in the school.  Can you describe the mission you're
17  referring to?
18    A.   The mission is to make sure that each
19  student reaches his or her potential for learning.
20    Q.   If a diversity coordinator believes that
21  discriminatory conduct has taken place in the
22  school, what if anything can he or she do about it?

Page 13

1    MR. WILLIAMSON:  Counsel, we are going to
2  have to object again about the job title that's
3  being used.  The witness has said what her job title
4  is.  Counsel keeps inserting a different title into
5  the questions.  And we think the record would be
6  cleaner and more orderly if the correct title were
7  used.
8  BY MR. RACIN:
9    Q.   In your job at the school, if you believe
10  that discriminatory conduct has taken place, what
11  can you do about it?
12    MR. WILLIAMSON:  Objection.  Vague.
13  Calls for speculation.
14  BY MR. RACIN:
15    Q.   As I said, there will be frequent
16  objections.  I think you have discovered that
17  already.  And absent an instruction not to answer,
18  you may answer.  The objection is for record
19  purposes.  Some attorneys object more than others
20  and can be disruptive.  But if you focus on the
21  question and absent an instruction not to answer,
22  you would simply answer, I think this will go a lot

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

55deabfe-e055-4683-97c2-96bbf4ea58ca

# DEPOSITION OF ELIZABETH A. DENEVI
## CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 14

1 quicker.
2      A.   Could you repeat the question for me?
3      Q.   Yes.  In your role at the school, and
4 frankly, the exact title eludes me.  Say it one more
5 time and --
6      A.   Co-director of diversity.
7      Q.   Co-director of diversity.  I think I can
8 keep that in my mind.  As a co-director of diversity
9 at the school, if you believe that discriminatory
10 conduct has taken place, what if anything can you
11 do about it?
12          MR. WILLIAMSON:  Objection.  Vague.
13 Foundation.  Calls for speculation.
14 BY MR. RACIN:
15      Q.   As you sit here today, do you have
16 a particular belief about any action you can take
17 if you find that discriminatory conduct has taken
18 place?
19      A.   I don't have a particular belief, no.
20      Q.   So it's your testimony that you don't
21 know what you could do?
22          MR. WILLIAMSON:  Objection.

Page 15

1 Mischaracterization of prior testimony.
2 BY MR. RACIN:
3      Q.   Is it your testimony that you don't know
4 what you could do if you found that discriminatory
5 conduct had taken place at the school?
6      A.   No.
7      Q.   What is your testimony in that respect?
8      A.   Your question was do I have a particular
9 belief about what I should do.
10      Q.   Yes.
11      A.   In my role as senior administrator, it's
12 not about my belief.  It is about what the standard
13 of the school says that I must do.
14      Q.   Do you have knowledge about what you
15 could do?
16      A.   Yes.
17      Q.   If in your role as co-director of
18 diversity you believe that discriminatory conduct
19 had taken place, do you have any knowledge about
20 what you could do?
21          MR. WILLIAMSON:  Objection as to form.
22 Vague.

Page 16

1          MR. RACIN:  I would just say that for the
2 record in 675 pages of Mrs. Killian's deposition,
3 any fair review would indicate that counsel for Mrs.
4 Killian allowed Mr. Williamson to proceed with the
5 deposition in an orderly fashion without being
6 interrupted every other, even every single question.
7 And I would simply seek on the record for similar
8 courtesy on his part.
9          MR. WILLIAMSON:  Counsel, for the record,
10 as long as a question is properly framed, which is
11 what I endeavored to do when I was taking your
12 client's deposition, then there will not be any
13 objection.  But we have a right, indeed a duty, to
14 make objections for the record where there are
15 questions that are susceptible to proper objections.
16          MR. RACIN:  Let's take a quick break, ten
17 minutes.
18          (Recess was taken, 9:48 to 9:57 a.m.
19          MR. RACIN:  Back on the record.
20 BY MR. RACIN:
21      Q.   Ms. Denevi, counsel cautioned against
22 seeking nonverbal cues from your attorney before

Page 17

1 answering questions.  As co-director of diversity,
2 if you believe that discriminatory conduct at the
3 school has taken place, what if anything can you do
4 about it?
5          MR. WILLIAMSON:  Same objection.  Form.
6 Vague.
7          THE WITNESS:  I would follow the
8 standards in the handbook and report the complaint
9 to my head of school.
10 BY MR. RACIN:
11      Q.   You would report the complaint to head of
12 school.  Anything else?
13      A.   I don't quite understand.
14      Q.   I think the question was:  If you believe
15 that discriminatory conduct had taken place, what if
16 anything could do you about it as co-director of
17 diversity?
18      A.   I believe I have answered you as to what
19 I do.
20      Q.   I think your testimony was you would
21 report the complaint to the head of school.  Is that
22 right?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202) 861-3410  (800) 292-4789  (301) 762-8282  (703) 288-0026  (410) 539-3664

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 18

1      A.  Yes.
2      Q.  And that would be your complaint at that
3  point?  You would report your belief that --
4      A.  No, I would not report my belief.
5      Q.  If you determined that discriminatory
6  conduct had taken place, what if anything could you
7  do about it?
8      A.  It's not for me to determine that
9  discriminatory things have happened.
10     Q.  Now, if a co-director of diversity at
11  the school should determine that someone is being
12  terminated by reason of his or her race, does that
13  person have the ability to prevent the termination?
14         MR. WILLIAMSON: Objection. Foundation.
15  Vague.
16         THE WITNESS:  Could you repeat the
17  question, please?
18  BY MR. RACIN:
19     Q.  If a co-director of diversity should
20  determine that someone is being terminated at the
21  school by the school by reason of race, does the
22  co-director of diversity have the ability to prevent

Page 19

1  the termination, if you know?
2      A.  I do not make that determination.
3         MR. RACIN:  Will you mark this as Denevi
4  2, I guess?
5         (Denevi Deposition Exhibit No.2 was
6  marked for identification.)
7  BY MR. RACIN:
8      Q.  I am handing you what has been marked as
9  Exhibit Denevi 2 and represent to you that it's the
10  cover page of the Georgetown Day High School Race
11  Relations Report dated July 19, 1999, and Appendix B
12  thereto.  We haven't duplicated the entire report
13  out of a decent regard for trees.  But I would ask
14  that you refer to the Appendix B, Job Description
15  for Diversity Coordinator.  Would you review that
16  for a second?
17     A.  Mm-hmm.
18     Q.  Do you have the job description as
19  co-director of diversity?
20     A.  Yes.
21     Q.  Now, does it bear any resemblance to
22  Appendix B?

Page 20

1      A.  Bears some resemblance, yeah.
2      Q.  In what respect does it bear a
3  resemblance?
4      A.  I think to promote greater sensitivity to
5  diversity issues in everything the school does, and
6  then it lists the three focus areas.  Working on
7  staff, we do training, we try to raise awareness.
8  The focus on students, we work extensively with the
9  high school clubs, not all that are listed here but
10  some.  We don't still conduct a race relations
11  retreat.  Third focus is on parents.  We work with
12  different parent groups.  And the diversity task
13  force is currently not operating.
14     Q.  Thank you.  Incidentally, at the school
15  are you occasionally called a diversity coordinator?
16  Have you heard yourself referred to as a diversity
17  coordinator?
18     A.  Yes.
19     Q.  How recently?
20     A.  I don't remember.
21     Q.  Before your arrival at the school, do you
22  know if there was a diversity coordinator on board?

Page 21

1      A.  Yes, there was.
2      Q.  And who was that person?
3      A.  Was John -- well, I'm sorry.  Could you
4  repeat the question again?
5      Q.  Yes.  At the time immediately before your
6  arrival at the school, was there a person serving in
7  the diversity coordinator role?
8      A.  There were two co-directors of diversity.
9      Q.  And who were they?
10     A.  John Burghardt and Vernese -- I'm not
11  sure if it's B-u-r-g-h-a-r-d-t, and Vernese,
12  V-e-r-n-e-s-e, Edghill, E-d-g-h-i-l-l.
13     Q.  Now, you came on board as a co-director
14  of diversity.  That suggests that another person
15  came on board also in the co-director role?
16     A.  Yes.
17     Q.  And who was that person?
18     A.  Mariama, M-a-r-i-a-m-a, Richards.
19     Q.  Now, did you at the time of your arrival
20  do anything in terms of transition activity with
21  Mr. Burkhardt and/or Ms. Edghill to get their
22  perceptions of conditions at the school?

6 (Pages 18 to 21)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 22

1    A.   Perceptions, I don't remember it being
2  perceptions of conditions at the school.  But we did
3  have a meeting before we started to go over what
4  they had done during their tenure and then the next
5  steps and follow-up things that Mariama and I needed
6  to be responsible for.
7    Q.   Now, did either person identify for you
8  potential problem areas, things you ought to keep an
9  eye out for?
10   A.   I don't recollect that, no.
11   Q.   Did either Mr. Burghardt or Ms. Edghill
12 leave any documentary material behind as a potential
13 resource for you?
14   A.   Yes.
15   Q.   What did they leave?
16   A.   They left meeting agendas.  Of course,
17 the Russell report.  They left --
18   Q.   The Russell report, you're referring to
19 is Denevi 2?
20   A.   Mm-hmm, mm-hmm.  We read that when we
21 came in.  Let's see, agendas, exercises that they
22 had done for training exercises.  We had notes

Page 23

1  from -- we had faculty meeting agendas,
2  administrative meeting agendas.  That's the stuff
3  that I can remember right now.
4    Q.   Do you recall any particular faculty
5  meetings referred to?
6    A.   Referred to in the material that they
7  left for us?
8    Q.   The materials, yes, yes.
9    A.   I don't remember a particular faculty
10 meeting, no.
11   Q.   Or a particular agenda item?
12   A.   You mean of all the things they left --
13   Q.   Right.
14   A.   -- from years of --
15   Q.   Does anything stand out?
16   A.   No.
17   Q.   Did they discuss with you any particular
18 situation that they had encountered in their role as
19 co-directors of diversity?
20   A.   I'm not -- I'm not understanding what
21 you're asking for.
22   Q.   Right.  Any particular situations that

Page 24

1  had occurred at the school that had engaged them as
2  co-directors of diversity?
3    A.   Yes.
4    Q.   Do you recall what?
5    A.   One piece I remember was working with
6  the parents to try to get them more involved in
7  educational issues.  And so they had started the
8  parent diversity discussions, and that was one of
9  the main pieces about making sure that the parents
10 felt that they were supported.
11         The other big program that I think they
12 really wanted to make sure continued to happen was
13 the mentoring program at the lower middle school,
14 which is mentoring program for students of color.
15 Certainly white students are welcome to attend, but
16 it was a very positive program, wanted to make sure
17 in our roles as K-12 administrators that we were
18 paying attention to the whole -- to each division.
19   Q.   While you have been a co-director of
20 diversity, has there been any system in place for
21 documenting reports of discriminatory conduct?
22   A.   Can you repeat the question?

Page 25

1    Q.   Right.  During your tenure as a
2  co-director of diversity, has there been any system
3  in place for documenting reports of discriminatory
4  conduct at the school?
5    A.   Do you mean in my office?
6    Q.   Yes.
7    A.   No.
8    Q.   Have you as co-director of diversity had
9  reports of discriminatory conduct come your way?
10   A.   Have I had.  No, not to me personally.
11   Q.   Now, during the period you have served as
12 co-director of diversity, have you ever come to
13 believe that discriminatory conduct based on race
14 had taken place?
15   A.   Can you repeat the question?
16   Q.   During your tenure as a co-director of
17 diversity at Georgetown Day School, have you ever
18 come to believe that discriminatory conduct based on
19 race had taken place?
20         MR. WILLIAMSON:  Objection as to form.
21 Vague.
22 BY MR. RACIN:

7  (Pages 22 to 25)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 26

1    Q.   You may answer if you can.
2    A.   Say it one more time?
3    Q.   During your tenure you have served as
4  a co-director of diversity at the school, have you
5  ever come to believe that discriminatory conduct
6  based on race had taken place?
7    A.   No.
8    Q.   Have you encountered any white people at
9  G.D.S. whose interactions with minority colleagues
10 you believe characterized by a feeling of white
11 privilege or white superiority?
12       MR. WILLIAMSON:  Objection.  Compound.
13 BY MR. RACIN:
14    Q.   I can break it down.  During your time at
15 G.D.S., have you encountered any white people whose
16 interactions with their minority colleagues you
17 believe characterized by a feeling of white
18 privilege?
19    A.   Yes.
20    Q.   And can you identify those people, those
21 white people?
22    A.   I'm not understanding the question.  I'm

Page 27

1  sorry.
2    Q.   Let me try again.  When I ask you a
3  question, I'm asking in your capacity as a
4  co-director of diversity, so I don't have to have
5  that introductory clause each time.
6    A.   Okay.
7    Q.   But it goes without saying, I hope for
8  present purposes, that as a co-director of diversity
9  at the school, have you encountered any white folks
10 at G.D.S. whose interactions with their minority
11 colleagues you believe characterize by a feeling of
12 white privilege?
13       MR. WILLIAMSON:  Objection as to form.
14 Vague.
15       THE WITNESS:  I thought I answered that
16 question.
17 BY MR. RACIN:
18    Q.   And I believe you said yes.
19    A.   Yes.
20    Q.   And then I asked which white people.
21 Have you encountered white people whose interactions
22 with minorities are characterized by a sense of

Page 28

1  white privilege?
2    A.   But white privilege is everywhere.  It's
3  in this room.  It's in your law office.  It's a
4  function of American society.  I'm not quite
5  understanding what piece you're trying to -- what
6  information you're trying to get from me.  I
7  apologize.
8    Q.   So it's your belief that an attitude of
9  white -- is it your belief that an attitude of white
10 privilege prevails at Georgetown Day School?
11    A.   As white privilege prevails everywhere in
12 American society, and G.D.S., Georgetown Day School,
13 being connected to American society, yes.
14    Q.   And is it also your belief that the
15 atmosphere at Georgetown Day School is pervaded by
16 a sense of white superiority?
17    A.   No.
18    Q.   Have you ever said to Sharon Killian that
19 you believed Nick Ryan's dealings with her were
20 affected by a sense of white privilege on his part?
21    A.   Say that question one more time?
22    Q.   Have you ever said to Sharon Killian that

Page 29

1  you believe Nick Ryan's dealings with her were
2  affected by a sense of white privilege on his part?
3    A.   Probably, yes.
4    Q.   And have you said to Sharon Killian that
5  you believed that Nick Ryan's dealings with her were
6  affected by a sense of white superiority --
7    A.   No.
8    Q.   -- on his part?
9    A.   No.
10    Q.   In discussion with Sharon Killian, have
11 you ever used the words, white superiority, in
12 reference to Nick Ryan's attitudes?
13    A.   I believe you just asked me that
14 question.  I'm not understanding how you're
15 distinguishing those two questions.  Can you repeat
16 them, please?
17    Q.   In discussion with Sharon Killian, did
18 you ever use the words, white superiority, in
19 reference to Nick Ryan's attitudes?
20    A.   I do not remember using that term.
21    Q.   Did a G.D.S. parent named Rosa Grillo
22 ever speak with you about Nick Ryan?

8  (Pages 26 to 29)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 30

1    A.   Not that I remember, no.
2    Q.   Let me see if I can refresh your memory.
3  Do you recall that Rosa Grillo spoke with you about
4  Nick Ryan in connection with Nick Ryan's treatment
5  of her daughter, who had special needs?
6    A.   Don't remember, no.
7    Q.   Do you recall that Rosa Grillo ever
8  reported to you that Nick Ryan had yelled at her
9  over the phone?
10    A.   No.
11    Q.   Do you recall any discussion with Tom
12  Yoder about such an episode as concerning an
13  instance in which Nick Ryan yelled at Rosa Grillo
14  over the telephone?
15    A.   No.
16    Q.   Do you recall ever reporting to Rosa
17  Grillo that Nick Ryan was the only person in the
18  whole school, the only faculty member in the whole
19  school, who had refused to attend a session
20  concerning white privilege?
21    A.   Can you say that again?
22    Q.   Yes.  Do you recall -- let's back up

Page 31

1  a second.  Do you know Rosa Grillo?
2    A.   Yes.
3    Q.   Have you ever spoken with her?
4    A.   Yes.
5    Q.   Do you know her by sight?
6    A.   Yes.
7    Q.   And my question is:  Do you recall
8  telling her on any occasion that Nick Ryan was the
9  only faculty member in the school to have refused
10  to attend a discussion concerning white privilege?
11    A.   No.
12    Q.   Do you recall whether any other G.D.S. --
13  any G.D.S. parents have complained to you about Nick
14  Ryan in any respect?
15    A.   No.
16    Q.   Now, did there come a time when you
17  became aware that Sharon Killian had reported a
18  remark by Nick Ryan that she believed to be racist?
19    A.   No.
20    Q.   You don't recall that Sharon Killian
21  reported a comment by Nick Ryan that she believed
22  to be a racist comment?

Page 32

1    MR. WILLIAMSON:  Objection.  Asked and
2  answered.
3  BY MR. RACIN:
4    Q.   The answer is no.
5    A.   She did not report a comment to me made
6  by Nick Ryan that was a racist comment, no.
7    Q.   Do you recall her reporting any comment
8  to you that she found objectionable?
9    A.   Yes.
10    Q.   And what was that comment?
11    A.   Sharon asked to meet with me and Mariama
12  and had said that she had had a conversation with
13  Nick that was very upsetting and that he had made
14  her upset in his response -- in a conversation with
15  the two of them had had.
16    Q.   Do you recall about when this was?
17    A.   This was early -- beginning of the year
18  of '04, beginning of the second semester.
19    Q.   And how did you become aware of the
20  complaint?
21    A.   Sharon came and spoke about it.
22    Q.   And do you know that was the first time

Page 33

1  that Sharon had raised the issue?
2    A.   Had raised which issue?
3    Q.   With a co-director of diversity.  Do you
4  know if she had already discussed the matter with
5  Mariama Richards or not?
6    A.   I don't remember the exact chain of
7  events of who she spoke to first.
8    Q.   Now, at the time that she came to you,
9  did you know the people in the art department?
10    A.   Yes.
11    Q.   And you knew Nick Ryan.
12    A.   Mm-hmm.
13    Q.   You knew Laurie Tolliver.
14    A.   Mm-hmm.
15    MR. WILLIAMSON:  Excuse me.  You should
16  say yes or no --
17    THE WITNESS:  I'm sorry.  Yes, I knew
18  Nick Ryan and yes, I knew Laurie Tolliver.
19    MR. RACIN:  Thank you, Mr. Williamson.
20  BY MR. RACIN:
21    Q.   And did you have social relationships
22  outside work with any of them?

9  (Pages 30 to 33)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 34

1    A.  No.
2    Q.  So you knew them strictly in a colleague
3  form.
4    A.  Yes.
5    Q.  Now, what did Mrs. Killian report to you?
6    A.  She reported that she and Nick had been
7  having a conversation, and it had gotten to a
8  frustrating point and that Nick had said to Sharon,
9  to my recollection, I don't remember the exact
10  words, but said to Sharon, I can't get sort of low
11  enough to please you, because of the conflicts they
12  were having in the conversation.  And it was, to
13  Sharon, feeling like, when she came to us, said that
14  Nick was saying that she was -- he was trying to get
15  low, to get low to her level.  And she was very
16  upset, and she asked if Mariama and I would be
17  willing to help her.
18    Q.  Now, did she say that Ryan had made any
19  physical gestures while --
20    A.  No.
21    Q.  -- while making the comment?
22    A.  No.

Page 35

1    Q.  You don't recall that she said he bent
2  low in his chair, made gestures with his hands?
3    A.  She did not tell me that, no.
4    Q.  Do you recall her saying that she
5  believed Ryan was indicating she was less than
6  human?
7    A.  Less -- could you say that the last part,
8  please?
9    Q.  Subhuman.
10    A.  I don't -- I don't remember that.
11    Q.  Now, she came to you in your capacity as
12  a co-director of diversity.
13    A.  Mm-hmm.
14    Q.  And Ms. Richards, is that right?
15    A.  Mm-hmm.
16    Q.  And is it reasonable to assume that she
17  came to you because she believed the remark was
18  discriminatory in nature?
19        MR. WILLIAMSON:  Objection.  Foundation.
20  Argumentative.
21  BY MR. RACIN:
22    Q.  Did you not understand at the time that

Page 36

1  she understood the comment to be discriminatory in
2  nature?
3        MR. WILLIAMSON:  Also vague.
4  BY MR. RACIN:
5    Q.  You may answer.
6    A.  No, she did not indicate that it was
7  a discriminatory comment.
8    Q.  Well, there is a human resource
9  department at G.D.S., right?
10        MR. WILLIAMSON:  Objection.  Foundation.
11  I'll withdraw the objection.  Go ahead.
12        THE WITNESS:  No, there is not.
13  BY MR. RACIN:
14    Q.  Is there anything akin to a human
15  resources office?
16    A.  We have a director of studies office
17  that's in charge of hiring.  Is that what you're --
18  I'm not sure what you're getting at.
19    Q.  Well, if an employee has a complaint
20  about a colleague, is your office the only place to
21  go to complain?
22    A.  No.

Page 37

1    Q.  At G.D.S.
2    A.  No.
3    Q.  What are the other potential outlets for
4  complaint?
5    A.  If a staff member has a complaint about
6  a colleague, they can go to their direct supervisor,
7  they can go to a division director, essentially
8  anyone on the senior administrative team.  So they
9  can go to Emari, division director.  They can also
10  go to Peter Branch, the head of the school.
11    Q.  Isn't your office, though, regarded as
12  a guarantor of equity in the school?
13        MR. WILLIAMSON:  Objection.  Foundation.
14        THE WITNESS:  No, we are not a guarantor
15  of equity.  We can't guarantee equity.
16  BY MR. RACIN:
17    Q.  Isn't that a primary concern expressed by
18  your office?
19    A.  It's a goal.  It's not a guarantee.
20    Q.  Now, did you take notes in the initial
21  interview with --
22    A.  The initial?

10  (Pages 34 to 37)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 38

1    Q.   When Sharon first came to report this
2  conversation, did you take notes?
3    A.   No.
4    Q.   Now, where did the conversation take
5  place?
6    A.   In our office.
7    Q.   And do you recall how long it lasted?
8    A.   I don't remember.
9    Q.   Do you recall what -- can you say
10  anything about Ms. Killian's emotional condition at
11  the time?
12    A.   She was very upset.
13    Q.   Was she crying?
14    A.   I can't remember.
15    Q.   Now, do you recall the nature of the
16  discussion that Mrs. Killian reported having with
17  Nick Ryan, the reason she was speaking with him in
18  the first place?
19    A.   I remember that part of the concern had
20  been -- part of what she expressed was the -- I want
21  to make sure that I remember properly.  My
22  recollection is that part of it was in relation to

Page 39

1  the alumni office and an artist that Sharon had
2  been in contact with and that, if I'm remembering
3  correctly, and that there had been a
4  miscommunication around the meeting time.  And
5  I believe this was a follow-up conversation with
6  Nick that Sharon was upset but said she was unable
7  to make the meeting between the alumni office and
8  the art department.
9    Q.   You don't recall that Mrs. Killian had
10  been discussing a course title with Mr. Ryan?
11    A.   I don't -- at that initial meeting, no.
12    Q.   Do you recall that Mrs. Killian said that
13  before going and speaking with Ryan she had spoken
14  with Kevin Barr?
15    A.   I don't remember.
16    Q.   Do you recall if she had said she had
17  first gone to Paul Levy, the principal of the
18  school, about the same subject?  Does that sound
19  familiar?
20    A.   I know that she had spoken with Paul.
21  I don't remember if she said that she had gone to
22  speak with Paul before she spoke with me and

Page 40

1  Mariama.  I just -- I don't recollect that.
2    Q.   You don't recall that she had said that
3  Paul Levy then sent her to Kevin Barr.
4    A.   Well, as I just said to you, I don't
5  remember the chain of events of who she spoke to
6  before coming to me and Mariama.
7    Q.   Now as you sit here today, your
8  recollection is that the conversation that Mrs.
9  Killian was having with Nick Ryan concerned an art
10  magazine?  Is that your testimony?
11    A.   It was -- my recollection is it was the
12  tension in the department.  It was great frustration
13  and miscommunication.  And my recollection is that,
14  a part that I can remember was that it had to do
15  with the meeting of the art magazine and getting the
16  artist involved.
17    Q.   When Ms. Killian reported to you, did she
18  say that Ryan immediately began screaming at her
19  during the conversation?
20    A.   I don't recall her saying he was
21  screaming at that time, no.
22    Q.   So your testimony is you did not

Page 41

1  understand Sharon Killian to be reporting an episode
2  that she believed to be racist in nature.
3    A.   Absolutely not.
4    Q.   I will now hand you what has been marked
5  as Denevi 1.  I think you gentlemen have a copy.
6  I ask if you recognize the compilation of --
7    A.   Mm-hmm.
8    Q.   -- handwritten notes marked as Denevi 1
9  and bearing Bates numbers 2782 through 2794.
10    A.   Yes -- oh, no, this is not.
11    Q.   Actually, 2794 --
12    A.   2794 is not my handwriting.
13    Q.   Let's delete 2794 from the exhibit.  This
14  appears to be not --
15    A.   That's not mine.  Let me make sure about
16  the rest of it.
17    Q.   If you could do that quickly and make
18  sure.
19    A.   These are all my handwriting except for
20  page 2794.
21    Q.   Thank you.  Unless I'm missing something,
22  I don't see a date.  There is a date -- excuse me --

11  (Pages 38 to 41)

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 42

1  at 2788, the date in the upper left, 3/1/04.
2      A.  Mm-hmm.
3      Q.  Is it accurate to say otherwise undated?
4      A.  Yes.
5          MR. RACIN:  With the court's indulgence,
6  I'm just trying to locate --
7          MR. WILLIAMSON:  Counsel, I wish I were
8  the court.  I will give you your indulgence anyway.
9          MR. RACIN:  I'm practicing for when you
10  are.  I'll be in tough shape, recusal.  Off the
11  record for a second.
12         (Discussion was held off the record.)
13         MR. RACIN:  May we have a short break?
14         MR. WILLIAMSON:  Sure.
15         MR. RACIN:  Ten minutes.
16         MR. WILLIAMSON:  If you can do it in
17  five, I'll appreciate it.
18         (Recess was taken, to 10:34 to 10:40
19  a.m.)
20         MR. RACIN:  Back on the record.
21  BY MR. RACIN:
22      Q.  Let's try to go through what has been

Page 43

1  marked as Denevi 1.  I don't think I will be
2  examining on portions that may be difficult to read.
3      A.  Okay.
4      Q.  Now, the first page is headed Sharon, is
5  that right?
6      A.  Mm-hmm.
7      Q.  Does this pertain to a conversation you
8  had with Sharon Killian?
9      A.  Yes.
10     Q.  And do you recall about when the
11  conversation took place?
12     A.  I believe it was February of '03.
13     Q.  Might it have been '04?
14     A.  I'm sorry -- February of '04.  I
15  apologize.
16     Q.  Thank you.  And do you recall that or
17  not?
18     A.  Do I recall?
19     Q.  Mr. Williamson doesn't want me to
20  testify.  He wants this to be your recollection.
21     A.  Mm-hmm.  Yes, I recall that it was
22  February of '04.

Page 44

1      Q.  Thank you.  And who attended this
2  interview?
3      A.  The mediation, me and Mariama and Sharon.
4      Q.  And let me ask you:  Halfway down there
5  is a reference, equity, and then arrow.  I think
6  that reads:  Said Nick was okay?
7      A.  Mm-hmm.
8      Q.  And what does that suggest to you that
9  she said on that occasion?
10     A.  That would be on the topic of equity, and
11  then my arrow is referral to, said that Nick was
12  okay on the issue of equity.
13     Q.  Now, if you refer to page 2784?
14     A.  Mm-hmm.
15     Q.  Halfway down:  Sharon, suffering, no
16  sorry, no apology.  Is that what that says?
17     A.  Mm-hmm.
18     Q.  And do you recall what that referred to?
19     A.  That's what Sharon was saying to us, that
20  she felt like she was suffering.  So no sorry, no
21  apology is that she was not -- there was not apology
22  to her.  That's a reference back to Sharon.

Page 45

1      Q.  Now, did that refer to the comment that
2  Nick Ryan -- that she had reported that Nick Ryan
3  made?
4      A.  That referred to Sharon's general, her
5  feeling, her state at the time.  I may not have
6  understood your question.
7      Q.  My question was if that referred to the
8  Ryan comment.
9      A.  I don't recall if that was a direct --
10  I can't remember the chain of the conversation, if
11  it was direct back to that.  Certainly was probably
12  a piece of that, but I don't remember if there were
13  other things that had -- there were other things
14  that had come up that Sharon had talked that you
15  can see in the notes, so.
16     Q.  Now, she came to you originally because
17  she was upset about a comment from Nick Ryan, is
18  that right?
19     A.  Yes.
20     Q.  The reason that she came to you and Ms.
21  Richards originally was a comment by Nick Ryan that
22  had upset her.

12  (Pages 42 to 45)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 46

1    A.   Yes.
2    Q.   In this conversation with her, did you
3  discuss that comment at all?
4    A.   Did we discuss that comment.  My
5  recollection -- this was our first meeting of the
6  mediation, and the piece was to have Sharon tell us
7  what was happening for her, because it was a way of
8  trying to bring the department back together again.
9  So this wasn't just about the comment that Nick
10  made.  This was where are you, what's happening,
11  tell us your story.  That is what these notes refer
12  to.
13    Q.   Was it in part about the comment?
14    A.   Yes.
15    Q.   Is there any mention made of the comment,
16  and I'll refer you to --
17    A.   I don't believe so.  I'll read it over
18  again, but.
19       MR. WILLIAMSON:  Counsel, let's be sure
20  the witness has a chance to read these notes over.
21       MR. RACIN:  Sure.  Do you want to take
22  a few minutes?

Page 47

1       MR. WILLIAMSON:  Why don't we go off for
2  five minutes, and you read through this.  If we're
3  going to have a continuing series of questions, that
4  will make it more efficient.
5       THE WITNESS:  Okay.
6       (Off the record, 10:45 to 10:47 a.m.)
7       MR. WILLIAMSON:  Ready to go back on?
8       THE WITNESS:  Mm-hmm, yes.
9  BY MR. RACIN:
10    Q.   Now, did the first three pages of Denevi
11  1, 2782 through 2784, reflect the interview with Ms.
12  Killian?
13    A.   This was the first meeting of the
14  mediation with Sharon, yes.
15    Q.   They don't include 2785.
16    A.   I'm just trying to see where this one
17  comes in.  Do you have another copy?  I'm just
18  wondering what's in that corner.
19    Q.   Here's a clean one.
20    A.   I'm trying to figure out where 2785 fits
21  into.  This seems to be out of order.  Is there
22  a staple?  Yeah, that doesn't -- 2785 is not part

Page 48

1  of our conversation with Sharon.
2       MR. WILLIAMSON:  Here is a better one.
3       MR. RACIN:  Thank you.
4  BY MR. RACIN:
5    Q.   Now, again referring to 2784, in that
6  same line, no sorry, no apology, what did you
7  understand that meant, no sorry for what?
8    A.   Didn't you ask me that?
9    Q.   I did.  I just want to make sure I'm
10  clear on it.
11    A.   To the best of my recollection, no sorry,
12  no apology was referring to -- I'm sorry.  I need
13  you to ask question again.  I'm not understanding
14  you're getting at.
15    Q.   Did that refer to the Ryan comment?
16    A.   I don't -- I don't remember.
17    Q.   Now, is there any mention of the Ryan
18  comment, of Killian's account of the Ryan comment
19  in these --
20    A.   No, I did not see anything.
21    Q.   -- three pages?  Now, refer to, looks
22  like page 2788 in the handwritten 3/1/04, and the

Page 49

1  name Nick in the box, looks like.
2    A.   Mm-hmm.
3    Q.   Is this a comment of the conversation
4  with Nick Ryan?
5    A.   This was Nick's mediation conversation
6  similar to the one with Sharon.
7    Q.   And do you recall about when in time this
8  would have taken place compared with the Killian
9  conversation, about?
10    A.   In the general time frame.  I do not
11  remember between Nick, Laura, and Sharon whose
12  interview was first, whose mediation was first.
13  I don't remember that.  But in roughly the same,
14  the time being sort of February, March of '04.
15    Q.   Now, on 2788, do you see in brackets
16  Debbie, colon?  I think that's:  Part time when
17  Nick came.  Is that right?
18    A.   Mm-hmm.
19    Q.   An then an arrow under Debbie:  Did do
20  terrible things.  What did that refer to?
21    A.   That was what Nick said to us, so I was
22  making notes about that, because it was prior to --

13  (Pages 46 to 49)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 50

1  Mari and I were not at the school when Debbie was
2  there.
3     Q.   Do you recall what those terrible things
4  were?
5     A.   I don't remember Nick elaborating what
6  they were.
7     Q.   Do you recall whether they were terrible
8  things with respect to Debbie's dealings with Mrs.
9  Killian?
10    A.   My recollection of what was understanding
11  with Debbie was that Debbie had personal issues and
12  personal problems, and that's what I remember, her
13  personal issues having struggles.  I do not
14  recollect, because Mari and I were not co-directors
15  at the time when Debbie was employed at G.D.S.
16    Q.   Now, if you will refer to 2790.
17    A.   Mm-hmm.
18    Q.   And I guess I will need some help with
19  the translation of the -- you can refer to that.
20    A.   Mm-hmm.
21    Q.   Can you make that -- beginning with Art
22  Award at the top of the page, could you read that

Page 51

1  into the record if you can make it out?
2     A.   Yes.  This is Nick speaking to us, and he
3  said:  Art award named for Debbie to recognize her
4  service, arrow, made the decision with Paul.  And
5  then I have a star, and it says harsh tone,
6  challenge from Sharon, hyphen, put Nick off, thought
7  Sharon was out of line, annoyed with her tone of
8  voice, unnecessary, didn't do it to hurt Sharon,
9  trying to close a chapter with Debbie.  Do you want
10  me to keep going?
11    Q.   Please do.
12    A.   I didn't think it was any of Sharon's
13  business, hyphen, about 36 years of service.  And
14  then I have:  School ends, dot, dot, dot, the
15  elipse, and then the initial N, hyphen, quote, Nick
16  saying, quote, Nick likes to be nice to people, end
17  quote.
18    Q.   Thank you.
19    A.   Okay.
20    Q.   Now, do you recall having any particular
21  reaction to the comment, didn't think it was any of
22  Sharon's business?

Page 52

1     A.   Particular, did I have a particular --
2  could you say it one more time?
3     Q.   Well, let me ask it a different way.  Did
4  that comment from Ryan surprise you at all?
5     A.   I don't remember.
6     Q.   Well, from where you sit, Sharon was
7  a member of the department, is that right?
8     A.   Mm-hmm, yes, she was a member of the art
9  department.
10    Q.   And do you think the naming of an award
11  should have been some of her business?
12    A.   I can't speak to -- I didn't know the
13  department procedures at that time, what it had
14  been.  This was simply Nick giving us past history.
15  So I don't know what the process was for determining
16  art awards.  I wouldn't have known at that time how
17  they came about it.  This is simply to get Nick's
18  story.  It's not for a reaction from me.  It was to
19  record what he was telling us about the conflicts
20  with Sharon.
21    Q.   So you don't recall any particular
22  reaction from that comment from Ryan at the time.

Page 53

1     A.   Would you ask the question again?
2     Q.   Now, as you sit here today, you don't
3  recall having any particular reaction to the
4  comment, didn't think it was any of Sharon's
5  business.
6     A.   I think I answered -- is there something
7  that I answered that was not clear or?  Okay.
8     Q.   Your answer is no, you don't recall
9  having any particular reaction, you were simply
10  reporting.
11         MR. WILLIAMSON:  Objection.  Asked and
12  answered.
13  BY MR. RACIN:
14    Q.   Now, if you turn to 2792, towards the
15  bottom of the page there is a reference to A.P. 2-D
16  design, looks like:  Anyone can take A.P., school
17  policy.
18    A.   Mm-hmm.
19    Q.   Next line:  Sharon V -- is the letter V,
20  I assume, very?
21    A.   Very, mm-hmm.
22    Q.   -- upset.  You made that decision, in

14  (Pages 50 to 53)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 54

1    quotes, right?
2        A.    Mm-hmm.
3        Q.    Then N, quote:  No, that's the school's
4    decision, close quote.  Does this appear to be the
5    conversation that led to the offensive comment?
6        A.    I don't remember.
7        Q.    Do you recall?
8        A.    I don't remember.
9        Q.    But perhaps you can read the rest
10   beginning with Escalated.
11       A.    Escalated, rejecting what Nick was
12   saying, then N, hyphen, and then quotation marks,
13   what do you want from me, close quotation marks, and
14   then will not listen, and then comment, quotation
15   marks, can't lower myself to please you.  And then
16   I wrote: Intention versus outcome.  I'm sorry, that
17   was in quotes.  Can't lower myself to please you was
18   in quotation marks.  Did not respect him, giving him
19   a hard time, hyphen, why, question mark.
20       Q.    Does this refresh your recollection about
21   the conversation that you were having at the time of
22   the comment?

Page 55

1        A.    It's possible.  I don't remember directly
2    if it was that specific conversation or it was
3    another.  I mean I honestly can't say I remember.
4        Q.    Can you say why Ryan's account of the
5    comment appears -- well, first of all, so Ryan's
6    report of what he said appears in your notes
7    concerning his interview, right?
8        A.    Ryans report, yes, that's what Ryan is
9    reporting to us.
10       Q.    And we have already established that in
11   your conversation with Mrs. Killian, her report of
12   the comment is not mentioned.  Is that right?  We
13   have established that.  You agree with that.
14           MR. WILLIAMSON:  Objection.  Foundation.
15           THE WITNESS:  No, I don't agree with
16   that, no.  You're saying two different things.
17   BY MR. RACIN:
18       Q.    Let's refer back.  I just want to make
19   sure we're on the same three pages here.  Turn back
20   to the first three pages of Denevi 1, 2782 through
21   2784.
22       A.    Mm-hmm.

Page 56

1        Q.    And I ask you to refer to any mention of
2    Mrs. Killian's account of the comment that offended
3    her.
4           MR. WILLIAMSON:  Objection, counsel.  Are
5    you limiting that to those three pages, or are you
6    talking about anywhere in the notes that were taken
7    during the mediation?  Would you just clarify that?
8           MR. RACIN:  For now I'm looking at --
9           THE WITNESS:  These three.
10          MR. RACIN:  -- these three.
11          THE WITNESS:  And what do you want to
12   know?
13   BY MR. RACIN:
14       Q.    Is there any mention made of the comment
15   that Mrs. Killian found offensive?
16       A.    This refers back to my earlier answer,
17   and it's just making me a bit uncomfortable.  What
18   I said was, was that this is Sharon's recollection
19   of what she wanted to share with us about her story.
20   These are not my -- this is recounting the
21   conversation that we were having with Sharon.
22       Q.    Right.

Page 57

1        A.    So I don't -- and as I said to you about
2    the point with Nick's comment similarly, there is
3    all kinds of things mentioned in here.  So I
4    don't -- I'm confused about -- I can't remember back
5    specifically to -- the process of mediation is to
6    try to figure out what the source of the conflict is
7    and how folks can move forward.  There are varying
8    truths.  There are different stories.  The idea is
9    to find way for these three folks to move forward.
10   So I'm a little bit confused about what you're
11   asking me to try to extract from that process.
12       Q.    Let me ask you this question:  Does the
13   absence of any reference to the comment in these
14   first three pages of notes suggest to you, as you
15   sit here today, that Mrs. Killian didn't mention the
16   comment during that interview?
17          MR. WILLIAMSON:  Objection.  Foundation.
18   BY MR. RACIN:
19       Q.    Well, there is no mention -- we have
20   established there is no mention of it in these first
21   three pages, is that right?
22          MR. WILLIAMSON:  Well, counsel, you have

15  (Pages 54 to 57)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 58

1   shifted your question is part of the concern that
2   motivates the objection here.  You're saying, as
3   I understood the question, that there is an absence
4   of any reference to the comment in these pages.
5         MR. RACIN:  In the first three pages.
6         MR. WILLIAMSON:  In the first three
7   pages.  Why don't we let the witness look at those
8   three pages and see whether she agrees whether there
9   is an absence of any reference to the comment.
10        MR. RACIN:  I thought I had done that,
11  but I will be happy to provide that opportunity.
12        THE WITNESS:  My concern is the way you
13  were characterizing the notes, and what my testimony
14  was is where my concern is.
15  BY MR. RACIN:
16    Q.   What is your concern?
17    A.   My concern is that this was to get
18  a general picture, was to understand what was
19  happening and what the concerns were.  That was
20  the purpose of this piece.  There is nothing
21  specifically written here about that, but that was
22  the reason for the mediation and why he had come

Page 59

1   together was to try to bring these three folks back
2   together to be able to work together.  So I just
3   want to just have that be clear on the record.
4     Q.   All right.  We have established that in
5   the first three pages there is no reference to the
6   comment that Ms. Killian found offensive, right?
7     A.   It is not quoted here, no.
8     Q.   Thank you.  And does that suggest to you,
9   as you sit here now, that it wasn't mentioned in
10  that initial conversation?
11    A.   I don't remember.
12    Q.   Now, would you take a look through the
13  remainder of these pages and see if there's any
14  mention made of the comment as reported by Mrs.
15  Killian?  And take all the time that you need.
16        (Off the record, 11:03 to 11:15 a.m.)
17  BY MR. RACIN:
18    Q.   Ready?
19    A.   Yes.  Apart from that, I can't remember
20  exactly what that comment is on 2792 that you went
21  over from Nick, I'm not sure if that was directed
22  back to that initial incident that you're asking

Page 60

1   me about.  I can't remember if it specifically is.
2   Seems connected in some way but it doesn't seem
3   specific.  I didn't see any other references in
4   the notes.
5     Q.   Thank you.  Now, did you ever tell Mrs.
6   Killian what Nick Ryan had said he said during that
7   conversation?
8     A.   The mediation process, the way that it
9   works is we spoke with Sharon and Nick and Laura,
10  and we said Mari and I are not trained certified
11  mediators but we would like to offer this process
12  to try to solve the miscommunication, told the three
13  folks that we would be interviewing the three of
14  them, then we would play back the stories that each
15  told and they would have the permission, so if
16  Sharon told her story I would play back to her what
17  we thought her story was and she could edit it and
18  she could say what -- she could have approval of
19  what could be shared with Nick and Laura.
20        So these are my notes that are before us.
21  These were things that only I saw and took.  Then we
22  distilled what we thought were the current issues,

Page 61

1   gave them to Sharon, to Nick, and Laura after the
2   three initial stories, labeled them Sharon's story,
3   Nick's story and Laura's story, and told the other
4   folks what each person involved in the mediation
5   had approved to be told back.  It wasn't what they
6   received -- I'm confused if you're asking if they
7   they received these notes.  These were my personal
8   notes to help me keep track of what was happening
9   with the mediation.
10    Q.   My question may have been less than
11  clear.  Ryan gave an account of what he had said
12  during the conversation that upset Mrs. Killian so
13  much, right?
14    A.   I'm sorry.  Say again?
15    Q.   Ryan gave an account of what he said from
16  his point of view in the conversation that had upset
17  Mrs. Killian so much and led her to contact you all,
18  right?
19    A.   No.
20    Q.   Again, 2792, N, quote, what do you want
21  from me, close quote.  The next line down, quote,
22  can't lower myself to please you, close quote.  Now,

16  (Pages 58 to 61)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 62

1    that represented Ryan's account of what he had
2    actually said in the conversation with Mrs. Killian.
3        A.   I was very clear with you that I just
4    said in my testimony that I do not directly remember
5    if that was absolutely back to that incident or if
6    that was another incident. It's not clear here, and
7    I can't remember exactly. I have spoken to you at
8    least twice, and you're misinterpreting my words,
9    that I have said that Nick's -- this is relaying,
10   the quote is what he is saying to Mariama and I.
11   I don't remember. There is a whole 'nother
12   conversation that happens in the notes that's
13   listed here.
14           I can't say with any certainty that you
15   are saying that my testimony says. I want to be
16   very clear. I cannot directly remember what exactly
17   he is referring back to there. I said it is
18   possible, not saying it's not possible, but I can't
19   under oath say that I directly, absolutely remember
20   what that was. That would be -- that would not be
21   accurate.
22       Q.   I can be thick. The veil has fallen

Page 63

1    away. Thank you for clarifying. You don't know
2    whether this refers to Ryan's version of the comment
3    that upset Mrs. Killian so.
4        A.   Can't be sure.
5        Q.   I understand that. Thank you very much.
6    Did you ever report to Mrs. Killian Ryan's version
7    of what he had said in the conversation with Ryan
8    that upset her?
9        A.   As I said before, I reported to each
10   member of the mediation piece that they felt
11   comfortable sharing with the other people in the
12   mediation.
13       Q.   Right.
14       A.   I didn't go to Sharon and say here's what
15   Nick said. I said, as I did with all three of them
16   to respect out of the three of them what piece,
17   here's what I had heard, here's what Mariama and
18   I heard, are you comfortable with us sharing this
19   with your colleagues. And they decided what part
20   of their story they wanted to be shared. And that
21   is all from Mariama and I that was shared.
22       Q.   Do you recall whether Nick Ryan ever

Page 64

1    authorized you to share his version of what he had
2    said in the conversation with Mrs. Killian --
3        A.   I honestly don't remember.
4        Q.   -- that upset her?
5        A.   I don't remember.
6        Q.   If you refer to page, the bottom of page
7    2782 continuing to the top of 2783, would you read
8    that last line in the record? I'm sorry. My copy
9    is --
10       A.   2782?
11       Q.   2782, right.
12       A.   It's years. And then I can't read the
13   second word. Hyphen, Nick here.
14       Q.   I'm sorry, the last line.
15       A.   I'm sorry. The last line. Oh, B.C.C.,
16   Black Culture Club assembly planning. Then it says:
17   Use art room. And then there is a line that says
18   Nick and Laura were not happy with kids there.
19       Q.   And then continuing on the next page?
20       A.   Mm-hmm. Brother's death, and then an
21   arrow: Unfeeling towards her. And then: Took down
22   Laura's stuff to put art from black artists for

Page 65

1    assembly. And then I have an arrow coming down from
2    the took down piece: Laura stopped with sanctions
3    from Nick, didn't get approval. And then Nick,
4    colon, I think it's through B.C.C., Black Culture
5    Club stuff around studio. And then there's a hyphen
6    that says: Sharon wonders, colon, negative response
7    only to this, exclamation point, why, question mark.
8    Then there's an arrow coming down from Nick, says:
9    Felt like Sharon had called him a racist, and then
10   in quotes, had a fit, arrow, screaming.
11       Q.   Thank you. Now, do you recall whether
12   you ever took up the matter of the Black Culture
13   Club assembly with Nick Ryan to get his perspective
14   of what Sharon had reported?
15       A.   Let me look at Nick's notes. I do not
16   see another reference to it.
17       Q.   Did Nick Ryan ever supplement the record,
18   so to speak, submit anything to you and Ms. Richards
19   concerning anything pertaining to this episode?
20           MR. WILLIAMSON: Objection.
21   Mischaracterization of prior testimony. There is
22   no indication that there is a formal record that

17 (Pages 62 to 65)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 66

1  was being maintained or that was available to be
2  supplemented by Mr. Ryan.
3  BY MR. RACIN:
4      Q.   Well, what did you do with these notes
5  after preparing them?
6      A.   Just kept them in my personal file.
7      Q.   Maintained them in your files, right?
8      A.   (Nodded.)
9          MR. RACIN:  Will you mark this as Denevi
10 3?
11         (Denevi Deposition Exhibit No. 3 was
12 marked for identification.)
13 BY MR. RACIN:
14     Q.   Denevi 3, I think, is in order Bates
15 numberwise but a little out of order when it comes
16 to the -- I think if you refer to Denevi 3, memo
17 concerning personnel issues, Date:  Written on
18 Tuesday, March 5th, 2002, three-page memo through
19 2850; 2853 appears to be a memo to you and Mari.
20 Is that Mariama Richards?
21     A.   On 2853?  Yeah, Mari, that's her
22 shortened version of her name.

Page 67

1      Q.   Nickname?  And you recognize the
2  signature?
3      A.   I don't -- I believe it says Nick.
4      Q.   Think that's a memo from Nick Ryan?
5      A.   Mm-hmm.
6      Q.   And 2854 and 2855 is a two-page document
7  headed Advanced Technology for the Studio Arts, one
8  section of students, parens, renamed Advanced
9  Graphic Design for '04.
10     A.   Mm-hmm.
11     Q.   Close quote.  Do you recall receiving
12 this memo and the accompanying documents from Nick
13 Ryan?
14     A.   I don't recall them, but it's there.
15     Q.   You don't have any independent knowledge
16 of these documents as you sit here today?
17     A.   I don't have any what?
18     Q.   Well, any recollection of having received
19 these documents on or about March 2nd, '04?
20     A.   The tech summary and the list of classes,
21 no.  You're talking about the two --
22     Q.   Right.

Page 68

1      A.   Correct.
2      Q.   Were these maintained in your file along
3  with your --
4      A.   No.
5      Q.   -- your notes?
6      A.   I didn't have copies of this, no.
7      Q.   And the memo Bates number 2853 dated
8  March 2, '04, was not maintained in your --
9      A.   No.  I did not have a copy of that.
10     Q.   -- file concerning.
11     A.   Uh-uh.  That's easy.
12     Q.   Now, in connection with this mediation
13 process, did you understand that Sharon Killian had
14 made a specific allegation of misconduct against
15 Nick Ryan?
16     A.   No.
17     Q.   Did you understand that she had said
18 that he had made an offensive comment during a
19 conversation with her?
20     A.   Yes.
21     Q.   And you understood her to believe that
22 represented misconduct on his part, did you not?

Page 69

1      A.   No.
2      Q.   Now, did Sharon Killian ever report
3  during the course of your interviews during this
4  period that she had gone to Paul Levy on numerous
5  occasions about Nick Ryan?  I'm not asking whether
6  it's reflected in your notes.  I'm asking if you
7  recall if during this period that she reported to
8  you that she had been to Paul Levy --
9      A.   Yes.
10     Q.   -- on numerous occasions.
11     A.   Yes.  It was a sense of frustration of
12 not being responded to.
13     Q.   And she had gone to Paul Levy about Nick
14 Ryan, is that right?
15     A.   I don't know if she went specifically
16 about Nick, but I knew issues in the art department
17 had been discussed.  She told us at that time that
18 she was coming to Mari and I because of her
19 frustration of having tried to go to her division
20 director.
21     Q.   And did you understand that she had gone
22 to see Paul Levy about conduct that she regarded as

18 (Pages 66 to 69)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 70

1  racist in the art department?
2      A.   No.
3      Q.   Now, at around the same time -- and I'm
4  referring to the winter of 2004, generally the
5  period that you testified these interviews took
6  place -- a matter of an African American student's
7  expulsion was happening in the school right around
8  that time also, right?
9          MR. WILLIAMSON: Objection. Relevance.
10 If you want to enter into a standing objection to
11 all questions relating to the expulsion of
12 African American student in -- I mean what year are
13 you looking --
14         MR. RACIN: In 2004.
15         MR. WILLIAMSON: -- in 2004, without
16 waiving our right to supplement our objections from
17 time to time.
18         MR. RACIN: Do you want to characterize
19 that objection more broadly? We will stipulate that
20 you strongly object to this entire line of
21 questioning.
22         MR. WILLIAMSON: Strongly object on the

Page 71

1  grounds of relevance.
2  BY MR. RACIN:
3      Q.   Do you recall that matter pending in the
4  school at about that time?
5      A.   Mm-hmm, yes, I do.
6      Q.   Do you recall that an order directing
7  staff and faculty to refrain from media contacts
8  concerning the case --
9      A.   From what contacts?
10     Q.   Media contacts -- went forward about that
11 same time?
12     A.   I don't understand the question.
13     Q.   Did an order go forth to faculty and
14 staff directing them to have no contacts with the
15 media concerning the case involving this African
16 American student?
17     A.   That's just a procedure of the school.
18 I don't -- I'm not understanding what you're.
19     Q.   Okay. What is the procedure of the
20 school?
21     A.   That if you have a media request that you
22 report to your supervisor that you had a request

Page 72

1  from the media. I don't understand the question.
2  Can you say it again, please?
3      Q.   Well, when did you learn that procedure
4  of the school's?
5      A.   Pardon me?
6      Q.   You say there is a procedure in place.
7  I don't want to mischaracterize --
8      A.   I believe it's the law regarding minors
9  in the United States for anybody who is under 18.
10 That is my belief. I'm not positive, but I think
11 it is.
12     Q.   I see. Now, in connection with that
13 expulsion -- that student was expelled, is that
14 right?
15     A.   Yes.
16     Q.   And were you aware of any concern in the
17 school at the time about the racial equity of the
18 expulsion decision?
19         MR. WILLIAMSON: Objection. Vague.
20         THE WITNESS: I'm not quite sure what --
21 whose concern or --
22 BY MR. RACIN:

Page 73

1      Q.   Well, the other man was African American,
2  is that right?
3      A.   Yes.
4      Q.   And did you ever become aware of any
5  concern on the part of staff, students, faculty,
6  parent of student that the expulsion decision was
7  racist?
8      A.   Are you saying did people express concern
9  to, me or did I --
10     Q.   Did you become aware of concerns being
11 expressed along those lines?
12     A.   Yes.
13     Q.   And how did you become aware of it?
14     A.   Which, what are you talking about?
15     Q.   You said -- I think your testimony is you
16 were aware of concerns expressed about the expulsion
17 of the student and its fairness. Is that right?
18     A.   Anytime a student is expelled in the
19 school, there are concerns for what happened. I'm
20 not -- I'm sorry. I'm not following exactly what
21 you're trying to -- what you're trying to get at.
22     Q.   Do you recall that any particular staff

19 (Pages 70 to 73)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 74

1  member objected, had concerns about the expulsion
2  decision being a racist decision?
3      A.   Not that I recall.
4      Q.   On the part of a faculty member, any
5  faculty member --
6      A.   Isn't that what you just asked me?  I'm
7  sorry.
8      Q.   -- so far as you know or heard?
9      A.   Didn't you just ask me?
10     Q.   I have no idea.
11     A.   Then I'll ask you to restate it.
12     Q.   I find your answers confusing at times,
13  so I'm doing my best.  I know you are too.
14     A.   Sure, absolutely.
15     Q.   I know you are too.  And you said
16  concerning staff, you can't remember any particular
17  staff members who expressed concerns about the
18  expulsion decision being racist, right?
19     A.   Yes.
20     Q.   Same question with respect to faculty.
21     A.   The same people.
22     Q.   Aren't there staff members who are in

Page 75

1  nonfaculty positions?
2      A.   Staff is a broad term for teaching and
3  nonteaching folks.  All the adults work at the
4  school.
5      Q.   Let's make sure we're on the same page.
6      A.   Okay.
7      Q.   So staff and faculty, your answer would
8  be the same, right?
9      A.   Yes.
10     Q.   The student population.  Do you recall
11  any particular objection from any particular student
12  that the decision was racist?
13     A.   No.
14     Q.   What about parents of G.D.S. students?
15     A.   Do I remember a particular parent?
16  You're saying any parent in the school coming
17  forward and saying that it was a racist intent to
18  me?  No.
19     Q.   Or hearing that -- I will move on.  Did
20  you have any misgivings about the decision to expel
21  the young man?
22     A.   No.

Page 76

1      Q.   You play any role in the decision to
2  expel him and, if so, what was that role?
3      A.   Peter Branch makes the ultimate decisions
4  around discipline issues at the school.  I, as a
5  member of the administratime team, part of my role
6  is to give counsel to him.  But I am not responsible
7  for making decisions about discipline at the school.
8  I am of a team that gives counsel, and Peter Branch
9  makes the ultimate decision.
10     Q.   Did you have an occasion to express an
11  opinion about it?
12     A.   I did.
13     Q.   And what was that opinion?
14     A.   My opinion was that it was the right
15  decision.
16     Q.   And you expressed that opinion to head of
17  school at the time.
18     A.   Yes.
19     Q.   Now, there came a time when the young man
20  reappeared, is that right?
21     A.   Yes.
22     Q.   And he went on to graduate --

Page 77

1      MR. WILLIAMSON:  Objection.  Vague.
2  BY MR. RACIN:
3      Q.   He appeared in the halls of the school
4  again, right?
5      A.   He was reinstated at the school.
6      Q.   He was reinstated.  So he presumably made
7  an appearance on occasion.  Did you see him in the
8  halls after he was reinstated?
9      A.   He was at school a limit -- I'm trying to
10  remember.  Yes.  I did see him at school.
11     Q.   So he reappeared at some point.
12     A.   It's odd phrasing to say he reappeared.
13  I mean he became -- a student was coming back to
14  school.  So I don't understand what you're.
15     Q.   He came back to school.  So you object to
16  the word reappeared?
17     A.   I didn't understand.  I don't know what
18  you're getting at.
19     MR. WILLIAMSON:  Objection was lodged by
20  counsel, and the objection was to vagueness of the
21  word reappeared.
22     MR. RACIN:  Thank you.

20  (Pages 74 to 77)

55deabfe-e055-4683-97c2-96bbf4ea58ca

Page 78

1 BY MR. RACIN:
2     Q.   Now, did you have any particular feelings
3 about his reinstatement, the African American
4 student's reinstatement?  If so, what were those
5 feelings?
6         MR. WILLIAMSON:  Objection.  Form.
7 Vague.
8         THE WITNESS:  I don't understand what.
9 BY MR. RACIN:
10     Q.   Do you recall having any particular
11 reaction at the time of the student's reinstatement?
12     A.   Reaction to him coming back?
13     Q.   Yes.
14     A.   A particular reaction?
15     Q.   Any reaction.
16     A.   I don't -- I'm really sorry, but I'm not
17 trying to be difficult.  I just don't understand how
18 this is going to fit in, what the piece that you're
19 trying to get out of this.  I mean there is a child
20 in the school; it's a discipline case; it's an
21 expulsion.  That's always a hard thing.  I'm really
22 not understanding where you're trying to --

Page 79

1     Q.   I'm asking you a question.  I have asked
2 the question.  Your counsel has made an objection,
3 but you may answer the question to the extent you
4 can.
5     A.   Okay.  What is the question you want me
6 to answer?
7         MR. RACIN:  Will you read that back?
8         (The record was read by the reporter,
9 page 78, lines 10 through 15.)
10         THE WITNESS:  I remember feeling sad for
11 the students, both the student who had been expelled
12 and the other students.  It was a very uncomfortable
13 situation.
14 BY MR. RACIN:
15     Q.   Thank you.  Now, did the administration
16 make any effort to explain the basis for the
17 expulsion of the student to the G.D.S. community at
18 the time of the expulsion?  And if so, what effort
19 did they make?
20     A.   In general, we don't discuss discipline
21 matters publicly, so I can't -- I cannot say for
22 certain what we -- what was said to.  Peter Branch

Page 80

1 would have to be -- it would come from Peter Branch.
2 I don't remember exactly what that was.
3     Q.   Do you recall any particular effort to
4 explain the student's reinstatement to the G.D.S.
5 community?
6     A.   Again, I don't remember, because
7 generally we don't discuss discipline matters
8 publicly.
9     Q.   Thank you.  Have any reason to believe
10 that the episode affected the morale of minority
11 members of the G.D.S. community in particular?
12         MR. WILLIAMSON:  Objection.  Vague.
13 Calls for speculation.
14 BY MR. RACIN:
15     Q.   Have any reason to believe.
16     A.   Can you say that one more time?
17     Q.   I'm not asking you to speculate.  Do you
18 have any reason to believe that the episode affected
19 the morale of the minority of the G.D.S. community
20 in particular?
21         MR. WILLIAMSON:  Same objection.  Vague
22 and calls for speculation.

Page 81

1         THE WITNESS:  I'm not a person of color.
2 I can't guess what the effect was.  I think that it
3 was more that a student, you know, had to leave our
4 community.  I think that's sad.  I couldn't guess
5 how a person of color -- not being a person of
6 color, I can't guess how others feel.
7 BY MR. RACIN:
8     Q.   Now, you made reference to the report
9 prepared by Katheryn Russell called Georgetown Day
10 High School Race Relations Report earlier, is that
11 right?
12     A.   Mm-hmm.
13     Q.   And you read that at the time of your --
14 around the time of your arrival at the school?
15     A.   Yes.
16     Q.   And I explained that out of a due regard
17 for trees, I have not brought an sufficient number
18 of copies to introduce the entire report today.  Let
19 me ask:  Do you recall a section of the report
20 pertaining to the departure of an African American
21 teacher in 1999?
22     A.   I have not looked at that document since

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 82

1  it was -- I don't want to try to speculate.  I don't
2  off the top of my head remember it.
3      Q.   I think that's all I -- one more
4  question.  Strike that.  Never trust a lawyer who
5  says he's done.  Refer back to Denevi 3 briefly.
6      A.   Mm-hmm.
7      Q.   I refer your attention to the memo headed
8  Personnel issues, a three-page memo, Bates 2848 to
9  2850.  Is it your testimony you have not seen this
10  document?
11         MR. WILLIAMSON:  Excuse me, counsel.  Did
12  you say this was a four-page memo or three-page?
13         MR. RACIN:  Three, I think.
14         THE WITNESS:  I have just three.  What
15  was your question?
16  BY MR. RACIN:
17      Q.   Have you seen this document before?
18      A.   No -- I do not remember.
19         MR. RACIN:  I think that's about it, if
20  we could have a few minutes.
21         MR. WILLIAMSON:  We'll take a few minutes
22  and see if we have any questions.

Page 83

1          MR. RACIN:  Thank you.
2          (Recess was taken, 11:35 to 11:46 a.m.)
3          MR. RACIN:  I still have no questions.
4          MR. WILLIAMSON:  We have got a few
5  questions.
6      EXAMINATION BY COUNSEL FOR DEFENDANT
7  BY MR. WILLIAMSON:
8      Q.   Ms. Denevi, I would like you to take
9  a look at the document that has been marked as
10  Denevi 1, page 2792.  Do you see toward the bottom
11  where it says:  N, dash, quote, what do you want
12  from me, will not listen, comment, can't lower
13  myself to please you?
14      A.   Yes.
15      Q.   And does the N refer to Nick?
16      A.   Yes.
17      Q.   And in these notes, were the quotes
18  intended to reflect what Nick Ryan said to you
19  during this session with him?
20      A.   Yes.
21      Q.   Do you remember you were asked about
22  whether you could tie that specifically to the

Page 84

1  comment that had caused Ms. Killian to come to you
2  in connection with the mediation in early 2004?
3      A.   Yes.
4      Q.   And your earlier testimony was that you
5  weren't certain or you couldn't absolutely guarantee
6  that?
7      A.   Yes.
8      Q.   Is that still your testimony?
9      A.   No.
10      Q.   What is your testimony now in that
11  regard?
12      A.   Well, I was struggling with it when we
13  were talking about it before, and I think I was
14  worried about the phrasing.  I'm reasonably certain
15  that that probably did connect back, and I was just
16  concerned because of the other notes that were here
17  of not wanting to be imprecise.  And I think my
18  desire to be precise -- you know, I think, because
19  thinking back on what the comment was, I think,
20  can't lower myself to please you, must have been in
21  reference, because I can't remember any other time
22  of Nick saying that something like that was said for

Page 85

1  another incident.
2      Q.   Now, during this mediation -- you were
3  involved in a mediation with Ms. Killian, Ms.
4  Tolliver, and Mr. Ryan, is that right?
5      A.   Yes.
6      Q.   The members of the art department?
7      A.   Yes.
8      Q.   And you were doing that mediation with
9  Mari Richards, is that right?
10      A.   Yes.
11      Q.   During that mediation did you ever ask
12  Ms. Killian whether she thought that the statement
13  that had been made by Mr. Ryan that she found so
14  offensive was racially motivated?
15      A.   Yes.
16      Q.   What did you ask her?
17      A.   I asked her as we were talking about her
18  relationship with Nick, I said:  Do you feel that
19  Nick is treating you in a racist way?  And Sharon
20  said no, in fact, she felt that Nick had a
21  tremendous amount of respect for her as a teacher
22  and as a colleague and knew that she was a good

22  (Pages 82 to 85)

55deabfe-e055-4683-97c2-96bbf4ea58ca

DEPOSITION OF ELIZABETH A. DENEVI
CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006

Page 86

1  teacher.
2       MR. WILLIAMSON:  Nothing further.
3       MR. RACIN:  I didn't get a chance to
4  object to a foundation, vagueness.  I have no
5  further questions.  Thank you.
6       MR. WILLIAMSON:  We're off the record.
7       (Signature not having been waived off the
8  record, at 11:49 a.m., the deposition of Elizabeth
9  A. Denevi concluded.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 87

1       ACKNOWLEDGMENT OF DEPONENT
2
3      DEPOSITION OF ELIZABETH A. DENEVI
4    CONDUCTED ON WEDNESDAY, SEPTEMBER 27, 2006
5
6       I, ELIZABETH A. DENEVI, do hereby
7  acknowledge that I have read and examined the
8  foregoing testimony, and the same is a true,
9  correct, and complete transcription of the testimony
10  given by me, and any corrections appear on the
11  attached Errata sheet signed by me.
12
13  _____  _____
14
15    (DATE)       (SIGNATURE)
16
17
18
19
20
21
22

Page 88

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2       I, Judith F. Richard, Registered
3  Professional Reporter, the officer before whom the
4  foregoing proceedings were taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the proceedings; that said proceedings
7  were taken by me in stenotype and thereafter reduced
8  to computer-aided transcription by me; and that I am
9  neither counsel for, related to, nor employed by any
10  of the parties to the case and have no interest,
11  financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set
13  my hand and affixed my notarial seal this 15th day
14  of October, 2006.
15
16
17
18       Judith F. Richard, RPR
19       Notary Public in and for
20       the District of Columbia
21  My commission expires
22  January 14, 2008

23  (Pages 86 to 88)

# EXHIBIT 10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHARON KILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-1925 (EGS) |
| | ) | |
| GEORGETOWN DAY SCHOOL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF NICK RYAN**

I, Nick Ryan, hereby declare:

      1.    I have personal knowledge of the facts discussed in this declaration.

      2.    I am a teacher in the Studio Arts Department ("Art Department") at Georgetown Day School ("GDS" or "School").

      3.    I was hired by GDS in the spring of 2000 to serve as Chair of the Art Department, beginning with the 2000–2001 academic year.

      4.    Debbie Haynes retired by the end of the 2000–2001 academic year during which she worked as a part-time teacher in the art department.

      5.    From the 2000–2001 academic year through her final year in the Department, 2004–2005, Sharon Killian taught four sections of courses:  two sections of Introduction to Photography and either one section of AP Studio Art and one section of Advanced Painting and Drawing, or two sections of AP Studio Art.

      6.    In the 2000–2001 academic year, I and then-Principal Paul Levy decided to name an Art Award in honor of Debbie Haynes.

7.      Over a weekend in February 2002, the Black Culture Club ("BCC") hosted a dance at the School, leaving paper banners advertising the dance hanging outside the art studio windows.  When I arrived in the art studio on Monday morning, I and GDS high school Building Manager George Buckwalter removed the banners, which had been damaged by the weather, brought them inside, and placed them on the floor.

8.      Those paper banners were the only banners I have seen that were hung outside the art studio windows.

9.      I have never replaced one of Tolliver's art displays without first consulting Tolliver.

10.     I have never replaced one of Sharon Killian's art displays without first consulting her.

11.     Tolliver has never replaced one of my art displays without first consulting me.

12.     I have never rejected or denied a request by Killian to purchase something out of her allocation of the supply budget.

13.     As between me, Tolliver, and Killian, the three members of the Art Department, Killian taught the fewest students each year from 2000–2001 through 2004–2005.

14.     During my time as Chair of the Art Department, Killian was the only teacher who requested to teach AP Studio Art.

15.     The Art Department's annual capital budget requests are sent to me in my capacity as Chair of the Art Department, and I compile them and pass them on to the administrative team.

16.    Killian's capital budget requests were, on multiple occasions, sent to me well after the deadline for submission. The requests sometimes lacked required information, such as how the requested item would be used by students.

17.    I never (i) failed to pass one of Killian's capital budget requests on to the School's administrative team, (ii) unfairly characterized one of her capital budget requests as a low priority, or (iii) otherwise "belittled" one of her capital budget requests to a member of the GDS administrative team.

18.    It is routine for capital budget requests from the Art Department not to be approved.

19.    In February 2005, Tolliver was the only teacher in the Art Department with a key to the cabinet with the Art Department's digital video cameras, because they had been purchased for use in Tolliver's Film and Video course. Limiting access to the teacher in charge of that course was considered an effective method to reduce the chance that a camera might become lost or unavailable for student use.

20.    I never indicated to anyone that I was opposed to Killian's teaching AP Studio Art. In fact, I believe Killian is an excellent teacher and was always supportive of her efforts with the AP Studio Art students.

21.    Michelle Cobb, an African American woman, has taught AP Studio Art since the 2005–2006 academic year.

22.    I never advised or guided students away from Killian's AP Studio Art course.

23.    In response to requests from students (and their parents) who wanted to know if they could submit an AP 2-D Design portfolio after taking multiple years of Tolliver's "Advanced Technology for the Studio Arts" course, Tolliver and I changed the course

3

description in the 2003–2004 "Course of Study" to state that particularly motivated students could follow the AP 2-D Design curriculum.

24.    For the May 2002 AP exams, the College Board expanded the "General Art" category of AP Studio Art portfolios to "2-D Design" and "3-D Design." For the 2003–2004 "Course of Study," in consultation with Killian, I arranged to change the course title of "Advanced Placement Studio Art" to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio," in order to describe more precisely the names of the AP Exams that the course prepared students to take.

25.    I did not discuss the change to Killian's course title with Tolliver because she did not teach Killian's AP Studio Art course.

26.    During the time that Killian taught AP Studio Art at GDS, that course remained the only available option for students submitting AP 3-D Design or AP Drawing portfolios. The number of AP Drawing and AP 3-D Design students alone was sufficient to justify running the AP Studio Art course. I have no reason to believe this would change.

27.    Killian continued to serve as the only faculty advisor to the Art Magazine until she left GDS is 2005. Since that time, the Art Magazine has ceased to exist.

28.    Killian did not discuss the change in the name of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)," to "Graphic Design and Publishing" with me.

29.    I proposed a new course for 2004–2005, entitled "Multicultural Art History," and submitted a written course proposal that described its content and goals.

30.    I played no role in the decision not to approve Killian's proposed new course for 2004–2005.

31.     Tolliver and I changed the title of "Technology for the Studio Arts" to "Graphic Design," in part, to describe more accurately the course's content, and, in part, to encourage higher female enrollment in the course.

32.     When Killian approached me to complain about that course name change, I was unaware that the name of her proposed Yearbook course had been changed to "Graphic Design and Publishing."  In response to Killian's complaint, I said "Sharon, what do you want?  I can't lower myself enough to please you."  The statement reflected my frustration that despite my many attempts to accommodate Killian's idiosyncratic desires in the face of her mistreatment of me, Killian could not be satisfied.

33.     Allowing some AP Studio Art students to prepare AP Drawing portfolios and others to prepare AP 2-D Design portfolios meant that some students often would be left working without faculty supervision because the AP Drawing students would generally work in the Art Studio and the AP 2-D Design students would generally work in the photo lab or the Mac lab.  This problem did not generally exist with AP 2-D Design students in either Advanced Technology for the Studio Arts or Advanced Photography, because all students in that class generally worked in the same classroom space.

34.     For Gay Pride Week in the spring of 2004 or 2005, I made posters celebrating famous gay individuals.  I wanted the display to reflect racial diversity, so I asked Mariama Richards, GDS Co-Director of Diversity, for suggestions.  Richards wrote "Audre Lord" on a piece of paper, and I subsequently created a poster celebrating the work of African American poet Audre Lorde, using the spelling that Richards had given me.  African American GDS English teacher Hayes Davis later complained to me that I had misspelled Lorde's last name.  I searched the internet and found her name spelled both "Lord" and "Lorde."  I e-mailed Davis

what I had found.  Davis replied by e-mail that the correct spelling of the author's name is
"Audre Lord."  He also informed me that there is an authoritative source that English teachers
use to find the correct spelling of authors' names.  Based on what he told me, I created a new
poster with the correct spelling and replaced the one I had previously displayed.

35.    During my tenure as Chair of the Art Department at GDS, I have divided the
Art Department's supply budget equally by course.  Tolliver, Killian, and I have each taught four
courses per semester from the 2000–2001 academic year through the 2004–2005 academic year.
As between Tolliver, Killian, and me, the art department supply budget has been allocated in
three equal parts from the 2000–2001 academic year through the 2004–2005 academic year.
Debbie Haynes also received a propotionate allocation of the art department supply budget when
she was working part-time during the 2000–2001 academic year.  Haynes taught only two
courses that academic year, so she received one half of what Tolliver, Killian, and I each
received.

I declare under penalty of perjury that the foregoing statement is true and correct.


Executed on this _10_ day of November, 2006.

Nick Ryan

6