IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                    )
                                   )
              Plaintiff,           )
                                   )
      vs.                          )          Civil Action No. 05-1925 (EGS)
                                   )
GEORGETOWN DAY SCHOOL,             )
                                   )
                                   )
              Defendant.           )

APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

VOLUME II

Exhibit   11.     Tolliver Declaration

Exhibit   12.     Richards Declaration

Exhibit   13.     Denevi Declaration

Exhibit   14.     Barr Declaration

Exhibit   15.     Branch Declaration

Exhibit   16.     Lindsey Declaration

Exhibit   17.     Buckwalter Declaration

Exhibit   18.      Ruble Declaration

Exhibit   19.     Killian Deposition Exhibit 1 (1994–1995 Evaluation).

Exhibit   20.     Killian Deposition Exhibit 2 (1999–2000 Evaluation).

Exhibit   21.     Killian Deposition Exhibit 3 (2000–2001 Evaluation).

Exhibit    22.    Killian Deposition Exhibit 4 (2001–2002 Evaluation).

Exhibit    23.    Killian Deposition Exhibit 5 (2002–2003 Evaluation).

Exhibit    24.    Killian Deposition Exhibit 6 (2003–2004 Evaluation).

Exhibit    25.    Killian Deposition Exhibit 7 (2004–2005 Evaluation).

Exhibit    26.    Memorandum from Caryn G. Pass & Grace H. Lee to Joe Sellers (Apr. 11, 2005) (hereinafter "Pass Report") [Bates 6836–55].

Exhibit    27.    Letter from John Racin to Daniel Johnson (Jul. 6, 2004) [Bates 2795–97].

Exhibit    28.    Letter from Racin to Pass (Aug. 27, 2004) (attaching Killian Talking Points for Branch (Mar. 12, 2004)) [Bates 2798–2803].

Exhibit    29.    Killian Deposition Exhibit 13 (hereinafter "Branch Memo").

Exhibit    30.    Killian Deposition Exhibit 39 (hereinafter "Pass Talking Points Memo").

# E X H I B I T   1 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHARON KILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-1925 (EGS) |
| | ) | |
| GEORGETOWN DAY SCHOOL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF LAURA TOLLIVER

I, Laura Tolliver, hereby declare:

1.  I have personal knowledge of the facts discussed in this declaration.

2.  I have been a teacher in the Georgetown Day School ("GDS") Studio Arts Department ("Art Department") since 1979.

3.  At Debbie Haynes' suggestion, GDS first hired Sharon Killian for the 1993–1994 academic year as a frequent substitute for the faculty of the Art Department.

4.  Debbie Haynes taught at GDS for nearly three decades before she retired.

5.  Art displays such as the one Killian took down in February 2002 without consulting me are generally kept up for approximately two to three weeks before they are replaced.

6.  Nick Ryan has never replaced one of my art displays without first consulting me.

7.  I have never replaced one of Ryan's art displays without first consulting him.

8.  I have never replaced one of Killian's art displays without first consulting her.

9.      School begins at 8:15 a.m., but faculty generally arrive around 7:45 a.m. and students around 8:00 a.m.

10.     On October 3, 2003, Killian and I participated in small group session discussions of long and short-term strategies to help students of color feel more connected to GDS for the School's "In Service Day."

11.     On October 15, 2003, the GDS Arts Faculty, including Ryan, Killian, and me, participated in discussions about the role racial influences play in the classroom and how we as a department could better integrate multicultural understanding into our curriculum.

12.     The computers in the Mac Lab each have separate hard drives designated for exclusive use by the Film and Video students, which are labeled "movie drives." These "movie drives" are necessary for the Film and Video course to run because video files are exceptionally large—significantly larger than digital photographs or other files.

13.     When I ran the Yearbook, Yearbook students used a primarily manual process for the cropping and placement of the photographs that they shot. The Yearbook moved to a completely digital system after Killian became the Yearbook advisor.

14.     In early February 2005, I was the only member of the Art Department that had a key to the cabinet with the digital video cameras, because they had been purchased for use in my Film and Video course.

15.     In late February 2005, I discovered that Killian had a key to certain cabinets to which I did not have access. I was subsequently given a key to those cabinets.

16.     I have never advised or guided a student away from Killian's AP Studio Art course.

17.    In response to requests from students (and their parents) who wanted to know if they could submit an AP 2-D Design portfolio after taking multiple years of my "Advanced Technology for the Studio Arts" course, Ryan and I changed the course description in the 2003–2004 "Course of Study" to state that particularly motivated students could follow the AP 2-D Design curriculum.

18.    I did not consult Killian about changing the course description for Advanced Technology for the Studio Arts for the 2003–2004 Course of Study because she did not teach my course.

19.    I was not privy to any discussion regarding the change in Killian's course title from "Advanced Placement Studio Art" to "AP Studio Art—Drawing, 2-D Design, and 3-D Design Portfolio."

20.    Killian did not inform me of the change in the name of her proposed course from "Yearbook Publishing and Advanced Independent Study Publishing (AISP)," to "Graphic Design and Publishing."  In fact, she did not discuss her proposed new course with me at all.

21.    I played no role in the decision not to approve Killian's proposed new course for 2004–2005.

22.    Ryan and I changed the title of "Technology for the Studio Arts" to "Graphic Design," in part, to more accurately describe the course's content, and, in part, to encourage higher female enrollment in the course.

23.    No significant substantive changes were made to either the course description or the curriculum of my Technology for the Studio Arts course from 2003–2004 to 2004–2005.

24.    From 2002–2003 through 2004–2005, the only person with whom I shared photography supplies was Sharon Killian.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this _9th_ day of November, 2006.

_Laura Tolliver_ (signature)

Laura Tolliver

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                    )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )        Civil Action No. 05-1925 (EGS)
                                   )
GEORGETOWN DAY SCHOOL,             )
                                   )
                                   )
            Defendant.             )

## DECLARATION OF MARIAMA RICHARDS

I, Mariama Richards, hereby declare:

1.      I have personal knowledge of the facts discussed in this declaration.

2.      I am an African American woman, and am currently a Co-Director of
Diversity at Georgetown Day School ("GDS" or "School").

3.      GDS is unusual, if not unique, among independent schools in the Washington,
D.C. area in that it has two full-time Co-Directors of Diversity on its staff working full-time as
members of the senior administrative team.  The other Co-Director of Diversity is Elizabeth
Denevi, a Caucasian woman.

4.      In 2003 GDS won the National Association of Independent Schools' Equity
and Justice Award.

5.      The Co-Directors of Diversity at GDS are recognized as national leaders in
the field of diversity education.  We both are called on as consultants for schools, non-profits,
and corporations. The GDS Diversity office is closely aligned with the Chief Diversity Officer at
Best Buy Incorporated.  The two Co-Directors are frequently asked by regional schools to come
in for trainings for staff, parents, and students throughout the school year.  Additionally, I have

worked with Court-Appointed Special Advocates and the National Cathedral on issues of non-profit equity program development.

6.    I am a member of the National Association of Independent Schools' think tank for diversity, "Call to Action," and am a member of the Association of Independent Greater Washington Schools' steering committee for diversity.

7.    As an active participant in the Staff of Color group, Sharon Killian met regularly with members of the staff to talk about issues affecting their community, and ordinarily attended the annual "Staff of Color Retreat" sponsored by the School.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this ___ day of November, 2006.

Mariama Richards

# E X H I B I T   1 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                    )
                                   )
              Plaintiff,           )
                                   )
       vs.                         )        Civil Action No. 05-1925 (EGS)
                                   )
GEORGETOWN DAY SCHOOL,             )
                                   )
                                   )
              Defendant.           )

## DECLARATION OF ELIZABETH DENEVI

I, Elizabeth Denevi, hereby declare:

      1.    I have personal knowledge of the facts discussed in this declaration.

      2.    I received a doctorate from the University of London in 2004 for my dissertation entitled "Racial Identity Development of Adolescents," and I have published articles in Independent School Magazine and the Journal of Multicultural Education on issues relating to multicultural diversity education.  I also serve on the Association of Independent Maryland Schools Diversity Committee as a trainer for National Multicultural Institute.

      3.    I am a Caucasian woman, and am currently a Co-Director of Diversity at Georgetown Day School ("GDS" or the "School").

      4.    GDS is unusual, if not unique, among independent schools in the Washington, D.C. area in that it has two full-time Co-Directors of Diversity on its staff working full-time as members of the senior administrative team.  The other Co-Director of Diversity is Mariama Richards, an African American woman.

      5.    In 2003 GDS won the National Association of Independent Schools' Equity and Justice Award.

6.      The Co-Directors of Diversity at GDS are recognized as national leaders in the field of diversity education.  We both are called on as consultants for schools, non-profits, and corporations. The GDS Diversity office is closely aligned with the Chief Diversity Officer at Best Buy Incorporated.  The two Co-Directors are frequently asked by regional schools to come in for trainings for staff, parents, and students throughout the school year.

7.      The School sponsors "Seeking Educational Equity and Diversity," ("SEED"), a national curriculum development program that focuses on infusing equity and multiculturalism into classroom practice, and other professional development programs geared towards multicultural education.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this 8ᵗʰ day of November, 2006.

_____
Elizabeth Denevi

# E X H I B I T   1 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                              )
                                            )
              Plaintiff,                     )
                                            )
        vs.                                  )          Civil Action No. 05-1925 (EGS)
                                            )
GEORGETOWN DAY SCHOOL,                       )
                                            )
                                            )
              Defendant.                     )

## DECLARATION OF KEVIN BARR

I, Kevin Barr, hereby declare:

1.      I have personal knowledge of the facts discussed in this declaration.

2.      I am currently the High School Principal at Georgetown Day School ("GDS" or "School"). My first position at GDS was in the English Department. I became Director of Studies at the High School on or about 1997, was named Acting High School Principal for the 2004–2005 academic year, and named High School Principal the following year.

3.      GDS High School department chairs regularly make administrative decisions without the input of the department members as part of their regular duties.

4.      As part of its process for proposing new courses, the School asks faculty to describe how the course will "further the School's commitment to multiculturalism and diverse learning styles."

5.      Neither Nick Ryan nor Laura Tolliver played a role in the decision not to approve Plaintiff's proposed new course for 2004–2005.

6.      The administrative team decided not to approve the course that Sharon Killian proposed for the 2004–2005 academic year.

7.     Killian complained to me on February 9, 2005 that Tolliver denied her equal access to certain digital video cameras.  At the time Killian complained, Tolliver had the only key to the cabinet with the cameras because they had been purchased for use in her course.

8.     Limiting access to the teacher in charge of that course can be a relatively effective method to reduce the chance that a camera might become lost or unavailable for student use.

9.     In the course of resolving Killian's complaint to me, I discovered that Killian had access to certain cabinets to which Ryan and Tolliver did not.  The decision was made that all members in the Art Department would have keys to all cabinets and other storage spaces in the Art Department.

10.     Killian was scheduled to return to work on Monday, August 29, 2005, for "staff week" to prepare for teaching at GDS in the 2005–2006 school year.

11.     On or about Friday, August 26, 2005 Killian left a voice message at the School saying that she could not return for staff week because of health reasons.

12.     On September 1, 2005, Killian told me by phone that she would be unable to return for at least a week or two.

13.     On September 8, 2005, Killian informed me by voice mail that she would be unable to return to work the following week.

14.     In light of Killian's continued absence, the School hired as long-term part-time substitutes an African American teacher, Michelle Cobb, and an Asian American teacher, Nguyen Nguyen.  Cobb and Nguyen are still teaching in the Art Department at GDS.

15.     Michelle Cobb has taught AP Studio Art since the 2005–2006 academic year.

16.     Debbie Haynes served as Chair of the Art Department for nearly thirty years.

17.    GDS first opened its doors in 1945 as an integrated school in a segregated city.  The School's mission statement is as follows:

> Georgetown Day School honors the integrity and worth of each individual within a diverse school community. GDS is dedicated to providing a supportive educational atmosphere in which teachers challenge the intellectual, creative, and physical abilities of our students and foster strength of character and concern for others. From the earliest grades, we encourage our students to wonder, to inquire, and to be self-reliant, laying the foundation for a lifelong love of learning.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this ___ day of November, 2006.

Kevin Barr

3

# E X H I B I T   1 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                              )
                                             )
          Plaintiff,                     )
                                             )
   vs.                                      )          Civil Action No. 05-1925 (EGS)
                                             )
GEORGETOWN DAY SCHOOL,                       )
                                             )
                                             )
          Defendant.                     )

### DECLARATION OF PETER M. BRANCH

I, Peter M. Branch, hereby declare:

    1.    I am the Head of School at Georgetown Day School (GDS).

    2.    I have personal knowledge of the facts discussed in this declaration.

    3.    GDS is a parent-owned nonprofit coeducational day school governed by a Board of Trustees elected by the parent body and administered by a Head of School appointed by the Board of Trustees.

    4.    I served my first year as Head of School at GDS in the 1996–1997 academic year.

    5.    Prior to coming to GDS, I was the Headmaster at Holland Hall in Tulsa Oklahoma, where I was the first headmaster in the Southwest to adopt the National Association of Independent Schools' (NAIS) multicultural assessment plan, served on the Episcopal Diocese's Committee to Dismantle Racism and on the Board of the National Council of Christians and Jews, and was a member of a conference committee for the city of Tulsa to promote diversity.

6.    Debbie Haynes retired by the end of the 2000–2001 academic year during which she worked as a part-time teacher in the Studio Art Department.

7.    In the Spring of 2000, Nick Ryan, a Caucasian male, was hired as Chair of the Studio Art Department beginning with the 2000–2001 academic year.

8.    GDS Department Chairs are authorized to make certain administrative decisions without the input of the department members.

9.    The Administrative Team decides which capital budget requests will be granted based on need and available funds.

10.    It is routine for capital budget requests from GDS faculty not to be approved.

11.    Neither Ryan nor Laura Tolliver has ever served on the School's Administrative Team.

12.    Although the total membership has varied over time, the School's Administrative Team is composed of approximately 8 to 12 administrators, including at least two African American women, Mariama Richards and Gloria Runyon.  A third African American, Vincent Rowe, joined the Administrative Team in the 2004–2005 academic year.

13.    Neither Ryan nor Tolliver played a role in the decision not to approve Sharon Killian's proposed new course for 2004–2005.

14.    On or about March 12, 2004, I met with Sharon Killian to discuss her unhappiness at the School.

15.    During that meeting with me, Killian referred to notes as the basis for her discussion, however, I did not see or receive a copy of those notes.

16.    During this same meeting, Killian informed me that she she was unhappy as a result of specific incidents that she said had occurred in her department.

2

17.    During this meeting with me, Killian also informed me that she wished to take time off from work, but that she could not afford to do so without pay.

18.    I informed Killian that the School does not offer paid time off, but that I would be willing to consider an application for leave without pay.

19.    Sometime not long after my meeting with Killian in the spring of 2004, I informed Killian of a job opening in the Art Department at the National Cathedral School and offered to write her a supportive recommendation.

20.    My wife, Paula Carreiro, is Head of School at Beauvoir, the National Cathedral's elementary school.

21.    Over the course of Killian's employment at GDS, both the number of African American faculty and their percentage of the total faculty at GDS increased significantly.

22.    Over the last four years of Killian's employment at the School alone, the number of African American faculty at GDS increased from 18 to 20 (12% to 13% of the total GDS faculty population).  During my tenure as Head of GDS, from school year 1996–1997 to 2006–2007, African American faculty have increased from 7 to 21 (from 5% to 13% of the faculty); faculty of color have increased from 9% to 28% of the faculty.

23.    From 1996 to 2006, GDS students of color have increased from 261 to 378 (25% to 36.5%).  African Americans have increased from 150 to 180 (14.5% to 17.4%).

24.    The School offers a Students of Color Mentoring Program and affinity groups such as Young Men and Women of Color.  Additional clubs of the School include the Black Culture Club ("BCC"); Rainbow Connections, a gay/straight alliance; Fusion, a club for multiracial students; and Brenner, a women's leadership group, all of which fall under the umbrella of Diversity Connections, a student club for promoting equity and justice that hosts

discussions on topics related to diversity, including a weekend retreat. GDS also requires all High School freshman to enroll in a seminar focusing on diversity issues.

25.    On July 6, 2004, Killian sent a letter to Daniel Johnson, an attorney who had previously represented the School, in which Killian's counsel outlined Killian's basis for believing she was subject to a racially hostile work environment at GDS.

26.    In response to Killian's letter, the GDS Board of Trustees retained Caryn Pass, an attorney from Krupin O'Brien LLC, to conduct an independent investigation into Killian's complaints.

27.    Killian was scheduled to return to work on Monday, August 29, 2005, for "staff week."

28.    On Friday, August 26, 2005, Killian left a message on the voice mail of Janis Webb, Controller, in the Business Office, that an illness would make it impossible for her to attend staff week, beginning Monday, August 29th.

29.    On August 31, 2005, the School placed an advertisement in the Washington Post for an "Art teacher to teach Studio Art, graphic design and film & video." The School replaced "Art teacher" with "long-term substitute" in the advertisement that appeared in September 4, 2005, edition.

30.    On September 5, 2005, Michelle Cobb, an African American woman, filed an application with GDS to be a "substitute teacher."

31.    On September 14, Nguyen Nguyen, an Asian American man, filed an application with the School to be a "substitute teacher."

32.    In light of Killian's continued absence, the School hired Michelle Cobb and Nguyen Nguyen as long-term part-time substitutes.

4

33.     Killian never informed the School that she wished to come back to teach at GDS if her long-term disability was denied.

34.     Upon the expiration of her "job restoration protections" under the DCFMLA, the School removed Killian from the payroll and terminated her employment.

I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this 2nd day of November, 2006.

Peter M. Branch

MARQUITTA ROBIN TAYLOR
Notary Public, District of Columbia
My Commission Expires Sept. 30, 2008

## INDIVIDUAL ACKNOWLEDGMENT

State/Commonwealth of ___Washington, DC___ } ss.

County of _____

On this the __2__ day of __November__, __2006__, before
        Day        Month        Year

me, __MARQUITTA Robin Taylor__, the undersigned Notary
       Name of Notary Public

Public, personally appeared __Peter M. Branch__,
                            Name(s) of Signer(s)

☑ personally known to me – **OR** –

☑ proved to me on the basis of satisfactory
   evidence

to be the person(s) whose name(s) is/are
subscribed to the within instrument, and
acknowledged to me that he/she/they
executed the same for the purposes therein
stated.

| |
|---|
| MARQUITTA ROBIN TAYLOR |
| Notary Public, District of Columbia |
| My Commission Expires Sept. 30, 2008 |

WITNESS my hand and official seal.

_____
         Signature of Notary Public

_____
Other Required Information (Printed Name of Notary, Residence, etc.)

Place Notary Seal and/or Any Stamp Above

———————————— **OPTIONAL** ————————————

*Although the information in this section is not required by law, it may prove valuable to
persons relying on the document and could prevent fraudulent removal and reattachment
of this form to another document.*

**Description of Attached Document**

Title or Type of Document: __DECLARATION OF Peter Branch__

Document Date: __11/2/06__ Number of Pages: __5__

Signer(s) Other Than Named Above: __NONE__

| Right Thumbprint of Signer |
|---|
| Top of thumb here |

© 2002 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org
Item No. 5936                     Reorder: Call Toll-Free 1-800 US NOTARY (1-800-876-6827)

# E X H I B I T   1 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## DECLARATION OF KATE LINDSEY

I, Kate Lindsey, hereby declare:

       1.    I am the Chief Financial Officer at Georgetown Day School ("GDS" or "School").

       2.    I have personal knowledge of the facts discussed in this declaration.

       3.    Throughout her tenure in the Studio Arts Department ("Art Department") at GDS, Sharon Killian was the most junior member of the Art Department by more than a decade of teaching experience. At the end of the 1999–2000 academic year, Debbie Haynes had nearly 40 years of teaching experience, Laura Tolliver had approximately 22 years of teaching experience, and Sharon Killian had approximately 7 years of teaching experience. When Nick Ryan was hired in Spring 2000, he had approximately 20 years of teaching experience.

       4.    Sharon Killian received, in addition to her regular salary, a 40% tuition discount for her two children (worth approximately $78,500), and approximately $45,500 in additional need-based financial aid so her two children could attend GDS. The tuition discounts and grants she received for her two children (including approximately $2,000 in free after-school care) totaled around $126,000 over eight academic years. The 40% tuition discount is available

to all GDS faculty.  GDS retroactively granted Killian $9,719 in need-based financial aid in January 2002 for the 2001–2002 academic year after learning that Killian's husband had lost his job.  The School subsequently granted Killian approximately $24,700 in financial aid for her youngest child's final two years at GDS.

5.     The GDS administrative team decides which capital budget requests will be granted based on need and available funds.

6.     Neither Ryan nor Tolliver has ever served on the School's administrative team.

7.     For the 2005–2006 academic year, the School approved and purchased Killian's capital budget request for $9,295.38 of equipment for her Film and Video class, and another $3,346 requested by Tolliver for use by Killian in the same course.  No other capital budget requests were granted for use in the Art Department for that academic year.

8.     Killian's stipend for supervising the Yearbook in 2004–2005 was the largest stipend given to any GDS faculty member for supervising an extracurricular activity that year.

9.     On or about June 20, 2005, I saw Killian removing boxes of what appeared to be files and personal belongings from the School at approximately six o'clock the evening.  I offered to help her with the boxes, but she declined.

10.     Killian provided to GDS, as her mailing address, a post office box in a shopping mall in Tyson's Corner, Virginia that forwarded her mail to Arkansas.

11.     Killian failed to notify the School that she was in Arkansas until late September 2005, after the School was unable to deliver a certified letter to the Tyson's Corner address she had provided to the School.

2

12.     On August 31, 2005, the School placed an advertisement in the Washington Post for an "Art teacher to teach Studio Art, graphic design and film & video." By September 4, 2005, the School had replaced "Art teacher" with "long-term substitute" in the advertisement.

13.     On September 1, 2005, I sent a letter informing Killian that she would receive short-term disability benefits until approximately November 25, 2005, and that her "job restoration protections" under the District of Columbia Family Medical Leave Act ("DCFMLA") would expire on December 16, 2005.

14.     To my knowledge, although the School asked Killian to inform the School when she would be able to report back to work, Killian never told the School whether she intended to return to work.

15.     Upon the expiration of Killian's "job restoration protections" under the DCFMLA, the School terminated her employment.

I declare under penalty of perjury that the foregoing statement is true and correct. Executed on this 9th day of November, 2006.

Kate Lindsey

# E X H I B I T   1 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN,                          )
                                         )
      Plaintiff,                     )
                                         )
      vs.                            )      Civil Action No. 05-1925 (EGS)
                                         )
GEORGETOWN DAY SCHOOL,                   )
                                         )
                                         )
      Defendant.                     )

## DECLARATION OF GEORGE BUCKWALTER

I, George Buckwalter, hereby declare:

      1.     I have personal knowledge of the facts discussed in this declaration.

      2.     I am the Building Manager at the Georgetown Day School ("GDS") high school.

      3.     Students at GDS regularly create paper banners advertising school events, birthdays, and making other announcements, and post them in locations around the school building. As a matter of course, I regularly dispose of such banners soon after the event takes place, regardless of their physical condition, without consulting the students or their faculty advisors. Most such banners are placed inside the School and are relatively undamaged when I take them down and dispose of them.

      I declare under penalty of perjury that the foregoing statement is true and correct.

Executed on this 3 day of November, 2006.

George Buckwalter

# E X H I B I T   1 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHARON KILLIAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 05-1925 (EGS) |
| | ) | |
| GEORGETOWN DAY SCHOOL, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF BRUCE RUBLE

I, Bruce Ruble, hereby declare:

1.    I am the Educational Technology Coordinator at Georgetown Day School.

2.    I have personal knowledge of the facts discussed in this declaration.

3.    A faculty member's computer needs depend on a number of factors, including the number of students and the nature of the courses taught.  For this reason, no one on the GDS faculty, including Laura Tolliver, had "similar or comparable needs" for computer equipment as Sharon Killian.

4.    Killian used more digital storage space than Tolliver on the School's servers.

5.    From June 2003 to September 2004, Studio Art Teachers were allocated 0.75 Gigabytes on the "Users" folder on the School's servers, three times as much space as any other teachers at the School, and Arts and Publications students were allocated much more space than other students.

6.    In September 2003, Killian was using 9.54 Gigabytes of space on the "Users" folder, which was more than any other teacher at the high school and nearly 13 times her allocation.

7.    Killian also used much more space than any other teacher in the high school, including Tolliver, in the "Public" folder on the School's servers.

8.    The computers in the Mac Lab have separate hard drives designated for exclusive use by the Film and Video students, which are labeled "movie drives." These "movie drives" are necessary for the Film and Video course to run because video files are exceptionally large. Video files are significantly larger than digital photographs or many other files.

9.    As Supervisor of the Yearbook, Plaintiff's students had exclusive use of the hard drives in the School's "publications room."

I declare under penalty of perjury that the foregoing statement is true and correct.


Executed on this 9th day of November, 2006.

Bruce Ruble

# E X H I B I T   1 9

*Exhibit 1*

**Sharon Killian - Studio Arts -1994 - 1995**

Sharon Killian came to the Studio Arts Department under very difficult circumstances last year as a frequent substitute for Laura Tolliver who was caring for her seriously ill husband. Sharon did a wonderful job last year and agreed to stay with us this year under conditions which could be seen as equally difficult for some. That is, Sharon was hired as an interim teacher, or "permanent substitute" while Erica Elliott was on a leave of absence.

Sharon has thrown herself wholeheartedly into teaching in the studio arts this year. She didn't act or even momentarily give the appearance of someone who was merely standing in for only a year.

Sharon is a gifted artist and teacher. Her teaching style invites her students to be open and creative. She presents a lesson in an engaging and organized manner.

Her students see her as direct and serious but not threatening. They have said that they really value her work with them especially one on one. The work which the students have produced, especially in drawing, has been some of the best I have seen since starting my career here.

Sharon is an excellent student herself, as she is always asking to learn more about what to teach and how to teach. This has been stimulating to me as a fellow professional and has enabled us, as a department to learn a great deal this year by joining her in her musings, explorations and successes and we have grown as a result of this.

Sharon has also been consistently and enthusiastically available for the design, creation and installation of exhibits, something which is invaluable to me and the department. I think that because of the kind of work which she did before teaching she brought with her an excellent understanding of how important a good presentation is.

This also includes how she presents herself. As a teacher as well as a full time and very involved mother, Sharon presents as a woman with strength and unwavering self esteem. She is a good role model and I have observed that she is admired and well liked by not only her students but by the staff.

I feel very fortunate that Sharon was here this year especially in light of the fact that Erica has given us notice that she will not be returning. Sharon has now been part of GDHS for most of two years. By Sharon accepting an offer of the job to replace Erica it means the department has a person familiar with our school and our curriculum.

I will be very happy to have Sharon as a full time teacher in the department next year. I think that she will prove to be an invaluable member of the department and the community as a whole.



Respectively submitted,

Deborah Haynes

6483

# EXHIBIT 20

**Exhibit 2**

Sharon Killian - 1999 - 2000

Sharon has had an extremely full and hopefully fulfilling year,
including the graduation of her very special and talented son
from GDHS.
Her first year teaching AP Studio Art went very well and I am
sure the majority of the class will score high with the AP
evaluators. Sharon spent a lot of time involving her students
in creating their own digital portfolios. She did this with
all of her classes.
The ART MAGAZINE 2000 was a great success, thanks to Sharon's
supervision. Her encouragement of students to contribute to
many of the other school publications added, to those works,
depth, color and richness.
In terms of the community, Sharon should be commended for pulling
the St. Elizabeth's mural project together with great craft,art
and efficiency. Sharon has also been a leader in promoting
activities which help to create an authentic awareness of our
institutions mission of diversity education.
I hope Sharon's next year will be equally as fruitful.



Δ π EXHIBIT 2

Deponent
Date 3/27/06  Rptr. D ✓
WWW.DEPOBOOK.COM

6498

# EXHIBIT 21

**Exhibit 3**

Art Department - Faculty Evaluation
Narrative Response
Georgetown Day School

Date: June 1, 2001
Faculty member: Sharon Killian
Teacher and Dept Head Signatures:

## Preparation and Instruction:

Sharon teaches a broad range of subjects and experiences a full
range of abilities from introductory to very advanced for which
she is well prepared and organized. Sharon's course material is
demanding and her expectations are high, but no challenge is
beyond the scope of her students. The work that results from
Sharon's assignments is impressive - at the advanced level it
often serves as a benchmark for other students.

## Student Assessments:

Sharon is timely and direct in her assessments. She freely
communicates her expectations to students and provides a fair
evaluation of their work with ample praise and constructive
criticism. Sharon never hesitates to confront a student who is
not reaching expectations and/or communicate directly with
parents when appropriate. Sharon's written assessments are also
strong. She discusses both the artwork and effort in detail in her
grade reports to parents. Although this was not an issue this year
- I am encouraging the entire department (including myself) to
utilize the 'alert' system to give written notice to parents,
advisors, and of course our students. As a rule of thumb any
grade in the C+/B- range deserves an alert, as do
lateness/unexcused absences, and tardy assignments.



Δ π EXHIBIT ⌐3
Deponent
Date 3/27/06 Rptr. BV
WWW.DEPOBOOK.COM

1967

## Classroom/studio learning climate:

Sharon maintains a positive learning environment. Her classes regularly receive written assignment sheets that establish clear expectations and she often culminates her projects with critiques. Sharon has also been active in exhibiting student work, and in fact, last quarter her photography students worked together to create web pages based on group research projects. This work is now posted on the school web-site.

One of the tough parts of an advanced level teacher is conveying the sense of individual responsibility and encouraging students to accept this role as artists. Creativity cannot be mandated, but I feel Sharon does well in leading students to this outcome.

## Goals and Recommendations:

#1. Our charge for the coming year is to continue to address multicultural education in all our classes and in the overall functioning of the department. I am asking each faculty member to brainstorm how to implement this objective.

#2. Student art exhibits remain our best form of communication, praise, and inspiration. This fall each faculty member will be working on a rotating schedule of on-campus exhibition spaces. Goal: I would like each teacher to find an off-campus venue for one or more of their classes to exhibit in.

#3. Begin implementation of digital photography in all course levels - contingent on purchase of necessary equipment.

#4. Participate in all-school art exhibit and web gallery

#5. Tighten control, use, and allocation of art supplies to contain waste

#6.  Better maintenance of shared teaching spaces: in particular darkroom/classroom with greater emphasis on student responsibility for cleaning/maintaining space, mixing chemicals, and setting-up chemical trays.

#7.  Establish an art department web-site with artwork from all classes and grade-levels.

#8.  Utilize the 'alert' system for written notification to parents, advisors, and students of issues - in short to provide a written record of potential trouble and hopefully guide students to positive outcomes.

#9.  Work toward short and long term goals set forth in your personal evaluation response.

# E X H I B I T   2 2

Exhibit 4



Upper School Art Department
Teacher Evaluation - January 2002
Teacher: Sharon Killian
Course observed: AP Studio Art
Lesson plan: Linoleum block printing
Observation period: three+ 70-minute class periods

During the first class I observed Sharon introduce a long-term assignment in linoleum printing based on self-portraits interpreted utilizing Adobe-PhotoShop. She effectively presented the concept and objective to the class answering questions and encouraging a creative response from each student. A handout covered the essential information and established process, expectations, and deadlines. I was impressed with Sharon's ability to clearly convey the material and explain the details of the process. There was a good balance of firmness in her adherence to the parameters of the assignment, which at this level inevitably invites challenge, especially from students more focused on product than process.

In the second class students were well on their way with the transfer of images onto the linoleum blocks. Sharon monitored everyone's progress and offered both encouragement and technical advice as needed. Students were reminded of deadlines previously outlined in the handouts. A couple of students were experiencing frustration and questioned the assignment in class. This natural response to a challenging assignment was met with a good mix of understanding and re-direction. Basically these students were told to withhold judgment and see where the process led them as the image was interpreted and developed.

In the third class students were printing their linoleum and the excitement was palpable. The diversity of images and success that each student ultimately encountered quieted even the most skeptical student. Students shared their prints, encouraged one another, and responded to their own work by continuing to print or re-working the block. Sharon floated around the room, suggesting various inking and cutting techniques and monitoring everyone's progress.

In a subsequent class that I happened to witness casually Sharon had students hang their work for exhibition and orchestrated a critique.

Accepted by: _____ Date: __11/4/02__

1966

# E X H I B I T   2 3

**Exhibit 5**

Upper School Art Department
Teacher Evaluation: Sharon Killian
Spring 2003



### Teaching Practice

**Course observed:** AP Studio Art

**Lesson plan:** figure drawing and painting

**Observation period:** informally over several weeks, culminating in the final exhibition of their paintings in the student lounge.

This assignment progressed over several weeks and evolved sequentially from earlier figure work executed in charcoal and paper. Sharon effectively presented the concept and objective to the class answering questions and encouraging a creative response from each student. Sharon used two-student models side light on a raised platform. Students took up their easels and began the challenging process of making figure studies that would ultimately evolve into paintings. Although in an AP level course students tend to be quite focused, it is inevitable that frustrations occur and in these instances Sharon employees a healthy mixture of encouragement and firmness to keep students positively motivated and on-task. While monitoring the progress of her class Sharon would offer praise, suggest options or pose questions that would lead a student to discover the solution.

The outcome of this lesson plan is a body of artwork that exceeded the achievement the class had previously been able to attain. I state it in this manner because although there were over a dozen separate paintings the class was very supportive of one another and everyone shared in the success.
This atmosphere, which Sharon fostered, is critical to the success of any class, but in this instance the individual growth that occurred would have been unthinkable for many without it. It became a defining moment for some students which lead them to fully recognize their own potential.

An important secondary outcome of this project was the positive impact these paintings had on the GDS community. The choice of models representing the diversity of the school made a powerful statement when the exhibition was mounted. Also, it is from this body of work that many students built their applications to art schools and colleges.

**Student Awards:**

As of this writing Sharon's students have received 4 Gold Key Awards from the National Scholastic Art & Writing Awards.

**Professional Development: 2002-2003**

Sharon continues to make a strong commitment to her professional development. Over the summer she worked independently on development of the AP Studio Art course content. In the fall of 2002 Sharon visited Washington University in St. Louis and the University of the Arts in Philadelphia as part of her ongoing effort to keep abreast with art programs our students might consider after graduation. In March of 2003 Sharon completed a full day workshop in Advanced Digital Workflow offered by the Nikon School.

**Evaluation by:** Nicholas Ryan, Chairperson, GDS Upper School Studio Art Dept.

**Reviewed and accepted:** _____ **Date:** _____

# E X H I B I T   2 4

**Exhibit 6**

Teacher Observation Form
HS Art Dept
Georgetown Day School

**Observation period:** informally over many weeks in the winter of 2004

**Course:** AP Studio Art

**Time:** Winter quarter 2004

**Assignment:** Figure Drawing & Painting

**NOTE:** This observation was to have been scheduled and formal, but for several months Sharon refused to respond to repeated requests for a specific lesson or class period to observe. In lieu I offered to write this more informal observation so there would be a record of the quality of Sharon's teaching at GDS.

**Observation:**
This assignment spanned many weeks and evolved sequentially from earlier figure work executed in charcoal and paper. Sharon effectively presented the concept and objective to the class answering questions and encouraging a creative response from each student. Sharon chose student model Cecilia Ekperi and seated her in a chair with a sidelight on a raised platform in the center of the art studio. Students took up their easels and began the challenging process of making figure studies that would ultimately evolve into paintings. Although in an AP level course students tend to be quite focused, it is inevitable that frustrations occur and in these instances Sharon employees a healthy mixture of encouragement and firmness to keep students positively motivated and on-task. While monitoring the progress of her class Sharon would offer praise, suggest options or pose questions that would lead a student to discover the solution. The high quality of the work from the students reflects a solid preparation earlier in the year and highly appropriate instruction during the project. The range of approaches also reflects Sharon's skill at fostering an environment in which students can be committed to their work, while exploring and expanding their individual styles as painters.

As in previous years, a secondary outcome of this project was the positive impact these paintings had on the GDS community. The choice of model represents the diversity of the school - as a body of work these paintings offer a powerful statement to what GDS stands for. Also, it is from this strong artwork that many students built their applications to art schools, colleges, art competitions, and the AP exam.



**Beyond the classroom:**

**Collegiality:**
This continues to be a difficult year in the art department. Since the middle of the second semester interpersonal relationships have been strained and tension exists on a daily basis making department business challenging.
I have attempted on many occasions to resolve the issue through mediation with Paul, Peter, Kevin, Mari and Elizabeth, but there has been little if any progress. I find Sharon's behavior unprofessional and hostile. Her continuing silent treatment of Laura and me since mid-February indicates an unwillingness to enter into an honest dialogue about issues she perceives here at GDS. Sharon appears to prefer a path of total isolation and hostility to functioning as part of a team that constitutes the art department at the high school.

**Summary of goal achievement as of 5/19/04:**
Goals for the 2003-2004 school year were due by October 31st. Despite repeated requests to Sharon over many months and additional requests conveyed through Mari and Elizabeth I have yet to receive Sharon goals for the current school year. I am therefore unable to address this aspect of her evaluation.

**Notes:**
Sharon's students continue to achieve at the highest levels as evidenced by the excellent artwork on exhibit throughout the school and most recently at the all-school art exhibition at the Lower/Middle School campus. On May 22nd two of Sharon's students will be receiving awards for the Congressional Art Competition.

_____          _____
Nicholas Ryan                    date
Chair – HS Art Dept.


_____          _____
Sharon Killian                   date

1963

# E X H I B I T   2 5

**Exhibit 7**

**HS Art Department**
**Faculty Evaluation**
**June 3, 2005**

**Teacher:** Sharon Killian
**Course observed:** Intro Photography

**Planning & Teaching:**
- Sharon employs a variety of teaching methods and uses then effectively in her classes.
- Assignments are clearly presented, posted on Blackboard, and accompanied with a descriptive assignment sheet.
- Sharon uses technology frequently and the students are well-versed in saving files to the network, scanning images, and utilizing Adobe PhotoShop software.
- In the particular assignment observed the use of photo-essay relates to a recent field trip to see Andre Kertesz. In other projects multicultural perspectives are frequently and effectively included.
- Sharon is sensitive to student learning styles.
- Sharon's curriculum is a well-developed and cohesive set of projects, readings, and field trips.

**Student Assessment:**
- Sharon assesses students appropriately, basing her evaluations on effort, attitude, and achievement.
- There are examples of successful assignments that guide students in their work.
- Students are asked to write self-reflective pieces for assignments.
- Assessment is based on a large body of work and students are encouraged to achieve to their highest level.
- Assessment is timely and written reports are thorough and insightful.

**Relationship with students:**
- Sharon has a good rapport with her students. Expectations are clear and consistently applied. Sharon also demonstrates sensitivity to individual personal issues which occasionally arise with students.
- Sharon is readily available during and after scheduled classes for extra help.

**Communication with Parents:**
- Sharon communicates clearly and effectively to parents. She does not hesitate to make a call and alert a student's parents to a change in effort or behavior in class.
- Sharon's grade reports offer thoughtful reflections about each student's progress.

2062

**Professional Growth:**
- Sharon is an active learner. Her command of technology – software and hardware is impressive. The AP Studio art website and GDS web gallery reflect this.

**Professional Practice:**

Sharon meets the established deadlines for grading and reporting. As mentioned earlier her grade reports are insightful and descriptive giving students and parents realistic and encouraging feedback on effort, work, and overall progress in class.

Maintenance of an orderly studio is a challenge for everyone in the department. As we look toward the next school year it is important that we all exercise more care in leaving the facilities as we would like them for the start of our own classes. Ideally that means students are made fully responsible for cleaning up and properly storing materials such as mat board, paint, brushes, artwork. Hardware such as digital cameras and video equipment etc. must be signed-out and inventoried on a regular basis.

During the school year there are obligations such as cross-divisional meetings, community service, etc. which should not be missed. It understood that emergencies and illnesses occur for which one is unable to plan, however these are the exception. In the interest of fostering collegial and respectful relationships with in the department and across the three divisions of the school anticipated absences such as personal leave should not coincide with the scheduled obligations such as meetings, community service, etc.

**Relationship with Colleagues:**

I am grateful that relationships within the department have improved since last year at this time. However, there remains an edge that undercuts the potential for members of the department to communicate openly and this too often stifles collaboration and the sharing of information. As we start the 2005-2006 school-year I would like all department members to treat each other with respect, as well as to listen and reflect on what has been said in department meetings. Three individuals will often have differing viewpoints and I believe the shared objective should be reaching a consensus when possible. It is also realistic to acknowledge that we may not agree on all things – nevertheless, we are obligated to work cooperatively. It is important for each department member to continue to work on being more collegial with one another each and everyday.

Sharon Killian
June 8, 2005

The evaluation of my teaching for 2004-05 is generally accurate; however, there are two aspects of it that require response.

Under "professional practice," it is asserted in a general way that hardware such as digital cameras and video equipment must be signed-out and inventoried on a regular basis. If the reviewer here intends to suggest that I have somehow departed from procedures established in the Spring, he is mistaken. As for the earlier "procedures" (lack thereof really) in place, please refer to my correspondence with Kevin Barr earlier this term (which should be in the reviewer's file as well).

I also feel bound to note I am disappointed the reviewer failed to recognize my work with the foreign language department to produce a book of prose and poetry accompanied by artwork. Such an inter-departmental collaboration seems to me worthy of mention in connection with professional practice, and relationships with colleagues for that matter.

Finally, I feel bound to respond to what seems to me implicit criticism of several absences this year: I missed a community service day and one after-school meeting this past year. Other than these two events and a couple of sick days, I attended all scheduled events. Yet I routinely stay after school to assist students, meet with parents and otherwise fulfill my teaching, extracurricular and administrative responsibilities. Many an hour I have spent at GDS making sure the meeting spaces, hallways and classrooms are presentable to all and reflect well on the school and the artistic achievements of the students. I organized and exhibited students' works at Politics & Prose and have done many other things to advance the school and art at GDS using my personal time outside of school. The reviewer does not find these extra efforts on my part worthy of mention, at the same time he has chosen to criticize, at least implicitly, two absences during the course of a long school year.

I find these aspects of my review disappointing.

**Addendum to Summary Evaluation 2004-2005**

Teacher: Sharon Killian

Date: June 8th, 2005

In response to our review of Sharon's observation and evaluation I offer the following clarifications:

Under Professional Practice:

- The inclusion of hardware such as digital cameras is intended to apply to all members of the department. No implication of a departure from existing professional practices was intended – it is my view we have all complied with the practice, but I would add that we need to continue to be vigilant about equipment and maintain accurate records via an effective sign-out system. Sharon will be taking over the Film & Video class and therefore will be the primary person in charge of the video cameras next year. I encourage her to develop appropriate methods that are workable for her and her students to track equipment for long-term care and use.

- I have encouraged Sharon to write a summary of her work with the foreign language department to produce a book of prose and poetry accompanied by artwork. This is a significant contribution which should be noted. In addition, I neglected to note the exhibition of Sharon's AP students' artwork at Politics and Prose, as well as her participation in the Scholastic Art Awards and Congressional Art Competition. As a matter of practice I will now be asking all department members for a summary of their work for classes and the GDS community each year so that I can better credit those efforts in the annual evaluations.

- The two absences noted did occur at times when the existing meeting schedule was clear and established. However, in conversation Sharon clarified that those absences were prompted by unavoidable emergencies or appointments she felt she could not miss.

- Finally, I will be posting a meeting schedule for regular department meetings to ensure we maintain communication within the department.

Teacher: _____ Date: _c/9/05_

Department Chair: _____ Date: _Jun 9th 2005_

# E X H I B I T   2 6

# KRUPIN O'BRIEN LLC

ATTORNEYS AT LAW

CARYN G. PASS
(202) 467-2469
CGP@KRUPINOBRIEN.COM

1156 FIFTEENTH STREET, N.W.
SUITE 200
WASHINGTON, D.C. 20005

T: (202) 530-0700
F: (202) 530-0703
WWW.KRUPINOBRIEN.COM

## Memorandum

To:        Joe Sellers

From:      Caryn G. Pass
           Grace H. Lee

Re:        Audit of Investigation of Claims Raised by Sharon Killian

Date:      April 11, 2005

## I.    Introduction

Pursuant to your request, we conducted an independent investigation of the allegations of race discrimination raised by Sharon Killian against Georgetown Day School ("GDS" or "the School"). These allegations were asserted and described in a letter dated July 6, 2004, which was sent to Daniel Johnson, Esq. by legal counsel for Sharon Killian, John P. Racin. In addition, Mr. Racin sent us a document drafted by Ms. Killian in March 2004 describing her allegations in more detail.

Ms. Killian has been employed as a teacher in the art department at GDS since 1994. She alleges that during her employment at the School, she was subjected to discrimination based on race by GDS faculty and administration. Specifically, Ms. Killian and her attorney describe instances in which Ms. Killian felt slighted, marginalized or felt that she was being treated unfairly. In summary, Ms. Killian complains that: (1) she has been slighted, undermined or belittled by co-workers; (2) she has been subject to unfair treatment and verbal abuse by her Department Head, Nick Ryan as well as his predecessor, Debbie Haynes; (3) she has not received the same resources, especially technology resources, and has not received the same level of support for new curriculum as Laura Tolliver, a fellow teacher in the Art Department; and (4) she

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO
PROTECTIVE ORDER**          6836

Memorandum
April 7, 2005
Page 2

has brought these concerns to the attention of Paul Levy and the Diversity Coordinators, and has not received an acceptable response.

In order to conduct a comprehensive and thorough investigation of these allegations we have reviewed a range of documents, including the personnel files of Ms. Killian, and other members of the art department. In addition, we met with Ms. Killian over the course of two days, and discussed her history with the School as well as her past and current frustrations and allegations. We discussed Ms. Killian's allegations at length with Peter Branch, the current Head of School, and visited the School and conducted interviews with individuals named in Ms. Killian's allegations, as well as individuals who were not named but may have information related to the claims asserted by Ms. Killian. Specifically, we interviewed the following people at the School:

Mariama Richards, Diversity Co-Director;

Elizabeth Denevi, Diversity Co-Director;

Kevin Barr, Principal of the Upper School;

Laura Tolliver, Art Teacher;

Tom Yoder, Assistant Principal;

Bruce Ruble, Educational Technology; and

Nick Ryan, Art Department Chair.

After conducting these comprehensive interviews, we met separately with Paul Levy, former Principal, near his home in Bethesda. We also had a telephone conference with Debbie Haynes, former Art Department Chair and Ms. Killian's previous supervisor. Though not named or mentioned otherwise in any interview, we met with Elaine Scott, an African-American staff member who has been employed at the School for 24 years in order to obtain an understanding of the history and culture of the School with respect to race relations. Finally, we interviewed Damisha Lee, a former college counselor, via telephone because Ms. Killian's attorney represented that Ms. Lee may be able to support Ms. Killian's claims of race discrimination.

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
                     PROTECTIVE ORDER        6837

Memorandum
April 7, 2005
Page 3

II.    Ms. Killian's Allegations

      Ms. Killian raised many issues and allegations in her March 2004 letter, her attorney's letter, and during her conversation with us during the investigation. We discussed her allegations during our conversations with various GDS faculty and reviewed the circumstances surrounding the allegations. We address Ms. Killian's more salient allegations and responses we gathered during our investigation below.

A.    _Complaints about the "clique"_

      During our investigation and in her complaint letter, Ms. Killian referred to an "old guard" or a "clique" of other faculty members who were already close friends when she began employment at the School. According to Ms. Killian, this group of friends was made up of employees who had worked together at GDS for many years. Ms. Killian alleges that Laura Tolliver and Debbie Haynes, the other two teachers in the art department, socialized with this group of other faculty at the School and that she felt belittled and marginalized by this "clique" of friends. She indicated that she felt as if she was excluded from their social events and on numerous occasions was not invited to join in their discussions. Ms. Killian asserted that her belief was that as a result of her race, these colleagues did not include her in their circle. When asked what she based this opinion on she responded that she couldn't think of any other reason that she would not have been included.

      During the investigation we discussed the "circle of friends" and Ms. Killian's perceptions with the employees named as part of this group. In response to our inquiries, the employees reported that they were not aware that Ms. Killian felt this way. The sources sited many instances in which Ms. Killian also socialized with various faculty members who were part of this "group" outside of work, including Laura Tolliver and Debbie Haynes. According to the individuals asserted to be part of this "clique" they were not in fact a group of friends as much as a group of individuals who had all worked at the School for many years and who knew each other from this experience. They did not socialize during or after school and were surprised at Ms. Killian's description of them as a "clique." In addition, there were several accounts of situations in which Ms. Killian was invited to socialize with other faculty members and either declined the invitation or accepted and then simply did not show up. While Ms. Killian certainly may have felt excluded, there was no evidence that Ms. Killian was either intentionally left out or ostracized from any "social circle". Moreover, no evidence existed establishing a connection between Ms. Killian's allegations that her co-workers exclusionary behavior resulted from her race or her allegations of race discrimination. While Ms. Killian's

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 4

feelings that she had been subject to exclusionary practice by her colleagues may certainly be genuine beliefs on her part, they could have been made by anyone who felt excluded by this alleged "clique" of friends, as there was no evidence that race was a factor.

Although Ms. Killian's allegations regarding the "clique" may seem inconsequential at first blush, it seems that this feeling of isolation and exclusion deeply affected Ms. Killian and impacted her perception of many other situations and events at the School. During the interviews with her she suggested that the employees within the alleged "clique" assisted each other in work-related matters to the detriment of Ms. Killian. For example, she believes that Bruce Ruble, technology director, provided Linda Tolliver, another Art teacher, with more technology resources than he provided to Ms. Killian because they were in the same group of friends. Also, this feeling of isolation seems to have contributed to the demise in her relationship with the other members of the Art department including Debbie Haynes, Nick Ryan, and Laura Tolliver. Ms. Killian believed that Nick Ryan, though neutral at first according to Ms. Killian, was invited into the "circle of friends" and became predisposed to negative sentiments as a result of the "clique's" attitude toward Ms. Killian. While numerous inquiries were made in a variety of manners with a variety of witnesses, evidence or even negative inclinations toward Ms. Killian were never articulated. In fact, consistently the interviewees stated that they liked Ms. Killian and didn't understand why she was reluctant to befriend other staff. In fact, the Art staff gave examples of times that they had invited Ms. Killian over for staff meetings or lunch and that, much to their disappointment, Ms. Killian never reciprocated.

While interpersonal relationships between faculty members and groups of friends that might develop at a school make for a more pleasant working relationship they are not mandatory. Whether it was self-imposed or if it was indeed a result of the acts of the other faculty members, Ms. Killian clearly felt like an outsider at the School and she attributes this to race discrimination. However, after extensive interviews, we were not able to substantiate her allegations that she was excluded, belittled, or marginalized by this "clique," and could not find any evidence of race factoring into the lack of a relationship. If anything, on a professional level, we learned of great efforts that were made to work cooperatively with Ms. Killian, to which, according to numerous employees, Ms. Killian was mostly unresponsive.

**B.**    **Complaints about Debbie Haynes**

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 5

When Ms. Killian joined GDS in1994, Debbie Haynes was the head of the art department and Linda Tolliver and Erica Elliott were fellow art teachers. Ms. Killian was first hired by GDS as a substitute art teacher while Linda Tolliver was taking time off to care for her sick husband. Ms. Killian knew Debbie Haynes because their husbands worked together. Debbie Haynes introduced Ms. Killian to GDS. The following year, when Erica Elliott did not return to teach, GDS hired Ms. Killian as a full time faculty member based on Debbie Haynes' endorsement. At the same time, Linda Tolliver returned to her full time status. By all accounts, Ms. Killian, Debbie Haynes, and Linda Tolliver worked well together during Ms. Killian's first year as a full time faculty member. Indeed, Ms. Killian's performance evaluation from Debbie Haynes for the 1994-1995 academic year was quite positive.

At some point during Ms. Killian's second year of teaching full time, the relationship between Ms. Killian and Debbie Haynes deteriorated. Although none of the individuals interviewed, including Ms. Killian, was able to offer an explanation for the demise, it was very clear to Debbie Haynes that Ms. Killian was unhappy. Debbie Haynes described a sudden change in Ms. Killian's behavior that was not marked by a specific event or situation. According to Debbie Haynes, she approached Ms. Killian and expressed that she noticed a change in their relationship and that she was very much concerned with this change, as she wanted them to keep an open dialogue. As remembered by Debbie Haynes, Ms. Killian was not responsive to her attempts to either discuss what was wrong, whether something had occurred to upset her, or to make efforts to mend the relationship.

Debbie Haynes reported that eventually Ms. Killian simply refused to attend department meetings and became increasingly difficult to work with. In a department consisting of only three people, this raised obvious concerns and difficult challenges for Debbie Haynes as the Department Chair. Debbie Haynes raised her concerns with Paul Levy, former Principal of the Upper School, who recommended that all three members of the art department meet with him. Apparently the art department met with Paul Levy in an effort to discuss the reason for Ms. Killian's unhappiness, but little progress towards creating a better working relationship resulted. In an effort to assist the department resolve this matter, Paul Levy suggested that they meet with the school psychiatrist. The three members of the art department met with the school psychiatrist numerous times in order to work on the conflicts and try to create a better working relationship. According to Haynes and Tolliver, they very much wanted to fix the problem and great efforts were made to resolve the issues within the art department and to address Ms. Killian's discontent during meetings with Paul Levy and the school

*Laura*

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
                        PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 6

psychiatrist. However, the parties stated that Ms. Killian would often deny that anything was wrong and was unable to articulate a specific problem or issue. Moreover, despite many opportunities to do so, Ms. Killian did not raise the issue of race discrimination during these meetings with Paul Levy or the school psychiatrist.

Despite these numerous attempts, over time, Ms. Killian's relationship with Debbie Haynes deteriorated to the point that in 2001, during Haynes' last year at GDS, Ms. Killian refused to communicate directly with her and would communicate only via e-mail. Debbie Haynes documented her concerns regarding Ms. Killian's interpersonal relationships in performance evaluations as far back as 1996. According to the evaluation, Ms. Killian had difficulty recognizing Debbie Haynes' position as department head, and had a problem accepting the fact that Laura Tolliver had seniority over her in terms of years of teaching at GDS. Ms. Killian responded to the performance evaluation in writing asserting that the problem in the relationship was not as a result of her behavior in any manner. No improvement was made in the relationship between Ms. Killian and Debbie Haynes. While we confirmed that the relationship between Debbie Haynes and Ms. Killian was neither pleasant nor cordial, we found no basis to support the allegations that the breakdown in communications occurred from treatment or negative attitude towards Ms. Killian as a result of her race. When questioned, Debbie Haynes was totally confused as to what she did or what occurred to cause the relationship to turn so very negative. Likewise, Ms. Killian was unable to provide an explanation of why she believed the relationship deteriorated as a result of her race. Ms. Killian stated that she had no other explanation for why this could have occurred other than her race.

C.    **Complaints about Nick Ryan**

In 2001, Nick Ryan was hired to replace Debbie Haynes as the new head of the art department. Everyone involved in the department seemed hopeful that he would help improve the dynamic within the department since he was a neutral party who had no previous history with anyone at the School. In fact, the existing members of the art department were involved in the decision to hire Nick Ryan and unanimously agreed that he was the best candidate. Ms. Killian stated that not only did she not want the position of department chair, but also was hopeful that Nick Ryan would be helpful in re-establishing a positive working relationship in the department. During Nick Ryan's first year at GDS, Debbie Haynes remained employed as a part-time faculty member. Nick Ryan remembered entering a situation in which the existing members of the department had deeply-rooted conflicts. He said he could immediately sense the tension when he arrived but hoped that with new leadership it would resolve itself. After Nick Ryan's first year, Debbie Haynes left GDS, and the department appeared to function collegially.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**      **SUBJECT TO**
**PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 7

Nick Ryan confirms that his second year was uneventful and that he and Ms. Killian "got along." However, at some point during Nick Ryan's third year at GDS, he noted a severe breakdown in their relationship. Ms. Killian eventually stopped speaking to Nick Ryan directly and communicated via e-mail, even when they shared an office.

In her March 2004 letter, Ms. Killian alleges that Nick Ryan treated her unfairly and verbally abused her. She identifies specific instances she believes support her allegation. Ms. Killian alleged that Nick Ryan tore down artwork that was displayed at the School by students in the Black Culture Club ("BCC") and threw it on the floor. Ms. Killian further alleges that when she confronted him about it, Nick Ryan exploded and stated "You are not going to force me out on the street like you did Debbie Haynes." Nick Ryan's account of this incident was drastically different. According to Nick Ryan, in early March 2002, with the help of a janitor, he took down a banner that had been hanging outside of the School advertising a BCC dance. The dance was over and as a result of the rain, the banner was very wet and dripping paint. They brought the wet banner in from the outside and laid it on the hallway floor. Once the banner was brought in, the bell rang and Nick Ryan needed to go to class. He left the banner to dry with the assumption that he would fold it and store it after class when it was no longer wet. At some point, Ms. Killian came in and saw the banner on the floor. She confronted Nick Ryan questioning him as to why he left the banner on the floor. Nick Ryan explained what had occurred to Ms. Killian. He absolutely denies yelling at Ms. Killian or making the alleged comment regarding Debbie Haynes. In fact, he is unaware of the reason that Debbie Haynes left and indicates that he had no reason to believe that Ms. Killian had anything to do with her departure. Because Ms. Killian appeared so very upset and responded in such an abrasive manner, Mr. Ryan documented his interaction with Ms. Killian over the banner. His explanation of the incident is consistent with his contemporaneous notes and consistent with the description provided by Laura Tolliver.

Ms. Killian also alleges that in February 2002, she returned from her brother's funeral and went to the School over the weekend to prepare wall space for artwork to be displayed in honor of Black History Month. Apparently, Ms. Killian was required to remove artwork displayed by Laura Tolliver's students in order to prepare her wall space. Ms. Killian alleges that Nick Ryan later "screamed" at her for taking down the artwork of Laura Tolliver's students without first asking permission. Nick Ryan took great exception to this version of events. According to Nick Ryan, Ms. Killian took down an exhibit of Laura Tolliver's students before checking with Laura Tolliver. This type of conversation was considered appropriate and was done as a means of assuring that all art staff was kept up to date with regard to the use of the limited wall space. Contrary to Ms. Killian's account, Nick Ryan alleged that he neither screamed nor

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**    SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 8

reprimanded Ms. Killian. What he indicated was that he suggested that in the future, as a courtesy, she might want to inform her colleagues prior to dismounting an exhibit. Ms. Killian was very upset by Nick Ryan's comment. Noting her agitation and wanting to avoid any conflict with her, he made notes of the conversation. His representation is *consistent with his contemporaneous notes.* In our conversations with other staff it was implied that it was not Nick Ryan's style or manner to "scream" at his colleagues but that it was very much Ms. Killian's style to perceive a passing comment as a reprimand. Nick Ryan indicated that it was this type of response that made it so very difficult to work with Ms. Killian. He noted that even innocent statements made in order to assure congeniality, respect and a proper working environment were interpreted by Ms. Killian as either "screaming" or a "reprimand." At some point, Nick Ryan and Laura Tolliver found themselves doing whatever they could to simply avoid enraging Ms. Killian.

Ms. Killian also complained about a meeting arranged with Susie Ryan, Alumni Director, to discuss publishing alumni artwork in the School's Art Magazine, which is published under Ms. Killian's supervision. Ms. Killian alleges that although she arranged the meeting and that she was in charge of the project, the meeting took place without her. *Ms. Killian blames Nick Ryan and claims that he purposefully kept her uninformed about the meeting time.* According to Ms. Killian, she spoke with Susie Ryan in December 2003 about publishing alumni artwork in the Art Magazine, and they agreed to meet in January 2004 to discuss the project in more detail. Based on Ms. Killian's conversation with Susie Ryan in December, Ms. Killian hoped that she and Susie Ryan would forge an ongoing partnership between the Art Magazine and Alumni Relations.

Ms. Killian was out sick for several days in the beginning of January. During her absence, Susie Ryan attempted to contact her to arrange the meeting. She was away from school and was unable to get back to Susie Ryan. Susie Ryan then contacted Nick Ryan to see if he knew how to contact Ms. Killian. Since the only manner to contact Ms. Killian had been tried and since the meeting needed to occur in a fixed time frame since the alumni was only in town for a very short period of time, *Susie Ryan set up the meeting and asked Nick Ryan if he would be able and or willing to come to the meeting if Ms. Killian was not available.* Ms. Killian alleges that Nick Ryan and Susie Ryan set up a meeting without checking with her schedule and without informing her about it until the day of the meeting. Ultimately, this meeting took place between Nick Ryan, Susie Ryan, Laura Tolliver, and the alumnus, but without Ms. Killian. According to Nick Ryan, he was only there in response to Susie Ryan's request and as a result of Ms. Killian's failure to respond to Susie Ryan's attempt to contact her. Ms. Killian brought this issue to the attention of Mariama Richards in the diversity office as she did not

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:    SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 9

believe either Susie Ryan's or Nick Ryan's explanation of why the meeting occurred
without her.

During our investigation, it appeared that this situation was an unfortunate
instance that resulted from a lack of communication or miscommunication. Even Ms.
Killian admits that Susie Ryan left a message for her about the meeting while she was out
sick. After Susie Ryan did not hear back from Ms. Killian, Susie Ryan called Nick Ryan
to see if he could assist her locate Ms. Killian. Ms. Killian further admits that when she
asked Nick Ryan why he did not inform her of the meeting, he stated that he assumed
Susie Ryan had informed her of the meeting since he was only standing in for Ms. Killian
and it was not his meeting. The investigation further revealed the alumnus was only in
town for a few days, and the meeting needed to occur while she was in town. In short,
both Nick Ryan and Susie Ryan each believed the other party was communicating the
meeting date and time to Ms. Killian to determine if Ms. Killian was available.

In any event, Ms. Killian was back at School by the day the meeting was
scheduled to take place and in the end, prior to the date and time of the meeting, Susie
Ryan informed Ms. Killian of the time and location of the meeting but Ms. Killian chose
not to attend. According to Nick Ryan, the intent was never to exclude Ms. Killian in any
way. Instead, the circumstances and timing of the meeting resulted in Ms. Killian not
knowing about it until the day it happened but with plenty of notice to make
arrangements so she could attend.

Ms. Killian expressed to the diversity office that she viewed this meeting
as an attempt by Nick Ryan and Laura Tolliver to take control of the Art Magazine away
from her. We were unable to confirm such an intention on the part of either Nick Ryan
or Laura Tolliver. In fact, just the opposite was true. Both Nick Ryan and Laura Tolliver
indicated that Ms. Killian had done a good job on the publication and that the only reason
they went to this meeting was in response to Susie Ryan. Ms. Killian also expressed to
the diversity office that she wanted Susie Ryan to understand that she and Nick Ryan
were not on speaking terms and that in the future Susie Ryan should deal with Ms.
Killian directly. It is difficult to determine why Ms. Killian believed that Susie Ryan
would have known the dynamics of the art department. Susie Ryan contacted Nick Ryan
who was attempting to assist her in her efforts to find Ms. Killian and in her efforts to
follow through with a meeting with an alumnus. By all accounts, the parties were
operating in a manner that was consistent with the goal, which was to set up a meeting
with the alumnus within a short period of time to see if she was interested in participating
in the Arts Magazine.   By all accounts, we confirmed that this was an unfortunate
incident that occurred as a result of Ms. Killian's absence, the limited availability of the

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 10

alumnus, and a lack of communication. We found no evidence of a racial motivation behind this situation.

Finally, Ms. Killian alleges that she was subject to verbal abuse by Nick Ryan when he allegedly stated in words or effect that he could not "bend low enough to the ground" to understand what she was saying, while gesturing his hand towards the floor. Ms. Killian interpreted this to be a racially motivated comment and went immediately to the diversity coordinators and the Principal. Nick Ryan readily admitted making a comment; however, he denies any racial interpretation of the statement.

Nick Ryan explained that on the day of the alleged comment, Ms. Killian approached him in a hostile manner because she was upset about what she perceived to be a change in the curriculum. Apparently, the School had hired a technology consultant and required each department to submit a report of its current technology classes so that the consultant could assess future technological resource needs. Each department was to submit a statement of needs. As the head of the department, Nick Ryan drafted a proposed report and gave a copy to both Laura Tolliver and Ms. Killian to review. Both teachers were provided the document at the same time and had at least one full week to review the proposal. Both were aware of when the report was due and were reminded to have comments back in a timely basis so that any changes could be made prior to the meeting with the consultant. Laura Tolliver reviewed the report and timely submitted her comments. Even though according to Nick Ryan, he provided reminders to Ms. Killian of the date and time of the meeting and the need for ample time to make necessary changes, Ms. Killian approached Nick Ryan one half hour before his scheduled meeting with the consultant and accused him of proposing new courses. In response to her accusation, Nick Ryan attempted to explain that he was simply outlining their current use of technology in the art department and that he was not proposing any new curriculum. According to Nick Ryan, Ms. Killian would not listen to his explanation and continued to insist that he was misrepresenting the curriculum and was not reporting the accurate statement of classes.

By this point in the year, the relationship between Nick Ryan and Ms. Killian was exceedingly tense. Nick described the relationship as one in which no matter how he tried to communicate or what he said he was made to feel that in some manner he was offending Ms. Killian or making her believe that he was acting in a condescending or off putting tone. Nick Ryan expressed during the investigation that he was feeling frustrated because he felt that she found fault in everything he said or did no matter what efforts he made to appease her. As a result, when Ms. Killian remained accusatory and hostile after he tried in a variety of ways to explain to her that the curriculum was not

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 11

changing, he grew increasingly frustrated. His approach was to defer to her and make every effort to assure that she understood that he was on her team and that his intent was to accommodate her needs. However he continued to feel as if no matter how hard he tried, she was not going to change her attitude towards him. As he described it, in a moment of maximum frustration and overwhelming concern, he wanted to know how he could express himself so that Ms. Killian felt neither threatened nor offended. "What do you want, I don't get it, and I can't lower myself enough to please you." Mr. Ryan explained during the investigation that he intended this statement to mean that no matter what he said or did, she was not happy, and that no amount of apologizing or groveling appeared to make her happy. From our investigation it appeared that the comment was intended by the speaker to mean one thing and interpreted by Ms. Killian to have a racial connotation.

During our conversations with Nick Ryan it was clear that his efforts with regard to working collaboratively and making peace with Ms. Killian took a significant amount of time and effort. He instituted a number of policies in an effort to assure that all members of the art department would feel as if they had equal access to materials, funds and classes. He asserted that no matter how he tried or what he did, fault was found. As he described it, one could see and hear the frustration and concern in his failure to succeed.

It is unclear what precipitated the discord between Nick Ryan and Ms. Killian, but by the middle of the 2003-2004 academic year, Ms. Killian refused to speak with Nick Ryan, refused to allow him to evaluate her class, and failed to appear at department meetings to the point where Nick Ryan simply ceased holding meetings. In Nick Ryan's 2004 evaluation of Ms. Killian, he notes that since the middle of the second semester, "interpersonal relationships have been strained and tension exists on a daily basis making department business challenging." He also recounts his efforts to resolve the issue through mediation and explains that there has been little, if any, progress. Nick Ryan noted that he finds Ms. Killian's behavior to be "unprofessional and hostile" and that "her continuing silent treatment of Laura and me since mid-February indicates an unwillingness to enter into an honest dialogue about issues she perceives here at GDS."

Although Nick Ryan denies the assertion, Ms. Killian believes that Nick Ryan immediately became allied with Debbie Haynes, Laura Tolliver and their "clique." This belief on the part of Ms. Killian may have contributed to the eventual breakdown of the relationship between Ms. Killian and Nick Ryan. However, we were unable to substantiate Ms. Killian's allegations that Nick Ryan treated her differently or unfairly because of her race. Nick Ryan made efforts to mend their relationship and work with

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 12

her in an effort to make the art department function effectively however, Ms. Killian did not appear to want to believe or listen to Nick Ryan's efforts and remained hostile and unwilling to contribute to a solution. As example, Nick Ryan made efforts to participate in sessions with an independent mediator and engaged in numerous conversations with the diversity coordinators to determine other more effective means of resolving the conflict with Ms. Killian. Nick Ryan documents the numerous attempts he has made to speak with her on an individual basis and in each instance, it appears that Ms. Killian was unresponsive and grew increasingly more hostile.

### D.  Complaints about curriculum and resources

Ms. Killian also complains about decisions that were made about the curriculum. For example, Ms. Killian alleges that she proposed a new course entitled "Graphic Design and Publishing." According to Ms. Killian, Nick Ryan verbally endorsed the course. In the end, the course was approved but the offering was to be postponed until after the scheduled renovations were completed to the building. Our investigation confirmed that Ms. Killian had proposed to teach a technology course, but the proposed course title was "Yearbook." Nick Ryan confirms that he supported the course, but suggested that the focus of the class be global graphic design. During the same period, the existing technological art class taught by Laura Tolliver was renamed from "Technology in the Arts" to "Graphic Design" in the published course list in and effort to attract more female students. Nick Ryan approved this name change but did not confer with Ms. Killian before the course-offering brochure was distributed. In short, the course description of Laura Tolliver's class had not changed and was still a technology art class, only the name had changed to include the term Graphic Design. Ms. Killian's class on the yearbook was still approved and was to begin as soon as the building renovation was complete in order to assure ample space. Ms. Killian was upset by this, and believed that she was being slighted because the course she proposed also related to graphic design. Ms. Killian's course was approved for implementation after the renovations were made to the art wing when there would be adequate space for it. The fact that both classes related to graphic design was of no consequence to that decision.

Ms. Killian alleges that she has not received the same amount of resources, especially technology resources, as other teachers in the art department. She asserted that Bruce Ruble, Chair of Technology, exerts his discretion with respect to technology resources to favor other art staff, especially Laura Tolliver, over her. Ms. Killian attributes this favoritism by Bruce Ruble in part to her belief that he is part of the "clique" of friends and that she is somehow being undermined because she is not. During the investigation we spoke extensively to Bruce Ruble. He explained how resources are

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 13

distributed and the method for providing such resources. In general, classes that are technology based are provided the greatest amount of resources and the other technology surplus is provided according to the needs of staff. Laura Tolliver teaches four technology-based art courses. In response to her workload she receives a fixed amount of technology support. While Ms. Killian has technology needs in general her classes are not technology based, so she does not receive as much technology support for her curriculum as Laura Tolliver does. This allocation of resources is not as a result of association with a staff member or as a result of a friendship, it is consistent with the manner in which a limited resource is divided among staff. Bruce Ruble indicated that he had been approached a number of times by Ms. Killian with claims of insufficient technology. In an effort to assist Ms. Killian and assure that she did not feel as if she was getting taken advantage of or receiving less then she deserved he made an effort to provide her with more technology resources then she probably would have been entitled to considering her needs relative to the other staff. In addition, according to Bruce Ruble, Ms. Killian had a separate Yearbook budget from which she could draw to purchase technology resources specifically for Yearbook. This was not provided to any other staff member. We were unable to confirm that Ms. Killian was treated unfairly in terms of getting resources for her classes or her extracurricular activities. Instead, it appears that Ms. Killian received more then a proportionate amount of technology resources considering the needs of all classroom requirements.

> ### E.    Complaints about the responses Ms. Killian received to her complaints

Ms. Killian alleges that she brought her concerns and raised various issues with Paul Levy, Head of the Upper School, and the diversity coordinators and did not receive an adequate response. While it is true that when a person believes they are in some manner being mistreated it is often difficult to clearly evaluate the assistance provided by people committed to aiding them, however, whether this assistance was to Ms. Killian's liking is open to discussion. What is clear is that the School made many efforts, some of which were above and beyond those ordinarily provided to staff in these situations, in an effort to assist her and resolve her complaints and feeling of mistreatment.

It is clear that numerous times over the years Ms. Killian has been employed at the School, the School has investigated Ms. Killian's complaints, and worked very closely with her to create a more healthy and cooperative work environment for her. These complaints have been with a range of staff members over a range of issues and have been addressed by a variety of staff and other professionals. First, both Debbie

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 14

Haynes and Nick Ryan experienced a similar breakdown in communication with Ms.
Killian. Both Nick Ryan and Debbie Haynes indicated during the investigation that they
approached Ms. Killian individually to try to resolve any issues when they noted that she
was growing hostile towards them. When after numerous efforts were unsuccessful, they
directed their concerns to the Heads of the Upper School at the time, Paul Levy or Kevin
Barr. In each instance, the Principal responded with great effort to maintain an open
dialogue and worked at trying to find a solution to the conflict that appeared to exist in
order to assist the department function effectively as a team. Not only did they each
attempt to meet with the parties and work out the issues, but also when their own efforts
failed, they brought in outside expertise to assist them.

While Debbie Haynes was the head of the art department, in response to
the complaints filed by Ms. Tolliver, Paul Levy initiated a meeting with Ms. Killian,
Debbie Haynes, and Laura Tolliver, and arranged for them to speak with the School's
psychiatrist. He was hoping that a third party would be able to serve as a mediator and
would be able to assist the three professionals try to establish a better working
relationship. Indeed, the three women in the art department met with the School's
psychiatrist on and off for several sessions. During those meetings, the parties discussed
their interactions and methods for producing a better working relationship. It is
interesting to note that despite many opportunities to do so, Ms. Killian did not complain
of race discrimination. It appears that while these meetings gave the parties a chance to
hear each other's perspective. However, it is not clear that they resolved Ms. Killian's
concerns as the parties never established a productive working relationship.

During our investigation, Paul Levy recounted countless efforts to seek a
resolution to Ms. Killian's problems to no avail. He conducted meeting after meeting
with her and other staff members to try to solve the conflict. He believed that he would
be able to fix this matter if there was a way to fix it. According to the many other faculty
members, there is a general consensus that Paul Levy was a very supportive principal and
the he worked toward resolving issues and creating imaginative solutions.

After Nick Ryan replaced Debbie Haynes, Nick Ryan became aware of the
tension and concerns of Ms. Killian. It was the same issues that she raised with Debbie
Haynes. At this point, the School's diversity coordinators became involved with the
conflict. They met extensively with all parties in order to see if there was a way to solve
the conflicts that existed. The coordinators met together with all parties as well as
separately with all parties. During the course of these meetings the coordinators attended
a workshop on dispute resolution and the School hired the mediator to assist the
coordinators draft a process that could be used to handle this situation. The School was

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

6849

Memorandum
April 7, 2005
Page 15

very committed to assuring that all parties felt as if their concerns were respected and that they did everything possible to make this difficult situation better for all concerned. The School's diversity coordinators, based on the plan designed with the mediator, conducted their own investigation into Ms. Killian's grievances. They held numerous meetings with each party separately and together trying to draft a plan that would help to resolve Ms. Killian's complaints. The diversity coordinators stated that both Nick Ryan and Laura Tolliver, while frustrated with the situation worked hard to participate in the process. When asked to work on a plan that would help to make the situation less conflict based they both assisted the coordinators by proposing numerous methods for helping to make the department run more collegially. In conversations with the parties, they all expressed confusion and disappointment that the attempts they made to work with Ms. Killian were not successful.

We were repeatedly told during our investigation that despite the School's efforts to resolve issues with Ms. Killian, she appeared reluctant to contribute to a solution. Repeatedly sources noted that Ms. Killian raised concerns but was unable and less then willing to assist the professional staff craft a way that her concerns could be resolved. When suggestions were made to her related to ways to fix the problem she refused to accept or agree that any would resolve the issue. She reportedly attended meetings with both the psychiatrist and with the diversity coordinators and either denied that anything was wrong or was unable and or unwilling to articulate her concerns. In addition, even when asked directly what she wanted, or what she wanted changed, she responded that she did not know, or that she could not explain. Even during our interview with her as part of this investigation, Ms. Killian was unable to articulate what she wanted or what changes the School or the art department could make that would resolve her issues.

According to the staff involved in this matter, she has told people not to try to figure her out. The perception from most of the people we spoke with was that Ms. Killian was (and still is) angry and frustrated but cannot see past her anger to consider that there might be a remedy. It is impossible for the School to resolve this matter if she is unwilling to participate in the resolution. What is clear is that many professionals at the School have dedicated many hours to working on a resolution to the concerns raised by Ms. Killian. Unfortunately, it is not clear that Ms. Killian is aware of what she would like to see happen.

We spoke at length with the diversity coordinators and it appears that they are very sensitive to the dynamics of race in the GDS community. According to both professionals, they worked very hard and were very committed to responding to Ms.

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 16

Killian's concerns. They feel that they did everything they could have done to redress
Ms. Killian's concerns. The diversity coordinators both have significant experience and
expertise in the area of diversity and the resolution of matters of this nature, and present
as insightful individuals who have made a concerted effort to bring a resolution to a
difficult situation. According to their description, they consulted with an independent
mediator, devised a plan of action, implemented the plan by meeting separately with each
individual involved, obtained each individual's perspective on the problem, and worked
with the parties to help develop a strategy for creating a method of resolving the issue.
They suggested that they received support from all levels of the administration and from
the other faculty members involved in the matter. Nevertheless, the diversity
coordinators found that their efforts to resolve this matter met with substantial negativity
from Ms. Killian. They indicated that while the other participants helped to devise
possible solutions Ms. Killian simply indicated that it was not her problem and had no
suggestions for what she wanted to see happen. The coordinators admit that they are at a
loss as to what else can be done or what a solution might be given Ms. Killian's
perspective. Despite the obvious lengths to which GDS has gone to mediate and
communicate, Ms. Killian is obviously unsatisfied with the result. However, based on
the evidence, while she may not feel the response was adequate, it is unclear as to what
else can or should be done to resolve her issues. Without her suggestions or
participation, the School would be forced to simply guess as to how to please her.

### III.    Actions by the School

In our conversations with all parties we found that there was a serious
commitment by the School to the issue of race and assuring a continuing conversation
with regard to the issue of diversity in general. When speaking with Damisha Lee, Ms.
Killian, and other staff, it was repeated that there were many opportunities to discuss the
issue of race and the feelings of all staff related to the issue of diversity. The School
regularly brings in speakers related to diversity, has conducted full day seminars on the
issue and hired an independent consultant to conduct a study of the School's actions and
behavior with regard to diversity in an effort to see what else can be done to assure a
diverse community and to make all members feel comfortable. There is a concerted
effort not only to recruit and support students of color but also to recruit and support
faculty of color. There is a faculty of color group that meets on a regular basis as well as
a number of other groups committed to studying and promoting diversity in the School.

In conversations with Peter Branch on this matter it was clear that this was
of great concern to him. Not because he articulated it in words as much as the concern
expressed in his questioning of how else such an issue can be resolved. Apparently it is

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:            SUBJECT TO
                         PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 17

an issue of great importance to him, as he felt compelled to revisit the various conversations he had conducted with Ms. Killian as well as the various programs he has instituted at the School to assure that the School was an institution that respected and celebrated diversity. In addition to the many programs and recruiting efforts, the School has a well-established department of diversity that is responsible for addressing issues raised by all of the School's constituencies.

### IV.    Conversation with Damisha Lee

As the final piece of our investigation, we spoke with Damisha Lee via telephone because Ms. Killian identified her as someone who would be able to corroborate her race discrimination allegations. Ms. Lee is an African-American woman who was employed at GDS for three years, from 2001-2004, as a college counselor. Ms. Lee stated that she knew about Ms. Killian's issues and concerns through conversations with Ms. Killian and through "staff of color" meetings. However, Ms. Lee did not witness any of the events or circumstances Ms. Killian complains about. Ms. Lee offered that she felt there was a general tendency to ignore complaints, but admitted that she never submitted a grievance or approached anyone, including the diversity coordinators, with a complaint of race discrimination. Ms. Lee denied feeling mistreated by GDS because of her race, and attributed any unfair treatment she might have experienced to her age. Ms. Lee felt that parents and faculty underestimated her abilities because she was relatively young when she was employed at GDS. Ms. Lee had one experience with Mr. Ryan in which he dealt mainly with her supervisor instead of her to discuss an issue with one of his students. When asked whether Ms. Lee felt Nick Ryan spoke with her colleague rather then her as a result of her race, Ms. Lee indicated that if anything, she believed it was as a result of her age, not her race. Ms. Lee was unable to articulate a basis for her support of Ms. Killian's race discrimination allegations, except that there was no other possible explanation for Ms. Killian's alleged experiences. Ms. Lee offered little if any corroboration of Ms. Killian's allegations. However, she commented that she felt as if there was a substantial amount of conversation and attention paid to the issue of race relations and diversity. In discussing her present situation, she said that while there was equal attention given to the issue it did not feel as prevalent an issue at all times. It was a more natural conversation as opposed to an issue of constant conversation.

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 18

V.    Ms. Killian's Behavior

There is no doubt that Ms. Killian is a skilled teacher and she contributes greatly to the GDS community through her classes and her extracurricular activities. Her performance evaluations and our investigation consistently revealed that she is an adept and successful teacher and the students benefit greatly from her skills. However, this is only part of her responsibility as a faculty member at GDS. As a member of the GDS community, it is incumbent upon each person to work in a manner that is professional and respectful of the other members of the community. We would be remiss if we did not include the numerous comments and statements made by witnesses concerning Ms. Killian.

Ms. Killian has had a very difficult time working either professionally or collegially within the art department for almost ten years. She was unable to work with Debbie Haynes and eventually refused to speak or communicate directly with her even though Haynes was her supervisor. On numerous occasions she did not attend department meetings called by the supervisor and did not give notice of her intent not to attend. Likewise, she regularly refused to attend meetings called by Nick Ryan and at some point in time refused to communicate with him in any manner other then by email. This highly inappropriate and insubordinate behavior towards both of her supervisors made it difficult for the supervisor to do their job. For example, Ms. Killian failed to show up to department meetings, to the point where attempting to hold such meetings became pointless. She had refused to speak directly with her department head for long periods of time, communicating only through e-mail. She has cancelled classes with no advance notice to take time off for personal reasons. Ms. Killian and Ms. Tolliver have had a strained working relationship for years. According to the witnesses, she displayed a highly defensive and hostile demeanor, and she has been highly emotional and indignant toward her co-workers, further derailing any real attempt to work out issues or problems within the department. Ms. Killian's conduct may seem justified in her mind based on her allegations, however, her actions are and have been disruptive to the operations of the art department and the School.

VI.    Findings, Conclusions and Recommendations

It is clear from speaking with Ms. Killian and reading her letter that she genuinely feels mistreated by GDS on several fronts and she is obviously frustrated with her situation. The specific instances in which she has felt mistreated seem to stay vivid in her mind even long after the fact and she becomes very emotional when discussing these issues. Without knowing exactly what has transpired during her ten years at GDS, it is

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 19

clear that when Ms. Killian finds a situation or encounter at School to her dislike her assumption is that it is based on her race. Throughout our interview with her, we asked her why she thought certain alleged treatment was as a result of race. Her response was that she could not think of any other reason for why she would be treated in that manner. She regularly compared herself with other staff who she stated did not get the same treatment and yet when it was explained to her why the treatment may have been different, it was difficult for her to consider the explanation.

It is unclear as to why this is Ms. Killian's perspective. It may be as a result of an experience she had at School where she was subjected to or perceived that she was subjected to discrimination and she did not receive the type of resolution that she wanted or response she was looking for. As she reports, her employment in the Art Department does not seem to have been a very pleasant experience, and has made her increasingly frustrated. However, whatever occurred or transpired, the School clearly made every effort to attempt to rectify any past grievances and despite its attempts, has been unable to find a workable solution.

We find it striking that she had very similar problems with both Debbie Haynes and Nick Ryan. Unlike a situation where she functioned successfully with one supervisor and then became subject to unfair treatment and raised concerns under a different supervisor, the fact that she found both supervisors intolerable raised questions of why both of these relationships broke down in such similar manners when these are such different individuals. According to many staff that we spoke to, Nick Ryan especially has been described as a fair and impartial leader, and we found his rebuttals to her claims of verbal or other types of mistreatment to be detailed and credible. Further, his efforts to make policies that would assure equal allocation of resources and treatment of all staff reflected a commitment to make the relationship with Ms. Killian productive and professional. On the other hand, Ms. Killian seemed to take every opportunity to construe a facially innocuous situation into something negative and somehow racially motivated.

Ms. Killian is obviously unhappy in her current situation. We have struggled to find a recommendation that would allow her to remain at the School, since she is a respected art teacher, while maintaining a positive working environment for all parties. While Ms. Killian is a good teacher, she has proven to be difficult for her peers to work with, disruptive to the art department and the collegial nature of the team, and has been unwilling to work in a manner that allows for the professionalism necessary for the further development of the art department. She has raised issues with everyone she has worked with and been supervised by. Based on past efforts that the School has made

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

6854

Memorandum
April 7, 2005
Page 20

and the information we gathered during our investigation, we believe that this is an untenable situation and we are not certain that any measure of conciliation or good will can satisfy Ms. Killian.

In an effort to assist the parties resolve this unfortunate matter, we proposed opening the lines of communication to determine if there was a method of resolving this matter. We spoke with Ms. Killian's attorney, John Racin, about the possibility of finding a mutually agreeable settlement that would release GDS from any future claims, possibly remove Ms. Killian from her teaching position, and most likely include a monetary settlement amount paid to Ms. Killian. After consulting with his client, Mr. Racin has demanded a settlement package on behalf of his client including six years of salary continuation, $25,000 for pain and suffering, plus attorney's fees. In behalf of the School, we have offered Ms. Killian, by way of her counsel, one year of salary including her benefits. This is the equivalent of buying out her 2005-2006 employment contract.

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
                       PROTECTIVE ORDER

6855

# E X H I B I T   2 7

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W.

Washington, D.C. 20010-2601

Telephone: (202) 265-2516

Telecopier: (202) 483-7895

E-Mail: swjriaw@erols.com

PRIVILEGED AND CONFIDENTIAL
FOR SETTLEMENT PURPOSES ONLY

July 6, 2004

VIA MESSENGER

Daniel Johnson, Esq.
McKenna Long & Aldridge
1900 K Street NW
Washington D.C. 20006

Re: Sharon Killian & Georgetown Day School ("GDS")

Dear Mr. Johnson:

You represented GDS recently in a case in which I made a brief appearance. Thus I am contacting you in a matter involving claims of racial discrimination in employment against GDS. If the correspondence should be directed elsewhere, I trust you will forward it as appropriate.

Sharon Killian is a teacher at GDS, where for more than a decade she has been one of the School's few black teachers and a member of its small, and otherwise exclusively white Art Department. She has encountered treatment from white colleagues that has ranged from the less than collegial to the downright hostile. The nature and scope of the offensive conduct has been such that describing it in any detail would be both unduly burdensome, and, depending on the School's attitude, even irrelevant at this stage. It should suffice for present purposes to say the record of Ms. Killian's unhappy experience at GDS includes the following: During her eleven years at the School she has been treated as a very junior colleague in the Department (another member only arrived in 2000). She has also been belittled and otherwise undermined before students and others; had difficulty acquiring resources and space readily available to white colleagues; had potential students guided away from her courses in the apparent hope there would be insufficient enrollment to justify them; and, the straw that broke the back of any further resistance to the conclusion racism was indeed at work, been subjected to verbal abuse by a Department Chair indicating he could not "bend low enough to the ground" to understand what she was saying (while gesturing with his hand towards the floor). The Chair is hardly the "equal opportunity abuser" of workplace lore: You should find him to have been invariably courteous in his dealings at GDS, at least to white counterparts in the School.

Daniel Johnson, Esq.
July 6, 2004
Page 2

  The record shows that other people of color formerly or now affiliated with GDS share the concern that racism infects the atmosphere at the School, a concern Ms. Killian has brought forward, to the former principal (who routinely called himself a "recovering racist"); to the director of the School (who has ignored Ms. Killian's most recent request to discuss the problem); and to "Diversity Coordinators" at the School assigned to address such concerns at GDS. These efforts have only reinforced the sense that racism is alive and well at an institution originally founded upon, and ostensibly still dedicated to, fundamental principles of racial and social justice. Indeed, the Diversity Coordinators (who unhappily proved less than vigorous in their "coordinating" efforts) shared with Ms. Killian their sense that white colleagues in the Art Department were approaching issues of racial equity from positions of "white privilege."

  Sharon Killian is no longer willing or able to tolerate what seems to her determined inaction by the School in the face of clear evidence of racial animus. She understands that hostile environment claims are necessarily somewhat uncertain, in that there is no bright line beyond which courts must find a "workplace is [so] permeated with discriminatory intimidation, ridicule, and insult that [it] is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an [illegal] abusive working environment ...." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). Nonetheless, anecdotal and other evidence of racially hostile treatment against Sharon Killian and others is such that she believes that GDS would be found well over the line into illegal "abusive working environment" territory.[1] Absent a willingness on the School's part (a) to address fundamental issues of racism at GDS; and (b) to provide monetary and other relief for the mental distress that is the natural and probable consequence of racial abuse in the workplace, Ms. Killian is determined to seek appropriate relief in the courts.

  This letter represents further activity on Ms. Killian's part in opposition to conduct she reasonably believes to have been racially discriminatory. Employers may not retaliate against current or former employees who have engaged in such "opposition activity", even if the activity is informal in nature. See Ravinskas v. Karalekas, 741 F.Supp. 978 (D.D.C. 1990). We trust GDS will do its utmost to ensure that Ms. Killian and any others who come forward on her behalf as the matter goes forward are protected against any acts of retaliation.

---

  [1]See, e.g., Villines v. United Brotherhood of Carpenters & Joiners, 999 F.Supp. 97 (D.D.C. 1998), where the court denied summary judgment on a racially abusive environment claim deriving from "four separate incidents occurring from June through August 1995 when [the white supervisor] allegedly chastised and mistreated [the plaintiff] ...." Id. at 104. The four incidents involved "yelling at ... and blaming [plaintiff] for stolen checks....[,] ordering several file cabinets placed in front of the plaintiff's desk [thus blocking her view]....[,] [and] on two separate occasions ... yelling at her when he could not locate his files." Ibid. There was no evidence that "white co-workers ... received the same frequent and hostile treatment." Ibid.

Daniel Johnson, Esq.
July 6, 2004
Page 3

Please be aware I will be virtually inaccessible from July 16th through July 31st. If the School intends to respond, it should do so some time before or after this two week period.

Sincerely,

John P. Racin

cc: Sharon Killian

# E X H I B I T   2 8

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W,

Washington, D.C. 20010-2601

Telephone: (202) 265-2516

Telecopier: (202) 483-7895

E-Mail: awjrlaw@erols.com

PERSONAL & CONFIDENTIAL

August 27, 2004

BY MESSENGER

Caryn Pass, Esq.
Krupin & O'Brien LLP
1156 15th Street, N.W.  Suite 200
Washington, D.C.  20005

Re: *Sharon Killian & GDS*

Dear Ms. Pass:

Sharon Killian and I look forward to the meeting scheduled in your firm's offices for 10:00 a.m. Monday, August 30, 2004.

My correspondence to counsel at McKenna Long & Aldridge only touched on the unhappy history of Mrs. Killian's experience at GDS, and in our conversation several weeks ago I said we would furnish a more detailed account of the kinds of treatment that convince us that racial animus indeed inspired the longstanding pattern of inequitable and downright abusive conduct that led Mrs. Killian to retain a lawyer.

I think it best to have broader, if necessarily representative, examples of this conduct come to you "unfiltered", from Mrs. Killian rather than through me. As it happens she prepared a letter for Peter Branch in March of this year, which she did not ultimately send, but which she did use as talking points for a meeting with Mr. Branch on or about March 12th (the enclosed is a version Mrs. Killian has modified slightly for clarity's sake). That a teacher would trouble to draft such a communication for the School's Director in the middle of a busy school year speaks powerfully to the keen level of distress that impelled it.

Mr. Branch had no particular reaction to any of the circumstances Mrs. Killian relayed to him on March 12th. Instead he suggested Mrs. Killian might be happier elsewhere; indeed, he thought there was an opening at the National Cathedral School!

*Caryn Pass, Esq.*
August 27, 2004
Page 2

Denial is more than a river in Egypt:  The phenomenon has been an operative principle at GDS.  We hope the investigation you have taken on serves to foster an approach to racial equality marked, not by lip service, but by committed action.

Again, Mrs. Killian and I look forward to meeting you Monday.

Sincerely,

John F. Racin

Enclosure

cc: Sharon Killian

**Prepared for Counsel - John Racin August 24, 2004**

3/12/2004

Dear Peter,

I know you are accessible but I have been trying my best to keep my problems from becoming yours and to use the proper chain of command. Perhaps this is why my head hurts so much – trying to work with the department head, the diversity office, the Assistant Principal and the Principal have been like hitting my head against a brick wall. Some of these people have tried to be helpful but my daily existence is so miserable and the attitudes I am facing are so ingrained that I must ask for your direct involvement to help solve it.

There are so many issues that I hardly know how to begin to talk with you in an organized, logical progression.

First, I can't afford to give up my job at GDS because I am currently the sole earner in my family and we have two children in school. This is my eleventh year at GDS and my mission is always to give my maximum and my best to the institution and our constituents. Second, I love teaching, I love my students, and I believe I conduct myself in a way that there is some appreciation of my work on the part of students, their parents and most of my colleagues.

1. I have lived through the debacle of having an alcoholic department head who, along with her sister-in-law (Laura Tolliver) both blame me for her leaving GDS. In fact, I had nothing to do with her leaving. Several white people, students and parents, are the ones who complained about her drunkenness during school and school-related functions. I've never heard them being blamed for her troubles. Only I have been blamed and targeted for reprisals. In fact, my concerns – the belittlement, marginalization and abuse at their hands for years - were less than meaningless in her departure. I have been a magnet for resentment by Tolliver, Haynes and her core of friends on the staff (Bruce Ruble, Norrine Mack and others). Each of them in their own style seeks to undermine and demean me and is not above dishonesty to achieve this end.

2. Nick Ryan who has become closely involved enough with this clique that he parties with them and has vacationed at Norrine's San Francisco home and used her new car while there. Last spring, Nick Ryan actually screamed at me in one of his episodic fits that I would not do the same to him – "You are not going to force me out on the street like you did Debbie Haynes". The context for this was Nick tearing down the children's work for the Black Culture Club (BCC) and throwing it onto the floor. He did this on a day I was out of the office and left it strewn on the floor until I returned. When I asked how the banners and posters were torn down and thrown about, he exploded with the Debbie Haynes reference. It was clear from that day forward that Nick Ryan, like Debbie Haynes would actually destroy children's work if I was associated with it and that works that involved children of color are especially vulnerable.

   The following weekend, I had to take down from the walls in the first floor entrance some works completed by Laura's students. This was well into February and I had been waiting on the space for the Black History Month display. Finally, the day came when I needed to do this. My brother had just died and I had been out for his funeral. I was sick with the flu when I returned. Laura had left for the weekend. Though I sought her out first thing Monday morning to explain why I had taken down the display and to bring the works to her, Ryan screamed at me that "you're supposed to ask permission first before you can take down anyone else's works." Evidently, he can rip down the Black Culture Club's works and leave it on the floor, but I can't take anything down without prior permission, even under these circumstances.

3. When all of this happened, I told Paul Levy about Nick's reference to Debbie Haynes and Paul's response was that "Nick should know better." This did not help me and Paul still

CONFIDENTIAL:                    SUBJECT TO
                              PROTECTIVE ORDER

does not seem to know what to do to help address the insults and demeaning acts that are nearly daily occurrences. I never heard another word about this matter from Paul.

4. Bruce Ruble holds a position in technology that he uses to assert power over whom and what received support and what does not. If there is need for educational technology, he is the one to decide what will be done and what will not. I have at once been encouraged to use technology and at the same time the means to do so have been systematically withheld. The effect of this is very disturbing to me and to the students who have tried to work on projects with me. For all of last year and most of this, I have been limited to disk space that is insufficient to hold the download and editing of even one digital camera's photographs. To give you some idea of the magnitude of this, our cameras use 1 gigabyte (GB) cards that compress photographs at between four-to-one and five-to-one ratio. This means that downloading a full gigabyte of data and expanding it to the format required to edit it could take between 4 and 5 GB of disk space on the computer. Of course, editing these photographs would create a new file that could also range up to 10 GB of additional space – representing one "roll" of a 1 GB digital image folder. My limit for most of last year while managing the yearbook and teaching was ten GB (resulting from begging the technology on a daily basis to give me more disk space from my originally allotted 2 gigabytes). Only in these past few months was I increased to a limit of 20 GB. As a point of comparison, a recent visit to Episcopal High School revealed that they currently allot a half terabyte (500 GBs) to their Art Dept and are prepared to increase that whenever it's needed. I will tell you also that when Laura Tolliver ran the yearbook, space was not at such a premium and even now she is allowed significantly more disk space than I am permitted. In fact, additional disk space was added to the art studio MACs and all the computers in the MAC lab labeled "art drive", specifically and only for Laura Tolliver's use.

5. Though I'm given lip service publicly, Bruce Ruble negatively questions all technology requests I make for my teaching and my students. Paul has been aware of this situation and finally, last year, sat in on a meeting of the art department and Bruce to assure that my voice was heard. Paul will confirm these problems, I believe.

6. My annual requests for capital budget items routinely go unapproved each year and are often belittled and challenged by Ryan & Tolliver. After that meeting about capital budget items with Paul in attendance, one of my suggestions was nevertheless taken - a new negative/slide scanner was ordered. This purchase was equally beneficial to my work as well as to Laura's and the entire department. The scanner was placed in the open class space that we all three use. On the other hand, Laura has to only hint at a wish and her requests are approved. In fact, during that meeting I saw for the first time the planned capital budget purchase of an entire suite of printers for the MAC lab where Laura teaches two classes and claims as her own personal classroom space. Laura's suite of printers was intended for only her and her students' use and would only benefit me if I "invaded" her space – something she has made clear isn't acceptable on a number of occasions. Ruble had a printed document showing this as a planned and approved expenditure for the coming year.

7. When computers were upgraded in the art department last year I asked that the used machines be transferred to the yearbook office. Instead, Bruce gave all but two machines to Iona House (Bill Young - former GDS assistant principal) along with two printers that I thought, and said, were still quite useful to the art department and to the Yearbook office.

8. I have asked for a dedicated art server or increased server space for over three years and have been met with refusal by Bruce but with instructions that I should take my art files off of the network by copying them to CD's (CD's hold 700 megabytes).

9. When my photography students, David Zax ('02) and others, asked me to be the advisor to a new club he wanted to form, the Film Club, I said yes. Debbie Haynes and Laura called a meeting with me and told me that I would not be the advisor to the film club. That she and Laura would take charge of that.

10. Debbie Haynes and Laura Tolliver promptly created a "film" class for Tolliver to teach the next year. When she panicked because the kids were not registering for the course she actually asked me which students could fill it. Because I am concerned more about the student experience, I encouraged the kids I knew were interested in film to register for the course.

11. Three years ago, Paul said that he would look into getting funding from a parent/s to do more with the Magazine such as was done for *Grasslands*. Although he put that on the table, my ideas to follow through with that were not taken. The Art Magazine still functions as a club, earning funding from the SSC. *I receive no compensation for the Art Magazine.*

12. *Susie Ryan called me in December, 2003 because she was interested in publishing alumni art and Fiorri DeCell told her that I have been doing that with the Art Magazine. We agreed to meet sometime in January to talk about plans to continue to do this on a broader scale.*

13. Susie Ryan's call meant that I could tell her my ideas and a logical partnership with Alumni Relations would begin.

14. I had been out of school, sick, in the beginning of January for two days. The following week, we had MLK holiday and a snow day. Susie Ryan left messages on my school phone wanting to meet. She did not call me at home but did call Nick Ryan to discover my whereabouts.

15. Nick Ryan did not tell me that Susie Ryan called him. When I contacted Susie to say that I was out sick, she told me not to worry, never mind, she had already spoken with Nick Ryan and that she and he had set a date to meet. I was informed by Susie of this meeting on the actual day of this meeting – the day after I returned to school.

16. I went to Nick Ryan to ask why he and Laura were meeting with Susie Ryan and he said *he assumed that she called me at home,* but nothing about why he was meeting with her about Art Magazine and Alumni issues.

17. Nick Ryan, Laura Tolliver, Susie Ryan and alumnae, Rebecca Drobis met about publishing her photographs. Nick Ryan, Susie Ryan, and Laura Tolliver have not subsequently said a word to me about that meeting.

18. I went to the Diversity office immediately and told of this without an appointment. Mari listened and said she would work on this. I later saw Elizabeth who said she and Mari would check into my story and provide help to me.

19. I couldn't go to Paul again. I had done this so many times already to no avail.

20. In November, I proposed a course called *Graphic Design and Publishing* that was verbally endorsed by Nick Ryan to me and, according to Paul, also to him.

21. *In the end, Paul said he would talk with Bruce Ruble about teaching another course in the MAC lab. My course proposal was approved but postponed until "06".*

22. I received an e-mail from Nick Ryan sent at 3:20 on Thursday, February 12 to "review the course descriptions and titles" and found that "Technology in the Studio Arts" course titles and important content was changed to reflect "Graphic Design". I was not included in any of the discussions leading up to this.

23. On Friday, February 13, I called Paul Levy and in a short conversation asked whether he knew these changes had been made and whether he understood what that means to my work. Paul said he had not seen these changes and would check into it. This demonstrates how they discount Paul's abilities to manage and control anything – including the course offerings in the High School.

24. This reminds me of the Film Club and Film class problem and I am very disappointed that it is being allowed to happen again.

25. Nick Ryan was hired as an outsider with no strings to the "old guard" to create an equitable teaching and learning environment. This has been a failure.

26. The art department and ultimately the school is an unhealthy environment for me, or anyone who looks like me, to work. I have been thwarted in so many ways, both overt and insidious that I can hardly enumerate. I am at a loss.

# E X H I B I T   2 9

3/12/2004

Dear Peter,

I know you are accessible but I have been trying my best to keep my problems from becoming yours and to use the proper chain of command. Perhaps this is why my head hurts so much – trying to work with the department head, the diversity office, the Assistant Principal and the Principal have been like hitting my head against a brick wall. Some of these people have tried to be helpful but my daily existence is so miserable and the attitudes I am facing are so ingrained that I must ask for your direct involvement to help solve it.

There are so many issues that I hardly know how to begin to talk with you in an organized, logical progression.

First, I can't afford to give up my job at GDS because I am currently the sole earner in my family and we have two children in school. This is my eleventh year at GDS and my mission is always to give my maximum and my best to the institution and our constituents. Second, I love teaching, I love my students, and I believe I conduct myself in a way that there is some appreciation of my work on the part of students, their parents and most of my colleagues.

1. I have lived through the debacle of having an alcoholic department head who, along with her sister-in-law (Laura Tolliver) both blame me for her leaving GDS. In fact, I had nothing to do with her leaving. Several white people, students and parents, are the ones who complained about her drunkenness during school and school-related functions. I've never heard them being blamed for her troubles. Only I have been blamed and targeted for reprisals. In fact, my concerns – the belittlement, marginalization and abuse at their hands for years - were less than meaningless in her departure. I have been a magnet for resentment by Tolliver, Haynes and her core of friends on the staff (Bruce Ruble, Norrine Mack and others). Each of them in their own style seeks to undermine and demean me and is not above dishonesty to achieve this end.

2. Nick Ryan who has become closely involved enough with this clique that he parties with them and has vacationed in Norrine's San Francisco home and used her new car while there. Last spring, Nick Ryan actually screamed at me in one of his episodic fits that I would not do the same to him – "You are not going to force me out on the street like you did Debbie Haynes". The context for this was Nick tearing down the children's work for the Black Culture Club (BCC) and throwing it onto the floor. He did this on a day I was out of the office and left it strewn on the floor until I returned. When I asked how the banners and posters were torn down and thrown about, he exploded with the Debbie Haynes reference. It was clear from that day forward that Nick Ryan, like Debbie Haynes would actually destroy children's work if I was associated with it and that works that involved children of color are especially vulnerable.

   The following weekend, I had to take down from the walls in the first floor entrance some works completed by Laura's students. This was well into February and I had been waiting on the space for the Black History Month display. Finally, the day came when I needed to do this. My brother had just died and I had been out for his funeral. I was sick with the flu when I returned. Laura had left for the weekend. Though I sought her out first thing Monday morning to explain why I had taken down the display and to bring the works to her, Ryan screamed at me that "you're supposed to ask permission first before you can take down anyone else's works." Evidently, he can rip down the Black Culture Club's works and leave it on the floor, but I can't take anything down without prior permission, even under these circumstances.

3. When all of this happened, I told Paul Levy about Nick's reference to Debbie Haynes and Paul's response was that "Nick should know better." This did not help me and Paul still

Δ π EXHIBIT 13

Deponent _____
Date 3/27/06   Rptr. DV
WWW.DEPOBOOK.COM

**108**

CONFIDENTIAL:          SUBJECT TO
                       PROTECTIVE ORDER

2633

Exhibit 13

does not seem to know what to do to help address the insults and demeaning acts that are nearly daily occurrences. I never heard another word about this matter from Paul.

4.  Bruce Ruble holds a position in technology that he uses to assert power over whom and what received support and what does not. If there is need for educational technology, he is the one to decide what will be done and what will not. I have at once been encouraged to use technology and at the same time the means to do so have been systematically withheld. The effect of this is very disturbing to me and to the students who have tried to work on projects with me. For all of last year and most of this, I have been limited to disk space that is insufficient to hold the download and editing of even one digital camera's photographs. To give you some idea of the magnitude of this, our cameras use 1 gigabyte (GB) cards that compress photographs at between four-to-one and five-to-one ratio. This means that downloading a full gigabyte of data and expanding it to the format required to edit it could take between 4 and 5 GB of disk space on the computer. Of course, editing these photographs would create a new file that could also range up to 10 GB of additional space – representing one "roll" of a 1 GB digital image folder. My limit for most of last year while managing the yearbook and teaching was ten GB (resulting from begging the technology on a daily basis to give me more disk space from my originally allotted 2 gigabytes). Only in these past few months was I increased to a limit of 20 GB. As a point of comparison, a recent visit to Episcopal High School revealed that they currently allot a half terabyte (500 GBs) to their Art Dept and are prepared to increase that whenever it's needed. I will tell you also that when Laura Tolliver ran the yearbook, space was not at such a premium and even now she is allowed significantly more disk space than I am permitted. In fact, additional disk space was added to the art studio MACs and all the computers in the MAC lab labeled "art drive", specifically and only for Laura Tolliver's use.

5.  Though I'm given lip service publicly, Bruce Ruble negatively questions all technology requests I make for my teaching and my students. Paul has been aware of this situation and finally, last year, sat in on a meeting of the art department and Bruce to assure that my voice was heard. Paul will confirm these problems, I believe.

6.  My annual requests for capital budget items routinely go unapproved each year and are often belittled and challenged by Ryan & Tolliver. After that meeting about capital budget items with Paul in attendance, one of my suggestions was nevertheless taken - a new negative/slide scanner was ordered. This purchase was equally beneficial to my work as well as to Laura's and the entire department. The scanner was placed in the open class space that we all three use. On the other hand, Laura has to only hint at a wish and her requests are approved. In fact, during that meeting I saw for the first time the planned capital budget purchase of an entire suite of printers for the MAC lab where Laura teaches two classes and claims as her own personal classroom space. Laura's suite of printers was intended for only her and her students' use and would only benefit me if I "invaded" her space -- something she has made clear isn't acceptable on a number of occasions. Ruble had a printed document showing this as a planned and approved expenditure for the coming year.

7.  When computers were upgraded in the art department last year I asked that the used machines be transferred to the yearbook office. Instead, Bruce gave all but two machines to Iona House (Bill Young - former GDS assistant principal) along with two printers that I thought, and said, were still quite useful to the art department and to the Yearbook office.

8.  I have asked for a dedicated art server or increased server space for over three years and have been met with refusal by Bruce but with instructions that I should take my art files off of the network by copying them to CD's (CD's hold 700 megabytes).

9. When my photography students, David Zax ('02) and others, asked me to be the advisor to a new club he wanted to form, the Film Club, I said yes. Debbie Haynes and Laura called a meeting with me and told me that I would not be the advisor to the film club. That she and Laura would take charge of that.

10. Debbie Haynes and Laura Tolliver promptly created a "film" class for Tolliver to teach the next year. When she panicked because the kids were not registering for the course she actually asked me which students could fill it. Because I am concerned more about the student experience, I encouraged the kids I knew were interested in film to register for the course.

11. Three years ago, Paul said that he would look into getting funding from a parent/s to do more with the Magazine such as was done for *Grasslands*. Although he put that on the table, my ideas to follow through with that were not taken. The Art Magazine still functions as a club, earning funding from the SSC. I receive no compensation for the Art Magazine.

12. Susie Ryan called me in December, 2003 because she was interested in publishing alumni art and Florri DeCell told her that I have been doing that with the Art Magazine. We agreed to meet sometime in January to talk about plans to continue to do this on a broader scale.

13. Susie Ryan's call meant that I could tell her my ideas and a logical partnership with Alumni Relations would begin.

14. I had been out of school, sick, in the beginning of January for two days. The following week, we had MLK holiday and a snow day. Susie Ryan left messages on my school phone wanting to meet. She did not call me at home but did call Nick Ryan to discover my whereabouts.

15. Nick Ryan did not tell me that Susie Ryan called him. When I contacted Susie to say that I was out sick, she told me not to worry, never mind, she had already spoken with Nick Ryan and that she and he had set a date to meet. I was informed by Susie of this meeting on the actual day of this meeting – the day after I returned to school.

16. I went to Nick Ryan to ask why he and Laura were meeting with Susie Ryan and he said he assumed that she called me at home, but nothing about why he was meeting with her about Art Magazine and Alumni issues.

17. Nick Ryan, Laura Tolliver, Susie Ryan and alumnae, Rebecca Drobis met about publishing her photographs. Nick Ryan, Susie Ryan, and Laura Tolliver have not subsequently said a word to me about that meeting.

18. I went to the Diversity office immediately and told of this without an appointment. Mari listened and said she would work on this. I later saw Elizabeth who said she and Mari would check into my story and provide help to me.

19. I couldn't go to Paul again. I had done this so many times already to no avail.

20. In November, I proposed a course called Graphic Design and Publishing that was verbally endorsed by Nick Ryan to me and, according to Paul, also to him.

21. In the end, Paul said he would talk with Bruce Ruble about teaching another course in the MAC lab. My course proposal was approved but postponed until "06".

**110**

22. I received an e-mail from Nick Ryan sent at 3:20 on Thursday, February 12 to "review the course descriptions and titles" and found that "Technology in the Studio Arts" course titles and important content was changed to reflect "Graphic Design". I was not included in any of the discussions leading up to this.

23. On Friday, February 13, I called Paul Levy and in a short conversation asked whether he knew these changes had been made and whether he understood what that means to my work. Paul said he had not seen these changes and would check into it. This demonstrates how they discount Paul's abilities to manage and control anything – including the course offerings in the High School.

24. This reminds me of the Film Club and Film class problem and I am very disappointed that it is being allowed to happen again.

25. Nick Ryan was hired as an outsider with no strings to the "old guard" to create an equitable teaching and learning environment. This has been a failure.

26. The art department and ultimately the school is an unhealthy environment for me, or anyone who looks like me, to work. I have been thwarted in so many ways, both overt and insidious that I can hardly enumerate. I am at a loss.

111

# EXHIBIT 30

Talking Points for Caryn Pass Meeting 8/30/04

**Exhibit 39**
5/17/06   LGM

## Being undermined in front of students

- I have been insulted in front of my students. For example, the chairperson, Debbie announced while my class was in session, "It's irrelevant what Sharon has told you to do, I am the chairperson of the department..."
- Bruce Ruble has stormed into the art studio during my class and condescendingly chastised me about my students' use of computer space when I had to stop him and ask that he not speak to me like this in front of my students. If he wished to confront me about any matter, I'd prefer that we go to another space out of the presence of my students.
- Nick Ryan has stopped me in the middle of class to angrily tell me that he wants me to immediately delete student files from the computer
- Being turned away from a theater performance when I made a special effort to make sure there were photographs of the play for the yearbook.
- At least one student in the Black Culture Club saw the banners and signs they had made strewn on the floor after Nick ripped them down.
- The faculty and staff who assisted the students in preparing these signs and banners also became aware of my powerlessness to even allow simple sign-making to occur in the space where I teach.

## Sabotaging Course Registration

- Laura Tolliver, with Nick Ryan's approval, began to incorporate AP components into her classes without discussion with me individually or as a department. When I asked that the departmental policy about teaching the AP course be discussed, I was told that anyone can teach AP. At GDS, specific teachers are assigned to teach AP classes and although a student doesn't have to be enrolled in an AP course to take the exam if she feels prepared, "any teacher" or all teachers doesn't teach the AP curriculum.
- I was told that I would not be participating in student on site registration process where students are advised about which courses to sign up for.
- As part of a long-term campaign to wrest the AP courses from me, Ryan and Tolliver attempted to persuade students to take Laura's courses rather than the AP classes that I teach.
- By guiding students out of my advanced courses as was done last year, there was a chance that an insufficient number of students would sign up and the course would have to be dropped.
- GDS has considered eliminating AP courses and decided that they would stand. However, Nick Ryan and Laura Tolliver continued a campaign to eliminate the AP Studio Art class that I have taught since 2000 when Paul Levy asked me to do the course since Debbie Haynes was no longer capable of teaching it.
- I have proposed review of the course including breaking it into three sections to allow them both the opportunity to teach it and to but no discussions about my proposal have occurred.

**117**

- Attempting to take credit and / or take away control of any activities that brought visibility to my teaching and leadership activities such as the film club and this year, the Art Magazine.

- Laura Tolliver had the printing contractor for the Art Magazine open the box he delivered to my desk so that she could inspect its contents. At the time I was in the adjoining classroom and neither she nor Nick Ryan came to retrieve me to receive the delivery.

- I have been affronted by Laura who asked on one particular occasion, "Did you just answer the phone, 'hello, Sharon Killian, department head?" I was absolutely appalled and asked her how she could think of such a thing. No apologies were offered, rather, she continued to do her typing. (2/17/97doc)

- New rules that did not apply to anyone else have been made up to thwart my teaching efforts.

- Meetings I have had with the former principal have been physically interrupted by the former chairperson who came in to say that rather than meeting with the principal I should have been working on a mailing for her.

- I have been told by the former chairperson that she knew I had talked to the principal about departmental issues and that both he and I wanted me to stop going to his office.

- Most recently, Nick Ryan said he knew that I had gone to Paul, principal, and allowed that he knew everything I said to him. This was said in a negative tone, that I really had nowhere to go, that I was trapped with no resource.

## Speaking about Discrimination and Experiencing Retaliation

- As a "recovering racist" Paul Levy used me to test the boundaries of his convictions about racial equality and equity and could only go so far – my black skin allowed him to always stop short of doing the right thing.

- Nick Ryan gesticulated as he said to me, in front of Laura Tolliver, "Sharon, I can't bend low enough to the ground to understand you." I have never seen Nick Ryan so disrespect another colleague. He did this even with company, his cohort in the room.

- All of these matters lead to the conclusion that Laura Tolliver and Nick Ryan treat me the way they do because of my race. Laura Tolliver and Nick Ryan reserve their disrespect and mistreatment for me and seem to have a cordial and collegial relationship with each other and with the other white faculty and staff at the high school.

- The fact that Nick Ryan did not work toward providing equity in the department as he was hired to do was no cause for concern to GDS. As Mariama Richards and Elizabeth Denevi, GDS diversity officers have said to me on more that one occasion, "Nick was only working from a position of white privilege and white superiority."

*118*

- I was told by both Debbie and Laura (in the presence of Paul Levy) that they liked me better when I asked them how to do this or that. i.e., knew my place!

- Around 2000, while I was chair of the GDS Diversity Task Force Recruitment & Retention subcommittee: When I suggested that GDS hire more teachers of color, Paul said "… there are no qualified Black teachers out there." He added that he has attended recruitment meetings and ",… some of the DC teachers can't even speak English well."

- After missing school for several days to attend my brother's funeral followed by a strong bout with the flu, I returned to school feeling an urgency to add art to the other activities surrounding Black history month. Over the weekend, I hung art by African-American artists that were borrowed from a gallery on the first floor display boards. I was severely reprimanded by Nick Ryan for removing Laura's student art work from the first floor lobby without Laura's express permission. He said that I should have used the last department meeting to ask permission. Laura and Nick switch artwork between them with ease and their interchanges about this do not happen in any meetings when I'm in attendance. These approvals must occur in the informal meetings from which I'm excluded.

- I was told by Debbie Haynes that my meetings with the principal were discussed with her and that I should no longer come to speak with him about the problems we were having in the department. She said Paul had given her permission to resolve the situation in any manner she deemed necessary. The means she chose was punishment and retaliation. In fact, she said she was given permission to "get rid of me." Debbie said that she would "write me out of the school." Paul Levy confirmed that he had given Debbie permission to design her own outcome for me.

- My involvement in multi-cultural and extra-curricular affairs of the school has been frowned upon and belittled by Debbie. She and Laura both stating that they are as "minority" as am I, Debbie claiming to be an Iroquois and Laura a Hispanic who suffer discrimination because of her father's last name. (2/17/97doc)

- In a meeting of school-wide department staff, Debbie has called me the "Jeffrey Holder" of the art department. (2/17/97doc)

- After parent conferences several years ago she said she was "afraid to talk truthfully to Rajai's father because he looked like he could be a terrorist or something." (2/17/97doc) Rajai Hakki was in the news in 2004 because he joined the military and functioned as an interpreter for the forces in Iraq.

- It seems that their goal has been to diminish my work at all costs.
- Tolliver and Ryan practiced systematic deception by telling students and parents during curriculum events that students can take "AP Photography." While students *can* submit portfolio of photography, it would be categorized as a 2-D Design. The College Board does not list "AP Photography" in any publication. Nevertheless, both Ryan and Tolliver told students that they could take Tolliver's courses and "do AP."
- Advising students out of my courses was conscious, deliberate and coordinated between the two of them. They made many comments to the effect that "anyone can teach AP." I always felt belittled by this and heard the suggestion that I have no reason to believe that I was successful at it due to my knowledge and expertise. They were entitled to teach these courses if they wanted and I should not feel that I made a unique contribution to the students, the department and the school.
- It is true that no special requirements by the College Board are made of faculty sponsoring students' submissions and in fact a science teacher could sponsor a student in the AP Art History exam. But, school policy and practice in handling AP courses govern this. In fact, the school sponsors AP teachers (including me) to enroll in AP prep courses themselves so that their teaching meets the AP curriculum.
- How to answer this: Was it professional jealousies or racially motivated? Since this behavior was only directed toward me and never, ever directed at Debbie Haynes or at Nick Ryan when he talked about teaching AP art history, I'm left with the conclusion that this also is racially motivated marginalization.

## Denial of Resources – Their Sense of Ownership and Me as an Outsider

- During the spring and summer of 1995 I cleaned the entire studio space alone. The department had agreed to do it together but I was the only one who came in to put out the piles of garbage and to organize the space for use the upcoming school year. Besides many parents complained that the studio resembled a junk yard and they were not far from telling the truth. (2/17/97doc)
- The previous chairperson, Debbie Haynes, told me on more than one occasion that the studio was "her space", that it was her baby and nothing occurs, including cleaning or reorganization, without her explicit instructions and participation. She insisted that since she did not show up to clean the studio, I should not have cleaned without reaching her. (2/17/97doc)
- Although Laura and Debbie used the art studio spaces freely, I was made to ask permission to use teaching space and equipment.
- I am constantly made aware that the MAC computer lab is Laura Tolliver's space. A course that was approved by the principal won't be offered this year because it is "Laura's space."
- In 2004, I am still made to ask permission to use art space and hardly have any say in whether the space allotted for my use during class is usurped.

freely assigned her students to use all of the computer equipment in the studio space in which I teach, even though there were several students in my class who use needed to use these computers. The message was that as long as she's around, the studio space was under her control.

- I have been limited to a minimum of computer space and this has been encouraged by Nick Ryan and Laura Tolliver. In any discussion with Ryan about computer disk space for my classes and my use as a faculty member in the art department, his response was that this is what Bruce wants and that's what I had to do.

- Indeed, at the same time that I was being refused computer disk space, Laura Tolliver had been given at least 748 gigabytes (a separate disk drive on every computer in the MAC lab and the computers in the large studio) more than the 2 gigabytes of computer disk space with which I began the school year.

- I was constantly made to beg for additional computer space and much too often refused those requests.

- Though I asked for a computer upgrade to perform my job, I was refused until Laura and Nick's newer computers were upgraded.

## Disrespect for My Professional Capacity & Activities

- Disproportionate and inequitable allocation of supplies, especially for larger expenditure from the capital budget items but including almost trivial items that I requested for my classes (showing me where the power resides.)

- I have been excluded from decision making about curriculum and course assignments

- Attempting to take credit and / or take away control of any activities that brought visibility to my teaching and leadership activities. This year, 2004, Laura and Nick Ryan decided that they would take control of the Art Magazine, by taking my appointment with the director of the Alumni affairs office without even informing me. I founded the Art Magazine with students over seven years ago. I often included past graduates' works and this year I was working to involve the Alumni Affairs office more formally. I had been out of school, sick for two days and returned to find that Ryan and Tolliver had planned a meeting with Alumni Affairs about this publication that I was responsible for – and neither of them said a word to me. I found out about their meeting by accident.

- My calls have directed to Laura Tolliver and Nick Ryan who have taken and discussed the critical information but never shared that information with me. This has negatively affected my teaching and my professional standing. When I make contact with the person who returned my call, it is more than demeaning when they say that they have apparently already talked to the person in charge.