**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**APPENDIX TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**VOLUME III**

Exhibit    31.    Killian Deposition Exhibit 59 (Killian 2005–2006 contract).

Exhibit    32.    E-mail from Barr to Killian (Aug. 30, 2005) [Bates 2750].

Exhibit    33.    Killian Deposition Exhibit 66 (E-mail from Killian to Maravell (Aug. 23, 2005)).

Exhibit    34.    Killian Deposition Exhibit 67 (E-mail from Killian to Velazquez (Aug. 23, 2005)).

Exhibit    35.    Letter from Lindsey to Killian (Sept. 1, 2005) [Bates 2888–89].

Exhibit    36.    Killian Deposition Exhibit 50 (E-mail from Killian to Maravell (Sept. 9, 2005)).

Exhibit    37.    Killian Deposition Exhibit 51 (E-mail from Killian to Russell-Einham (Sept. 9, 2005)).

Exhibit    38.    Killian Deposition Exhibit 53 (Killian Long-Term Disability App. (Nov. 18, 2005)).

Exhibit    39.    E-mail from Barr to Killian (Sept. 2, 2005) [Bates 2749].

Exhibit    40.    E-mail from Barr to Killian (Sept. 9, 2005) [Bates 2743].

Exhibit    41.    E-mail from Barr to Webb (Sept. 7, 2005) [Bates 2748].

Exhibit     42.     MRIS Listing for 7101 Alger Rd., Falls Church, VA [Bates 6513–16].

Exhibit     43.     Letter from Racin to Pass (Apr. 14, 2005) [Bates 2810–11].

Exhibit     44.     Letter from Williamson to Racin (Sept. 6, 2005), with tolling agreement attached [Bates 2812–17].

Exhibit     45.     Letter from Racin to Williamson (Sept. 29, 2005) with Tolling Agreement attached [Bates 2818–22].

Exhibit     46.     Barr Deposition Exhibit 2 (E-mail from Killian to Barr (Feb. 9, 2005)) [Bates 2805–07].

Exhibit     47.     Letter from Racin to Pass (Feb. 9, 2005), attaching E-mail from Killian to Barr (Feb. 9, 2005) [Bates 2805–07].

Exhibit     48.     Classified Ads (Aug. 31, 2005 & Sept. 4, 2005) [Bates 2987].

Exhibit     49.     E-mail from Ryan to Levy (Mar. 6, 2002) ("Ryan Account") [Bates 2866–69].

Exhibit     50.     Killian Draft letter to Ryan (Mar. 1, 2002) ("Killian Draft") [Bates 2595].

# E X H I B I T  3 1

# GEORGETOWN DAY SCHOOL
# FACULTY CONTRACT
## 2005-2006 School Year



### This Contract constitutes the formal and confidential agreement between Sharon Killian and Georgetown Day School, Inc.

A.   **EMPLOYMENT**:  Georgetown Day School agrees to employ **Sharon Killian** as a full-time faculty member, an exempt employee, for the 2005-2006 contract year. The terms and conditions of employment are outlined in the Employee Handbook and the Handbooks of Personnel Policies and Procedures, which may be changed from time to time.

B.   **TERM**:  This Contract will be effective for the 2005-2006 school year beginning August 29, 2005 through August 28, 2006, with June 9, 2006 through August 28, 2006 designated as a paid vacation.

C.   **COMPENSATION:** For your services, you will be paid a salary of **$53,842** to be paid in 24 semi-monthly equal installments, less normal deductions, with the first payment due on August 31, 2005 and the last payment on August 15, 2006. This salary includes a 5% increase for 2005-2006.

D.   **BENEFITS:**   You will receive such fringe benefits as are provided to all other faculty members in your employment status, which benefits may change from time to time.

This contract will be binding only if signed by you and returned to Janis Webb, Controller, in the Business Office by **Friday, February 25, 2005**.  Return the white copy; retain the yellow copy for your files.

GEORGETOWN DAY SCHOOL

By: _____
　　　Head of School

Date: __2/4/05__

By: _____
　　　Faculty Member

Date: __2/15/05__

**CONFIDENTIAL:**　　　　　**SUBJECT TO
PROTECTIVE ORDER**

# EXHIBIT 32



Tuesday, August 30, 2005 4:15:15 PM
Message

| From: | Kevin Barr,GDS High School |
| Subject: | Your Absence |
| To: | Sharon Killian,GDS High School |
| Bcc: | Peter Branch |

Dear Sharon,

I have learned from Janis Webb that you called her last Friday, August 24, to say that you were ill and would not be in for staff week. I am sorry to hear that you are not feeling well. I know that your 9th grade advisees will be disappointed not to be able to meet you at orientation.

For the future, I would remind you that in case of absence you should contact either Nick Ryan or me. I am concerned that your absence may extend beyond this week. If you will be out next week or longer, I will need to get coverage for your classes, your advisees, and the yearbook. It has also come to my attention that copies of your 05-06 purchase orders are not in the three ring binder that the art department keeps. Would you please let me know where copies can be found. It is critical for us to make sure that all supplies for your courses have been ordered and received.

I look forward to hearing from you as soon as possible but no later than by tomorrow afternoon, Wednesday, August 31, by 2:00 pm.
You input here is crucial to a successful and smooth start of the school year for your students.

To contact me, you can reach me at school at 202-274-3185, or on my cellphone at 202-497-6509, or in the evenings, after 8:00 pm at my home number 301-652-3817.

All my best,
Kevin

# E X H I B I T   3 3

**Exhibit 66**

5/17/06   46m

Tuesday, August 23, 2005 11:57:50 AM
Message

From:        Sharon Killian

Subject:     Re: AP independent study

To:          "Sophia Maravell06" <smaravell06@gds.org>

hey Sophia,
How are you doing?  You were to have written a couple paragraphs concerning our discussion and agreement
for me to sign so that you can give it to Tom Yoder.  I don't recall whether that was done.  Do you?  I did already
speak with Tom about the plan and that you would be able to do well with this independent study; that you were
taking an additional course outside with an artisan, etc. etc.

Which rule book did you read?  In the past my students' ISP courses were included in the gpa.  Are you thinking
of courses taken independently at another school?  I don't believe GDS includes outside courses in the gpa.

Let me know the answers to these questions before I write Tom.
Sharon
ps How's mom?


**"Sophia Maravell06" <smaravell06@gds.org> writes:**
Dear Sharon,

I just recieved my shedule in the mail and everything is great except that
art isn't on the schedule.  I attempted to switch from regular AP studio
art to
AP independent study, so maybe they don't put independent study on the
schedule?  There is also the problem that AP independent
study does not count toward my gpa whereas regular AP art does (according
to the rule book).  I was hoping you could advise me on this.  Any help
would be much appreciated.

Thank you and hope you're having a relaxing summer.

Sophia Maravell

# E X H I B I T   3 4

**Exhibit 67**

5/17/06     46M

| | Tuesday, August 23, 2005 1:36:52 PM |
|---|---|
| | Message |
| From: | Sharon Killian |
| Subject: | Re: Zak Velazquez |
| To: | **tvzap@aol.com** |

Hi Zak,
Hope summer's been good.  Did you find a college campus that you like?  A program that you like?

I am so sorry about the craziness with course and schedule problems you're having.  Generally speaking, Zak, AP studio is the last course you want to do as an independent study since the schedule for students in the final year is already flexible.  Each independent student becomes another class period for the teacher.  Sometimes matching our schedules just won't work since our open class periods infrequently match.  Constant boosting and encouragement are critical in this last year and class-time/face-time is very important to accomplish this.  If you were carrying a portfolio class at the Corcoran I'd be more confident that you'd be able to put in the work time that's necessary to do this AP thing right.

Please keep thinking of any change here as a last resort.  I think that everything will work out to your satisfaction...keep in touch with Tom and let me know how it goes.

Did you finish your portrait?  Did you draw/paint?  How was your trip?
Sharon

**tvzap@aol.com writes:**
Hey Sharon, this is Zak Velazquez and I am e-mailing you because I want to inform you of a schedule crisis I am having. I have been trying to switch some of the classes assigned to me so I don't have a hectic and stressful year. I was dumped into Age of Shakespeare, which is the last lit. course I wanted to take and I am trying to switch out of AP Biology into AP Environmental so that I could have two free periods.  I have already talked to Tom and he said that he would try to change my schedule but he also said that the chances of him being able to change it aren't too high. So I was wondering, if this whole thing fails, whether I would be able to take AP Studio Art at another time in order to free up my schedule.  Maybe I could do the course in an independent study style but still do all the assignments for the actual course. This is just a last resort for my schedule crisis and I hope I won't have to come to something like this. But just tell me what you think and e-mail me back at TVZap@aol.com

# E X H I B I T   3 5

# GDS

www.gds.org

GEORGETOWN DAY SCHOOL

HEAD OF SCHOOL
Peter M. Branch

September 1, 2005

Sharon Killian
6312 Seven Corners Center, #144
Falls Church, VA 22044

Dear Sharon:

Kevin has informed me that you have not been able to be at staff week and will not be able to be at school next week, and perhaps for some time beyond that. Please accept my best wishes for a speedy recovery. As Chief Financial Officer, it is my responsibility to inform you of your rights under the Family Medical Leave Act of 1993. Please allow me to apologize for the technical nature of the following language.

Your medical leave commenced on August 29, 2005 and has continued through the date of this communication. During this time, you have received benefits under our Short-Term Disability/Sick Leave program.

Because you are employed in Washington DC and meet other eligibility requirements, the provisions of both the District of Columbia Family and Medical Leave Act of 1990 (DCFMLA) and the Family and Medical Leave Act of 1993 (FMLA) apply to your leave. Both laws provide leave to eligible employees for prolonged illness, subject to some exceptions, provide job restorations at the conclusion of the leave. However, the laws differ in a number of respects, including in the amount of leave provided and the time within which such leave may be taken.

The DCFMLA provides leave for prolonged illness of up to 16 workweeks during any 24 month period to an employee. Thus, any medical leave taken during the last 24 months is counted toward your 16 workweek entitlement. You have not elected an FMLA leave in the last 24 months prior to your leave on August 29, 2005. As a result, your entitlement to leave under the DCFMLA and to the job restoration protections provided by that law will expire on Friday, December 16, 2005, assuming that you remain out of work on a continuous basis until that time.

In contrast, the FMLA provides medical leave of up to 12 workweeks during a 12 month period to an employee. The 12 month period is August 1, 2005 to July 31, 2006, corresponding to the calendar year. Your 12 workweek entitlement began on August 29, 2005. Your 12 workweek entitlement to leave and the job restoration protections will expire on Friday, November 18, 2005, again assuming that you remain out of work on a continuous basis until that time.

**2888**

HIGH SCHOOL  4200 Davenport Street, NW ▪ Washington, DC 20016-4560 ▪ 202-274-3200 ▪ FAX 202-364-9603
LOWER/MIDDLE SCHOOL  4530 MacArthur Boulevard, NW ▪ Washington, DC 20007-4297 ▪ 202-295-6200  LS FAX 202-295-6151 ▪ MS FAX 202-295-6221
BUSINESS/DEVELOPMENT OFFICE  4530 MacArthur Boulevard, NW ▪ Washington, DC 20007-4297 ▪ 202-295-1060 ▪ FAX 202-338-0480

Ms. Sharon Killian
Page Two


Sharon, if your disability should extend beyond 90 days and you will be unable to return to work you are eligible to collect long-term disability upon completion of a certification of your disability by your physician. Please notify Janis Webb so she can contact our LTD carrier to start a case file for you in the event you will be out of work 90 days. Your personal leave balance was 45 days at the start of your disability. We will use your leave to supplement your short-term disability until Long-Term disability commences.

If you have any questions, please feel free to contact me. I can be reached at 202-295-6100 or by e-mail at klindsey@gds.org.

Sincerely,

Kate C. Lindsey
Chief Financial Officer

cc:    Peter Branch

2889

# EXHIBIT 36

**Exhibit 50** 
5/17/06

|  | Friday, September 09, 2005 12:17:15 PM |
| --- | --- |
|  | Message |
| From: | Sharon Killian |
| Subject: | Re: Paragraphs for ind. study |
| To: | "Sophia Maravell06" <smaravell06@gds.org> |
| Cc: | Nick Ryan |

Hi Sophia,
I just read your proposal and it seems just right.
Because of health issues my status is uncertain so you should make arrangements with the substitute AP
teacher through Nick Ryan.
Sharon

# E X H I B I T   3 7

**Exhibit 51**
5/17/06     L6m

Friday, September 09, 2005 12:13:25 PM
Message

From:          Sharon Killian

Subject:       Re: Film and Video

To:            Rebecca Russell-Einhorn06

Cc:            Nick Ryan

---

Hi Becca,
Thanks for your good wishes.
My status is quite uncertain in light of health issues.  Under the circumstances you should coordinate your independent study through Nick Ryan and the person teaching the course in my absence.

Sharon

**Rebecca Russell-Einhorn06 writes:**
Sharon,
        I'm sorry to hear that you've been ill lately and I really hope you get better.  Nick told me that you were still answering e-mails so I thought I'd give it a shot.  I was wondering if there was anything I should do for film and video because as you know it is an independent study for me and is my studio art credit for high school. Any advice would be greatly appreciated.  Thanks a lot and I hope you're feeling better.
-Becca Russell-Einhorn

# E X H I B I T   3 8

LOO Ø    [ 8Ⱶ⥀8 .ON 80ſ ]    ∠Ⱶ:81 IƆⱵ 9002/81/11

**Exhibit 53**

5/17/06    Lbm

The UPS Store #2662
1722 N College Ave  Ste C
Fayetteville, AR 72703
479.442.5036 Tel
479.442.5046 Fax
8 to 6 M-F, 9 to 5 Sat



## Fax Cover                    The UPS Store

To: _Kate Lindey / Janis Webb_  Fax #: _202  338-0480_

Date: _11-18-05_          # of Pages (including cover sheet): _7_

From: _Sharon Killian_    Phone #: _703. 623-2390_

Subject: _LTD_

_Personal  &  Confidential_

# New Name.
# New Low UPS® Rates.
# Same Helpful Services.

2908

If you are not the intended recipient, do not disclose, copy, distribute or use this information. If you received this transmission in error, please call immediately to arrange return of the document at no cost to you.

Long Term Disability Claim Statement—is/it

 **ASSURANT** Employee Benefits

### Employer Claim Statement (Please print or type.)

New claim: ☒ Yes  ☐ No

| | |
|---|---|
| 1. Name of employer <br><br> Georgetown Day School | 2. Policy no. <br><br> 4037352 | 3. Participation no. <br><br> 96 |

| 4. Full name of claimant <br><br> Claudette Sharon Killian | 5. Social Security no. <br><br> 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 | 6. Date employed <br><br> 09/01/1994 | 7. Effective date <br><br> 09/01/1994 |

8. Date last worked 06/08/2005

No. of hours worked that day ___8___

9. Work schedule of claimant at time of disability:

___5___ Days per week   ___8___ Hours per day

10. Was claimant a member of a union at the time of disability?  ☐ Yes  ☒ No

11. Was plan effective when disability began?  ☒ Yes  ☐ No

If "No," please indicate date of termination _____

12. Was claimant covered under your prior LTD plan?  ☐ Yes  ☐ No (Answer only if employer has policy in effect less than 12 months.)

Effective date under prior plan _____   Termination date under prior plan _____

13. Does claimant have any other coverage(s) with Assurant Employee Benefits?
☒ Yes  ☐ No   If "Yes," please indicate the type of coverage(s).  ☒ Basic Life  ☐ STD  ☐ Voluntary Life

14. Has claimant returned to work?  ☐ Yes  ☒ No
If "Yes," on what date:
_____ With restrictions  _____ Full capacity

15. Current work schedule of claimant?

___5___ Day(s) per week   ___8___ Hours per day

16. Have you and the claimant discussed reasonable accommodations which would allow a return to work?  ☐ Yes  ☒ No
If "Yes," please explain.

17. Basic monthly earnings

$ 4,274.42

18. How is claimant paid?
☐ Hourly      ☐ Other _____
☒ Salaried
☐ Salary + Bonus

19. Does claimant contribute toward the cost of this LTD insurance?  ☒ Yes  ☐ No
If "Yes," what is the % paid by: __100__ % Claimant   __0__ % Employer

20. Are claimant premium contributions made under Section 125 of the Internal Revenue Code? (i.e. a Cafeteria Plan paid with pre-tax dollars)  ☐ Yes  ☒ No

21. Is there any reason why FICA should not be withheld from the claimant's benefits?  ☐ Yes  ☒ No   If "Yes," please explain.

22. Did this disability occur as a result of the claimant's employment?  ☐ Yes  ☒ No  ☐ Currently disputed
If "Yes," or under dispute, please provide us with the policy no., name, address and phone no. of Workers' Compensation administrator.

23. Is the employee an active participant in the employer-sponsored pension plan?  ☒ Yes  ☐ No

24. To the best of your knowledge, is the claimant receiving, or entitled to receive benefits from any of the following sources?
☒ Salary continuance   Amount: $ 4,274.42 per bi-monthly paycheck.   From 9/29/05 to 11/25/05
☐ Workers' Compensation   Weekly benefit _____   Effective date _____
☐ Retirement or pension   Benefit amount _____   Effective date _____
☐ Other _____   Lump sum distribution?  ☐ Yes  ☐ No

*(handwritten margin note, left side): not—n ibility/ sonal ave*

25. Remarks

26. Date  10/5/05

By  Janie Webb - Controller
AUTHORIZED SIGNATURE/TITLE

Fax no. 202-338-0480

Phone no. 202-295-6114

E-mail address jwebb@gds.org

CONFIDENTIAL:   SUBJECT TO PROTECTIVE ORDER

Page 4 of 8
KC3283I (9/2005)

2897

**DISABILITY—HIPAA Authorization for Release of Health Information**



ASSURANT Employee Benefits

Insured/Member name  Claudette Sharon Killian          SSN 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  DOB April 12, 1955

Policy no. ___4037352___  Participation no. 96 _____

**Persons/categories of persons providing the information:** Any provider of medical services, insurance company, Social Security Administration, governmental agency, vocational provider or employer having medical information with respect to any physical or mental condition of mine.

**Persons/categories of persons receiving the information:** Union Security Insurance Company or Union Security Life Insurance Company of New York ("Companies").

I hereby authorize the use or disclosure of my protected health information as described below:

**Information to be disclosed:** All information necessary to allow the Companies or its representatives to determine my eligibility for disability benefits and to process my disability claim. Such information may include, but is not limited to: Any and all medical/dental records relating to my physical and/or mental health whether for treatment or evaluation purposes, pharmacy records, and strength/functional testing.

**The sole purpose of this disclosure is for the adjudication of my disability claim.**

I understand the following:

- This authorization is voluntary and I may revoke it at any time by contacting Union Security Insurance Company, Privacy Office, P.O. Box 419052, Kansas City, MO 64141-6052, but any such revocation will not affect any actions that the Companies took before receipt of the revocation.

- I may inspect and/or copy the health information described above.

- The information disclosed may be subject to redisclosure by the recipient and thereby no longer protected by HIPAA.

- I may refuse to sign this authorization; however, if I refuse to sign this authorization I may not receive disability benefits under the disability plan.

- My medical treatment or payment of medical benefits cannot be conditioned upon whether I sign this authorization.

- If there is a conflict between a prior request for restrictions and this authorization, this authorization controls.

- This authorization is effective from the date signed below until my disability claim ends or 24 months from the date signed below, whichever is earlier.

_____          _November 18, 2005_
SIGNATURE OF INSURED/MEMBER OR LEGAL PERSONAL REPRESENTATIVE                    DATE

_____          _____
PRINTED NAME OF LEGAL PERSONAL REPRESENTATIVE                    RELATIONSHIP TO INSURED/MEMBER

*YOU MAY REFUSE TO SIGN THIS AUTHORIZATION.*

Please return to:
Assurant Employee Benefits (Large Case Team)  PO Box 419744  Kansas City  Missouri  64179-0023
T 800.998.7858 • F 816.881.6060

Page 2 of 8
KC3283I (9/2005)

CONFIDENTIAL:   SUBJECT TO PROTECTIVE ORDER

2898

**Claimant Statement** *(Please print or type.)*

**Section I**

| 1. Full name <br><br> Claudette Sharon Killian | 2. Social Security no. <br><br> 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 | 3. Date of birth <br><br> 04/12/1955 |
|---|---|---|

| 4. Address *(city, state, zip code)* <br><br> 2227 N College Avenue Fayetteville AR 72703 | 5. Home phone no. <br><br> 703 623-2930 |
|---|---|

| 6. Sex: ☐ Male ☑ Female | 7. Marital Status: ☐ Single ☑ Married ☐ Separated ☐ Widowed ☐ Divorced |
|---|---|

| 8. Names and birthdates of spouse and all dependent children under age 18. <br><br> *Charles D. Killian* | 9. Your occupation <br><br> *Teacher* |
|---|---|

**Section II**

1. Nature of illness and when symptoms first appeared, or describe how and where accident occurred. *hypertension (uncontrolled) Depression, anxiety, insomnia, colitis nausea and diarrhea.  April 2005*

2. Date first unable to work because of this disability. *August 29, 2005*

3. Have you returned to work?  ☐ Yes  ☑ No   If "Yes," on what date: _____ Part-time _____ Full-time

   If you have not returned to work, on what date do you expect to return to work? *unknown* _____ Part-time _____ Full-time

4. Please provide the names and addresses of all physicians who have been consulted for this condition. Please include dates of consultation.

| Name | Address | Dates of Consultation |  |
|---|---|---|---|
|  |  | First Visit | Last Visit |
| *Fran Pearson, MD* | *1216 W Lakeridge Drive Fayetteville AR 72703* | *9/7/05* | *Nov 18, 2005* |

5. If you have been hospital confined for this disability, please provide name and address of hospital and confinement dates.

| Name of Hospital | Address | From | To |
|---|---|---|---|
|  |  |  |  |

**Section III**

1. Check if you are receiving or entitled to receive benefits from any of the following sources:

   ☑ Salary, Wages or Commissions   ☐ Retirement or Pension Plan   ☐ Railroad Retirement Act
   ☐ State Disability   ☐ Social Security Disability   ☐ Other sources
   ☐ Workers' Compensation   ☐ Social Security Retirement

   For each source marked above, please provide us with the following information:

| Source | Income | | Date Application Filed | Benefit Effective Date |
|---|---|---|---|---|
|  | Amount | Frequency |  |  |
| *GDS* | *$2243.42* | *bi-monthly* | *September, 05* | *8/29/05* |
|  |  |  |  |  |
|  |  |  |  |  |

Provide documentation of any source indicated above; i.e. award notices, denial notices or applications.

2. Do you have medical insurance? ☑ Yes ☐ No   Policy no., name, address and phone no. of medical plan administrator.
   *Care First Blue Choice - EBS810-36-820C* *National Acct Dedicated Serv.*
   *Phone# 800-628-8549* *PO Box 1725*
   *Cumberland MD 21501-1725*
   Please indicate the type of coverage provided (Check all that apply.):
   ☑ Employer Group   ☐ COBRA   ☐ Conversion   ☐ Individual   ☐ Spouse   ☐ Government   ☐ Other *(Specify.)* _____

Page 5 of 8
KC32631 (9/2005)

**CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER**

**Section IV**

I authorize any provider of medical services, insurance company, consumer reporting agency, Social Security Administration, governmental agency, educational institute, law enforcement agency, or employer having medical information with respect to any physical or mental condition, rehabilitation and other non-medical information of me to give to Union Security Insurance Company, or its representative, any and all such information. **I UNDERSTAND** the information obtained by use of this Authorization will be used by Union Security Insurance Company to determine the eligibility for benefits. I know that a photographic copy of this authorization shall be as valid as the original. I agree this Authorization shall be valid for the duration of the claim. This authorization is not governed by HIPAA, however, when necessary, I may be asked to execute a HIPAA authorization form, allowing Union Security Insurance Company to use and disclose protected health information.

If I receive a disability benefit greater than that which I should have been paid, I understand this insurance company has the right to recover such overpayments from me, including the rights to reduce or adjust future benefits, if any.

Signature of claimant _____ Date __11/18/05__

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

2900

**Attending Physician's Initial Statement of Disability—is/it**

 **ASSURANT** Employee Benefits

---

The patient must pay any costs for completion of this form.

**To the Attending Physician**
Please read the following instructions before completing this form.

An authorization to release information can be found on the Claimant's Statement.

Clearly print or type this form. Fully complete each applicable section of this form.

Sign and date this form after completion. Also, clearly print or type your name, address and phone number in the spaces provided. If applicable, include your fax number.

After you have completed this form, return the claim statement to the patient.

| Name of patient | Date of birth | Social Security number |
|---|---|---|
| Claudette Sharon Killian | 04/12/1955 | 070 48 0487 |

**History**

Patient's symptoms result from (Check all that apply.): ☐ Employment ☒ Illness

☐ Auto accident (state in which accident occurred) _____ ☐ Other accident

☐ Pregnancy (expected/actual delivery date) _____ Type of delivery _____

Date symptoms first appeared *April 2005*    Patient's height *5' 8"*  Weight *172*

First visit for this condition *9·7·05*  Most recent visit *11·18·05*  Most recent comprehensive exam *9·7·05*

Frequency of treatment and/or symptoms: ☐ Weekly ☐ Monthly ☒ Other (Specify). *Biweekly – monthly*

Name(s) and address(es) of other treating or referring physician(s)

Hospital name *None*    Confinement dates _____ thru _____

**Diagnoses**

Diagnoses (including any complications) *1. Incapacitating depression with severe anxiety and incapacitating insomnia. 2. Headaches 3. Colitis with diarrhea 4. Hypertension 5. Hypokalemia*

Subjective symptoms *Depression  Diarrhea  Insomnia  Muscle Tension  Anxiety  Headaches  Dizziness  Chronic pain*

Objective findings (include results/copies of x-rays, lab tests, EKGs, MRIs and scans.) *Potassium 3.1 → 3.5*

Attach medical records as appropriate.

**Treatment**

Describe treatment program, including any surgery, medications, (give dates) physical therapy or psychotherapy
*1. Depression – Effexor XR and counseling  5. Pain – Aleve, physical therapy
2. Insomnia – Lunesta and sleep hygiene
3. HTN – HCTZ, lisinopril, KCl  4. Diarrhea – Imodium*

**Psychiatric Impairment**

☐ Class 1—Patient is able to function under stress and engage in interpersonal relations (no limitations).
☐ Class 2—Patient is able to function in most stress situations and engage in only limited interpersonal relations (slight limitations).
☐ Class 3—Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations).
☒ Class 4—Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations).
☐ Class 5—Patient has significant loss of psychologic, physiological, personal and social adjustment (severe limitations).
☐ Remarks

Please define stress as it applies to this patient. *Stress is due to harassment on the job.*
What stress and problems in interpersonal relations has patient had on the job? *Lack of respect on personal and profession level by her department staff.*
Do you believe a legal guardian or conservator should be appointed for this patient? ☐ Yes ☒ No

Page 7 of 8
KC32B3I (9/2005)

CONFIDENTIAL:    SUBJECT TO PROTECTIVE ORDER

**Physical Impairment**

☐ Class 1—No limitation; capable of heavy work*—
exert 50–100# occasionally and/or 25–50# force frequently ................................................. No restrictions (0–10%)
☐ Class 2—Medium activity*—exert occasional 20–50# force and/or 10–25# force frequently ................................... (15–30%)
☒ Class 3—Slight limitation; capable of light work*—exert occasional 20# force and/or up to 10# force frequently .... (35–55%)
☐ Class 4—Moderate limitation; capable of sedentary*, clerical or administrative work—
occasional 10# force, mostly sitting ....................................................................... (60–70%)
☐ Class 5—Severe limitation; incapable of minimal activity or sedentary* work ........................................ (75–100%)
    ☐ Bed confined    ☐ House confined
☐ Remarks                                                                    *As defined in the Federal Dictionary of Occupational Titles

**Cardiac**

Complete only if applicable.
Functional capacity (American Heart Association)
☐ Class 1 (no limitation)    ☐ Class 2 (slight limitation)    ☐ Class 3 (marked limitation)    ☐ Class 4 (complete limitation)
Blood pressure (latest reading) _____ as of (date) _____
Is patient in a cardiac rehabilitation program?    ☐ Yes    ☐ No

**Work Capabilities**

Please describe fully how patient's symptoms/limitations affect ability to work, e.g. how are work schedule or duties restricted and why?

Patient becomes anxiety-ridden and tearful with fear at the thought of returning to the harassment at work. Physical symptoms of diarrhea and headaches restrict her ability to teach.

When did these limitations apply?    Began April 2005 Ended ongoing
When would you anticipate a reduction of these symptoms?    6 months (May - June 2006)

**Prognosis**

Prognosis:    ☐ Terminal    ☐ Poor    ☒ Good    ☐ Excellent
Would any further therapy be reasonably expected to result in full or partial recovery?
☒ Yes (Describe below.)    When 6+ months ☐ No    ☐ Unknown          if she returns too soon.
Depression is slowly improving but would relapse
Has patient reached maximum medical improvement?    ☐ Yes    ☒ No    If "No," when 6 months    ☐ Unknown

**Rehab**

Is patient a candidate for rehabilitation services?    ☐ Yes (Describe.)    ☒ No (Explain.)

Would job modification enable patient to work with impairment?    ☐ Yes (Describe.)    ☒ No
Not if patient must return to existing situation with harassment.

**Name**

Physician's name FRAN PEARSON Degree MD Specialty/Board certification Internal Medicine
Address 1216 W. Lakeridge Dr. Fayetteville          AR    72703
              STREET                        CITY                      STATE    ZIP CODE
Telephone no. 479-973-4331          Fax no. _____
Signature _____ Date 11.18.2005          746215982
                                    DO NOT PRE-DATE            PHYSICIAN'S EIN OR SSN

CONFIDENTIAL:          SUBJECT TO
                        PROTECTIVE ORDER

Page 8 of 8
KC3283I (8/2005)

2902

# E X H I B I T   3 9



Friday, September 02, 2005 4:22:31 PM
Message

From:        ♀ Kevin Barr,GDS High School

Subject:     Re: syllabi

To:          ♀ Sharon Killian,GDS High School

Bcc:         ♀ Peter Branch

**Sharon Killian writes:**
Kevin,
I have attached a syllabus for Film & Video along with assignments. If possible, a useful text for this course is
*The Visual Story: Seeing the structure of film, TV & New Media* by Bruce Block (see the syllabus); the AP
Studio Art syllabus, which is largely unchanged from last year. Assignments and other teaching tools are still on
Bladkboard.
I planned on using a similar syllabus to the existing Graphic Design document with only minor changes so Nick
or Laura should have a copy from 04-05 that can be used with minor updates.
Sharon


*Dear Sharon,*

Thank you for sending a copy of your syllabus and suggestions for texts. We will go ahead and order texts for
your classes. In addition, I wanted to follow up on our phone conversation yesterday, just to make sure we are
clear as to how to proceed. As you suggested, we are looking to see if we can find someone who will be able to
cover your classes for at least a week or two. It will be important for you to contact me by the end of the school
day (3:15 p.m.) Wednesday, September 7, so I will know whether it will be necessary to have a substitute in
place for the week of September 12. On the subject of supplies for your classes, since none have arrived and
we have no record of them being ordered, I will also follow your suggestion that we go ahead and order them. I
will need to meet with the editor of the yearbook (am I right that it is Emily Stern?) just to let her know that you
may be out a while and she should get going anyway. I imagine that Ian Yaffe left reams of information and
procedures. I don't think you ever picked up the yearbook contract. Shall I see if it is in your box and, if so,
follow up with the publisher?

Please let me know if I have misunderstood any of our conversation. I want to make sure we do everything
necessary to get your classes and other responsibilities covered. What do you think we should do with your
*advisees at this juncture?* Obviously we will have someone meet them on Tuesday.
I hope you feel better soon.

Kevin

# E X H I B I T   4 0



Friday, September 09, 2005 5:56:03 PM
Message

From:        Kevin Barr,GDS High School

Subject:     Follow Up to Message

To:          Sharon Killian,GDS High School

Bcc:         Peter Branch

Dear Sharon,

Thank you for leaving me a voice mail yesterday, September 8th, 2005.  I am sorry that you continue not to be well.  The students who are working on the yearbook are particularly feeling your absence.  No one knows as well as you do, how time sensitive the yearbook is and how pressing is the kids' need for an adult supervisor.  Given your message that you won't be coming in for the next few weeks, I am going to have to find a faculty member who can assume immediate responsibility for advising the 2005-2006 yearbook staff.

As I mentioned in my last e-mail, I appreciate your sending a syllabus for AP Art and Film and Video; however, we are still in need of a syllabus for Graphic Design.  Unfortunately, we have not yet been able to locate a substitute teacher for the Film and Video course.  If you happen to have any contacts who might be able to substitute, I would appreciate your e-mailing their names and addresses.

Finally, as next week will be the third week of your absence from GDS, I am forwarding your message to Kate Lindsey, so that she can send you the necessary paperwork to apply for short-term medical disability.

Yours,


Kevin Barr
Principal

# E X H I B I T   4 1

 Wednesday, September 07, 2005 1:42:30 PM
Message

From:           Kevin Barr,GDS High School

Subject:      Long Term Substitute

To:              Janis Webb

Cc:              Peter Branch
                  Susan Levy
                  Nick Ryan,GDS High School

Dear Janis,

We have a long term substitute at the High School.  Her name is Michelle Cobb.  Susan has her job application
and I am sending down her tax forms.  She lives in D.C.  Please pay her at the new long term substitute rate.
She began yesterday and will be with us until further notice.  She is substituting for Sharon Killian.

Kevin

# E X H I B I T    4 2

## Courtesy of Jim Kaull

Result **1** of **1**.
Previous | Next | **[1]** | Bottom



# Metropolitan Regional Information Systems, Inc.

**FX5212323** - FAIRFAX                                                    **Full Listing**
**7101 ALGER RD, FALLS CHURCH, VA 22042**                                   Residential



©Copyright 2005 MRIS ©

| | | |
|---|---|---|
| **Status: Sold** | **Style:** Contemporary | **List Price: $460,000** |
| Close Date: 14-Jul-2005 | Seller Subsidy: $0 | Close Price: $460,000 |
| Ownership: Fee Simple | Type: Detached | Inc City/Town: |
| Sale or Rental: Sale | TH Type: | Zip: 22042 - 2501 |
| Listing Type: Excl. Right | #Levels: 1 | Election District: 5 |
| Adv Sub: Woodley | #Fireplaces: 10 | Map Coord: 15G8 |
| Legal Sub: WOODLEY | Model: | |
| Condo/Coop Proj Name: | | Area: |
| | | |
| Tax ID: 50-3-4- -86 | Total Taxes: $3,248 | Level Location: |
| HOA Fee: /mo pd | Tax Year: 2004 | Age: 54 |
| C/C Fee: /mo pd | Lot AC/SF: .40/17,353 | Year Built: 1951 |
| | | |
| Elementary: WESTLAWN | Middle: JACKSON | High: FALLS CHURCH |

**INTERIOR**

| | Total | Main | Upper 1 | Upper 2 | Lower 1 | Lower 2 |
|---|---|---|---|---|---|---|
| **Bedrooms:** | 3 | 3 | 0 | 0 | 0 | 0 |
| **Full Baths:** | 1 | 1 | 0 | 0 | 0 | 0 |
| **Half Baths:** | | | | | | |

| Room | Dimensions | Level | Flooring | Fireplace |
|---|---|---|---|---|
| Living Room | x | | | |
| Dining Room | x | | | |
| Bedroom-Master | x | | | |
| Bedroom-First | x | | | |
| Bedroom-Second | x | | | |
| Bedroom-Third | x | | | |
| Bedroom-Fourth | x | | | |

6513

| | |
|---|---|
| Bedroom-Fifth | x |
| Bedroom-Master #2 | x |
| Sitting Room | x |
| Kitchen | x |
| Recreation Room | x |
| Family Room | x |
| Den | x |
| Unfinished Basement | x |
| Other Room #1 | x |
| Other Room #2 | x |
| Other Room #3 | x |
| Library | x |
| Breakfast Room | x |
| Foyer | x |
| Garage | x |
| Carport | x |

## FEATURES

Rooms:
Main Entrance: Living Room
Interior Style: Floor Plan-Open
Dining/Kitchen: Dining "L"
Appliances:
Amenities: Attic-Strs Pull Dwn, Entry Lvl BR, FP Glass Doors, Home Warranty, Shades/Blinds, Wood Floors
Security:
Windows/Doors: Skylight(s)
Walls/Ceilings: Vaulted Ceilings

**Basement:** No                        Foundation: Slab
Handicap:
Unit Description:
R-Factor Basement:               R-Factor Ceilings:              R-Factor Walls:
House Dimensions:  x             SQFT-Tot Fin:
Above Grade Unfinished:          Above Grade Finished:
Below Grade Finished:            Below Grade Unfinished:

**Directions:**
WEST ON RT 50, L GRAHAM (AT LOEHMANN'S PLAZA), L ALGER TO END.

## REMARKS

Internet/Public:
Wonderful, inviting 3BR Frank Lloyd Wright-inspired contemporary w/walls of windows & corner windows looking out t
gorgeous 17000+ sq ft (.4 acre) lot on cul-de-sac. Wood flrs, fpl. Updated kit, bath. Shows well. HOW. Inside Beltway
EZ access to DC, Metro, Rt 66, 495. 3 blks to Express bus.

## EXTERIOR

Building Sites/Lots:             Lot Dimension:  x  x            Lot Acres/Sqft: .40/17,353
Exterior:  Deck, Fenced - Rear
Exterior Construction:  Shingle
Lot Description:
Other Buildings:  Shed
Original Builder:                                                New Construction:  No
Property Condition:  Shows Well
Roads:  City/County
Roofing:
Soil Type:
Topography:
Transportation:  1 mi-Metro Bus
View/Exposure:
Year Converted:                  Year Renovated:

## PARKING

Parking: Carport, Drvwy/Off Str                                 # Gar/Carpt/Assgn Sp:  /1/
Garage Type:                                                    Parking Space #:
Carport Type:  Attached                                         Parking Block/Square:
Parking Incl in List Price:  Yes    Parking Incl in Sale Price:  Yes

6514

## UTILITIES

Heat System: Baseboard, Hot Water
Cool System: Ceiling Fan(s), Window Unit(s)
Water: Public
Sewer Septic: Public Sewer
TV/Cable/Comm: CATV/Dwelling, DSL Available

Heat Fuel: Natural Gas
Cool Fuel: Electric
Hot Water: Natural Gas

## FINANCIAL INFORMATION

Earnest Money:
Total Taxes: $3,248
Tax Year: 2004

**Assessments:**
Land: $125,000

Project Approved:
Possession: 61-90 Days CD
Tenant Rights:

Other Fees: /month paid
City/Town Tax:
Refuse Fee: $240
Water/Sewer Hook-up:
Special Tax Assess: $42
Improvements: $137,480
Investor Ratio:

County Tax: $2,966
Tap:
Front Foot Fee:
Yr Assessed: 2004
Total Tax Assess: $262,480
Total Units:

## HOA/CONDO

HOA Fee: /month paid
Condo/Coop Fee: /month paid
HOA/Condo/Coop Amenities:
HOA/Condo/Coop Rules:
HOA/Condo/Coop Fee Includes:
HOA/Condo/Coop Management:

HOA: No

## LEGAL INFORMATION

Tax Map: 0503 04 0086
Section: 2
Liber:
Zoning Code: 140
Historic Designation ID:
Contract Info: None
Disclosures: Prop Disclaimer
Documents:
Special Permits:

Lot #: 86
Phase:
Folio: 503

Master Plan Zoning:

Block/Square:
Parcel Number:

## PROPERTY MANAGEMENT

Property Mgmt Company:
Prop Mgr's Name:

Office:
Phone:

**Broker Name:** Weichert, REALTORS

List Date: 14-Apr-2005
VRP: No
Low Price: $460,000

Orig List Price: $460,000
Prior List Price:
Status Change Date: 18-Jul-2005

Off Mkt Date:
DOM-MLS: 7
DOM-Prop: 7

## SOLD INFORMATION

Contract Date: 20-Apr-2005
Close Date: 14-Jul-2005
New 1st Trust Loan Amt:$368,000
New 2nd Trust Loan Amt:$45,239
Selling/Rental Office: PECK1

Sell/Rent Agency:Buyer Agency
Close Price: $460,000
New 1st Trust Loan Type:Conventional
New 2nd Trust Loan Type:Conventional

Seller Subsidy: $0

Previous | Next | [1] | Top

James T. Kaull
Washington Fine Properties -
Sotheby's International Realty
3201 New Mexico Avenue, NW Suite 220
Washington, DC 20016

6515

www.wfpsir.com
202-243-1659 office
202-368-0010 mobile
jim.kaull@wfpsir.com

© 2005 Metropolitan Regional Information Systems, Inc.
Information is believed to be accurate, but should not be relied upon without verification.

Accuracy of square footage, lot size and other information is not guaranteed.

6516

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W.
Washington, D.C. 20010-2601
Telephone: (202) 265-2516
Telecopier: (202) 483-7895
E-Mail: awjrlaw@erols.com

FOR SETTLEMENT PURPOSES ONLY

April 14, 2005

VIA REGULAR MAIL AND FACSIMILE TO (202) 530.0703

Caryn Pass, Esq.
Krupin & O'Brien LLP
1156 15th Street, N.W.  Suite 200
Washington, D.C.  20005

      Re: Sharon Killian & Georgetown Day School

Dear Caryn:

      We conveyed proposed terms for settlement in January. They included compensation commensurate with six years' pay and benefits; annual payments of $25,000 over a six year period to account separately for the mental distress element of Ms. Killian's claim for compensatory damages; and payment of attorney fees, all in exchange for a broad release of claims and relinquishment of a very valuable interest in continuing employment at GDS.

      The terms were not presented on a non-negotiable basis, but clearly suggested the need for a significant commitment of resources if the parties were to avoid litigating racial harassment and related claims deriving from experiences encountered by our client and other African American teachers, staff members and students at GDS relative to their white counterparts.

      The School deferred negotiations in favor of expanding the investigation begun last September.  Additional information apparently served to bolster the sense on the part of GDS officials that perceptions of a racially discriminatory and hostile atmosphere at the School are simply wrong.  This in turn has translated into a very modest counteroffer calling for the School to "buy out" Ms. Killian's contract for the 2005-06 academic year alone, in exchange for her agreement to give up serious claims of racism and depart quietly.

      Yet these claims, if proven to a jury, could well result in awards of damages and attorney fees greater than the total figure represented by our settlement proposal, and would in any case cost far more to defend than the value of a one year contract.  Thus in our view the counter is inherently unreasonable:  It fails to account for risk of loss, and it fails to account for the certain and substantial cost of litigation.

Caryn Pass, Esq.
April 14, 2005
Page 2

Ms. Killian is obviously disappointed, if not especially surprised: The School and its officials have long trivialized concerns coming from African Americans. If it is true that most of us have strength enough to bear the *misfortune of others*, then the dynamic is especially true when the "others" are not only different, but vocal in their differences with the dominant group.

*Despite this sense of disappointment*, Ms. Killian remains willing to work for settlement a while longer. Though prepared for litigation, her preference is to focus on the future. Towards that end, and for settlement purposes only, she has authorized me to withdraw the request for annual payments to account separately for mental distress, and to modify the request for compensation to five years' salary and benefits. She is unwilling to withdraw the request for attorney fees, an element normally part and parcel of any *settlement in this context*.

We appreciate your labors in this long and difficult effort, and look forward to hearing from you.

Sincerely,

John P. Racin

cc: Sharon Killian

2811

# E X H I B I T   4 3

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W.

Washington, D.C. 20010-2601

Telephone: (202) 265-2516

Telecopier: (202) 483-7895

E-Mail: awjrlaw@erols.com

FOR SETTLEMENT PURPOSES ONLY

April 14, 2005

VIA REGULAR MAIL AND FACSIMILE TO (202) 530.0703

Caryn Pass, Esq.
Krupin & O'Brien LLP
1156 15th Street, N.W.  Suite 200
Washington, D.C.  20005

Re: Sharon Killian & Georgetown Day School

Dear Caryn:

We conveyed proposed terms for settlement in January. They included compensation commensurate with six years' pay and benefits; annual payments of $25,000 over a six year period to account separately for the mental distress element of Ms. Killian's claim for compensatory damages; and payment of attorney fees, all in exchange for a broad release of claims and relinquishment of a very valuable interest in continuing employment at GDS.

The terms were not presented on a non-negotiable basis, but clearly suggested the need for a significant commitment of resources if the parties were to avoid litigating racial harassment and related claims deriving from experiences encountered by our client and other African American teachers, staff members and students at GDS relative to their white counterparts.

The School deferred negotiations in favor of expanding the investigation begun last September.  Additional information apparently served to bolster the sense on the part of GDS officials that perceptions of a racially discriminatory and hostile atmosphere at the School are simply wrong.  This in turn has translated into a very modest counteroffer calling for the School to "buy out" Ms. Killian's contract for the 2005-06 academic year alone, in exchange for her agreement to give up serious claims of racism and depart quietly.

Yet these claims, if proven to a jury, could well result in awards of damages and attorney fees greater than the total figure represented by our settlement proposal, and would in any case cost far more to defend than the value of a one year contract.  Thus in our view the counter is inherently unreasonable:  It fails to account for risk of loss, and it fails to account for the certain and substantial cost of litigation.

Caryn Pass, Esq.
April 14, 2005
Page 2

Ms. Killian is obviously disappointed, if not especially surprised: The School and its officials have long trivialized concerns coming from African Americans. If it is true that most of us have strength enough to bear the *misfortune of others*, then the dynamic is especially true when the "others" are not only different, but vocal in their differences with the dominant group.

*Despite this sense of disappointment*, Ms. Killian remains willing to work for settlement a while longer. Though prepared for litigation, her preference is to focus on the future. Towards that end, and for settlement purposes only, she has authorized me to withdraw the request for annual payments to account separately for mental distress, and to modify the request for compensation to five years' salary and benefits. She is unwilling to withdraw the request for attorney fees, an element normally part and parcel of any settlement in this context.

We appreciate your labors in this long and difficult effort, and look forward to hearing from you.

Sincerely,

John P. Racin

cc: *Sharon Killian*

2811

# E X H I B I T   4 4

# COVINGTON & BURLING

1201 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20004-2401
TEL 202.662.6000
FAX 202.662.6291
WWW.COV.COM

WASHINGTON
NEW YORK
SAN FRANCISCO
LONDON
BRUSSELS

THOMAS S. WILLIAMSON, JR.
TEL 202.662.5438
FAX 202.778.5438
TWILLIAMSON@COV.COM

September 6, 2005

**VIA HAND DELIVERY**

John P. Racin
Law Office of John P. Racin, LLC
1721 Lamont Street, NW
Washington, DC 20010-2601

> **Re:   Sharon Killian**

Dear Mr. Racin:

You have indicated to me in previous telephone conversations that Georgetown Day School ("GDS") had not been receptive to your request to enter into a tolling agreement, and I informed you that I would consult with GDS about revisiting the issue. As a result, I am enclosing for your review and consideration two, partially executed originals of a proposed tolling agreement relating to our efforts to settle the outstanding dispute between the Georgetown Day School ("GDS") and your client, Sharon Killian. The proposed "tolling period" is from May 1, 2005 through September 30, 2005. My records indicate that you and I first spoke in early July of this year regarding the possibility for settlement of this matter. However, we are proposing the earlier date, May 1, because it approximates the beginning of the time period when GDS first authorized Covington to contact GDS's insurer and seek consent for settlement negotiations.

As you know, we have obtained consent from the insurer, but not the dollar-amount flexibility we had hoped for to try to achieve early settlement. The tolling agreement is intended to affirm that GDS, acting through Covington & Burling, entered into settlement consultations with the insurer in good faith and that we did not intend to gain any tactical advantage during the pendency of our discussions with the insurer.

2812

COVINGTON & BURLING

John P. Racin
September 6, 2005
Page 2

Thank you for your consideration, and please give me a call if you have any questions or comments about the enclosed agreement.  If the agreement is satisfactory to you as drafted, please sign and return to me one of the originals at your earliest convenience.

Sincerely,

Thomas S. Williamson, Jr.

Enclosure

2813

**Tolling Agreement**

This Tolling Agreement ("Agreement") is made and entered into by Sharon Killian ("Killian") and the Georgetown Day School ("GDS") (collectively the "Parties").

WHEREAS, Killian is a member of the faculty of the Georgetown Day School who contends that she has been treated in a racially discriminatory and hostile manner with respect to the terms and conditions of her employment at GDS.

WHEREAS, Killian is contemplating filing litigation against GDS asserting claims of discrimination under federal and District of Columbia ("D.C.") laws;

WHEREAS, GDS denies that it or any employee or agent acting on its behalf has engaged in any unlawful discrimination or hostile treatment with respect to the terms and conditions of Killian's employment at GDS.

WHEREAS, the Board of Directors of GDS has authorized its undersigned counsel to obtain consent for a settlement amount from its insurer and to pursue settlement negotiations with the undersigned counsel for Killian.

WHEREAS, the undersigned counsel for Killian and GDS have conferred starting on July 5, 2005 for the purpose of attempting to achieve a negotiated settlement of Killian's claims, and the Parties wish to explore fully the possibilities for settlement before litigation is commenced;

WHEREAS, Killian wishes to preserve for herself all employment-related discrimination claims under D.C. or federal law, that existed as of May 1, 2005, and to avoid a claim by GDS that any statute of limitations or time for filing any administrative charge to satisfy jurisdictional prerequisites applicable to filing suit on such claims has run or that the

2814

doctrine of laches bars suit or recovery based on the passage of time during which the Parties have engaged or may engage in discussions for possible settlement;

WHEREAS, *if successful, the efforts contemplated pursuant to this Tolling Agreement will save both Parties substantial time, money, and inconvenience;*

NOW THEREFORE, in reliance upon this Tolling Agreement, the Parties do hereby STIPULATE AND AGREE *as follows:*

1. GDS agrees to waive completely any defense that an applicable statue of limitations or a deadline for filing a lawsuit or an administrative Charge of Discrimination as a jurisdictional prerequisite has run or expired, any defense of laches, and all other defenses on grounds of timeliness for the period May 1, 2005 through September 30, 2005 (the "Tolling Period"), solely for the claims of employment-related discrimination described above, that may be possessed by Killian against GDS that were still timely as of April 30, 2005, (the day before the start of the Tolling Period). The purpose of this Agreement is to permit the Parties to engage in discussions for possible settlement of their disputes.

2. During this Tolling Period, the running of all statutes of limitation applicable to any District of Columbia Office of Human Rights (DCOHR) or Equal Employment Opportunity Commission ("EEOC") charge of discrimination or any civil action brought under the D.C. Human Rights Act, Title VII, or 42 U.S.C. Section 1981, will be suspended and tolled. *The intent of this Agreement is that during the Tolling Period the Parties will stand in their respective positions and not be prejudiced by the passage of time until the Tolling Period ends on September 30, 2005 or on such later date as the Parties may hereafter agree in writing, signed by counsel for the respective Parties.*

- 2 -

3.    While this Tolling Agreement is in effect, Killian and her undersigned counsel shall not initiate any administrative charges or civil lawsuits against GDS. This Tolling Agreement does not otherwise, except as expressly stated herein, limit GDS's ability to defend against Killian's claims or any claim that may hereafter be asserted on behalf of Killian. The Parties agree that any claim that was barred by an applicable statute of limitations, jurisdictional prerequisite, the doctrine of laches or otherwise before May 1, 2005 is not revived or extended by this Tolling Agreement. GDS does not waive any other substantive or procedural defense to any action filed by Killian. Likewise, except as provided in this Agreement, Killian has not waived any other substantive or procedural right.

4.    This Tolling Agreement shall be binding and hereby is binding upon Killian and GDS and on all of their respective legal representatives, successors, and assigns.

5.    This Tolling Agreement shall not be used as evidence in any proceeding, except (i) by either Party to enforce the terms of this Tolling Agreement or (ii) by Killian solely for the purpose of establishing, if the matter be contested, the timeliness of any Complaint or EEOC/DCOHR charge that may be filed in the future.

6.    This Tolling Agreement contains the entire agreement between the Parties and constitutes the complete, final and exclusive embodiment of their agreement with respect to the subject matter hereof. The terms of this Tolling Agreement are contractual and not a mere recital.

7.    The signatories to this Tolling Agreement represent that they have the requisite authority to bind and act on behalf of the respective Parties for whom and which they sign.

2816

8.    This Tolling Agreement may not be modified expect by a written instrument which explicitly refers to this Tolling Agreement and explicitly purports to modify its terms, and that is signed by all Parties hereto or their counsel.

9.    This Tolling Agreement shall be deemed to have been entered into and shall be construed and enforced in accordance with the laws of the District of Columbia as applied to contracts made and to be performed entirely with the District of Columbia.

10.    This Tolling Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  IN WITNESS WHEREOF, the undersigned have duly authorized and cause this Agreement to be executed.


Dated:  September ___, 2005              By:  _____
                                              John P. Racin, LLC
                                              1721 Lamont Street, NW
                                              Washington, DC  20010-2601

                                              For and on behalf of Sharon Killian



Dated:  September _6_, 2005              By:  _____
                                              Thomas S. Williamson, Jr.
                                              Covington & Burling
                                              1201 Pennsylvania Avenue, NW
                                              Washington, DC  20004-2401

                                              For and on behalf of GDS


- 4 -

# E X H I B I T   4 5

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W.

Washington, D.C. 20010-2601

Telephone: (202) 265-2516

Telecopier: (202) 483-7895

E-Mail: awjrlaw@erols.com

September 29, 2005

VIA MESSENGER

Thomas S. Williamson, Jr., Esq.
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

Re: Sharon Killian & Georgetown Day School

Dear Mr. Williamson:

We appreciate the courtesy represented by the Tolling Agreement proposed earlier this month (signed version enclosed).

We also look forward to working with you further in the matter.

Sincerely,

John P. Racin

Enclosure

cc: Sharon Killian (w/enc.)

2818

**Tolling Agreement**

This Tolling Agreement ("Agreement") is made and entered into by Sharon Killian ("Killian") and the Georgetown Day School ("GDS") (collectively the "Parties").

WHEREAS, Killian is a member of the faculty of the Georgetown Day School who contends that she has been treated in a racially discriminatory and hostile manner with respect to the terms and conditions of her employment at GDS.

WHEREAS, Killian is contemplating filing litigation against GDS asserting claims of discrimination under federal and District of Columbia ("D.C.") laws;

WHEREAS, GDS denies that it or any employee or agent acting on its behalf has engaged in any unlawful discrimination or hostile treatment with respect to the terms and conditions of Killian's employment at GDS.

WHEREAS, the Board of Directors of GDS has authorized its undersigned counsel to obtain consent for a settlement amount from its insurer and to pursue settlement negotiations with the undersigned counsel for Killian.

WHEREAS, the undersigned counsel for Killian and GDS have conferred starting on July 5, 2005 for the purpose of attempting to achieve a negotiated settlement of Killian's claims, and the Parties wish to explore fully the possibilities for settlement before litigation is commenced;

WHEREAS, Killian wishes to preserve for herself all employment-related discrimination claims under D.C. or federal law, that existed as of May 1, 2005, and to avoid a claim by GDS that any statute of limitations or time for filing any administrative charge to satisfy jurisdictional prerequisites applicable to filing suit on such claims has run or that the

doctrine of laches bars suit or recovery based on the passage of time during which the Parties have engaged or may engage in discussions for possible settlement;

WHEREAS, if successful, the efforts contemplated pursuant to this Tolling Agreement will save both Parties substantial time, money, and inconvenience;

NOW THEREFORE, in reliance upon this Tolling Agreement, the Parties do hereby STIPULATE AND AGREE as follows:

1.    GDS agrees to waive completely any defense that an applicable statue of limitations or a deadline for filing a lawsuit or an administrative Charge of Discrimination as a jurisdictional prerequisite has run or expired, any defense of laches, and all other defenses on grounds of timeliness for the period May 1, 2005 through September 30, 2005 (the "Tolling Period"), solely for the claims of employment-related discrimination described above, that may be possessed by Killian against GDS that were still timely as of April 30, 2005, (the day before the start of the Tolling Period). The purpose of this Agreement is to permit the Parties to engage in discussions for possible settlement of their disputes.

2.    During this Tolling Period, the running of all statutes of limitation applicable to any District of Columbia Office of Human Rights (DCOHR) or Equal Employment Opportunity Commission ("EEOC") charge of discrimination or any civil action brought under the D.C. Human Rights Act, Title VII, or 42 U.S.C. Section 1981, will be suspended and tolled. The intent of this Agreement is that during the Tolling Period the Parties will stand in their respective positions and not be prejudiced by the passage of time until the Tolling Period ends on September 30, 2005 or on such later date as the Parties may hereafter agree in writing, signed by counsel for the respective Parties.

2820

3.    While this Tolling Agreement is in effect, Killian and her undersigned counsel shall not initiate any administrative charges or civil lawsuits against GDS. This Tolling Agreement does not otherwise, except as expressly stated herein, limit GDS's ability to defend against Killian's claims or any claim that may hereafter be asserted on behalf of Killian. The Parties agree that any claim that was barred by an applicable statute of limitations, jurisdictional prerequisite, the doctrine of laches or otherwise before May 1, 2005 is not revived or extended by this Tolling Agreement. GDS does not waive any other substantive or procedural defense to any action filed by Killian. Likewise, except as provided in this Agreement, Killian has not waived any other substantive or procedural right.

4.    This Tolling Agreement shall be binding and hereby is binding upon Killian and GDS and on all of their respective legal representatives, successors, and assigns.

5.    This Tolling Agreement shall not be used as evidence in any proceeding, except (i) by either Party to enforce the terms of this Tolling Agreement or (ii) by Killian solely for the purpose of establishing, if the matter be contested, the timeliness of any Complaint or EEOC/DCOHR charge that may be filed in the future.

6.    This Tolling Agreement contains the entire agreement between the Parties and constitutes the complete, final and exclusive embodiment of their agreement with respect to the subject matter hereof. The terms of this Tolling Agreement are contractual and not a mere recital.

7.    The signatories to this Tolling Agreement represent that they have the requisite authority to bind and act on behalf of the respective Parties for whom and which they sign.

- 3 -

2821

8.      This Tolling Agreement may not be modified expect by a written instrument which explicitly refers to this Tolling Agreement and explicitly purports to modify its terms, and that is signed by all Parties hereto or their counsel.

9.      This Tolling Agreement shall be deemed to have been entered into and shall be construed and enforced in accordance with the laws of the District of Columbia as applied to contracts made and to be performed entirely with the District of Columbia.

10.     This Tolling Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  IN WITNESS WHEREOF, the undersigned have duly authorized and cause this Agreement to be executed.


Dated: September 29, 2005          By: _____

                                   John P. Racin, LLC
                                   1721 Lamont Street, NW
                                   Washington, DC  20010-2601

                                   For and on behalf of Sharon Killian



Dated: September 6, 2005           By: _____

                                   Thomas S. Williamson, Jr.
                                   Covington & Burling
                                   1201 Pennsylvania Avenue, NW
                                   Washington, DC  20004-2401

                                   For and on behalf of GDS


- 4 -

2822

# E X H I B I T   4 6

**From:** "Sharon Killian" <skillian@gds.org>
**Date:** Wed Feb 9, 2005  5:26:06  AM America/Chicago
**To:** kbarr@gds.org
**Cc:** skillian@gds.org
**Subject:** department property

Dear Kevin:

I continue to be troubled by the incident with Laura Tolliver last week. Laura all but accused me of I stealing a camera I returned to her in December. It is obviously hurtful to have a colleague imply such a thing, though I've long since concluded that hostile treatment from Laura is not going to change. What really must change is the sense of entitlement that Laura directs toward me, and that has long marked her treatment of department property when it comes to me.

The camera I used was a department camera that Laura treats as her own. She keeps it secured by a lock only she can open, requiring me to ask permission and account for its use. This and similar practices in the department have been imposed on me for many years and I'm not sure why I put up with them as much as I do - but it's past time for a change. I ask that you notify Laura that as a colleague, I am free to use any department property without her permission, provided it is not being actively used in a class. Also, please let her know she needs to have cameras and other department property made equally accessable, in storage arrangements and access by key for example.

Sharon



EXHIBIT
Barr 2
Date: 9-26-06
Reporter: Donna Q. Buckhaults

122

**From:** "Kevin Barr" <kbarr@gds.org>
**Date:** Wed Feb 9, 2005  8:14:58  AM America/Chicago
**To:** skillian@cox.net, skillian@gds.org
**Cc:** nryan@gds.org, ltolliver@gds.org
**Subject:** Re: department property

Dear Sharon,

I appreciate your concern over the use of equipment.  As you know, the
practice of keeping equipment purchased through the Capitol Budget for
specific classes under lock and key was done to ensure its availability
for student use.  I am open, as I know Nick is, to a discussion of whether
there is a better system for keeping track of such equipment. Let's find a
time that the four of us can meet to discuss options today or tomorrow.

Kevin

**12**

**From:** "Nick Ryan" <nryan@gds.org>
**Date:** Thu Feb 10, 2005  8:26:00  AM America/Chicago
**To:** skillian@cox.net, skillian@gds.org, ltolliver@gds.org, bruble@gds.org, kbarr@gds.org, tyoder@gds.org
**Subject:** Keys to the Digital Camera Storage Units in Mac Lab

RE: Keys to the Digital Camera Storage Units in Mac-Lab
After talking with Bruce about the keys to the cameras in the Mac-Lab we
jointly came to the conclusion that I should hold the second key. Bruce
already has an enormous quantity of equipment to keep track of and the
addition of pieces outside his department seems an unreasonable burden.
Ideally needs for classes can be anticipated well in advance, however, in
those instances when there is no equipment available through the
Technology Office Laura and I will hold keys to the camera storage units
and we will sign cameras out and back in, but for short durations only.
Thanks,
Nick

Nick Ryan
Chair - Art Dept.
Georgetown Day High School
4200 Davenport Street NW
Washington, DC 20016
202-274-3258

124

# EXHIBIT 47

# LAW OFFICE OF JOHN P. RACIN, LLC

1721 Lamont Street, N.W.

Washington, D.C. 20010-2601

Telephone: (202) 265-2516

Telecopier: (202) 483-7895

E-Mail: awjrlaw@erols.com

February 9, 2005

VIA REGULAR MAIL AND FACSIMILE TO (202) 530.0703

Caryn Pass, Esq.
Krupin & O'Brien LLP
1156 15th Street, N.W. Suite 200
Washington, D.C. 20005

Re: Sharon Killian & GDS

Dear Caryn:

I write to report continuing problems that seem to us part and parcel of the hostile environment Sharon Killian has long endured at GDS. Last week her colleague Laura Tolliver all but accused her of stealing a camera.

The suggestion was outlandish - Ms. Killian's integrity is obviously above reproach, and she returned the camera in December - but troubling nonetheless. For starters, Ms. Tolliver must be aware of the pending investigation resulting from Ms. Killian's strong belief racism has been at work in the school. A normal person - at least one free of incredible arrogance, deep-seated personal animus and/or sense of absolute job security - would take care not to offend during such a sensitive period.

Moreover, the camera in question is department property. Ms. Tolliver simply treats it as her own, thereby requiring others to "borrow" (and, at least if Ms. Killian, confront the implication of theft if Tolliver somehow overlooks its return). Proprietary treatment of property is a departmental practice Ms. Killian now seeks to change (enclosure). She has long ceased hoping for a change in Laura Tolliver.

In any event, ongoing problems of this kind, and the emotional toll they continue to exact, make it imperative the parties either come to an informal resolution soon, or simply agree Ms. Killian should seek resolution of the controversy elsewhere.

Caryn Pass, Esq.
February 9, 2005
Page 2

Thank you for your assistance.

Sincerely,

John P. Racin

Enclosure

cc: Sharon Killian



Wednesday, February 09, 2005 6:26:06 AM
Message

| | |
|---|---|
| From: | "Sharon Killian" <skillian@gds.org> |
| Subject: | department property |
| To: | kbarr@gds.org |
| Cc: | Sharon Killian |

Dear Kevin:

    I continue to be troubled by the incident with Laura Tolliver last week. Laura all but accused me of I stealing a camera I returned to her in December. It is obviously hurtful to have a colleague imply such a thing, though I've long since concluded that hostile treatment from Laura is not going to change. What really must change is the sense of entitlement that Laura directs toward me, and that has long marked her treatment of department property when it comes to me.

    The camera I used was a department camera that Laura treats as her own. She keeps it secured by a lock only she can open, requiring me to ask permission and account for its use. This and similar practices in the department have been imposed on me for many years and I'm not sure why I put up with them as much as I do - but it's past time for a change. I ask that you notify Laura that as a colleague, I am free to use any department property without her permission, provided it is not being actively used in a class. Also, please let her know she needs to have cameras and other department property made equally accessible, in storage arrangements and access by key for example.

Sharon

# EXHIBIT 48



Note:
- wording was changed
by GDS after Wednesday's
edition came out to
be "long-term sub"

Sunday, Sept 4

# E X H I B I T   4 9

 Wednesday, March 06, 2002 8:11:16 AM
Message

| From: | Nick Ryan |

| Subject: | Message from Nick |

| To: | Paul Levy |

Re: Personnel issues
Teacher: Sharon Killian
Date: Tuesday, March 5th, 2002

I am writing this summary of events at 6:30pm on Tuesday, March 5th while the matter
is still fresh in my mind. The history leading to this afternoon's discussion with Sharon
Killian began on Friday, February 22 when Sharon neglected to notify me that she was
feeling ill and would not be in school to teacher her classes that day (an E –day). I
covered Sharon's first period photography class and excused the matter as a one-time
slipup. Additionally, over the weekend Sharon evidently came into school and removed
a student's photography exhibit (Jon Kelman's) from the first floor display boards and
hung artwork from the Ramee Art Gallery in its place (in anticipation of the BCC
assembly the following Friday, March 1st) I arrived at school at 7:30am Monday and
encountered banners from a weekend dance hanging from the art room windows and
riser steps in the art studio gallery that evidently were in the process of being painted –
clearly an unfinished student project from the weekend. Since it was windy and the
dance was over George Buckwalter and I removed the tattered dance banners from the
art room windows – I thought little of this, students often use art room materials for
school events so this was nothing unusual. I was in a rush to get ready for my
photography class at 8:15am, a few students were already showing up, so I neglected to
put the paper banners in the trashcans. I honestly had other things to attend to – such as
mixing chemicals (fixer) and setting up the darkroom photographic trays for my class.
George and I noted that students who painted the steps had tracked a small amount of
black paint onto the floor. I was not happy about the steps and paint on the floor, but
again this use of the facility over the weekend was fairly typical and I assumed there
was a reasonable explanation. Brandon Jackson-Baird, one of my photo students, told
me the BCC had painted the steps and that Sharon had granted permission (I doubted
Sharon had said to use the gallery area, but students being students these things happen).
Sometime after 8am Sharon arrived in the art room and asked about the banners on the
floor and the riser steps. I passed on what I knew and shrugged – I said George and I
had taken the paper banners in and apologized that I hadn't managed to put them in the
trash yet, but I recall adding that it was 'no big deal.' All in all I thought no harm done –
Sharon and I had both looked at the steps and noted the paint on the floor – she seemed
far more concerned than I – she even remarked that, "they should have done that in the
drama work area". After my photography class while returning to my desk I overheard
Sharon asking someone (I presume George Buckwalter) to remove the steps from the

2866

gallery. Shortly thereafter I mentioned to Sharon that Laura Tolliver was probably unhappy that an art exhibit of one of her students had been taken down after only being up for three days. It seemed to me that Sharon had neglected to inform anyone of her intension to change the first floor display during our art department meeting earlier that week (my recollection is we met either on Monday or Tuesday during lunch). I quite gently suggested that she might want to speak with Laura and try and smooth things over. I added that she needed to be more forthcoming and that simply taking down a student's display was hurtful to the student as well as Laura with whom Sharon has a marginal collegial relationship. Sharon's response was terse and certainly did not acknowledge that an underlying problem between she and Laura had been exacerbated. I waited a bit then asked whether I had missed a voice mail message from Sharon about her absence from school on Friday. As I best can recall her response was almost hostile – along the lines of "I had only one class and what happened?" I said I covered the class and let the matter rest – I could sense Sharon was getting emotional and in fact she started to cry. Realizing that she was feeling vulnerable I rose to comfort her – placing my hands on her shoulders and saying: "Sharon don't worry about it – none of this was a big deal – you were feeling sick, you lost a family member – in the grand scheme of things family always comes first". She calmed down and seemed okay and I passed all of it off to her continuing anxiety and feelings of loss from her brother's death earlier that month. The remainder of the day appeared to go smoothly. Tuesday I noticed Sharon was distant with Laura and I. I was busy getting ready for a visiting artist I had scheduled for my ceramics classes 7 & 8 periods that day. At the conclusion of the day (Laura had evidently left early - not sure of exact time – probably between 2-3pm – her son was sick). When I emerged from the ceramics room and started my end of the day check of facilities I encountered a darkroom left in disarray. Water left on, print dryer running, trays with photos in them, and three boxes of photographic paper left open and therefore exposed to light and ruined. I was frankly angry that my two department colleagues had in my mind abandoned the facility and no one had spoken to me before leaving about any need to leave urgently. I checked the schedule and saw Laura had a class period 6 followed by Sharon period 8. I assumed each had 'passed the buck' and assumed the other would cleanup. It is a pattern of behavior that has occurred many times before in other instances with each person unwilling to accept responsibility. I closed the facility, but left the mess because I thought a point needed to be made. When I came into school on Wednesday I sent the same email to both Laura and Sharon and said the exact same thing to each. I was angry, but I was quite careful to chose my words carefully and let each person know that I was tired of "babysitting the department" – "cleaning up messes" – and "playing intermediary between adults who were clearly blaming one another for matters that were their own responsibility." For the remainder of the day neither Laura nor Sharon spoke to me. Thursday when I came in both were continuing to be distant. I told Sharon that Kendal, our student intern had called about 7:45 to indicate she was caught in traffic and would be late. Once Kendal arrived I asked Kendal, Sharon, and Laura to decide upon a time for setting up the photography exhibition Sunday at the Corcoran. I said I was available anytime that was convenient to them. At about 11am I returned to the art room Sharon and Kendal were

talking and I asked what had been decided about setting up the show. Sharon tersely said "1-2pm." And I said "which is it 1 or 2"? She replied in a very hostile tone that she didn't know yet. To me it seemed once again that Laura and Sharon weren't communicating and even the simplest thing would require me running between the two to figure it out. I was fed up. I felt Sharon's tone of voice was hostile and as dept. head I deserved more respect and consideration. In addressing Sharon I said "you both need to work it out and start communicating" and Sharon responded that "there must be something wrong with you – there must be something in your personal life." I was hurt and walked out of the facility feeling betrayed and attacked by someone I had shown support and consideration with for the past year and a half. I searched out Norrine to get some support, and simultaneously encountered Laura. I shared my frustrations, Laura shared hers, and we had a good talk about what needed to change. I felt supported, but still faced with a difficult situation. Later that day I spoke with Paul Levy, principal, and shared this sequence of events and my feelings of frustration. Paul was supportive and offered some good advice about setting clear expectations and suggested I begin documenting everything. Sunday the Corcoran show was hung with no incident and I was hopeful that matters would gradually improve. Monday I spoke with Helen Steinberg, school psychologist about how to best deal with the situation. I felt I needed some advice on how to defuse the hostility Sharon was continuing to exhibit. It was a good discussion and Helen advised I give Sharon some time, which was my natural inclination – after all the lines of communication were beginning to open – although I was the one offering the olive branches. Tuesday, March 5th at about 4pm as I sat at my desk Sharon sent me an email. We had both been making and receiving phone calls about various matters. I turned to her and said shall we talk about this? She said, "why don't you just read the email". I did and she left the room. When she returned I said, "how about we talk. You know Sharon I don't want to be your enemy." I then refuted her email version of the past two-week's events, but she was adamant that her version of events was right and I was the one attacking her. She added again "there must be something wrong with you – there must be something going wrong in your personal life." The conversation went on for 30 minutes in which I made clear to her point by point that the version of events as she portrayed them was wrong and that I would not accept that I took a hostile tone Monday about the risers, banners, artwork, and absence on Friday. Sharon became more agitated and I frankly grew nervous that if things continued we would never be able to repair the breech. In so many words I told her I felt *I needed someone to document/observe the discussion we were having* – that the truth was being distorted and I would no longer listen to her version of events. I said I felt deeply betrayed and walked out of the office and headed straight to Paul Levy's office where I recounted the interaction and these events to Paul and Tom Yoder, who was also present. I found them both to be very supportive. I took their advice to document/summarize the events as best I could immediately and I believe I have done this as objectively as possible here.

An addition, Wednesday morning 8am:
This morning upon re-reading Sharon's email I am stunned by the approach. I can find

no basis to accept her version of events on Monday - I feel like every possible attempt has been made to misrepresent my thoughts and words and I am frankly deeply concerned.

# EXHIBIT 50

March 1, 2002

As you may recall, this is my first week back to school since February 4th when I learned of my brother's death and Tuesday, February 19th when I had to leave school with a terrible case of the flu.

This Monday morning when I arrived and before I was able to remove my coat you reprimanded me with the admonition that Laura is angry because I took down her student's work from the first floor display areas and put up other work without her permission. I told you that I came in on Saturday to put up the work in honor of Black History Month. I explained that this wasn't enough, you badgered me to tears. On Monday morning I learned that you were also angry with me for allowing the Black Culture Club students to paint in the art gallery and to hang banners from the studio windows about the dance the previous Saturday. I tried to remind you that I was sick, in bed, all last week and couldn't have given permission for painting in the gallery or even in the studio.

Later on Monday as I sat at my desk, two calls rang on Laura's cell phone. I went to her class to retrieve her because when her cell rings its usually one of her children calling. She immediately came to the office and saw that it was indeed her son, Dylan calling and he was sick. When she left the darkroom in disarray -- she dried the prints from the wash during part of my class -- I assumed that she had to pick up Dylan from school. Only some of my students needed to print and they worked around the mess.

I left the print processing trays in tact because Laura allows certain students to work after hours. Since we were preparing for the Corcoran exhibit, I thought this was a likely scenario. Although I left the boxes of paper where they laid, I covered each and every one and turned off the water before I left to see about my own sick child who had stayed home from school. I also knew that I had the first class in photography on Tuesday morning (Feb 26) and would not hinder your progress.

My honest thoughts at 8am Tuesday morning was not that I would be screamed at by my chairperson about how much Laura and I get on your nerves, about the state of the darkroom or anything else. GDS has always shown kindness and understanding toward working parents and their children and so I hadn't any second thoughts about my decisions of the night before. It would be a mistake for this policy to change.

**070**