UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN                          )
                                        )
            Plaintiff                   )
                                        )
      v.                                )      Civil Action No. 05-1925 (EGS)
                                        )
GEORGETOWN DAY SCHOOL                   )
                                        )
            Defendant.                  )
_____ )

MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I. INTRODUCTION

The Georgetown Day School ("GDS" or "the School") presents a straightforward case for

summary judgment:  Sharon Killian is a wonderful teacher who performed in exemplary fashion

in the High School Art Department throughout her employment at GDS.  She was compensated

and otherwise treated fairly in economic and other material terms, and cannot demonstrate that

despair deriving from relationships within the Department was attributable to a racially abusive

work environment, just as she cannot demonstrate that inability to return to School for the 2005-

06 academic year was attributable to a hostile environment in the Art Department grown utterly

intolerable.

This tidy scenario bears little resemblance to the reality of Mrs. Killian's experience at

GDS, and ignores the School's utter and willful failure to address serious allegations of racial

discrimination in the Art Department.  The record shows that Mrs. Killian's tenure there was

marked by rude, demeaning and otherwise abusive treatment of varying intensity, punctuated by

several instances of truly outrageous conduct on the part of the Department Chair Nick Ryan,

which for present purposes leaves little doubt that Mrs. Killian's race was the motivating factor;
and that the conduct involved was sufficiently severe, pervasive and ultimately intolerable to
permit a jury to find for Mrs Killan with respect to each of her claims against the School.

The record also shows responsible officials at GDS were aware of racist conduct in the
Art Department and elsewhere in the School, but, rather than take meaningful action to
investigate or otherwise address the serious issues involved, either did nothing or devoted their
energies to protecting the School against potential liability.

For example, Elizabeth Denevi, a white person and one of the School's "Co-Directors of
Diversity" (also "diversity coordinators"), testified that during her tenure at GDS she personally
has never heard a single report of racist conduct. ("Q.  Have you ... had reports of discriminatory
conduct ...?  A. ... No, not to me personally").  Exhibit ("Ex.") 1, Deposition of Elizabeth Denevi
at 26.  Yet Anike Oliver, a teacher in the Math Department at the High School for five years and
now a Ph.D. candidate at Howard University, has furnished an Affidavit in which she reports in
part that "I also went to Ms. Denevi on a number of occasions to complain about what I believed
to be instances of racism in the high school.  Ms. Denevi almost invariably agreed and routinely
answered, 'Yes, I know, my people *are* racist.'" (emphasis in original). Ex. 2, Affidavit of Anike
Oliver, ¶ 7.

Ms. Denevi also testified she agreed with a decision the Head of School Peter Branch
rendered during the relevant period to expel an African American male student.  Ex. 1, Denevi
Deposition at 76 ("My opinion was that it was the right decision").  It is undisputed the student
involved nonetheless obtained reinstatement and graduated with his class in the Spring of 2004
after bringing a lawsuit alleging claims of racial bias.  Ex. 2, Oliver Affidavit, ¶¶ 7-8.

Far from agreeing with the expulsion decision, the record shows **both** the School's Co-Directors of Diversity actually agreed with Ms. Oliver's assessment that the decision to expel the African American student was fundamentally racist.  Ex. 2, Oliver Affidavit, ¶ 9 ("Ms. (Mariama) Richards and Ms. Denevi both said they agreed, and did not think the student would have been expelled if he had been white."[1])

In February 2004, the very period the expulsion decision was under challenge, Mrs. Killian reported grossly offensive and racist conduct on the part of the Department Chair Mr. Ryan (whom she described as saying, "Sharon, I can't bend down low enough to the ground to understand you," while bending low in his chair and making ape-like gestures, Ex. 3, Deposition of Sharon Killian at 302).  The evidence shows that Ms. Denevi and Ms. Richards, rather than undertake a meaningful investigation, instead engaged in a sham "mediation" process in which they did not trouble to document the conduct reported by Mrs. Killian, while troubling to describe Mr. Ryan's account.  Ex. 5 (Elizabeth Denevi "Mediation" Notes, Bates 2792); Ex. 6 (Mariama Richards "Mediation" Notes, Bates 2852 ("Did not feel like it was her business"). Indeed, the diversity coordinators did not even inform Mrs. Killian what Mr. Ryan himself said about the episode (Mrs. Killian was not aware of Mr. Ryan's account until discovery in this lawsuit. Ex. 4, Killian Affidavit, ¶ 4). Yet they both had to know Mrs. Killian "was confronting the frightening prospect of daily contact in the Art Department with someone in authority ... [she] believed had engaged in grossly offensive conduct.  It is difficult ... to believe

---

[1]These are "statement[s] by a party's agent or servant concerning a matter with the scope of agency or employment, made during the existence of the relationship, Fed.R.Evid. 801(d)(2)(D), and as such represent the admissions of a party opponent.  See Saunders v. George Washington University, 768 F.Supp. 843, 869 (D.D.C. 1991).

they would have withheld information that might help allay [her] fears if they actually found the information to be remotely plausible."  Ex. 4, Killian Affidavit, ¶ 7.

As part of what the record suggests have been persistent efforts to protect the School rather than address allegations of discriminatory conduct in a meaningful way, the Co-Directors of Diversity also testified Mrs. Killian told them she did not believe Mr. Ryan's conduct to have been racist!  Ex. 1, Denevi Deposition at 85; Ex. 7, Deposition of Mariama Richards at 43.

The record shows efforts to safeguard the School against claims of racial discrimination that have extended beyond a failure to see, hear or speak anything adverse.  They have included efforts to deny victims of alleged racism access to potential witnesses or relevant information by fostering an atmosphere of coercion and intimidation:  During the course of the challenge undertaken by the African American student, the record shows the Administration specifically directed  that "no faculty or staff should engage in conversation with [the student's] family, their lawyers, or the media." Ex. 8 (Email re "Dept. Heads Mtg. Update", February 26, 2004); Ex. 2, Oliver Affidavit, ¶ 10 ("the Administration warned faculty and staff against having any contact with the student, his family, or their lawyers.  This made me very uncomfortable, in that it seemed to me the student should have the same access to information as the School would have in defending the decision").

When Mrs. Killian brought this lawsuit, the School's lawyer met with faculty and staff. As Ms. Oliver has described it, "[M]ost non-lawyers listening to the School's attorney the day I heard him would have assumed as I did that if they were unable to support the School, they would have to hire an attorney.  I left the meeting that day feeling intimidated, and I know other

faculty, especially minority faculty, felt intimidated too because they told me after the meeting that they were intimidated". Id., ¶ 12.

Thus, as we proceed to demonstrate at greater length, the record shows abusive conduct on the basis of race sufficiently severe, pervasive and ultimately intolerable to warrant trial on the merits of hostile environment and constructive discharge claims against the School.  Evidence of the School's sytematic efforts to thwart claims of discriminatory conduct rather than address them in any meaningful fashion also undermines any affirmative defense based on the contention that complaint procedures worthy of the designation were in place, or that Mrs. Killian unreasonably failed to take advantage of a meaningful process for addressing claims of discrimination at the Georgetown Day School.

## II.  THE RECORD

### A.  Debbie Haynes Era: 1994-2000[2]

Mrs. Killian worked as a substitute in the Art Department before being hired for a regular teaching position in 1995.  Her colleagues at the time were Debbie Haynes, the Department Chair, and Laura Tolliver.  Haynes and Tolliver are white, and had taught at the School for a number of years.  They have also been related by marriage and are "close friends." Ex. 9, Deposition of Laura Tolliver at 13.

Mrs. Killian testified that relationships in the Department early on were fairly good, but soured over time.  It was her sense the change took place because, with increased experience, she

_____

[2]The years refer to the period Mrs. Killian was in the Department while Ms. Haynes was Chair.

would look to her  colleagues for guidance on a less frequent basis. During the course of an effort

to mediate emerging difficulties in the Department, Ms. Haynes and Ms. Tolliver said they "liked

[Mrs. Killian] better when [she] asked them how to do this or that," Ex. 3. Killian Deposition at

561, which she understood meant when she "knew [her] place."  Ibid.

Problems in the Art Department eventually became such that in March 1997, Mrs. Killian

wrote the Assistant Head of School (copying the Head of School Peter Branch) to report as

follows:

> "[F]or every attempt at independent thought and action within the quite acceptable
> confines of the core curriculum, I have been met with crude, abusive and
> unwarranted belittling by Debbie and Laura.  I am convinced no other teacher in
> the high school is required to perform under such conditions.... Is it because
> Debbie and Laura are sisters-in-law with relatives in common nepotism rears its
> ugly head?  Is because, as both Debbie and Laura say, the art studio space belongs
> to them and I am an outsider and so must not be comfortable to use any space or
> thing within it without their express permission?  Is it because Debbie and Laura
> have held their territory for sixteen years together and now cannot share space that
> is already activity specific?  Is it because I am black and therefore thought to be
> somehow "lesser.""

Ex. 10 (Sharon Killian to Walter Ailes, March 16, 1997)

There is no evidence the School acted to address the disparities identified by Mrs. Killian

in any meaningful way, or that Mrs. Killian had any cause for regret when deepening personal

problems led the School to replace Ms. Haynes as Department Chair at the beginning of the

2000-01 academic year.  Mrs. Killian had to have high hopes a new Chair would mean a fresh

start in the Art Department.

### B.  Nick Ryan's Tenure as Chair of Art Department

#### 1.  Deborah Haynes Award for Excellence and Achievement in Studio Art

Nick Ryan replaced Debbie Haynes, who stayed on as a teacher in the Department before

leaving the School at the end of the 2000-01 academic year.  It is undisputed that within a short time of Ms. Haynes' departure from the School, Mr. Ryan arranged to have an award in the Department named for someone he knew at the very least had a "strained" relationship with Mrs. Killian.  Mr. Ryan knew full well such an award would mean that annually Mrs. Killian would be compelled to nominate her most deserving students for the "Deborah Haynes Award for Excellence and Achievement in Studio Art." Ex. 11 (Nick Ryan to Sharon Killian and Laura Tolliver Re "Art Awards 2002").  As we have said, he also knew full well that relations between Ms. Haynes and Mrs. Killian had been "strained," Ex. 12, Deposition of Nick Ryan at 14, while on the other hand knew Ms. Haynes and Ms. Tolliver had a "good relationship" and had somehow "been related".  Id. at 13.

The record also suggests Mr. Ryan knew full well Ms. Haynes had done "terrible things" while at the School.  The phrase appears in the notes ("Debbie ... did do terrible things") taken by Elizabeth Denevi during the sham effort at "mediation" that took place following Mrs. Killian's subsequent report of racist conduct by Mr. Ryan.  Ex. 5 (Denevi Mediation Notes, Bates 2788).[3] Ms. Denevi confirmed "[t]hat was what Nick said to us ...", Ex. 1, Denevi Deposition at 49, but said "I don't remember Nick elaborating what they were." Id. at 50.

For his part Mr. Ryan denied knowing Debbie Haynes had done any "terrible things", or telling the School's diversity coordinators she had done so.  Ex. 12, Ryan Deposition at 102.  However, for present purposes it is reasonable to infer that shortly after her departure Mr. Ryan arranged to have Ms. Haynes honored with a prestigious student award, despite having

---

[3]Appearing on the same page is bracketed language to the effect Mr. Ryan said that "Sharon [and] Debbie did not speak", suggesting he was aware the relationship between the two was worse than "strained."

knowledge she had done "terrible things" while at the School, and despite having knowledge

such an award would risk alienating and causing Mrs. Killian continuing discomfiture.  That

Laura Tolliver was unlikely to object to such an honorific for her friend suggests that Mr. Ryan

was quite willing to please a white colleague at the risk of causing continuing discomfort to the

lone African American in the Department.

The record also shows that, in the matter of the Haynes Award, Mr. Ryan "didn't think it

was any of Sharon's business", Ex. 5 (Denevi Notes, Bates 2790), language appearing in Ms.

Richards' notes as well.  Ex. 6 (Richards Notes, Bates 2852 ("Did not feel like it was her

business").

Yet Mr. Ryan was relatively new to the School, Mrs. Killian had a long history in the

Department and with Ms. Haynes, and such an honor clearly  risked disappointing and alienating

the lone African American in the Department, while at the same time was certain to please

Laura Tolliver.

We submit the matter of the Haynes Award is an important example of Mr. Ryan's  sense

of "white privilege", the malady reported to afflict him by no less an authority than Elizabeth

Denevi, the School's Co-Director of Diversity.[4]  Ms. Denevi acknowledged explaining Mr.

Ryan's conduct to Mrs. Killian by reference to the phrase, Ex. 1, Denevi Deposition at 28-29,

while Mrs. Killian testified the School's Co-Directors of Diversity went further, saying that Mr.

Ryan had a "sense of white superiority and privilege."  Ex. 3, Killian Deposition at 164.

The exchange echoes a discussion between Ms. Denevi and Rosa Grillo, an Afro-

---

[4]Ms. Denevi made clear her view Mr. Ryan is not unique, saying "white privilege
is everywhere....  It's a function of American society...."  Id. At 28.

Hispanic GDS parent whose affidavit documents a conversation she had with Mr. Ryan during

the 2003-04 academic year in which he yelled  at her in a manner she attributed to, and reported

to School officials including Ms. Denevi as racism:

> 2.  My daughter Nina is a 2004 graduate of the Georgetown Day School.
> During Nina's four years at GDS high school Nick Ryan served as her advisor.  In
> November 2003 during Nina's senior year I spoke with Mr. Ryan about Nina.  He
> became very angry during the conversation, and at one point screamed at me.  I
> was shocked that he exhibited what I perceived as presumed superiority.
> 3.  I simply could not imagine Mr. Ryan screaming at a white parent.  I
> went to see Elizabeth Denevi, one of the School's co-directors of diversity, or
> "diversity coordinators".  While Mr. Ryan exhibited superiority, it was clear that
> our discussion had struck a raw nerve.  Ms. Denevi confirmed my suspicion that
> Mr. Ryan was being challenged on diversity on other fronts, and that my
> complaint was not the first one heard.  She volunteered the information that he
> had resisted participating in a workshop on "white privilege", a phrase used to
> describe the sense of inherent superiority still affecting too many among our
> society's white majority.   She stated that Mr. Ryan would state that he did not
> have a problem with others, that he saw all persons as the same, that he was not
> bigoted.  (To see all people as the same is directly contradictory to accepting
> diversity – and differences in others.) I knew Ms. Denevi fairly well:  I was one of
> five parents who served as points of contact with the diversity coordinators, and
> had discussed issues of diversity at the School with her.  When I reported Mr.
> Ryan's behavior, and said he would not have screamed at a white parent, Ms.
> Denevi's response left no doubt she agreed.
> 4.  On December 4, 2003, rather than documenting his file, at a meeting
> that I requested, I reported the episode to the Principal of the High School Paul
> Levy, the Vice-Principal Tom Yoder, and to I made clear to both of them I did not
> believe Mr. Ryan would have behaved in the same manner with a white parent.  I
> expressed my regret that I had not seen his true feelings before, and that my
> daughter's high school experience was adversely affected by having as an advisor,
> one who thought she was inferior to other students.   Latent bigotry can be more
> harmful than more overt expressions of superiority.   (When I asked my daughter
> about her recent contacts with Mr. Ryan, she said that he would say, "Why can't
> you be like [a white child confronting issues like Nina]?")

Ex. 13, Affidavit of Rosa Grillo, ¶¶ 2-4.

Thus the record shows that Ms. Denevi was aware Mr. Ryan had screamed at another

person of color associated with the School, and **agreed** with her that race was the motivating

factor in the conduct.[5]  At the same time there is no evidence in the record that Mr. Ryan has ever

screamed at Laura Tolliver or at any other white person associated with the School during his

tenure at the School.  Ex. 9, Tolliver Deposition at 30.

## 2..  Black History Month: February 2002

The record shows that February 2002 was a very difficult time for Mrs. Killian, and that

as a result she was unable to display relevant artwork in the School throughout Black History

Month as had been her custom.  As she explained,

> A.  I think it was for the past four or five years I have invited the owner of Remy
> Art Gallery to help us to celebrate Black History Month, and how she did that was
> by bringing original artwork to the school for me and hang them on the first floor
> right in the entryway.  So that parents, teachers and so on would get another feel.
> Would get to see the works of African American artists or artists who -- who
> enhanced African American artwork or the visible reputation of African
> American's, especially for that time of year, you know, that month.
>
> * * * * *
>
> A.  And I had been very, very busy.   Very busy  that February.   My brother died
> that year, that February month and so I wasn't able to get the works up for the
> entire month.   Edith Buffalo said we can do it. We can still do it for the rest of
> February.   My  husband helped me to go pick up the works, bring them out to the
> school.   Laura [Tolliver] was gone, and he helped me put the works up on the
> first floor.  It wasn't even as substantial as I would have normally done, but that's
> the only reason I took the students work down.   I assumed, you know, I didn't
> have to call her at home about this.   That it would be  okay to take down the
> students' work and, you know, the kids' work. * * *

Ex. 3, Killian Deposition at 195-97.

Laura Tolliver testified it was "not a big deal in my eyes" that Mrs. Killian had taken

down the student artwork, and she did not remember saying anything to Mr. Ryan about it.

Ex. 9, Tolliver Deposition at 24-25.

---

[5]Ms. Denevi had no memory of such a conversation with with Ms. Grillo, Ex. 1, Denevi
Deposition at 29-31; nor did the School's Vice-Principal Tom Yoder at 7-8.

However, taking down student artwork without permission in this instance was a very big

deal in Mr. Ryan's eyes, despite the extenuating circumstances of a brother's recent death and the

context of Black History Month, and despite the fact that "[Mr. Ryan has] taken down [Laura

Tolliver's] things without asking."  Ex. 3, Killian Deposition at 197.

The record shows that, when he saw the new display on his arrival at School the

following Monday morning (February 25, 2002), Mr. Ryan went immediately to the Art

Department, where banners created by members of the School's Black Culture Club were

hanging from the windows.  Mr. Ryan testified that he and the School custodian "pulled the

banners in, put them on the floor.... [W]e might have just left them on the floor.  It's hard to say

which the - I know one was just left basically intact on the floor.  And then I had to go mix

[chemicals] - for the beginning of class ...."  Ex. 12, Ryan Deposition at 30.

Mrs. Killian testified to the following scene in the Art Department:

A. ... I came in in the morning and [the banners] were strewn all over.
* * * * *
Q.  If you were not present when the work was taken down, how is it that you
know he tore it down and threw it on the floor.
A.  Because the were ripped and torn, and then he was also throwing – he starts to
pick them up, picks some up and throws them in the trash.  So I assumed he was.
They looked like they were ripped and they were torn.  He ripped them off and
and tore them down, yeah, and he I believe said he did that.

Ex. 3, Killian Deposition at 183-84.

Mrs. Killian also testified that when she asked about what she encountered, "[H]e was

pretty upset about it, that I would even ask and screamed and marched very quickly back and

forth through the studio."  Id. at 186.

Mrs. Killian documented the encounter in an email to Mr. Ryan of March 5, 2002, but not

-11-

before running it by Vernese Edghill, the School's Director of Diversity at the time.  Ex. 15

(Killian Draft, March 4, 2002).  As explained by Mrs. Killian, she had gone to Ms. Edghill a

number of times to complain about abusive treatment from Mr. Ryan.  Indeed, Ms. Edghill had

sent her to the principal of the School Paul Levy several times, and informed Mrs. Killian she

herself had reported problems in the Art Department to Mr. Levy that Ms. Edghill attributed to

racist attitudes on Mr. Ryan's part.  Ex. 3, Killian Affidavit, ¶¶ 11-12.  Ms. Edghill confirms the

same in her Affidavit.  Ex. 24, Affidavit of Vernese Edghill (" ... I encouraged Mrs. Killian

several times to discuss her concerns with the principal of the School Paul Levy, and believe she

did so, because she reported back in each instance the results had not been satisfactory. * * *

I also spoke with Mr. Levy myself on several occasions to let him know I also thought that the

problems in the Art Department were attributable to racist attitudes and conduct on the part of

Mr. Ryan").

     Once Ms. Edghill weighed in on the draft, Mrs. Killian forwarded the email to Mr. Ryan,

saying in part,

> I understand that you were angry about all the activity surrounding the Black
> Culture Club use of the art studio in preparation for the assembly on Friday.  You
> seem to have assumed that I gave permission to the faculty and students to use the
> space even though I was not at the school ...  Nick, the tantrum that you had,
> tearing down the posters and leaving them all over the floor of the art room was
> an inappropriate response and your blaming me without question was wrong -
> even if I had told the BCC [Black Culture Club] they could use the art room to
> paint and hang in the window their posters for the dance.
>
> You were also angry about my taking down Laura's student's work from the first
> floor lobby to put up artwork in commemoration of Black History Month.  You
> said I did not get permission from Laura in advance during our department
> meeting at break on Thursday, Feb. 19.  I was under the impression that you both
> knew that February was Black History Month and that I would want to put
> something up on the first floor for the BCC multi-school dance and before the

month expired, in any event.  I didn't anticipate being out sick for the rest of that
week.  I will try not to let that happen again....

Ex. 16 (Sharon Killian to Nick Ryan, March 5, 2002)

The email from Mrs. Killian prompted Mr. Ryan to prepare a response the following

morning, which he then emailed, not to Mrs. Killian, but to the principal of the School Mr. Levy.

Mr. Ryan, Ex. 17 (Nick Ryan email to Paul Levy, March 6, 2002).  Mr. Ryan described his

conduct throughout in altogether benign terms, suggesting he had never even raised his voice.

Id., Bates 2867 ("I quite gently suggested she might want to speak with Laura and try and smooth

things over.  I added that she needed to be more forthcoming and that taking down a student's

display was hurtful to the student as well as to Laura ...").

In March 2004 Mr. Ryan furnished this same email in memorandum form to the School's

new diversity coordinators, Ms. Richards and Ms. Denevi. Ex. 18 (Re: Personnel Issues, March

5, 2002, Bates 2848).  In a covering memo, Mr. Ryan explained that the memorandum of March

2, 2002 as follows:

> [It] is a summary I wrote in March 2002.  In re-reading it there is nothing I would
> change, but I would add that have never shared this with anyone (except a verbal
> version with Paul at that time - he advised I write something for my records) and I
> am hesitant to do so now.  It is even a bit difficult for me to read because it
> brought me right back to an episode I would rather get past.  I offer it to you both
> in this light and trust you will consider it as necessary.

Id., Bates 2853.

This was obviously inaccurate, and for present purposes gives rise to the inference Mr.

Ryan engaged in deception with the School's diversity coordinators in an effort to suggest the

memorandum recounting his version of Black History Month 2002 had special reliability, since

he had  "never shared this with anyone."

-13-

State of mind can be difficult to discern, but on the foregoing record, and given the opinions about Mr. Ryan and his attitudes ascribed to the School's diversity coordinator Ms. Denevi, it is reasonable to infer Mr. Ryan's state of mind during Black History Month 2002 was again one of white privilege and superiority :  If Mrs. Killian could take down a white colleague's student exhibit without getting permission first, then Mr. Ryan could arrange for her to find banners created by members of the Black Culture Club ripped down and discarded as trash, notwithstanding the extenuating personal circumstances and the context of Black History Month.

3.  <u>"Sharon, I Can't Bend Down Low Enough to the Ground to Understand You!"</u>

Mrs. Killian testified to a familiar pattern emerging during Mr. Ryan's tenure as Chair, whereby she was excluded from departmental decisions bearing on issues of curriculum and allocation of resources.  Ex. 3, Killian Deposition at 130-131 ("[I was] still being denied resources.  Still being kept out of the loop for any kind of decision-making about what we're supposed to be doing in the art department, and actually just being told about the decisions.  Not even – not even being told about some of the decisions.  Not necessarily even being involved with the decision, but not even being told about decisions.")[6]

---

[6]The School has devoted inordinate time and energy to showing relatively equal treatment in the matter of resources.  The treatment is disingenuous in several important respects.  <u>See</u> Ex. 4, Killian Affidavit, ¶ 17-18 ("At the beginning of the 2003-04 academic year ... my allocation of computer disk space was two (2) gigabytes.  Two gigabytes is like two rolls of unprocessed film. * * * At this very time and unbeknownst to me, Laura Tolliver was given an additional 65-75 gigabytes of disk space on each computer in the MAC lab (about 25 computers) and on every art studio computer for her own use.  Meanwhile, I was bring required to copy my student and publications files to CD's in order to give my students an adequate technology experience").  But fundamentally the School has ignored Mrs. Killian's contention she was consistently denied a role in departmental decisionmaking.  Ex. 3, Killian Deposition at 131 ("Not necessarily even being involved with the decision, but not even being told about decisions").

It was her exclusion from a rare departmental decision involving a change in course title,

Ex. 9, Tolliver Deposition at 28-29, that finally led Mrs. Killian to approach Mr. Ryan to discuss

the issue:

> A.  I had gone to him to talk about the names of courses that were going to be offered the following year.
> * * *
> A.  I walked into the room and I asked Nick if I could talk with him about something, and he said yeah. And I started to talk with him about the name of a course, a graphic design course.
> * * *
> A. ... I said, "Nick, I'd like to talk with you about the graphic design course that is now named and formerly Technology for the Studio Arts and the new course that was recently approved called Graphic Design and Publishing and I wondered first doesn't that seem to be redundant."
> * * *
> A. ... He said, "Sharon, I can't bend low enough to the ground to understand you.' (Indicating)
> * * *
> A. He was talking fairly loudly and very…with expressiveness.
> * * *
> He moved forward in his chair, bent low over his knees or between his knees with his arms outstretched in a scooping motion towards his head as he said that. (Indicating).
> Q: How did you interpret that movement?
> A: I—the only thing I could think of is, is he is calling me an ape? [sic] He said—and I said to him, 'You just said I can't bend low enough to the ground to understand you?' And I repeated that and then I—I left the room and went downstairs [to Kevin Barr's office].

Ex. 34, Killian Deposition at 359-361.

Under questioning from defense counsel she had explained as follows:

> ... Nick Ryan bent over his chair like he was an ape (indicating) and scooped up like he was an ape.  Saying he can't bend down low enough to the ground to understand me as if, you know, he was talking about an animal or that's the only way that he could understand me.
> Q Talking about apes, are you suggesting that apes move their arms to scoop

---

things up?
A.  Well, my characterization right now is that he scooped down with his arms
like so (indicating) and said he can't bend low enough to the ground to
understand.

Id. at 302.

This was the outburst that proved the final straw for Mrs. Killian's relationship with Nick

Ryan. Stunned and horrified, she went immediately to Kevin Barr's office. She testified that Mr.

Barr phoned one of the School's diversity coordinators Mariama Richrds asking that she come to

his office immediately, which gives rise to a reasonable inference that Mr. Barr understood

immediately at the time that Mrs. Killian was reporting deeply disturbing and racist conduct on

Mr. Ryan's part.  Indeed, a contemporaneous journal entry of Mrs. Killian's reflects that when

she saw Mr. Barr at a conference the following day, he "asked me whether I had had a sleepless

night – said he did too." Ex. 4, Killlian Affidavit ¶ 13.[7]

4.  The Sham "Mediation" Process Intended to Protect the School

The record shows a "mediation" following the episode of February 20, 2004 intended, not

to determine if Mr. Ryan had engaged in racist conduct, but rather to protect the School against

yet another serious allegation of racial discrimination.

It is undisputed Mrs. Killian reported the conduct during the very period the expulsion of

an African American student was being challenge as racist.  Indeed, on February 26th, within days

of the incident in the Art Department, Mr. Ryan emailed his colleagues to the effect that principal

_____

[7]For his part Kevin Barr confirmed Mrs. Killian's account of Mr. Ryan's statement, Ex.
19, Deposition of Kevin Barr at 45, but not that Mrs. Killian thought the outburst racist.  Ibid.
He also could not remember calling Mariama Richards to his office.  Id. at 48.  Mr. Barr also
failed to remember a conversation with Mrs. Killian the next day, id. at 59,  which she noted
down on her calendar ("Kevin asked me whether I had a sleepless night - said he did too", Ex. 4,
Killian Affidavit, ¶ 13).

-16-

Paul Levy had directed that "no faculty or staff should engage with [the student, his family], their lawyers, or the media." Ex. 8 (Ryan email to Sharon Killian & Laura Tolliver, February 26, 2004).

Such a directive could only have compounded a sense of despair as Mrs. Killian contemplated her own situation. She had complained repeatedly to the principal of the School Paul Levy about racist treatment to no avail, Ex. 24, Edghill Affidavit, ¶ 3, and it soon seemed to her the diversity coordinators in this instance were focusing on future relationships in the Art Department rather than investigating a complaint of truly outrageous conduct on Mr. Ryan's part. Indeed, within a few weeks after the episode Mrs. Killian she felt compelled to email Mariama Richards in part as follow:

> Paul tried to treat this problem before and it sure doesn't feel good to see this shaping up as "let's all get together and understand each other" scenario. It's not about attitude, it's about offensive behavior. I expected a real apology; some sort of reprimand to Nick for his behavior, not another "let's feel good discussion."

Ex. 20 (Killian email to Mariama Richards, March 31, 2004).

Anike Oliver attests that Ms. Richards knew full well Mrs. Killian had already complained to Mr. Levy about racial discrimination in the Art Department, Ex. 2, Oliver Affidavit, ¶ 5 ("Mari [Richards] told me on at least one occasion that Sharon Killian had complained directly to the principal of the School (at the time a white male named Paul Levy) about racist conduct in the Art Department directed against her by Mr. Ryan"). Rosa Grillo attests that Ms. Denevi agreed with her assessment that Mr. Ryan's verbal outburst was motivated by race. Ex. 13, Grillo Affidavit, ¶ 3.

Thus the diversity coordinators at the School had reason to know a meaningful

investigation of Mrs. Killian's complaint could compound problems for the School at the very time an expulsion decision  (which they themselves thought racist) was being challenged.  Ex. 2, Oliver Affidavit¶ 9.

As we have noted Ms.Denevi and Ms. Richards both failed to record Mrs. Killian's version of events, Ex. 5 (Denevi Notes); Ex. 6 (Richards Notes), at the same time they set forth Mr. Ryan's competing account in some detail. Ex. 5 (Bates 2792); Ex. 6 (Bates 2847). Indeed, it is undisputed the diversity coordinators did not trouble to **inform** Mrs. Killian of the competing account, Ex. 4, Killian Affidavit, ¶ 7, though they let Mr. Ryan know what Mrs. Killian said about the episode.  Ex. 12, Ryan Deposition at 104.

As Mrs. Killian has described, "Ms. Denevi and Ms. Richards knew I was confronting the frightening prospect of daily contact in the Art Department with someone in authority whom I believed had engaged in grossly offensive conduct.  It is difficult for me to believe they would have withheld information that might help allay my fears if they actually found the information to be remotely plausible."  Ex. 4, Killian Affidavit, ¶ 7.

Mrs. Killian eventually declined to participate any further in such a process, which offered no hope of addressing the serious misconduct she had reported, and which effectively consigned her to "the frightening prospect of daily contact" with Nick Ryan.

2.  <u>Events Subsequent to the Sham Mediation Process: 2004-05</u>

In a final effort to obtain some assistance from the Administration in her struggle, Mrs. Killian sought out the Head of School Peter Branch.  Mr. Branch has furnished an affidavit introduced by the School which makes clear he offered no assistance in addressing serious concerns about racist conduct in the Art Department.  Instead, Mr. Branch himself attests he

suggested that Mrs. Killian consider applying for a job elsewhere.

Shortly thereafter Mrs. Killian retained an attorney, who gave notice of the claims deriving from Mr. Ryan's conduct, and of her intention to bring suit against the School absent settlement on a mutually agreeable basis.

It is undisputed the School arranged to have Mrs. Killian's claims 'investigated", and that Mrs. Killian deferred any lawsuit as this process ran its course.  The School has introduced the report of investigation produced the following year despite its patently inadmissible character.  It has not troubled to have the attorney/investigator involved authenticate it, nor bother to suggest a basis the admissibility for substantive content that is in most respects self-serving and obvious hearsay.  A motion to strike, however, would only exaggerate its importance, because, thanks to Anike Oliver, the record shows the diversity coordinators Ms. Denevi and Ms. Richards both withheld vital information during the investigation, including knowledge of other racist conduct in the School and racist attitudes on the part of Mr. Ryan. The report also reflects a statement attributed to the former principal of the School Paul Levy, to the effect that Mrs. Killian had never reported racist conduct on Mr. Ryan's part.  Defendant's Exhibit 26.  But see Ex. 2, Oliver Affidavit, ¶  ; Exhibit 4, Killian Affidavit, ¶ 11.

We submit most reasonable people aware of an ongoing investigation of claims of racist in their Department (at least most reasonable people uncertain of the outcome) would do their utmost to avoid additional controversy during the course of the investigation.  Yet it is undisputed that mid-way through the 2004-05 academic year Mrs. Killian was compelled to fight for access to camera equipment on an equal basis.  She described the dispute in a memorandum to the Kevin Barr, who had by that time become principal of the School:

The camera I used was a departmental camera that Laura treats as her own. She keeps it secured by a lock only she can open, requiring me to ask permission and account for its use.  This and similar practices in the department have been imposed on me for many years and I'm not sure why I put up with them as much as I do - but it's past time for a change.  I ask that you notify Laura that as a colleague, I am free to use any department property without her permission, provided it is not being actively used in class.  Also, please let her know she needs to have cameras and other department property made equally accessible, in storage arrangements and access to key for example.

Ex. 21 (Killian email to Kevin Barr, February 9, 2005).

Mr. Ryan's response was a proposal that he have a second key along with Ms.Tolliver.

Id. (Ryan email to Mrs. Killian and others, February 10, 2005, Bates 124) ("Laura and I will hold keys to the camera storage units and will sign cameras out and back in, but for short durations only").  Only after Mrs. Killian continued to object did Mr. Barr finally intercede on her behalf, though he noted that "I share Nick's concern that the more keys floating the harder it is to maintain inventory ...."  Id. (Barr email to Mrs. Killian and others, February 16, 2005, Bates 129).

C.  Negotiations and Inability to
Return for the 2005-06 Academic Year

Negotiations to resolve the controversy began in early 2005.  The School again has no apparent qualms about introducing information patently inadmissible, in this instance correspondence relating to settlement negotiations in violation of Fed.R.Evid. 408.  A motion to strike would again simply exaggerate the significance of information showing no more than good faith efforts to resolve the controversy - Mrs. Killian modified her position without indicating non-negotiability - along with knowledge on Mrs. Killian's part that settlement was in the realm of possibility.

The record of her experience at GDS was such that Mrs. Killian could be forgiven the hope the matter would indeed settle on a basis that would not require her to return  for the 2005-06 academic year.  The School's officials, including especially diversity coordinators acting as guardians against potential liability rather than guardians of equity, had failed miserably to protect her against racist attitudes and conduct in the Art Department. The physical and emotional toll exacted over time was considerable and continuing.  Ex. 3, Killian Deposition at 656.

However, the record establishes that Mrs. Killian was intent upon returning for the 2005-06 academic year if the parties failed to reach agreement.  Id. at 636 ("Everybody, my bill paying, everybody had my box number, because there was definitely a possibility that I would be back. As far as I knew, the Fayetteville address was going to be my summer residence." See also Ex. 4, Killian Affidavit, ¶¶ 16, 17 and18.

The School suggest the sale of the family home in Virginia suggests otherwise, but, as Mrs. Killian testified, "GDS and I were in what were to have been some negotiations. They had asked me previously about the option of not coming back to school as one of the things that I, that could be part of a settlement agreement. So, it wasn't unusual that could be a possibility. We were, the market was great, and we sold our little house."  Ex. 3, Killian Deposition at

It is undisputed negotiations broke down in August 2005 and that Mrs. Killian did not ultimately return to GDS.  It is very much disputed whether Mrs. Killian abandoned her position, or whether it was poor health attributable to the cumulative effects of an intolerable work environment that prevented her return.   Ex. 22 (Affidavit of Fran Pearson, M.D.).

Mrs. Killian filed suit against the School a short time later.[8]  The evidence shows that

meeting took place at the School thereafter involving faculty and the School's attorney. Anike

Oliver has described it as follows:

> When Sharon Killian sued the School, a lawyer for the School named Mr.
> Williamson met with staff and faculty.  He informed us that Mrs. Killian was
> claiming she had been victimized by racism, that the School intended to deny all
> her allegations, and that we were expected to support the School.  I was troubled,
> for the same reason I was troubled about the directive not to speak with the
> expelled African American student, his family and his lawyers.  I felt Mrs. Killian
> was as entitled to information as the School was, and asked if the attorney meant
> we were going to be asked to say things we did not believe.  He said, no, we
> should tell the truth, but that, if we could not support the School, we would have
> to hire an attorney.  I understood that to mean that if we could not support the
> School wholeheartedly, we would have to hire an attorney.  For that reason I
> consulted a lawyer, expecting to be charged for services.  I was told that in all
> likelihood I would not need representation, and was pleasantly surprised I did not
> receive a bill for the time involved.   I believe most non-lawyers listening to the
> School's attorney the day I heard him would have assumed as I did that if they
> were unable to support the School, they would have to hire an attorney.  I left the
> meeting that day feeling intimidated, and I know other faculty, especially minority
> faculty, felt intimidated too because they told me after the meeting that they were
> intimidated.

Ex. 2, Oliver Affidavit, ¶ 12.

   Ms. Oliver also describes a visit made by Mariama Richards to a meeting

of a group called the Faculty of Color some time after Mrs. Killian filed suit:

> After Mrs. Killian sued the School, Mari Richards, one of the School's
> diversity coordinators came to a meeting of the Faculty of Color and said it would
> be unwise to discuss any concerns about racial equity at the School in light of the
> lawsuit. She said we could be called to testify about anything critical said about
> the School, and implied this would not be in the best interest of the particular
> critic involved.  Thereafter the group did not discuss things as freely as before and
> tended to speak much more in generalities than specifics.  This made me

---

[8]Suit was filed one day before expiration of a tolling agreement covering the preceding
several months, a lapse for which Mrs. Killian's attorney has apologized to defense counsel and
remains at a loss to explain.  Ex. 23 (Affidavit of John P. Racin).

uncomfortable too.  I believed it was yet another effort to intimidate faculty and to deny a possible victim of racist conduct access to potentially helpful information.

Id., ¶ 13.

The Oliver Affidavit suggests it was furnished by someone both determined and courageous:  On the occasion of her departure from the School (which took place on good terms), Ms. Oliver "told my Department Chair and my entire department the School was an unhealthy place for people of color, and, as I have said, that remains my belief.  Students, staff and faculty of color encounter subtle but nonetheless real differences in attitudes and treatment on a daily basis at the Georgetown Day School."  Id., ¶ 17.

Yet it was only after she left the School that even someone as courageous as Anike Oliver could speak for the record about her own experience, and her important conversations with its Co-Directors of Diversity Mariama Richards and Elizabeth Denevi.  The evidence suggests that the atmosphere of coercion and intimidation fostered by the School was such that "[i]t was only after I left the School that I finally felt free to discuss the things I have described in this Affidavit."  Id, ¶ 19.

## III. ARGUMENT

### THE APPLICABLE LEGAL PRINCIPLES ON SUMMARY JUDGMENT

Summary judgment is appropriate only where the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56( c).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions ...."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  See also Reeves v. Sanderson Plumbing

Products, Inc. ("Reeves"), supra at 150.  Thus "[the district judge, in ruling on a motion for summary judgment must assume the truth of the non-movant's evidence, and draw all justifiable inferences in that party's favor." Bayer v. United States Department of the Treasury, 956 F.2d 330, 333 (D.C.Cir. 1992).

These principles are to be "applied with added rigor in employment discrimination cases, where intent is inevitably the issue." McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 370-371 (7th Cir. 1992).  See also, Ross v. Runyon, 859 F.Supp. 15, 21 (D.D.C. 1994) ("[i]n discrimination cases, summary judgment must be approached with special caution"). Summary judgment is especially inappropriate where a case is "based largely on circumstantial evidence[,] and the relative merit of each party's case depends significantly on credibility." Hase v. Missouri Div. of Employment Sec., 972 F.2nd 893, 897 (8th Cir.), cert. denied, 508 U.S. 906 (1993).

THE HOSTILE WORK ENVIRONMENT CLAIM

The elements of a racially abusive work environment claim are well established: "[A] plaintiff must demonstrate: (1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff;  4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." Moore v. Ashcroft, 401 F. Supp. 2d 1, 42 (D.D.C. 2005) (internal quotations and citations omitted).

In assessing whether a plaintiff has adequately alleged hostile work environment, courts should to look at "'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." Faragher v. City of

Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993)). Although a plaintiff is "not required to plead a prima facie case of hostile work

environment in the complaint, the alleged facts must be able to support such a claim." Moore,

401 F. Supp. 2d at 42 (citing Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir.

2000)).

In determining whether the conduct at issue meets the "severe and pervasive" standard,

number of incidents is but one of the relevant factors.   See  Smith v. Northwest Financial

Acceptance, Inc., 129 F.3d 1408, 1415 (10th Cir. 1997) ("[The word 'pervasive' is not a counting

measure. The trier of fact utilizes a broader contextual analysis. It begins with the number,

sequence, and timing of the conduct. The fact finder then looks at the nuances of an environment

that is imposed by each instance of discriminatory behavior").

The required showing of severity varies inversely with the pervasiveness or frequency

of the conduct: The more egregious the conduct, the fewer the incidents necessary to meet the

"severe and pervasive" standard. Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991); Steiner v.

Showboat Operating Company, 25 F.3d 1459, 1463 n.4. (9th Cir. 1994). Thus, the more serious

the incidents the less frequently they need occur to establish a hostile work environment. Indeed,

a single episode of harassing conduct can create a hostile work environment. See, e.g., Daniels v.

Essex Group, Inc., 937 F.2d 1264, 1274 n.4 (7th Cir. 1991) (single instance of racial harassment

can establish hostile work environment); Torres v. Pisano, 116 F.3d 625, 631 n.4 (2nd Cir.

1997) (single incident of sexual harassment can suffice to state a claim of hostile  environment);

Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2nd  Cir. 1995).

In <u>Villines v. United Brotherhood of Carpenters & Joiners</u>, 999 F.Supp. 97 (D.D.C. 1998), Judge Urbina found the African American plaintiff to have established an issue of hostile environment for the jury based on "four separate incidents occurring from June through August when [her supervisor] chastised and mistreated her." <u>Id.</u> at 104. The supervisor "yelled" on three occasions, and acted to "block[] her view to her colleagues and visitors entering the office." <u>Ibid.</u> The plaintiff also showed "that none of the white co-workers under [his] supervision received the same frequent and hostile treatment." <u>Ibid.</u>.

Here Mrs. Killian has shown that from the outset of her dealings with Nick Ryan she had problems with him, and established that these problems derived from racist attitudes and conduct on his part.  The conduct was severe and pervasive enough to compel the former Director of Diversity Vernese Edghill to intercede with the Principal Mr. Levy on Mrs. Killian's behalf to report that in her view problems in the Department indeed derived from Mr. Ryan's racist attitudes and conduct.

The record also shows that Mr. Ryan has never yelled or otherwise subjected Mrs. Killian's white counterpart to verbal abuse, yet has yelled at Mrs. Killian, and in several instances - in Black History Month 2002 and February 2004 - subjected her to treatment truly outrageous in the circumstances.   We respectfully submit that a jury should determine the merits of Mrs. Killian's hostile environment claim.

CONSTRUCTIVE DISCHARGE

The court in <u>Villines</u> also outlined the elements of a claim of constructive discharge:

(1) the existence of intentional discrimination, (2) that the employer deliberately made working conditions intolerable and drove the employee into an involuntary quit, and (3) that the constructive discharge was justified by the existence of

-26-

aggravating factors.... This inquiry focuses on whether the employer "creates or condones discriminatory working conditions that would drive a reasonable person to resign. (interior quotations, citations omitted).

Id. 999 F.Supp. at 105.

Judge Urbina explained that "because both the plaintiff's claims of constructive discharge and hostile work environment require a finding of intentional discrimination, the viability of the constructive discharge claim is inextricably linked to the hostile work environment inquiry." Ibid.  There he again found an evidentiary showing adequate to warrant trial, where "a reasonable jury could find ... working conditions [so] intolerable as to cause her to take unpaid medical leave."  Ibid.

It is difficult to posit a work environment grown more intolerable than the one confronting Mrs. Killian, even had she been physically able to return to work for the 2005-06 academic year.[9]  She had suffered regular and pervasive discriminatory treatment in the Art Department, sought assistance from School officials to no avail, and, after she reported conduct on Mr. Ryan's part that was simply outrageous, the focus of the School still remained what she described as the "'let's all get together and understand each other' scenario".  Ex.11 (Sharon Killian to Mariama Richards, Bates 2858).  Sharon Killian hoped for meaningful help at long last, but instead encountered School officials, including Co-Directors of Diversity, effectively "condon[ing] discriminatory working conditions that would drive a reasonable person to resign."

---

[9]It is undisputed that she qualified for short term disability that was exhausted by November 2005, and her primary care physician did not clear her to attempt re-entry to the job market until August 2006.  Ex. 22, Pearson Affidavit.

<u>CONCLUSION</u>

For the foregoing reasons, and such other reasons as may appear in the record, Plaintiff

Sharon Killian respectfully requests that this Court deny Defendant's Motion for Summary

Judgment upon her claims of hostile work environment and constructive discharge.


Respectfully submitted,

LAW OFFICE OF JOHN P. RACIN


_/s/_
John P. Racin   Bar No. 942003

1721 Lamont Street, N.W.
Washington, D.C.  20010
202.265.2516

Attorney for Sharon Killian