# Exhibit 2

# Affidavit of Anike Oliver

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN              )
                            )
        Plaintiff           )
                            )
    v.                      )    Civil Action No. 05-1925 (EGS)
                            )
GEORGETOWN DAY SCHOOL       )
                            )
        Defendant.          )
_____)

## AFFIDAVIT OF ANIKE OLIVER

ANIKE OLIVER hereby certifies that the following is true, correct and based on personal knowledge:

1. I am an adult African American female citizen of the United States residing in Baltimore, Maryland.

2. I am now a doctoral student in mathematics at Howard University, but from about August 2001 to June 2006 was a faculty member in the Math Department of the high school at the Georgetown Day School ("GDS" or "School") in Washington, D.C.

3. Sharon Killian was a faculty member in the high school Art Department for three or four of the five years I was at the School, and I valued her as a colleague and a friend.

4. Mrs. Killian and I were members of the "Faculty of Color" group at the School, a forum in which minority members of the faculty met to discuss issues including instances of apparent racial bias at the School that gave rise to concerns on an individual or collective basis. On several occasions Mrs. Killian informed the group the Chair of the Art Department Nick Ryan was mistreating her, and said that she believed her race was the motivating factor in Mr. Ryan's conduct.

5. Mariama (or "Mari") Richards is an African American woman and one of the co-directors of diversity (also called "diversity coordinators") during a part of the time I was a faculty member of the School (a white woman named Elizabeth Denevi was the other). Mari told me on at least one occasion that Sharon Killian had complained directly to the principal of the School (at the time a white male named Paul Levy) about racist conduct in the Art Department directed against her by Mr. Ryan.

6. It was plain to me the Administration did not regard or treat Ms. Richards and Ms. Denevi as equal in their roles as diversity coordinators. Ms. Denevi and her views carried greater weight. I once asked Ms. Richards about attending a diversity workshop I had attended the previous year. She got back to me, saying the administration denied the request (They said no"). I reported this to Ms. Denevi, who responded immediately, "Just go back to Kevin [Kevin Barr, then Director of Studies of the School], and we'll work it out." I went to Mr. Barr as directed, and Ms. Denevi was right. It did work out: I was able to attend the workshop.

7. I also went to Ms. Denevi on a number of occasions to complain about what I believed to be instances of racism in the high school. Ms. Denevi almost invariably agreed and routinely answered, "Yes, I know, my people *are* racist."

8. During the 2003-04 academic year the Headmaster of the School Peter Branch expelled an African American male student then in his senior year at the High School. He was a member of the basketball team, and he allegedly engaged in sexual harassment against a female manager of the team. In my view, the decision to expel the African American involved was fundamentally racist because the comments that he made were known to be said frequently by white male students with absolutely no disciplinary action following their infractions. I already knew that white faculty tended to feel physically threatened by the African American student,

-2-

even though he was very slender and well short of 6 feet tall, and even though much bigger and taller white male students routinely engaged in far more aggressive verbal and physical horseplay in the hallways without presenting any apparent threat to the overwhelmingly white faculty and staff at the High School

9. I told both Ms. Richards and Ms. Denevi I thought the decision to expel the African American male student was racist, that he would not have been expelled for the same conduct had he been a white student with the same record at the School. Ms. Richards and Ms. Denevi both said they agreed, and did not think the student would have expelled if he had been white.

10. The African American student's family brought a lawsuit against the School challenging his expulsion as racist. Some time thereafter the Administration warned faculty and staff against having any contact with the student, his family, or their lawyers. This made me very uncomfortable, in that it seemed to me the student should have the same access to information as the School would have in defending the decision. I did not object at the time because I was concerned about keeping my job.

11. The School reinstated the African American student within a fairly short time, and he went on to graduate with his class in the Spring of 2004. I thought it odd that the Administration did not feel the need to explain the true reasons for the student's reinstatement or to let us know whether the court had decided the School's decision was tainted by racism or not.

12. When Sharon Killian sued the School, a lawyer for the School named Mr. Williamson met with staff and faculty. He informed us that Mrs. Killian was claiming she had been victimized by racism, that the School intended to deny all her allegations, and that we were expected to support the School. I was troubled, for the same reason I was troubled about the directive not to speak with the expelled African American student, his family and his lawyers. I

-3-

felt Mrs. Killian was as entitled to information as the School was, and asked if the attorney meant we were going to be asked to say things we did not believe. He said, no, we should tell the truth, but that, if we could not support the School, we would have to hire an attorney. I understood that to mean that if we could not support the School wholeheartedly, we would have to hire an attorney. For that reason I consulted a lawyer, expecting to be charged for services. I was told that in all likelihood I would not need representation, and was pleasantly surprised I did not receive a bill for the time involved. I believe most non-lawyers listening to the School's attorney the day I heard him would have assumed as I did that if they were unable to support the School, they would have to hire an attorney. I left the meeting that day feeling intimidated, and I know other faculty, especially minority faculty, felt intimidated too because they told me after the meeting that they were intimidated.

13. After Mrs. Killian sued the School, Mari Richards, one of the School's diversity coordinators came to a meeting of the Faculty of Color and said it would be unwise to discuss any concerns about racial equity at the School in light of the lawsuit. She said we could be called to testify about anything critical said about the School, and implied this would not be in the best interest of the particular critic involved. Thereafter the group did not discuss things as freely as before and tended to speak much more in generalities than specifics. This made me uncomfortable too. I believed it was yet another effort to intimidate faculty and to deny a possible victim of racist conduct access to potentially helpful information.

14. My decision to leave the School was voluntary and I know I left on friendly terms. Indeed the principal of the School Kevin Barr tried to persuade me to stay on. I decided to leave when I did in large part because I had come to believe GDS was an unhealthy environment for people of color. Minority students, staff and faculty are treated differently on a daily basis, in

-4-

subtle but obvious ways that over time take a severe emotional toll.

15. One of the specific things that persuaded me to leave GDS was an incident involving a request from a white student to transfer to another class. I was the only African American teacher in the Department, so a transfer request necessarily meant the student was asking for a class taught by a white faculty member. When a student requested transfer from another math class, the white colleague would be involved, and could ultimately approve the request or not. When one of my students requested transfer, the Administration invariably excluded me from the process: I received a form for signature indicating approval, in the clear expectation I would simply sign off.

16. During my last year at the School I refused to go along with this procedure when a white student asked to transfer. I insisted on a meeting with the parents, after which the student and parents changed their mind and said the student wanted to remain in my class. The student's advisor Kathy Reuter and the Department Chair both sat in on the meeting and seemed amazed at the outcome, and complimented me on handling the situation so well. Yet I had simply done what white colleagues were invariably offered the opportunity to do, meet with the student and family and address concerns in a forthright way. I found the response patronizing - I did not think my supervisor would have attended the conference or given such high praise to a white teacher - and told Elizabeth Denevi I thought the episode was another example of the difference in treatment encountered by African American teachers at the School. Ms. Denevi agreed with me.

17. Before I left the school, I told my Department Chair and my entire department the School was an unhealthy place for people of color, and, as I have said, that remains my belief. Students, staff and faculty of color encounter subtle but nonetheless real differences in attitudes

-5-

and treatment on a daily basis at the Georgetown Day School.

18. An attorney for the School interviewed me some time during my last year at the School. For obvious reasons I was uncomfortable and did not speak freely. We had already been told we were expected to support the School, and I knew my views and the discussions I have described with Ms. Richards and Ms. Denevi would not be welcome.

19. So far as I am aware Mrs. Killian's attorney John Racin did not attempt to contact me while I was employed at the School. Had he done so I would probably have felt uncomfortable speaking with him. It was only after I left the School that I finally felt free to discuss the things I have described in this Affidavit.

I hereby certify under penalty of perjury that the foregoing is true and accurate.

Dated: 12/23/06

ANIKE OLIVER