# Exhibit 3

# Deposition of Sharon Killian

Page 130

1 to come to your aid?
2    A. Yes.
3    Q. Whom did you ask?
4    A. I've asked Paul Levy, Kevin Barr, the
5 diversity officers, the -- John Burkhart. All of the
6 administrators I think that you've -- you've been told
7 about that.
8    Q. Is it your testimony that Mr. Levy and Mr.
9 Barr and the staff of the diversity office did nothing
10 in response to your complaints?
11    A. I'm -- I'm not sure. I know that I have
12 asked and we've talked, and I don't know if there was a
13 culmination. There may have been actions in between,
14 but I don't know if there was a culmination of
15 anything.
16    Q. What do you mean a culmination?
17    A. A result.
18    Q. Of the incidents that occurred in the
19 2002-2003 school year, what did you consider the most
20 serious example of racial harassment?
21    A. It was all serious, sir. Not being included
22 in the process for what occurs in the department as we

Page 131

1 were supposed to, as was decided that we were supposed
2 to be able to do.
3    Q. Okay. I've got some similar questions about
4 the 2003-2004 school year.
5    A. Uh-huh.
6    Q. Can you tell me in chronological order to the
7 best of your recollection what incidents of racial
8 harassment occurred in the 2003-2004 school year?
9    A. The primary -- the primary -- in chronological
10 order. In chronological order. Still being denied
11 resources. Still being kept out of the loop for any
12 kind of decision-making about what's -- what we're
13 supposed to be doing in the art department, and
14 actually just being told about the decisions. Not
15 even -- not even being told about some of the
16 decisions. Not necessarily even being involved with
17 the decision, but not even being told about decisions.
18    Q. What was --
19    A. Be --
20    Q. What would be an example of a decision you
21 weren't told about?
22    A. Course name changes. Course offerings.

Page 132

1    Q. How did you find about the course name change?
2    A. When -- when it was time for the departments
3 to tell the curriculum director what course offerings
4 we have decided to -- to present and also supplies
5 being taken away by Laura Tolliver. Being hidden.
6    Q. This is 2003-2004?
7    A. Yes.
8    Q. What supplies were taken away by Laura
9 Tolliver?
10    A. Photographic supplies. Photographic supplies
11 being taken out and hidden that were bought for the use
12 of my students.
13    Q. How did you find out these supplies had been
14 taken out and hidden?
15    A. Well, I've actually seen her try to do that
16 physically. I mean, visibly try to do that and
17 then --
18    Q. But when you saw her trying to do that, what
19 did you do?
20    A. I said, "Oh, those -- those were mine." "Oh,
21 I thought" -- she responded those were -- "I thought
22 they were actually my -- that was actually my paper."

Page 133

1    Q. And was it your view that she was doing that
2 because of her dislike for you as an African American?
3    A. Yes, and it had been happening for years.
4 Yes.
5    Q. She had been taking your supplies for years?
6    A. Yes.
7    Q. Had you complained to anybody about that?
8    A. Yes.
9    Q. Whom did you complain to?
10    A. Paul Levy.
11    Q. And what did he do?
12    A. Deborah Haynes. I don't know.
13    Q. Any other incidents of racial harassment that
14 you recall from the 2003-2004 school year?
15    A. There -- there are so many of them, sir, that
16 I -- that I probably just need to relax for a minute
17 to -- to get them to come -- to come up. I'm -- I
18 feel like I need a break, but I'm going to -- to tell
19 you that it is a daily -- it was a daily occurrence of
20 marginalization, and it's very difficult to tell you of
21 for those 200 days how awful it was on a daily basis by
22 giving you every specific thing because it was so

Page 162

1 black is part of this whole thing. I think that.
2  Q. Okay. Now --
3  A. Uh-huh.
4  Q. -- what I'm asking about is, which things do
5 you feel were reprisals that you're referring to here
6 in response to the perception by these individual that
7 you were involved in the termination of Debbie Haynes.
8     Now, what I've heard you say so far is the
9 incident where Nick Ryan said something to you about
10 bending so low, and Laura Tolliver's taking the
11 photographic paper, and then you said there were other
12 incidents that you regarded as part of the reprisal.
13 Maybe I can ask it another way.
14     Were the meetings where you were excluded from
15 the decision-making about course offerings and
16 allocation of resources part of the reprisals against
17 you?
18  A. They very well could have been.
19  Q. You don't know whether they were?
20  A. That's -- I'd say they very well could have
21 been.
22  Q. Okay.

Page 163

1  A. And that they could do these things because of
2 who I was in that department.
3  Q. Okay.
4  A. And get away with that.
5  Q. What about -- what about denial of access to
6 computers? Was that part of the reprisals that you
7 felt you were subjected to because these individuals
8 viewed you as having been involved in the termination
9 of -- of Debbie Haynes?
10  A. I -- I -- let me think about that for a
11 second. I -- I do believe that a lot of that was
12 because of this blaming me, but in addition, the
13 marginalization and the treatment that they conducted
14 only applied to me and no one else.
15  Q. Okay. And did you -- do you know if there was
16 anybody else whom they blamed for Debbie Haynes' losing
17 her job at GDS?
18  A. I believe that you could probably find that
19 they all -- many of them probably knew other folks or
20 folks who actually did go to Paul about problems that
21 Debbie Haynes might have had. But I didn't see anyone
22 else being treated the way I was being treated.

Page 164

1  Q. Okay. What about the occasions when Mr. Ryan
2 would come into your class and make comments that you
3 thought marginalized you? Did you view that as part
4 of the reprisal that he was taking against you because
5 he thought you had played a role in the termination
6 of Ms. Haynes?
7  A. No. I believe as the diversity officer
8 explained it, it was as a sense of white superiority
9 and privilege.
10  Q. What -- what explanation or who gave you that
11 explanation?
12  A. Mariama Richards and Elizabeth Denevi.
13  Q. I see. And were they present when he came
14 into your room to make the statements that you felt
15 were inappropriate?
16  A. No, and that was only one of the instances,
17 but I believe they talked with him after the "I can't
18 bend low enough to the ground to understand you"
19 incident and that was one of the things they told me.
20  Q. And it's still your belief that you were
21 subject to these reprisal actions that you've described
22 because you were being blamed by others for the

Page 165

1 termination of Debbie Haynes? You still believe that?
2  A. Sir, the record stands as it is. I've told
3 you what I know.
4  Q. I'm asking you a question. Just calls for a
5 yes or no answer. Do you still believe that's the
6 case?
7     MR. RACIN: Objection. I would ask for
8 clarification. Could you rephrase that?
9     MR. WILLIAMSON: All right.
10    MR. RACIN: I didn't understand that.
11 BY MR. WILLIAMSON:
12  Q. Do you still believe that you were subject to
13 the reprisal actions you've discussed during this
14 deposition because you were being blamed by others for
15 the termination of Debbie Haynes?
16  A. Yes. Some of those were -- do apply there I
17 believe, yes.
18  Q. Now, do you see where it says that still on
19 numbered paragraph 1 -- let me find it myself. Yeah.
20 You see where it says that you have been or that you're
21 saying you have been a magnet for resentment by
22 Tolliver, Haynes and her core of friends on the staff?

Page 178

1  Q. Did you feel that it was a form of racial
2 harassment that you were not invited to visit the
3 vacation home of Norrine Mac in San Francisco and
4 allowed to use her new car?
5  A. No.
6  Q. How is it that you know Mr. Ryan vacationed at
7 Norrine Mac's San Francisco home and used her new car
8 while there?
9  A. I happened upon a discussion between them. I
10 was in a -- coming into a meeting and -- and they were
11 there and they were -- their backs were turned to the
12 door and I -- and they were talking about it and they
13 stopped as soon as I heard. You know, it was too late
14 for me to hear the whole thing, but I -- that's what I
15 heard.
16  Q. Do you know when Mr. Ryan was visiting
17 with Ms. Mac on vacation, was that an activity that he
18 was doing as part of his job as an employee of GDS?
19  A. No, I'm sure that was his personal time. I'm
20 not sure. I shouldn't say I'm sure. I'm not -- I
21 don't know if it was business or pleasure.
22  Q. And what -- is Ms. Mac a member of the art

Page 179

1 department?
2  A. No.
3  Q. Now, looking again at numbered paragraph 2 of
4 Exhibit 13, would you read the second sentence that
5 begins "Last spring"?
6  A. "Last spring Nick Ryan actually screamed at me
7 while in episodic fits that I would not do the same to
8 him. 'You are not going to force me on the street
9 like you did Debbie Haynes.'"
10  Q. Now, when you referred to last spring in that
11 sentence, are you referring to the spring of 2002?
12  A. 2002-03 I guess it was. I don't know.
13  Q. Do you know which?
14  A. It's -- it was 2002 after the ripping down of
15 the -- of the -- and there have been more than one. So
16 I'm trying to --
17  Q. Ripping down of the what?
18  A. Of the kids' work from the walls. The Black
19 Culture Club banners and other things. There have
20 been more than one scream. So...
21  Q. Now, was that --
22  A. Yes, here it is. Content for this was Nick's

Page 180

1 tearing down the children's room for the Black Culture
2 Club.
3  Q. Do you remember approximately what -- what
4 date Mr. Ryan allegedly screamed at you?
5  A. In that regard, it would be 2002 around Black
6 History Month, which was around February 20 something
7 probably.
8  Q. Is it Black History Month?
9  A. February.
10  Q. It's for the whole month, right?
11  A. Yes.
12  Q. But you think this happened around February 20
13 something?
14  A. Uh-huh.
15  Q. All right.
16  A. Or 17th, something like that.
17  Q. Now, where was it that he was screaming at you
18 in one of his episodic fits as you describe it?
19  A. In and out of the art department office.
20  Q. Where is that located?
21  A. On the third floor.
22  Q. Okay. Was there anybody else present who

Page 181

1 either saw or heard Mr. Ryan screaming at you in the
2 spring of 2002?
3  A. I don't recall exactly if Laura Tolliver was
4 in the room or not.
5  Q. Is there anything that would refresh your
6 recollection?
7  A. Perhaps there could be something. It was
8 very shocking to me. So, you know, I don't know if
9 she was there yet or not. 8 o'clock. She might not
10 have been there yet.
11  Q. Was there someplace where you said he was
12 doing this in front of one of your colleagues?
13  A. And students, yeah.
14  Q. Would that colleague have been Laura Tolliver?
15  A. It would have been Laura Tolliver and -- this
16 is a different situation you're talking about?
17  Q. No. For this I'm asking about when --
18  A. Uh-huh.
19  Q. -- the screaming relating to -- that occurred
20 around the time these banners were taken down.
21  A. It probably would have been Laura Tolliver at
22 that time of the morning. Maybe.

Page 182

1  Q. What do you think Mr. Ryan meant when he said
2  "You are not going to force me out on the street like
3  you did Debbie Haynes"?
4  A. This as I explained before, he blamed me for
5  Debbie Haynes' departure.
6  Q. How did you interpret what he said?
7  A. That's what I -- I just said, sir.
8  Q. Okay. Now, was it your belief at the time --
9  well, let me skip that question.
10      Why don't you take a look, again, at paragraph
11 2 of Exhibit 13. Do you see in the middle of that
12 paragraph it says, "The context for this was Nick's
13 tearing down the children's work for the Black Culture
14 Club and throwing it onto the floor"?
15  A. Yes.
16  Q. What children's work for the Black Culture
17 Club were you talking about when you made that
18 statement?
19  A. The Black Culture Club students had been
20 making banners. I believe it was for an assembly and
21 surrounding activities.
22  Q. When you say banners, what are -- are banners

Page 183

1 pictures or something?
2  A. Yes. Drawings. Sayings on big paper painted
3 with acrylic paint or other materials like that.
4  Q. You'll have to bear with me during the
5 deposition. I'm -- as you can see, I'm a lawyer and
6 most presumptively artistically challenged.
7  A. You have kids, do you?
8  Q. I do have children.
9  A. (Laughs).
10  Q. But if their artistic ability depends on
11 hereditary, they're going to come up short.
12  A. (Laughs).
13  Q. Now, were you actually present when Mr. Ryan,
14 as you said, tore down the children's work for the
15 Black Culture Club and threw it onto the floor?
16  A. No. I came in in the morning and they were
17 strewn all over.
18  Q. All right.
19  A. And I asked him.
20  Q. If you were not present when the work was
21 taken down, how is it that you know he tore it down and
22 threw it onto the floor?

Page 184

1  A. Because they were ripped and torn, and then he
2 was also throwing -- he starts pick them up, picks some
3 up and throw them in the trash. So I assumed he was.
4 They looked like they were ripped and they were torn.
5 He ripped them off and tore them down, yeah, and he I
6 believe said he did that.
7  Q. Now, would it be fair to say that you came
8 into the room and saw the work on the floor and
9 inferred that it had been torn down and thrown onto the
10 floor by Mr. Ryan; is that right?
11  A. No. He ripped them and tore them and --
12  Q. Were you a witness to his ripping and tearing?
13  A. Subsequent to the stuff on the floor, the way
14 he snatched them up and threw them and tore them and
15 put them in the trash as he was doing this.
16  Q. Were you a witness to his tearing down the
17 banners, Ms. Killian?
18  A. I was not a witness. As I said in here, I
19 came or in something else that you might have read,
20 that I came in and they were ripped and torn and strewn
21 all over the floor.
22  Q. Do you know if there was anybody else who was

Page 185

1 involved in taking down the banners that you saw on the
2 floor?
3  A. Not to my knowledge. He told me he did -- he
4 had done that.
5  Q. He told you he had done it by himself?
6  A. Well, he told me he had taken -- he had
7 done -- he had taken them down because there was --
8 there were other things to do or other people needed
9 the space or something like that.
10  Q. Now, later in the paragraph you say, "I asked
11 how the banners were torn down and thrown about."
12  A. Uh-huh.
13  Q. You see that?
14  A. Let's read it.
15  Q. Now, did you ask that question because you had
16 not actually seen the manner in which the banners and
17 posters had been taken down and put on the floor?
18  A. As I had told you, yes, that's right. When I
19 came in, they were ripped and torn and strewn on the
20 floor and I asked him.
21  Q. And how did he answer the question?
22  A. He said, you know, he was pretty upset about

Page 186

1 it, that I would even ask and screamed and marched very
2 quickly back and forth through the studio. And I think
3 I -- let me see what I said here. "He exploded with
4 the Debbie Haynes reference." "You're not going
5 to" -- yeah, that's what he said.
6   Q. There was screaming. Was there anybody else
7 who was present who would have heard Mr. Ryan screaming
8 at that time?
9   A. As I said, I -- I don't recall exactly. If
10 anyone was there, then perhaps Laura Tolliver would
11 have been there. Although she might not have been
12 there.
13   Q. Okay.
14   A. I'll have to --
15   Q. In the last sentence of that first paragraph
16 associated with number 2.
17   A. Uh-huh.
18   Q. You say, "It was clear from that day forward
19 that Nick Ryan, like Debbie Haynes, would actually
20 destroy children's work if I was associated with it and
21 that works that involve children of color are
22 especially vulnerable."

Page 187

1   A. Yes.
2   Q. Now, did you say that because you believe
3 that Mr. Ryan thought you had played a role in Ms.
4 Haynes' termination and he resented you for that?
5   A. I don't know. I just know that the children
6 of color, you know, other -- other groups come up to
7 the studio and work, and this is the only one that has
8 ever been ripped down.
9   Q. Is it your testimony now that you don't know
10 whether Mr. Ryan resented you for -- because of his
11 belief that you had played a role in the termination
12 of Ms. Haynes?
13         MR. RACIN: I object on an asked and
14 answered grounds at this point. This has been going
15 on at some length. You can answer but, you know,
16 we're going to the end of this inquiry.
17         THE WITNESS: In the paragraph 1, I
18 believe that I said there that -- or paragraph 2 I talk
19 to you about in this, you could see that I mentioned
20 the clique and so you can probably infer from that that
21 there's a relationship. But other students --
22 BY MR. WILLIAMSON:

Page 188

1   Q. Relationship between what and what?
2   A. From -- between Debbie Haynes and Laura
3 Tolliver and that group that you had me go through.
4 But many kids have many different clubs, and they come
5 up to the art studio to create their banners or their
6 posters or whatever it may be. This is the only
7 group's stuff that's ever been ripped down and thrown
8 out and especially laying all over the floor and -- and
9 treated with disgust. He's saved other things.
10 Taken down carefully and saved other things and so
11 that's my point.
12   Q. What other banners like this has he saved?
13   A. There -- as I said, sir, there are many other
14 groups.
15   Q. Can you give me any specific example?
16   A. I'm trying to think for you here. There are
17 hundreds, if not -- of groups that -- that work in
18 there. There -- there are banners for the Christmas
19 assembly. There are banners for any number of
20 programs that occur.
21   Q. And do you know if the banners for the
22 Christmas assembly are saved each year?

Page 189

1   A. No, I don't know if they're saved each year.
2   Q. All right. Is there any other specific
3 example you can give?
4   A. No, not at this time.
5   Q. Were there any African American students who
6 complained to you that they had expected that their
7 banners would be -- be taken down and saved in February
8 of 2002?
9   A. I -- indeed, the children were working with
10 Vernese Edgehill, who was the -- one of the codirectors
11 of diversity at the time, and indeed she was the one
12 who was up there working with the kids and also gave
13 the kids -- brought them into the space to use the
14 space. So, and I shared the incident with her, and I
15 think maybe you need to talk to her about that.
16   Q. Would you answer my question, please?
17   A. No.
18   Q. And did you regard the incident involving the
19 Black Culture Club banners as an example of racially
20 hostile treatment of you by GDS?
21   A. Yes.
22   Q. Did Mr. Ryan tell you that he was taking down

Esquire Deposition Services
D.C. - 1-800-441-3376
MD - 1-800-539-6398
VA - 1-800-752-8979

Page 190

1  -- he had taken down the banners because there was
2  another group that needed to use the space?
3      A.  He said that other people needed the space.
4      Q.  All right.  And why is it you think Mr.
5  Ryan's motive for taking down the Black Culture Club
6  banners was racial prejudice against you as an African
7  American?
8      A.  Well, they really weren't taken down.  They
9  were ripped down.  Taking down and ripping down are
10 two different things and so that -- that stark
11 difference in itself says something like -- says
12 something to me about racial prejudice.
13     Q.  Do you know were these banners exposed to any
14 weather or any outside conditions?
15     A.  I really don't know, sir.  I didn't really
16 inspect them very clearly, you know, closely, except I
17 could see that they were ripped, ripped and strewn.
18     Q.  So you wouldn't know whether they might have
19 been ripped because of weather or some outside
20 condition over the weekend?
21     A.  Right.
22     Q.  In the second paragraph of that numbered item

Page 191

1  2 of Exhibit 13, do you see where it says you had to
2  take down from the walls on the first floor entrance
3  some works completed by Laura's students?
4      A.  Uh-huh.
5      Q.  Would those be Laura Tolliver's students?
6      A.  Yes, sir.
7      Q.  And you took those works down on a Friday
8  after Ms. Tolliver -- let me see.  I want to go back
9  before I ask you these questions.  On these BCC
10 banners that we were talking about, did that incident
11 occur on a -- was that after a weekend or do you
12 remember?
13     A.  Let me just dry my glasses.
14     Q.  Do you remember if that encounter --
15     A.  Yeah.
16     Q.  -- with Mr. Ryan was after a weekend?
17     A.  Just -- just a second, please.  I cannot tell
18 you with complete accuracy at this moment, sir.
19     Q.  Okay.
20     A.  I need to be refreshed on that.
21     Q.  Let's go back to this question about Laura's
22 students.  You took down those -- the work of Laura's

Page 192

1  students on a Friday --
2      A.  Uh-huh.
3      Q.  -- when Ms. Tolliver had already left for the
4  weekend; is that right?
5      A.  Yes.
6      Q.  And since she had left for the weekend, you
7  didn't have a chance to ask her permission for taking
8  down her students' work?
9      A.  Yes.
10     Q.  Now, did you think it was appropriate to ask
11 permission of another teacher before taking down her
12 students' artwork?
13     A.  Generally speaking, there should be some -- I
14 agree with there being a discussion about these things,
15 yes, sir.
16     Q.  Okay.  I think we're going to change a tape
17 now for a moment.
18     A.  Okay.
19         THE VIDEOGRAPHER:  Going off the record
20 at 3:39:02.  End of tape 2.
21         (Discussion off the record.)
22         THE VIDEOGRAPHER:  Going back on the

Page 193

1  record at 3:40:28.  Beginning of tape 3.
2  BY MR. WILLIAMSON:
3      Q.  Ms. Killian, do you see in the second
4  paragraph under numbered item 2 of Exhibit 13 where you
5  say, "Ryan screamed at me that you're supposed to ask
6  permission first before you can take down anyone else's
7  works."
8      A.  Uh-huh.  Yes.
9      Q.  Where was it that Mr. Ryan screamed at you
10 that you're supposed to ask permission first before you
11 can take down anyone else's works?
12     A.  In the office, art office.
13     Q.  Do you know the approximate date when that
14 incident occurred?
15     A.  It was -- it was, ooh, again late February and
16 I -- I wrote -- I wrote something to him pretty soon
17 after that happened.  I sent him a note.  So that the
18 date should exist in much more accuracy than I would
19 speculate for you right now.
20     Q.  Sometime in February?
21     A.  Yes.
22     Q.  Was there anybody present who heard Mr. Ryan

Page 194

1 scream at you that you're supposed to ask permission
2 first before you can take down anyone else's works?
3     A.  Not that I recall.  We were in the office,
4 and I didn't know.  I didn't see Laura then at that
5 time.  I don't recall seeing her in the room at that
6 time and since it's the three of us usually, that would
7 be --
8     Q.  Is the art office next to any other office?
9     A.  No.  No.  It's in a large studio and it's in
10 the back.
11    Q.  Is there anybody else on the floor?
12    A.  Yes.  Science is on that floor as is
13 technology.
14    Q.  If -- if someone was screaming at you, would
15 anybody in science or technology be able to hear the
16 screaming?
17    A.  The gallery space is very long and goes out to
18 the hallway, and the doors would have to be definitely
19 open and, you know, people had to be there at the time
20 of day that this is all happening.  So, you know.
21    Q.  What time of day was it happening?
22    A.  It would either be late afternoon or early

Page 195

1 morning.
2     Q.  Would there have been other faculty around at
3 that time?
4     A.  It all depends.  You know, what happens in
5 the -- this, no.  For this particular situation, my
6 answer is no.
7     Q.  Now, in the next sentence where you say, "He
8 can rip down the Black Culture Club's works and leave
9 it on the floor," is that in reference to the incident
10 where you were not actually present when the Black
11 Culture Club works were taken down and left on the
12 floor?
13    A.  Uh-huh.  Yes.
14    Q.  Now, did you regard Mr. Ryan's statement to
15 you that you're supposed to ask permission first before
16 you can take down anyone else's work as an example of
17 racial harassment?
18    A.  Yes.
19    Q.  And what made you think that statement was
20 based on racial prejudice towards you?
21    A.  I think it was for the past four or five years
22 I have invited the owner of Remy Art Gallery to help us

Page 196

1 to celebrate Black History Month, and how she did that
2 was by bringing original artwork to the school for me
3 and hang them on the first floor right in the entryway.
4 So that parents, teachers and so on would get another
5 feel.  Would get to see the works of African American
6 artists or artists who -- who enhanced African American
7 artwork or the visible reputation of African
8 American's, especially for that time of year, you know,
9 that month.
10    Q.  Sure.
11    A.  And I had been very, very busy.  Very busy
12 that February.  My brother died that year, that
13 February month and so I wasn't able to get the works up
14 for the entire month.  Edith Buffalo said we can do
15 it.  We can still do it for the rest of February.  My
16 husband helped me to go pick up the works, bring them
17 out to the school.  Laura was gone, and he helped me
18 put the works up on the first floor.
19        It wasn't even as substantial as I would have
20 normally done, but that's the only reason I took the
21 students work down.  I assumed, you know, I didn't
22 have to call her at home about this.  That it would be

Page 197

1 okay to take down the students' work and, you know, the
2 kids' work.  I mean, I later found out whose work it
3 was.  I respect my students' works or any students'
4 works.  So I packaged them very carefully, took them
5 upstairs to her office, and put them in a very safe
6 place.  I didn't call her at home to say I had to.
7 Although, you know, I really thought I should have, but
8 I didn't do it.
9     Q.  Hold on, Ms. -- I just want to be sure you
10 understand the question I'm asking you.
11    A.  Yes.
12    Q.  What made you think that the statement by Mr.
13 Ryan was based on racial prejudice towards you?
14        MR. RACIN:  This is fully responsive.
15        THE WITNESS:  At any rate, it was for
16 Black History Month and he takes -- he's taken her
17 things down without asking.  I have not heard or I
18 have not been privy to any discussion about why he
19 didn't ask her or vice versa, and this was a special
20 situation.  And I -- I think I've answered the
21 questions.
22 BY MR. WILLIAMSON:

Page 198

1   Q.  If I understand your answer, the normal or the
2 answers you've given today, the normal practice is to
3 ask permission first before you take down the work of
4 another teachers' students; is that right?
5   A.  And I use the word permission here
6 specifically, but usually among colleagues if there's a
7 real need, I believe that one can say, may I borrow
8 this space and so on, and it didn't necessarily happen
9 in exchange with me, but this I thought was a special
10 situation.  It should have been -- I shouldn't have
11 had to have heard a negative response like this.  It
12 should have been "The works are beautiful up.  I am
13 glad you had a chance to do some celebration for Black
14 History Month in this way, Sharon -- month in this way,
15 Sharon.  I'm sure Laura will understand."
16   Q.  Now, would you answer my question, please?
17 Is it -- was it your prior testimony that the normal
18 practice among the art school teachers is if you're
19 going to take down the work of another teacher, that
20 you ask that teacher's permission before you do that?
21   A.  Yes.
22   Q.  And why is it you have a practice like that at

Page 199

1 GDS when you were there?
2   A.  Perhaps Nick Ryan can answer this one, but
3 there are three of us and we have many, many students
4 and it's -- I think it's -- I think it's appropriate --
5   Q.  Okay.
6   A.  -- that we have, you know, we ask.
7   Q.  And setting aside that -- your allegation
8 that Mr. Ryan screamed at you, what makes you think he
9 made this statement about following that practice for
10 any other reason than that the faculty -- the art
11 faculty thinks that's an appropriate way to operate?
12          MR. RACIN:  In addition to what's
13 already been testified to?
14          THE WITNESS:  Yeah.  I don't -- I don't
15 know.
16          MR. RACIN:  I mean, asked and answered.
17 BY MR. WILLIAMSON:
18   Q.  Would you answer my question?
19   A.  I -- I don't know what else you want me to say
20 about that, sir.
21   Q.  I just --
22   A.  I believe --

Page 200

1   Q.  I'm trying to understand why you think that or
2 tell me, do you think that the reason he gave that he
3 thinks you should follow the policy, whether or not he
4 had adequate justification in this particular
5 circumstance, are you saying that that reason was not
6 the real reason why he asked -- said to you that you
7 should get permission before you take down these
8 things?
9   A.  Well, considering all I have been suffering
10 over these past years with -- with him, I suppose
11 that's possible.
12   Q.  Or is it your testimony the real reason he
13 said that to you is because he wanted to make you feel
14 racial hostility?
15   A.  Yes.
16   Q.  That's --
17   A.  He wants me to feel racial hostility.  He
18 couldn't -- obviously couldn't help it.
19   Q.  Now, in numbered paragraph 3, you say that you
20 told Paul Levy about Nick's reference to Debbie Haynes.
21 Why did you feel that it was important to tell Paul
22 Levy about Nick's reference to Debbie Haynes?

Page 201

1   A.  Because he was coming in.  He was brought in
2 from the outside to do something totally different.
3   Q.  Did you tell Nick -- did you tell Paul Levy
4 because you believe that Nick Ryan resented you because
5 of his understanding that you had played a role in the
6 termination of Debbie Haynes?
7   A.  Repeat that, please.
8   Q.  Did you -- did you go to Paul Levy because you
9 believed that Nick Ryan resented you because of his
10 understanding that you had played a role in the
11 termination of Debbie Haynes?
12   A.  I went to Paul because I felt harassed by that
13 statement.
14   Q.  But why did you make the reference to or why
15 did you tell him about the references to Debbie Haynes?
16   A.  Because I felt harassed by it.
17   Q.  All right.  And was that harassment based on
18 Nick Ryan's resentment of you because of what he
19 thought you had done to Debbie Haynes?
20   A.  I -- if you will, a combination of racial
21 hostility and resentment since he really didn't know
22 and wasn't there when.  He was hired, in fact,

~uire Deposition Services
~. - 1-800-441-3376
MD - 1-800-539-6398
VA - 1-800-752-8979

Page 302

1 the advance -- actually, here we are.  This is a
2 perfect example.  I asked about the change in Laura
3 Tolliver's course name from Technology in the Arts or
4 Technology in the Studio Arts to Graphic Design, and it
5 relates to this newly approved course that I had been
6 working on called Graphic Design and Publishing.
7        And the response I believe was worse than the
8 request in that Nick Ryan bent over in his chair like
9 he was an ape (indicating) and scooped up like he was
10 an ape.  Saying he can't bend low enough to the ground
11 to understand me as if, you know, he was talking to an
12 animal or that's the only way that he would understand
13 me.  And so I believe, I feel that that was worse than
14 me -- the response to my question was worse than --
15 worse than the actual asking.
16     Q.  Talking about apes, are you suggesting that
17 apes move their arms to scoop things up?
18     A.  Well, my characterization right now is that he
19 scooped down with his arms like so (indicating) and
20 said he can't bend low enough to the ground to
21 understand me.
22          MR. RACIN:  And, counsel, so that the

Page 303

1 written record fairly reflects the motion involved,
2 would you take a stab at describing that for the
3 record?
4          MR. WILLIAMSON:  I'm not going to take a
5 stab at it since I'm not the one being deposed,
6 counsel.  If you got an objection, make your objection
7 for the record.  Otherwise, we're moving on.
8          MR. RACIN:  Well, I think the record
9 should reflect what the -- so that the written record
10 also -- I'm not sure the --
11          MR. WILLIAMSON:  Counsel, we've got a
12 videotape here.  That's how --
13          MR. RACIN:  But the video --
14          MR. WILLIAMSON:  That's how we record.
15          MR. RACIN:  The video is not showing it,
16 you know, accurately it seems to me.  But I will have
17 cross-examination.
18 BY MR. WILLIAMSON:
19     Q.  Ms. Killian, would you please turn your
20 attention to numbered paragraph 7 of Exhibit 13.
21     A.  Yes.
22     Q.  You see where you say:  "When computers were

Page 304

1 upgraded in the art department, I asked that the used
2 machines be transferred to the Yearbook office.
3 Instead, Bruce gave all but two machines to the Iona
4 House (Bill Young former GDS assistant principal) --
5     A.  Uh-huh.
6     Q.  -- along with two printers that I thought and
7 said were still quite useful to the art department and
8 to the Yearbook office."
9     A.  Uh-huh.
10    Q.  Do you see that?
11    A.  Yes.
12    Q.  All right.  Ms. Killian, I would like to show
13 you a document that's been marked as Exhibit 22.
14    A.  Okay.
15         (Thereupon, a document was marked for
16 identification Exhibit No. 22.)
17         THE WITNESS:  Okay.
18 BY MR. WILLIAMSON:
19    Q.  Can you tell us what Exhibit 22 is?
20    A.  It's a memo.  An e-mail, rather, Tuesday,
21 June 10th.  Message from Bruce Ruble.  Subject -- you
22 want me to go through all that?

Page 305

1    Q.  Yes.
2    A.  Subject?  All right.  Macs.  To Nick Ryan,
3 Sharon Killian and Laura Tolliver.
4    Q.  And what's the message?
5    A.  It says, "Please deal with any files saved to
6 the hard drives of the Macs in the art studio and the
7 photo class in this week.  I will be setting up the
8 art studio Macs with OS 10 -- or OS X versions of
9 software beginning next week.  The blue and white Macs
10 in the photo classroom will be cleaned off and given
11 away to Iona."
12    Q.  And does it say B underneath that?
13    A.  B for Bruce Ruble I'm assuming.
14    Q.  Okay.
15    A.  It's kind of highlighted up here.  I'm not
16 used to seeing that print like that.  The name.
17    Q.  Let me just ask you a few questions --
18    A.  Right here.
19    Q.  -- about that.  When he says, "The blue and
20 white Macs in the photo classroom will be cleaned off
21 and given away to Iona," is that what you were
22 referring to in paragraph 7 of Exhibit 13?

Esquire Deposition Services
D.C. - 1-800-441-3376
MD - 1-800-539-6398
VA - 1-800-752-8979

Page 358

1  this juncture.
2          MR. WILLIAMSON: Fine.
3          MR. RACIN: Well, one, one inquiry,
4  really.
5     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
6  BY MR. RACIN:
7     Q. You mentioned several times the episode -- you
8  made several references in your testimony to the
9  episode involving Nick Ryan in which he bent low to the
10 ground.  (Ringing).  Excuse me.  Let me turn this off.
11         And I'm going to ask you for the record to
12 describe more about that, but first, what did you --
13 tell us more about the encounter with Nick Ryan.  What
14 did you go to him for?
15    A. I had gone to him to talk about the names of
16 courses that were going to be offered the following
17 year.
18    Q. Where was he at the time?
19    A. He was in his office.
20    Q. And --
21    A. In the art studio office.
22    Q. Behind a desk?

Page 359

1     A. Sitting at his desk.
2     Q. And what did you do to initiate the
3  conversation?
4     A. I walked into the room and I asked Nick if I
5  could talk with him about something, and he said yeah.
6  And I started to talk with him about the name of a
7  course, a graphic design course.
8     Q. Did you remain standing?
9     A. I actually sat down in my chair, and we were
10 facing each other almost as like this.
11    Q. What did you say?
12    A. And I --
13    Q. As best you recall it now.
14    A. Yes.  I said, "Nick, I'd like to talk with you
15 about the graphic design course that is now named and
16 formerly Technology For the Studio Arts and the new
17 course that was recently approved called Graphic Design
18 and Publishing and I wondered first doesn't that seem
19 to be redundant?"  And -- and, you know, when did
20 this -- I didn't realize that we had a graphic design
21 course on the curriculum.  And he immediately looked
22 at me and Laura Tolliver was in the room at the time.

Page 360

1  And he --
2     Q. Did he say, first of all?
3     A. -- sat like this.  He said, I can't --
4  "Sharon, I can't bend low enough to the ground to
5  understand you."  (Indicating).
6     Q. Was that the first thing he said to you?
7     A. Yes.
8     Q. And what was the level of his voice?  Was he
9  yelling?  Was he talking in normal tone?
10    A. He was talking fairly loudly and very -- with
11 expressiveness.
12    Q. And describe for the record, remember that
13 folks may be reading this deposition.
14    A. Yes.
15    Q. Describe for the record what he did.
16    A. He moved forward in his chair, bent low over
17 his knees or between his knees with his arms
18 outstretched in a scooping motion towards his head as
19 he said that.  (Indicating).
20    Q. And how did you interpret that?
21    A. I can't bend.
22    Q. How did you interpret that movement?

Page 361

1     A. I -- the only thing I could think of is, is he
2  is he calling me an ape?  He said -- and I said to
3  him, "You just said I can't bend low enough to the
4  ground to understand you?"  And I repeated that and
5  then I -- I left the room and went downstairs.
6     Q. Now, when you say he made a scooping motion?
7     A. Yes.
8     Q. Did he come up towards his sides as he --
9     A. Yes.
10    Q. -- scooped?
11    A. Yes, he did.
12         MR. WILLIAMSON: Objection, leading.
13         MR. RACIN: This is cross.
14         No further questions.
15         THE WITNESS: Thank you.
16         MR. WILLIAMSON: We have nothing further
17 at this time.  Just reserve our right to seek a second
18 day of deposition of Ms. Killian.
19         THE VIDEOGRAPHER: Going off the record
20 at 7:24:16.  End of the deposition.  End of tape 4.
21         (Thereupon, at 7:22 p.m., signature
22 having not been waived, the deposition in the

Page 560

1  superiority. That's what they told me.
2       Q.   Did they say to you that they
3  believed Nick Ryan was acting toward you with the
4  intent of creating a racially hostile environment
5  at GDS?
6       A.   I don't recall that.
7       Q.   At the top of the third page of
8  Exhibit 39, you say: "I was told by both Debbie
9  and Laura, in the presence of Paul Levy, that
10 they liked me better when I asked them how to do
11 this or that, i.e., knew my place."
12           Do you see that?
13      A.   Yes.
14      Q.   When was it that Debbie and Laura
15 made this statement to you?
16      A.   It was '97, I think.
17      Q.   Were there any witnesses to that
18 statement?
19      A.   Yes.
20      Q.   Who were the witnesses?
21      A.   Paul Levy and Bill Licamelli (ph.),
22 M.D.

Page 561

1       Q.   Anybody else?
2       A.   None that I know of.
3       Q.   What was the context in which the
4  statements were made?
5       A.   Meeting about the disparity and the
6  problems that I was having in the office.
7       Q.   Was Dr. Licamelli being brought in
8  to act as some sort of mediator?
9       A.   A listener, I think, at least. Yes.
10      Q.   Is he a psychiatrist?
11      A.   Yes.
12      Q.   Did they actually say they liked you
13 better when you knew your place, or is that your
14 interpretation of their statement that they liked
15 you better when you asked them how to do this or
16 that?
17      A.   They liked me better when I asked
18 them how to do this or that.
19      Q.   So, did they actually say to you
20 they liked you better when you knew your place?
21      A.   No, I said that is, i.e., that is,
22 knew my place. That's what I -- that's what it

Page 562

1  meant to me.
2       Q.   That's how you interpreted it?
3       A.   Yes.
4       Q.   Okay. Do you see on the second
5  bullet of the fourth page now of Exhibit 39,
6  still on Exhibit 39. Go to the fourth page.
7       A.   The fourth page?
8       Q.   Yes.
9       A.   Okay.
10      Q.   Where it says: "Around 2000, while
11 I was chair of the GDS diversity task force
12 recruitment and retention subcommittee" --
13      A.   Sorry, which bullet?
14      Q.   Turn to the fourth page, which is
15 going to be Bates numbered?
16      A.   One, two, three, fourth page is 120.
17      Q.   Let me see if we've got the right
18 page. Make it the third page, make it Bates
19 number 2644.
20           I'm sorry I created the confusion
21 there.
22      A.   Okay. Sorry.

Page 563

1       Q.   You see there in the second bullet
2  there where it says: "Around 2000, while I was
3  chair of the GDS diversity task force recruitment
4  and retention subcommittee."
5            Do you see where it says that?
6       A.   Yes.
7       Q.   And "you had made a suggestion that
8  GDS hire more teachers of color and Paul Levy
9  said there are no qualified black teachers out
10 there.
11           "He added that he has attended
12 recruitment meetings and some of the D.C.
13 teachers can't even speak English well."
14           When was that statement made to
15 you by Paul Levy?
16      A.   Earlier I had said something about
17 '99.
18      Q.   Okay.
19      A.   And here it says around 2000, so,
20 maybe it was '99, 2000, that some time during
21 that academic year.
22      Q.   That academic year, okay. Is

50 (Pages 560 to 563)

Page 628

1  been occasions.
2       You asked me about whether there
3  were times when calls were directed to Laura
4  Tolliver and critical information would be
5  discussed.
6       And that I wouldn't, I would not get
7  the information. And it had occurred with Tim
8  Ford and Laura Tolliver in this regard, before,
9  not every time.
10     Q.   Did it occur shortly after the
11 transition had been made?
12     A.   I don't know. Within the next year,
13 yes.
14     Q.   What was the most recent time when
15 one of these incidents occurred involving Tim
16 Ford and Laura Tolliver?
17     A.   It was the 2002/2003 academic year.
18     Q.   And has it occurred since then?
19     A.   No.
20     Q.   Any other examples?
21     A.   Not that I know.
22     Q.   I beg your pardon?

Page 629

1      A.   No.
2      Q.   And what's your basis for thinking
3  that the taking of these calls by Mr. Ryan and
4  Ms. Tolliver were motivated by racial prejudice
5  against you?
6      A.   Because this happened to me and no
7  one else in that department, and consistently
8  occurred over and over, this marginalization.
9  That's my feeling about that.
10     Q.   Can you give any more specific
11 reason?
12     A.   No.
13     Q.   Ms. Killian, you currently reside in
14 Fayetteville, Arkansas, don't you?
15     A.   Yes.
16     Q.   Before you moved to Arkansas, where
17 did you live?
18     A.   7101 Algeron in Falls Church.
19     Q.   Is that in Virginia?
20     A.   Yes.
21     Q.   And when did you decide that you
22 were going to move to Arkansas?

Page 630

1      A.   When we decided to sell our house,
2  we were going to relocate.
3      Q.   And when was that?
4      A.   April, the house was sold, was put
5  on the market. And, yes.
6      Q.   Was it put on the market about
7  April 14, 2005?
8      A.   Yes.
9      Q.   And how long before April 14, 2005,
10 did you, or you and your husband decide that you
11 were going to move to Arkansas?
12     A.   Not long, not long before that.
13     Q.   Was it a few days, or a few weeks,
14 or a month?
15     A.   No. You know, GDS and I were in
16 what were to have been some negotiations. They
17 had asked me previously about the option of not
18 coming back to school as one of the things that
19 I, that could be part of a settlement agreement.
20     So, it wasn't unusual that that
21 could be a possibility. We were, the market was
22 great, and we sold our little house.

Page 631

1      Q.   You say the market was great, how
2  long was the house on the market before a
3  purchaser signed a contract on the house?
4      A.   I think that it was within a week
5  that it was sold.
6      Q.   April 20th sound about right,
7  April 20, 2005?
8      A.   Something like that, uh-huh.
9      Q.   Keep in mind we have to have one
10 person talking at a time. I know you're trying
11 to be responsive.
12     A.   Sorry.
13     Q.   But our reporter has persevered very
14 graciously with us and we don't want to tamper
15 with that as we go down the stretch here.
16     A.   Yes.
17     Q.   Now, when you -- and what was the
18 close date for the sale of the house?
19     A.   July 17th or some thereabouts, or
20 14th. I don't remember exactly.
21     Q.   July 14th, 2005?
22     A.   2005.

67 (Pages 628 to 631)

Page 636

1  possibility that I would be back.
2      As far as I knew, the Fayetteville
3  address was going to be my summer residence.
4      Q.  You said your intention was to just
5  stay in Fayetteville for the summer?
6      A.  As far as I knew at the time,
7  Fayetteville, Arkansas could be my summer
8  residence.
9      Q.  Didn't you testify earlier that you
10 moved to your household belongings to Arkansas in
11 July of 2005?
12     A.  Yes.
13     Q.  And if you were just going to, if
14 you were just contemplating that Arkansas would
15 be your summer residence, why is it that you
16 moved your household furnishings to Fayetteville?
17     A.  My husband would stay in
18 Fayetteville. And I would be commuting to and
19 from, for the period that I would have to. That
20 was the plan.
21     Q.  So, the plan was that your husband
22 would establish permanent residence, and that you

Page 637

1  would commute to the Washington area after the
2  summer?
3      A.  That was the plan. If everything,
4  if that's what I had to do, yes.
5      Q.  Now, did you understand in July of
6  2005 that, based on your, the contract you had
7  signed with GDS in February of 2005, that GDS was
8  expecting you to teach at the school during the
9  2005/2006 school year?
10     A.  Yes.
11     Q.  When did you first decide that you
12 were not coming back to teach at GDS in the
13 2005/2006 school year?
14     A.  It wasn't so much as a decision as a
15 compelling illness that made it happen, that I
16 couldn't come back.
17     Q.  When did -- well, we'll get to some
18 questions about that in a moment.
19         Do you know what staff week is at
20 GDS?
21     A.  Yes.
22     Q.  What is it?

Page 638

1      A.  It's a period before classes begin
2  where a faculty and staff come to school and
3  prepare.
4      Q.  Does it normally occur around the
5  last week of August before school starts?
6      A.  Yes.
7      Q.  When did you inform GDS that you
8  would not be attending staff week in August of
9  2005?
10     A.  It was, it may have been the day
11 that, the Friday before staff week, something
12 like that.
13     Q.  Would that have been around
14 August 24, 2005?
15     A.  Somewhere around there.
16     Q.  On the --
17     A.  I'm not looking at a calendar.
18     Q.  On the day before you informed GDS
19 that you were not going to be coming for staff
20 week -- well, who was the person you spoke to at
21 GDS, was that Janice Webb?
22     A.  I think I left a message.

Page 639

1      Q.  Okay. On the day before you left
2  your message, were you still planning to return
3  to GDS to work during the 2005/2006 school year?
4      A.  I was planning on it until I felt so
5  horrible -- by emotionally -- emotionally drained
6  and emotionally ill from the outcome of my wait
7  and trust of the school to talk with us freely.
8      Q.  Explain that a little bit more.
9      A.  I had every intention on coming back
10 until I was sick, until I became sick.
11     Q.  Did you make any travel arrangements
12 to come back in August of 2005?
13     A.  I -- you know, I would have driven
14 is how I would have done it, driven. I don't
15 usually make, you know, you don't have to do too
16 much to do that.
17     Q.  When you went out to Arkansas, did
18 you drive out there?
19     A.  Uh-huh.
20     Q.  And how many cars do you own?
21     A.  One now. One.
22     Q.  And does your husband use the car?

69 (Pages 636 to 639)

Page 656

1  not provide accurate information, you could be
2  liable for insurance fraud, correct?
3      A.  Yes.
4      Q.  Now, would you please turn to the
5  page that has the Bates Number 2899 in the lower
6  right-hand corner.
7      A.  Yes.
8      Q.  Do you see the section Roman Numeral
9  II, Number 1?
10     A.  Yes.
11     Q.  I want to direct your attention to
12 that.
13         Can you please read the question and
14 your response?
15     A.  Section II, Number 1?
16     Q.  Yes.
17     A.  "Nature of illness and when symptoms
18 first appeared or describe how and where the
19 accident occurred.
20         "Hypertension, controlled,
21 depression, anxiety, insomnia, colitis, nausea
22 and diarrhea, April 2005."

Page 657

1      Q.  Were you telling the truth when you
2  provided that information?
3      A.  Yes.
4      Q.  Does April 2005 refer to when your
5  symptoms first appeared?
6      A.  The depression, the serious
7  depression hyped up, as far as I'm concerned,
8  yes.  I had, the hypertension was ongoing.
9  Insomnia definitely started to increase in 2005.
10     Q.  Was that in April of 2005?
11     A.  April 2005.  I think there was
12 another incident at school that -- well --
13     Q.  What incident was that Ms. Killian?
14     A.  It was something about I would be
15 the only person in the office without access to
16 the key to the department resources.
17         Like the two white people could have
18 access to the key, but the black person couldn't
19 have access to the key to the resources.
20     Q.  Was that the incident that you
21 discussed in your deposition on the first day
22 where you said it was worked out that you would

Page 658

1  be given access to the key?
2      A.  That -- eventually.
3      Q.  When you say eventually, when was it
4  that you were given access to the key?
5      A.  I don't remember exactly, but the
6  resolution was that, the resolution based on the
7  meeting with Kevin Barr and Tom Yoder and Nick
8  Ryan and Laura Tolliver and me would be that I
9  would not have the key, and the two white people
10 in my office would have the key.
11         And I would have to ask permission
12 to use the key to get to equipment and I believe
13 my lawyer talked to Carin Pass or something at
14 that time and eventually somebody, I think Kevin
15 Barr, changed his mind and decided that -- it
16 didn't all go away.  When I got handed the key,
17 it didn't all go away.
18     Q.  And when you say eventually, when
19 was it that you were given the key?
20     A.  I don't remember the exact date.
21     Q.  What is the approximate date?
22     A.  It's something around April or May,

Page 659

1  I believe.
2      Q.  Of 2005?
3      A.  2005.
4      Q.  Okay.  Was that the incident that
5  precipitated your symptoms in April, 2005?
6      A.  Ongoing, ongoing incidents and that
7  was a shocker, that was a shocker, yes.
8      Q.  What were the other ongoing
9  incidents in April of 2005 that triggered your
10 symptoms?
11     A.  I don't even recall having written
12 down everything because I mean, I still had to
13 teach my classes.
14         I had shows going on, my kids were
15 participating in the auction, and, you know, I
16 was trying to do the best I could.
17         And another wrench was thrown in,
18 and a pretty big wrench.  And my body -- my --
19 my -- I responded.
20     Q.  And you felt like you were under a
21 lot of pressure at that time because of these
22 other responsibilities?

74 (Pages 656 to 659)