# Exhibit 4

# Affidavit of Sharon Killian

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHARON KILLIAN                )
                              )
        Plaintiff            )
                              )
        v.                   )   Civil Action No. 05-1925 (EGS)
                              )
GEORGETOWN DAY SCHOOL         )
                              )
        Defendant.           )
_____)

## AFFIDAVIT OF SHARON KILLIAN

SHARON KILLIAN hereby certifies that the following is true, correct and based on personal knowledge:

1.    I am the Plaintiff in this lawsuit and furnish this Affidavit to address several matters of importance in light of testimony taken subsequent to my deposition from employees at the School including the former Director of Studies and now-Principal Kevin Barr (Caucasian male), and the School's current diversity coordinators, Elizabeth Denevi (Caucasian female) and Mariama Richards (African American female).

2.    Ms. Denevi and Ms. Richards both testified they never furnished me with Nick Ryan's version of the events of February 20, 2004 that led me to report outrageous and racist conduct on his part.

3.    Mr. Ryan testified that Denevi and Richards told him what I had reported, which was, "Sharon, I can't bend low enough to the ground to **understand** you." Despite the severity of this abuse, no one bothered to inform me of his claims immediately following the event or subsequently. I only learned of

1

this as a result of Discovery.

4. It was only after my legal counsel managed to obtain their notes of the ensuing "mediation" that I discovered what his account was.

5. Had I known at the time I could have refuted it, and otherwise explained why it did not make sense, beginning with the purpose of the discussion that day. It was not, as Mr. Ryan reported to Ms. Denevi and Ms. Richards, a discussion about a technology report, it was about a rare change of course title decided by Mr. Ryan and Laura Tolliver alone, without involving me.

6. I would also have said what seems to me obvious, that Mr. Ryan's version of the remark he yelled at me - "…I can't lower my self enough to please you" - makes little sense: "Please" sounds nothing like "understand", and I could not have misheard Mr. Ryan given the decibel level of the remark.

7. Ms. Denevi and Ms. Richards knew I was confronting the frightening prospect of daily contact in the Art Department with someone in authority whom I believed had engaged in grossly offensive conduct. It is difficult for me to believe they would have withheld information that might help allay my fears if they actually found the information to be remotely plausible.

8. It is also difficult for me to know Ms. Denevi and Ms. Richards testified I not only failed to describe Mr. Ryan's conduct as racist, but specifically denied believing it. They never asked such a question. It had to be obvious to all concerned including Head of School Peter Branch (Caucasian male) I was complaining about fundamentally racist conduct in the Art Department. That was the reason for Kevin Barr involving the School's "diversity coordinators" in the first place.

9. The notes taken by Ms. Richards during the "mediation" include a page bearing the heading "Major Points." Next to the name "Sharon" is the word "race" in parentheses, which helps show I did say Mr. Ryan's outburst was motivated by my race (as the ape-like gestures I also reported made absolutely clear). Yet Ms. Richards testified the notation referred, not to "Sharon's" belief that "race" was the major point, but to Mr. Ryan's belief that I might **say** race was the major point!

10. Ms. Richards also testified she was unaware I had on prior occasions complained about racist conduct on the part of Mr. Ryan to the former Principal Paul Levy (Caucasian male). Anike Oliver has called the testimony into question, saying that "Mari told me on at least one occasion that Sharon Killian had complained directly to the principal of the School (at the time a white male named Paul Levy) about racist conduct in the Art Department directed against her by Mr. Ryan."

11. I went to Mr. Levy several times at the specific suggestion of Vernese Edghill, African American female, who was co-director of diversity with John Burghardt (Caucasian male), before Ms. Richards and Ms. Denevi were hired by the School.

12. Ms. Edghill also told me she had gone to Mr. Levy several times to report her concern that I was being subjected to racist treatment in the Art Department. It was precisely because Ms. Edghill knew the history so well that I asked her to review a draft of the email I sent Mr. Ryan on March 5, 2002 objecting to his conduct after I removed an exhibit of photographs from the entranceway to the School in order to display African American artwork in honor of Black History Month.

13. Mr. Barr testified that, when I went to him after the incident with Mr. Ryan of February 20, 2004, I

did not say the conduct involved was racist. Mr. Barr also denied remembering a conversation with me during the technology retreat that took place the next day, Saturday, February 21st. Yet we had discussed our difficulty sleeping as a result of the incident with Mr. Ryan. Accompanying this Affidavit is a photocopy of a page from my calendar for 2004, showing a contemporaneous entry that I made on February 21, 2004: "made tech conf. Kevin asked me whether I had sleepless night – said he did too. I just can't believe this."

14. On March 12, 2004 I met with Head of School Peter Branch and told him personally about Nick Ryan's outrageous and racist conduct and used a memorandum dated 3/12/2004 I prepared as talking points. These talking points are a true and accurate account of some of the things I encountered at the School.

15. Mr. Branch's reaction when I told him what happened to me on February 20th was one of disappointment with me for reporting it not outrage at Nick Ryan's conduct. At the end of the meeting he said there was a position at NCS; he wouldn't mind if I applied for that job.

16. Kate Lindsey, the School's Chief Financial Officer, has furnished a Declaration to the effect she saw me carrying boxes out of the School some time during the summer of 2005. She apparently intends to suggest I knew I would not be returning, so arranged to remove my things. Ms. Lindsey should know I carried boxes out of the School *every* year. I prepared for the coming year over the summer, and my practice was to work from home.

17. Part of my preparation for the coming year is ordering supplies for my classes which I had done.

18. I also prepared syllabi for my classes and provided them to Kevin Barr in August, 2005.

19. At the beginning of the 2003-04 academic year at the School my allocation of computer disk space was two (2) gigabytes. Two gigabytes is like two rolls of unprocessed of film. A two gigabyte storage card was commonly used in advanced amateur digital cameras during this period. In order to "process" two gigabytes of photographs, the files must first be uncompressed so that they may be viewed and edited with digital software. Two gigabytes of unprocessed digital photographs require an additional seven (7) gigabytes of space just to uncompress them. This doesn't even allow disk space to edit or in any way manipulate the digital images.

20. At this very time and unbeknown to me, Laura Tolliver was given an additional 65 to 75 gigabytes of disk space on each computer in the MAC lab (about 25 computers) and on every art studio computer for her own use. Meanwhile, I was being required to copy my student and publications files to CD's in order give my students an adequate technology experience.

21. My capital budget requests were routinely prioritized by Nick Ryan before being sent to administration; they were not merely passed on.

22. There was never any indication to me that there was ever "proportionate allocation" of capital budget monies, except for the 05-06 academic year after my complaint of racial discrimination was named through my legal counsel.

23. The display space in the old student lounge was not seen as the prime location for a teacher to show student art exhibits. Students were notorious for throwing food and having rough play there. That is how I came to inherit the space. This invariably meant that student artwork may be destroyed. I

worked to change students' outlook over the years so that they came in the end to treasure having such valuable things as artwork among them as they ate, relaxed and studied.

24. Banners created for school events are routinely kept from year to year as appropriate. The art department reuses from year to year a large banner welcoming students back to school; banners students create for the Passover assembly are reused from year to year; banners created by the Black Culture Club are reused also.

January 8, 2007

DATED_____

_____
SHARON KILLIAN

| Thursday • Feb. 19 | Friday • Feb. 20 | Sat / Sun • Feb. 21/22 |
|---|---|---|
| **D** | **E** | |
| 1 | 1 | |
| 3 | Advisor Meeting | |
| | A* | |
| MB | MB | |
| 5 | 2 | |
| B | B | Made tech conf<br><br>Kevin asked me whether I had sleepless night — said he did too I just can't believe this |
| 6 | 4<br><br>cuba | |
| 8 | 7 | **Note**<br><br>**Presidents' Day**<br>Feb. 16<br><br>**ISL Basketball Tournament**<br>Feb. 22, Feb. 23, Feb. 24 |
| | | |

February