# Exhibit 12

# Deposition of Nick Ryan

DEPOSITION OF NICOLAS RYAN
CONDUCTED ON MONDAY, OCTOBER 2, 2006
Case 1:05-cv-01925-EGS    Document 28-3    Filed 01/10/2007    Page 2 of 6

4 (Pages 13 to 16)

**Page 13**

1  Stilted.
2  Q  Now, the other member of the art department
3  is Laura Tolliver; is that right?
4  A  Correct.
5  Q  And what was the relationship between
6  Deborah Haynes and Laura Tolliver as best you know?
7  A  She was another art teacher in the
8  department.
9  Q  Well, can you describe the relationship
10 between Laura Tolliver and Debbie Haynes as you saw it
11 after your arrival?
12     MR. WILLIAMSON: Objection to the form,
13 vague.
14 BY MR. RACIN:
15 Q  Did it seem to be a good relationship?
16 A  Yes.
17 Q  Did you ever hear it said that they were
18 related by marriage?
19 A  No, I wasn't completely aware I knew there
20 was some -- that someone had been related. But I
21 didn't know whether it was an in-law or I honestly
22 didn't care. It didn't make any difference to me.

**Page 14**

1  So --
2  Q  It seemed to you they were friends?
3  A  They seemed friends. That was really the
4  extent of it. I never really was made aware of what
5  the specific relationship if there was one between
6  them.
7  Q  And during your first year as chair of the
8  department, is it fair to say you knew that the
9  relationship between Laura Tolliver and Debbie Haynes
10 was friendly?
11 A  Yes.
12 Q  And is it also fair to say you knew the
13 relationship between Sharon Killian and Debbie Haynes
14 was not friendly?
15 A  I don't know that I would describe it as not
16 friendly. I would describe it as strained.
17 Q  Now, Deborah Haynes retired after your first
18 year as chair of the department; is that right?
19 A  Well, she retired as chair with my arrival.
20 And then she retired from her position as part-time
21 teacher of the school in that spring of 2001.
22 Q  Thank you for clarifying that.

**Page 15**

1  Now, after Ms. Haynes' departure, a decision
2  was taken to honor her by naming a student award for
3  excellence after her; is that right?
4  A  Yes.
5  Q  And who was responsible for that decision?
6  A  Paul Levy and I were responsible for that
7  decision.
8  Q  Did you consult anyone in the department
9  before making that decision?
10 A  No.
11 Q  And, again, before you and Mr. Levy I should
12 have said made that decision.
13 That was a joint decision between you and
14 Paul Levy; is that fair to say?
15 A  Correct.
16 Q  Now, at the time, you had no reason to
17 believe that Laura Tolliver would have any objection;
18 isn't that right?
19     MR. WILLIAMSON: Objection, foundation.
20 BY MR. RACIN:
21 Q  Is it fair to say that at the time you and
22 Mr. Levy made that decision, you had no reason to

**Page 16**

1  believe that Laura Tolliver would object to that, to
2  designating an award in Debbie Haynes' honor?
3  A  I had no feelings that anyone would object
4  to anyone having that award named in their honor.
5  Q  Well, you knew that -- I think you testified
6  that Mrs. Killian had a strained relationship with
7  Debbie Haynes; is that right?
8  A  Correct.
9  Q  And it never occurred to you that she might
10 object?
11 A  No.
12 Q  Did there come a time when you became aware
13 that she had problems with it?
14 A  Long after the fact, yes.
15 Q  Now, this decision meant that each and every
16 year throughout the rest of her career at GDS, Sharon
17 Killian was going to have to nominate a student for a
18 Debbie Haynes award; is that right?
19 A  Not completely.
20 Q  Okay. In what respect is that inaccurate to
21 say?
22 A  There are -- there is an award -- well,

Page 21

1  of the Haynes award, you didn't think it was any
2  of Mrs. Killian's business whether she got an
3  award or not; is that right?"
4       MR. WILLIAMSON: We renew our objection, foundation.
5  foundation.
6  BY MR. RACIN:
7    Q  I'll withdraw it on the ground it's badly
8  framed. Let me try to restate.
9       Is it fair to say that at the time of the
10 creation of the Haynes award, you didn't think the
11 matter was any of Mrs. Killian's business?
12      MR. WILLIAMSON: Objection, foundation.
13   A  Is there a way to -- I probably -- the way
14 the question is asked because the question doesn't
15 reflect what I was feeling, how I viewed the
16 situation.
17 BY MR. RACIN:
18   Q  Well, did you think it was any of her
19 business?
20      MR. WILLIAMSON: Objection, foundation --
21 I'm sorry, withdraw that objection.
22   A  My feeling is that it was a matter between

Page 22

1  the administration and the department head. And it
2  was in recognizing extensive years of service to the
3  school.
4       I think it was approaching 30 years of
5  service to Georgetown Day School for Mrs. Killian -- I
6  mean for Debbie Haynes.
7  BY MR. RACIN:
8    Q  I want to direct your attention to the 2001,
9  2002 academic year, specifically February of that year
10 which I believe is Black History Month; is that right?
11 Is February of each year Black History Month?
12   A  Yes, it is.
13      (Ryan Exhibit Number 2 was marked for
14 identification and was attached to the
15 transcript.)
16 BY MR. RACIN:
17   Q  Please review what was been marked as Ryan
18 Exhibit 2 which appears to be an Email from you to
19 Paul Levy, date Wednesday, March 6, 2002.
20   A  I finished reading the document.
21   Q  Now, referring to the introduction, My
22 summary of the events at 6:30 p.m. Tuesday,

Page 23

1  March 5th while the matter is still fresh in my mind.
2       Did I read that correctly?
3    A  Yes.
4    Q  The events in question had happened more
5  than a week before; isn't that right?
6       You began the narrative with, Friday,
7  November 22nd when Mrs. Killian took a sick day; is
8  that right?
9    A  Sharon didn't show up for work on
10 February 22nd, correct.
11   Q  Was that a rare occurrence for Mrs. Killian
12 to miss work?
13   A  Actually, I'd have to check the records as
14 to -- but I don't remember Sharon missing any
15 extensive number of classes. What was unusual was not
16 receiving any notification, so there was no one there
17 to teach the class. So I had to cover the class
18 unexpectedly.
19   Q  This is a difficult period in Mrs. Killian's
20 life; isn't that right? Well, you knew she had lost
21 her brother within weeks this event, right?
22   A  Yes.

Page 24

1    Q  And you knew that was an unexpected event,
2  right?
3    A  Yes.
4    Q  And she took a sick day on Friday,
5  February 22nd without notice to you. That's your
6  testimony?
7    A  Yes.
8    Q  Now, my question is wasn't it a rare event
9  for Sharon Killian to miss work at GDS?
10      MR. WILLIAMSON: Objection, asked and
11 answered.
12 BY MR. RACIN:
13   Q  I should say at -- I do my best to let folks
14 finish questions. And sometimes I take a while to get
15 a question out. So if we could make an effort not to
16 speak over each other, that would certainly ease the
17 job of our court reporter.
18      The question again didn't you know that
19 Mrs. Killian was one who rarely missed work?
20      MR. WILLIAMSON: Objection, asked and
21 answered.
22 BY MR. RACIN:

25

1  Q  Again, absent an instruction not to answer,
2  you're free to answer the question.
3  A  I would say that my memory is that Sharon
4  did not miss an extraordinary number of classes. She
5  was usually there to teach her class. It wasn't an
6  issue in my mind.
7  Q  We can skip to the fourth sentence,
8  "Additionally, over the weekend Sharon evidently came
9  into school and removed a student's photography
10 exhibit (Jon Kelman's) from the first floor display
11 boards and hung art work from the Ramee Art Gallery in
12 its place (in anticipation of the BCC assembly the
13 following Friday, March 1st)."
14     Do you see that?
15 A  I do.
16 Q  When did you notice that had been done?
17 A  As soon as I walked into the school.
18 Q  Is it your routine to come in the front
19 entrance of the school?
20 A  Yes.
21 Q  And is that where this art work was hung?
22 A  Yes.

26

1  Q  And as you saw that, did that seem
2  inappropriate to you that she had hung that art work?
3     MR. WILLIAMSON: Objection, foundation.
4  A  I didn't think it was so much inappropriate
5  as I was surprised that an exhibit that had just gone
6  up had been taken down. And we had had a department
7  meeting earlier in the week. And no mention of the
8  shift in artwork had occurred during that meeting.
9  BY MR. RACIN:
10 Q  Did you understand this artwork was for an
11 upcoming assembly to honor Black History Month?
12 A  I didn't at the time, no, because we had had
13 a department meeting earlier in the week. And no
14 mention of that occurred and that seemed to me a
15 reasonable time to say, I'm going to be changing the
16 exhibit. Otherwise Laura Tolliver wouldn't have hung
17 the exhibit later in that week to have it come down
18 two days later.
19 Q  Was it not a routine at the school to put up
20 art work in connection with Black History Month?
21 A  I believe it was.
22 Q  And did you understand that Mrs. Killian

27

1  generally took charge of that effort?
2  A  I didn't know who did it actually from year
3  to year. This was only my second year of working at
4  the school. So this is the second February I had been
5  there.
6  Q  Well, the first February, February '01, do
7  you recall --
8  A  I don't remember honestly at that point.
9  Everything was very new to me my first year at the
10 school.
11 Q  As you entered the school that day, it was
12 apparent to you Mrs. Killian must have come in over
13 the weekend for this purpose to place this artwork; is
14 that right?
15 A  Yes.
16 Q  Then continuing, quote, "I arrived at school
17 at 7:30 a.m. Monday and encountered banners from a
18 weekend dance hanging from the art room windows and
19 riser steps in the studio gallery that evidently were
20 in the process of being painted - clearly an
21 unfinished student project from the weekend."
22     Did I read that correctly?

28

1  A  Yes, you did.
2  Q  So it seems as if you proceeded from the
3  entrance of the school to your office, and you
4  encountered these banners?
5  A  I noticed the banners when I was driving up
6  to the school.
7  Q  Oh, I see. And where were the banners?
8  A  Hanging from the second floor windows of the
9  art room -- third floor windows, I'm sorry.
10 Q  What did these banners look like?
11 A  They were paper banners 36 inches wide and
12 maybe 8 feet long. I can't remember whether it was
13 one or two of them.
14    Students make banners on a regular basis for
15 dances. They'll do it for a birthday. They'll do it
16 for ecology, a birthday, any kind of event, gay pride
17 week. And they'll hang them either in the stairwell,
18 various locations for brief time the event occurs.
19 Then they take them down and throw them away.
20 Q  Do you know why these banners were there
21 this particular morning?
22 A  This was for the dance that occurred over

29

1 the weekend.
2  Q  And as you saw those banners, do you recall
3 having any particular reaction to them?
4  A  No.
5  Q  Okay. Now you go on to say, "Since it was
6 windy and the dance was over, George Buckwalter and I
7 removed the tattered dance banners from the art room
8 windows - I thought little of this, students often use
9 art room materials for school events so this was
10 nothing unusual."
11   Did I read that correctly?
12  A  Yes, you did.
13  Q  Who is George Buckwalter?
14  A  George Buckwalter is one of the maintenance
15 men at the school.
16  Q  Do you recall if -- did you call
17 Mr. Buckwalter?
18  A  No, I believe he is -- he will in the
19 mornings do what I would call a walk-through through
20 the school.
21   So he -- not every morning, but he'll pass
22 through the various floors. And he came into the art

30

1 room and helped me pull those in. Whether he had seen
2 the banners and was on his way up or whether he just
3 happened upon it and began helping me, I'm not sure.
4  Q  And you go on to say, "I was in a rush to
5 get ready for my photography class at 8:15 a.m., a few
6 students were already showing up, so I neglected to
7 put the paper banners in the trash cans."
8   Where did you leave the banners?
9  A  We opened -- George and I opened the
10 windows. We pulled the banners in, put them on the
11 floor. George might have -- we might have put one of
12 them in the trash already, or we might have just left
13 them on the floor. It's hard to say which the -- I
14 know one was just left basically in tact on the floor.
15   And then I had to go mix -- for the
16 beginning of class, there are various chemicals one
17 mixes up especially on a Monday morning you need to
18 make fresh chemicals for the darkroom trays.
19   So I had to get that ready for my students
20 coming to class. That was my first priority.
21  Q  Let me hand you what was introduced during
22 the course of Mrs. Killian's deposition as Exhibit 62.

31

1 I guess remark as Ryan 3.
2   (Ryan Exhibit Number 3 was marked for
3 identification and was attached to the
4 transcript.)
5 BY MR. RACIN:
6  Q  Ryan 3 purports to be the third floor of the
7 Georgetown Day High School, a depiction of the floor
8 plan; is that right?
9  A  Yes, it is.
10  Q  Can you describe for the record where the
11 banners were.
12  A  The banners were on the side of the school
13 facing Davenport Street hanging from the third floor
14 windows.
15  Q  If you could refer to this floor plan, if
16 you would, where were the banners?
17  A  Well, the 42nd Street which isn't pictured
18 on here runs along the side of the floor plan from the
19 art studio to the gymnasium. So it's on the top of
20 the floor plan, that entire side of the school is
21 Davenport Street. And so in the art studio area, the
22 windows, they're all along the entire side of both

32

1 sides of the studio. But on the side that faces
2 Davenport Street, there were windows from which the
3 banners hung.
4  Q  Did the banners, were they just on the
5 windows of the art studio? Did they continue any
6 further?
7  A  They hung -- they were anywhere six to eight
8 to ten feet paper banners hanging from the third-floor
9 windows. So how far they hung down, I don't know.
10 They weren't attached. They were just hanging,
11 blowing in the wind.
12  Q  The top left of the floor plan, the art
13 studio, it would be --
14  A  Do you want me to mark it with an "X"?
15  Q  If you would, sure. With an "X," mark where
16 the banners were.
17  A  Roughly here. If there are two, it would be
18 there. If it was one, it would be somewhere between
19 these two.
20   Here is bookshelves, computer station. And
21 this area is -- over here is a solid wall and some
22 easles. So this is the only place where there is

**101**

1 That's unreadable. And a good portion of that is
2 unreadable. So as long as we don't talk about those.
3  Q  We will. But why don't you keep the clearer
4 version anyway.
5  A  So I should read these?
6  Q  If you would. I'll represent this
7 compilation of handwritten notes, Bates 2788 through
8 2793, have been testimony that these are handwritten
9 notes prepared by Elizabeth Denevi in her capacity as
10 co-director of Diversity.
11  A  Okay.
12  Q  Referring to Ryan Exhibit 7, Bates 2788
13 appears it's dated 3/1/04, Nick, at the top.
14     And then you see the bracketed line one of
15 the first legible lines, "Debbie: part-time when Nick
16 came," closed bracket?
17  A  Yes.
18  Q  Did that refer to Debbie Haynes?
19  A  It did.
20  Q  There is an arrow under, Debbie, "did do
21 terrible things."
22     Do you see that?

**102**

1  A  I did.
2  Q  Do you recall saying that Debbie did
3 terrible things to the Diversity coordinator, to the
4 co-director of Diversity?
5  A  That Debbie did terrible things.
6  Q  There is an arrow and, "did do terrible
7 things."
8     Do you know what that refers to?
9  A  No -- I'm puzzled as to what your question
10 is though. Who did terrible things, Debbie? Is that
11 what you're asking?
12  Q  I don't know. "Debbie," there is an arrow.
13 And under the arrow, "did do table things."
14     Do you have any idea what the reference is?
15  A  No. I didn't perceive Debbie as doing
16 terrible things, not in the brief time that she was
17 there that I was there I didn't witness terrible
18 things.
19  Q  And you never said to the co-directors of
20 Diversity in substance in affect that Debbie Haynes
21 did do terrible things?
22     MR. WILLIAMSON: Objection, asked and

**103**

1 answered.
2 BY MR. RACIN:
3  Q  See under that, "wanted to stay, didn't want
4 to leave."
5     Do you know what that refers to? Did you
6 say anything like that to them?
7  A  As the spring -- as we entered spring,
8 Debbie floated the idea of remaining on in some
9 part-time capacity.
10     But employment is an administrative
11 decision, not a department head decision. So that was
12 something they had -- this was all done prior to my
13 arrival at the school.
14  Q  And you also say, "admin had to make the
15 decision," is that right?
16  A  Administration, yes. It's an administrative
17 decision.
18  Q  Does that sound familiar? Would you say
19 something like that to them?
20  A  Well, the administration does make the
21 hiring, firing decisions at the school.
22  Q  Do you have any knowledge of the basis for

**104**

1 the decision not to have Debbie Haynes there?
2  A  No, I don't.
3  Q  Okay. Now, in your meetings with the
4 Diversity coordinator were you ever told that Sharon
5 Killian had heard you say, I can't bend down -- in
6 affect, I can't bend down low enough to the ground to
7 understand you?
8  A  Were you referring to a certain page?
9  Q  No.
10  A  Can you state the question one more time.
11  Q  During the course of your meetings with the
12 Diversity folks, Ms. Denevi and Ms. Richards, did they
13 ever indicate to you that Mrs. Killian had heard you
14 say, had reported hearing, I can't bend down low
15 enough to the ground to understand you?
16  A  I believe they expressed to me that Sharon
17 was presenting her version of what I had said. And my
18 version of what I said were different. What exact
19 words, they told me at that time, I don't know other
20 than what's on these notes here. All I know is what I
21 said.
22  Q  Okay.