# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S REPLY MEMORANDUM IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dated: January 31, 2006

Thomas S. Williamson, Jr. (D.C. Bar No. 217729)
Timothy R. Clinton (D.C. Bar No. 497901)
**COVINGTON & BURLING LLP**
1201 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 662-6000
(202) 778-5218 - Fax

**COUNSEL FOR DEFENDANT**

# TABLE OF CONTENTS

Page

I.   Plaintiff Has Failed to Controvert Any of the School's Statements of Undisputed, Material Facts. ................................................................................................................ 1

II.  Plaintiff Has Effectively Conceded that GDS Is Entitled to Summary Judgment on Her Retaliation and Wrongful Discharge Claims. ......................................................... 2

III. Plaintiff's Arguments in Opposition to GDS's Motion Are Insufficient to Defeat Summary Judgment on Her Hostile Work Environment Claims. ................................. 3

    A.   Plaintiff's Opposition Does Not Establish that She Was Subject to Severe or Pervasive Racially Hostile Treatment. .............................................................. 3

        1.   Plaintiff Has Inaccurately Stated the Applicable Standard. ...................... 3

        2.   Incidents Prior to September 30, 2001 are Time-Barred and Unsupported by the Record. .................................................................... 5

        3.   Plaintiff's Allegation Regarding Camera Equipment is Unsupported. .................... 8

        4.   The Isolated Incidents in February 2002 and February 2004 are Insufficient to Establish a Racially Hostile Work Environment. ......................... 9

    B.   Plaintiff Has Not Raised a Genuine Material Issue Regarding Whether the School Failed to Take Prompt Remedial Action. ........................................... 15

        1.   The Undisputed Evidence Shows that the Mediation Was Legitimate. ................. 15

        2.   Meeting with Peter Branch ..................................................................... 19

        3.   The Caryn Pass Investigation ................................................................ 20

    C.   Plaintiff's Remaining Allegations Are Irrelevant or Immaterial. ................................... 21

IV. GDS Is Entitled to Summary Judgment on Plaintiff's Constructive Termination Claim. .......................................................................................................................... 22

V.   Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

Page

## CASES

\* *Al-Mahdi v. District Of Columbia Pub. Schs.*, No. 01-1014 (JR), 2005 U.S. Dist.
LEXIS 38670 (D.D.C. Dec. 2, 2005) .................................................................................22, 25

*Coleman v. Potomac Electric Power Co.*, No. 04-7043, 2004 U.S. App.
LEXIS 21820 (D.C. Cir. Oct. 19, 2004) ..........................................................................5

\* *Everson v. Medlantic Healthcare Group*, 414 F. Supp. 2d 77 (D.D.C. 2006) ...................................3-4

\* *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ........................................................14

*Holcomb v. Powell*, 433 F.3d 889 (D.C. Cir. 2006) ..............................................................20

*Jones v. Billington*, 12 F. Supp. 2d 1 (D.D.C. 1997), aff'd, No. 98-5014, 1998
U.S. App. LEXIS 15459 (June 30, 1998) ..........................................................................14

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004) ........................................................5

*Kalekiristos v. CTS Hotel Management Corp.*, 958 F. Supp. 641 (D.D.C. 1997).................................6

\* *Kelley v. Billington*, 370 F. Supp. 2d 151 (D.D.C. 2005)...............................................1, 6, 21

*Lemmons v. Georgetown University Hospital*, 431 F. Supp. 2d 76 (D.D.C. 2006) ..............................7

\* *Moore v. Ashcroft*, 401 F. Supp. 2d 1 (D.D.C. 2005)................................................3, 14

*Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549 (D.C. Cir. 1997).....................................22

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) ...............................................................22

*Taylor v. FDIC*, 132 F.3d 753 (D.C. Cir. 1997) ................................................................22

*Twist v. Meese*, 854 F.2d 1421 (D.C. Cir. 1988) ..............................................................1

\* *Vickers v. Powell, No. Civ. 03-174*, 2005 WL 3207775 (D.D.C. Nov. 21, 2005)..............................5

\* *Villines v. AFL-CIO*, 999 F. Supp. 97 (D.D.C. 1998) .......................................................3, 25

*Waterhouse v. District of Columbia*, 298 F.3d 989 (D.C. Cir. 2002).......................................2

\* *Welzel v. Bernstein*, 436 F. Supp. 2d 110 (D.D.C. 2006).................................................6, 13

*Zubrow v. Solvay Pharmaceuticals*, No. 03CV1929, 2006 U.S. Dist. LEXIS 7039
(D. Conn. Feb. 3, 2006) ..........................................................................................19

Page

**STATUTES AND RULES**

Fed. R. Evid. 408 .......................................................................................................... 13

Fed. R. Evid. 602 ............................................................................................................ 6

Fed. R. Evid. 801 ............................................................................................................ 6

D.C. Rules of Prof'l Conduct 1.7 .................................................................................. 22

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

Defendant Georgetown Day School ("GDS" or "School"), by its undersigned counsel, submits this Reply Memorandum in Support of its Motion for Summary Judgment to dismiss all of Plaintiff's claims with prejudice.

## I.     Plaintiff Has Failed to Controvert Any of the School's Statements of Undisputed, Material Facts.

Plaintiff's "Statement of Genuine Issues" fails to controvert any of the School's undisputed material facts pursuant to Local Civil Rule 56.1, which provides that any fact not specifically controverted in a non-moving party's statement of genuine issues may be deemed admitted.[1]  Kelley v. Billington, 370 F. Supp. 2d 151, 152 n.1 (D.D.C. 2005) (Bates, J.).  The rationale for the Local Rule is set forth in Burke v. Gould:  "[A] district court judge should not be obligated to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact."  286 F.3d 513, 518 (D.C. Cir. 2002) (quoting Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).  Plaintiff's

---

[1] See Pl.'s Statement of Genuine Issues.  LCvR 56.1 ("An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement. . . . **the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion**.") (emphasis added).

Statement of Genuine Issues is similar to that of the plaintiff in <u>Gibson v. Office of the Architect of the Capitol</u>, where the Court noted: "Plaintiff's Statement is almost completely unhelpful to the Court as its provisions rarely address the facts outlined in Defendant's Statement, instead describing in lengthy detail the 'contextual and structural background' surrounding Defendant's stated facts. Such excess, unresponsive verbiage is a clear violation of both the letter and the spirit of Local Rule 56.1." No. 00-2424 (CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) (Kollar-Kotelly, J.). Accordingly, Plaintiff's failure to controvert **any** of the specific facts identified by the Defendant means they all should be deemed admitted.

## II.     Plaintiff Has Effectively Conceded that GDS Is Entitled to Summary Judgment on Her Retaliation and Wrongful Discharge Claims.

The School's Motion for Summary Judgment[2] seeks summary judgment on all Counts of Plaintiff's Amended Complaint. In her Opposition,[3] Plaintiff offers **no** argument with regard to Retaliation or Wrongful Discharge and concludes by asking that the Court deny summary judgment **only** "upon her claims of hostile work environment and constructive discharge."[4] As a result, Plaintiff has effectively conceded that GDS is entitled to summary judgment with respect to Count II, "Section 1981 (Retaliation)," Count IV, "DCHRA (Retaliation)," and her Wrongful Termination claims, described under Counts I and III.

---

[2] For purposes of this Memorandum, Defendant refers to its Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment as "Def.'s Mot. for Summary Judgment" or "Motion for Summary Judgment" or simply "Defendant's Motion."

[3] For purposes of this Memorandum, Defendant refers to Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment as "Pl.'s Opp'n" or "Opposition."

[4] Pl.'s Opp'n. at 28.

**III.     Plaintiff's Arguments in Opposition to GDS's Motion Are Insufficient to Defeat Summary Judgment on Her Hostile Work Environment Claims.**

Summary judgment must be granted where the non-moving party does not make a showing sufficient to establish the existence of **each essential element** on which that party will bear the burden of proof at trial.  See Waterhouse v. District of Columbia, 298 F.3d 989, 992 (D.C. Cir. 2002) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  In her Opposition, Plaintiff is unable to establish (i) that she was subject to severe or pervasive hostile treatment on account of her race; (ii) that a reasonable person would view GDS's treatment of Plaintiff as racially hostile conduct;  or (iii) that the School failed to adequately respond to her complaints.  These are each essential elements of a claim based on a racially hostile work environment.  See Moore v. Ashcroft, 401 F. Supp. 2d 1, 42–43 (D.D.C. 2005).  Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claims should be granted.

> **A.     Plaintiff's Opposition Does Not Establish that She Was Subject to Severe or Pervasive Racially Hostile Treatment.**

>> **1.     Plaintiff Has Inaccurately Stated the Applicable Standard.**

Plaintiff cites a single case, Villines v. AFL-CIO, 999 F. Supp. 97 (D.D.C. 1998) (Urbina, J.), to illustrate the minimum set of facts sufficient to establish a racially hostile work environment.[5] Plaintiff's description of this case does not disclose critically relevant facts, including the severity and pervasiveness of the defendant supervisor's conduct, and the evidence presented regarding the defendant supervisor's racial motivations.  Plaintiff's description of the case is as follows:

> In Villines, Judge Urbina found the African American plaintiff to have established an issue of hostile environment for the jury based on "four separate incidents occurring from June through August when [her supervisor] chastised and mistreated her."  The supervisor "yelled" on three occasions, and acted to "block[] her view to her colleagues and visitors entering the office."

---

[5] Pl.'s Opp'n. at 26.

> The plaintiff also showed "that none of the white co-workers under [his] supervision received the same frequent and hostile treatment."[6]

This description is materially incomplete and therefore highly misleading. Plaintiff omits the finding that the <u>Villines</u> plaintiff's supervisor raised his arm as if to strike the plaintiff when she accused him of racism and made disparaging remarks associating the plaintiff with former Mayor Marion Barry after his arrest for drug use. <u>Villines</u>, 999 F. Supp. at 99–100. When asked whether race was a motivating factor in his treatment towards the plaintiff in that case, the supervisor said, "Well, she's black, isn't she?" <u>Id</u>. at 100.

Compare Plaintiff's selectively incomplete factual account of <u>Villines</u> with a more recent and more analogous case, <u>Everson v. Medlantic Healthcare Group</u>, 414 F. Supp. 2d 77 (D.D.C. 2006) (Facciola, Mag. J.). In <u>Everson</u>, the Court granted summary judgment for the defendant on a hostile work environment claim where the alleged harassment consisted of "four reprimands made approximately every six months, two incidents of harsh words," (one of which involved "shouting"), and a variety of other relatively innocuous "conduct [that] caused [plaintiff] to feel stressed." <u>Id</u>. at 83, 86. According to the Court, "[r]eprimands and unpleasant bosses are not uncommon in the workplace," and the fact that such conduct caused a plaintiff to feel stressed is insufficient to establish a hostile work environment claim. <u>Id</u>. at 86.

Unlike the plaintiff in <u>Villines</u>, Plaintiff has alleged no specific facts giving rise to a reasonable inference that her treatment was racially motivated. Plaintiff has not alleged a single example of an explicitly racial comment or provided evidence to establish that any allegedly hostile conduct by her supervisor, Nick Ryan, was on account of her race. To the contrary, she admits that Ryan has given

---

[6] Pl.'s Opp'n. at 26 (citations omitted).

her consistently positive evaluations of her work,[7] and it is undisputed that Ryan gave her frequent praise for promoting the multicultural mission of the School.  For example, in her 2003–2004 evaluation, Ryan praised Plaintiff's choice of an African American student model for a painting project, which he said made "a powerful statement to what GDS stands for."[8]  In her 2004–2005 evaluation, Ryan praised Plaintiff for "frequently and effectively" including "multicultural perspectives" in her projects.[9]  At her deposition, the **only** comment Plaintiff recalled receiving from GDS regarding her extensive participation in diversity activities was "supportive of her participation and contributions to GDS' diversity efforts."[10]

### 2. Incidents Prior to September 30, 2001 are Time-Barred and Unsupported by the Record.

Defendant's Motion for Summary Judgment explains that the statute of limitations in this case extends back to September 30, 2001.[11]  Incidents outside the statutory period may be revived only if (1) the incidents alleged to have occurred within the limitations period are sufficient to raise an inference of racial discrimination; and (2) the incidents falling prior to the statutory period are "sufficiently related to the incidents occurring within the statutory period as to form one continuous hostile work environment."  Vickers v. Powell, No. Civ. 03-174 (CKK), 2005 WL 3207775, at *32–33

---

[7] See, e.g., Ex. 21 attached to Def.'s Mot. for Summary Judgment (2000–2001 Eval.); Ex. 22 attached to Def.'s Mot. for Summary Judgment (2001–2002 Eval.); Ex. 23 attached to Def.'s Mot. for Summary Judgment (2002–2003 Eval.); Ex. 24 attached to Def.'s Mot. for Summary Judgment (2003–2004 Eval.); Ex. 25 attached to Def.'s Mot. for Summary Judgment (2004–2005 Eval.).

[8] Ex. 24 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 6); see also Ex. 23 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 5).

[9] Ex. 25 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 7).

[10] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 715:20–716:7).

[11] Def.'s Mot. for Summary Judgment at 13–14 (citing Coleman v. Potomac Elec. Power Co., No. 04-7043, 2004 U.S. App. LEXIS 21820, at *2 (D.C. Cir. Oct. 19, 2004); Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383–84 (2004)).

(D.D.C. Nov. 21, 2005) (Kollar-Kotelly, J.) (unpublished) (quoting Wheaton v. N. Oakland Med. Ctr.,

130 Fed. Appx. 773, 787 (6th Cir. 2005)).

Plaintiff makes two allegations in her Opposition relating to conduct outside of the statute of

limitations period:  (1) that Laura Tolliver and Debbie Haynes "belittl[ed]" her; and (2) that Nick Ryan

named an award after Haynes.[12]  The alleged belittling by Tolliver and Haynes occurred in 1997[13]; and

the naming of the award for Haynes occurred during the 2000–2001 academic year, i.e., well before

the September 30, 2001 beginning date for the limitations period.  These allegations are barred by the

statute of limitations and should be disregarded.

Even if not barred, these allegations fail to raise a genuine, material issue.  Plaintiff's only

specific example of belittling conduct is when Haynes and Tolliver allegedly "said they 'liked

[Plaintiff] better when [she] asked them how to do this or that.'"[14]  This statement, which could be

based on a multiplicity of different factors besides race,[15] is not sufficient to define a racially hostile

work environment.  See Kelley v. Billington, 370 F. Supp. 2d 151, 158 (D.D.C. 2005) (Bates, J.)

(comments that African American plaintiff was a Nazi sympathizer, that plaintiff's music was

---

[12] Plaintiff also alleges that Haynes was replaced as Department Chair because of "deepening personal problems."  Pl.'s Opp'n. at 6.  This statement is unsupported by any citation to the record.

[13] See Ex. 10 attached to Pl.'s Opp'n. (Killian to Ailes, Mar. 16, 1997).

[14] Id. (citing Ex. 3 attached to Pl.'s Opp'n. (Killian Dep. 561)).  While Plaintiff states she understood the statement to mean that Haynes and Tolliver liked her better when she "knew [her] place," id., her characterization of the statement should **not** be considered by the Court.  See Welzel v. Bernstein, 436 F. Supp. 2d 110, 119–20 (D.D.C. 2006) (Huvelle, J.) (considering on summary judgment the defendant employee's **actual statement**, rather than the plaintiff's "'impression' or 'understanding'" of the statement's implied meaning).

[15] Plaintiff herself recognizes a variety of possibilities.  See Pl.'s Opp'n. at 6 (quoting Ex. 10 attached to Pl.'s Opp'n.) ("Is it because [Haynes] and [Tolliver] are sisters-in-law with relatives in common [and] nepotism rears its ugly head?  Is because [sic], as both [Haynes] and [Tolliver] say, the art studio space belongs to them and I am an outsider . . . ?  Is it because [Haynes] and [Tolliver] have held their territory for sixteen years together . . . ?  Is it because I am black and therefore thought to be somehow 'lesser?'"").

"hillbilly," and that a wedding with a white officiant was "nice," are unrelated to the plaintiff's race and cannot be used to support a hostile work environment claim).

Plaintiff's two other references to her time-barred treatment by Haynes and/or Tolliver are a vague, conclusory allegation[16] and a hearsay statement by a witness lacking personal knowledge.[17] Neither statement should be considered by the Court on summary judgment. See Kalekiristos v. CTF Hotel Mgmt. Corp., 958 F. Supp. 641, 665 (D.D.C. 1997) (O'Connor, J.) (vague, conclusory allegations unsupported by specific facts in the record are insufficient to create a genuine issue of material fact); Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 90 (D.D.C. 2006) (Walton, J.) ("inadmissible hearsay . . . may not be considered in resolving a motion for summary judgment").

In addition, Plaintiff argues that Ryan's decision to name an award after Ryan's predecessor as Art Department Chair, Debbie Haynes, was racially hostile towards the Plaintiff.[18]  Ryan made the decision during the 2000–2001 academic year, which ended months before the beginning of the statutory limitations period.[19]  The undisputed record demonstrates that this decision was made for a legitimate reason—namely, Haynes' long tenure as head of the Art Department; and Plaintiff has presented **no** evidence to show that the reason given was a pretext for racial discrimination against her. Plaintiff argues that the decision was hostile towards Killian because it "clearly risked disappointing

---

[16] In 1997, Plaintiff allegedly told Assistant Head of School Walter Ailes that she had "been met with crude, abusive, and unwarranted belittling by [Haynes] and [Tolliver]." Pl.'s Opp'n. at 6 (citing Ex. 10 attached to Pl.'s Opp'n.).

[17] Plaintiff argues that Ryan "knew full well [that Haynes] had done 'terrible things' while at the School." Pl.'s Opp'n. at 7 (citing Ex. 5 attached to Pl.'s Opp'n. (Denevi Notes 2788)).  As evidence, Plaintiff cites Elizabeth Denevi's notes of what Ryan said in a 2004 meeting.  These notes are hearsay to the extent they are offered to show that Haynes did unspecified "terrible things" to Plaintiff.  See Fed. R. Evid. 801.  This statement should also be disregarded because there is also no evidence that Ryan had personal knowledge of any "terrible things" by Haynes toward Plaintiff.  See Fed. R. Evid. 602. See also Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 102) (denying personal knowledge regarding "terrible things" by Haynes).

[18] Pl.'s Opp'n. at 7.

[19] Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 6).

and alienating the lone African American in the Department, while at the same time was certain to please Laura Tolliver[, a Caucasian]."[20]  It is undisputed that Ryan made the decision to recognize Haynes for her nearly **thirty years** of teaching at GDS, serving as Chair of the Studio Art Department for most of those years.[21]  Plaintiff also cannot dispute that Ryan made this decision in consultation with High School Principal Paul Levy, and **without** consulting Plaintiff or Tolliver, Plaintiff's Caucasian counterpart in the Art Department.[22]  Regardless of whether Ryan knew that relations between Haynes and Plaintiff had been "strained,"[23] there is no reasonable basis to infer that Ryan and Levy's decision to name an award after the outgoing Chairperson was in any way racially hostile towards Plaintiff.

### 3.  Plaintiff's Allegation Regarding Camera Equipment is Unsupported.

Plaintiff alleges that in February 2005 she "was compelled to fight for access to camera equipment on an equal basis."[24]  Plaintiff ignores Defendant's discussion of this topic in the moving

---

[20] Pl.'s Opp'n. at 8.

[21] Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 97–99); Ex. 7 attached to Def.'s Mot. for Summary Judgment  (Tolliver Dep. 17–19); Ex. 14 attached to Def.'s Mot. for Summary Judgment (Barr Decl. ¶ 16).

[22] Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 97:3–98:1).  In her Statement of Genuine Issues, Plaintiff states that Ryan made this decision on a "unilateral basis," but the source to which she cites is clear that Ryan made the decision in consultation with Levy.  See Pl.'s Statement ¶ 1 (citing Ex. 5 to Pl.'s Opp'n. (Denevi Mediation Notes at 2790) ("Art Award named for Debbie to recognize her service → made decision w/ Paul [Levy].")).

[23] Pl.'s Opp'n. at 7 (citing Ex. 12 attached to Pl.'s Opp'n. (Ryan Dep. 14)).

[24] Pl.'s Opp'n. at 19.  In a footnote and without explanation, Plaintiff also states that "[t]he School has devoted inordinate time and energy to showing relatively equal treatment in the matter of resources.  The treatment is disingenuous in several important respects."  Pl.'s Opp'n. at 14 n.6.  Plaintiff cites generally to her deposition statement that at the beginning of the 2003–2004 academic year, she was allocated 2 gigabytes of computer disk space while Tolliver had 65–75 gigabytes of disk space on separate drives in the Mac Lab.  Id. (citing Ex. 3 attached to Pl.'s Opp'n. (Killian Dep. 131)).  Yet Plaintiff fails to dispute **any** of the facts on this subject presented in Defendant's Motion.  See generally Def.'s Mot. for Summary Judgment at 14–22 ("2. GDS Equitably Allocated Supplies, Equipment, and Technology.").  For example, Plaintiff does not dispute (1) that no one on the GDS faculty, including Tolliver, had "similar or comparable needs" for computer equipment as Plaintiff, Ex. 18 attached to Def.'s Mot. for Summary Judgment (Ruble Decl. ¶ 3); (2) that Plaintiff used **more** digital storage space than Tolliver on the School's servers, Ex. 18 attached to Def.'s Mot. for Summary Judgment (Ruble Decl. ¶ 4); (3) that the separate drives to which she refers were used by Tolliver's Film and Video students, Ex. 18 attached to Def.'s Mot. for Summary Judgment (Ruble Decl. ¶ 8); or (4) that Plaintiff, as Film and Video instructor, would have had (continued…)

papers.[25]  Specifically, Plaintiff does not dispute that Tolliver had the only key to the cameras because they had been purchased for her Film and Video course,[26] or that Plaintiff herself was set to have primary responsibility for the cameras the following academic year (2005–2006) as the Film and Video instructor.[27]  Plaintiff does not dispute that limiting access to the teacher in charge of that course was considered an effective method to reduce the chance that a camera might become lost or unavailable for student use.[28]  Moreover, she admits that Barr arranged for her to get a key a mere **five days** after she complained.[29]  Plaintiff has presented **no** evidence to establish how this incident is probative of any racial hostility toward her.

        **4.**        **The Isolated Incidents in February 2002 and February 2004 are Insufficient to Establish a Racially Hostile Work Environment.**

       Plaintiff's remaining allegations relating to the hostile treatment to which she was allegedly subjected at GDS consist of two isolated incidents, **occurring two years apart** in February 2002 and February 2004.  These allegations are insufficient to establish that she was subject to racially-motivated harassment sufficiently severe or pervasive to constitute a hostile work environment.

---

**exclusive** access to those drives had she returned to GDS for the 2005–2006 academic year.  Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 439).

[25] See Def.'s Mot. for Summary Judgment at 22 ("2(d) Access to Digital Video Cameras").

[26] Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl.¶ 19); Ex. 14 attached to Def.'s Mot. for Summary Judgment (Barr Decl. ¶ 7); Ex. 11 attached to Def.'s Mot. for Summary Judgment (Tolliver Decl. ¶ 14).

[27] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 42–44).

[28] Ex. 14 attached to Def.'s Mot. for Summary Judgment (Barr Decl. ¶ 8).

[29] Ex. 4 attached to Def.'s Mot. for Summary Judgment (Pl.'s Supplemental Answer to Interrogs. at 4); Ex. 66 attached to Def.'s Mot. for Summary Judgment (E-mail from Barr to Buckwalter (Feb. 14, 2005)).

### a)     The February 2002 Incident

Plaintiff states that in February 2002, Ryan "arrange[d] for her to find banners created by members of the Black Culture Club ripped down and discarded as trash . . . ."[30]  When Plaintiff asked Ryan how the BCC banners had been taken down, he allegedly got "pretty upset about it, that [Plaintiff] would even ask and screamed and marched very quickly back and forth through the studio."[31]  According to Plaintiff, Ryan "arranged" for Plaintiff to find the banners in this condition because he was upset that she had replaced Tolliver's art display without asking Tolliver's permission.[32]  Plaintiff, however, provides no factual basis for this inference and avoids addressing any aspect of the discussion of this incident in Defendant's Motion.[33]  To illustrate, Plaintiff does not dispute that, (1) Ryan took the banners down with the help of GDS high school Building Manager George Buckwalter[34]; (2) Plaintiff did not witness Ryan and Buckwalter taking the banners down[35]; (3) they were paper banners of the type that Buckwalter ordinarily discards after the advertised event takes place, regardless of their condition[36]; and (4) weather had damaged these particular banners.[37]

---

[30] Pl.'s Opp'n. at 14.

[31] Pl.'s Opp'n. at 11 (quoting Ex. 3 attached to Pl.'s Opp'n. (Killian Dep. 185:22–186:2)).

[32] Id.  Somewhat mysteriously, the allegation of a causal link between Plaintiff's replacement of Tolliver's art display and Ryan discarding the BCC banners appears for the first time in Plaintiff's Opposition.  Cf., Ex. 28 attached to Def.'s Mot. for Summary Judgment (Branch Memo 2798); Ex. 30 attached to Def.'s Mot. for Summary Judgment (Pass Talking Points).  Also, Plaintiff mischaracterizes the record when she claims that Ryan has taken down Tolliver's art displays without asking.  Pl.'s Opp'n. at 11.  Plaintiff has not disputed the sworn testimony of both Ryan and Tolliver that contradicts her claim.  See Def.'s Statement ¶ 64 (citing Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 9); Ex. 11 attached to Def.'s Mot. for Summary Judgment (Tolliver Decl. ¶ 6)).  Moreover, Plaintiff has admitted that she was not privy to the conversations between Tolliver and Ryan regarding the replacement of their art displays.  See Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 565 (referring to Killian Dep. Ex. 39)).

[33] See. Def.'s Motion for Summary Judgment at 31–35 ("4(a) February 2002 Incidents").

[34] Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 29); Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 7).

[35] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 190).

[36] Ex. 17 attached to Def.'s Mot. for Summary Judgment (Buckwalter Decl. ¶ 3).

Regarding the alleged "screaming" in February 2002, nowhere does Plaintiff describe **what Ryan actually said**. According to her, Ryan became "pretty upset . . . that [Plaintiff] would even ask [why the BCC banners were being discarded] and screamed . . . ."[38] Ryan's alleged "screaming" at Plaintiff is facially race-neutral. Plaintiff attempts to impute discriminatory motives to Ryan by noting that the incident occurred during Black History Month and involved the Black Culture Club's banners.[39] Plaintiff makes this argument despite the fact that although "[a]t least one student in the Black Culture Club saw the banners and signs they had made strewn on the floor . . . ,"[40] Plaintiff has acknowledged that **there were no African American students who complained to Plaintiff that they had expected that the banners would be saved**.[41] Plaintiff has presented far too attenuated a basis for a reasonable person to infer that the February 2002 incident had anything to do with her race.

**b)     The February 2004 Incident**

Lastly, Plaintiff complains of her "exclusion from a rare departmental decision involving a change in course title" of one of Tolliver's courses to "Graphic Design," and Ryan's reaction to her complaint in that regard.[42] Defendant's Motion discusses this decision in detail;[43] yet Plaintiff's Opposition completely ignores the undisputed evidence presented there. For example, Plaintiff chose

---

[37] Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 29); Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 7).

[38] Pl.'s Opp'n. at 11 (quoting Ex. 3 attached to Pl.'s Opp'n. (Killian Dep. 185:22–186:2)).

[39] Pl.'s Opp'n. at 14.

[40] Ex. 30 attached to Def.'s Mot. for Summary Judgment(Killian Dep. Ex. 39, at 2642).

[41] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 189).

[42] See Pl.'s Opp'n. at 15. In a footnote, Plaintiff states without explanation that "fundamentally[,] the School has ignored Mrs. Killian's contention [that] she was consistently denied a role in departmental decision-making." Pl.'s Opp'n. at 14 n.6. Yet Plaintiff fails to cite **any** example (other than the course name change discussed separately below) or address **any** aspect of the **eight pages** of factual argument regarding departmental decision-making that the School presented in its Motion. See Def.'s Mot. for Summary Judgment at 23–31 ("3. GDS Made No Efforts to Undermine Plaintiff or Exclude Her from Department Decisions.").

[43] Def.'s Mot. for Summary Judgment at 29–31 ("3(d) Change in the Title of Tolliver's Course").

not to mention that Tolliver's course had been officially described as a "graphic design" course for **at least three years** prior to the change in the title to "Graphic Design,"[44] and that Plaintiff knew of no substantive changes to either the course description or the curriculum of the course.[45] Also, Plaintiff's allegation that such a decision was "rare" is unsupported by the record.  For example, it is undisputed that prior to this decision, Plaintiff had recently changed the title of one of her existing courses for the 2003–2004 academic year **without consulting Tolliver**,[46] and Plaintiff had changed the name of her proposed course in January 2004 **without informing either Tolliver or Ryan**.[47]  Plaintiff has no reasonable basis to claim that her exclusion from this insignificant decision to change the title of Tolliver's course was in any way racially prejudicial towards her.

Nevertheless, Plaintiff approached Ryan to discuss the decision.  According to Plaintiff, Ryan, responding to her inquiry, "moved forward in his chair, bent low over his knees or between his knees with his arms outstretched in a scooping motion towards his head as he said ['Sharon, I can't bend low enough to the ground to understand you.']."[48]  Plaintiff allegedly thought to herself, "Is he calling me

---

[44] Ex. 72 attached to Def.'s Mot. for Summary Judgment (2002–2003 Course of Study); Ex. 73 attached to Def.'s Mot. for Summary Judgment (2001–2002 Course of Study); Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 36).

[45] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 450–52).

[46] Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 24); compare Ex. 71 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 36) with Ex. 72 attached to Def.'s Mot. for Summary Judgment (2002–2003 Course of Study at 7210); Ex. 11 attached to Def.'s Mot. for Summary Judgment (Tolliver Decl. ¶ 19).

[47] Compare Ex. 59 attached to Def.'s Mot. for Summary Judgment (Killian Course Proposal at 2649) with id. at 2624; Ex. 11 attached to Def.'s Mot. for Summary Judgment (Tolliver Decl ¶ 20); Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 32).

[48] Pl.'s Opp'n. at 15.  According to Ryan, he told Plaintiff, "Sharon, what do you want?  I can't lower myself enough to please you."  Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 77)  The statement reflected his frustration that despite his many attempts to accommodate her idiosyncratic desires in the face of Plaintiff's mistreatment of **him**, she could not be satisfied.  Ex. 10 attached to Def.'s Mot. for Summary Judgment (Ryan Decl. ¶ 32).

an ape?"  She then twice repeated to Ryan, "You just said I can't bend low enough to the ground to understand you?" and left to report the incident to the then-Director of Studies, Kevin Barr.[49]

Plaintiff's attempt to characterize Ryan's gestures as "ape-like" is an after-the-fact attempt to inject a racial component into the otherwise race-neutral interactions between her and Ryan.  Barr, Denevi, and Richards each stated under oath that Plaintiff **never reported to them any "gestures"** accompanying Ryan's statement.[50]  Plaintiff's own contemporaneous documents belie her assertion that Ryan made an "ape-like gesture."  In a four-page laundry list of allegations prepared in advance of her March 2004 meeting with Head of School Peter Branch, Plaintiff **neglected to mention either Ryan's comment or his alleged gestures**.[51]  In a March 31, 2004 e-mail to Richards and Denevi, Plaintiff describes the comment as an "explicit and unapologetic, insulting confrontation directed at me by Nick Ryan," **making no mention of "gestures."**[52]  Plaintiff's counsel, John Racin, described Ryan in a July 6, 2004 letter as **"gesturing with his hand towards the floor"** when he made the statement.[53] There is no reference to bowing or the gesture being "ape-like."  Plaintiff's August 2004 "Talking

---

[49] Pl.'s Opp'n. at 15.

[50] See Attached Ex. 1 (Barr Dep. 49–50); Ex. 9 attached to Def.'s Mot. for Summary Judgment (Denevi Dep. 34–35); Ex. 8 attached to Def.'s Mot. for Summary Judgment (Richards Dep. 7–9).

[51] See Ex. 29 attached to Def.'s Mot. for Summary Judgment (Branch Memo).

[52] Ex. 20 attached to Pl.'s Opp'n at 2858.

[53] Ex. 27 attached to Def.'s Mot. for Summary Judgment (Letter from John Racin to Daniel Johnson at 2795 (Jul. 6, 2004)). Plaintiff purports to consider objecting to Defendant's use of this letter and a subsequent letter by counsel.  See Pl.'s Opp'n. at 20 ("The School again has no apparent qualms about introducing information patently inadmissible, in this instance correspondence relating to settlement negotiations in violation of Fed. R. Evid. 408.").  Plaintiff ignores the fact, however, that this correspondence was not offered to show admission of the invalidity of Plaintiff's claim.  Rather, this correspondence was used to describe when the School became aware of Plaintiff's complaints and to describe the materials Pass used in her investigation.  See Def.'s Mot for Summary Judgment 7 (citing Ex. 27 attached to Def.'s Mot. for Summary Judgment) ("In July 2004, Plaintiff, through counsel, complained to GDS that she was subject to a racially hostile work environment."); Def.'s Mot. for Summary Judgment 40 (citing Ex. 28 attached to Def.'s Mot. for Summary Judgment) ("As part of her investigation, Racin sent Pass a copy of a document Plaintiff had prepared for a meeting she had with Head of School Peter Branch in March 2004 to discuss her unhappiness at the School.").  Likewise, Racin's letter is not offered for a purpose prohibited by Fed. R. Evid. 408.  Plaintiff's backhanded allusion to the rule is inapposite.

Points" document states merely that Ryan **"gesticulated"** while making the statement.[54]  Indeed, it was

not until February 2006, approximately **two years after the incident**, that Plaintiff's "ape-like"

characterization **first** appeared, in Plaintiff's Supplemental Answer to the School's Interrogatories.[55]

Regardless of Plaintiff's credibility in this regard, the Court should only consider what Plaintiff

alleges that Ryan did and said, and disregard her characterization of his alleged gestures as "ape-like."

See Welzel v. Bernstein, 436 F. Supp. 2d 110, 119–20 (D.D.C. 2006) (Huvelle, J.) (considering on

summary judgment the defendant employee's **actual statement**, rather than the plaintiff's

"'impression' or 'understanding'" of the statement's implied meaning).  Plaintiff admits that Ryan

**never actually** called her an ape, nor did anyone else ever tell her that they heard Ryan refer to

Plaintiff as an ape.[56]  Moreover, she cannot recall any other occasion when Ryan gesticulated in a

fashion that she interpreted as ape-like behavior.[57]

Viewed together, Plaintiff's allegations do not describe working conditions sufficiently severe

or pervasive to constitute a hostile work environment.  "[S]imple teasing, offhand comments, and

isolated incidents (unless extremely serious)" do not constitute a hostile work environment.  Faragher

v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citation and quotations omitted).  At worst,

Plaintiff's claims reflect no more than the "ordinary tribulations of the workplace, such as the sporadic

use of abusive language," which the Supreme Court has cautioned does not qualify as a racially hostile

work environment.  Id.  Regardless of how Plaintiff interpreted Ryan's conduct, Plaintiff's claims also

---

[54] Ex. 30 attached to Def.'s Mot. for Summary Judgment (Pass Talking Points, at 2643).  Plaintiff prepared this document for her interview with  Caryn Pass, the independent investigator hired by the School to investigate Plaintiff's allegations. Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 466–67).

[55] See Ex. 4 attached to Def.'s Mot. for Summary Judgment (Supp. Ans. to Interr. at 6).

[56] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 555–56).  The School did not include these facts in its Statement of Undisputed Material Facts because it does not view these facts as material.

[57] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 556).  The School did not include these facts in its Statement of Undisputed Material Facts because it does not view these facts as material.

fall short because she cannot show that the alleged harassment "would detrimentally affect a reasonable person of the same race in [her] position." Moore v. Ashcroft, 401 F. Supp. 2d 1, 42 (D.D.C. 2005) (Kollar-Kotelly, J.).  Accordingly, Plaintiff's hostile work environment claims should be dismissed with prejudice.

> **B.      Plaintiff Has Not Raised a Genuine Material Issue Regarding Whether the School Failed to Take Prompt Remedial Action.**

Plaintiff devotes most of her Opposition to arguing that the School knew about Plaintiff's allegations and failed to take adequate remedial measures.[58]  See Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, No. 98-5014, 1998 U.S. App. LEXIS 15459 (June 30, 1998) (the last element of a hostile-work-environment claim is that the employer knew or should have known of the harassment and failed to take prompt remedial action).  Plaintiff contends that the mediation process was a "sham," that Branch "offered no assistance in addressing serious concerns about racist conduct in the Art Department," and that the Caryn Pass report is unreliable.  These arguments are either unsupported or directly contradicted by the undisputed evidence.

> **1.      The Undisputed Evidence Shows that the Mediation Was Legitimate.**

Plaintiff calls the School's mediation process, directed by Elizabeth Denevi and Mariama Richards, a "sham"[59] that "offered no hope of addressing the serious misconduct [Plaintiff] had reported."[60]  Plaintiff's argument relies on speculation, misrepresentations of the record, and opinions of counsel masquerading as facts.

---

[58] See, e.g., Pl.'s Opp'n. at 2 ("responsible officials at GDS were aware of racist conduct in the Art Department and elsewhere in the School, but, rather than take meaningful action to investigate or otherwise address the serious issues involved, either did nothing or devoted their energies to protecting the School against potential liability.").

[59] Pl.'s Opp'n. at 16.

[60] Pl.'s Opp'n. at 18.

First, Plaintiff argues that Richards and Denevi, the School's Co-Directors of Diversity, were uninterested in resolving Plaintiff's complaints because Plaintiff made them "during the very period the expulsion of an African American student was being challenge [sic] as racist."[61]  According to Plaintiff, Richards and Denevi did not conduct a "meaningful investigation" into Plaintiff's complaints because they believed it "could compound problems for the School . . . ."[62]  This speculative allegation impugning the professional integrity of Richards and Denevi is completely unsupported (Plaintiff does not even bother to cite to the record).  Plaintiff also cites an e-mail in which Ryan passes along the High School Principal's directive, while the litigation involving the expelled student was pending.[63]  The e-mail directed that "no faculty or staff should engage in conversation with [the expelled student]'s family, their lawyers, or the media."[64]  Counsel for Plaintiff argues that this e-mail "could only have compounded a sense of despair as [Plaintiff] contemplated her own situation."[65]  This is another example of pure speculation by Plaintiff's counsel.  Moreover, Plaintiff's allegations of employment harassment relate to members of the Art Department; there is no allegation that Ryan or any member of the Art Department played a role in this student disciplinary decision.

---

[61] Pl.'s Opp'n. at 16.  Plaintiff's repeated references to the School's decision to discipline this student is an improper and transparent attempt to create an atmosphere of guilt by association.  Counsel for Plaintiff, who was tangentially involved in that matter, is well aware that the litigation regarding the student's expulsion is under seal, and that the School will not discuss the facts underlying its decision to discipline a minor for what it deemed inappropriate conduct.  Plaintiff herself does not attempt to explain how this decision involved racial discrimination relating to her employment.  Rather, she relies on her speculation that the decision was racist based on the student's subsequent reinstatement.  Pl.'s Opp'n. at 2.

[62] Pl.'s Opp'n. at 17–18.

[63] Ex. 6 attached to Def.'s Mot. for Summary Judgment (Ryan Dep. 130–32).  The School did not include this fact in its Statement of Undisputed Material Facts because it does not view this fact as material.

[64] Plaintiff blatantly mischaracterizes the text of this e-mail in her Opposition, writing that the faculty and staff were also directed to refrain from conversations with the student himself.  Compare Pl.'s Opp'n. at 17 and Ex. 8 attached to Pl.'s Opp'n. with Attached Ex. 2.

[65] Pl.'s Opp'n. at 17.

Second, Plaintiff argues that the mediation was a sham because Richards and Denevi "did not trouble to document the conduct reported by [Plaintiff], while troubling to describe Mr. Ryan's account."[66] Here, Plaintiff has contrived the record to mischaracterize the facts.  To support her allegation that Richards and Denevi "did not trouble to document" Plaintiff's complaints, she cites to her Exhibit 5 (Elizabeth Denevi "Mediation" Notes) and Exhibit 6 (Mariama Richards "Mediation" Notes).  The glaring flaw is that **Plaintiff's exhibits omit the two pages of Richards' notes and the three pages of Denevi's notes that document their mediation meeting with Plaintiff.**[67]  Plaintiff also ignores e-mail correspondence in which Richards and Denevi asked Plaintiff to comment regarding the source of conflicts in the Art Department.[68]  In response to their e-mail, Plaintiff wrote, "The breakdown is directly attributable to an, explicit and unapologetic, insulting confrontation directed at me by Nick Ryan."[69]  (Note that Plaintiff did not mention that she believed this "confrontation" was based on her race.[70])

Third, Plaintiff, citing Ryan's deposition, argues that the mediation was a sham because the mediators told Ryan what Plaintiff had said about the February 2004 incident, but failed to do the same for Plaintiff.[71]  Again, Plaintiff mischaracterizes the record.  Ryan did **not** state that the mediators told him Plaintiff's version of the incident, but rather that they indicated to him that Plaintiff had given a

---

[66] Pl.'s Opp'n. at 3.  See also Pl.'s Opp'n. at 18 (same).

[67] Compare Attached Ex. 3 (Richards Notes 2856–57) with Ex. 6 attached to Pl.'s Opp'n. (Richards Notes); compare Attached Ex. 4 (Denevi Notes 2782–84) with Ex. 5 attached to Pl.'s Opp'n. (Denevi Notes).

[68] Ex. 20 attached to Pl.'s Opp'n.  In this e-mail, Richards wrote, "Sharon--As Elizabeth and I promised, we are forwarding a copy of what we would like to share with Laura and Nick. . . . If you have any comments or changes to make, please feel free to contact us."  Id. at 2858.

[69] Id. at 2858.

[70] See id.

[71] Pl.'s Opp'n. at 18 (citing Ex. 12 attached to Pl.'s Opp'n. (Ryan Dep. 104)).

competing account.[72]  Plaintiff also glosses over the undisputed fact that the mediators did not share **any** individual's perspective with the other members of the Art Department because Plaintiff told Richards that she was not comfortable with Richards' sharing her version of events with the others.[73]

Fourth, Plaintiff argues that the mediation was a sham because Denevi believes Ryan feels a sense of "white privilege."[74]  This is a particularly misleading reference in light of Denevi's well-documented opinion that **all** white people, including Plaintiff's counsel, are imbued with attitudes of white privilege.[75]

Finally, Plaintiff claims that the mediators should have reprimanded Ryan rather than "focusing on future relationships in the Art Department."[76]  But Plaintiff does not dispute that when Richards asked Plaintiff how she would like her complaints resolved, Plaintiff did not suggest that Ryan be reprimanded.[77]  Instead, she said she did not know what the solution should be.[78]

In light of the undisputed facts, Plaintiff has presented no evidence to establish a genuine issue regarding whether the School's mediation process was a "sham."

---

[72] Ex. 12 attached to Pl.'s Opp'n. (Ryan Dep. 104) ("Q:  During the course of your meetings with the Diversity folks, Ms. Denevi and Ms. Richards, did they ever indicate to you that Mrs. Killian had heard you say, had reported hearing, I can't bend down low enough to the ground to understand you?  A:  I believe they expressed to me that Sharon was presenting her version of what I had said.  And my version of what I said were different.  What exact words, they told me at that time.  I don't know other than what's on these notes here.  All I know is what I said.").

[73] Ex. 8 attached to Def.'s Mot. for Summary Judgment (Richards. Dep. 24–25, 53).

[74] Pl.'s Opp'n. at 8.

[75] See, e.g., Ex. 1 attached to Pl.'s Opp'n. (Denevi Dep. 28) ("white privilege is everywhere. It's in this room.  It's in your [counsel for Plaintiff's] law office. It's a function of American society."); Ex. 55 attached to Def.'s Mot. for Summary Judgment (Elizabeth Denevi, Whiteness, Independent School Magazine, at 100 (2001)) (describing the historical and social roots of white privilege and advocating diversity education as a means to combat it).

[76] See Pl.'s Opp'n. at 17.

[77] Ex. 8 attached to Def.'s Mot. for Summary Judgment (Richards Dep. 54).

[78] Id.

### 2.     Meeting with Peter Branch

In another cursory and misleading paragraph in her Opposition, Plaintiff alleges that "[Head of School Peter] Branch has furnished an affidavit introduced by the School which makes clear he offered no assistance in addressing serious concerns about racist conduct in the Art Department."[79]  Branch's declaration does nothing of the sort.  Rather, Branch states that he met with Plaintiff in March 2004, during which time Plaintiff discussed her unhappiness at the School resulting from specific incidents that she said happened in her department, using notes as a reference.[80]  Notably, she did not even mention the February 2004 incidents in the four pages of notes she used at that meeting.[81]

Plaintiff also complains that in response to Plaintiff's complaints, Branch "suggested that Mrs. Killian consider applying for a job elsewhere."[82]  Once again, Plaintiff takes improper liberties with the factual record.  Plaintiff ignores the undisputed fact that Plaintiff told Branch she wanted to take time off work but could not afford leave without pay.[83]  Sometime later in the spring of 2004, Branch informed Plaintiff of a job opening in the Art Department at the National Cathedral School and offered to write a supportive recommendation for her.[84]

---

[79] Pl.'s Opp'n. at 18.

[80] See Ex. 15 attached to Def.'s Mot. for Summary Judgment (Branch Decl. ¶¶ 14–16).

[81] See id.

[82] Pl.'s Opp'n. at 18–19.

[83] See Ex. 15 attached to Def.'s Mot. for Summary Judgment (Branch Decl. ¶ 17).

[84] Ex. 15 attached to Def.'s Mot. for Summary Judgment (Branch Decl. ¶ 19); Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 153:4–21).  Branch's wife, Paula Carreiro, is Head of School at Beauvoir, the National Cathedral's Elementary School.  Ex. 15 attached to Def.'s Mot. for Summary Judgment (Branch Decl. ¶ 20).

### 3.    The Caryn Pass Investigation

Finally, Plaintiff alleges that the School's formal investigation report is "patently inadmissible" hearsay.[85]  Plaintiff is incorrect.  The report is offered not for the truth of the matters asserted (e.g., to prove the truth of Pass's factual findings), but as evidence of the reasonableness of the School's response to Plaintiff's complaints.[86]  See Zubrow v. Solvay Pharmaceuticals, No. 03CV1929, 2006 U.S. Dist. LEXIS 7039, at *15, *18–19 (D. Conn. Feb. 3, 2006) (admitting, over a hearsay objection, defendant's internal investigation report concluding no discrimination had occurred, when offered to show defendant's "reasons for the decision to terminate plaintiff's employment" in an age and religious discrimination case).

Plaintiff also tries to discredit the investigation by alleging that Richards and Denevi "withheld vital information" from the investigators.[87]  This allegation is unsupported by the record.  Plaintiff effectively admits this by not attempting a citation to the record to support her assertion.  More importantly, there is no dispute that Plaintiff herself had a full and fair opportunity to discuss her allegations with Pass during Plaintiff's interview (with her own counsel present) and in the various items of correspondence that Plaintiff's counsel sent to Pass.[88]  Plaintiff does not allege that Pass ignored a single substantive complaint by Plaintiff, and has admitted her belief that Pass was not

---

[85] Pl.'s Opp'n. at 19.  In response to the authentication concern raised by Plaintiff, id., Defendant has attached a declaration authenticating the report.  See attached Ex. 5 (Lee Decl. ¶ 4–10).

[86] This is extremely probative regarding the final element of Plaintiff's hostile work environment claim, i.e., whether the School knew about Plaintiff's allegations and failed to take adequate remedial measures.

[87] Pl.'s Opp'n. at 19.

[88] See Ex. 19 attached to Def.'s Mot. for Summary Judgment (Pass Report 6837); Ex. 30 attached to Def.'s Mot. for Summary Judgment (Pass Talking Points Memo); Ex. 27 attached to Def.'s Mot. for Summary Judgment (Letter from John Racin to Daniel Johnson (Jul. 6, 2004)); Ex. 28 attached to Def.'s Mot. for Summary Judgment (Letter from Racin to Pass (Aug. 27, 2004) (attaching Ex. 29 attached to Def.'s Mot. for Summary Judgment (Branch Memo)); attached Ex. 5 (Lee Decl. ¶ 7).

racially prejudiced against her.[89]  In light of Pass's ultimate conclusion that Plaintiff's claims of racial

discrimination were unfounded,[90] Plaintiff has not established a genuine issue of material fact

regarding whether the School's response to her complaints was reasonable.

### C.     *Plaintiff's Remaining Allegations Are Irrelevant or Immaterial.*

The remainder of Plaintiff's Opposition consists of various allegations that have no material

relevance to the issues presented in Defendant's Motion for Summary Judgment.  Such allegations

should be disregarded by the Court.  See Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006)

("factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

determination") (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A few

illustrative examples are discussed below.

Plaintiff alleges that Ryan "screamed" at an Afro-Hispanic GDS parent, and that Denevi agreed

with the parent that Ryan "would not have screamed at a white parent."[91]  Plaintiff has made no

attempt to connect this allegation to the terms and conditions of her own employment.  Neither the

parent nor Plaintiff claim in their "affidavits" that Plaintiff had any knowledge of this alleged

incident.[92]  This allegation is insufficient to evidence racial animus by Ryan against Plaintiff, and

Plaintiff has presented no evidence that this incident affected her in any way.[93]

Plaintiff also relies heavily on the affidavit of a former GDS teacher, Anike Oliver.  Oliver

makes several allegations unrelated to the terms and conditions of Plaintiff's employment.  For

---

[89] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 709).

[90] Ex. 26 attached to Def.'s Mot. for Summary Judgment (Pass Report, at 6850, 6854).

[91] Pl.'s Opp'n. at 9.

[92] Ex. 4 attached to Pl.'s Opp'n. (Killian Aff.); Ex. 13 attached to Pl.'s Opp'n. (Grillo Aff.).

[93] Moreover, allegations of harassment are considered less hostile when directed at others.  Kelley v. Billington, 370 F. Supp. 2d 151, 159 (D.D.C. 2005) (Bates, J.).

example, Oliver, who was a member of the Math Department faculty, alleges that she told Denevi "about what [she] believed to be [unspecified] instances of racism in the high school."[94]  After Plaintiff filed this lawsuit (i.e., several months **after** Plaintiff's departure from the School), Oliver reports that she was made "uncomfortable" by a comment Richards made at a Faculty of Color meeting.[95]  Citing Oliver's affidavit, Plaintiff even accuses counsel for the School, Thomas S. Williamson, Jr., of intimidating the GDS staff and faculty by advising that they "should tell the truth" regarding the facts in this litigation, but that they might need their own independent counsel if their interests appear to conflict with the School's interest.[96]  Plaintiff is unable to explain how Mr. Williamson's conduct was improper, especially since she appears not to understand that Mr. Williamson's reference to obtaining separate counsel is precisely what the D.C. Bar's ethical rules require if a lawyer discovers that a potential conflict may exist.[97]  Oliver's affidavit is composed entirely of irrelevant or inappropriate assertions and should therefore be disregarded.

## IV.     GDS Is Entitled to Summary Judgment on Plaintiff's Constructive Termination Claim.

Plaintiff claims that the work environment at GDS was so intolerable that it forced her to resign her job.[98]  A "compound claim of hostile environment constructive discharge requires an additional showing" beyond the existence of a hostile work environment.  Al-Mahdi v. District Of Columbia Pub.

---

[94] Pl.'s Opp'n. at 2 (citing Ex. 2 attached to Pl.'s Opp'n. (Oliver Affidavit)).

[95] Pl.'s Opp'n. at 22.

[96] Pl.'s Opp'n. at 4–5, 22.

[97] See generally D.C. Rules of Prof'l Conduct 1.7 ("Conflict of Interest: General Rule").

[98] See Pl.'s Opp'n. at 27.  As a threshhold matter, it should be noted that Plaintiff must establish a racially hostile work environment as a prerequisite for demonstrating constructive discharge.  Al-Mahdi v. District of Columbia Pub. Schs., No. 01-1014 (JR), 2005 U.S. Dist. LEXIS 38670, at *15 (D.D.C. Dec. 2, 2005) (Robertson, J.); see also Villines, 999 F. Supp. at 105 ("because both the plaintiff's claims of constructive discharge and hostile work environment require a finding of intentional discrimination, the viability of the constructive discharge claim is inextricably linked to the hostile work environment inquiry").  Based on the discussion in Section III, supra, Plaintiff has not satisfied this threshhold requirement.

<u>Schs.</u>, No. 01-1014 (JR), 2005 U.S. Dist. LEXIS 38670, at *14 (D.D.C. Dec. 2, 2005) (Robertson, J.).

A plaintiff also must "show working conditions so intolerable that a reasonable person would have felt

compelled to resign." <u>Pa. State Police v. Suders</u>, 542 U.S. 129, 131 (2004). Constructive discharge

requires a finding that "the employer deliberately made working conditions intolerable and drove the

employee out." <u>Mungin v. Katten Muchin & Zavis</u>, 116 F.3d 1549, 1558 (D.C. Cir. 1997). There is

no constructive discharge "when an employee leaves an unpleasant but objectively tolerable job

because alternatives have become more attractive, even if the employer's misbehavior causes the

unpleasantness." <u>Taylor v. FDIC</u>, 132 F.3d 753, 766 (D.C. Cir. 1997).

Plaintiff's claim falls far short of showing that her working environment was objectively

intolerable, or that GDS forced her to resign. Rather, the undisputed facts demonstrate that Plaintiff

signed her contract to return to teach for the 2005–2006 academic year on February 25, 2005, eleven

days **after** the resolution of her last alleged incident of harassment (involving Plaintiff's access to the

digital cameras used in Tolliver's Film and Video course).[99] Although Plaintiff's Opposition states

that she was "intent upon returning for the 2005–2006 academic year,"[100] the undisputed facts belie

this assertion.

Plaintiff claims that her allegedly disabling symptoms "first appeared" in April 2005.[101] This

is **one month after the last alleged incident of harassment**. That same month, before the end of the

2004–2005 academic year, Plaintiff decided to relocate to Arkansas.[102] On June 8, 2005, Plaintiff

---

[99] <u>Cf.</u> Ex. 31 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 59) (signed Feb. 25, 2005); <u>with</u> Ex. 66 attached to Def.'s Mot. for Summary Judgment (E-mail from Barr to Buckwalter (Feb. 14, 2005)).

[100] Pl.'s Opp'n. at 21.

[101] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 668:15–669:6, 672:22–673:5); <u>see</u> Ex. 38 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 53, at 2899) (describing the "nature of illness and when symptoms [contributing to Plaintiff's long-term disability] first appeared.").

[102] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 629:13–32:2).

responded to her 2004–2005 evaluation to correct what she interpreted as a "mistake[]," an "implicit criticism," and some important omissions.[103]  The next day, Plaintiff and Ryan signed an "Addendum" to the 2004–2005 evaluation, correcting the alleged "mistake," removing the "implicit criticism," and praising Plaintiff her various contributions.[104]  **Neither Plaintiff's response to her year-end evaluation nor its Addendum makes any mention of Plaintiff's intention to relocate to Arkansas or her alleged belief that the working conditions at the School were intolerable**.[105]  Rather, Plaintiff admitted that the Addendum was a satisfactory reply to her response to her evaluation.[106]

The **next month**, July 2005, Plaintiff sold her Virginia home and sent **all** of her personal belongings to Arkansas, where she claims she intended to stay only for the summer.[107]  On or about Friday, August 26, 2005, a few days before she was supposed to return to work for "staff week," Plaintiff left a voice message at the School saying that she could not return for staff week because of health reasons. [108]  She left this message even though she had **not** seen a doctor for treatment of her alleged symptoms from the time they "first appeared" in April 2005, until September 7, 2006.  It is undisputed that the September visit to her doctor occurred **two weeks after** she told the School she

---

[103] Ex. 25 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 7, at 2064).

[104] Id. at 2065.

[105] Id.

[106] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 44).

[107] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 629:13–32:2, 636); Ex 42 attached to Def.'s Mot. for Summary Judgment (MRIS Listing for 7101 Alger Rd., Falls Church, VA).

[108] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 637:5–638:6, 640–41, 687:3–14); Ex. 14 attached to Def.'s Mot. for Summary Judgment (Barr Decl. ¶ 10); Ex. 15 attached to Def.'s Mot. for Summary Judgment (Branch Decl. ¶ 27); Ex. 32 attached to Def.'s Mot. for Summary Judgment (E-mail from Barr to Killian (Aug. 30, 2005)).

could not return to work because of health reasons.[109]  Moreover, this doctor had not been consulted by Plaintiff at any time when Plaintiff was actually on campus teaching at GDS.[110]

Although GDS asked Plaintiff to inform them when she would be able to report back to work, she never told the School whether she intended to return to work at all.[111]  However, Plaintiff eventually told the School that she was physically incapable of working because of a medical disability and applied for long-term disability benefits on November 18, 2005.[112]  Upon the subsequent expiration of her "job restoration protections" under the DCFMLA, the School terminated Plaintiff's employment because she had effectively abandoned her job.[113]  In short, Plaintiff's constructive discharge claim must fail because no reasonable juror could conclude that GDS deliberately tried to force Plaintiff out of her job.

## V.     Conclusion

For the foregoing reasons, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's entire lawsuit with prejudice.

---

[109] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 668:15–669:6, 672:22–673:5); see Ex. 38 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 53, at 2899) (describing the "nature of illness and when symptoms [contributing to Plaintiff's long-term disability] first appeared.").

[110] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 670).  In another mischaracterization, Plaintiff states, without citation, that "[i]t is undisputed [that] negotiations broke down in August 2005 . . . ."  Pl.'s Opp'n. at 21.  In reality, Defendant's counsel, Thomas S. Williamson, Jr., sent a partially executed tolling agreement to Plaintiff's counsel Racin on September 6, 2005, which offered a "tolling period" from May 1, 2005 through September 30, 2005.  Ex. 44 attached to Def.'s Mot. for Summary Judgment (Letter from Williamson to Racin (Sept. 6, 2005), with Tolling Agreement attached).  Negotiations did not "break down" until September 29, 2005, when Plaintiff's counsel Racin sent to Mr. Williamson a signed copy of the tolling agreement, in which Plaintiff and her counsel agreed to "not initiate any administrative charges or civil lawsuits against GDS" from May 1, 2005 to September 30, 2005.  Ex 45 attached to Def.'s Mot. for Summary Judgment (Letter from Racin to Williamson (Sept. 29, 2005) with Tolling Agreement attached).  **Plaintiff filed this lawsuit the same day**.  Ex. 1 attached to Def.'s Mot. for Summary Judgment (Compl.).

[111] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 687–89); Ex. 16 attached to Def.'s Mot. for Summary Judgment (Lindsey Decl. ¶ 14).

[112] Ex. 5 attached to Def.'s Mot. for Summary Judgment (Killian Dep. 655); Ex. 38 attached to Def.'s Mot. for Summary Judgment (Killian Dep. Ex. 53).

[113] Ex. 16 attached to Def.'s Mot. for Summary Judgment (Lindsey Decl. ¶ 15).

Dated:  January 31, 2006                    Respectfully submitted,


                                            /s Thomas S. Williamson, Jr.
                                            Thomas S. Williamson, Jr. (D.C. Bar No. 217729)
                                            Timothy R. Clinton (D.C. Bar No. 497901)
                                            **COVINGTON & BURLING LLP**
                                            1201 Pennsylvania Ave., N.W.
                                            Washington, D.C. 20004
                                            (202) 662-6000
                                            (202) 778-5218 - Fax

                                            **COUNSEL FOR DEFENDANT**

<u>**CERTIFICATE OF SERVICE**</u>

I, Timothy R. Clinton, hereby certify that on this date I caused a true and correct copy of the

above document, Defendant's Reply Memorandum in Support of its Motion for Summary Judgment,

and Its Attached Appendix (Exhibits 1–5), to be served upon Plaintiff's attorney as follows:

<u>**BY E-MAIL AND ECF:**</u>
John Racin
1721 Lamont Street, N.W.
Washington, DC  20010
202 265-2516
awjrlaw@erols.com

Dated: January 31, 2006


/s Timothy R. Clinton
Timothy R. Clinton