**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |


**APPENDIX TO DEFENDANTS' REPLY MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**


Exhibit  1.        Barr Deposition, at 46–53

Exhibit  2.        E-mail from Ryan to Tolliver and Killian (Feb. 26, 2004) [3433–34]

Exhibit  3.        Richards Mediation Notes [2856–57]

Exhibit  4.        Denevi Mediation Notes [2782–84]

Exhibit  5.        Lee Declaration

# EXHIBIT 1

# DEPOSITION OF KEVIN J. BARR
## CONDUCTED ON TUESDAY, SEPTEMBER 26, 2006

Page 46

1  Sharon saying, you know, how could he say this as if I
2  were black. I mean I don't remember any -- I just
3  remember Sharon being very upset because it seemed
4  like in some ways he was saying, you know, I can't --
5  you can't understand me or I can't understand you,
6  something that made it seem as if they could not
7  connect at all.
8      Q. Now, you discussed this with the diversity
9  coordinator that very day; is that right?
10     A. I think Mari was in the room when Nick came
11 in.
12     Q. And why was she there?
13     A. Because she was often there because -- well,
14 one is because we met a lot. But, two, because she
15 often blew by my office to see what I was doing. And
16 I actually think -- I mean I think that probably Mari
17 came by and I said, Mari, here, you know, I've got
18 one. I've got a situation. Like, how are you doing,
19 what's going on? And I said, Well, you know, we've
20 got a situation.
21     Q. Now, did you address the situation with the
22 diversity coordinator because you understood an issue

Page 47

1  of race was involved?
2         MR. WILLIAMSON: Objection, asked and
3      answered.
4      A. No. I really think Mari came in, and Mari
5  was the first person -- I suspect that Mari was the
6  first person to walk in who was a fellow administrator
7  and as a fellow administrator would be someone that I
8  would consult with about a personnel issue.
9      Q. And Mari routinely came into your office?
10 Is that your testimony?
11     A. About every day.
12     Q. And describe your relationship with her.
13     A. Mari?
14     Q. Mari.
15     A. Very good, very professional. I have
16 enormous respect for Mari's ability to kind of
17 facilitate meetings. I mean she does many things, but
18 one of the jobs that she often does is facilitate
19 whole group discussions or small discussions, and she
20 is particularly good and adept at that. And she's --
21 yeah.
22     Q. What is Mari' race?

Page 48

1      A. She's black. She's black.
2      Q. So you don't recall you called her to come
3  to your office?
4         MR. WILLIAMSON: Objection, asked and
5      answered.
6      A. No, I don't recall calling Mari to my
7  office.
8         MR. RACIN: Why don't we go off the record
9      for a second.
10         (Brief recess.)
11 BY MR. RACIN:
12     Q. If it came to your attention while serving
13 as principal of the school that a faculty member, a
14 white faculty member said to a black faculty member I
15 can't bend down low enough to the ground to understand
16 you while gesturing like an ape, would discipline be
17 warranted in your view?
18         MR. WILLIAMSON: Objection, foundation,
19     calls for speculation.
20     A. Could you rephrase that or just repeat it?
21     Q. If you found that the following had
22 happened, a white faculty member said to a black

Page 49

1  faculty member I can't bend down low enough to the
2  ground to understand what you're saying while
3  gesturing like an ape, would you believe any
4  discipline would be appropriate?
5         MR. WILLIAMSON: Objection, foundation,
6      hypothetical, calls for speculation.
7      A. Yeah, I can't imagine a situation like that
8  occurring, so I can't speculate what I would do.
9      Q. Well, you heard a report that that very
10 thing happened; isn't that right?
11         MR. WILLIAMSON: Objection,
12     mischaracterization of prior testimony.
13     A. No, I did not hear a report that that, as
14 you describe it, occurred.
15     Q. Did Sharon Killian not tell you that Ryan
16 had been gesturing, making ape-like gestures --
17         MR. WILLIAMSON: Objection, argumentative.
18 BY MR. RACIN:
19     Q. -- when he was speaking --
20         MR. WILLIAMSON: Objection, argumentative.
21 BY MR. RACIN:
22     Q. -- with her?

13 (Pages 46 to 49)

06374ca4-a457-4ec6-92c4-21c76af42e4a

# DEPOSITION OF KEVIN J. BARR
## CONDUCTED ON TUESDAY, SEPTEMBER 26, 2006

Page 50

1      MR. RACIN: Well, you've got to let me
2  complete the question as a matter of courtesy.
3      MR. WILLIAMSON: I'm sorry, counsel.
4      MR. RACIN: Then you can object.
5      MR. WILLIAMSON: I'm sorry. I thought you
6  had completed it.
7      A. No.
8      Q. Now, if you had understood her to say that,
9  can you say as you sit here now what you would have
10 done?
11      MR. WILLIAMSON: Objection, calls for
12  speculation.
13      A. I can't speculate what I would have done.
14      Q. Would it have been important to determine
15 whether it happened or not?
16      A. Yes.
17      Q. And how would you go about determining that?
18      A. I would ask all involved parties.
19      Q. Now, Mari Ann Richards and her colleague as
20 diversity coordinator investigated this episode, did
21 they not? Do you --
22      MR. WILLIAMSON: Objection, foundation. I'm

Page 51

1      sorry. Excuse me, counsel.
2  BY MR. RACIN:
3      Q. Do you have knowledge of that?
4      MR. WILLIAMSON: Objection, foundation,
5  compound.
6  BY MR. RACIN:
7      Q. Do you know whether diversity coordinators
8  at GDS investigated this episode -- that is, the
9  conversation between Nick Ryan and Sharon Killian that
10 we've been discussing?
11      A. Yes.
12      Q. And what, if any, role did you play in that
13 investigation?
14      A. As I said, I had an initial conversation
15 with Sharon and with Nick.
16      Q. Now, in your mind did you make a judgment
17 about whose account of the conversation was accurate?
18      A. Initially, no.
19      Q. Did there come a time when you decided whose
20 account was accurate?
21      A. You have given one account which is
22 different from what Ms. Killian shared with me, so I'm

Page 52

1  not sure which account you'd like me to refer to.
2      Q. Well, you've testified to two different
3  accounts; isn't that right?
4      A. Yes. And you've mentioned a third account.
5      Q. Which you've testified you don't recall.
6      A. Yes.
7      Q. And -- well, at the risk of another asked
8  and answered objection, could you again describe the
9  competing accounts you heard?
10      MR. WILLIAMSON: Objection, asked and
11  answered. This deposition is just being
12  unnecessarily extended. We're going over the
13  same thing over and over again.
14      MR. RACIN: Well --
15      A. Would you like me to answer that?
16      Q. Yes. Thank you.
17      A. Sharon came down to say that Nick had said
18 something along the lines of, Sharon, I can't get low
19 enough to understand you. Nick said that what he had
20 said was, Sharon, I don't know how to get low enough
21 to please you.
22      Q. And did there come a time when you made a

Page 53

1  judgment about whose account, whose description was
2  accurate?
3      A. I would -- yes.
4      Q. Okay. When did you make that decision?
5      A. Probably after -- you know, I would guess
6  after sometime on when I had had a chance to
7  kind of just think about various possibilities.
8      Q. Sometime later on. Can you say about when?
9      A. Not really, no.
10      Q. And describe that process.
11      MR. WILLIAMSON: Objection, form --
12  BY MR. RACIN:
13      Q. You say you had a chance to think about --
14      MR. WILLIAMSON: Counsel, I should have a
15  chance to complete my objection for the record.
16      MR. RACIN: You're right.
17      MR. WILLIAMSON: Objection to form, vague.
18      A. Could you ask that question again?
19      Q. Well, I think your testimony is you had a
20 chance to think about what had happened. I asked
21 about when did you have that opportunity.
22      A. Well, I suppose sometime after it happened.

14 (Pages 50 to 53)

# EXHIBIT 2



Thursday, February 26, 2004 10:08:56 AM
Message

From:        Nick Ryan

Subject:     Dept Head Mtg Update

To:          Sharon Killian
             Laura Tolliver

**Sharon & Laura:**
**There is some important information I need to share with you both:**

**RE: Dept Heads Meeting Update**
Paul conveyed the following information which dept heads have been told to share with faculty.
- all inquiries about GDS from the news media, lawyers, or other 'curious people' should be immediately referred to Wes Gibson.
- no faculty or staff member should comment or respond to questions posed in these instances.
- all faculty and staff should immediately report any and all contact from media, lawyers etc to Paul.
- more specifically, no faculty or staff should engage in conversation with ▪▪▪▪▪ (redacted) ▪▪▪▪▪'s family, their lawyers, or the media.

**Other matters:**
Our charge from the technology retreat is to follow up with a mission statement from the Art Dept regarding technology. From that document should emerge an action plan for the next 5 years. Both of these pieces are seen as critical to each department making its case for space and technology in the new/renovated high school building. The time table for the Mission statement and action plan is  early April for first draft. The school administration still sees next spring '05 as the start of the 'big dig' and Fall of '06 as the completion date for the whole project, which is both ambitious and exciting. We have very little time to influence the course of events. If either of you have thoughts on the mission and/or action plan please email them for me to consider. I placed a copy of the existing K-12 Technology Mission statement in your mailbox this morning. I am attempting to get a copy of the preliminary architecture plans so that each of your can examine the space and consider options.

**Evaluations:**
I still need those dates for your formal observations - I need to complete the observation prior to March 19th. The written evaluation will follow the formal observation(s) - Thanks

3433

**Capital Budget Requests:**

Due to me in writing no later than Friday, March 5th  (email please so I have a record)
item, supplier, catalog #, price, course(s) to be used in and how.


Thanks,
Nick

Nick Ryan
Chair - Art Dept.
Georgetown Day High School
4200 Davenport Street NW
Washington, DC 20016
202-274-3258

3434

# EXHIBIT 3

Sharon → March 15, 2004

Feeling bad - Not willing to give the nicety this is contrary to her training
in previous job - sick of being the one who accommodates. - Classroom
work is good.
Meeting - She doesn't want to go.
Side meetings going on without her. - Others are able to order → her orders &
questions.

When did things shift?: Debbie had boxes throughout the space →
Sharon moved them → Paul wanted the space to be accessible this made
Debbie upset. - shift when Sharon no longer had to ask them
for help & support - she was then developing her own classes.
- Noreen, Bonie, Debbie → running buddies → blame her for Debbie leaving

Shift w/ Nick - engulfed Nick in a close personal relationships - summer
homes, parties → this is good - but this situation is difficult as it is

Nick Doesn't like conflict → She noticed this right on. Tech meetings became
horrible → Bonie, Nick, Laura - Anti-sharon
2 years ago right after Folk Arts Assy. Kids came upstairs - use paints/
paper to prepare - Became a conflict. - This was right around the
time that her Brother died. → They were unfeeling. Sharon took
down some Art that Laura had up. They had always
put up A-A Art for the assembly. They weren't happy.
Kids brought up the left over left from the assembly
to the Art room - He wasn't happy about it being up there
he through it around the studio - when she questioned him
about it. He got mad & thought that she was calling him a
racist.

Believed that Debbie through out here students art work
instead of sending it to Nat. Scholastic.

"You're not gonna get rid of me like you got rid of Debbie"

Laura easily manipulated - but now manipulates Nick

Nick's leadership style → weak - plays lipservice can be illogical - not considering both sides not usually equitable evidence of process would be nice. - Helps students w/prices - Order was refreshing change after Debbie.

Laura & Debbie → even had conflicts w/ Erica - Laura not supporting projects - yearbook

How could it be made right?

- Nick hasn't really apologized since the incident - No response from Paul - Email from Kevin about Sharons evaluation.

# EXHIBIT 4

Sharon

~~Due ... mother → usually ... no ... respect~~
~~pense of decorum~~
~~doesn't want to bend~~

( Classes/ students — good )

Nothing's going to be OK with her

casual meetings between
Laura + Nick —
They will do what they
want to do

+  Done w/ being marginalized
+  Questioned about $ —→ petty stuff

( Moment )

Laura = Debbie
↳ helping her, OK

Old head —→ didn't want people to visit

When she didn't need Laura/Debbie, problems started

Norma, Bruce, Laura —→ all friends

[ Saw Sharon as reason not Debbie left ]

Equity —→ Said Nick was OK

Nick: doesn't like conflict, wouldn't take on hard problems
—→ Told Paul —→ no response

Bruce
Nick —→ Chummy w/ Debbie's group ← Norma
Laura

Sharon: outsider, feels like they collude against her

2 yrs ago - Nick here (1st yr) Debbie gone
BCC Assembly planning ... use at noon,     Nick/Laura
                                            not happy w/ their
                                            Nick

Brother's death ⟶ unfeeling toward her

~~Too~~ ~~late~~ ~~Craig~~ ~~still~~ ~~to~~ ~~get~~ ~~rid~~ ~~of~~ ~~his~~

~~Black~~ ~~artist~~ ~~to~~ ~~assembly~~

⟶ Sanctioned from Nick — didn't get approval ~~conflict~~

Nick: Threw BCC stuff around studio — Sharon        Negative only
⟶ felt like Sharon had called him a racist              report to /
"Had a fit" ⟶ screaming                                      this?

                                                                        why?

┌─────────────────────────────────┐
│ LACK OF COMMUNICATION │                    ⟨ sense of
└─────────────────────────────────┘               space ⟩

= avon ⟶ trying to keep it clean

    [ Debbie Haynes threw her stuff out — Kids ]

    " You're not going to get rid of me the way you
NICK:        got rid of Debbie "


His style of leadership:  Not effective

                          easily manipulated

                          partial to Laura ⟶ not equitable

                          Weak

                          Pays lip service

                          Illogical ⟶ falls on one side,
            never an equitable side, no proves that Sharon can see

    Need to see a VISIBLE press
    ⟨ Nick knows re Kids' work ⟩  — Paul knows

Beginning : his sense of order gived

Now too anal

~~Shut~~ ... at ... Laura — ~~Mid~~ ... that behavior

Asked Laura for a memory card reader
→ Laura said No — lie, Knew Laura had it
   (Laura doesn't know Sharon Knows)

( Entitled / Empowered ) — Nothing changed for them

— Sharon - suffering — No sorry, no apology
Feels like "Dirt under His Shoe"
      Sick of it

Told Paul → nothing changes, nothing happens

✗ ( Note to Kevin ) — evaluation

2784

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHARON KILLIAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 05-1925 (EGS)** |
| | ) | |
| **GEORGETOWN DAY SCHOOL,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>DECLARATION OF GRACE H. LEE</u>

I, Grace H. Lee, hereby declare:

1.    I have personal knowledge of the facts discussed in this declaration.

2.    From September 13, 2004 through January 18, 2007, I was employed as an associate attorney at the law firm of Krupin O'Brien LLC.

3.    I am currently employed as an associate attorney at the law firm of Venable LLP.

4.    On April 11, 2005, Caryn G. Pass and I sent to Joe Sellers, a member of the Board of Trustees of Georgetown Day School, a report we co-authored describing the results of our independent investigation into allegations of race discrimination by Sharon Killian against Georgetown Day School.

5.    The allegations described in Paragraph 4 were asserted and described in a letter dated July 6, 2005, which was sent to Daniel Johnson, Esq. by legal counsel for Sharon Killian, John P. Racin.  In addition, Mr. Racin sent Caryn Pass and me a document drafted by Ms. Killian in March 2004 describing her allegations in more detail.

6.    Caryn Pass and I conducted the investigation described in Paragraph 4 over a period of approximately six months.

7.    As part of the investigation described in Paragraph 4, Caryn Pass and I met with Ms. Killian over the course of two days, and discussed her history with the School as well as her past and current frustrations and allegations.  Ms. Killian's counsel, Mr. Racin, was present during these meetings.

8.    As part of the investigation described in Paragraph 4, Caryn Pass and I reviewed a range of documents, including the personnel files of Ms. Killian and other members of the GDS art department.

9.    As part of the investigation described in Paragraph 4, Caryn Pass and I also interviewed Peter Branch, Mariama Richards, Elizabeth Denevi, Kevin Barr, Laura Tolliver, Tom Yoder, Bruce Ruble, Elaine Scott, Paul Levy, and Nick Ryan.  We also held telephone conferences with Debbie Haynes and Damisha Lee.

10.    I recognize the document attached as Exhibit 26 to Defendant's Motion for Summary Judgment (attached hereto as well).  It is a complete and accurate copy of the report described in Paragraph 4.  I do not recognize the handwritten notes appearing on Bates 6837 and 6840.

I declare under penalty of perjury that the foregoing statement is true and correct.


Executed on this 30 day of January, 2007.

Grace H. Lee

# E X H I B I T   2 6

# KRUPIN O'BRIEN LLC

### ATTORNEYS AT LAW

CARYN G. PASS
(202) 467-2469
CGP@KRUPINOBRIEN.COM

1156 FIFTEENTH STREET, N.W.
SUITE 200
WASHINGTON, D.C. 20005

T: (202) 530-0700
F: (202) 530-0703
WWW.KRUPINOBRIEN.COM

### Memorandum

To:        Joe Sellers

From:    Caryn G. Pass
            Grace H. Lee

Re:        Audit of Investigation of Claims Raised by Sharon Killian

Date:    April 11, 2005

## I.    Introduction

Pursuant to your request, we conducted an independent investigation of the allegations of race discrimination raised by Sharon Killian against Georgetown Day School ("GDS" or "the School"). These allegations were asserted and described in a letter dated July 6, 2004, which was sent to Daniel Johnson, Esq. by legal counsel for Sharon Killian, John P. Racin. In addition, Mr. Racin sent us a document drafted by Ms. Killian in March 2004 describing her allegations in more detail.

Ms. Killian has been employed as a teacher in the art department at GDS since 1994. She alleges that during her employment at the School, she was subjected to discrimination based on race by GDS faculty and administration. Specifically, Ms. Killian and her attorney describe instances in which Ms. Killian felt slighted, marginalized or felt that she was being treated unfairly. In summary, Ms. Killian complains that: (1) she has been slighted, undermined or belittled by co-workers; (2) she has been subject to unfair treatment and verbal abuse by her Department Head, Nick Ryan as well as his predecessor, Debbie Haynes; (3) she has not received the same resources, especially technology resources, and has not received the same level of support for new curriculum as Laura Tolliver, a fellow teacher in the Art Department; and (4) she

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**            **SUBJECT TO
                                        PROTECTIVE ORDER**                6836

Memorandum
April 7, 2005
Page 2

has brought these concerns to the attention of Paul Levy and the Diversity Coordinators, and has not received an acceptable response.

In order to conduct a comprehensive and thorough investigation of these allegations we have reviewed a range of documents, including the personnel files of Ms. Killian, and other members of the art department. In addition, we met with Ms. Killian over the course of two days, and discussed her history with the School as well as her past and current frustrations and allegations. We discussed Ms. Killian's allegations at length with Peter Branch, the current Head of School, and visited the School and conducted interviews with individuals named in Ms. Killian's allegations, as well as individuals who were not named but may have information related to the claims asserted by Ms. Killian. Specifically, we interviewed the following people at the School:

Mariama Richards, Diversity Co-Director;

Elizabeth Denevi, Diversity Co-Director;

Kevin Barr, Principal of the Upper School;

Laura Tolliver, Art Teacher;

Tom Yoder, Assistant Principal;

Bruce Ruble, Educational Technology; and

Nick Ryan, Art Department Chair.

After conducting these comprehensive interviews, we met separately with Paul Levy, former Principal, near his home in Bethesda. We also had a telephone conference with Debbie Haynes, former Art Department Chair and Ms. Killian's previous supervisor. Though not named or mentioned otherwise in any interview, we met with Elaine Scott, an African-American staff member who has been employed at the School for 24 years in order to obtain an understanding of the history and culture of the School with respect to race relations. Finally, we interviewed Damisha Lee, a former college counselor, via telephone because Ms. Killian's attorney represented that Ms. Lee may be able to support Ms. Killian's claims of race discrimination.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**      **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 3

## II.   Ms. Killian's Allegations

Ms. Killian raised many issues and allegations in her March 2004 letter, her attorney's letter, and during her conversation with us during the investigation. We discussed her allegations during our conversations with various GDS faculty and reviewed the circumstances surrounding the allegations. We address Ms. Killian's more salient allegations and responses we gathered during our investigation below.

### A.   *Complaints about the "clique"*

During our investigation and in her complaint letter, Ms. Killian referred to an "old guard" or a "clique" of other faculty members who were already close friends when she began employment at the School. According to Ms. Killian, this group of friends was made up of employees who had worked together at GDS for many years. Ms. Killian alleges that Laura Tolliver and Debbie Haynes, the other two teachers in the art department, socialized with this group of other faculty at the School and that she felt belittled and marginalized by this "clique" of friends. She indicated that she felt as if she was excluded from their social events and on numerous occasions was not invited to join in their discussions. Ms. Killian asserted that her belief was that as a result of her race, these colleagues did not include her in their circle. When asked what she based this opinion on she responded that she couldn't think of any other reason that she would not have been included.

During the investigation we discussed the "circle of friends" and Ms. Killian's perceptions with the employees named as part of this group. In response to our inquiries, the employees reported that they were not aware that Ms. Killian felt this way. The sources sited many instances in which Ms. Killian also socialized with various faculty members who were part of this "group" outside of work, including Laura Tolliver and Debbie Haynes. According to the individuals asserted to be part of this "clique" they were not in fact a group of friends as much as a group of individuals who had all worked at the School for many years and who knew each other from this experience. They did not socialize during or after school and were surprised at Ms. Killian's description of them as a "clique." In addition, there were several accounts of situations in which Ms. Killian was invited to socialize with other faculty members and either declined the invitation or accepted and then simply did not show up. While Ms. Killian certainly may have felt excluded, there was no evidence that Ms. Killian was either intentionally left out or ostracized from any "social circle". Moreover, no evidence existed establishing a connection between Ms. Killian's allegations that her co-workers exclusionary behavior resulted from her race or her allegations of race discrimination. While Ms. Killian's

---

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

---

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER
6838

Memorandum
April 7, 2005
Page 4

feelings that she had been subject to exclusionary practice by her colleagues may certainly be genuine beliefs on her part, they could have been made by anyone who felt excluded by this alleged "clique" of friends, as there was no evidence that race was a factor.

Although Ms. Killian's allegations regarding the "clique" may seem inconsequential at first blush, it seems that this feeling of isolation and exclusion deeply affected Ms. Killian and impacted her perception of many other situations and events at the School. During the interviews with her she suggested that the employees within the alleged "clique" assisted each other in work-related matters to the detriment of Ms. Killian. For example, she believes that Bruce Ruble, technology director, provided Linda Tolliver, another Art teacher, with more technology resources than he provided to Ms. Killian because they were in the same group of friends. Also, this feeling of isolation seems to have contributed to the demise in her relationship with the other members of the Art department including Debbie Haynes, Nick Ryan, and Laura Tolliver. Ms. Killian believed that Nick Ryan, though neutral at first according to Ms. Killian, was invited into the "circle of friends" and became predisposed to negative sentiments as a result of the "clique's" attitude toward Ms. Killian. While numerous inquiries were made in a variety of manners with a variety of witnesses, evidence or even negative inclinations toward Ms. Killian were never articulated. In fact, consistently the interviewees stated that they liked Ms. Killian and didn't understand why she was reluctant to befriend other staff. In fact, the Art staff gave examples of times that they had invited Ms. Killian over for staff meetings or lunch and that, much to their disappointment, Ms. Killian never reciprocated.

While interpersonal relationships between faculty members and groups of friends that might develop at a school make for a more pleasant working relationship they are not mandatory. Whether it was self-imposed or if it was indeed a result of the acts of the other faculty members, Ms. Killian clearly felt like an outsider at the School and she attributes this to race discrimination. However, after extensive interviews, we were not able to substantiate her allegations that she was excluded, belittled, or marginalized by this "clique," and could not find any evidence of race factoring into the lack of a relationship. If anything, on a professional level, we learned of great efforts that were made to work cooperatively with Ms. Killian, to which, according to numerous employees, Ms. Killian was mostly unresponsive.

**B.    Complaints about Debbie Haynes**

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:        SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 5

When Ms. Killian joined GDS in 1994, Debbie Haynes was the head of the art department and Linda Tolliver and Erica Elliott were fellow art teachers. Ms. Killian was first hired by GDS as a substitute art teacher while Linda Tolliver was taking time off to care for her sick husband. Ms. Killian knew Debbie Haynes because their husbands worked together. Debbie Haynes introduced Ms. Killian to GDS. The following year, when Erica Elliott did not return to teach, GDS hired Ms. Killian as a full time faculty member based on Debbie Haynes' endorsement. At the same time, Linda Tolliver returned to her full time status. By all accounts, Ms. Killian, Debbie Haynes, and Linda Tolliver worked well together during Ms. Killian's first year as a full time faculty member. Indeed, Ms. Killian's performance evaluation from Debbie Haynes for the 1994-1995 academic year was quite positive.

At some point during Ms. Killian's second year of teaching full time, the relationship between Ms. Killian and Debbie Haynes deteriorated. Although none of the individuals interviewed, including Ms. Killian, was able to offer an explanation for the demise, it was very clear to Debbie Haynes that Ms. Killian was unhappy. Debbie Haynes described a sudden change in Ms. Killian's behavior that was not marked by a specific event or situation. According to Debbie Haynes, she approached Ms. Killian and expressed that she noticed a change in their relationship and that she was very much concerned with this change, as she wanted them to keep an open dialogue. As remembered by Debbie Haynes, Ms. Killian was not responsive to her attempts to either discuss what was wrong, whether something had occurred to upset her, or to make efforts to mend the relationship.

Debbie Haynes reported that eventually Ms. Killian simply refused to attend department meetings and became increasingly difficult to work with. In a department consisting of only three people, this raised obvious concerns and difficult challenges for Debbie Haynes as the Department Chair. Debbie Haynes raised her concerns with Paul Levy, former Principal of the Upper School, who recommended that all three members of the art department meet with him. Apparently the art department met with Paul Levy in an effort to discuss the reason for Ms. Killian's unhappiness, but little progress towards creating a better working relationship resulted. In an effort to assist the department resolve this matter, Paul Levy suggested that they meet with the school psychiatrist. The three members of the art department met with the school psychiatrist numerous times in order to work on the conflicts and try to create a better working relationship. According to Haynes and Tolliver, they very much wanted to fix the problem and great efforts were made to resolve the issues within the art department and to address Ms. Killian's discontent during meetings with Paul Levy and the school

*Laura*

---

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:            SUBJECT TO
                         PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 6

psychiatrist. However, the parties stated that Ms. Killian would often deny that anything
was wrong and was unable to articulate a specific problem or issue. Moreover, despite
many opportunities to do so, Ms. Killian did not raise the issue of race discrimination
during these meetings with Paul Levy or the school psychiatrist.

      Despite these numerous attempts, over time, Ms. Killian's relationship
with Debbie Haynes deteriorated to the point that in 2001, during Haynes' last year at
GDS, Ms. Killian refused to communicate directly with her and would communicate only
via e-mail. Debbie Haynes documented her concerns regarding Ms. Killian's
interpersonal relationships in performance evaluations as far back as 1996. According to
the evaluation, Ms. Killian had difficulty recognizing Debbie Haynes' position as
department head, and had a problem accepting the fact that Laura Tolliver had seniority
over her in terms of years of teaching at GDS. Ms. Killian responded to the performance
evaluation in writing asserting that the problem in the relationship was not as a result of
her behavior in any manner. No improvement was made in the relationship between Ms.
Killian and Debbie Haynes. While we confirmed that the relationship between Debbie
Haynes and Ms. Killian was neither pleasant nor cordial, we found no basis to support the
allegations that the breakdown in communications occurred from treatment or negative
attitude towards Ms. Killian as a result of her race. When questioned, Debbie Haynes
was totally confused as to what she did or what occurred to cause the relationship to turn
so very negative. Likewise, Ms. Killian was unable to provide an explanation of why she
believed the relationship deteriorated as a result of her race. Ms. Killian stated that she
had no other explanation for why this could have occurred other than her race.

### C.    Complaints about Nick Ryan

      In 2001, Nick Ryan was hired to replace Debbie Haynes as the new head
of the art department. Everyone involved in the department seemed hopeful that he
would help improve the dynamic within the department since he was a neutral party who
had no previous history with anyone at the School. In fact, the existing members of the
art department were involved in the decision to hire Nick Ryan and unanimously agreed
that he was the best candidate. Ms. Killian stated that not only did she not want the
position of department chair, but also was hopeful that Nick Ryan would be helpful in re-
establishing a positive working relationship in the department. During Nick Ryan's first
year at GDS, Debbie Haynes remained employed as a part-time faculty member. Nick
Ryan remembered entering a situation in which the existing members of the department
had deeply-rooted conflicts. He said he could immediately sense the tension when he
arrived but hoped that with new leadership it would resolve itself. After Nick Ryan's
first year, Debbie Haynes left GDS, and the department appeared to function collegially.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**    **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 7

Nick Ryan confirms that his second year was uneventful and that he and Ms. Killian "got along." However, at some point during Nick Ryan's third year at GDS, he noted a severe breakdown in their relationship. Ms. Killian eventually stopped speaking to Nick Ryan directly and communicated via e-mail, even when they shared an office.

In her March 2004 letter, Ms. Killian alleges that Nick Ryan treated her unfairly and verbally abused her. She identifies specific instances she believes support her allegation. Ms. Killian alleged that Nick Ryan tore down artwork that was displayed at the School by students in the Black Culture Club ("BCC") and threw it on the floor. Ms. Killian further alleges that when she confronted him about it, Nick Ryan exploded and stated "You are not going to force me out on the street like you did Debbie Haynes." Nick Ryan's account of this incident was drastically different. According to Nick Ryan, in early March 2002, with the help of a janitor, he took down a banner that had been hanging outside of the School advertising a BCC dance. The dance was over and as a result of the rain, the banner was very wet and dripping paint. They brought the wet banner in from the outside and laid it on the hallway floor. Once the banner was brought in, the bell rang and Nick Ryan needed to go to class. He left the banner to dry with the assumption that he would fold it and store it after class when it was no longer wet. At some point, Ms. Killian came in and saw the banner on the floor. She confronted Nick Ryan questioning him as to why he left the banner on the floor. Nick Ryan explained what had occurred to Ms. Killian. He absolutely denies yelling at Ms. Killian or making the alleged comment regarding Debbie Haynes. In fact, he is unaware of the reason that Debbie Haynes left and indicates that he had no reason to believe that Ms. Killian had anything to do with her departure. Because Ms. Killian appeared so very upset and responded in such an abrasive manner, Mr. Ryan documented his interaction with Ms. Killian over the banner. His explanation of the incident is consistent with his contemporaneous notes and consistent with the description provided by Laura Tolliver.

Ms. Killian also alleges that in February 2002, she returned from her brother's funeral and went to the School over the weekend to prepare wall space for artwork to be displayed in honor of Black History Month. Apparently, Ms. Killian was required to remove artwork displayed by Laura Tolliver's students in order to prepare her wall space. Ms. Killian alleges that Nick Ryan later "screamed" at her for taking down the artwork of Laura Tolliver's students without first asking permission. Nick Ryan took great exception to this version of events. According to Nick Ryan, Ms. Killian took down an exhibit of Laura Tolliver's students before checking with Laura Tolliver. This type of conversation was considered appropriate and was done as a means of assuring that all art staff was kept up to date with regard to the use of the limited wall space. Contrary to Ms. Killian's account, Nick Ryan alleged that he neither screamed nor

---

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 8

reprimanded Ms. Killian. What he indicated was that he suggested that in the future, as a courtesy, she might want to inform her colleagues prior to dismounting an exhibit. Ms. Killian was very upset by Nick Ryan's comment. Noting her agitation and wanting to avoid any conflict with her, he made notes of the conversation. His representation is *consistent with his contemporaneous notes.* In our conversations with other staff it was implied that it was not Nick Ryan's style or manner to "scream" at his colleagues but that it was very much Ms. Killian's style to perceive a passing comment as a reprimand. Nick Ryan indicated that it was this type of response that made it so very difficult to work with Ms. Killian. He noted that even innocent statements made in order to assure congeniality, respect and a proper working environment were interpreted by Ms. Killian as either "screaming" or a "reprimand." At some point, Nick Ryan and Laura Tolliver found themselves doing whatever they could to simply avoid enraging Ms. Killian.

Ms. Killian also complained about a meeting arranged with Susie Ryan, Alumni Director, to discuss publishing alumni artwork in the School's Art Magazine, which is published under Ms. Killian's supervision. Ms. Killian alleges that although she arranged the meeting and that she was in charge of the project, the meeting took place without her. *Ms. Killian blames Nick Ryan and claims that he purposefully kept her uninformed about the meeting time.* According to Ms. Killian, she spoke with Susie Ryan in December 2003 about publishing alumni artwork in the Art Magazine, and they agreed to meet in January 2004 to discuss the project in more detail. Based on Ms. Killian's conversation with Susie Ryan in December, Ms. Killian hoped that she and Susie Ryan would forge an ongoing partnership between the Art Magazine and Alumni Relations.

Ms. Killian was out sick for several days in the beginning of January. During her absence, Susie Ryan attempted to contact her to arrange the meeting. She was away from school and was unable to get back to Susie Ryan. Susie Ryan then contacted Nick Ryan to see if he knew how to contact Ms. Killian. Since the only manner to contact Ms. Killian had been tried and since the meeting needed to occur in a fixed time frame since the alumni was only in town for a very short period of time, *Susie Ryan set up the meeting and asked Nick Ryan if he would be able and or willing to come to the meeting if Ms. Killian was not available.* Ms. Killian alleges that Nick Ryan and Susie Ryan set up a meeting without checking with her schedule and without informing her about it until the day of the meeting. Ultimately, this meeting took place between Nick Ryan, Susie Ryan, Laura Tolliver, and the alumnus, but without Ms. Killian. According to Nick Ryan, he was only there in response to Susie Ryan's request and as a result of Ms. Killian's failure to respond to Susie Ryan's attempt to contact her. Ms. Killian brought this issue to the attention of Mariama Richards in the diversity office as she did not

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          SUBJECT TO
PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 9

believe either Susie Ryan's or Nick Ryan's explanation of why the meeting occurred
without her.

       During our investigation, it appeared that this situation was an unfortunate
instance that resulted from a lack of communication or miscommunication. Even Ms.
Killian admits that Susie Ryan left a message for her about the meeting while she was out
sick. After Susie Ryan did not hear back from Ms. Killian, Susie Ryan called Nick Ryan
to see if he could assist her locate Ms. Killian. Ms. Killian further admits that when she
asked Nick Ryan why he did not inform her of the meeting, he stated that he assumed
Susie Ryan had informed her of the meeting since he was only standing in for Ms. Killian
and it was not his meeting. The investigation further revealed the alumnus was only in
town for a few days, and the meeting needed to occur while she was in town. In short,
both Nick Ryan and Susie Ryan each believed the other party was communicating the
meeting date and time to Ms. Killian to determine if Ms. Killian was available.

       In any event, Ms. Killian was back at School by the day the meeting was
scheduled to take place and in the end, prior to the date and time of the meeting, Susie
Ryan informed Ms. Killian of the time and location of the meeting but Ms. Killian chose
not to attend. According to Nick Ryan, the intent was never to exclude Ms. Killian in any
way. Instead, the circumstances and timing of the meeting resulted in Ms. Killian not
knowing about it until the day it happened but with plenty of notice to make
arrangements so she could attend.

       Ms. Killian expressed to the diversity office that she viewed this meeting
as an attempt by Nick Ryan and Laura Tolliver to take control of the Art Magazine away
from her. We were unable to confirm such an intention on the part of either Nick Ryan
or Laura Tolliver. In fact, just the opposite was true. Both Nick Ryan and Laura Tolliver
indicated that Ms. Killian had done a good job on the publication and that the only reason
they went to this meeting was in response to Susie Ryan. Ms. Killian also expressed to
the diversity office that she wanted Susie Ryan to understand that she and Nick Ryan
were not on speaking terms and that in the future Susie Ryan should deal with Ms.
Killian directly. It is difficult to determine why Ms. Killian believed that Susie Ryan
would have known the dynamics of the art department. Susie Ryan contacted Nick Ryan
who was attempting to assist her in her efforts to find Ms. Killian and in her efforts to
follow through with a meeting with an alumnus. By all accounts, the parties were
operating in a manner that was consistent with the goal, which was to set up a meeting
with the alumnus within a short period of time to see if she was interested in participating
in the Arts Magazine. By all accounts, we confirmed that this was an unfortunate
incident that occurred as a result of Ms. Killian's absence, the limited availability of the

_____

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY
_____

**CONFIDENTIAL:**          **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 10

alumnus, and a lack of communication. We found no evidence of a racial motivation
behind this situation.

Finally, Ms. Killian alleges that she was subject to verbal abuse by Nick
Ryan when he allegedly stated in words or effect that he could not "bend low enough to
the ground" to understand what she was saying, while gesturing his hand towards the
floor. Ms. Killian interpreted this to be a racially motivated comment and went
immediately to the diversity coordinators and the Principal. Nick Ryan readily admitted
making a comment; however, he denies any racial interpretation of the statement.

Nick Ryan explained that on the day of the alleged comment, Ms. Killian
approached him in a hostile manner because she was upset about what she perceived to
be a change in the curriculum. Apparently, the School had hired a technology consultant
and required each department to submit a report of its current technology classes so that
the consultant could assess future technological resource needs. Each department was to
submit a statement of needs. As the head of the department, Nick Ryan drafted a
proposed report and gave a copy to both Laura Tolliver and Ms. Killian to review. Both
teachers were provided the document at the same time and had at least one full week to
review the proposal. Both were aware of when the report was due and were reminded to
have comments back in a timely basis so that any changes could be made prior to the
meeting with the consultant. Laura Tolliver reviewed the report and timely submitted her
comments. Even though according to Nick Ryan, he provided reminders to Ms. Killian of
the date and time of the meeting and the need for ample time to make necessary changes,
Ms. Killian approached Nick Ryan one half hour before his scheduled meeting with the
consultant and accused him of proposing new courses. In response to her accusation,
Nick Ryan attempted to explain that he was simply outlining their current use of
technology in the art department and that he was not proposing any new curriculum.
According to Nick Ryan, Ms. Killian would not listen to his explanation and continued to
insist that he was misrepresenting the curriculum and was not reporting the accurate
statement of classes.

By this point in the year, the relationship between Nick Ryan and Ms.
Killian was exceedingly tense. Nick described the relationship as one in which no matter
how he tried to communicate or what he said he was made to feel that in some manner he
was offending Ms. Killian or making her believe that he was acting in a condescending or
off putting tone. Nick Ryan expressed during the investigation that he was feeling
frustrated because he felt that she found fault in everything he said or did no matter what
efforts he made to appease her. As a result, when Ms. Killian remained accusatory and
hostile after he tried in a variety of ways to explain to her that the curriculum was not

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
PROTECTIVE ORDER

6845

Memorandum
April 7, 2005
Page 11

changing, he grew increasingly frustrated. His approach was to defer to her and make
every effort to assure that she understood that he was on her team and that his intent was
to accommodate her needs. However he continued to feel as if no matter how hard he
tried, she was not going to change her attitude towards him. As he described it, in a
moment of maximum frustration and overwhelming concern, he wanted to know how he
could express himself so that Ms. Killian felt neither threatened nor offended. "What do
you want, I don't get it, and I can't lower myself enough to please you." Mr. Ryan
explained during the investigation that he intended this statement to mean that no matter
what he said or did, she was not happy, and that no amount of apologizing or groveling
appeared to make her happy. From our investigation it appeared that the comment was
intended by the speaker to mean one thing and interpreted by Ms. Killian to have a racial
connotation.

During our conversations with Nick Ryan it was clear that his efforts with
regard to working collaboratively and making peace with Ms. Killian took a significant
amount of time and effort. He instituted a number of policies in an effort to assure that
all members of the art department would feel as if they had equal access to materials,
funds and classes. He asserted that no matter how he tried or what he did, fault was
found. As he described it, one could see and hear the frustration and concern in his
failure to succeed.

It is unclear what precipitated the discord between Nick Ryan and Ms.
Killian, but by the middle of the 2003-2004 academic year, Ms. Killian refused to speak
with Nick Ryan, refused to allow him to evaluate her class, and failed to appear at
department meetings to the point where Nick Ryan simply ceased holding meetings. In
Nick Ryan's 2004 evaluation of Ms. Killian, he notes that since the middle of the second
semester, "interpersonal relationships have been strained and tension exists on a daily
basis making department business challenging." He also recounts his efforts to resolve
the issue through mediation and explains that there has been little, if any, progress. Nick
Ryan noted that he finds Ms. Killian's behavior to be "unprofessional and hostile" and
that "her continuing silent treatment of Laura and me since mid-February indicates an
unwillingness to enter into an honest dialogue about issues she perceives here at GDS."

Although Nick Ryan denies the assertion, Ms. Killian believes that Nick
Ryan immediately became allied with Debbie Haynes, Laura Tolliver and their "clique."
This belief on the part of Ms. Killian may have contributed to the eventual breakdown of
the relationship between Ms. Killian and Nick Ryan. However, we were unable to
substantiate Ms. Killian's allegations that Nick Ryan treated her differently or unfairly
because of her race. Nick Ryan made efforts to mend their relationship and work with

---

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 12

her in an effort to make the art department function effectively however, Ms. Killian did not appear to want to believe or listen to Nick Ryan's efforts and remained hostile and unwilling to contribute to a solution. As example, Nick Ryan made efforts to participate in sessions with an independent mediator and engaged in numerous conversations with the diversity coordinators to determine other more effective means of resolving the conflict with Ms. Killian. Nick Ryan documents the numerous attempts he has made to speak with her on an individual basis and in each instance, it appears that Ms. Killian was unresponsive and grew increasingly more hostile.

### D.    Complaints about curriculum and resources

Ms. Killian also complains about decisions that were made about the curriculum. For example, Ms. Killian alleges that she proposed a new course entitled "Graphic Design and Publishing." According to Ms. Killian, Nick Ryan verbally endorsed the course. In the end, the course was approved but the offering was to be postponed until after the scheduled renovations were completed to the building. Our investigation confirmed that Ms. Killian had proposed to teach a technology course, but the proposed course title was "Yearbook." Nick Ryan confirms that he supported the course, but suggested that the focus of the class be global graphic design. During the same period, the existing technological art class taught by Laura Tolliver was renamed from "Technology in the Arts" to "Graphic Design" in the published course list in and effort to attract more female students. Nick Ryan approved this name change but did not confer with Ms. Killian before the course-offering brochure was distributed. In short, the course description of Laura Tolliver's class had not changed and was still a technology art class, only the name had changed to include the term Graphic Design. Ms. Killian's class on the yearbook was still approved and was to begin as soon as the building renovation was complete in order to assure ample space. Ms. Killian was upset by this, and believed that she was being slighted because the course she proposed also related to graphic design. Ms. Killian's course was approved for implementation after the renovations were made to the art wing when there would be adequate space for it. The fact that both classes related to graphic design was of no consequence to that decision.

Ms. Killian alleges that she has not received the same amount of resources, especially technology resources, as other teachers in the art department. She asserted that Bruce Ruble, Chair of Technology, exerts his discretion with respect to technology resources to favor other art staff, especially Laura Tolliver, over her. Ms. Killian attributes this favoritism by Bruce Ruble in part to her belief that he is part of the "clique" of friends and that she is somehow being undermined because she is not. During the investigation we spoke extensively to Bruce Ruble. He explained how resources are

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
                       PROTECTIVE ORDER

6847

Memorandum
April 7, 2005
Page 13

distributed and the method for providing such resources. In general, classes that are
technology based are provided the greatest amount of resources and the other technology
surplus is provided according to the needs of staff. Laura Tolliver teaches four
technology-based art courses. In response to her workload she receives a fixed amount of
technology support. While Ms. Killian has technology needs in general her classes are
not technology based, so she does not receive as much technology support for her
curriculum as Laura Tolliver does. This allocation of resources is not as a result of
association with a staff member or as a result of a friendship, it is consistent with the
manner in which a limited resource is divided among staff. Bruce Ruble indicated that he
had been approached a number of times by Ms. Killian with claims of insufficient
technology. In an effort to assist Ms. Killian and assure that she did not feel as if she was
getting taken advantage of or receiving less then she deserved he made an effort to
provide her with more technology resources then she probably would have been entitled
to considering her needs relative to the other staff. In addition, according to Bruce Ruble,
Ms. Killian had a separate Yearbook budget from which she could draw to purchase
technology resources specifically for Yearbook. This was not provided to any other staff
member. We were unable to confirm that Ms. Killian was treated unfairly in terms of
getting resources for her classes or her extracurricular activities. Instead, it appears that
Ms. Killian received more then a proportionate amount of technology resources
considering the needs of all classroom requirements.

      **E.**    <u>Complaints about the responses Ms. Killian received to her
complaints</u>

      Ms. Killian alleges that she brought her concerns and raised various issues
with Paul Levy, Head of the Upper School, and the diversity coordinators and did not
receive an adequate response. While it is true that when a person believes they are in
some manner being mistreated it is often difficult to clearly evaluate the assistance
provided by people committed to aiding them, however, whether this assistance was to
Ms. Killian's liking is open to discussion. What is clear is that the School made many
efforts, some of which were above and beyond those ordinarily provided to staff in these
situations, in an effort to assist her and resolve her complaints and feeling of
mistreatment.

      It is clear that numerous times over the years Ms. Killian has been
employed at the School, the School has investigated Ms. Killian's complaints, and
worked very closely with her to create a more healthy and cooperative work environment
for her. These complaints have been with a range of staff members over a range of issues
and have been addressed by a variety of staff and other professionals. First, both Debbie

<u>PRIVILEGED AND CONFIDENTIAL</u>
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**      **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 14

Haynes and Nick Ryan experienced a similar breakdown in communication with Ms.
Killian. Both Nick Ryan and Debbie Haynes indicated during the investigation that they
approached Ms. Killian individually to try to resolve any issues when they noted that she
was growing hostile towards them. When after numerous efforts were unsuccessful, they
directed their concerns to the Heads of the Upper School at the time, Paul Levy or Kevin
Barr. In each instance, the Principal responded with great effort to maintain an open
dialogue and worked at trying to find a solution to the conflict that appeared to exist in
order to assist the department function effectively as a team. Not only did they each
attempt to meet with the parties and work out the issues, but also when their own efforts
failed, they brought in outside expertise to assist them.

While Debbie Haynes was the head of the art department, in response to
the complaints filed by Ms. Tolliver, Paul Levy initiated a meeting with Ms. Killian,
Debbie Haynes, and Laura Tolliver, and arranged for them to speak with the School's
psychiatrist. He was hoping that a third party would be able to serve as a mediator and
would be able to assist the three professionals try to establish a better working
relationship. Indeed, the three women in the art department met with the School's
psychiatrist on and off for several sessions. During those meetings, the parties discussed
their interactions and methods for producing a better working relationship. It is
interesting to note that despite many opportunities to do so, Ms. Killian did not complain
of race discrimination. It appears that while these meetings gave the parties a chance to
hear each other's perspective. However, it is not clear that they resolved Ms. Killian's
concerns as the parties never established a productive working relationship.

During our investigation, Paul Levy recounted countless efforts to seek a
resolution to Ms. Killian's problems to no avail. He conducted meeting after meeting
with her and other staff members to try to solve the conflict. He believed that he would
be able to fix this matter if there was a way to fix it. According to the many other faculty
members, there is a general consensus that Paul Levy was a very supportive principal and
the he worked toward resolving issues and creating imaginative solutions.

After Nick Ryan replaced Debbie Haynes, Nick Ryan became aware of the
tension and concerns of Ms. Killian. It was the same issues that she raised with Debbie
Haynes. At this point, the School's diversity coordinators became involved with the
conflict. They met extensively with all parties in order to see if there was a way to solve
the conflicts that existed. The coordinators met together with all parties as well as
separately with all parties. During the course of these meetings the coordinators attended
a workshop on dispute resolution and the School hired the mediator to assist the
coordinators draft a process that could be used to handle this situation. The School was

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
                 PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 15

very committed to assuring that all parties felt as if their concerns were respected and that they did everything possible to make this difficult situation better for all concerned. The School's diversity coordinators, based on the plan designed with the mediator, conducted their own investigation into Ms. Killian's grievances. They held numerous meetings with each party separately and together trying to draft a plan that would help to resolve Ms. Killian's complaints. The diversity coordinators stated that both Nick Ryan and Laura Tolliver, while frustrated with the situation worked hard to participate in the process. When asked to work on a plan that would help to make the situation less conflict based they both assisted the coordinators by proposing numerous methods for helping to make the department run more collegially. In conversations with the parties, they all expressed confusion and disappointment that the attempts they made to work with Ms. Killian were not successful.

We were repeatedly told during our investigation that despite the School's efforts to resolve issues with Ms. Killian, she appeared reluctant to contribute to a solution. Repeatedly sources noted that Ms. Killian raised concerns but was unable and less then willing to assist the professional staff craft a way that her concerns could be resolved. When suggestions were made to her related to ways to fix the problem she refused to accept or agree that any would resolve the issue. She reportedly attended meetings with both the psychiatrist and with the diversity coordinators and either denied that anything was wrong or was unable and or unwilling to articulate her concerns. In addition, even when asked directly what she wanted, or what she wanted changed, she responded that she did not know, or that she could not explain. Even during our interview with her as part of this investigation, Ms. Killian was unable to articulate what she wanted or what changes the School or the art department could make that would resolve her issues.

According to the staff involved in this matter, she has told people not to try to figure her out. The perception from most of the people we spoke with was that Ms. Killian was (and still is) angry and frustrated but cannot see past her anger to consider that there might be a remedy. It is impossible for the School to resolve this matter if she is unwilling to participate in the resolution. What is clear is that many professionals at the School have dedicated many hours to working on a resolution to the concerns raised by Ms. Killian. Unfortunately, it is not clear that Ms. Killian is aware of what she would like to see happen.

We spoke at length with the diversity coordinators and it appears that they are very sensitive to the dynamics of race in the GDS community. According to both professionals, they worked very hard and were very committed to responding to Ms.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**      **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 16

Killian's concerns. They feel that they did everything they could have done to redress
Ms. Killian's concerns. The diversity coordinators both have significant experience and
expertise in the area of diversity and the resolution of matters of this nature, and present
as insightful individuals who have made a concerted effort to bring a resolution to a
difficult situation. According to their description, they consulted with an independent
mediator, devised a plan of action, implemented the plan by meeting separately with each
individual involved, obtained each individual's perspective on the problem, and worked
with the parties to help develop a strategy for creating a method of resolving the issue.
They suggested that they received support from all levels of the administration and from
the other faculty members involved in the matter. Nevertheless, the diversity
coordinators found that their efforts to resolve this matter met with substantial negativity
from Ms. Killian. They indicated that while the other participants helped to devise
possible solutions Ms. Killian simply indicated that it was not her problem and had no
suggestions for what she wanted to see happen. The coordinators admit that they are at a
loss as to what else can be done or what a solution might be given Ms. Killian's
perspective. Despite the obvious lengths to which GDS has gone to mediate and
communicate, Ms. Killian is obviously unsatisfied with the result. However, based on
the evidence, while she may not feel the response was adequate, it is unclear as to what
else can or should be done to resolve her issues. Without her suggestions or
participation, the School would be forced to simply guess as to how to please her.

III.     **Actions by the School**

        In our conversations with all parties we found that there was a serious
commitment by the School to the issue of race and assuring a continuing conversation
with regard to the issue of diversity in general. When speaking with Damisha Lee, Ms.
Killian, and other staff, it was repeated that there were many opportunities to discuss the
issue of race and the feelings of all staff related to the issue of diversity. The School
regularly brings in speakers related to diversity, has conducted full day seminars on the
issue and hired an independent consultant to conduct a study of the School's actions and
behavior with regard to diversity in an effort to see what else can be done to assure a
diverse community and to make all members feel comfortable. There is a concerted
effort not only to recruit and support students of color but also to recruit and support
faculty of color. There is a faculty of color group that meets on a regular basis as well as
a number of other groups committed to studying and promoting diversity in the School.

        In conversations with Peter Branch on this matter it was clear that this was
of great concern to him. Not because he articulated it in words as much as the concern
expressed in his questioning of how else such an issue can be resolved. Apparently it is

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO
PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 17

an issue of great importance to him, as he felt compelled to revisit the various conversations he had conducted with Ms. Killian as well as the various programs he has instituted at the School to assure that the School was an institution that respected and celebrated diversity. In addition to the many programs and recruiting efforts, the School has a well-established department of diversity that is responsible for addressing issues raised by all of the School's constituencies.

### IV.   Conversation with Damisha Lee

As the final piece of our investigation, we spoke with Damisha Lee via telephone because Ms. Killian identified her as someone who would be able to corroborate her race discrimination allegations. Ms. Lee is an African-American woman who was employed at GDS for three years, from 2001-2004, as a college counselor. Ms. Lee stated that she knew about Ms. Killian's issues and concerns through conversations with Ms. Killian and through "staff of color" meetings. However, Ms. Lee did not witness any of the events or circumstances Ms. Killian complains about. Ms. Lee offered that she felt there was a general tendency to ignore complaints, but admitted that she never submitted a grievance or approached anyone, including the diversity coordinators, with a complaint of race discrimination. Ms. Lee denied feeling mistreated by GDS because of her race, and attributed any unfair treatment she might have experienced to her age. Ms. Lee felt that parents and faculty underestimated her abilities because she was relatively young when she was employed at GDS. Ms. Lee had one experience with Mr. Ryan in which he dealt mainly with her supervisor instead of her to discuss an issue with one of his students. When asked whether Ms. Lee felt Nick Ryan spoke with her colleague rather then her as a result of her race, Ms. Lee indicated that if anything, she believed it was as a result of her age, not her race. Ms. Lee was unable to articulate a basis for her support of Ms. Killian's race discrimination allegations, except that there was no other possible explanation for Ms. Killian's alleged experiences. Ms. Lee offered little if any corroboration of Ms. Killian's allegations. However, she commented that she felt as if there was a substantial amount of conversation and attention paid to the issue of race relations and diversity. In discussing her present situation, she said that while there was equal attention given to the issue it did not feel as prevalent an issue at all times. It was a more natural conversation as opposed to an issue of constant conversation.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO**
**PROTECTIVE ORDER**

Memorandum
April 7, 2005
Page 18

###   V.   Ms. Killian's Behavior

There is no doubt that Ms. Killian is a skilled teacher and she contributes greatly to the GDS community through her classes and her extracurricular activities. Her performance evaluations and our investigation consistently revealed that she is an adept and successful teacher and the students benefit greatly from her skills. However, this is only part of her responsibility as a faculty member at GDS. As a member of the GDS community, it is incumbent upon each person to work in a manner that is professional and respectful of the other members of the community. We would be remiss if we did not include the numerous comments and statements made by witnesses concerning Ms. Killian.

Ms. Killian has had a very difficult time working either professionally or collegially within the art department for almost ten years. She was unable to work with Debbie Haynes and eventually refused to speak or communicate directly with her even though Haynes was her supervisor. On numerous occasions she did not attend department meetings called by the supervisor and did not give notice of her intent not to attend. Likewise, she regularly refused to attend meetings called by Nick Ryan and at some point in time refused to communicate with him in any manner other then by email. This highly inappropriate and insubordinate behavior towards both of her supervisors made it difficult for the supervisor to do their job. For example, Ms. Killian failed to show up to department meetings, to the point where attempting to hold such meetings became pointless. She had refused to speak directly with her department head for long periods of time, communicating only through e-mail. She has cancelled classes with no advance notice to take time off for personal reasons. Ms. Killian and Ms. Tolliver have had a strained working relationship for years. According to the witnesses, she displayed a highly defensive and hostile demeanor, and she has been highly emotional and indignant toward her co-workers, further derailing any real attempt to work out issues or problems within the department. Ms. Killian's conduct may seem justified in her mind based on her allegations, however, her actions are and have been disruptive to the operations of the art department and the School.

###   VI.   Findings, Conclusions and Recommendations

It is clear from speaking with Ms. Killian and reading her letter that she genuinely feels mistreated by GDS on several fronts and she is obviously frustrated with her situation. The specific instances in which she has felt mistreated seem to stay vivid in her mind even long after the fact and she becomes very emotional when discussing these issues. Without knowing exactly what has transpired during her ten years at GDS, it is

---

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**          **SUBJECT TO**
**PROTECTIVE ORDER**

6853

Memorandum
April 7, 2005
Page 19

clear that when Ms. Killian finds a situation or encounter at School to her dislike her
assumption is that it is based on her race. Throughout our interview with her, we asked
her why she thought certain alleged treatment was as a result of race. Her response was
that she could not think of any other reason for why she would be treated in that manner.
She regularly compared herself with other staff who she stated did not get the same
treatment and yet when it was explained to her why the treatment may have been
different, it was difficult for her to consider the explanation.

It is unclear as to why this is Ms. Killian's perspective. It may be as a
result of an experience she had at School where she was subjected to or perceived that
she was subjected to discrimination and she did not receive the type of resolution that she
wanted or response she was looking for. As she reports, her employment in the Art
Department does not seem to have been a very pleasant experience, and has made her
increasingly frustrated. However, whatever occurred or transpired, the School clearly
made every effort to attempt to rectify any past grievances and despite its attempts, has
been unable to find a workable solution.

We find it striking that she had very similar problems with both Debbie
Haynes and Nick Ryan. Unlike a situation where she functioned successfully with one
supervisor and then became subject to unfair treatment and raised concerns under a
different supervisor, the fact that she found both supervisors intolerable raised questions
of why both of these relationships broke down in such similar manners when these are
such different individuals. According to many staff that we spoke to, Nick Ryan
especially has been described as a fair and impartial leader, and we found his rebuttals to
her claims of verbal or other types of mistreatment to be detailed and credible. Further,
his efforts to make policies that would assure equal allocation of resources and treatment
of all staff reflected a commitment to make the relationship with Ms. Killian productive
and professional. On the other hand, Ms. Killian seemed to take every opportunity to
construe a facially innocuous situation into something negative and somehow racially
motivated.

Ms. Killian is obviously unhappy in her current situation. We have
struggled to find a recommendation that would allow her to remain at the School, since
she is a respected art teacher, while maintaining a positive working environment for all
parties. While Ms. Killian is a good teacher, she has proven to be difficult for her peers
to work with, disruptive to the art department and the collegial nature of the team, and
has been unwilling to work in a manner that allows for the professionalism necessary for
the further development of the art department. She has raised issues with everyone she
has worked with and been supervised by. Based on past efforts that the School has made

PRIVILEGED AND CONFIDENTIAL
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

CONFIDENTIAL:          SUBJECT TO
                       PROTECTIVE ORDER

Memorandum
April 7, 2005
Page 20

and the information we gathered during our investigation, we believe that this is an untenable situation and we are not certain that any measure of conciliation or good will can satisfy Ms. Killian.

In an effort to assist the parties resolve this unfortunate matter, we proposed opening the lines of communication to determine if there was a method of resolving this matter. We spoke with Ms. Killian's attorney, John Racin, about the possibility of finding a mutually agreeable settlement that would release GDS from any future claims, possibly remove Ms. Killian from her teaching position, and most likely include a monetary settlement amount paid to Ms. Killian. After consulting with his client, Mr. Racin has demanded a settlement package on behalf of his client including six years of salary continuation, $25,000 for pain and suffering, plus attorney's fees. In behalf of the School, we have offered Ms. Killian, by way of her counsel, one year of salary including her benefits. This is the equivalent of buying out her 2005-2006 employment contract.

**PRIVILEGED AND CONFIDENTIAL**
THE CONTENTS OF THIS LETTER ARE ATTORNEY PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE(S) ONLY

**CONFIDENTIAL:**      **SUBJECT TO
PROTECTIVE ORDER**