UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              )
SHARON KILLIAN,               )
                              )
          Plaintiff,          )
                              ) Civil Action No. 05-1925 (EGS)
          v.                  )
                              )
GEORGETOWN DAY SCHOOL,        )
                              )
          Defendant.          )
                              )
```

### MEMORANDUM OPINION

Plaintiff Sharon Killian brings this action against defendant Georgetown Day School ("GDS" or the "School"), alleging claims of racial discrimination and retaliation under Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01, *et seq.* ("DCHRA").  Currently pending before the Court is defendant's motion for summary judgment on all of plaintiff's claims.  Upon consideration of the motion, the response and reply thereto, the applicable law, and the entire record, the Court determines that plaintiff's claims of racial discrimination and retaliation fail as a matter of law.  Therefore, for the reasons stated herein, defendant's motion for summary judgment is **GRANTED**.

**BACKGROUND**[1]

Plaintiff is an African American woman.  GDS is a parent-owned nonprofit coeducational day school in Washington, D.C.  At the recommendation of then-high school Studio Art Department ("Art Department") Chair, Debbie Haynes, GDS first hired plaintiff for the 1993-1994 academic year as a frequent substitute for the Art Department faculty.  The next year plaintiff served as a "permanent substitute" for Erica Elliott, who had taken an unpaid leave of absence.  Plaintiff received a positive evaluation for her teaching efforts that year.  Plaintiff was hired as a full-time member of the Art Department for the 1995-1996 academic year when Elliott decided not to return to GDS.  Haynes continued to be the Art Department Chair through the 1999-2000 academic year.  Although the relationship between Haynes and plaintiff was not always positive, Haynes's final evaluation of plaintiff was favorable.  In 2000-2001, newly-hired Nick Ryan, a Caucasian male, replaced Haynes as Department Chair.  She stayed on part-time before retiring at the end of the academic year.

From the 2000-2001 academic year through her final year in the Department, 2004-2005, plaintiff taught four sections of art courses: two sections of Introduction to Photography and either

---

[1] Unless otherwise indicated, the facts are drawn from defendant's statement of undisputed material facts and were not disputed by plaintiff.  See Local Civil Rule 56.1.

one section of AP Studio Art and one section of Advanced Painting and Drawing, or two sections of AP Studio Art.  In addition, plaintiff played an active role in various GDS diversity-related initiatives.  During that period, the only other full-time members of the Art Department were Ryan and Laura Tolliver, a Caucasian woman.  Ryan's evaluations of plaintiff's work were consistently positive throughout plaintiff's tenure at GDS, and Ryan specifically praised plaintiff for promoting the multi-cultural mission of the School.  Plaintiff believes that Ryan's evaluations of her as a member of the GDS faculty were fair and that these evaluations did not reflect racial prejudice against her as an African American.

In the 2000-2001 academic year, Ryan and then-Principal Paul Levy decided to name an Art Award in honor of Haynes.  This decision was made without consulting plaintiff or Tolliver. Debbie Haynes taught at GDS for nearly three decades, and she chaired the Art Department for almost all of those years.  GDS High School department chairs, such as Ryan, often make administrative decisions without the input of the department members as part of their regular duties.  Ryan considered the decision to name an art award after Haynes to be an administrative decision.

In February 2002, plaintiff came to the School over a weekend and replaced an art display of the work of one of

3

Tolliver's students with African American art from a local gallery, without first seeking permission from Tolliver.  That same weekend, the Black Culture Club ("BCC") hosted a dance at the School, leaving paper banners advertising the dance hanging outside the art studio windows.  When Ryan arrived in the art studio on Monday morning, he and GDS high school Building Manager George Buckwalter removed the paper banners, which had been damaged by the weather.  The two brought the paper banners inside and placed them on the floor.  Plaintiff did not witness Ryan and Buckwalter while they were taking the paper banners down.  The BCC paper banners were the type of banner advertising a School event that is generally disposed of soon after the event takes place, regardless of their physical condition.

Later that Monday, Ryan communicated to plaintiff that she should have asked Tolliver's permission before replacing the art display of Tolliver's student.  Plaintiff has characterized Ryan's tone of voice as screaming.  The normal practice among the art teachers is to ask permission before replacing an art display, a practice that plaintiff believes is appropriate and acknowledges she did not follow.  Plaintiff claims, however, that Ryan never yelled at any other teachers in the School.[2]

---

[2] Plaintiff also submits that Ryan once screamed at an Afro-Hispanic parent who believed that Ryan would not have behaved "in the same manner with a white parent."  Aff. of Rosa Grillo, Pl.'s Ex. 13, ¶¶ 3-4.

In February 2004, plaintiff became aware of Tolliver's plan to change the name of her graphic design course to "Graphic Design" for the 2004-2005 academic year. When plaintiff approached Ryan to complain about the change in the name of the course to "Graphic Design," Ryan was unaware that the name of plaintiff's proposed yearbook course had been changed to "Graphic Design and Publishing." In response to plaintiff's complaint, plaintiff claims that Ryan leaned forward in his chair and said, in a fairly loud and expressive voice, "Sharon, I can't bend low enough to the ground to understand you."[3] Plaintiff also claims that Ryan gestured in an ape-like manner. Plaintiff twice repeated to Ryan, "You just said I can't bend low enough to the ground to understand you?" and went downstairs to report the incident to then-Director of Studies Kevin Barr.

In light of plaintiff's complaint, Barr suggested that the GDS Co-Directors of Diversity, Mariama Richards and Elizabeth Denevi, use mediation as a way to help the members of the Art Department understand each others' perspectives and work more cooperatively. The attempt at mediation was unsuccessful. On July 6, 2004, plaintiff sent a letter to Daniel Johnson, an attorney who had previously represented the School, in which

---

[3] According to Ryan, he told plaintiff, "Sharon, what do you want? I can't lower myself enough to please you." He claims that the statement reflected his frustration that despite his attempts to accommodate plaintiff, she could not be satisfied.

5

plaintiff's counsel outlined plaintiff's basis for believing she was subject to a racially hostile work environment at GDS. In response to plaintiff's letter, the School retained Caryn Pass, an attorney from Krupin O'Brien LLC, to conduct an independent investigation into plaintiff's complaints.

Plaintiff complained on February 9, 2005, that she was being denied equal access to the Art Department's digital video cameras. At that time, only Tolliver had a key to the cabinet with the cameras because they had been purchased for use in Tolliver's Film and Video course. Limiting access to the teacher in charge of the Film and Video course was considered an effective method to reduce the chance that a camera might become lost or unavailable for student use. On February 14, 2005, Principal Kevin Barr directed "that each member of the Art Department have a key and equal access" to the storage cabinet. Had plaintiff returned to teach at GDS during the 2005-2006 school year, she would have taught Film and Video and been in charge of the digital video cameras herself, a result which plaintiff has acknowledged was satisfactory. In the course of resolving plaintiff's complaint to Barr, it was also discovered that plaintiff had access to certain cabinets to which Tolliver did not. Tolliver was subsequently given a key to those cabinets.

On February 25, 2005, plaintiff signed a contract to teach

at GDS for the 2005-2006 academic year.  Plaintiff, however, moved to Arkansas in the summer of 2005.  Plaintiff did not notify the School that she was in Arkansas until late September 2005.  On or about August 26, 2005, plaintiff left a voice message at the School saying that she could not return for the initial week of work because of health reasons.  In the following weeks, she continued to tell the School that she could not return to work.  On September 1, 2005, the School sent a letter informing plaintiff that she would receive short-term disability benefits until approximately November 25, 2005, and that her "job restoration protections" under the District of Columbia Family Medical Leave Act ("DCFMLA") would expire on December 16, 2005.

Although the School asked plaintiff to inform them when she would be able to report back to work, she never told the School whether she intended to return to work.  In light of her continued absence, the School hired as long-term part-time substitutes Michelle Cobb, an African American teacher, and Nguyen Nguyen, an Asian American teacher.  Cobb and Nguyen are still teaching at GDS in the Art Department.  Plaintiff eventually told the School that she was physically incapable of working because of a medical disability and applied for long-term disability benefits on November 18, 2005.  The School terminated plaintiff's employment after her DCFMLA protections expired on December 16, 2005.

Plaintiff filed this suit on September 29, 2005. Plaintiff's amended complaint, filed in March 2006, alleges four claims: (1) hostile work environment, constructive discharge, and termination of her position on the basis of race under Section 1981; (2) retaliation for filing this suit under Section 1981; (3) hostile work environment, constructive discharge, and termination of her position on the basis of race under the DCHRA; and (4) retaliation for filing this suit under the DCHRA. Following the close of discovery, defendant filed its motion for summary judgment.

## STANDARD OF REVIEW

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R.

Civ. P. 56(e); *see Celotex Corp.*, 477 U.S. at 324.

## ANALYSIS

**I. Hostile Work Environment Standards**

"The burdens of persuasion and production for claims raised under § 1981 or under the [DCHRA] are identical to those for claims alleging discriminatory treatment in violation of Title VII" of the Civil Rights Act of 1964. *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1553 (D.C. Cir. 1997); *see Villenes v. United Bhd. of Carpenters and Joiners of Am.*, 999 F. Supp. 97, 101 n.21, 103-04 (D.D.C. 1998) (analyzing Section 1981 and DCHRA hostile work environment claims with Title VII standards). To establish a claim of a hostile work environment based on race, a plaintiff must demonstrate: "'(1) that he or she suffered intentional discrimination because of race; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability.'" *Raymond v. U.S. Capitol Police Bd.*, 157 F. Supp. 2d 50, 57 (D.D.C. 2001) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996)). "The hostile work environment must be the result of discrimination based on the plaintiff's protected status." *Roberson v. Snow*, 404 F. Supp. 2d

9

79, 97 (D.D.C. 2005).

A plaintiff may establish an inference that her treatment was based on her race "by demonstrating that she was treated differently from similarly-situated employees who are not part of [her] protected class." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005). To be similarly situated, the plaintiff must show that her employment situation was "similar in all relevant regards to those with whom [s]he seeks comparison." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 97 (D.D.C. 2005). Incidents unrelated to the plaintiff's race cannot be used to support a hostile work environment claim. *Roberson*, 404 F. Supp. 2d at 97.

In order for harassment to rise to the level of being so offensive as to be actionable as a matter of law, the workplace must be "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998). When determining whether a work environment is so hostile or abusive as to be unlawful, courts examine the facts under the totality of circumstances, considering the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v.*

*Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In addition, the Supreme Court has stated that "these standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code[, and p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (citation and quotations omitted).  For example, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient to establish a hostile work environment claim.  *Id.*

The statute of limitations is one year for DCHRA claims. *Potts v. Howard Univ.*, 240 F.R.D. 14, 18 (D.D.C. 2007).  The statute of limitations for hostile work environment claims under Section 1981, as amended in 1991, is four years.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-84 (2004).  With regard to hostile work environment claims in particular, the Supreme Court has held that so long as one act contributing to a hostile work environment occurred within the statute of limitations period, a court may consider all acts comprising the same hostile environment claim, regardless of when they occurred.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  Under *Morgan*, a court must determine "whether purported incidents of harassment occurring outside the statutory period are

11

sufficiently related to those incidents occurring within the statutory period as to form one continuous hostile work environment." *Vickers v. Powell*, 2005 WL 3207775, at *32 (D.D.C. Nov. 21, 2005) (quoting *Wheaton v. North Oakland Med. Ctr.*, 130 Fed. Appx. 773, 787 (6th Cir. 2005)).

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). A "prevailing constructive discharge plaintiff is entitled to all damages available for formal discharge." *Id.* at 147 n.8. When a plaintiff brings a compound "hostile-environment constructive discharge claim," in addition to satisfying the hostile work environment standard, the plaintiff must also demonstrate "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147. "A plaintiff's failure to show a hostile work environment necessarily means that the constructive discharge claim fails." *Al-Mahdi v. Dist. of Columbia Pub. Schs.*, 2005 WL 3272075, at *5 (D.D.C. Dec. 2, 2005).

**II. Plaintiff's Hostile Work Environment Claims**

Defendant contends that plaintiff's hostile work environment and constructive discharge claims fail as a matter of law because plaintiff did not suffer discrimination on the basis of race, and

any discrimination was not sufficiently severe or pervasive to constitute a hostile work environment.  Plaintiff contends that the Ryan's conduct towards her constitutes a hostile work environment on the basis of race.

Several of the incidents plaintiff complains of are relatively slight and lack any evidence of racial animus. Plaintiff only speculates that Ryan and Principal Levy named an award after Debbie Haynes in order to spite plaintiff out of racial animus.  Plaintiff has no evidence that the reason given for the decision – recognition of Haynes' long service with the School – was pretext for racial discrimination against her.[4] Similarly, plaintiff has presented no evidence that racial animus played any part in Ryan taking down the paper banners in February 2002.  Rather, plaintiff has failed to dispute the legitimate reasons for Ryan's actions, specifically that the banners had been damaged by weather and the special event banners were of the type usually taken down after the event occurs.  Finally, plaintiff has presented no evidence that the lack of video camera access in 2005 was in any way racially motivated.  Again, plaintiff has failed to dispute the legitimate reason for this policy, namely that only Tolliver had access because she taught

---

[4] For this reason, the Court need not resolve whether the award-naming incident is sufficiently connected to the other incidents under *Morgan* so that it can be considered even though it occurred more than four years prior to the initiation of this case.

the only course that utilized the cameras.  Moreover, these incidents are not severe or pervasive, but are instead minor, "ordinary tribulations of the workplace," that do not give rise to a cognizable hostile work environment claim.  *See Faragher*, 524 U.S. at 788.

Apart from those events, plaintiff's hostile work environment claims rest on the two incidents of Ryan yelling at the plaintiff in 2002 and 2004.  Plaintiff has not alleged there to be any race-based content to Ryan's communication in 2002, but drawing inferences in plaintiff's favor, Ryan's comment in 2004 could have a racial element.  In addition, there is evidence that Ryan did not yell at other teachers.  Even if these incidents were racially discriminatory, however, they are not sufficiently severe or pervasive to make out a claim.  *See id.* (stating that complaints of "sporadic use of abusive language" are not actionable); *Vickers*, 2005 WL 3207775, at *34 (holding that plaintiff's claim as to her supervisor's yelling "details a discordant working environment, but not one that could be considered objectively hostile as is required to prevail on such a claim" (citing *Faragher*)).

Plaintiff compares her case to *Villines v. United Brotherhood of Carpenters*, 999 F. Supp. 97 (D.D.C. 1998).  The discriminatory conduct in that case was more pervasive though, as it entailed four incidents of yelling and mistreatment that

14

occurred over three months.  *Id.* at 104.  In this case, plaintiff relies on two yelling incidents that occurred two years apart and over the course of five years under Ryan's supervision. Moreover, the incidents in *Villines* were preceded by a long line of racially hostile and discriminatory acts by the supervisor. *Id.* at 99-100.

Instead, this case is more similar to cases where courts have found conduct insufficiently hostile.  In *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the D.C. Circuit held that statements by three employees over a six-month period telling a plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved was conduct that did not rise to the level of severity necessary to find a hostile work environment.  *Id.* at 416-17.  Similarly, in *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48 (D.D.C. 2004), this Court found that a plaintiff's allegations that her employer humiliated her at important meetings, screamed at her in one instance, told her to "shut up and sit down" in one instance, and was "constantly hostile and hypercritical" did not amount to a hostile work environment.  *Id.* at 54-57.  And in *Chaple v. Johnson*, 453 F. Supp. 2d 63 (D.D.C. 2006), this Court found that a plaintiff being removed from the leadership position of a workgroup and demeaning comments about the plaintiff's EEO

activity did not "demonstrate the type of extreme behavior that the Supreme Court requires to make out a prima facie case of hostile work environment discrimination." *Id.* at 74-75.

In line with these cases, the Court concludes that after examining plaintiff's disputes with Ryan, taken individually or collectively, it would be impossible for a reasonable trier of fact to find that plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Harris*, 510 U.S. at 21. Thus, plaintiff's claims of constructive discharge fail as well. *See Al-Mahdi*, 2005 WL 3272075, at *5.

### III. Plaintiff's Remaining Claims

Defendant contends that plaintiff's wrongful termination and retaliation claims fail as a matter of law because plaintiff cannot demonstrate that the School terminated her position for discriminatory or retaliatory reasons. Plaintiff failed to address these claims in her opposition to defendant's motion. "It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003). The Court will

not treat defendant's arguments as conceded as they succeed on their merits in any event.

Wrongful termination claims are analyzed under the familiar *McDonnell Douglas* framework. *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005). A plaintiff may meet her prima facie burden by showing that she is a member of a protected class, was otherwise qualified for the position, was discharged by the defendant, and was replaced by another employee. *Id.* Once the employer has rebutted the prima facie case by articulating its legitimate, non-discriminatory reason for the termination, the court must determine whether a jury could infer discrimination from the totality of the evidence. *Id.*; *see also id.* at 715 (holding that the replacement of the terminated employee with someone of the same protected class cuts strongly against any inference of discrimination). Retaliation claims are analyzed under the same framework, except that a prima facie case requires a showing that the plaintiff engaged in statutorily protected activity, her employer took an adverse personnel action against her, and a causal connection exists between the two. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003).

Plaintiff can make out a prima facie case for both wrongful termination and retaliation for the filing of this suit. Defendant's legitimate reason for plaintiff's termination is that she failed to report to work for the 2005-2006 academic year. As

17

plaintiff told the School that she would not be able to return to work, the School had no choice but to replace her. Plaintiff has presented no evidence that the School's explanation is pretextual, and there does not appear to be any such evidence in the record. Therefore, no jury could infer discrimination or retaliation from the totality of the evidence. *See Murray*, 406 F.3d at 713.

## CONCLUSION

Plaintiff has not presented evidence of discrimination sufficiently severe or pervasive to constitute a hostile work environment or constructive discharge. Nor can she demonstrate that her discharge was act of discrimination or retaliation. Therefore, defendant's motion for summary judgment is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

**Signed:     Emmet G. Sullivan**
**             United States District Judge**
**             May 24, 2007**